UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| GLASS, LEWIS & CO., LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-01153 |
| | ) | |
| KEN PAXTON, *in his Official Capacity as* | ) | |
| *Attorney General of Texas*, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

YETTER COLEMAN LLP
Bryce L. Callahan
State Bar No. 24055248
bcallahan@yettercoleman.com
Grant B. Martinez
State Bar No. 24104118
gmartinez@yettercoleman.com
Lily E. Hann
State Bar No. 24133836
lhann@yettercoleman.com
Jared LeBrun
State Bar No. 24144647
jlebrun@yettercoleman.com
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
(713) 632-8002 (fax)

*Attorneys for Plaintiff Glass, Lewis & Co., LLC*

# TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Background ............................................................................................................ 1

I.  Glass Lewis provides advice and recommendations on important corporate matters. ............................................................................................................. 1

II.  There is vigorous social and political debate over the role of DEI and ESG in investing. ............................................................................................................ 2

III.  Overview of S.B. 2337 ....................................................................................... 3

    A.  Section 101 mandates disclosures when advice reflects certain viewpoints. ......... 3

    B.  Section 102 requires disclosures when a proxy advisor provides differing advice or advice contrary to the views of a company's management. ................... 5

    C.  The Act expressly authorizes enforcement by the Attorney General. ................... 5

Argument ............................................................................................................... 6

I.  The Court has Jurisdiction. ................................................................................ 6

II.  Glass Lewis Is Likely to Succeed on the Merits. .............................................. 7

    A.  The Act Violates the First Amendment. .......................................................... 7

        1.  The Act fails because of its viewpoint discrimination. .............................. 7

        2.  The Act regulates speech based on content and fails strict scrutiny. ......... 10

        3.  The Act does not regulate commercial speech, so no more lenient standard applies. ........................................................................................ 12

        4.  Even if *Central Hudson* intermediate scrutiny applies, the Act fails. ....... 13

        5.  *Zauderer* does not apply. ........................................................................ 14

    B.  The Act Is Void for Vagueness. ..................................................................... 14

        1.  Persons of common intelligence must guess at the Act's meaning. ......... 15

        2.  The Act allows arbitrary and discriminatory enforcement. ...................... 17

    C.  ERISA Preempts the Act. ............................................................................... 17

        1.  ERISA regulates what fiduciaries must consider. .................................... 18

        2.  The Act governs a central matter of plan administration and disrupts nationally uniform administration. ............................................ 18

III.  The Remaining Preliminary Injunction Factors Favor Glass Lewis. ............... 19

Conclusion & Prayer ............................................................................................. 20

## INTRODUCTION

Plaintiff Glass, Lewis & Co., LLC ("Glass Lewis") respectfully moves to preliminarily enjoin Attorney General Paxton and his office from enforcing against Glass Lewis a novel, unconstitutional Texas law. This first-of-its-kind law ("S.B. 2337" or the "Act," Ex. 1) violates the First Amendment's prohibition on viewpoint discrimination. Whenever Glass Lewis' speech reflects certain viewpoints disfavored by the government, the Act compels Glass Lewis to broadcast the government's contrary viewpoint and publicly condemn itself: Glass Lewis must tell its clients that its services are "not being provided solely in the financial interest of the company's shareholders" and "conspicuously disclose" this warning on the firm's website homepage.

The Act's legislative sponsors did not hide their viewpoint-discriminatory purpose: Glass Lewis takes "positions on so many issues that affect our daily lives" in areas "where tremendous policy decisions are being made," so the legislators sought to counteract speech "on political hot-button issues" that they perceived as "increasingly political with a hard *left* bent." Decl. of Jared LeBrun ("LeBrun Decl.") ¶ 5. The Act's egregious viewpoint discrimination is dispositive and fatal under the First Amendment.

The Act is also unconstitutionally vague and preempted by federal law. Because enforcement of the Act will deprive Glass Lewis of its constitutional rights and cause it irreparable harm, it <u>requests a preliminary injunction before the Act's effective date, September 1, 2025</u>.

## BACKGROUND

## I.    Glass Lewis provides advice and recommendations on important corporate matters.

Glass Lewis is a proxy advisory firm that offers independent research and voting recommendations to institutional investors on corporate governance issues, including executive compensation, board composition, and shareholder proposals. Glass Lewis provides advice and recommendations to its highly sophisticated clients to help them make informed voting decisions.

Glass Lewis' recommendations are tailored to each client's specific voting policy. Decl. of John Wieck ("Wieck Decl.") ¶¶ 13, 17-23. Glass Lewis' Benchmark Policy considers governance, environmental, social, financial, and reputational risks insofar as they affect shareholder value. *Id.* The consideration and relevance of these factors reflects the consensus views of Glass Lewis' 1300+ institutional investor clients, with trillions of dollars in assets under management, as supported by two decades of Glass Lewis' research and analysis on the factors for creating and preserving shareholder value. *Id.* Corporate governance is assessed in virtually every report. *Id.*

The significant majority of Glass Lewis' institutional-investor clients vote according to a custom policy. *Id.* ¶ 18. Custom policies cater to a client's specific fiduciary obligations, investment strategies, risk tolerances, and ideological preferences. *Id.* Developing custom policies involves extensive discussions with and explicit confirmation from the client. *Id.* Glass Lewis also offers thematic policies that run the gamut—from a Climate Policy for investors focused on mitigating risks associated with climate change to a Catholic Policy that reflects the unique fiduciary responsibility of Catholic institutions and the voting guidelines of the Conference of Catholic Bishops. *Id.* ¶ 24, Ex. 3.

Ultimately, Glass Lewis' speech assists institutional shareholder clients in implementing their chosen proxy voting policy and provides governance insights that help its clients create long-term shareholder value. No client has suggested this advice is deceptive. *Id.* ¶ 9.

## II.    There is vigorous social and political debate over the role of DEI and ESG in investing.

In recent years, ESG and DEI have come to the forefront of public discourse. There is no agreed definition of these highly politicized terms. *Id.* ¶ 37. Instead, critics often use these acronyms as shorthand for purportedly left-leaning views, at times even sweeping in widely accepted industry best practices such as corporate governance—the "G" in "ESG." *Id.* ¶¶ 29, 38.

Enter the Texas Legislature, seeking to control proxy advisors' speech on these important issues. Introducing a companion bill in the House, the bill's sponsor expressed concern "that these [proxy advisory] firms are basing their advice to clients based on factors . . . such as in many cases environmental, social, and governance, *political hot-button issues*, DEI factors." LeBrun Decl. ¶ 6. The bill's sponsor in the Senate had similar concerns: "Sadly, in recent years, proxy advisory firms have become increasingly political and with a hard *left* bent. . . . Some are basing their advice on ESG standards, other times on DEI priorities." *Id.* ¶ 5.

## III.    Overview of S.B. 2337.

To address this advice on matters of public concern, the Legislature burdened speech reflecting disfavored viewpoints and compelled private parties to broadcast the government's viewpoint. *See* Compl., ECF 1, ¶¶ 14-29 (describing Act in detail). The Act has two disclosure sections and an enforcement section. Notably, the Act does not regulate advice *to Texans* or *in Texas*, but rather regulates worldwide speech *about Texas companies* or companies with a proposal to move to Texas. S.B. 2337 §§ 6A.001, 101, 102.

### A.    Section 101 mandates disclosures when advice reflects certain viewpoints.

Section 101 requires disclosures when proxy advisors' advice is "not provided solely in the financial interest of the shareholders," as that phrase is defined by the Act. *Id.* § 6A.101(a). The Act defines that phrase vaguely and oddly. Specifically, it states that, "[f]or purposes of this section," advice "is not provided solely in the financial interest of the shareholders" whenever it:

> (1) is wholly or partly based on, or otherwise takes into account, one or more nonfinancial factors, including a commitment, initiative, policy, target, or subjective or value-based standard based on:
>
> > (A) an environmental, social, or governance (ESG) goal, factor, or investment principle;
> >
> > (B) diversity, equity, or inclusion (DEI) . . . ;
> >
> > (C) a social credit or sustainability factor or score; or

- 3 -

(D) membership in or commitment to an organization or group that wholly or partly bases its evaluation or assessment of a company's value over any period on nonfinancial factors;

(2) involves providing a voting recommendation with respect to a shareholder-sponsored proposal that:

(A) is inconsistent with the voting recommendation of the board of directors or a board committee composed of a majority of independent directors; and

(B) subject to Subsection (c), does not include a written economic analysis of the financial impact on shareholders of the proposal;

(3) is not based solely on financial factors and subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk to promote nonfinancial factors; or

(4) advises against a company proposal to elect a governing person unless the proxy advisor affirmatively states that the proxy advisory service solely considered the financial interest of the shareholders in making such advice.

*Id.* § 6A.101(a). This bespoke definition is broad, vague, and at odds with ordinary meaning.

If one of these ill-defined circumstances applies, the Act compels the proxy advisor to publicly and harshly disparage its own services through warnings to its clients and on its website homepage. *Id.* § 6A.101(b). The proxy advisor must publish the government-mandated statements, even if it believes they are false or misleading.

In these warnings, the advisor must tell its client that the advice "is not being provided solely in the financial interest of the company's shareholders." *Id.* § 6A.101(b)(1)(A). The advisor must also explain "with particularity" its advice and state that "the advice subordinates the financial interest of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk to promote one or more nonfinancial factors." *Id.* § 6A.101(b)(1)(B). The disclosure must be provided to each shareholder receiving the advice and to the company. *Id.* § 6A.101(b)(1)-(2). Also, the proxy advisor must "publicly and conspicuously disclose" on its homepage that its "proxy advisory serves include advice and recommendations that are not based solely on the financial interest of the shareholders." *Id.* § 6A.101(b)(3).

**B.    Section 102 requires disclosures when a proxy advisor provides differing advice or advice contrary to the views of a company's management.**

Section 102 requires disclosures when a proxy advisor provides different voting advice to different clients (even though they may be differently situated or have different investing approaches) *or* advice "in opposition to the recommendation of the company's management." *Id.* § 6A.102. A proxy advisor must make disclosures if clients have not "expressly requested services for a nonfinancial purpose." *Id.* § 6A.102(b). The government-mandated statements must identify "which of the conflicting advice or recommendations" is "provided solely in the financial interest of the shareholders" and is "supported by any specific financial analysis." *Id.* § 6A.102(b)(3). These disclosures must be provided to:

(A)  each shareholder receiving the advice or recommendation;

(B)  each entity or other person receiving the advice or recommendation on behalf of a shareholder;

(C)  the company that is the subject of the company or proxy proposal; and

(D)  the attorney general[.]

*Id.* § 6A.102(b)(2).

**C.    The Act expressly authorizes enforcement by the Attorney General.**

The Act contains an express enforcement provision for the Attorney General. It specifies that a violation "is actionable under section 17.47" of the Business and Commerce Code, which is enforced by the Consumer Protection Division of the Attorney General's Office. *Id.* § 6A.201; Tex. Bus. & Com. Code § 17.47. Other parties may sue for injunctive or declaratory relief. S.B. 2337 § 6A.202.  The Act goes into effect September 1, 2025. *Id.* § 4.

**LEGAL STANDARD**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat.*

*Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

Glass Lewis meets all the requirements for a preliminary injunction. Glass Lewis is likely to prevail on the merits. ***First***, the Act violates the First Amendment. It discriminates based on viewpoint and content, and it fails under strict scrutiny. Although the Act does not regulate commercial speech, it also fails under intermediate scrutiny. ***Second***, the Act is unconstitutionally vague. ***Third***, the Act is preempted by ERISA.

The remaining preliminary injunction factors also favor Glass Lewis, which will suffer irreparable harm from violations of its constitutional rights and unrecoverable, substantial compliance costs. An injunction of this unconstitutional law would not harm the State and would protect the public's interest in free speech.

## I.    The Court has Jurisdiction.

Glass Lewis has Article III standing because S.B. 2337 compels it to undertake burdensome compliance measures that chill its protected expression and compel it to speak messages it does not believe. These harms are directly traceable to Paxton, who, as ultimate head of the Consumer Protection Division, is charged with enforcing the Act. *See* S.B. 2337 § 6A.201; Tex. Bus. & Comm. Code § 17.47; *Computer & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1022, 1028 (W.D. Tex. 2024) ("*CCIA*"). An injunction against Paxton would redress Glass Lewis' injuries by eliminating the threat of his enforcement. *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 515 (5th Cir. 2017).

The suit also fits the *Ex parte Young* exception to sovereign immunity. *See City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019) (citing *Ex parte Young*, 209 U.S. 123, 157 (1908)). Paxton has a specific duty and authority to enforce S.B. 2337; has publicly signaled willingness to hold accountable "[a]ny institution found to be violating the law" in connection with DEI and ESG

issues; and holds the power to seek penalties and injunctive relief. LeBrun Decl., Ex. 2.

## II.    Glass Lewis Is Likely to Succeed on the Merits.

Glass Lewis is likely to succeed on its claims that the Act violates the First Amendment, is unconstitutionally vague, and is preempted by ERISA.

### A.    The Act Violates the First Amendment.

The First Amendment "protect[s] the freedom to think as you will and to speak as you think." *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (citation and quotation marks omitted). "[T]he government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

The Act regulates protected speech: Glass Lewis' "proxy advisory service[s]" in the form of detailed reports containing Glass Lewis' reasoned analysis and opinions based on industry best practices. Wieck Decl. ¶¶ 11-13, 36. These reports touch on a variety of topics relevant to the general public, such as the leadership of major corporations, executive pay, and environmental risks. *Id.* ¶ 11. As the bill sponsor recognized, this speech concerns "tremendous policy decisions" and involves "positions on so many issues that affect our daily lives." LeBrun Decl. ¶ 5.

#### 1.    The Act fails because of its viewpoint discrimination.

The "First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others[.]" *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 394 (1993). S.B. 2337 discriminates based on viewpoint when it subjects certain viewpoints to rigorous regulation but not their counterpoints. Worse, it compels private speakers to adopt and parrot the government's viewpoint on hotly contested topics.

##### a.    The Act burdens particular viewpoints.

The Act engages in a "particularly 'egregious form of content discrimination'—viewpoint discrimination. A viewpoint-based regulation targets not merely a subject matter, but 'particular

views taken by speakers on a subject.'" *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (quoting *Rosenberger*, 515 U.S. at 829).

The Act targets particular views taken by Glass Lewis. When Glass Lewis' advice reflects the relevance of governance or diversity or sustainability to companies' performance *or* advises against the views of a company's management or board, Section 101 heavily regulates that speech. *See* S.B. 2337 § 6A.101. On the contrary, advice that disparages the relevance of governance and diversity does not trigger regulation. Likewise, advice favoring company management avoids regulation. So, anti-management views result in burdensome regulation, while pro-management views are unregulated and unburdened. And the Act punishes Glass Lewis for taking the view that ESG or DEI factors are relevant to a company's financial performance, but not the opposite view.

Section 102 targets different advice to different clients *and* advice "in opposition to" management's recommendation. S.B. 2337 § 6A.102. Glass Lewis must disclose "which of the conflicting advice" was "provided solely in the financial interest of the shareholders," incorporating the blatant viewpoint discrimination found in Section 101. And again, pro-management views escape regulation, while anti-management views are heavily burdened.

Restricting speech with certain viewpoints was the express intent of the bill's sponsor: "[T]he point here is to make sure that proxy advisory firms, when they're rendering advice . . . that they're focused on economic factors . . . . So, when they're focused on non-economic-type factors, whether it's ESG, whether it's DEI . . . that's what we want to prevent[.]" LeBrun Decl. ¶ 4.

Both on its face and in its purpose, the Act impermissibly seeks to "interfere with an uninhibited marketplace of ideas." *303 Creative*, 600 U.S. at 585 (quotation marks omitted).

**b.     The Act compels Glass Lewis to voice the State's viewpoints.**

The Act also discriminates on viewpoint when it compels Glass Lewis to speak the Texas government's viewpoints. Texas "seeks to compel this speech in order to 'excis[e] certain ideas or

viewpoints from the public dialogue.'" *303 Creative*, 600 U.S. at 588 (citation omitted). Generally, "the government may not compel a person to speak its own preferred messages." *Id.* at 586.

Whenever Glass Lewis wishes to speak with certain viewpoints, the Act compels Glass Lewis to make disparaging disclosures about its own services to its clients. S.B. 2337 §§ 101(b), 102(b). Failure to do so can result in sanctions, including penalties. These compelled disclosures impermissibly alter the content of Glass Lewis' speech. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*"). They force Glass Lewis to "provide a government-drafted script" advocating positions it vehemently opposes. *Id.*; *see* Wieck Decl. ¶¶ 14, 49.

Egregiously, the Act compels Glass Lewis to "conspicuously disclose" on its homepage the government's viewpoint denigrating Glass Lewis' own services. S.B. 2337 § 6A.101(b)(3). "[R]equiring a company to publicly condemn itself is undoubtedly a more 'effective' way for the government to stigmatize and shape behavior than for the government to have to convey its views itself, but that makes the requirement more constitutionally offensive, not less so." *Nat'l Ass'n of Manufacturers v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (citation omitted).

Like the unconstitutional law in *303 Creative*, here the Act puts Glass Lewis "to a similar choice: If [it] wishes to speak, [it] must either speak as the State demands or face sanctions for expressing [its] own beliefs." 600 U.S. at 589. That is "more than enough[] to represent an impermissible abridgment of the First Amendment's right to speak freely." *Id.*

So. the Act's blatant viewpoint discrimination, by itself, renders the Act unconstitutional. "[I]t is all but dispositive to conclude that a law is . . . viewpoint discriminatory." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011). Without the need for any strict scrutiny analysis, "[t]he Court's finding of viewpoint bias end[s] the matter." *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019).

Texas is entitled to its view of ESG. But it may not compel proxy advisors to parrot that

view, nor regulate their speech because Texas disagrees with their views. "The government may not discriminate against speech based on the ideas or opinions it conveys," full stop. *Id.* at 393.

### 2. The Act regulates speech based on content and fails strict scrutiny.

The Act also fails because it engages in content discrimination and fails strict scrutiny. A law is content based if it "target[s] speech based on its communicative content." *NIFLA*, 585 U.S. at 766 (quoting *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)). It does so when "a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163 (quotation marks omitted). That is undeniably the case here, because the Act regulates reports based on the content of Glass Lewis' advice and ultimate recommendations. And compelled speech is always content-based. *NIFLA*, 585 U.S. at 766.

Because the Act engages in content-based discrimination, it is subject to strict scrutiny, which it fails. Content-based laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. "Strict scrutiny is unforgiving because it is the standard for reviewing the direct targeting of fully protected speech." *Free Speech Coal., Inc. v. Paxton*, 2025 WL 1773625, at *12 (U.S. 2025). In practice, it must be "fatal in fact absent truly extraordinary circumstances." *Id.*

The Act's stated interest is likely not genuine. "Government justifications for interfering with First Amendment rights must be genuine, not hypothesized." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (cleaned up). The Act states a goal to "prevent fraudulent or deceptive acts and practices in this state." S.B. 2337 § 1(4). This interest appears to be pretext for regulating disfavored views because the Act is "wildly underinclusive." *NIFLA*, 585 U.S. at 774 (citation omitted). "Such underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Id.* (cleaned up). The Act only targets speech *about Texas companies*—it does not address speech

- 10 -

occurring *in Texas* or *by Texans* or *to Texans*. S.B. 2337 § 6A.001(1). So long as they avoid discussing Texas companies or companies that might move here, proxy advisors may give advice to Texas investors on DEI or ESG—or differing advice to different Texas investors—without being covered by the Act. This underinclusiveness strongly suggests the Act's true interest is suppressing disfavored views about Texas companies, not stopping fraud in Texas.

Even if the State had a genuine interest in preventing fraud, the Act fails strict scrutiny because it is not narrowly tailored to serve that interest. ***First***, Glass Lewis exclusively serves highly sophisticated institutional clients who know whether to consider ESG or DEI. The majority use custom voting policies, and all Glass Lewis clients choose their voting policy and thereby tell Glass Lewis when and how they want to consider such factors. Wieck Decl. ¶¶ 18-23. Glass Lewis is transparent about how it considers these factors. *See id.* Exs. 4-5. Glass Lewis' voting policies and reports *already* inform clients what it has considered. Glass Lewis' sophisticated clients are not deceived by its speech, *id.* ¶¶ 7-10, so government-mandated warnings will not reduce fraud.

***Second***, there is nothing inherently fraudulent about the targeted speech. Proxy advisers appropriately give different recommendations to different clients who have different investment preferences and situations. *See* Wieck Decl. ¶¶ 25-27; *see NIFLA*, 585 U.S. at 772. The bill sponsor compared it to telling one legislator to vote for a bill because it is good for her district while telling a different legislator to vote against it because it would be bad for their district. LeBrun Decl. ¶ 6. Such differing advice does not indicate fraud—only that differently situated clients can have different interests. A long-term investment outlook might appropriately factor in sustainability and climate change, while a short-term outlook might not. *See* Wieck Decl. ¶ 33. Nor is there anything fraudulent in recommending a vote against the position of the company's management or board. *Id.* §§ 6A.101(a)(2)(A), .102(a)(3). Shareholders regularly vote against company management,

especially when its proposal is self-interested. Wieck Decl. ¶¶ 35-36. So, targeting this speech, which is not at all fraudulent, will not reduce fraud.

*Third*, the Act's "regulatory technique," a sweeping[1] scheme of self-denigrating disclosures, does not use "the least restrictive means" available. *Free Speech Coal.*, 2025 WL 1773625, at *11. Texas could conceivably have regulated material misrepresentations or regulated instances where proxy advisors failed to follow their client's chosen voting policies. And the Legislature's failure to consider other, less burdensome alternatives, such as a "government-funded public information campaign," is fatal. *Free Speech Coal.*, 95 F.4th at 284; *see Sec. Indus. & Fin. Markets Ass'n v. Ashcroft*, 745 F. Supp. 3d 783 (W.D. Mo. 2024); *NIFLA*, 585 U.S. at 775.

Because the Act discriminates based on the content of Glass Lewis' speech and is not narrowly tailored to serve a compelling state interest, the Act violates the First Amendment.

### 3.    The Act does not regulate commercial speech, so no more lenient standard applies.

Commercial speech is "speech which does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (citation omitted). Even where speech "has an economic motivation" that is "insufficient by itself to turn" it into commercial speech. *Id.* at 67. Whether speech is commercial turns on three factors: "(i) whether the communication is an advertisement, (ii) whether the communication refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech." *Phi Theta Kappa Honor Soc'y v. HonorSociety.org., Inc.*, 2025 WL 1030240, at *2 n.2 (5th Cir. 2025).

All three factors show the Act does not target commercial speech. ***First***, proxy advice is not an advertisement, and the Act's definition of "proxy advisory service" confirms this. *See*

---

[1] Disclosures will be required for nearly every recommendation because Glass Lewis effectively always considers corporate governance. Wieck Decl. ¶ 29. The noise will drown out anything the Act had intended to signal.

S.B. 2337 § 6A.001(4). Glass Lewis only provides recommendations and reports to existing clients. Wieck Decl. ¶ 15. Glass Lewis' advice reflects the company's opinions, often on matters of significant public importance, unrelated to its own business interests. *Id.* ¶ 11, Ex. 4; LeBrun Decl. Ex 1. ***Second***, the Act regulates speech on "how to vote on a proxy proposal or company proposal" and on "corporate governance"—not products or services. S.B. 2337 § 6A.001(4); Wieck Decl. ¶ 15. Indeed, the Act targets certain proxy advice precisely because it contains allegedly "nonfinancial" content about matters of public concern. ***Third***, the purpose of the reports is to provide advice on how to vote, not to solicit clients. The Act targets Glass Lewis' speech to existing clients on how to vote on important corporate matters—not speech seeking to sell services. The regulated "proxy advisory services" are analogous to the editorial opinions of a newspaper or the endorsement of a political candidate: they offer judgment and analysis, not products. This is pure speech at the heart of the First Amendment, not commercial speech.

### 4.  Even if *Central Hudson* intermediate scrutiny applies, the Act fails.

When a law regulates commercial speech (which this Act does not), discrimination based on viewpoint is still subject to strict scrutiny. *Rosenberger*, 515 U.S. at 829. Even if the Court were to treat the Act as a viewpoint-neutral regulation of commercial speech, the Act fails intermediate scrutiny. The *Central Hudson* test provides:

> First, the court "must determine whether the expression concerns lawful activity and is not misleading." Second, the court asks "whether the asserted governmental interest is substantial. If both inquiries yield positive answers, [the court] must determine whether the regulation advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest."

*Free Speech Coal., Inc.*, 95 F.4th at 283 (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980)).

The first factor applies to "*restrictions* on commercial speech, not *compelled* speech." *Id.* At any rate, Glass Lewis' services are lawful and its advice on matters of judgment is reasoned,

clear, and not misleading. Wieck Decl. ¶ 34. The asserted interest is pretextual. *See* Section II.A.2.

In any event, the Act fails under the third and fourth factors. It does not "directly or materially advance the asserted government interest[.]" *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). Texas has made no findings that compelled disclosures are effective at achieving its goals. *See Edenfield v. Fane*, 507 U.S. 761, 771 (1993). And the fact that the Legislature failed to consider less burdensome alternatives and its failure to try "a government-funded public information campaign" is fatal under intermediate scrutiny. *See Free Speech Coal.*, 95 F.4th at 284; *NIFLA*, 585 U.S. at 775. So, the Act fails under *Central Hudson*.

### 5.    *Zauderer* **does not apply.**

The lower standard in *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct.*, 471 U.S. 626 (1985) does not apply. *Zauderer* applies only "where a state compels commercial enterprises to disclose purely factual and uncontroversial information about their services." *Free Speech Coal.*, 95 F.4th at 281 (citation omitted). A "compelled statement is 'uncontroversial' for purposes of *Zauderer* . . . where the statement is not an integral part of a live, contentious political . . . debate." *Id.* at 281-82. Deciding if a vote is in the financial interest of shareholders is a matter of judgment and opinion—it is not "purely factual." Wieck Decl. ¶¶ 14, 26. And ESG and DEI are "political hot-button issues" currently at the center of some of the fiercest political debates in the country. Wieck Decl. ¶ 38; *see NIFLA*, 585 U.S. at 769; LeBrun Decl. ¶ 6. *Zauderer* does not apply here.

Whatever test the Court applies, the Act violates the First Amendment.

### B.    **The Act Is Void for Vagueness.**

S.B. 2337 is also unconstitutionally vague. The Due Process Clause of the Fourteenth Amendment "proscribes laws so vague that persons of common intelligence must necessarily guess at their meaning and differ as to their application." *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001) (cleaned up) (citation omitted). "A law is unconstitutionally

vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Id.* Because the Act affects First Amendment rights, the test is especially stringent. *La Union del Pueblo Entero v. Abbott*, 751 F. Supp. 3d 673, 726-27 (W.D. Tex. 2024).

The Act fails this test. It gives the key phrase "solely in the financial interest of the shareholders," which appears in both sections 101 and 102, a vague and idiosyncratic definition.[2] That sweeping, bespoke definition depends on buzzwords whose meanings are notoriously amorphous and subjective, leaving the phrase open to politically charged interpretations. Glass Lewis must guess when to disclose and what to say—a wrong guess can result in steep penalties.

### 1.    Persons of common intelligence must guess at the Act's meaning.

The Act does not provide "a reasonable opportunity to know" when Glass Lewis must make the mandated disclosures and what those disclosures must contain. Section 101 requires proxy advisors to make disclosures when a proxy advisory service is "not provided solely in the financial interest of the shareholders." S.B. 2337 § 6A.101(a). But the Act gives that phrase a bespoke meaning dependent on undefined buzzwords. It applies to any advice that "takes into account[] one or more *nonfinancial factors*, including" *any* of the following factors: diversity, equity, inclusion, sustainability, environmental, social, or governance factors. *Id.* § 6A.101(a)(1) (emphasis added). This bespoke definition—at odds with reality—displaces any common understanding of the key phrase and replaces it with something subjective and vague. Section 102 employs the same phrase, presumably with its bespoke meaning. *Id.* § 6A.102(b)(3).[3]

The bespoke definition confuses rather than clarifies because it uses terms that are "broad

---

[2] The Act raises other vagueness concerns. For example, Section 102 requires notifications but does not specify what those should entail, forcing Glass Lewis to guess at how to comply. Wieck Decl. ¶ 40.

[3] The definition in Section 101 is "[f]or purposes of this section." S.B. 2337 § 6A.101(a).

and undefined" and susceptible to multiple definitions. *CCIA*, 747 F. Supp. 3d at 1040. When a statute "fails to define key categories," it is unconstitutionally vague. *Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575, 602 (W.D. Tex. 2025).

 "ESG" and "DEI" specifically are subject to shifting political and social interpretations. Wieck Decl. ¶ 38. ESG is "a concept that is so undefined as to be virtually all encompassing." *Id.* Ex. 6, at 11. In a survey of corporate directors, 66% agreed that "ESG means different things to different people." *Id.* Ex. 1, at 15. As a commentator observes, unmoored from any specific meaning, "ESG" has "become a kind of Rorschach test." *Id.* Ex. 8, at 4. It is unclear whether advice that considers long-term risk, reputational harm, or regulatory compliance—factors often associated with ESG—would be deemed not "solely" in shareholders' financial interest, even though such considerations are widely accepted as material to financial performance. *Id.* ¶ 29.

Within ESG, the outer boundaries of the term "governance" are especially broad and unclear. *Id.* ¶ 37. It "encompasses so wide an ambit that people of common intelligence can do no more than guess at its application." *CCIA*,- 747 F. Supp. 3d at 1040 (quotes omitted).

"DEI" is similarly ill-defined. Other federal courts have held that "vaguely-defined prohibitions on DEI initiatives" were void for vagueness. *NAACP v. U.S. Dep't of Educ.*, 2025 WL 1196212, at *6-7 (D.D.C. 2025); *Perkins Coie LLP v. U.S. Dep't of Justice*, 2025 WL 1276857, at *45-46 (D.D.C. 2025) (collecting cases).

In an analogous case, a federal court struck down a Missouri rule requiring securities firms to obtain consent before incorporating a "'nonfinancial objective' into their securities recommendations or investment advice." *Ashcroft*, 745 F. Supp. 3d at 790, 800. The court held that "nonfinancial objective" was not "adequately defined" where the definition left "many concepts . . . unexplained" and was open to multiple, different interpretations. *Id.* at 800-01. The

court emphasized that the rule's vagueness was "particularly troublesome" because firms could be fined for noncompliance. *Id.* at 801.

The same is true here: the definition of "solely in the financial interest of the shareholders" depends on terms that themselves are vague and subject to differing interpretations. And failure to comply can result in $10,000 penalties for each violation. Tex. Bus. & Com. Code § 17.47(c).

The Act's profound vagueness leaves proxy advisors to guess whether their advice triggers the Act's disclosure requirements and what—specifically—they are supposed to do to comply.

### 2.    The Act allows arbitrary and discriminatory enforcement.

For the same reasons the Act leaves ordinary people to guess at its meaning, "officials could attach different meaning to the words in an arbitrary and discriminatory manner." *Shamloo v. Miss. State Bd. of Trs. of Insts. of Higher Learning*, 620 F.2d 516, 523-24 (5th Cir. 1980). The lack of a commonly understood meaning for ESG and DEI means that enforcement will inevitably turn on the subjective views of the Attorney General, rather than any objective standard. The Attorney General has already taken a sweeping view of what DEI means and has used it to target law firms and major financial institutions. LeBrun Decl. Exs. 2-4.

### C.    ERISA Preempts the Act.

S.B. 2337 is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq. ERISA has a "broad pre-emption provision," which states that ERISA "supersede[s] any and all State laws insofar as they . . . relate to any employee benefit plan." 29 U.S.C. § 1144(a); *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137-38 (1990). Interpreting this language, the Supreme Court has held that ERISA preempts "a state law that has an impermissible 'connection with' ERISA plans, meaning a state law that governs a central matter of plan administration or interferes with nationally uniform plan administration." *Gobeille v. Liberty Mut. Ins.*, 577 U.S. 312, 320 (2016) (cleaned up) (citation omitted). ERISA preempts the

Act because it inappropriately interferes with the information available to plan fiduciaries and puts a heavy, manipulative thumb on the scale of what they should consider.

### 1.    ERISA regulates what fiduciaries must consider.

Federal regulations require a plan fiduciary, such as an asset manager for a company pension plan, to "[e]valuate relevant facts that form the basis for any particular proxy vote." 29 C.F.R. § 2550.404a-1(d)(2)(ii). Fiduciaries' decisions "must be based on factors that the fiduciary reasonably determines are relevant to a risk and return analysis." *Id.* § 2550.404a-1(b)(4). "Risk and return factors may include the economic effects of climate change and other environmental, social, or governance factors[.]" *Id.* "Whether any particular consideration is a risk-return factor depends on the individual facts and circumstances." *Id.* Thus, fiduciaries must consider "relevant facts," which in various circumstances will include environmental, social, or governance factors.

ERISA also regulates fiduciaries' use of proxy advisors. A fiduciary may not "follow[] the recommendations of a proxy advisory firm . . . without a determination that such firm['s] . . . proxy voting guidelines are consistent with the fiduciary's obligations." 29 C.F.R. § 2550.404a-1(d)(2)(iii). So, when advising ERISA fiduciaries, Glass Lewis must evaluate relevant facts and "risk and return" factors, including ESG. A significant number of Glass Lewis' asset-manager clients are ERISA fiduciaries. At these clients' request, Glass Lewis signs certifications stating that it has considered relevant facts to show compliance with ERISA. Wieck Decl. ¶ 47.

### 2.    The Act governs a central matter of plan administration and disrupts nationally uniform administration.

The Act has the requisite connection with ERISA to fall within its broad pre-emption provision. S.B. 2337 interferes with a central matter of plan administration by shaping the advice Glass Lewis may give its ERISA-fiduciary clients and actively discouraging the consideration of relevant facts. In doing so, the Act disrupts a nationally uniform system. *See* Compl. ¶ 154.

The Act interferes with ERISA's requirements for fiduciaries and their advisors in three ways. ***First***, the Act's disclosure requirements —as expressly intended by the Act's sponsor— discourage proxy advisors from considering facts and factors that must be considered under ERISA. *See Nat'l Ass'n of Mfrs.*, 800 F.3d at 530 (recognizing effectiveness of requiring a company to publicly condemn itself to shape behavior). ***Second***, when Glass Lewis considers all relevant facts, as ERISA requires, S.B. 2337 compels Glass Lewis to make statements that both stigmatize its advice and make it misleading. ***Third***, by following a recommendation marred by the Act's disclosures, the fiduciary exposes itself to lawsuits for considering allegedly inappropriate factors. *See* Compl. ¶ 155; Wieck Decl. ¶ 47.

In an analogous case, a court held that Missouri rules requiring securities firms to obtain a specified form of written consent before incorporating "nonfinancial objectives" into their recommendations were preempted by ERISA. *Ashcroft*, 745 F. Supp. 3d at 797. These rules were preempted by ERISA because they restricted "what investments may be recommended or selected" and "mandate[d] disclosure and recordkeeping requirements not required by ERISA." *Id.*

The Act imposes similar requirements and is similarly preempted. Glass Lewis is likely to prevail on the merits of its claim that the Act is preempted by ERISA. Where, as here, "a statute is expressly preempted, a finding with regard to likelihood of success fulfills the remaining preliminary injunction requirements." *United States v. Texas*, 719 F. Supp. 3d 640 (W.D. Tex.), *aff'd*, 2025 WL 1836640 (5th Cir. 2025).

## III.    The Remaining Preliminary Injunction Factors Favor Glass Lewis.

Without a preliminary injunction, Glass Lewis faces a substantial threat of irreparable injury. A preliminary injunction will not harm the State or the public.

**<u>Irreparable harm.</u>** Glass Lewis faces two types of irreparable harm: (1) the violation of its First Amendment rights, and (2) unrecoverable costs. The "loss of First Amendment freedoms,

for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "Because [the Act] threatens [Glass Lewis'] right to be free from compelled speech," Glass Lewis has "shown an irreparable injury." *Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024). This harm is amplified because the forced speech will undermine Glass Lewis' reputation. *See* 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.).

Additionally, Glass Lewis will be forced to incur unrecoverable compliance costs, totaling hundreds of thousands of dollars at minimum. *See Rest. L. Ctr. v. DOL*, 66 F.4th 593, 600 (5th Cir. 2023); Wieck Decl. ¶ 43-45. These costs relate to preparing the required economic analyses and detailed disclosures. *Id.* Sovereign immunity bars the recovery of these costs as damages, rendering the harm irreparable. *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, 2023 WL 5610293, at *4-8 (N.D. Tex. 2023). Furthermore, the misleading disclosures could cause Glass Lewis to lose clients and profits. Wieck Decl. ¶¶ 44, 49.

**Balance of harms and public interest.** The final factors "overlap considerably in suits against public officers" and support an injunction. *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 408 (5th Cir. 2025) (cleaned up). Here, there is no harm to the government because it "suffers no injury when a court prevents it from enforcing an unlawful law." *Free Speech Coal.*, 95 F.4th at 287. "Injunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 298 (5th Cir. 2012) (cleaned up).

## CONCLUSION & PRAYER

Glass Lewis requests that the Court, prior to September 1, grant its motion and enter a preliminary injunction enjoining Ken Paxton, in his official capacity as Attorney General of Texas—and his officers, agents, and employees, including the Consumer Protection Division of the Office of the Attorney General—from enforcing the Act against Glass Lewis.

Glass Lewis further requests all other legal and equitable relief to which it may be entitled.

Dated: July 24, 2025                    Respectfully submitted,

                                        **YETTER COLEMAN LLP**

                                        /s/ *Bryce L. Callahan*
                                        Bryce L. Callahan
                                        State Bar No. 24055248
                                        bcallahan@yettercoleman.com
                                        Grant B. Martinez
                                        State Bar No. 24104118
                                        gmartinez@yettercoleman.com
                                        Lily E. Hann
                                        State Bar No. 24133836
                                        lhann@yettercoleman.com
                                        Jared LeBrun
                                        State Bar No. 24144647
                                        jlebrun@yettercoleman.com
                                        811 Main Street, Suite 4100
                                        Houston, Texas 77002
                                        (713) 632-8000
                                        (713) 632-8002 (fax)

                                        *Attorneys for Plaintiff Glass, Lewis & Co., LLC*