**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **GLASS, LEWIS & CO., LLC,** | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 1:25-cv-01153-ADA** |
| | § | |
| | § | |
| | § | |
| **KEN PAXTON, in his official capacity** | § | |
| **as the Texas Attorney General,** | § | |
| *Defendant.* | § | |
| | § | |
| | § | |
| | § | |
| | § | |

---

### DEFENDANT'S MOTION TO DISMISS

---

This is a pre-enactment, pre-enforcement challenge to SB 2337, a consumer-protection law set to go into effect on September 1, 2025. The Court should dismiss Plaintiff, Glass, Lewis & Co., LLC's ("Glass Lewis") claims against the Attorney General under Rules 12(b)(1) and (b)(6):

*First*, the Court lacks subject matter jurisdiction over Plaintiff's claims. Plaintiff has yet to suffer any injury, and it never will, so there is, therefore, no "case" or "controversy" for the Court to decide. Plaintiff lacks standing for all its so-called claims, which are—in any event—unripe. In addition, sovereign immunity bars Plaintiff's claims and no exception applies.

*Second*—jurisdictional failings aside—Plaintiff has failed to plausibly allege any causes of action against the Attorney General. SB 2337 is sound. It does not violate the U.S. Constitution, and it is not preempted by any federal law. The Court should dismiss Plaintiff's claims.

**I.     Table of Contents**

I.  Table of Contents ................................................................................................ 2

II.  Background ...................................................................................................... 4

    A.  The proxy advisor market and Glass Lewis' duopoly with ISS .................................... 4

    B.  Why SB 2337? ............................................................................................... 5

    C.  When does SB 2337 apply? ............................................................................ 6

    D.  What does SB 2337 require? ........................................................................... 6

        1.  When is a proxy advisory service "not provided solely in the financial
           interest of the shareholders of a company" and what disclosures are
           required for such service? ........................................................................ 7

        2.  When does a proxy advisor give materially different advice or make
           materially different voting recommendations to different clients and what
           disclosures are required? ......................................................................... 8

    E.  What happens if a proxy advisor violates SB 2337? ............................................. 9

III.  Standard of Review .......................................................................................... 9

    A.  Federal Rule of Civil Procedure 12(b)(1): Lack of Subject-Matter Jurisdiction ........... 9

    B.  Federal Rule of Civil Procedure 12(b)(6): Failure to State a Claim ........................... 10

IV.  Argument & Authorities .................................................................................... 11

    A.  The Court lacks subject-matter jurisdiction. ...................................................... 11

        1.  There is no case or controversy. ................................................................ 12

           a.  Plaintiff lacks standing. ..................................................................... 12

               i.  Plaintiff has no evidence of an injury in fact for any of its claims .............. 12

               ii.  Plaintiff has no evidence of traceability and redressability ...................... 15

           b.  Plaintiff's claims are not ripe. ............................................................ 16

        2.  Defendant is entitled to sovereign immunity. ............................................... 16

    B.  Plaintiff has failed to state any claims upon which relief may be granted .................... 18

        1.  Plaintiff does not state a claim for relief under the Dormant Commerce
           Clause ............................................................................................... 19

        1.  Plaintiff does not assert any cognizable Section 1983 claims. ........................... 20

           a.  ERISA does not preempt SB 2337 ....................................................... 20

           b.  Plaintiff fails to allege a freedom-of-association claim. ............................ 23

           c.  Plaintiff has not pled a cognizable facial challenge to SB 2337. .................. 23

           d.  Plaintiff has not pled facts demonstrating that SB 2337 violates the
           First Amendment. ........................................................................... 24

      i.  To the extent that Plaintiff's speech is misleading, it warrants no protection. ................................................................................................ 24

     ii.  SB 2337's regulates commercial speech about proxy statements. ............. 24

    iii.  Zauderer applies. .................................................................................... 29

    iv.  SB 2337 passes rational basis review under Zauderer. .............................. 32

     v.  SB 2337 passes intermediate review under Central Hudson. .................... 34

   e.  SB 2337 is not unconstitutionally vague. .......................................................... 35

V.  Conclusion ............................................................................................................... 38

## II.    Background

In the 89th Legislative Session, the Texas Legislature passed Senate Bill 2337 ("SB2337" or the "Act"). The Act is a consumer-protection law "relating to the regulation of the provision of proxy advisory services." (Exhibit 1, SB 2337). It is designed to protect shareholders who pay proxy advisors for proxy advisory services. (*Id.*)

### A.  The proxy advisor market and Glass Lewis' duopoly with ISS.

In *National Association of Manufacturers v. United States Securities and Exchange Commission*, the Fifth Circuit gave a succinct summary of the proxy advisor market, the role Plaintiff, ISS, plays in it, and the need for regulation:

> Under state law, shareholders of public companies generally have the right to vote on issues of corporate governance during annual and special shareholder meetings. *See, e.g.*, Del. Code tit. 8, §§ 211, 212. Shareholders exercise their rights at these meetings by, for instance, electing directors and voting on proposals from shareholders or management that require shareholder approval. Most shareholders—including institutional investors like hedge funds and mutual funds—do not attend shareholder meetings in person. They instead vote by proxy. *See* Exemption from the Proxy Rules for Proxy Voting Advice, 85 Fed. Reg. 55,082, 55,082 (September 3, 2020) [hereinafter 2020 Rule].
>
> Institutional investors and investment advisers are highly active in today's financial markets. These entities own, in the case of institutional investors, or are given authority to vote, in the case of investment advisers, a significant number of shares in public companies (known in this context as "registrants"). As the SEC explained in 2020, institutional investors and investment advisers are accountable for "voting in potentially hundreds, if not thousands, of shareholder meetings and on thousands of proposals that are presented at these meetings each year, with the significant portion of those voting decisions concentrated in a period of a few months." *Id.* at 55,083. During this period, they often need assistance managing the voting process, which otherwise might be unmanageable.
>
> Proxy voting advice businesses, or proxy firms, provide such assistance. Proxy firms research matters subject to vote and advise clients how to vote on these matters, with the advice they provide often serving as "an important factor in their clients' proxy voting decisions." *Id.* Proxy firms may also provide clients administrative assistance in voting by, for example, enabling clients to vote through an electronic platform or by executing votes directly on their clients' behalf. *Id.*

With institutional investors and investment advisers relying so extensively on them, proxy firms "have become uniquely situated in today's market to influence, and in many cases directly execute, [their clients'] voting decisions." *Id.* As these firms have continued to grow in influence, however, certain concerns have emerged about their practices.  Notably, the proxy advice market is effectively a duopoly, because two firms, Institutional Shareholders Services (ISS) and Glass Lewis, control roughly 97% of the market. Investors, registrants, and others have questioned the accuracy of the information and the soundness of the advice that proxy firms provide in this duopolistic market, and they complain about the proxy firms' unwillingness to engage with issuers to correct errors. Attention has also been drawn to potential conflicts of interest arising from proxy firms' provision of consulting services to the same registrants about which they provide voting advice. *See id.* at 55,085.[1]

**B.  Why SB 2337?**

Proxy Advisory firms provide advice for hundreds or thousands of shareholder votes each year. SB 2337 § 1(2)(A). When Texas shareholders hire proxy advisory firms to provide advice, they expect that the advice given will be in their financial interest. *Id.* § 1(1). Proxy advisory firms, such as ISS, however, provide voting recommendations and other services that often prioritize non-financial goals, such as environmental, social, or governance goals, *id.* § 6A.101, and provide irreconcilably conflicting recommendations to different clients on the same company or shareholder proposals, both of which necessarily cannot be in the financial interest of the shareholders. *Id.* § 6A.102. They also issue corporate governance rating for public companies, use those corporate governance ratings in formulating their voting recommendations for or against a company, and provide consulting services to companies to assist in raising their corporate governance ratings. "Conflicts of interest abound at every step." Exhibit 2, SB 2337, Bill Analysis.

Criticism of proxy advisors is at an all-time high as public companies grow increasingly frustrated with proxy advisors' lack of transparency and rampant conflicts of interest. During its last

---

[1] *Nat'l Assoc. of Manufacturers v. U.S. SEC*, 105 F. 4th 802, 806-07 (5th Cir. 2024).

session, the Texas Legislature stepped into this fray, passing SB 2337. The stated purpose of the Act is to "prevent fraud and deceit by requiring proxy advisory firms to make certain disclosures when their proxy advisory services are based on non-financial factors and/or are in conflict with other proxy advisory services relating to the same company or shareholder proposal." *Id.*

### C. When does SB 2337 apply?

SB 2337 regulates "proxy advisors," SB 2337 § 6A.001(3) when they provide "proxy advisory services," id. § 6A.001(4), to Texas shareholders or other persons with authority to vote on behalf of shareholders in Texas for compensation in connection with or in relation to (1) a domestic publicly traded, for profit corporation, partnership, or other business entity with its principal place of business in Texas, or (2) a foreign entity that has made a company proposal to become a domestic entity. Id. § 6A.001(1).

### D. What does SB 2337 require?

SB 2337 is designed to ensure that a proxy advisor's client clearly understands whether the proxy advisor is making voting recommendations that are "solely in the financial interest of the shareholders of [the] company." *See* SB 2337 § 6A.101(a). It does not restrict what a proxy advisor can say to its client in any way. And it does not regulate a proxy advisor's advice or otherwise require the proxy advisor to make voting recommendations that are "solely in the financial interests of the shareholder of a company." It is designed to merely require "proxy advisors to provide clear, factual disclosures when the advisor[] recommend[s] casting a vote for nonfinancial reasons or provide[s] conflicting advice to multiple clients who [are] seek[ing] to maximize financial returns." SB 2337 § 1(4).

SB 2337 is divided into two distinct parts that require different disclosures under different conditions. Section 101 disclosures are triggered when a proxy advisor provides a service that is not

provided solely in the financial interest of the shareholders of a company. Section 102 disclosures are triggered when a proxy advisor provides "materially different" advice or recommendations to different clients. Each is discussed below.

### 1. When is a proxy advisory service "not provided solely in the financial interest of the shareholders of a company" and what disclosures are required for such service?

Section 6A.101(a) defines when "a proxy advisory service is not provided solely in the financial interest of the shareholders of a company," and Section 6A.101(b) defines the disclosures a proxy advisor must make when it "provides a proxy advisory service that is not provided solely in the financial interest of the shareholders of a company," and to whom they must be made. In addition, while the Act lists ESG, DEI, and social credit as "nonfinancial factors," the consideration of which triggers disclosures, the Act takes no sides with respect to those items. This means that a "anti-ESG" proxy advisor who takes ESG in account in making its recommendations must make the same disclosures to the same persons as a "pro-ESG" proxy advisor who takes ESG into account in making its recommendations.

If a proxy advisor provides advice or a recommendation "not based solely on the financial interest of the shareholders of a company," § 6A.101(b) requires it to "include a disclosure to each shareholder or entity or other person acting on behalf of a shareholder receiving the service that (1) conspicuously states that the service is not being provided solely in the financial interest of the company's shareholders because it is based wholly or partly on one or more nonfinancial factors; and (2) explains, with particularity, the basis of the proxy advisor's advice…and that the advice subordinates the financial interest of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk to promote one or more nonfinancial factors." SB 2337 § 6A.101(b)(1)(A)-(B). The proxy advisor must provide this notice to the company that is the

subject of the service[2] as well and publicly and conspicuously disclose on the front page of its website that the advisor's proxy advisory services include advice and recommendations that are not based solely on the financial interest of shareholders. *Id.* § 6A.101(b)(2)-(3). Notably, subsection (b) does not proscribe a particular from of disclosure and leaves it open to proxy advisor to decide exactly what to say.

2. **When does a proxy advisor give materially different advice or make materially different voting recommendations to different clients and what disclosures are required?**

Section 6A.102(a) defines when a proxy advisor's advice or a recommendation on how to vote on a company or proxy proposal to one client is "materially different" from the proxy advisor's advice to a different client. Section 6A.102(b) defines the disclosures a proxy advisor must make when it offers "materially different" different advice or a recommendation on how to vote to different clients and to whom they must be made.

Under § 6A.102(b), if a proxy advisor provides to different clients who have not expressly requested services for a nonfinancial purpose either advice or a recommendation on how to vote on a proxy or company proposal that is materially different, the advisor must (1) comply with § 6A.101(b), if applicable, and (2) notify the following, in writing or electronic means, of the conflicting advice or recommendation: each shareholder receiving the conflicting advice or recommendation; each entity or other person receiving the conflicting advice or recommendation on behalf of the shareholder; the subject company; and the attorney general. *Id.* § 6A.102(b)(1)-(2). Once again,

---

[2] The statute requires notice to the company because it "may have information regarding whether the proposal at issue is in the shareholder's financial interest or regarding the costs of the proposal, and notice would allow the company to provide relevant information to shareholders that may prevent fraudulent or deceptive practices associated with proxy advisors making recommendations for nonfinancial reasons." *See* Ex. 1.

subsection 102(b) like 101(b) does not proscribe a particular form of disclosure and leaves it open to the proxy advisor to decide what to say.

### E.  What happens if a proxy advisor violates SB 2337?

Section 6A.201 makes any violation of SB 2337 in Texas a "deceptive trade practice" under Subchapter E, Chapter 17 of the Texas Business and Commerce Code—the Deceptive Trade Practices-Consumer Protection Act. A violation is actionable under Texas Business & Commerce Code § 17.47, which gives the Attorney General's consumer protection division the discretion to file suit for injunctive relief if it believes that proceedings would be in the public interest. In addition to injunctive relief, the consumer protection division may request a civil penalty of not more than $10,000.

Section 6A.202 allows an "affected party," defined as (1) the recipient of a proxy advisory service, (2) the company that is the subject of such services, or any (3) any shareholder of such a company to bring an action under Texas' Declaratory Judgment Act seeking declaratory or injunctive relief. The plaintiff in such an action must give the Attorney General notice of it within seven (7) days of bringing the action. The statute gives the Attorney General express permission to intervene in the suit.

### III.    Standard of Review

### A.  Federal Rule of Civil Procedure 12(b)(1): Lack of Subject-Matter Jurisdiction

Rule 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. "Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). Accordingly, "[a] case is properly dismissed for lack of subject matter jurisdiction when the court lacks the

statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) motion before addressing any motion as to the merits. *Ramming*, 281 F.3d at 161. "If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P 12(h)(3).

## B.  Federal Rule of Civil Procedure 12(b)(6): Failure to State a Claim

Rule 12(b)(6) governs motions to dismiss for failure to state a claim upon which relief can be granted. "To survive a Rule 12(b)(6) motion, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S.at 679).

Although a court accepts all well-pleaded facts as true, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556

U.S. at 678. A plaintiff's obligation to demonstrate his entitlement to relief requires more than mere conclusory statements. *Twombly*, 550 U.S. at 555. Rather, a plaintiff must plead facts with enough specificity "to raise a right to relief above the speculative level." *Id*. A plaintiff must allege more than "'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Id*. (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citation omitted). "Where the facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has stopped short of showing that the pleader is plausibly entitled to relief." *Howe v. Yellowbook, USA*, 840 F. Supp. 2d 970, 975 (N.D. Tex. 2011).

## IV.    <u>Argument & Authorities</u>

### A.  The Court lacks subject-matter jurisdiction.

Plaintiff asserts claims against the Attorney General for injunctive and declaratory relief. It alleges violations of the First and Fourteenth Amendment under 42 U.S.C. § 1983. Specifically, it alleges that SB 2337 violates its freedom of speech and free association, that it is void for vagueness, is preempted by ERISA, and finally, violates the Dormant Commerce Clause. (*See* Dkt. 1 ¶ 82-165). The Court should dismiss Plaintiff's claims because the Court lacks subject-matter jurisdiction over them. *See* Fed. R. Civ. P. 12(b)(1). *First*, there is no case or controversy under Article III of the U.S. Constitution. Plaintiff lacks standing, and even if it had standing, its claims are not ripe. And *second*, even if Plaintiff had standing and its claims were ripe, sovereign immunity bars Plaintiff's claims and the *Ex parte Young* exception does not apply.

1.  **There is no case or controversy.**

Article III of the U.S. Constitution limits the jurisdiction of federal courts to "cases" and "controversies."[3] *Nat'l Press Photographers Assoc. v. McGraw*, 90 F. 4th 770, 781 (5th Cir. 2024). "'The basic inquiry is whether the conflicting contentions of the parties present a real, substantial controversy between parties having adverse legal interests.'" *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). It is Plaintiff's burden to establish a justiciable case and controversy in this matter; however, Plaintiff does not present facts that establish one. Plaintiff lacks standing to bring its claims, and its claims are not ripe.

### a.  *Plaintiff lacks standing.*

Plaintiff bears the burden of establishing the three elements of standing. *Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023). It must allege (1) an injury in fact that is concrete, particularized, actual, and imminent (injury) that is (2) fairly traceable to Defendant's actions (traceability), and (3) likely to be redressed by a favorable judicial decision (redressability). *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). At this stage of the case, Plaintiff must make a "clear showing" that it has standing. *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017).

### i.  *Plaintiff has no evidence of an injury in fact for any of its claims*

Plaintiff seeks injunctive relief, so it must show "a continuing injury or threatened future injury." *Missouri v. Biden*, 83 F.4th 350, 366 (5th Cir. 2023). "[T]he threatened injury [must be]

---

[3] In *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, the U.S. Supreme Court noted that it has "often emphasized that, in our federal system, it is preferable that constitutional attacks on state statutes be raised defensively in state-court proceedings rather than in proceedings initiated in federal court." 471 U.S. 626, 638 n.8 (1985) (citing *Younger v. Harris*, 401 U.S. 37 (1971)). Indeed it is likely this has to do, at least in part, to the lack of an actual case or controversy in such preemptory challenges.

certainly impending, or there [must be] a substantial risk that the [injury] will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Injuries predicated "on a highly attenuated chain of possibilities" or that "require guesswork as to how…decisionmakers will exercise their judgment" are insufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Plaintiff lacks standing with respect to its non-freedom-of-speech claims because it cannot demonstrate an actual, concrete, imminent, and particularized harm for each claim. Indeed, "[t]he issue whether [SB 2337's] provisions are unlawfully vague in their proscriptions, violate Plaintiff's right to free association, [are preempted or that SB 2337 violates the Dormant Commerce Clause] is…a mere hypothetical dispute lacking the concreteness and imminence required by Article III." *See McGraw*, 90 F. 4th at 782.

In *McGraw*, the Fifth Circuit reversed the trial court's ruling that plaintiffs had standing to assert a pre-enforcement Due Process claim for unconstitutional vagueness. It explained:

> Plaintiffs lack standing to bring their Due Process claims. They have never been arrested or prosecuted for violating Chapter 423. And the available evidence suggests that Defendants have never enforced Chapter 423 against Plaintiffs (or anybody else). The issue of whether [its]…provisions are unlawfully vague in their proscriptions is therefore a mere hypothetical dispute lacking the concreteness and imminence required by Article III. In the absence of any imminent or even credible threat of prosecution under Chapter 423, Plaintiffs lack standing to preemptively challenge Chapter 423 under the Due Process Clause.

> *Id.*

Here, as in McGraw, Plaintiff lacks standing to preemptively challenge SB 2337 as unconstitutionally vague. The Act has yet to take effect. There is, therefore, obviously no record of its enforcement. It is not a criminal statute and carries no criminal penalties for violation. It provides for only injunctive relief and an administrative penalty of up to $10,000 per violation. Determining whether Plaintiff would be subject to such an injunction or administrative penalty under SB 2337 is

an entirely speculative venture. The decision whether to enforce SB 2337 is at the complete discretion of the government. *See* Tex. Bus. & Comm. Code § 17.47. There is nothing in the Act requiring enforcement. *Id.* To file suit, the government must not only find that Plaintiff has violated SB 2337 but also that a lawsuit to enforce it is in the public's interest. *Id.* In other words, the government could determine that Plaintiff violated SB 2337 but decide not to bring suit because such a suit would not be in the public's best interest. In addition, the decision whether to impose an injunction and administrative penalty, including the amount of the penalty, is at the complete discretion of the factfinder in the case (judge or jury) and requires consideration of several statutory factors—it is by no means automatic. *Id.* This highly attenuated chain of events requiring guesswork as to how several decisionmakers will exercise their judgment is insufficient to establish a concrete and imminent injury necessary for standing. *Susan B. Anthony List*, 573 U.S. at 158.

In addition, Plaintiff has not identified any other potential harm that is concrete or imminent. It complains that its relationships with its clients may be harmed but those complaints are speculative at best. Plaintiff's non-freedom-of speech claims therefore, should be dismissed for this reason.

Plaintiff's First Amendment claim is another matter because the standing rules are relaxed for First Amendment claims. In the pre-enforcement context, a plaintiff has suffered an injury-in-fact if (1) it intends to engage in a course of action arguably affected with a constitutional interest; (2) the course of action is arguably proscribed by the law at issue; and (3) there is a credible threat of prosecution for the course of action under the law at issue. *Susan B. Anthony List*, 573 U.S. at 159. Plaintiff must still also show traceability and redressability to have standing. *See McGraw*, 90 F.4th at 784-85.

*First*, nowhere in Plaintiff's Complaint does it state that it plans to engage in a course of action that is proscribed by SB 2337 in some way. (*See generally* Dkt. 1) *See Empower Texans, Inc. v. Nodolf*, 306 F. Supp. 3d 961, 965 (W.D. Tex. 2018) ("Plaintiff does not meet the injury-in-fact requirement because Plaintiff does not demonstrate that its intended conduct is proscribed."). *Second*, Plaintiff has presented no specific evidence that its speech has *actually* been chilled in any way by SB 2337. *Cf. McGraw*, 90 F.4th at 783 (finding standing to assert First Amendment claim where plaintiffs provided evidence that the threat enforcement had *actually* chilled their speech).

And *third*, Plaintiff has not established that there is a credible threat of prosecution. *See Nodolf*, 306 F. Supp. 3d at 965 ("Plaintiff does not meet the injury-in-fact requirement because Plaintiff does not demonstrate that…a credible threat of prosecution exists."). Allegations of chilled speech or "self-censorship must arise from a fear of prosecution that is not 'imaginary or wholly speculative.'" *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006) (quoting *Babbitt v. UFW Nat'l Union*, 442 U.S. 289 (1979)). As discussed above, however, SB 2337 has yet to go into effect, and even when it does the potential for enforcement is highly attenuated at best and requires the Court to look into the proverbial "crystal ball" or otherwise guess as to how a number of different players will exercise their judgment. *See Clapper*, 568 U.S. at 409. The only evidence of enforcement is compelling evidence to the contrary, *that enforcement is not imminent*. Plaintiff, therefore, lacks standing to assert a First Amendment violation under 42 U.S.C. § 1983.

ii.    *Plaintiff has no evidence of traceability and redressability*

To establish traceability, Plaintiff must show "a causal connection between the [alleged] injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of…some third party not before the court." *Lujan*, 504 U.S. at 560. Plaintiff must plead facts linking an injury for each of its claims back to the Attorney General.

It has not done so, and, indeed, with respect to its preemption and Contract-Clause claims, it is difficult to see how it ever could. Nor has Plaintiff pled any facts that any alleged injury for each of its claims could be redressed through a favorable decision in this case. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). In sum, Plaintiff lacks standing to assert any of its claims in this case, and, therefore, the Court should dismiss them.

### b.  *Plaintiff's claims are not ripe.*

Plaintiff's claims, therefore, are presently unripe for consideration and this Court should dismiss them. A claim is ripe, i.e., "fit for judicial decision," if it presents a pure legal question requiring no further factual development. *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586-87 (5th Cir. 1987). If a claim is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all," the claim is unripe. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (citation omitted). Once again, SB 2337 has yet to even go into effect. Plaintiff has not alleged any facts suggesting that it has changed any planned course of action or that the looming prospect of SB 2337 going into effect has had any effect on it or will have any effect on it. As discussed above, Plaintiff has yet to suffer any injury for *any* of its claims, and Plaintiff's theories of harm are entirely "contingent [on] future events that may not occur as anticipated or indeed may not occur at all." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985). Nothing has happened—quite literally—and until something does, the Court need not entertain Plaintiff's so-called "claims."

### 2.  Defendant is entitled to sovereign immunity.

The Eleventh Amendment deprives a federal court of jurisdiction to hear a suit against the State of Texas, regardless of the relief sought, unless the State or Congress expressly waives sovereign immunity under the Amendment. *Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-

02 (1984). A suit against a state official in their official capacity is a suit against the state. *Will v. Mich. Dep't of St. Police*, 491 U.S. 58, 71 (1989). Thus, sovereign immunity bars Plaintiff's claims in this case unless an exception applies for each claim. *See McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citation omitted).

Plaintiff argues that the *Ex parte Young* exception to sovereign immunity applies.  209 U.S. 123, 157 (1908). (Dkt. 4 p. 6). Under the exception, when a plaintiff "seeks prospective, injunctive relief from a state actor, in [their] official capacity, based on an ongoing violation of the federal constitution." *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013). Plaintiff cannot sustain its burden to show the Ex parte Young exception applies for several reasons.

*First*, *Young* requires a higher showing of enforcement than Plaintiff has proffered. Under *Young*, "[t]he officer sued must have 'some connection with the enforcement of the [challenged] act." *Lewis v. Scott*, 28 F.4th 659, 663 (5th Cir. 2022) (citing *Ex Parte Young*, 209 U.S. 123, 157 (1908)). To have the requisite connection to enforcement, an official must have more than "the general duty to see that the laws of the state are implemented." *City of Austin v. Paxton*, 943 F.3d 993, 999-1000 (5th Cir. 2019). Rather, the official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020). "If the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." *Tex. All for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022). The "Article III standing analysis and Ex parte Young analysis 'significant[ly] overlap.'" *City of Austin*, 943 F.3d at 1002 (citation omitted). "'[A]t the point that a threatened injury becomes sufficiently imminent and particularized to confer…standing, that threat of enforcement also becomes sufficient to satisfy [the connection to the

enforcement] element of Ex parte Young.'" *Id.* at 1003 (citation omitted). Plaintiff's Complaint does allege facts sufficient to establish such a threat, and Ex parte Young does not apply for the same reasons Plaintiff lacks standing—namely, because Plaintiff has not alleged an injury-in-fact.

*Second*, even if the Attorney General is the proper defendant in this case, *Young* is still not applicable because there is no ongoing violation of federal law. For *Young* to apply, "a complaint must allege that the defendant is violating federal law," not that the defendant may do so in the future. *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015). Plaintiffs plead no facts indicating that SB 2337 has chilled its speech in any way or that the Attorney General is somehow actively violating any of Plaintiff's rights. Indeed, it is impossible that any of Plaintiff's rights could be implicated in this case because SB 2337 has not even taken effect.

*Third*, and finally, Plaintiff requests impermissible injunctive relief under *Ex parte Young* to prevent SB 2337's enforcement. In *Young*, the Court stated that "[t]here is no doubt that the court cannot control the exercise of the discretion of an officer." 209 U.S. at 158. As discussed above, enforcement of SB 2337 is completely discretionary. Any injunction preventing the Attorney General from enforcing SB 2337 is, therefore, an attempt to control the Attorney General in the exercise of his discretion, which violates sovereign immunity under *Young*. *See Ex parte Young*, 209 U.S. at 158; *see also Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 241-42 (5th Cir. 2020). Consequently, sovereign immunity bars Plaintiff's request for an injunction preventing enforcement of SB 2337.

## B. Plaintiff has failed to state any claims upon which relief may be granted.

In its Complaint, Plaintiff identifies five (5) causes of action: (1) Count I, "Violation of the First Amendment…(Freedom of Speech);" (Dkt. 1 ¶ 82-123); (2) Count II, "Violation of the First Amendment…(Freedom of Association);" (*Id.* ¶ 124-132); (3) Count III, "Void for Vagueness;" (*Id.* ¶ 135-148); (4) Count IV, ERISA Preemption (*Id.* ¶ 149-156); and (5) Count V, "Violation of the

Dormant Commerce Clause" (Id. ¶ 159-165). Plaintiff is requesting (1) declaratory relief declaring SB 2337 unconstitutional or otherwise unenforceable both facially and as applied to it; (2) injunctive relief against the Attorney General and his office enjoining them from taking any action to enforce SB 2337 or intervene in a case by an individual based on SB 2337; and (3) an award of attorney fees and costs. (Dkt. 1 ¶ 166-176).

The Court should dismiss all of these claims and deny all requested relief because Plaintiff has failed to plead facts to state a claim for relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6).

1. **Plaintiff does not state a claim for relief under the Dormant Commerce Clause**

Plaintiff alleges that SB 2337 violates the Dormant Commerce Clause; however, Plaintiff fails to allege any facts demonstrating that SB 2337 either "discriminates against interstate commerce" or imposes "undue burdens on interstate commerce." (Dkt. 1 ¶ 160-165)

Plaintiff claims that SB 2337 is unduly burdensome because the burden it imposes is "clearly excessive" in relation to the local benefits. (Id. ¶ 162). More specifically, Plaintiff alleges that while the "purported purpose of the Act is to prevent shareholders from being defrauded,…the shareholders need not reside in Texas, so there is no local benefit. (Id. ¶ 163). Plaintiff goes on to state that the "Act burdens interstate commerce by requiring out-of-state proxy advisors to give out-of-state shareholders time-consuming, expensive, and distracting disclosures about companies that need not even be incorporated in Texas." (*Id.*).

To state an excessive burden claim, a plaintiff must allege that "the burden imposed on interstate commerce is 'clearly excessive' in relation to the putative local benefit." Pike v. Bruce Church, 397 U.S. 137, 142 (1970). "Laws that 'merely impose an incidental burden on interstate commerce…face much smoother sailing." Tesla v. La. Auto Dealers Assoc., 677 F. Supp. 3d 417, 422 (E.D. La. 2023). Plaintiff has not alleged sufficient facts that would suggest the burden imposed

on interstate commerce by SB 2337 is "clearly excessive" in relation to its consumer-protection benefit. Plaintiff's claim, therefore, fails.

1.  **Plaintiff does not assert any cognizable Section 1983 claims.**

42 U.S.C. § 1983 provides a federal remedy for "the deprivation of any rights, privileges, or immunities secured by the [U.S.] Constitution and laws." *Golden St. Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105 (1989); *see also* 42 U.S.C. § 1983. To state a claim under Section 1983, Plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the U.S. and (2) demonstrate that the alleged violation was committed by a person acting under color of state law." *James v. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008). Plaintiff alleges violations of the First and Fourteenth Amendment as well as the Contracts Clause of the U.S. Constitution. Plaintiff, however, has not sufficiently alleged a violation of any of its rights, and the Court should dismiss all of its claims under 42 U.S.C. § 1983.

### a.  *ERISA does not preempt SB 2337.*

Plaintiff attempts to assert an ERISA preemption claim under Section 1983. It has failed to state a plausible claim. ERISA does not preempt Section 1983 for two main reasons:

*First*, SB 2337 does not regulate what fiduciaries can (or must) consider. ERISA fiduciaries are not required to consider ESG factors. *See* 29 C.F.R. § 2550.404a-1(b)(4) ("Risk and return factors may include the economic effects of climate change and other environmental, social, or governance factors on the particular investment or investment course of action.") [emphasis add-ed]. So, the statute does not modify or restrict ERISA fiduciary actions because its disclosure requirements apply only to proxy advisory firms.

Plaintiff argues that SB 2337 restricts what an ERISA fiduciary must consider and relies on a regulation explicitly stating that an ERISA fiduciary must independently determine if following

the recommendations of a proxy advisory firm is consistent with the ERISA fiduciary's obligations. "A fiduciary may not 'follow[] the recommendations of a proxy advisory firm . . . without a determination that such firm['s] . . . proxy voting guidelines are consistent with the fiduciary's obligations.'" (quoting 29 C.F.R. § 2550.404a- 1(d)(2)(iii)). (Dkt . 4)

SB 2337 does not restrict, compel, or otherwise interfere with an ERISA fiduciary's duty to evaluate a proxy advisory firm's recommendation. The statute's only concern with ERISA fiduciary obligations is to provide fiduciaries with additional context they can use (or not use) to in-form their independent assessment of a proxy advisory firm's recommendations. Glass Lewis in-correctly states that it must "evaluate relevant facts and 'risk and return' factors, including ESG." *See* 29 C.F.R. § 2550.404a-1. SB 2337 allows proxy advisory firms to make recommendations based on ESG subject to disclosure obligation if they do so. Further, nothing in the statute prohibits proxy advisory firms from signing certifications they have considered relevant facts to show compliance with ERISA.

*Second*, SB 2337 does not govern a central matter of plan administration or disrupt national uniform administration. "Crucially, not every state law that affects an ERISA plan or causes some disuniformity in plan administration has an impermissible connection with an ERISA plan." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 87 (2020). After all, "all state laws create some potential for lack of uniformity." *Egelhoff v. Egelhoff*, 532 U.S. 141, 150 (2001). If any disuniformity were enough for ERISA preemption, "then for all practical purposes pre-emption would never run its course." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016) (cleaned up).

Instead, ERISA is "primarily concerned with pre-empting laws that require providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits or by

binding plan administrators to specific rules for determining beneficiary status." Rutledge, 592 U.S. at 86–87. So ERISA "does not pre-empt state rate regulations that merely increase costs or alter incentives for ERISA plans without forcing plans to adopt any particular scheme of substantive coverage." Id. at 88. And it does not preempt laws "operating as an indirect source of merely economic influence on administrative decisions." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 662 (1995).

SB 2337 does not force plans to invest in any particular way or even affect how they can vote on proxy matters. It "does not bind ERISA plans to anything" at all. *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 328 (1997). And ERISA does not, of course, require plan administrators to rely on proxy advisors. It requires the administrators themselves to manage plans prudently. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 416 (2014). Department of Labor regulations add that prudent plan management includes proxy voting that is "solely in accordance with the economic interest of the plan and its participants and beneficiaries." 29 C.F.R. § 2550.404a 1(d)(2)(ii)(A). They then forbid relying on proxy advisors unless the plan fiduciary determines that the advisor's voting guidelines are consistent with the fiduciary's obligations—they certainly do not require, or even recommend, that ERISA fiduciaries rely on proxy advisors. Id. § 2550.404a-1(d)(2)(iii). So SB 2337 does not govern a central matter of plan administration or interfere with nationally uniformity.

Finally, SB 2337 creates no obligation for ERISA fiduciaries to take any specific action (or inaction) with respect to any recommendation or required disclosure. The statute does not "expose" fiduciaries to lawsuits, nor does it require the production of misleading facts or inappropri-

ate factors. Here, Glass Lewis relies on inapposite authority. *Sec. Indus. & Fin. Markets Ass'n v. Ashcroft*, 745 F. Supp. 3d 783 (W.D. Mo. 2024). The Missouri rule in Ashcroft directly regulated broker-dealers and investment advisors who, indeed, are ERISA fiduciaries. *Id.* at 790–92. Proxy advisory firms are not. Because the statute does not regulate ERISA fiduciaries, the holding in Ashcroft does not apply.

### b. *Plaintiff fails to allege a freedom-of-association claim.*

Though it's Plaintiff's burden, it has not adequately alleged a violation of the "guilt-by-association" doctrine or otherwise stated a freedom of association claim. The facts stated in Plaintiff's Complaint do not suggest any violation of its rights to associate. (Dkt. 1 ¶ 124-132). The Court, therefore, should dismiss this claim.

### c. *Plaintiff has not pled a cognizable facial challenge to SB 2337.*

Plaintiff has lodged facial as well as as-applied challenges to SB 2337 under the First and Fourteenth Amendments. "[T]hat decision comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). "[C]ourts usually handle constitutional claims case by case, not en masse. (citation omitted) 'Claims of facial invalidity often rest on speculation' about the law's coverage and its future enforcement. (citation omitted) And 'facial challenges threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitution ways. (citation omitted) [The U.S. Supreme] Court has therefore made facial challenges hard to win." *Id.*

To succeed on a facial challenge under any basis other than the First Amendment, Plaintiff must "establish that no set of circumstances exists under which [SB 2337] would be valid," or that the law lacks a "plainly legitimate sweep." *Id.* (citing *United States v. Salerno*, 481 U.S. 739 (1987); *Wash. St. Grange v. Wash. St. Repub. Party*, 552 U.S. 442 (2008)). "In First Amendment cases, how-

ever,…[t]he question is whether 'a substantial number of [SB 2337's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* (citing *Ams. for Prosp. Foundation v. Bonta*, 594 U.S. 595 (2021)). Thus, if the SB 2337's unconstitutional applications substantially outweigh its constitutional ones under the First Amendment, it would be facially invalid.

Here, Plaintiff has pled no facts, which—if proven—would establish facially invalidity under the First Amendment, Fourteenth Amendment, or any other part of the U.S. Constitution. The Court should, therefore, dismiss its facial challenges.

### d. *Plaintiff has not pled facts demonstrating that SB 2337 violates the First Amendment.*

#### i. *To the extent that Plaintiff's speech is misleading, it warrants no protection.*

An impetus behind SB 2337 is the misleading nature of Plaintiff's (and other proxy advisors) advice. *See e.g.,* SB 2337 § 1. Their clients reasonably believe that the advice they are receiving is in their best financial interest. Often, however, the advice they receive is not in their best financial interest of, but rather designed to promote some other ideal, such as climate change, diversity, etc. Such speech is misleading, at best, and insofar as Plaintiff's speech misleads its client, such speech warrants no protection under the law, and the Court's inquiry need not go any further. *See In re R.M.J.*, 455 U.S. 191, 203 (1982).

#### ii. *SB 2337's regulates commercial speech about proxy statements.*

In this pre-enforcement challenge, Plaintiff alleges that SB 2337 warrants strict scrutiny review in accordance with *303 Creative v. Elenis*, 600 U.S. 570, 603 (2023) (statute requiring web site designer to create web sites for homosexual couples getting married) and *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (statute regulating speech about abortion). The speech at issue in this case, however, is not the same type of political speech implicated in those two cases.

SB 2337 regulates commercial speech related to proxy statements, and as discussed further, is afforded the *least* protection by the law. *See, e.g., Ohralik v. Ohio Bar Assoc.*, 436 U.S. 447, 456 (1978) ("Numerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about…corporate proxy statements."); *Dun & Bradstreet, Inc. v. Greenmoss Builders*, *Inc.*, 472 U.S. 749, 759 n.5 (1985) (distinguishing the regulatory disclosure requirements involving "the exchange of information about…corporate proxy statements" upheld in the U.S. Supreme Court in *Ohralik* from "similar regulation of political speech [that] is subject to the most rigorous scrutiny.").

Indeed, courts have long recognized that "regulation of the exchange of information regarding securities is subject only to limited First Amendment scrutiny." *SEC v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988). "Speech relating to…securities…forms a distinct category of communications in which the government's power to regulate is at least as broad as with respect to the general rubric of commercial speech." *Id*; *see Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 64 (1973); *Ohralik*, 436 U.S. at 456; *Dun & Bradstreet, Inc.*, 472 U.S. at 758 n.5; *see also S.E.C. v. AT&T, Inc.*, 626 F. Supp. 3d 703, 743 (S.D.N.Y. 2022) (Indeed, "[i]f speech employed directly or indirectly [concerning] securities were totally protected, any regulation of the securities market would be infeasible—and that result has long been rejected.")

The commercial speech at issue in this case "merits only a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, allowing modes of regulation that might be impermissible in the realm of noncommercial expression." *Pub. Citizen Inc. v. La. Att'y Disciplinary Bd.*, 632 F.3d 212, 217-18 (5th Cir. 2011) (cleaned up); *Centr. Hudson*

*Gas & Elect. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 562-63 (1980) ("The Constitution…accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."). As the Fifth Circuit has explained, "unlike other areas of First Amendment protection, the commercial speech doctrine is concerned primarily with the level and quality of information reaching the listener." *Dunagin v. City of Oxford*, 718 F.2d 738, 752 (5th Cir. 1983).

Plaintiff asserts that SB 2337 is impermissibly content- and viewpoint-based, warranting strict scrutiny. Defendant denies this, but the Court need not decide this issue. Even if it is content-based, as speech related to securities, it would still not warrant strict or even intermediate scrutiny. The court in *Securities and Exchange Commission v. AT&T, Inc.* explained:

> Defendants' suggestion that all content-based regulations must satisfy strict scrutiny overlooks the significant body of decisions involving laws and regulations mandating affirmative disclosures of information, particularly for…participants in the securities industry. These disclosure provisions are explicitly content based. They require the disclosure of certain content…and do not require the disclosure of others. Yet these have routinely withstood First Amendment challenges without any suggestion that strict, or even intermediate, scrutiny applied. As the District of Columbia Circuit has recognized, "Speech relating to…securities forms a distinct category of communications." (citation omitted). "If [such] speech…were totally protected, any regulation of the securities market would be infeasible—and that result has long since been rejected." (citation omitted).

> *SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 743 (S.D.N.Y. 2022) (quoting *S.E.C. v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988).

The court went on to reject the idea that the speech at issue—compelled disclosures of nonpublic information by securities issuers—was, technically speaking, commercial speech and lumped it in broadly with "information about securities" and "corporate proxy statements," nevertheless warranting the lowest-level of rational basis review. *Id.* at 744. Thus, whether the speech SB 2337 regulates is commercial speech, information about corporate proxy statements, or commercial speech about proxy statements, it warrants only rational basis review.

Plaintiff also complains about SB 2337 because it compels speech as opposed to restricting it and requires Plaintiff to speak when Plaintiff would otherwise choose to be silent. According to Plaintiff this means the Act requires stricter scrutiny. This is surprising because the law states the opposite. Indeed, there are "material differences between disclosure requirements and outright prohibitions on speech;" and the former warrant lesser scrutiny than the latter. *Zauderer v. Office of Disciplinary Counsel of Supreme Ct. of Ohio*, 471 U.S. 626, 650 (1985); *see Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796 n.9 (1988) (observing, in reference to securities regulations, that "[p]urely commercial speech is more susceptible to compelled disclosure requirements"). In *Zauderer*, for example, the court stated clearly that "the First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed." *Id.* at 651 n.14.

Plaintiff erroneously argues that SB 2337 does not target commercial speech, because commercial speech "'does no more than propose a commercial transaction.'" But transactional proposals merely represent *one* type of commercial speech, which the U.S. Supreme Court has defined more broadly as encompassing "expression related solely to the economic interests of the speaker and its audience." *Central Hudson*, 447 U.S. at 561 (1980); *White Buffalo Ventures, LLC v. University of Texas at Austin*, 420 F.3d 366, 374 (5th Cir. 2005) (same); *Houston Balloons & Promotions, LLC v. City of Houston*, 589 F. Supp. 2d 834, 847 (S.D. Tex. 2008). As discussed above, "the exchange of information about…corporate proxy statements" is subject to regulation as commercial speech. *Ohralik*, 436 U.S. at 456; *see also United States v. Wenger*, 427 F.3d 840, 848 (10th Cir. 2005) (nontransactional securities disclosures are commercial speech);

Disclosure requirements such as those in SB 2337 are commonplace in the securities industry, and routinely upheld. *See e.g., SEC v. City of Rochester*, *N.Y.*, 731 F. Supp. 3d 455, 473 (W.D.N.Y. 2024) (upholding SEC rule requiring municipal advisors to disclose material conflicts of interest arising out of contingency fee arrangements.) For example, in *Chamber of Commerce of the U.S. v. U.S. SEC*, the Fifth Circuit rejected a First Amendment challenge to an SEC rule requiring companies to "report day-to-day share repurchase data once a quarter and to disclose the reason why the issuer repurchased shares of its own stock." 85 F.4th 760, 766 (5th Cir. 2023). And year after year, companies file an array reports and other disclosures that the SEC has mandated since the 1930s. *See, e.g.*, 15 U.S.C. §§ 77aa, 78l; *see also Macquarie Infrastructure Corp. v. Moab Partners, LP*, 601 U.S. 257, 260 (2024). Large chunks of the Code of Federal Regulations are dedicated to the precise form and content those mandatory disclosures must take. *See* 17 C.F.R. pt. 210. Those settled requirements show a long "history and tradition" that supports mandatory commercial disclosures in the securities industry. *Vidal v. Elster*, 602 U.S. 286, 301 (2024); *see also CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 442 (2024) (Kagan, J., concurring, joined by Sotomayor, Kavanaugh, & Barrett, JJ.).

Finally, Plaintiff complains that SB 2337 is "under-inclusive." This criticism, however, misses the mark: in the commercial speech context, "governments are entitled to attack problems piecemeal." *Zauderer*, 471 U.S. at 651 n.14. It also complains that SB 2337 is "over-inclusive. This criticism, however, is similarly irrelevant "because the overbreadth doctrine does not apply to commercial speech." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496-97 (1982) (citing *Central Hudson*, 477 U.S. at 565 n.8).

*iii.*    <u>Zauderer *applies.*</u>

Plaintiff argues that *Zauderer* does not apply because SB 2337 is not limited to purely factual and uncontroversial information but, rather, requires it to utter false statements. This is simply wrong. *First*, in the Fifth Circuit "forcing a company to 'explain the reason' for its actions is a purely factual disclosure'" under *Zauderer*. *See Chamber of Commerce*, 85 F.4th at 769 (citation omitted). *Second*, "'[a] factual disclosure does not reflect an opinion merely because it compels a speaker to convey information contrary to its interests.'" *City of Rochester*, 731 F. Supp. 3d at 473 (quoting *Grocery Mfrs. Ass'n*, 102 F. Supp. 3d 583, 625 (D. Vt. 2015)). *Third*, and *finally*, "[d]isclosure rules requiring speakers to disclose facts with which the speakers *disagree* are consistently found *not* to offend the First Amendment." *City of Rochester, N.Y.*, 731 F. Supp. 3d at 473. (collecting cases) (emphasis added). That is why, for example, the government can compel cigarette manufacturers to include graphic warnings condemning their own products on every cigarette package. *RJ Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 882 (5th Cir. 2024). Companies would, presumably, prefer not to tell every customer that considers purchasing their products that the product can lead to amputation, erectile dysfunction, and neck cancer. *Id.* at 872. But the First Amendment does not give them a right to conceal that information from customers. *Id.* at 887.

In *City of Rochester*, the court rejected arguments identical to Plaintiff's. There, municipal advisors brought a First Amendment challenge to an SEC rule requiring them to characterize their contingent fee arrangements as conflicts of interest in disclosures to their municipal clients. 731 F. Supp. 3d at 469. The advisors resisted review under *Zauderer* arguing that the disclosure requirements were neither "factual" because none of the advisors' contingent fee arrangements ever created an actual conflict of interest. *Id.* at 472. Finding that the rule passed constitutional muster under

*Zauderer*, the court rejected the advisors' arguments because the SEC rule did not mandate a particular disclosure. *Id.* And notably, "[i]t did not place[ ]…limitations on what municipal advisors [could] say in defense of [their] arrangements." *Id.*

Similarly, here, the disclosures under SB 2337 are purely factual and uncontroversial. Like the required disclosures in *City of Rochester*, SB 2337 does not mandate the form for the disclosures or limit what Plaintiff can say in defense of its advice. Indeed, if Plaintiff would like, it can qualify its disclosures by letting the recipients know the State of Texas compels them. Disclosures under § 6A.101(b)(1)(B) effectively mirror the disclosure upheld by the Fifth Circuit in *Chamber of Commerce*: proxy advisors must "explain[], with particularity, the basis of the proxy advisor's advice concerning each recommendation." SB 2337 § 6A.101(b)(1)(B). Similarly, the mandate that, when providing notice of conflicting advice, a company identify which recommendation, if any, is "supported by any specific financial analysis performed or relied on by the advisor" simply requires a company to explain its decisionmaking process. *Id.* § 6A102.(b)(3)(B). Again, requiring a company to explain its actions is perfectly constitutional. *Chamber of Commerce*, 85 F.4th at 769; *NetChoice*, 49 F.4th at 487. Other required disclosures simply require the proxy advisor to notify certain persons that the advisor provided "conflicting advice or recommendation[s]" to different shareholders. *Id.* § 6A.102(b)(2). That notice is, of course, purely factual and uncontroversial—it is a simple statement that a proxy advisor made different recommendations about the same proposal or disagreed with management about a proposal.

SB 2337 requires, for example, that a proxy advisor that bases its advice on diversity, equity, and inclusion provide, alongside its DEI-based recommendation, a disclosure that its service "is not being provided solely in the financial interest of the company's shareholders because it is based

wholly or partly on one or more nonfinancial factors." *Id.* § 6A.101(b)(1)(A) (emphasis added); *see also* § 6A.102(b)(3)(A). That is a statement of fact that simply describes the basis for the advisor's recommendation—it considered, for example, the advisor's view that boards should be racially balanced in addition to any possible financial effects. Recipients of proxy advice have a right to know if an advisor is shaping their votes based on the advisor's support for the "sordid business" of "divvying us up by race." *LULAC v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, J., concurring in part and dissenting in part).

In addition, the law applies equally. The law applies equally. If a self-styled "anti-ESG" firm recommends against a proposal that is "pro-ESG," based wholly or partly on or taking into account its "anti-ESG" stance, there is nothing in SB 2337 that would allow the firm to escape the Act's disclosure requirements. SB 2337 § 6A.101(a)(1)(A)-(C) states "[A] proxy service is not provided solely in the financial interest of the shareholders…if the service is wholly or partly based on, or otherwise takes into account…an…(ESG) goal, factor [etc.]…" Section 6A.101(b)(1)(A)-(B) states "[i]f a proxy advisor provides a proxy advisory service that is not provided solely in the financial interest of the shareholders…the advisor shall…include a disclosure to each shareholder…receiving the service that…conspicuously states…[etc.]" Nothing relieves the proxy advisor from making its disclosure if takes a particular stance on ESG, DEI, etc.; thus, Plaintiff has no basis to argue that SB 2337 promotes Texas' preferred message or that it would lead to unequal enforcement. It applies equally to each party in the debate and will be enforced accordingly.

In sum, the disclosures under SB 2337 are uncontroversial. They are "non-ideological" in nature, *Nat'l Ass'n of Mfrs. ("NAM") v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015), and do not force Plaintiff to take "sides in a heated political controversy," *The Wireless Ass'n v. City of Berkeley*, 928

F.3d 832, 845 (9th Cir. 2019), or speak a "preferred message." *City of Rochester, N.Y.*, 731 F. Supp. 3d at 473. Moreover, by allowing proxy advisors to make the disclosures in their own words, rather than requiring them to use government-mandated language, the Act gives them the flexibility to tailor the disclosures to their "individual circumstances." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 252, (2010). Thus, nothing in the SB 2337 requires false or controversial speech within the meaning of *Zauderer. Id.*

iv.    *SB 2337 passes rational basis review under* Zauderer.

Under *Zauderer*, a required disclosure does not violate the First Amendment if it is "reasonably related to a legitimate state interest" and not "unjustified or unduly burdensome" in a way that "chill[s] protected commercial speech." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 485 (5th Cir. 2022); *Zauderer,* 471 U.S. at 651. This test is animated by the principle that required disclosure in the commercial context "furthers, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the 'marketplace of ideas.'" *N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114, 132 (2d Cir. 2009). SB 2337 satisfies this standard.

The disclosure requirements in SB 2337 are reasonably related to the State's interest. Texas has a legitimate state interest in broadly protecting consumers from fraud and deception. *See Ohralik*, 436 U.S. at 460 (state clearly has an interest in consumer protection); *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 167 (5th Cir. 2007) ("The State…[has] successfully asserted a legitimate interest in consumer protection."); *RJ Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 883 (5th Cir. 2024) ("[A]nti-deception is a legitimate state interest."). More specifically, Texas has a legitimate interest in insuring participants in the proxy services market are fully informed as to potential conflicts and the economic rationale behind the advice they receive so they can make the best possible decisions about how to vote. *See City of Rochester*, 731 F. Supp. 3d at 473-74. (disclosure requirement reasonably

related to legitimate interest in "insuring participants in the municipal securities market are fully informed as to potential conflicts so as to make the best possible decisions."). SB 2337's provisions requiring advisors to notify a company's management when their recommendations conflict ensure that shareholders can receive both perspectives, and that management can correct the frequent mistakes proxy advisors make. *See Chamber of Commerce*, 85 F.4th at 771 (the government "has a legitimate interest in promoting the free flow of commercial information").

SB 2337 is designed to remedy deception in the proxy services market by imposing disclosure obligations on proxy advisors to provide investors with the financial rationale for voting advice. SB 2337, therefore, seeks to tie proxy advice to shareholder value by requiring proxy advisors to support their recommendations. SB 2337 also helps clarify conflicting recommendations to different clients on the same company or shareholder proposals, both of which necessarily cannot be in the financial interest of the shareholders. SB 2337, Bill Analysis; SB 2337 § 1.

None of the required disclosures under SB 2337 are unduly burdensome. Contrary to Plaintiff's focus on purported financial and other business costs related to complying with SB 2337, the *Zauderer* analysis does not concern "economic[] or operations burdens" that disclosure requirements might impose; the question is instead whether requirements "unduly burden (or chill) protected speech and thereby intrude on an entity's First Amendment speech rights," *NetChoice*, 49 F.4th at 486 (cleaned up), or otherwise "drowns out their message." *Chamber of Commerce*, 85 4th at 772. Here, Plaintiff is free to craft its disclosures however it likes and make clear that the views in its disclosures belong to the state of Texas. Additionally, Plaintiff is free to tell its clients that it is merely doing what the clients have asked of it and has considered nonfinancial factors at the client's direction or demonstrate that voting based on nonfinancial factors is in the best financial interests of

the client. *See City of Rochester*, 731 F. Supp. 3d at 474. ("[T]he regulation [does not] unduly burden speech…[plaintiff] is free to make clear that the views belong to [defendant], and to tell its clients why, in its view the contingency nature of the arrangement 'will not impact their advice or otherwise harm their clients.'"). Ultimately, the state need not select the "least restrictive means" to address a problem but rather must only take an approach that is "reasonably related" to it. *Zauderer*, 471 U.S. at 651 n.14.

> v.    *SB 2337 passes intermediate review under* Central Hudson.

Even if *Zauderer* did not apply, "commercial speech enjoys lesser, intermediate-scrutiny constitutional protection" under the "framework established in *Central Hudson*." *RTM Media L.L.C. v. City of Houston*, 584 F.3d 220, 224 (5th Cir. 2009). Contrary to Plaintiff's claim, where a commercial disclosure requirement "does not fall within … *Zauderer* … *Central Hudson* is the appropriate standard." *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1217 (D.C. Cir. 2012), *rev'd in part on other grounds*, *Am. Meat Inst. v. Dep't of Agric*, 760 F.3d 18, 23 (D.C. Cir. 2014); *see also Zauderer*, 471 U.S. at 637 ("*Central Hudson*" applies to "[w]hatever else the category of commercial speech may encompass").

In *Central Hudson*, the Court held that a restriction on commercial speech is permissible if it "directly advances" a "substantial" governmental interest and is "not more extensive than is necessary to serve that interest." 447 U.S. at 566. This standard does not require that a restriction be the "single best disposition" or "least restrictive means" of achieving that end but rather requires a "fit" between the "ends and the means" that is "reasonable" and "in proportion to the interest served." *Board of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989). For the reasons already discussed above, SB 2337 passes scrutiny under this standard.

### e. *SB 2337 is not unconstitutionally vague.*

Plaintiff fails to state a claim that SB 2337 violates its right to Due Process because it too vague. Under the void-for-vagueness doctrine, a law is unconstitutional if it fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Tel. Stations, Inc.*, 567 U.S. 239, 253 (2012).

An economic regulation like SB 2337 is void for vagueness "only if it commands compliance in terms 'so vague and indefinite as really to be no rule or standard at all' ... or if it is 'substantially incomprehensible.'" *United States v. Clinical Leasing Service, Inc.*, 925 F.2d 120, 122 n. 2 (5th Cir.1991) (quoting *A.B. Small Co. v. American Sugar Refining Co.*, 267 U.S. 233, 239 (1925)). The U.S. Supreme Court has cautioned:

> The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action .... The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982).

Here, SB 2337 is precisely the type of economic regulation carrying civil penalties that the Supreme Court cautioned is "subject to a less strict vagueness test." *Id.*; *see also Papachristou v. City of Jacksonville*, 405 U.S. 156, 163 (1972) ("In the field of regulatory statutes governing business activities…greater leeway is allowed).

Plaintiff claims that SB 2337 is vague on the front end—in what triggers its obligations— and on the back—what those obligations entail. Respecting the conduct proscribed, the law only

requires that the state give Plaintiff "a reasonable degree" of certainty. *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552-53 (5th Cir. 2008). "[P]erfect clarity and precise guidance have never been required." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

Nevertheless, SB 2337 is sufficiently clear on what it requires. It is not lengthy, and it defines multiple key terms and phrases that are used throughout the statute. *See, e.g.,* SB 2337 §§ 6A.001, 101(a), 101(c), 102(a). Indeed, Plaintiff's Complaint belies credulity. Plaintiff claims not to understand what "ESG," "governance," "DEI," "nonfinancial," and "solely," mean." A person of common intelligence would not need to guess as to what these terms mean, and they are readily understood—even if undefined—based on their plain and common meaning. *See Portee v. Morath*, 683 F. Supp. 3d 628, 634 (W.D. Tex. 2023).[4] Indeed, courts are routinely called upon to determine and can easily determine what these terms mean when undefined. *See e.g., Theriot v. Mundy Cos.*, No. 4:15-CV2481, 2017 WL 274812, at \*4 (S.D. Tex. Jan. 20, 2017) ("This Court previously defined the word 'solely' to mean 'without another' and 'to the exclusion of all else.'"); *Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2004) ("Language may satisfy the conspicuousness requirement by appearing in large type, contrasting colors, or otherwise calling attention to itself."); *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 844 (Tex. 2018) (analyzing the meaning of the term "only")

Plaintiff's reliance on *Ashcroft* is once again misplaced. The *Ashcroft* court found that the Missouri regulation at issue was impermissibly vague. *Ashcroft*, 754 F.Supp.3d at 800-801. This was

---

[4] When compared the subjective and vague terms that courts have struck down, SB 2337 is a model of clarity. *See United States v. Williams*, 553 U.S. 285, 304 (2008) (noting the court has "struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meaning); *see also Papachristou v. Jacksonville*, 405 U.S. 156, n. 1, (1972) (striking city ordinances referring to "vagrants," defined to include "[r]ogues and vagabonds," "persons who use juggling," and "common night walkers," as unconstitutionally vague).

not because of the word "nonfinancial," however. The court took issue with Missouri's lack of explanation regarding what could trigger the statute's disclosure and consent obligations. Specifically, the terms "nonfinancial objective" or "consider" did not provide proper notice as to how and under what circumstances an advisor could run afoul of the statute. *Ashcroft*, 754 F.Supp.3d at 801. SB 2337, however, is explicit when it comes to understanding how and when the disclosure obligations kick in.

Plaintiff quarrels with the meaning of "financial interest," but it is a common statutory term susceptible to a plain meaning interpretation. In fact, "financial interest" can be found in hundreds of Texas statutes with no issue. *See* Tex. Bus. & Org. Code § 200.317 ("This section applies to a contract or transaction between a real estate investment trust and . . . an entity or other organization in which one or more trust managers or officers, or one or more affiliates or associates of one or more directors or officers of the trust . . . has a financial interest); Tex. Util. Code Ann. § 39.1512(a) (requiring public disclosure when a member of a governing body has a "substantial financial interest" in a person who has a direct interest in a matter before the governing body); Tex. Gov't Code Ann. § 321.007 ("The State Auditor may not have a financial interest in the transactions of any department"); Tex. Gov't Code Ann. § 2165.354 (the commission shall . . . "determine if the proposal is in the best long-term financial interest of the state").

Though Plaintiff claims that SB 2337 is so vague that it would allow the Attorney General to "arbitrarily discriminate in his enforcement," it never explains how. (*See* Dkt. 1 ¶ 85; *see also* Dkt. 14 p. 18-19). There is nothing in its statutory language that permits selective law enforcement, but if there was, the Court should not "assume that the [Government] will take no further steps to minimize the dangers of arbitrary enforcement." *Vill. of Hoffman Ests.*, 455 U.S. at 504.

## V.    <u>Conclusion</u>

For all of the reasons set forth above, Defendant respectfully requests that the Court dismiss all of Plaintiff's claims against Defendant

Respectfully submitted,

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

*/s/ C. Lee Winkelman*
C. LEE WINKELMAN
Assistant Attorney General
State Bar No. 24042176
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 241-9629
(512) 320-0667 fax
lee.winkelman@oag.texas.gov

**COUNSEL FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2025, true and correct copy of the foregoing document was served via the Court's electronic filing system to all counsel of record.

*/s/ C. Lee Winkelman*
C. LEE WINKELMAN
Assistant Attorney General