**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

**FILED**

August 19, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _Christian Rodriguez_

DEPUTY

| | | |
|---|---|---|
| **GLASS, LEWIS & CO., LLC,** *Plaintiff,* | § § § § § | |
| **v.** | § § § | **CIVIL ACTION NO. 1:25-cv-01153-ADA** |
| **KEN PAXTON, in his official capacity as the Texas Attorney General,** *Defendant.* | § § § § § § § § | |

---

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

---

This is a pre-enactment, pre-enforcement challenge to SB 2337, a consumer-protection law set to go into effect on September 1, 2025. The Court should deny Plaintiff, Glass, Lewis & Co.'s ("Glass Lewis") attempt to prevent SB 2337 from going into effect:

*First*, the Court lacks subject matter jurisdiction over Plaintiff's claims. Plaintiff has yet to suffer any injury, and it never will, so there is, therefore, no "case" or "controversy" for the Court to decide. Plaintiff lacks standing for First and Fourteenth Amendment and ERISA preemption claims, which are—in any event—unripe. In addition, sovereign immunity bars Plaintiff's claims and no exception applies.

***Second***—jurisdictional failings aside—Plaintiff does not have a substantial likelihood of success on the merits of its First Amendment, Fourteenth Amendment, and ERISA preemption claims. SB 2337 is sound. It does not violate the U.S. Constitution, and it is not preempted by any federal law.

***Third***—and finally—Plaintiff has not and cannot establish that it will suffer irreparable harm if the Court fails to enjoin enforcement of SB 2337 against it, and the public will be done a great disservice if the Court enjoins the Attorney General from enforcing a perfectly valid law against Plaintiff.

# I.    Table of Contents

I.   Table of Contents.................................................................................................3

II.  Background .....................................................................................................5

    A.   The proxy advisor market and ISS's duopoly with Glass, Lewis & Co..........................5

    B.   Why SB 2337? ........................................................................................ 6

    C.   When does SB 2337 apply? .........................................................................7

    D.   What does SB 2337 require?........................................................................7

        1.   When is a proxy advisory service "not provided solely in the financial interest of the shareholders of a company" and what disclosures are required for such service? ........................................................................ 8

        2.   When does a proxy advisor give materially different advice or make materially different voting recommendations to different clients and what disclosures are required?........................................................................ 9

    E.   What happens if a proxy advisor violates SB 2337?...........................................10

III. Standard of Review for Injunctive Relief ........................................................... 11

IV.  Argument & Authorities ............................................................................... 11

    A.   Plaintiff does not have a substantial likelihood of success on the merits of its claims because the Court lacks subject-matter jurisdiction ......................................... 11

        1.   There is no case or controversy...............................................................12

            a.   Plaintiff lacks standing. ...............................................................12

                i.   Plaintiff has no evidence of an injury in fact for any of its claims..............12

                ii.   Plaintiff has no evidence of traceability and redressability........................15

            b.   Plaintiff's claims are not ripe. ........................................................16

        2.   Defendant is entitled to sovereign immunity. ..........................................16

    B.   Lack of Jurisdiction aside, Plaintiff is unlikely to succeed on the merits of his claims. ..............................................................................................18

        1.   ERISA does not preempt SB 2337 .........................................................18

        2.   SB 2337 does not violate the First Amendment.........................................21

            a.   SB 2337 regulates commercial speech about proxy statements........................21

            b.   *Zauderer* applies. ......................................................................25

            c.   SB 2337 passes rational basis review under *Zauderer*. .................................. 29

            d.   SB 2337 passes intermediate review under *Central Hudson*. ..........................31

        3.   SB 2337 is not unconstitutionally vague...................................................31

    C.   Plaintiff cannot establish the additional requirements for a preliminary injunction ...........................................................................................35

D.  If the Court finds any portion of SB 2337 unconstitutional it must sever it out
    and enforce what remains. ..........................................................................................36

V.  Conclusion ..........................................................................................................................37

## II.    Background

In the 89th Legislative Session, the Texas Legislature passed Senate Bill 2337 ("SB2337" or the "Act"). The Act is a consumer-protection law "relating to the regulation of the provision of proxy advisory services." (Exhibit 1, SB 2337). It is designed to protect shareholders who pay proxy advisors for proxy advisory services. (*Id.*)

### A.  The proxy advisor market and ISS's duopoly with Glass, Lewis & Co.

In *National Association of Manufacturers v. United States Securities and Exchange Commission*, the Fifth Circuit gave a succinct summary of the proxy advisor market, the role Plaintiff, ISS, plays in it, and the need for regulation:

> Under state law, shareholders of public companies generally have the right to vote on issues of corporate governance during annual and special shareholder meetings. *See, e.g.*, Del. Code tit. 8, §§ 211, 212. Shareholders exercise their rights at these meetings by, for instance, electing directors and voting on proposals from shareholders or management that require shareholder approval. Most shareholders—including institutional investors like hedge funds and mutual funds—do not attend shareholder meetings in person. They instead vote by proxy. *See* Exemption from the Proxy Rules for Proxy Voting Advice, 85 Fed. Reg. 55,082, 55,082 (September 3, 2020) [hereinafter 2020 Rule].

> Institutional investors and investment advisers are highly active in today's financial markets. These entities own, in the case of institutional investors, or are given authority to vote, in the case of investment advisers, a significant number of shares in public companies (known in this context as "registrants"). As the SEC explained in 2020, institutional investors and investment advisers are accountable for "voting in potentially hundreds, if not thousands, of shareholder meetings and on thousands of proposals that are presented at these meetings each year, with the significant portion of those voting decisions concentrated in a period of a few months." *Id.* at 55,083. During this period, they often need assistance managing the voting process, which otherwise might be unmanageable.

> Proxy voting advice businesses, or proxy firms, provide such assistance. Proxy firms research matters subject to vote and advise clients how to vote on these matters, with the advice they provide often serving as "an important factor in their clients' proxy voting decisions." *Id.* Proxy firms may also provide clients administrative assistance in voting by, for example, enabling clients to vote through an electronic platform or by executing votes directly on their clients' behalf. *Id.*

With institutional investors and investment advisers relying so extensively on them, proxy firms "have become uniquely situated in today's market to influence, and in many cases directly execute, [their clients'] voting decisions." *Id*. As these firms have continued to grow in influence, however, certain concerns have emerged about their practices.  Notably, the proxy advice market is effectively a duopoly, because two firms, Institutional Shareholders Services (ISS) and Glass Lewis, control roughly 97% of the market. Investors, registrants, and others have questioned the accuracy of the information and the soundness of the advice that proxy firms provide in this duopolistic market, and they complain about the proxy firms' unwillingness to engage with issuers to correct errors. Attention has also been drawn to potential conflicts of interest arising from proxy firms' provision of consulting services to the same registrants about which they provide voting advice. *See id*. at 55,085.[1]

## B. Why SB 2337?

Proxy Advisory firms provide advice for hundreds or thousands of shareholder votes each year. SB 2337 § 1(2)(A). When Texas shareholders hire proxy advisory firms to provide advice, they expect that the advice given will be in their financial interest. *Id*. § 1(1). Proxy advisory firms, such as ISS, however, provide voting recommendations and other services that often prioritize non-financial goals, such as environmental, social, or governance goals, *id*. § 6A.101, and provide irreconcilably conflicting recommendations to different clients on the same company or shareholder proposals, both of which necessarily cannot be in the financial interest of the shareholders. *Id*. § 6A.102. They also issue corporate governance rating for public companies, use those corporate governance ratings

---

[1] *Nat'l Assoc. of Manufacturers v. U.S.* SEC, 105 F. 4th 802, 806-07 (5th Cir. 2024). The SEC originally undertook to address these concerns with the proxy advice market and increase transparency and accuracy in proxy voting advice as far back as 2010. After nearly ten years of study and collaboration with interested parties, the SEC published its first formal regulatory proposal in 2019. The 2019 proposed rule was intended to increase the reliability and accuracy of proxy advice by allowing registrants to identify and address inaccuracies in the advice before it was disseminated to clients. After criticism of the proposed rule, the SEC adopted the 2020 Rule, which was more modest than the 2019 Rule but with the same aims. The 2020 Rule never went into effect, however; the SEC rescinded it in 2021 just before it was to go into effect. The National Association of Manufacturers and Natural Gas Services Group ultimately sued the SEC in the Western District of Texas for rescinding it without sufficient notice. *See id*. at 808-09.

in formulating their voting recommendations for or against a company, and provide consulting ser-

vices to companies to assist in raising their corporate governance ratings. "Conflicts of interest

abound at every step." Exhibit 2, SB 2337, Bill Analysis.

Criticism of proxy advisors is at an all-time high as public companies grow increasingly frus-

trated with proxy advisors' lack of transparency and rampant conflicts of interest. Moreover, while

the SEC has attempted to, it has yet to adopt a rule regulating the proxy advice market resulting in

the market becoming the proverbial "Wild West" of the securities industry. *See Nat'l Assoc. of Mfrs.*,

105 F.4th at 808-10. During its last session, the Texas Legislature stepped into this vacuum, passing

SB 2337.  The stated purpose of the Act is to "prevent fraud and deceit by requiring proxy advisory

firms to make certain disclosures when their proxy advisory services are based on non-financial fac-

tors and/or are in conflict with other proxy advisory services relating to the same company or share-

holder proposal." *Id.*

## C.  When does SB 2337 apply?

SB 2337 regulates "proxy advisors," SB 2337 § 6A.001(3) when they provide "proxy advi-

sory services," id. § 6A.001(4), to Texas shareholders or other persons with authority to vote on

behalf of shareholders in Texas for compensation in connection with or in relation to (1) a domestic

publicly traded, for profit corporation, partnership, or other business entity with its principal place

of business in Texas, or (2) a foreign entity that has made a company proposal to become a domestic

entity. Id. § 6A.001(1).

## D.  What does SB 2337 require?

SB 2337 is designed to ensure that a proxy advisor's client clearly understands whether the

proxy advisor is making voting recommendations that are "solely in the financial interest of the

shareholders of [the] company." *See* SB 2337 § 6A.101(a). It does not restrict what a proxy advisor

can say to its client in any way. And it does not regulate a proxy advisor's advice or otherwise require the proxy advisor to make voting recommendations that are "solely in the financial interests of the shareholder of a company." It is designed to merely require "proxy advisors to provide clear, factual disclosures when the advisor[] recommend[s] casting a vote for nonfinancial reasons or provide[s] conflicting advice to multiple clients who [are] seek[ing] to maximize financial returns." SB 2337 § 1(4).

SB 2337 is divided into two distinct parts that require different disclosures under different conditions. Section 101 disclosures are triggered when a proxy advisor provides a service that is not provided solely in the financial interest of the shareholders of a company. Section 102 disclosures are triggered when a proxy advisor provides "materially different" advice or recommendations to different clients. Each is discussed below.

**1. When is a proxy advisory service "not provided solely in the financial interest of the shareholders of a company" and what disclosures are required for such service?**

Section 6A.101(a) defines when "a proxy advisory service is not provided solely in the financial interest of the shareholders of a company," and Section 6A.101(b) defines the disclosures a proxy advisor must make when it "provides a proxy advisory service that is not provided solely in the financial interest of the shareholders of a company," and to whom they must be made. In addition, while the Act lists ESG, DEI, and social credit as "nonfinancial factors," the consideration of which triggers disclosures, the Act takes no sides with respect to those items. This means that a "anti-ESG" proxy advisor who takes ESG in account in making its recommendations must make the same disclosures to the same persons as a "pro-ESG" proxy advisor who takes ESG into account in making its recommendations.

If a proxy advisor provides advice or a recommendation "not based solely on the financial interest of the shareholders of a company," § 6A.101(b) requires it to "include a disclosure to each shareholder or entity or other person acting on behalf of a shareholder receiving the service that (1) conspicuously states that the service is not being provided solely in the financial interest of the company's shareholders because it is based wholly or partly on one or more nonfinancial factors; and (2) explains, with particularity, the basis of the proxy advisor's advice…and that the advice subordinates the financial interest of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk to promote one or more nonfinancial factors." SB 2337 § 6A.101(b)(1)(A)-(B). The proxy advisor must provide this notice to the company that is the subject of the service[2] as well and publicly and conspicuously disclose on the front page of its website that the advisor's proxy advisory services include advice and recommendations that are not based solely on the financial interest of shareholders. *Id.* § 6A.101(b)(2)-(3). Notably, subsection (b) does not proscribe a particular from of disclosure and leaves it open to proxy advisor to decide exactly what to say.

**2.    When does a proxy advisor give materially different advice or make materially different voting recommendations to different clients and what disclosures are required?**

Section 6A.102(a) defines when a proxy advisor's advice or a recommendation on how to vote on a company or proxy proposal to one client is "materially different" from the proxy advisor's advice to a different client. Section 6A.102(b) defines the disclosures a proxy advisor must make

---

[2] The statute requires notice to the company because it "may have information regarding whether the proposal at issue is in the shareholder's financial interest or regarding the costs of the proposal, and notice would allow the company to provide relevant information to shareholders that may prevent fraudulent or deceptive practices associated with proxy advisors making recommendations for nonfinancial reasons." *See* Ex. 1.

when it offers "materially different" different advice or a recommendation on how to vote to different clients and to whom they must be made.

Under § 6A.102(b), if a proxy advisor provides to different clients who have not expressly requested services for a nonfinancial purpose either advice or a recommendation on how to vote on a proxy or company proposal that is materially different, the advisor must (1) comply with § 6A.101(b), if applicable, and (2) notify the following, in writing or electronic means, of the conflicting advice or recommendation: each shareholder receiving the conflicting advice or recommendation; each entity or other person receiving the conflicting advice or recommendation on behalf of the shareholder; the subject company; and the attorney general. *Id.* § 6A.102(b)(1)-(2). Once again, subsection 102(b) like 101(b) does not proscribe a particular form of disclosure and leaves it open to the proxy advisor to decide what to say.

### E.  What happens if a proxy advisor violates SB 2337?

Section 6A.201 makes any violation of SB 2337 in Texas a "deceptive trade practice" under Subchapter E, Chapter 17 of the Texas Business and Commerce Code—the Deceptive Trade Practices-Consumer Protection Act. A violation is actionable under Texas Business & Commerce Code § 17.47, which gives the Attorney General's consumer protection division the discretion to file suit for injunctive relief if it believes that proceedings would be in the public interest. In addition to injunctive relief, the consumer protection division may request a civil penalty of not more than $10,000.

Section 6A.202 allows an "affected party," defined as (1) the recipient of a proxy advisory service, (2) the company that is the subject of such services, or any (3) any shareholder of such a company to bring an action under Texas' Declaratory Judgment Act seeking declaratory or injunctive relief. The plaintiff in such an action must give the Attorney General notice of it within seven

(7) days of bringing the action. The statute gives the Attorney General express permission to intervene in the suit.

## III.    Standard of Review for Injunctive Relief

Injunctive relief is an extraordinary remedy; one that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). To obtain a preliminary injunction, an applicant for such relief must establish:

> (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.

*City of El Cenizo v. Tex.*, 890 F.3d 164, 176 (5th Cir. 2018) (citations omitted).

## IV.    Argument & Authorities

In its Motion Plaintiff claims to have a likelihood of success on the merits of its claims against Defendant that (1) SB 2337 violates its freedom of speech, (2) that it is void for vagueness, and (3) is preempted by ERISA. (*See* Dkt. 4 p. 7). This Response, therefore, will focus on these causes of action

### A. Plaintiff does not have a substantial likelihood of success on the merits of its claims because the Court lacks subject-matter jurisdiction

The Court should deny Plaintiff's Motion because it lacks jurisdiction over the claims asserted in its Motion. *First*, there is no case or controversy under Article III of the U.S. Constitution. Plaintiff lacks standing, and even if it had standing, its claims are not ripe. And *second*, even if Plaintiff had standing and its claims were ripe, sovereign immunity bars Plaintiff's claims and the *Ex parte Young* exception does not apply.

1. **There is no case or controversy.**

Article III of the U.S. Constitution limits the jurisdiction of federal courts to "cases" and "controversies."[3] *Nat'l Press Photographers Assoc. v. McGraw*, 90 F. 4th 770, 781 (5th Cir. 2024). "'The basic inquiry is whether the conflicting contentions of the parties present a real, substantial controversy between parties having adverse legal interests.'" *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). It is Plaintiff's burden to establish a justiciable case and controversy in this matter; however, Plaintiff does not present facts that establish one. Plaintiff lacks standing to bring its claims, and its claims are not ripe.

a. *Plaintiff lacks standing.*

Plaintiff bears the burden of establishing the three elements of standing. *Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023). It must allege (1) an injury in fact that is concrete, particularized, actual, and imminent (injury) that is (2) fairly traceable to Defendant's actions (traceability), and (3) likely to be redressed by a favorable judicial decision (redressability). *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). At this stage of the case, Plaintiff must make a "clear showing" that it has standing. *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017).

i. *Plaintiff has no evidence of an injury in fact for any of its claims*

Plaintiff seeks injunctive relief, so it must show "a continuing injury or threatened future injury." *Missouri v. Biden*, 83 F.4th 350, 366 (5th Cir. 2023). "[T]he threatened injury [must be]

---

[3] In *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, the U.S. Supreme Court noted that it has "often emphasized that, in our federal system, it is preferable that constitutional attacks on state statutes be raised defensively in state-court proceedings rather than in proceedings initiated in federal court." 471 U.S. 626, 638 n.8 (1985) (citing *Younger v. Harris*, 401 U.S. 37 (1971)). Indeed it is likely this has to do, at least in part, to the lack of an actual case or controversy in such preemptory challenges.

certainly impending, or there [must be] a substantial risk that the [injury] will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Injuries predicated "on a highly attenuated chain of possibilities" or that "require guesswork as to how…decisionmakers will exercise their judgment" are insufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Plaintiff lacks standing with respect to its non-freedom-of-speech claims because it cannot demonstrate an actual, concrete, imminent, and particularized harm for each claim. Indeed, "[t]he issue whether [SB 2337's] provisions are unlawfully vague in their proscriptions, or [are preempted] is…a mere hypothetical dispute lacking the concreteness and imminence required by Article III." *See McGraw*, 90 F. 4th at 782.

In *McGraw*, the Fifth Circuit reversed the trial court's ruling that plaintiffs had standing to assert a pre-enforcement Due Process claim for unconstitutional vagueness. It explained:

> Plaintiffs lack standing to bring their Due Process claims. They have never been arrested or prosecuted for violating Chapter 423. And the available evidence suggests that Defendants have never enforced Chapter 423 against Plaintiffs (or anybody else). The issue of whether [its]…provisions are unlawfully vague in their proscriptions is therefore a mere hypothetical dispute lacking the concreteness and imminence required by Article III. In the absence of any imminent or even credible threat of prosecution under Chapter 423, Plaintiffs lack standing to preemptively challenge Chapter 423 under the Due Process Clause.

> *Id.*

Here, as in McGraw, Plaintiff lacks standing to preemptively challenge SB 2337 as unconstitutionally vague. The Act has yet to take effect. There is, therefore, obviously no record of its enforcement. It is not a criminal statute and carries no criminal penalties for violation. It provides for only injunctive relief and an administrative penalty of up to $10,000 per violation. Determining whether Plaintiff would be subject to such an injunction or administrative penalty under SB 2337 is

an entirely speculative venture. The decision whether to enforce SB 2337 is at the complete discretion of the government. *See* Tex. Bus. & Comm. Code § 17.47. There is nothing in the Act requiring enforcement. *Id*. To file suit, the government must not only find that Plaintiff has violated SB 2337 but also that a lawsuit to enforce it is in the public's interest. *Id*. In other words, the government could determine that Plaintiff violated SB 2337 but decide not to bring suit because such a suit would not be in the public's best interest. In addition, the decision whether to impose an injunction and administrative penalty, including the amount of the penalty, is at the complete discretion of the factfinder in the case (judge or jury) and requires consideration of several statutory factors—it is by no means automatic. *Id*. This highly attenuated chain of events requiring guesswork as to how several decisionmakers will exercise their judgment is insufficient to establish a concrete and imminent injury necessary for standing. *Susan B. Anthony List*, 573 U.S. at 158.

In addition, Plaintiff has not identified any other potential harm that is concrete or imminent. (*See* Dkt. 4 p. 6). Plaintiff's non-freedom-of speech claims therefore, should be dismissed for this reason.

Plaintiff's First Amendment claim is another matter because the standing rules are relaxed for First Amendment claims. In the pre-enforcement context, a plaintiff has suffered an injury-in-fact if  (1) it intends to engage in a course of action arguably affected with a constitutional interest; (2) the course of action is arguably proscribed by the law at issue; and (3) there is a credible threat of prosecution for the course of action under the law at issue. *Susan B. Anthony List*, 573 U.S. at 159. Plaintiff must still also show traceability and redressability to have standing. *See McGraw*, 90 F.4th at 784-85.

*First*, nowhere in Plaintiff's Motion does it state that it plans to engage in a course of action that is proscribed by SB 2337 in some way. (*See generally* Dkt. 4) *See Empower Texans, Inc. v. Nodolf*, 306 F. Supp. 3d 961, 965 (W.D. Tex. 2018) ("Plaintiff does not meet the injury-in-fact requirement because Plaintiff does not demonstrate that its intended conduct is proscribed."). *Second*, Plaintiff has presented no specific evidence that its speech has *actually* been chilled in any way by SB 2337. *Cf. McGraw*, 90 F.4th at 783 (finding standing to assert First Amendment claim where plaintiffs provided evidence that the threat enforcement had *actually* chilled their speech).

And *third*, Plaintiff has not established that there is a credible threat of prosecution. *See Nodolf*, 306 F. Supp. 3d at 965 ("Plaintiff does not meet the injury-in-fact requirement because Plaintiff does not demonstrate that…a credible threat of prosecution exists."). Allegations of chilled speech or "self-censorship must arise from a fear of prosecution that is not 'imaginary or wholly speculative.'" *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006) (quoting *Babbitt v. UFW Nat'l Union*, 442 U.S. 289 (1979)). As discussed above, however, SB 2337 has yet to go into effect, and even when it does the potential for enforcement is highly attenuated at best and requires the Court to look into the proverbial "crystal ball" or otherwise guess as to how a number of different players will exercise their judgment. *See Clapper*, 568 U.S. at 409. The only evidence of enforcement is compelling evidence to the contrary, *that enforcement is not imminent*. Plaintiff, therefore, lacks standing to assert a First Amendment violation under 42 U.S.C. § 1983.

ii.    *Plaintiff has no evidence of traceability and redressability*

To establish traceability, Plaintiff must show "a causal connection between the [alleged] injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of…some third party not before the court." *Lujan*, 504 U.S. at 560. Plaintiff must plead facts linking an injury for each of its claims back to the Attorney General.

It has not done so, (*see* Dkt. 4 p. 6). Nor has Plaintiff pled any facts that any alleged injury for each of its claims could be redressed through a favorable decision in this case. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). In sum, Plaintiff lacks standing to assert any of its claims in this case, and, therefore, it does not have a likelihood of success in establishing them.

### b. Plaintiff's claims are not ripe.

Plaintiff's claims are presently unripe for consideration. A claim is ripe, i.e., "fit for judicial decision," if it presents a pure legal question requiring no further factual development. *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586-87 (5th Cir. 1987). If a claim is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all," the claim is unripe. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (citation omitted). Once again, SB 2337 has yet to even go into effect. Plaintiff has not alleged any facts suggesting that it has changed any planned course of action or that the looming prospect of SB 2337 going into effect has had any effect on it or will have any effect on it. As discussed above, Plaintiff has yet to suffer any injury for *any* of its claims, and Plaintiff's theories of harm are entirely "contingent [on] future events that may not occur as anticipated or indeed may not occur at all." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985). Nothing has happened—quite literally—and until something does, the Court need not entertain Plaintiff's so-called "claims."

### 2. Defendant is entitled to sovereign immunity.

The Eleventh Amendment deprives a federal court of jurisdiction to hear a suit against the State of Texas, regardless of the relief sought, unless the State or Congress expressly waives sovereign immunity under the Amendment. *Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-02 (1984). A suit against a state official in their official capacity is a suit against the state. *Will v. Mich.*

*Dep't of St. Police*, 491 U.S. 58, 71 (1989). Thus, sovereign immunity bars Plaintiff's claims in this case unless an exception applies for each claim. *See McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citation omitted).

Plaintiff argues that the *Ex parte Young* exception to sovereign immunity applies. 209 U.S. 123, 157 (1908). (Dkt. 4 p. 6). Under the exception, when a plaintiff "seeks prospective, injunctive relief from a state actor, in [their] official capacity, based on an ongoing violation of the federal constitution." *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013). Plaintiff cannot sustain its burden to show the Ex parte Young exception applies for several reasons.

*First*, *Young* requires a higher showing of enforcement than Plaintiff has proffered. Under *Young*, "[t]he officer sued must have 'some connection with the enforcement of the [challenged] act." *Lewis v. Scott*, 28 F.4th 659, 663 (5th Cir. 2022) (citing *Ex Parte Young*, 209 U.S. 123, 157 (1908)). To have the requisite connection to enforcement, an official must have more than "the general duty to see that the laws of the state are implemented." *City of Austin v. Paxton*, 943 F.3d 993, 999-1000 (5th Cir. 2019). Rather, the official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020). "If the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." *Tex. All for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022). The "Article III standing analysis and Ex parte Young analysis 'significant[ly] overlap.'" *City of Austin*, 943 F.3d at 1002 (citation omitted). "'[A]t the point that a threatened injury becomes sufficiently imminent and particularized to confer…standing, that threat of enforcement also becomes sufficient to satisfy [the connection to the enforcement] element of Ex parte Young.'" *Id*. at 1003 (citation omitted). Plaintiff's Complaint does

allege facts sufficient to establish such a threat, and *Ex parte Young* does not apply for the same reasons Plaintiff lacks standing—namely, because Plaintiff has not alleged an injury-in-fact.

*Second*, even if the Attorney General is the proper defendant in this case, *Young* is still not applicable because there is no ongoing violation of federal law. For *Young* to apply, "a complaint must allege that the defendant is violating federal law," not that the defendant may do so in the future. *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015). Plaintiffs plead no facts indicating that SB 2337 has chilled its speech in any way or that the Attorney General is somehow actively violating any of Plaintiff's rights. Indeed, it is impossible that any of Plaintiff's rights could be implicated in this case because SB 2337 has not even taken effect.

*Third*, and finally, Plaintiff requests impermissible injunctive relief under *Ex parte Young* to prevent SB 2337's enforcement. In *Young*, the Court stated that "[t]here is no doubt that the court cannot control the exercise of the discretion of an officer." 209 U.S. at 158. As discussed above, enforcement of SB 2337 is completely discretionary. Any injunction preventing the Attorney General from enforcing SB 2337 is, therefore, an attempt to control the Attorney General in the exercise of his discretion, which violates sovereign immunity under *Young*. *See Ex parte Young*, 209 U.S. at 158; *see also Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 241-42 (5th Cir. 2020). Consequently, sovereign immunity bars Plaintiff's request for an injunction preventing enforcement of SB 2337.

## B. Lack of Jurisdiction aside, Plaintiff is unlikely to succeed on the merits of his claims.

### 1. ERISA does not preempt SB 2337

In its Motion, Plaintiff argues that ERISA preempts SB 2337 because (1) it regulates what fiduciaries must consider, and (2) it governs a central matter of plan administration and disrupts nationally uniform administration. (Dkt. 4 p. 18). Neither is the case.

*First*, SB 2337 does not regulate what fiduciaries can (or must) consider. ERISA fiduciaries are not required to consider ESG factors. See 29 C.F.R. § 2550.404a-1(b)(4) ("Risk and return factors may include the economic effects of climate change and other environmental, social, or governance factors on the particular investment or investment course of action.") [emphasis added]. So, the statute does not modify or restrict ERISA fiduciary actions because its disclosure requirements apply only to proxy advisory firms.

Plaintiff argues that SB 2337 restricts what an ERISA fiduciary must consider and relies on a regulation explicitly stating that an ERISA fiduciary must independently determine if following the recommendations of a proxy advisory firm is consistent with the ERISA fiduciary's obligations. "A fiduciary may not 'follow[] the recommendations of a proxy advisory firm . . . without a determination that such firm['s] . . . proxy voting guidelines are consistent with the fiduciary's obligations.'" (quoting 29 C.F.R. § 2550.404a- 1(d)(2)(iii)). (Dkt. 4 p. 20).

SB 2337 does not restrict, compel, or otherwise interfere with an ERISA fiduciary's duty to evaluate a proxy advisory firm's recommendation. The statute's only concern with ERISA fiduciary obligations is to provide fiduciaries with additional context they can use (or not use) to inform their independent assessment of a proxy advisory firm's recommendations. Glass Lewis incorrectly states that it must "evaluate relevant facts and 'risk and return' factors, including ESG." *See* 29 C.F.R. § 2550.404a-1. SB 2337 allows proxy advisory firms to make recommendations based on ESG subject to disclosure obligation if they do so. Further, nothing in the statute prohibits proxy advisory firms from signing certifications they have considered relevant facts to show compliance with ERISA.

*Second*, SB 2337 does not govern a central matter of plan administration or disrupt national uniform administration. "Crucially, not every state law that affects an ERISA plan or causes some

disuniformity in plan administration has an impermissible connection with an ERISA plan." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 87 (2020). After all, "all state laws create some potential for lack of uniformity." *Egelhoff v. Egelhoff*, 532 U.S. 141, 150 (2001). If any disuniformity were enough for ERISA preemption, "then for all practical purposes pre-emption would never run its course." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016) (cleaned up).

Instead, ERISA is "primarily concerned with pre-empting laws that require providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits or by binding plan administrators to specific rules for determining beneficiary status." *Rutledge*, 592 U.S. at 86–87. So ERISA "does not pre-empt state rate regulations that merely increase costs or alter incentives for ERISA plans without forcing plans to adopt any particular scheme of substantive coverage." *Id.* at 88. And it does not preempt laws "operating as an indirect source of merely economic influence on administrative decisions." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 662 (1995).

SB 2337 does not force plans to invest in any particular way or even affect how they can vote on proxy matters. It "does not bind ERISA plans to anything" at all. *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 328 (1997). And ERISA does not, of course, require plan administrators to rely on proxy advisors. It requires the administrators themselves to manage plans prudently. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 416 (2014). Department of Labor regulations add that prudent plan management includes proxy voting that is "solely in accordance with the economic interest of the plan and its participants and beneficiaries." 29 C.F.R. § 2550.404a 1(d)(2)(ii)(A). They then forbid relying on proxy advisors unless the plan

fiduciary determines that the advisor's voting guidelines are consistent with the fiduciary's obliga-

tions—they certainly do not require, or even recommend, that ERISA fiduciaries rely on proxy ad-

visors. Id. § 2550.404a-1(d)(2)(iii). So SB 2337 does not govern a central matter of plan administra-

tion or interfere with nationally uniformity.

*Finally*, SB 2337 creates no obligation for ERISA fiduciaries to take any specific action (or

inaction) with respect to any recommendation or required disclosure. The statute does not "ex-

pose" fiduciaries to lawsuits, nor does it require the production of misleading facts or inappropriate

factors. Here, Glass Lewis relies on inapposite authority. *Sec. Indus. & Fin. Markets Ass'n v. Ashcroft*,

745 F. Supp. 3d 783 (W.D. Mo. 2024). The Missouri rule in *Ashcroft* directly regulated broker-deal-

ers and investment advisors who, indeed, are ERISA fiduciaries. *Id.* at 790–92. Proxy advisory firms

are not. Because the statute does not regulate ERISA fiduciaries, the holding in *Ashcroft* does not

apply.

For these reasons Plaintiff does not have a likelihood of success on its ERISA preemption

claim.

### 2. SB 2337 does not violate the First Amendment.

#### a. *SB 2337 regulates commercial speech about proxy statements.*

In this pre-enforcement challenge, Plaintiff alleges that SB 2337 warrants strict scrutiny re-

view in accordance with *303 Creative v. Elenis*, 600 U.S. 570, 603 (2023) (statute requiring web site

designer to create web sites for homosexual couples getting married) and *Nat'l Inst. of Fam. & Life

Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (statute regulating speech about abortion). The speech

at issue in this case, however, is not the same type of political speech implicated in those two cases.

SB 2337 regulates commercial speech related to proxy statements, and as discussed further, is af-

forded the <u>least</u> protection by the law. *See, e.g., Ohralik v. Ohio Bar Assoc.*, 436 U.S. 447, 456 (1978)

("Numerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about…corporate proxy statements."); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 n.5 (1985) (distinguishing the regulatory disclosure requirements involving "the exchange of information about…corporate proxy statements" upheld in the U.S. Supreme Court in *Ohralik* from "similar regulation of political speech [that] is subject to the most rigorous scrutiny.").

Indeed, courts have long recognized that "regulation of the exchange of information regarding securities is subject only to limited First Amendment scrutiny." *SEC v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988). "Speech relating to…securities…forms a distinct category of communications in which the government's power to regulate is at least as broad as with respect to the general rubric of commercial speech." *Id*; *see Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 64 (1973); *Ohralik*, 436 U.S. at 456; *Dun & Bradstreet, Inc.*, 472 U.S. at 758 n.5; *see also S.E.C. v. AT&T, Inc.*, 626 F. Supp. 3d 703, 743 (S.D.N.Y. 2022) (Indeed, "[i]f speech employed directly or indirectly [concerning] securities were totally protected, any regulation of the securities market would be infeasible—and that result has long been rejected.")

The commercial speech at issue in this case "merits only a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, allowing modes of regulation that might be impermissible in the realm of noncommercial expression." *Pub. Citizen Inc. v. La. Att'y Disciplinary Bd.*, 632 F.3d 212, 217-18 (5th Cir. 2011) (cleaned up); *Centr. Hudson Gas & Elect. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 562-63 (1980) ("The Constitution…accords a lesser protection to commercial speech than to other constitutionally guaranteed

expression."). As the Fifth Circuit has explained, "unlike other areas of First Amendment protection, the commercial speech doctrine is concerned primarily with the level and quality of information reaching the listener." *Dunagin v. City of Oxford*, 718 F.2d 738, 752 (5th Cir. 1983).

Plaintiff asserts that SB 2337 is impermissibly content- and viewpoint-based, warranting strict scrutiny. (Dkt. 4 p. 7-8). Defendant denies this, but the Court need not decide this issue. Even if it is content-based, as speech related to securities, it would still not warrant strict or even intermediate scrutiny. The court in *Securities and Exchange Commission v. AT&T, Inc.* explained:

> Defendants' suggestion that all content-based regulations must satisfy strict scrutiny overlooks the significant body of decisions involving laws and regulations mandating affirmative disclosures of information, particularly for…participants in the securities industry. These disclosure provisions are explicitly content based. They require the disclosure of certain content…and do not require the disclosure of others. Yet these have routinely withstood First Amendment challenges without any suggestion that strict, or even intermediate, scrutiny applied. As the District of Columbia Circuit has recognized, "Speech relating to…securities forms a distinct category of communications." (citation omitted). "If [such] speech…were totally protected, any regulation of the securities market would be infeasible—and that result has long since been rejected." (citation omitted).

> *SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 743 (S.D.N.Y. 2022) (quoting *S.E.C. v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988).

The court went on to reject the idea that the speech at issue—compelled disclosures of nonpublic information by securities issuers—was, technically speaking, commercial speech and lumped it in broadly with "information about securities" and "corporate proxy statements," nevertheless warranting the lowest-level of rational basis review. *Id.* at 744. Thus, whether the speech SB 2337 regulates is commercial speech, information about corporate proxy statements, or commercial speech about proxy statements, it warrants only rational basis review.

Plaintiff also complains about SB 2337 because it compels speech as opposed to restricting it and requires Plaintiff to speak when Plaintiff would otherwise choose to be silent. (Dkt. 4 p. 8-10).

According to Plaintiff this means the Act requires stricter scrutiny. (*Id.*) This is surprising because the law states the opposite. Indeed, there are "material differences between disclosure requirements and outright prohibitions on speech;" and the former warrant lesser scrutiny than the latter. *Zauderer v. Office of Disciplinary Counsel of Supreme Ct. of Ohio*, 471 U.S. 626, 650 (1985); *see Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796 n.9 (1988) (observing, in reference to securities regulations, that "[p]urely commercial speech is more susceptible to compelled disclosure requirements"). In *Zauderer*, for example, the court stated clearly that "the First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed." *Id.* at 651 n.14.

Plaintiff erroneously argues that SB 2337 does not target commercial speech, because commercial speech "'does no more than propose a commercial transaction.'" (Dkt. 4 p. 12). But transactional proposals merely represent *one* type of commercial speech, which the U.S. Supreme Court has defined more broadly as encompassing "expression related solely to the economic interests of the speaker and its audience." *Central Hudson*, 447 U.S. at 561 (1980); *White Buffalo Ventures, LLC v. University of Texas at Austin*, 420 F.3d 366, 374 (5th Cir. 2005) (same); *Houston Balloons & Promotions, LLC v. City of Houston*, 589 F. Supp. 2d 834, 847 (S.D. Tex. 2008). As discussed above, "the exchange of information about…corporate proxy statements" is subject to regulation as commercial speech. *Ohralik*, 436 U.S. at 456; *see also United States v. Wenger*, 427 F.3d 840, 848 (10th Cir. 2005) (non-transactional securities disclosures are commercial speech);

Disclosure requirements such as those in SB 2337 are commonplace in the securities industry, and routinely upheld. *See e.g., SEC v. City of Rochester*, *N.Y.*, 731 F. Supp. 3d 455, 473 (W.D.N.Y. 2024) (upholding SEC rule requiring municipal advisors to disclose material conflicts of interest

arising out of contingency fee arrangements.) For example, in *Chamber of Commerce of the U.S. v. U.S. SEC*, the Fifth Circuit rejected a First Amendment challenge to an SEC rule requiring companies to "report day-to-day share repurchase data once a quarter and to disclose the reason why the issuer repurchased shares of its own stock." 85 F.4th 760, 766 (5th Cir. 2023). And year after year, companies file an array reports and other disclosures that the SEC has mandated since the 1930s. *See, e.g.*, 15 U.S.C. §§ 77aa, 78l; *see also Macquarie Infrastructure Corp. v. Moab Partners, LP*, 601 U.S. 257, 260 (2024). Large chunks of the Code of Federal Regulations are dedicated to the precise form and content those mandatory disclosures must take. *See* 17 C.F.R. pt. 210. Those settled requirements show a long "history and tradition" that supports mandatory commercial disclosures in the securities industry. *Vidal v. Elster*, 602 U.S. 286, 301 (2024); *see also CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 442 (2024) (Kagan, J., concurring, joined by Sotomayor, Kavanaugh, & Barrett, JJ.).

Finally, Plaintiff complains that SB 2337 is under-inclusive. (Dkt. 4 p. 11). This criticism, however, misses the mark: in the commercial speech context, governments are entitled to attack problems piecemeal." *Zauderer*, 471 U.S. at 651 n.14. It also complains that SB 2337 is "over-inclusive. (Dkt. 4 p. 11). This criticism, however, is similarly irrelevant "because the overbreadth doctrine does not apply to commercial speech." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496-97 (1982) (citing *Central Hudson*, 477 U.S. at 565 n.8).

### *b.* **Zauderer** *applies.*

Plaintiff argues that *Zauderer* does not apply because SB 2337 is not limited to purely factual and uncontroversial information but, rather, requires it to utter false statements. (Dkt. 4 p. 14). This is simply wrong. *First*, in the Fifth Circuit "forcing a company to 'explain the reason' for its actions is a purely factual disclosure'" under *Zauderer*. *See Chamber of Commerce*, 85 F.4th at 769 (citation

omitted). *Second*, "'[a] factual disclosure does not reflect an opinion merely because it compels a speaker to convey information contrary to its interests.'" *City of Rochester*, 731 F. Supp. 3d at 473 (quoting *Grocery Mfrs. Ass'n*, 102 F. Supp. 3d 583, 625 (D. Vt. 2015)). *Third*, and *finally*, "[d]isclosure rules requiring speakers to disclose facts with which the speakers *disagree* are consistently found *not* to offend the First Amendment." *City of Rochester, N.Y.*, 731 F. Supp. 3d at 473. (collecting cases) (emphasis added). That is why, for example, the government can compel cigarette manufacturers to include graphic warnings condemning their own products on every cigarette package. *RJ Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 882 (5th Cir. 2024). Companies would, presumably, prefer not to tell every customer that considers purchasing their products that the product can lead to amputation, erectile dysfunction, and neck cancer. *Id*. at 872. But the First Amendment does not give them a right to conceal that information from customers. *Id*. at 887.

In *City of Rochester*, the court rejected arguments identical to Plaintiff's. There, municipal advisors brought a First Amendment challenge to an SEC rule requiring them to characterize their contingent fee arrangements as conflicts of interest in disclosures to their municipal clients. 731 F. Supp. 3d at 469. The advisors resisted review under *Zauderer* arguing that the disclosure requirements were neither "factual" because none of the advisors' contingent fee arrangements ever created an actual conflict of interest. *Id*. at 472. Finding that the rule passed constitutional muster under *Zauderer*, the court rejected the advisors' arguments because the SEC rule did not mandate a particular disclosure. *Id*. And notably, "[i]t did not place[ ]…limitations on what municipal advisors [could] say in defense of [their] arrangements." *Id*.

Similarly, here, the disclosures under SB 2337 are purely factual and uncontroversial. Like the required disclosures in *City of Rochester*, SB 2337 does not mandate the form for the disclosures

or limit what Plaintiff can say in defense of its advice. Indeed, if Plaintiff would like, it can qualify its disclosures by letting the recipients know the State of Texas compels them. Disclosures under § 6A.101(b)(1)(B) effectively mirror the disclosure upheld by the Fifth Circuit in *Chamber of Commerce*: proxy advisors must "explain[], with particularity, the basis of the proxy advisor's advice concerning each recommendation." SB 2337 § 6A.101(b)(1)(B). Similarly, the mandate that, when providing notice of conflicting advice, a company identify which recommendation, if any, is "supported by any specific financial analysis performed or relied on by the advisor" simply requires a company to explain its decisionmaking process. *Id*. § 6A102.(b)(3)(B). Again, requiring a company to explain its actions is perfectly constitutional. *Chamber of Commerce*, 85 F.4th at 769; *NetChoice*, 49 F.4th at 487. Other required disclosures simply require the proxy advisor to notify certain persons that the advisor provided "conflicting advice or recommendation[s]" to different shareholders. *Id*. § 6A.102(b)(2). That notice is, of course, purely factual and uncontroversial—it is a simple statement that a proxy advisor made different recommendations about the same proposal or disagreed with management about a proposal.

SB 2337 requires, for example, that a proxy advisor that bases its advice on diversity, equity, and inclusion provide, alongside its DEI-based recommendation, a disclosure that its service "is not being provided solely in the financial interest of the company's shareholders because it is based wholly or partly on one or more nonfinancial factors." *Id*. § 6A.101(b)(1)(A) (emphasis added); *see also* § 6A.102(b)(3)(A). That is a statement of fact that simply describes the basis for the advisor's recommendation—it considered, for example, the advisor's view that boards should be racially balanced in addition to any possible financial effects. Recipients of proxy advice have a right to know

if an advisor is shaping their votes based on the advisor's support for the "sordid business" of "divvying us up by race." *LULAC v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, J., concurring in part and dissenting in part).

In addition, the law applies equally. If a self-styled "anti-ESG" firm recommends against a proposal that is "pro-ESG," based wholly or partly on or taking into account its "anti-ESG" stance, there is nothing in SB 2337 that would allow the firm to escape the Act's disclosure requirements. SB 2337 § 6A.101(a)(1)(A)-(C) states "[A] proxy service is not provided solely in the financial interest of the shareholders…if the service is wholly or partly based on, or otherwise takes into account…an…(ESG) goal, factor [etc.]…" Section 6A.101(b)(1)(A)-(B) states "[i]f a proxy advisor provides a proxy advisory service that is not provided solely in the financial interest of the shareholders…the advisor shall…include a disclosure to each shareholder…receiving the service that…conspicuously states…[etc.]" Nothing relieves the proxy advisor from making its disclosure if takes a particular stance on ESG, DEI, etc.; thus, Plaintiff has no basis to argue that SB 2337 promotes Texas' preferred message.

In sum, the disclosures under SB 2337 are uncontroversial. They are "non-ideological" in nature, *Nat'l Ass'n of Mfrs. ("NAM") v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015), and do not force Plaintiff to take "sides in a heated political controversy," *The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019), or speak a "preferred message." *City of Rochester, N.Y.*, 731 F. Supp. 3d at 473. Moreover, by allowing proxy advisors to make the disclosures in their own words, rather than requiring them to use government-mandated language, the Act gives them the flexibility to tailor the disclosures to their "individual circumstances." *Milavetz, Gallop & Milavetz, P.A. v. United*

*States*, 559 U.S. 229, 252, (2010). Thus, nothing in the SB 2337 requires false or controversial speech within the meaning of *Zauderer*. *Id.*

### c. *SB 2337 passes rational basis review under* **Zauderer.**

Under *Zauderer*, a required disclosure does not violate the First Amendment if it is "reasonably related to a legitimate state interest" and not "unjustified or unduly burdensome" in a way that "chill[s] protected commercial speech." *NetChoice*, *L.L.C. v. Paxton*, 49 F.4th 439, 485 (5th Cir. 2022); *Zauderer,* 471 U.S. at 651. This test is animated by the principle that required disclosure in the commercial context "furthers, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the 'marketplace of ideas.'" *N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114, 132 (2d Cir. 2009). SB 2337 satisfies this standard.

The disclosure requirements in SB 2337 are reasonably related to the State's interest. Texas has a legitimate state interest in broadly protecting consumers from fraud and deception. *See Ohralik*, 436 U.S. at 460 (state clearly has an interest in consumer protection); *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 167 (5th Cir. 2007) ("The State…[has] successfully asserted a legitimate interest in consumer protection."); *RJ Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 883 (5th Cir. 2024) ("[A]nti-deception is a legitimate state interest."). More specifically, Texas has a legitimate interest in insuring participants in the proxy services market are fully informed as to potential conflicts and the economic rationale behind the advice they receive so they can make the best possible decisions about how to vote. *See City of Rochester*, 731 F. Supp. 3d at 473-74. (disclosure requirement reasonably related to legitimate interest in "insuring participants in the municipal securities market are fully informed as to potential conflicts so as to make the best possible decisions."). SB 2337's provisions requiring advisors to notify a company's management when their recommendations conflict ensure

that shareholders can receive both perspectives, and that management can correct the frequent mistakes proxy advisors make. *See Chamber of Commerce*, 85 F.4th at 771 (the government "has a legitimate interest in promoting the free flow of commercial information").

SB 2337 is designed to remedy deception in the proxy services market by imposing disclosure obligations on proxy advisors to provide investors with the financial rationale for voting advice. SB 2337, therefore, seeks to tie proxy advice to shareholder value by requiring proxy advisors to support their recommendations. SB 2337 also helps clarify conflicting recommendations to different clients on the same company or shareholder proposals, both of which necessarily cannot be in the financial interest of the shareholders. SB 2337, Bill Analysis; SB 2337 § 1.

None of the required disclosures under SB 2337 are unduly burdensome. Contrary to Plaintiff's focus on purported financial and other business costs related to complying with SB 2337, the *Zauderer* analysis does not concern "economic[] or operations burdens" that disclosure requirements might impose; the question is instead whether requirements "unduly burden (or chill) protected speech and thereby intrude on an entity's First Amendment speech rights," *NetChoice*, 49 F.4th at 486 (cleaned up), or otherwise "drowns out their message." *Chamber of Commerce*, 85 4th at 772. Here, Plaintiff is free to craft its disclosures however it likes and make clear that the views in its disclosures belong to the state of Texas. Additionally, Plaintiff is free to tell its clients that it is merely doing what the clients have asked of it and has considered nonfinancial factors at the client's direction or demonstrate that voting based on nonfinancial factors is in the best financial interests of the client. *See City of Rochester*, 731 F. Supp. 3d at 474. ("[T]he regulation [does not] unduly burden speech…[plaintiff] is free to make clear that the views belong to [defendant], and to tell its clients why, in its view the contingency nature of the arrangement 'will not impact their advice or otherwise

harm their clients.'"). Ultimately, the state need not select the "least restrictive means" to address a problem but rather must only take an approach that is "reasonably related" to it. *Zauderer*, 471 U.S. at 651 n.14.

### d. *SB 2337 passes intermediate review under* Central Hudson.

Even if *Zauderer* did not apply, "commercial speech enjoys lesser, intermediate-scrutiny constitutional protection" under the "framework established in *Central Hudson*." *RTM Media L.L.C. v. City of Houston*, 584 F.3d 220, 224 (5th Cir. 2009). Contrary to Plaintiff's claim, where a commercial disclosure requirement "does not fall within … *Zauderer* … Central Hudson* is the appropriate standard." *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1217 (D.C. Cir. 2012), *rev'd in part on other grounds*, *Am. Meat Inst. v. Dep't of Agric*, 760 F.3d 18, 23 (D.C. Cir. 2014); *see also Zauderer*, 471 U.S. at 637 ("*Central Hudson*" applies to "[w]hatever else the category of commercial speech may encompass").

In *Central Hudson*, the Court held that a restriction on commercial speech is permissible if it "directly advances" a "substantial" governmental interest and is "not more extensive than is necessary to serve that interest." 447 U.S. at 566. This standard does not require that a restriction be the "single best disposition" or "least restrictive means" of achieving that end but rather requires a "fit" between the "ends and the means" that is "reasonable" and "in proportion to the interest served." *Board of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989). For the reasons already discussed above, SB 2337 passes scrutiny under this standard.

### 3. SB 2337 is not unconstitutionally vague.

Plaintiff claims that SB 2337 violates its right to Due Process because it too vague. (Dkt. 4 p. 14). Under the void-for-vagueness doctrine, a law is unconstitutional if it fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or

encourages seriously discriminatory enforcement." *FCC v. Fox Tel. Stations, Inc.*, 567 U.S. 239, 253 (2012).

An economic regulation like SB 2337 is void for vagueness "only if it commands compliance in terms 'so vague and indefinite as really to be no rule or standard at all' ... or if it is 'substantially incomprehensible.'" *United States v. Clinical Leasing Service, Inc.*, 925 F.2d 120, 122 n. 2 (5th Cir.1991) (quoting *A.B. Small Co. v. American Sugar Refining Co.*, 267 U.S. 233, 239 (1925)). The U.S. Supreme Court has cautioned:

> The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action .... The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982).

Here, SB 2337 is precisely the type of economic regulation carrying civil penalties that the Supreme Court cautioned is "subject to a less strict vagueness test." *Id.*; *see also Papachristou v. City of Jacksonville*, 405 U.S. 156, 163 (1972) ("In the field of regulatory statutes governing business activities…greater leeway is allowed).

Plaintiff claims that SB 2337 is vague on what its obligations entail. (Dkt. 4 p. 15-16). Respecting the conduct proscribed, the law only requires that the state give Plaintiff "a reasonable degree" of certainty. *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552-53 (5th Cir. 2008). "[P]erfect clarity and precise guidance have never been required." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

Nevertheless, SB 2337 is sufficiently clear on what it requires. It is not lengthy, and it defines multiple key terms and phrases that are used throughout the statute. *See, e.g.,* SB 2337 §§ 6A.001, 101(a), 101(c), 102(a). Indeed, Plaintiff's Complaint belies credulity. Plaintiff claims not to understand what "ESG," "governance," "DEI," "nonfinancial"[4] and "solely" mean. A person of common intelligence would not need to guess as to what these terms mean, and they are readily understood—even if undefined—based on their plain and common meaning. *See Portee v. Morath*, 683 F. Supp. 3d 628, 634 (W.D. Tex. 2023).[5]  Indeed, courts are routinely called upon to determine and can easily determine what these terms mean when undefined. *See e.g., Theriot v. Mundy Cos*., No. 4:15-CV2481, 2017 WL 274812, at *4 (S.D. Tex. Jan. 20, 2017) ("This Court previously defined the word 'solely' to mean 'without another' and 'to the exclusion of all else.'"); *Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2004) ("Language may satisfy the conspicuousness requirement by appearing in large type, contrasting colors, or otherwise calling attention to itself."); *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 844 (Tex. 2018) (analyzing the meaning of the term "only")

Plaintiff's reliance on *Ashcroft* is once again misplaced. The *Ashcroft* court found that the Missouri regulation at issue was impermissibly vague. *Ashcroft*, 754 F.Supp.3d at 800-801. This was not because of the word "nonfinancial," however. The court took issue with Missouri's lack of explanation regarding what could trigger the statute's disclosure and consent obligations. Specifically,

---

[4] If Plaintiff understands what "financial" means (which, it should), it would—by necessity—understand its negation, "nonfinancial."

[5] When compared the subjective and vague terms that courts have struck down, SB 2337 is a model of clarity. *See United States v. Williams*, 553 U.S. 285, 304 (2008) (noting the court has "struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meaning); *see also Papachristou v. Jacksonville*, 405 U.S. 156, n. 1, (1972) (striking city ordinances referring to "vagrants," defined to include "[r]ogues and vagabonds," "persons who use juggling," and "common night walkers," as unconstitutionally vague).

the terms "nonfinancial objective" or "consider" did not provide proper notice as to how and under what circumstances an advisor could run afoul of the statute. *Ashcroft*, 754 F.Supp.3d at 801. SB 2337, however, is explicit when it comes to understanding how and when the disclosure obligations kick in.

Plaintiff quarrels with the meaning of "financial interest," but it is a common statutory term susceptible to a plain meaning interpretation. In fact, "financial interest" can be found in hundreds of Texas statutes with no issue. *See* Tex. Bus. & Org. Code § 200.317 ("This section applies to a contract or transaction between a real estate investment trust and . . . an entity or other organization in which one or more trust managers or officers, or one or more affiliates or associates of one or more directors or officers of the trust . . . has a financial interest); Tex. Util. Code Ann. § 39.1512(a) (requiring public disclosure when a member of a governing body has a "substantial financial interest" in a person who has a direct interest in a matter before the governing body); Tex. Gov't Code Ann. § 321.007 ("The State Auditor may not have a financial interest in the transactions of any department"); Tex. Gov't Code Ann. § 2165.354 (the commission shall . . . "determine if the proposal is in the best long-term financial interest of the state").

Though Plaintiff claims that SB 2337 is so vague that it would allow the Attorney General to "arbitrarily discriminate in his enforcement," it never explains how. (*See* Dkt. 4 p. 17). There is nothing in its statutory language that permits selective law enforcement, but if there was, the Court should not "assume that the [Government] will take no further steps to minimize the dangers of arbitrary enforcement." *Vill. of Hoffman Ests.*, 455 U.S. at 504.

**C.  Plaintiff cannot establish the additional requirements for a preliminary injunction**

Setting aside the likelihood of success on the merits, Plaintiff must also establish that (1) absent an injunction it would suffer irreparable harm, and (2) that given the balance of harms, an injunction serves the public interest. *Alliance for Hippocratic Medicine*, 78 F.4th at 251.

Plaintiff will not suffer irreparable harm absent an injunction. For the reasons discussed above, relative to Plaintiff's constitutional claims, Plaintiff will not suffer deprivation of any constitutional right if the Court denies Plaintiff's Motion. Nor would it suffer any irreparable harm of nonrecoverable compliance costs. *See Book People Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024). Moreover, as also discussed above, Plaintiff has not shown that any harm—economic or otherwise—is imminent or not speculative. *Terex Corp. v. Cubex Ltd.*, No. 3:06-CV-1639-G, 2006 WL 3542706, at *9 (N.D. Tex. Dec. 7, 2006).

Plaintiff complains that it *may* lose customers. "While courts are willing to entertain a loss of customers or goodwill as a harm, the movant must come forward with evidence that such an injury is irreparable by showing that the loss cannot be measured in money damages." *Brink's Inc. v. Patrick*, No. 3:14-CV-775-B, 2014 WL 2931824, at *6 (N.D. Tex. June 27, 2014) (Boyle, J.) (citation omitted). As discussed above, Plaintiff offers nothing more than perfunctory complaints about SB 2337's specificity and then speculates about arbitrary enforcement and lost customers. This is not enough.

Finally, an injunction would not be in the public's interest. The third and fourth factors for injunctive relief require the Court to weigh the harms and public interest in deciding Plaintiff's Motion. These two factors merge when the government is the party opposing an injunction, so the Court should consider them together. *Smith v. U.S. Dep't of the Treasury*, 761 F. Supp. 3d 952, 973

(E.D. Tex. 2025). As already discussed, Plaintiff will not suffer harm absent an injunction. The government, on the other hand, always suffers irreparable harm when an enacted law is enjoined. *Texas All. for Retired Americans v. Hughs*, 976 F.3d 564, 568 (5th Cir. 2020) (quoting *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020)). Nor would it be in the public's interest to have a consumer-protection law meant to prevent fraud be enjoined as unenforceable. *Smith*, 761 F. Supp. 3d at 973. The Court, therefore, should deny Plaintiff's request for an injunction.

### D. If the Court finds any portion of SB 2337 unconstitutional it must sever it out and enforce what remains.

Plaintiff has argued that SB 2337's invalid provisions are integral to and inseverable from any surviving portion, such that SB 2337 must be declared invalid in its entirety. (Dkt. 4). This completely wrong. *First*, as has been discussed at length, there are no "invalid provisions" in SB 2337. But, *second*, to the extent the Court finds any, it should sever that portion and leave the valid components in place. This is the U.S. Supreme Court's "decisive preference," *Barr v. Am. Ass'n of Pol. Consultants*, 140 S.Ct. 2335, 2350-52 (2020) (plurality opinion)—and a preference shared by Texas law.

When a federal court considers the constitutionality of a state statute, it applies the state's law of severability. *See Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) ("Severability is of course a matter of state law."). Under Texas law, a court must sever invalid portions of a statute where possible. *See* Tex. Gov't Code Ann. § 311.032(c) ("[I]f any provision of the statute or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the statute that can be given effect without the invalid provision or application … ."); Tex. Bus. Orgs. Code Ann. § 1.051 (applying this rule of construction to the Business Organization Code, which includes SB 2337); *see also, e.g., Rose v. Drs. Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990) ("If, when the

unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must stand.") (quoting *Western Union Tel. Co. v. State*, 62 Tex. 630, 634 (1884)); *Commission for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 441 (Tex. 1998) ("The unconstitutionality of one part of a statute does not require us to invalidate the entire statute unless the unconstitutional provision is not separable from the remainder."); *Salinas v. State*, 523 S.W.3d 103, 110 (Tex. Crim. App. 2017) ("[I]t is possible for only a portion of a statute to be facially unconstitutional, and if that is the case, the court should invalidate only that portion, leaving the remainder of the statute intact, as long as doing so would be feasible.").

Thus, if, in deciding Plaintiff's Motion, this Court finds a substantial likelihood that any portion of SB 2337 is unconstitutional, invalid, preempted, or otherwise unenforceable, it must sever that portion unless the valid and invalid provisions are inextricably intertwined so that a severance would render the statute incomplete or contrary to legislative intent. *Ex parte Perry*, 483 S.W.3d 884, 903 (Tex. Crim. App. 2016). And the functionality of the severed statute provides the best evidence of such intent. *Nat'l Fed'n of the Blind of Texas, Inc. v. Abbott*, 647 F.3d 202, 211 (5th Cir. 2011). SB 2337 contains multiple components unaffected by Plaintiff's (erroneous) First Amendment theories that could function independently. Most notably the statute contains two separate sets of disclosure obligations with independent triggering events--§ 6A.101 ("Disclosure of Nonfinancial Proxy Voting Services to Prevent Fraud or Deceit") and § 6A.102 ("Disclosures if Providing Conflicting Voter Advice or Recommendations"). The Court could easily sever § 101 without affecting § 102 and vice versa.

## V.    Conclusion

For all of the reasons set forth above, Defendant respectfully requests that the Court deny Plaintiff's Motion for Preliminary Injunction.

Respectfully submitted,

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division


*/s/ C. Lee Winkelman*
C. LEE WINKELMAN
Assistant Attorney General
State Bar No. 24042176
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 241-9629
(512) 320-0667 fax
lee.winkelman@oag.texas.gov

**COUNSEL FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2025, true and correct copy of the foregoing document

was served via the Court's electronic filing system to all counsel of record.

*/s/ C. Lee Winkelman*
C. LEE WINKELMAN
Assistant Attorney General