UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| GLASS, LEWIS & CO., LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-01153-ADA |
| | ) | |
| KEN PAXTON, *in his Official Capacity as* | ) | |
| *Attorney General of Texas,* | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

YETTER COLEMAN LLP
Bryce L. Callahan
State Bar No. 24055248
bcallahan@yettercoleman.com
Grant B. Martinez
State Bar No. 24104118
gmartinez@yettercoleman.com
Lily E. Hann
State Bar No. 24133836
lhann@yettercoleman.com
Jared LeBrun
State Bar No. 24144647
jlebrun@yettercoleman.com
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
(713) 632-8002 (fax)

*Attorneys for Plaintiff Glass, Lewis & Co., LLC*

# TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Argument .............................................................................................................. 1

I.    Glass Lewis Has Standing. ............................................................................ 1

    A.    Injury-in-fact: Glass Lewis faces an ongoing injury to its constitutional rights. ........................................................................................... 2

    B.    The injury is traceable to the Attorney General and redressable through an injunction. ............................................................................... 4

    C.    Glass Lewis' claims are ripe. ................................................................ 4

II.    Sovereign Immunity Does Not Shield the Attorney General from Suit. ........... 5

III.    The Act Violates the First Amendment ........................................................ 6

    A.    The Act fails because of its viewpoint discrimination. ........................... 7

        1.    Viewpoint discrimination is never subject to lesser scrutiny. .................... 7

        2.    The Act plainly discriminates based on viewpoint. ................................. 9

    B.    The Act fails because *Zauderer* does not apply. ................................... 11

        1.    The Act's compelled disclosures are not "uncontroversial." ................... 11

        2.    The Act's compelled disclosures are not "purely factual." ..................... 13

    C.    The Attorney General has no real argument that the Act survives under *Central Hudson*. ............................................................................. 14

IV.    The Act Is Void for Vagueness. ................................................................... 15

    A.    The Act fails to provide Glass Lewis a reasonable opportunity to know when disclosures are required. ............................................................ 16

    B.    The Act allows arbitrary and discriminatory enforcement. ................... 17

V.    ERISA Preempts the Act. ........................................................................... 17

VI.    Glass Lewis Will Suffer Irreparable Harm and the Equities Favor an Injunction. ........... 19

VII.    The Court Has Options on Timing. .............................................................. 20

Conclusion ........................................................................................................... 20

## INTRODUCTION

Senate Bill 2337 ("the Act") compels Glass Lewis to disparage its advice on its website and to its clients whenever its speech reflects certain views Texas disfavors—such as anti-management views or the view that governance is relevant to shareholder value. The First Amendment strictly forbids such viewpoint discrimination. The Attorney General never tries to justify this discrimination, instead retreating to *Zauderer*. He is wrong: viewpoint discrimination is prohibited wherever it occurs, and *Zauderer* has no application where the law compels speakers to propound subjective, self-denigrating, false messages. Because the statute flouts the First Amendment, is hopelessly vague, and is expressly preempted by ERISA, Glass Lewis is likely to succeed on the merits. Every day of forced compliance imposes irreparable constitutional and economic harm. The Court should enjoin enforcement before the Act takes effect on September 1.

## ARGUMENT

### I.    Glass Lewis Has Standing.

Glass Lewis plainly has standing. The Act compels Glass Lewis to speak Texas' preferred message or face financially devastating enforcement from an attorney general committed to targeting pro-ESG views. *See* Compl., ECF 1, ¶¶ 60-79. With S.B. 2337 set to take effect in ten days, Glass Lewis has *already* altered its speech, incurred costs, and diverted resources from its regular business to comply with it. Other constitutional and economic injuries will occur imminently. Supp. Decl. of John Wieck ("Supp. Wieck Decl.") ¶¶ 14-21, 27-30. Compelled speech and costly compliance measures suffice to show standing. *See Book People, Inc. v. Wong*, 692 F. Supp. 3d 660, 681 (W.D. Tex. 2023), *aff'd in relevant part*, 91 F.4th 318, 330 (5th Cir. 2024).

The Response mistakenly takes aim at all pre-enforcement challenges, suggesting that because there has been no enforcement against Glass Lewis, its injuries must be "hypothetical." Resp., ECF 17, at 13. Texas already lost this argument. *See Book People*, 692 F. Supp. 3d at 680;

*Inst. for Free Speech v. Johnson*, 2025 WL 2104354, at *6 n.4 (5th Cir. 2025) ("requiring a past history of enforcement . . . would undermine the very purpose of pre-enforcement challenges").

**A.    Injury-in-fact: Glass Lewis faces an ongoing injury to its constitutional rights.**

In a pre-enforcement challenge, a plaintiff can establish injury in fact if "(1) they have an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) their intended future conduct is arguably proscribed by the policy in question, and (3) the threat of future enforcement of the challenged policies is substantial." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020); *see Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 926 (5th Cir. 2023).

Glass Lewis easily meets these factors. First, the company engages in pure speech protected by the First Amendment. *See* Compl. ¶¶ 31; Wieck Decl., ECF 5, ¶¶ 25-36, 41-43. Glass Lewis will continue providing advice on Texas companies that goes against company management, differs among clients, and considers ESG and DEI factors, and will continue to do so after the Act goes into effect. Supp. Wieck Decl. ¶ 5. Glass Lewis also intends to continue speaking through its website, www.glasslewis.com, where it conveys Glass Lewis' views on matters of public concern. Absent S.B. 2337, Glass Lewis' proxy reports would not convey Texas' viewpoints reflected in Section 101(b) and Section 102(b), nor would Glass Lewis "conspicuously disclose" on its website views denigrating its own services. *Id.* ¶¶ 8-10; Wieck Decl. ¶ 14.

Second, the Act proscribes the course of conduct that Glass Lewis would engage in otherwise—providing advice and recommendations on Texas companies to its clients *without* including Texas' views and *without* denigrating itself on its own website. Supp. Wieck Decl. ¶ 10.

Third, the threat of enforcement is daunting. In connection with DEI and ESG, the Attorney General warned earlier this year that "[a]ny institution found to be violating the law *will be held accountable*." Press Release, ECF 6-2 (emphasis added). Nor does the Attorney General disavow S.B. 2337's enforcement. Courts must "assume that [Glass Lewis] face[s] a credible threat of

enforcement because the State has provided no compelling contrary evidence." *Book People*, 91 F.4th at 330 (quote omitted); *Book People*, 692 F. Supp. 3d at 681-82 (sufficient threat when "the State is unwilling or unable to disavow" enforcement). Moreover, each violation of the Act qualifies as a "deceptive trade practice," meaning that the Attorney General can seek penalties of $10,000 per violation. S.B. 2337 § 6A.201; Tex. Bus. & Comm. Code § 17.47(c)(1). If each report to each client were to qualify as a violation carrying with it a $10,000 penalty, the threatened penalties for September 2025 alone would be at least $130 million. Supp. Wieck Decl. ¶ 11.[1]

Glass Lewis also has standing for its vagueness and preemption claims, which are intertwined with the Act's compelled speech. The Attorney General devotes an entire page to how *McCraw* forecloses Glass Lewis' void-for-vagueness challenge, Resp. 13-14, but he overlooks footnote 32, which states the opposite. *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 n.32 (5th Cir. 2024) ("We note that vagueness may be grounds for a pre-enforcement challenge insofar as it chills protected speech under the First Amendment."); *see Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546-47 (5th Cir. 2008) ("Many times void-for-vagueness challenges are successfully made when laws have the capacity to chill . . . conduct protected by the First Amendment."). Glass Lewis' vagueness claim stems from a free speech injury: the Act's egregiously broad terms enable the Attorney General to target disfavored views and compel speech unrelated to the Act's ostensible purpose of preventing fraud. *See Book People*, 692 F. Supp. 3d at 695 (conducting pre-enforcement review of vague compelled speech provisions); *Computer & Communications Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1041 (W.D. Tex. 2024) (same).

The Attorney General also ignores *McCraw*'s discussion of preemption. The Fifth Circuit

---

[1]    The State takes aggressive positions in counting violations. Recently, the State's method for counting DTPA violations yielded potential statutory penalties of "$230 quadrillion." *See* Pls.' Resp. to Mot. to Exclude at 58, *Texas v. Google LLC*, No. 4:20-cv-00957-SDJ (E.D. Tex. Dec. 30, 2024), ECF 750-1.

expressly held that because compliance was costing plaintiffs "real money," they had "standing to raise their preemption claim" in a pre-enforcement context. 90 F.4th at 795. Here, Glass Lewis is already incurring compliance costs and preparing to send out the denigrating warnings required by the Act—that ongoing injury suffices to show standing. *Id.*; *see Sec. Indus. & Fin. Markets Ass'n v. Ashcroft*, 745 F. Supp. 3d 783, 792, 796 (W.D. Mo. 2024); Supp. Wieck Decl. ¶¶ 22-30.

### B. The injury is traceable to the Attorney General and redressable through an injunction.

The Attorney General mistakenly argues that Glass Lewis does not plead traceability or redressability. This is verifiably incorrect—Glass Lewis pleads and meets both elements. *See* Compl. ¶¶ 69-72. Traceability requires that Glass Lewis show "a causal connection between the injury and the conduct complained of." *Book People*, 91 F.4th at 332.

The Attorney General enforces the Act through the Consumer Protection Division, so his "potential enforcement of the challenged law" has a causal connection to Glass Lewis' injury. *Inst. for Free Speech*, 2025 WL 2104354, at * 7 (cleaned up); S.B. 2337 § 6A.201; Tex. Bus. & Comm. Code § 17.47. Redressability requires only that Glass Lewis show "a favorable decision will relieve a discrete injury." *Book People*, 91 F.4th at 332. An injunction against the Attorney General would "remove a 'discrete injury' caused by state defendants' enforcement of [the Act]." *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 515 (5th Cir. 2017); *Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575, 589 (W.D. Tex. 2025) (law enforced by Consumer Protection Division was traceable to Attorney General and redressable through an injunction against him). These elements are "easily satisfied" by Glass Lewis' pre-enforcement challenge. *Inst. for Free Speech*, 2025 WL 2104354, at * 7.

### C. Glass Lewis' claims are ripe.

"In pre-enforcement challenges like this one, the standing and ripeness analyses overlap."

*Id.* at *8. In other contexts, the Court considers "two factors: (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Book People*, 91 F.4th at 333 (cleaned up). Glass Lewis' claims depend on questions of law that will not be furthered by other factual developments, as shown by the fact that the Response does not contest Glass Lewis' evidence or introduce any of its own. And withholding judicial review would subject Glass Lewis to unconstitutional viewpoint discrimination and compel it to speak a false, demeaning message about itself or face millions of dollars in liability. Glass Lewis' claims are ripe for review.

## II.    Sovereign Immunity Does Not Shield the Attorney General from Suit.

The *Ex parte Young* exception to sovereign immunity applies if the official has "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Inst. for Free Speech*, 2025 WL 2104354, at *9. This inquiry "significantly overlap[s]" with standing. *Air Evac*, 851 F.3d at 515. Here, the Act expressly authorizes the Attorney General's enforcement, satisfying the "particular duty" prong. *See* Compl., ¶ 75; Mot. 6-7; *In re Paxton*, 60 F.4th 252, 257 (5th Cir. 2023). And the Attorney General has demonstrated a willingness to enforce the law by publicly stating earlier this year, in connection with DEI and ESG, "[a]ny institution found to be violating the law will be held accountable." LeBrun Decl. Ex. 2, ECF 6-2.

The Attorney General suggests that a pre-enforcement challenge cannot allege an "ongoing" violation, but "where there is a threat of future enforcement that may be remedied by prospective relief, the ongoing and continuous requirement has been satisfied." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999); *Roake v. Brumley*, 141 F.4th 614, 638-39 (5th Cir. 2025) (same). Glass Lewis "does not have to await the consummation of threatened injury to obtain preventive relief." *Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 581 (1985).

Nor does this case implicate the discretionary functions doctrine, which applies to

*affirmative* injunctions compelling conduct, not *prohibitions* on enforcement. *Cf. Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 242 (5th Cir. 2020) ("a court may not compel officers to take *affirmative* official actions that are discretionary") (emphasis added). Indeed, the Fifth Circuit rejected Texas' same argument just three months ago. *See Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 397 (5th Cir. 2025) ("[W]here such compulsion or constraint amounts to a violation of the Constitution or the federal laws, those responsible may be properly restrained from commission of the wrong."). Courts routinely grant injunctions prohibiting the enforcement of unconstitutional laws. *See, e.g.*, *Book People*, 91 F.4th at 335; *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 287 (5th Cir. 2024) (affirming injunction against the Attorney General's enforcement of compelled health warnings).

### III.    The Act Violates the First Amendment.

The Motion showed that the Act violates the First Amendment under all applicable tests. Mot. 7-14. It established that: (1) the Act is *per se* unconstitutional because it engages in viewpoint discrimination; (2) the Act fails strict scrutiny; (3) the Act fails intermediate scrutiny under *Central Hudson*; and (4) the lowest possible tier, *Zauderer* scrutiny, does not apply. *Id.*

The Response helpfully narrows the First Amendment issues for the Court to decide. In 35 pages, the Response never refutes that the Act engages in viewpoint discrimination or that viewpoint discrimination is *per se* unconstitutional. *See* Mot. 9; Compl. ¶ 99; Resp. 23. At minimum, *viewpoint* discrimination (even for commercial speech) is always subject to strict scrutiny, and the Response has zero argument that the Act satisfies strict scrutiny. Mot. 13.

Instead, the Response essentially puts all its eggs in the *Zauderer* basket: arguing that "SB 2337 passes rational basis review under *Zauderer*" and that "*Zauderer* applies." Resp. 25-31. If the Court rejects the application of *Zauderer*, the Attorney General has nothing left.

He argues that, if *Zauderer* does not apply, then intermediate scrutiny under "*Central*

*Hudson* is the appropriate standard." Resp. 31. But the Response does not explain why the Act survives under that standard—it provides just a recitation of the test and an *ipse dixit* sentence that "SB 2337 passes scrutiny under this standard." *See id.*; Section III.C. With no actual argument or evidence, the Attorney General falls drastically short of his "burden to prove all elements of the *Central Hudson* test." *Cocroft v. Graham*, 122 F.4th 176, 179 (5th Cir. 2024).

As a result, the Court has available two straightforward paths to resolve the First Amendment analysis: (1) concluding that the Act engages in viewpoint discrimination; or (2) concluding that *Zauderer* does not apply. Either conclusion is fatal to the Attorney General's defense of the Act—although it may be more efficient for appellate purposes to address both.

### A.    The Act fails because of its viewpoint discrimination.

Texas "cannot advance some points of view by burdening the expression of others. To give government that power is to enable it to control the expression of ideas, promoting those it favors and suppressing those it does not. And that is what the First Amendment protects all of us from." *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024) (citation and quotation marks omitted).

The Motion showed this is exactly what the Act impermissibly seeks to do: advancing Texas' view that consideration of DEI or ESG factors or anti-management positions are not in the financial interests of shareholders by burdening the expression of proxy advisors when their speech conveys the opposite viewpoint. Mot. 7-9. The Attorney General has two responses on viewpoint discrimination, both of which are wrong and addressed below.

### 1.    Viewpoint discrimination is never subject to lesser scrutiny.

The Response contends that the Act's viewpoint discrimination is subject to the least scrutiny merely because Glass Lewis' speech relates to securities. Resp. 21-25. Not even close.

***First***, the Attorney General elides the distinction between *viewpoint* discrimination and mere *content* discrimination. Resp. 23 ("Plaintiff asserts that SB 2337 is impermissibly content-

and viewpoint-based, warranting strict scrutiny. . . . Even if it is content-based, . . . it would still not warrant strict or even intermediate scrutiny."). But "[t]his analysis conflates two distinct but related limitations . . . . Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'— is a 'more blatant' and 'egregious form of content discrimination.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 168-69 (2015) (citation omitted).

Numerous authorities say that viewpoint discrimination—as opposed to mere content or subject-matter discrimination—is always *per se* unconstitutional. Mot. 9; Compl. ¶ 99. Viewpoint discrimination always requires at least strict scrutiny. "The First Amendment requires heightened scrutiny *whenever* the government creates a regulation of speech because of disagreement with the message it conveys. . . . Commercial speech is no exception." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) (emphasis added); *accord Vidal v. Elster*, 602 U.S. 286, 293 (2024). The main case that the Response cites did not involve "expressions of opinion or points of view." *SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 750 (S.D.N.Y. 2022).

**Second**, laws "obviously repugnant to the First Amendment" "should not face relaxed review just because [the government] used the 'securities' label." *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 372 (D.C. Cir. 2014) ("*NAM*"), *adhered to on reh'g*, 800 F.3d 518 (D.C. Cir. 2015).[2] The Fifth Circuit has no trouble distinguishing a securities-related "disclosure requirement" from a "public-shaming penalty for a corporation's failure to abide by the Government's diversity" views. *All. for Fair Bd. Recruitment v. SEC*, 125 F.4th 159, 184 (5th Cir. 2024) (en banc).

---

[2]    In *NAM*, the D.C. Circuit counseled against a broad reading of *SEC v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365 (D.C. Cir. 1988), which the Response mischaracterizes through selective quotation. *Compare id.* at 373 *with* Resp. 22, 23. "To read *Wall Street Publishing* broadly would allow [the government] to easily regulate otherwise protected speech using the guise of securities laws." *NAM*, 748 F.3d at 372.

*Finally*, while public issuers' proxy *statements* may be subject to a "history and tradition" of compelled disclosures, the Attorney General recognizes that the federal government has not regulated third-party proxy *advice*—calling it the "Wild West" and explaining that the "Texas Legislature stepped into this vacuum." Resp. 7. Given this "vacuum," no case holds that proxy *advice* receives lesser protection, especially from the government's viewpoint discrimination.

So, viewpoint discrimination is always either *per se* unconstitutional or at least subject to strict scrutiny. As noted above, the Attorney General has zero argument that the Act would survive strict scrutiny, on which he bears the burden. *See Reed*, 576 U.S. at 163. Thus, the conclusion that the Act engages in viewpoint discrimination is dispositive.

### 2.    The Act plainly discriminates based on viewpoint.

The Act engages in viewpoint discrimination—both facially and in its design. *See id.* at 163-64 (explaining facial and purposeful discrimination); Mot. 7-8. The Act's legislative sponsor expressly stated the Act was designed to suppress views—to "prevent" "advice . . . focused on . . . ESG . . . DEI." Mot. 8; LeBrun Decl., ECF 6, ¶ 4. The Response never engages with any statements by the bill sponsors, including this admission of discriminatory intent.

Also, on its face, the Act engages in viewpoint discrimination. Whenever Glass Lewis' advice is "inconsistent with the voting recommendation of the board of directors" or "against a company proposal to elect a governing person," Glass Lewis must state that its advice is not "solely in the financial interest of the company's shareholders" and "subordinates the financial interests of shareholders to other objectives." S.B. 2337 §§ 6A.101(a)(2),(4), 101(b); *see id.* § 102(a)(3),(b) (requiring disclosures for advice "in opposition to" company management). No disclosure requirement attaches to advice in favor of a company's proposals. Remarkably, the Response *never* addresses the Act's facial discrimination against anti-management views.

On DEI or ESG factors, the Attorney General obliquely suggests there is no viewpoint

discrimination because "anti-ESG" views are regulated "equally" as much as "pro-ESG" views. Resp. 8, 28. This frames the contrasting viewpoints at issue incorrectly. The Act is triggered when advice is "wholly or partly based on, or otherwise takes into account" various factors—including ESG, DEI, and sustainability. S.B.2337 § 6A.101(a)(1). So, the discrimination is not necessarily against the views that diversity or governance are *good*, but rather against the view that these factors are *relevant to* shareholder value. For example, advice against a proposal *because governance restraints are bad* would likely trigger disclosure, but advising the same vote *because governance is irrelevant and should not be considered* would be exempt from disclosure. The proper framing is not pro-ESG or anti-ESG, but rather pro-ESG-relevance or anti-ESG-relevance. *See* Mot. 8 (focusing on pro-relevance vs. anti-relevance views). Consider these examples:

| **Views burdened by the Act** | **Contrary views unburdened by the Act** |
|---|---|
| "We recommend you vote FOR the proposal based on our belief that board oversight of the environmental risks and opportunities the company faces is important to ensuring the sustainability and success of this company's operations over the long term." | "We recommend you vote AGAINST the proposal. We have not considered environmental factors in any way in making this recommendation because any environmental factor is irrelevant to the bottom line." |
| "We recommend you vote FOR the proposal, because the company is the only one of its peers with a classified board and because we believe, based on empirical evidence, that declassified boards promote director accountability and enhance company value." | "We recommend you vote AGAINST the proposal. In making this recommendation, we have not considered corporate governance factors in any way because of our belief that they do not matter." |
| "We recommend you vote FOR the proposal because human capital management is a material issue and maintaining a diverse and engaged workforce can help mitigate risks related to low worker productivity, employee turnover, and lawsuits based on discrimination or harassment." | "We recommend you vote AGAINST the proposal. We do not take into account diversity in any way when making our recommendations because it is liberal nonsense." |

On its face, the Act heavily burdens the pro-ESG-relevance viewpoint with compelled warnings, while proxy advice conveying the anti-ESG-relevance viewpoint escapes regulation.

Almost all of Glass Lewis' advice conveys the view that governance is *relevant* to shareholders' financial interest. Wieck Decl. ¶¶ 12-13. The Act targets expression of that viewpoint by compelling Glass Lewis to disparage itself to its clients and the internet with Texas' contrary view.

So, regarding the Act's discrimination against anti-management views, the Response says nothing. On views regarding the relevance of DEI or ESG factors, the Response addresses the wrong question. The Act's purposeful, facial viewpoint discrimination renders it unconstitutional.

### B.    The Act fails because *Zauderer* does not apply.

Rather than approaching the First Amendment analysis from the top down, the Court can approach it from the bottom up, starting at the lowest possible level of scrutiny: *Zauderer*.

The Motion showed that *Zauderer* does not apply. *See* Mot. 14. "In *Zauderer*, the Supreme Court explained that the State may at times prescribe what shall be orthodox in commercial advertising by requiring the dissemination of purely factual and uncontroversial information." *Book People*, 91 F.4th at 339-40 (footnote and quotation marks omitted). But "outside that context, it may not compel affirmation of a belief with which the speaker disagrees." *Id.* (alteration omitted).

Even if proxy advice qualified as commercial speech—it does not, Mot. 12-13—to apply *Zauderer* to the Act's compelled warnings, the Attorney General bears the burden to "show that the warnings are both (1) purely factual and (2) uncontroversial." *Free Speech Coal.*, 95 F.4th at 281. He did not come close on either prong.

### 1.    The Act's compelled disclosures are not "uncontroversial."

The Motion showed that the compelled disclosures are not "uncontroversial" under the controlling standard stated in *Free Speech Coalition*. Mot. 14. There, the Fifth Circuit held: "a compelled statement is 'uncontroversial' for purposes of *Zauderer* where the truth of the statement is not subject to good-faith . . . evidentiary dispute and where the statement is not an integral part of a live, contentious political . . . debate." *Free Speech Coal.*, 95 F.4th at 281-82; *accord RJ*

*Reynolds Tobacco Co. v. Food & Drug Admin.*, 96 F.4th 863, 881 (5th Cir. 2024).[3]

Here, the compelled statements are either abjectly false or subject to dispute and part of a live, contentious political debate. Most notably, the Act forces Glass Lewis to convey the Texas Legislature's wrong view that any advice taking into account an environmental, social, or even a corporate governance factor "is not being provided solely in the financial interest of the company's shareholders" and "that the advice subordinates the financial interests of shareholders to other objectives." S.B. 2337 § 6A.101(b)(1), (3). Glass Lewis showed, and the Response does not refute, that corporate governance is universally considered relevant to a company's finances. *See* Wieck Decl. ¶ 13; ECF 5-9 at 3 ("[T]he inescapable reality is that ESG risks have long been considered by boards . . . and must continue to be so considered in order to ensure the company's value over the long term."). At minimum, it showed that the relevance of all listed factors is (1) subject to good-faith evidentiary dispute and (2) an integral part of a live, contentious political debate:

- BlackRock's 2025 Proxy Voting Guidelines state that "well-managed companies will effectively evaluate and manage material sustainability related risks and opportunities" and "[m]any S&P 500 companies report in their disclosures benefitting from their current levels of diversity." ECF 5-15, at 9, 18.

- In a June 2024 speech, a Republican SEC Commissioner emphasized that despite the "divisiveness of the ESG conversation . . . [s]ome of the issues on today's ESG list historically factored into assessments of the long-term financial value of companies." ECF 6-9, at 1.

- Teneo reports that while 72% of CEOs are making some change in response to the "politicization of ESG," 92% are overall "standing by their ESG-related programs." ECF 5-14, at 26.

As Glass Lewis' COO explained, the terms "ESG" and "DEI" are "highly controversial topics in

---

[3]    *RJ Reynolds*, on which the Attorney General relies, distilled its rule in part from a since-vacated decision. 96 F.4th at 881 (relying on *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439 (5th Cir. 2022), *vacated and remanded sub nom. Moody v. NetChoice, LLC*, 603 U.S. 707 (2024)). By contrast, *Free Speech Coalition* was affirmed by the Supreme Court, and its *Zauderer* analysis was not challenged.

corporate governance and investment." Wieck Decl. ¶ 37. Indeed, the Act's legislative sponsors agree: they expressly sought to regulate speech on "political hot-button issues." LeBrun Decl. ¶ 6. And the Attorney General believes that DEI and ESG involve "unlawful race- and sex-based quotas and radical environmental policies" and the "sordid business of divvying us up by race." ECF 6-2; Resp. 28 (citation omitted). The Court need look no further to see that the warnings are controversial. *See Ashcroft*, 745 F. Supp. 3d at 799 (controversial based on defendant's rhetoric).

The Response comes nowhere close to showing that the compelled disclosures are "uncontroversial"; indeed, it says *nothing* about the candid admissions of the legislative sponsors or Glass Lewis' evidence or *Free Speech Coalition*'s controlling standard. Instead, the Response relies on the Fifth Circuit's *NetChoice* decision, without acknowledging that it has been vacated by the Supreme Court, and on *Chamber of Commerce v. SEC*, which dealt with SEC regulations of companies conducting stock repurchases and is also likely no longer good law. 85 F.4th 760, 769 (5th Cir. 2023) (explicitly resting its holding on since-vacated *NetChoice*). Because the regulations only required companies to collect data and "disclose their reasons for repurchasing shares," it was not controversial. *Id.* The Act here goes far beyond mere disclosure. Section 101 forces proxy advisors to say that considering ESG is "sacrificing investment returns" and "subordinat[ing] the financial interests of shareholders." S.B. 2337 § 6A.101(b)(1)(B). Section 102 incorporates these views and appears to seek to force Glass Lewis to label some of its advice as nonfinancial. *Id.* § 6A.102(b)(3). And the Response glosses over the Act's website warning, which operates as a digital scarlet letter that has nothing to do with Glass Lewis "explaining its actions." *Id.* § 6A.101(b)(3). "Because the state has not met its burden on the uncontroversial nature of the warnings . . . *Zauderer* is inapplicable." *Free Speech Coal.*, 95 F.4th at 281.

### 2. The Act's compelled disclosures are not "purely factual."

"[T]he 'factual' nature of a statement turns on the certainty the statement expresses." *RJ*

*Reynolds*, 96 F.4th at 879 n.48. Non-falsifiable "interpretations, reactions, or opinions" are non-factual. *Id.* at 879 (cleaned up). As Glass Lewis argued, "[d]eciding if a vote is in the financial interest of shareholders is a matter of judgment and opinion[.]" Mot. 14. The SEC has long recognized that "desirability of a particular initiative subject to a shareholder vote is by its nature judgmental" and "there is typically not a 'correct' viewpoint." ECF 5-10; Wieck Decl. ¶ 26. So, when the Act requires Glass Lewis to state that advice is not "solely in the financial interest of shareholders" or state that it is "sacrificing investment returns," this compelled statement reflects the subjective view of the Texas Legislature—not verifiable truth. Texas cannot turn its subjective beliefs into "facts" by legislative fiat.

Again, it is no answer to say that the Act merely requires Glass Lewis to explain its recommendation. Glass Lewis has no objection to explaining its recommendations to clients. That is its very business model. But the Act requires something different, compelling the company to carry Texas' self-denigrating messages and value-laden judgments about which considerations are properly financial. S.B. 2337 §§ 6A.101(b)(1)(A)-(B), 101(b)(1)(3), 102(b). That is the precise kind of "statement[] of opinion" that falls outside *Zauderer*'s ambit. *RJ Reynolds*, 96 F.4th at 879.

### C.    The Attorney General has no real argument that the Act survives under *Central Hudson*.

Because the warnings reflect controversial matters of opinion, *Zauderer* does not apply. The Attorney General contends that, if *Zauderer* does not apply, *Central Hudson* is the appropriate standard. Resp. 31. It is the Attorney General's burden to prove the Act passes *Central Hudson*'s intermediate scrutiny, and he has failed. *Cocroft*, 122 F.4th at 179. He simply has no argument. He merely recounts the *Central Hudson* standard, and then *ipse dixit* asserts: "For the reasons already discussed above, SB 2337 passes scrutiny under this standard." Resp. 31. First, this is just a conclusory assertion, not an argument. Second, this conclusory assertion is obviously, fatally

flawed: the only "reasons already discussed above" are those explaining why the Act survives rational-basis review. Resp. 29-31. So, the Attorney General says that, for the reasons the Act survives the *less demanding* rational-basis review "discussed above," it also survives *more demanding* intermediate scrutiny under *Central Hudson*. That is wrong on basic logic.

In any event, the Attorney General could not possibly meet his burden for the reasons Glass Lewis stated in its Motion. *See* Mot. 10-11, 13-14. Taking one dispositive point: the fact that the Legislature failed to consider less burdensome alternatives and failed to try "a government-funded public information campaign" is fatal under intermediate scrutiny. *See Free Speech Coal.*, 95 F.4th at 284; *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 775 (2018). The Attorney General says nothing about this because he has no argument under *Central Hudson*, which means the Act cannot survive intermediate scrutiny.

Under any test, the Act violates the First Amendment, and enforcement should be enjoined.

## IV. The Act Is Void for Vagueness.

S.B. 2337 is also unconstitutionally vague. It demands disclosures when a proxy advisory service is "not provided solely in the financial interest of shareholders," but gives that key phrase a bespoke definition using undefined buzzwords like "ESG" and "DEI." S.B. 2337 § 6A.101(a); *id.* 6A.102(b)(3)). The Motion showed that because the undefined "terms at issue are so broad and involve inherent value judgments," the Act is unconstitutionally vague for two independent reasons. *Am. Fed'n of Teachers v. Dep't of Educ.*, 2025 WL 2374697, at *31 (D. Md. 2025); *see* Mot. 14-17. It fails to provide Glass Lewis "a reasonable opportunity to know" when disclosures are required, and it "is so indefinite that it allows arbitrary and discriminatory enforcement." *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001).

The Attorney General has failed to show ESG and DEI are *not* vague. His response does not engage with (or even acknowledge) the complete phrase that is the focus of Glass Lewis'

Motion. He likewise ignores Glass Lewis' evidence and precedent.

> **A.    The Act fails to provide Glass Lewis a reasonable opportunity to know when disclosures are required.**

The Act is vague because "persons of common intelligence" must guess when advice is "not provided solely in the financial interest of shareholders." *See* Mot. 15-16. The undefined terms that comprise the definition of that phrase are subject to multiple, deeply subjective, interpretations. *Id.* The Attorney General's response provides no clarity.

The Act "lacks many key definitions, which allows [it] to be wide sweeping in many ways." *Tex. A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792, 809 (S.D. Tex. 2025) (citation and quotation marks omitted). The Motion argued specifically that the Act is vague because disclosures turn on a proxy advisor's consideration of diversity, equity, inclusion, environmental, social, governance, and sustainability, none of which the Act defines. Mot. 15-16.

In response, the Attorney General makes only an unfounded pronouncement that a "person of common intelligence would not need to guess what [ESG and DEI] mean." Resp. 33. He cites no relevant precedent or evidence. He does not refute Glass Lewis' evidence, including that a majority of corporate directors agree that the term "ESG means different things to different people." ECF 5-1. And he does not explain how other federal courts were wrong to conclude that "DEI" is vague. *See* Mot. 16 (collecting cases); *see also Am. Fed'n of Teachers*, 2025 WL 2374697, at *30. In sum, the Response does not show the key definitional terms are not vague.

The Attorney General acknowledges that in *Ashcroft*, the court held that a rule requiring consent before incorporating a "nonfinancial objective" into investment advice was vague. 745 F. Supp. 3d at 790, 800; Resp. 34. He distinguishes *Ashcroft* by asserting S.B. 2337 "is explicit when it comes to understanding how and when the disclosure obligations kick in." Resp. 34. But, far from being "explicit," the Act's "concepts in the definition" are "unexplained," rendering the Act

vague. *See Ashcroft*, 745 F. Supp. 3d at 800.

Finally, the Attorney General resorts to focusing myopically on "financial interest" and invoking its plain meaning. Resp. 34. But "financial interest" is a subcomponent of (and not a substitute for) the broader vague phrase, "not solely in the financial interest of the shareholders." S.B. 2337 § 6A.101(a). The Legislature has crafted a bespoke definition of that phrase that is vague and dependent on buzzwords, and the Attorney General never shows otherwise.

**B.    The Act allows arbitrary and discriminatory enforcement.**

Independently, the Act is also vague because it is "so indefinite that it allows arbitrary and discriminatory enforcement." *Women's Med. Ctr.*, 248 F.3d at 421; *see* Mot. 14-15.

The evidence shows that different people, including sophisticated parties, understand the terms in the definition differently. Wieck Decl. ¶¶ 37-39. The Attorney General does not rebut this evidence, demonstrating that the Act is ripe for subjective interpretation and arbitrary enforcement.

The Attorney General's own words make the risk plain: throughout the Response, his interpretation of the Act is wholly divorced from the statutory text. When assessing whether a law "provides sufficiently clear enforcement standards," courts can analyze "the interpretation of the [law] given by those charged with enforcing it." *Cunney v. Bd. of Trustees of Vill. of Grand View, N.Y.*, 660 F.3d 612, 622 (2d Cir. 2011) (citation omitted). Because his understanding of the Act is not grounded in the law's text, any prosecution will be arbitrary.

Thus, the Act is unconstitutionally vague, and its enforcement should be enjoined.

**V.    ERISA Preempts the Act.**

S.B. 2337 is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq*. *See* Mot. 17-19. Proxy advisors are a critical component of the ERISA ecosystem. Indeed, ERISA *expressly* contemplates that fiduciaries will rely on advisors. 29 C.F.R. § 2550.404a-1(d)(2)(iii). The Act impermissibly interferes with the advice

proxy advisors give their fiduciary clients by discouraging the consideration of certain factors and by compelling disclosures undermining their advice when they do so anyway. Accordingly, the Act violates both independent bases for ERISA preemption: it "governs a central matter of plan administration" and "interferes with nationally uniform plan administration." *Gobeille v. Liberty Mut. Ins.*, 577 U.S. 312, 320 (2016). The Attorney General misunderstands the law and the Motion.

Beginning with the Attorney General's misunderstanding of the law: an ERISA fiduciary's decisions "*must* be based on factors that the fiduciary reasonably determines are relevant to a risk and return analysis." 29 C.F.R. § 2550.404a-1(b)(4) (emphasis added). Explicit among those factors are "the economic effects of climate change and other environmental, social, or governance factors[.]" *Id.*; *see* Mot. 18. Governance is always "a critical element of how companies create and preserve long-term shareholder value." Wieck Decl. ¶ 13. So, it is "relevant to a risk and return analysis," and is a factor a fiduciary must consider. The Attorney General's statement that "ERISA fiduciaries are not required to consider ESG factors" is therefore misleading. Resp. 19.

The Response contends that the Act "does not modify or restrict ERISA fiduciary actions because its disclosure requirements apply only to proxy firms." Resp. 19-20. Glass Lewis has never argued that the Act directly regulates ERISA fiduciaries. Rather, the Act's disclosure requirements affect the substance of the advice given to fiduciaries, which necessarily affects their decisions.

The Attorney General has no serious response to the three primary arguments in the Motion. Mot. 18-19. **First**, the Attorney General does not dispute that the Act's disclosure requirements *discourage* proxy advisors from considering factors that must be considered under ERISA. *See Nat'l Ass'n of Manufacturers v. SEC*, 800 F.3d 518, 529 (D.C. Cir. 2015).

**Second**, the Attorney General inappropriately downplays that the Act requires Glass Lewis to stigmatize its own advice and make it misleading by labeling it "not solely in the financial

- 18 -

interest of the shareholders." S.B. 2337 § 6A.101(a); *id.* 6A.102(b)(3). The Attorney General characterizes this as "additional context" that does not "interfere with an ERISA fiduciary's duty to evaluate a proxy advisory firm's recommendation." Resp. 19. But the mandated disclosure is not context; it is misdirection. Wieck Decl. ¶¶ 12-14.

**Third**, the Attorney General fails to explain how a fiduciary that considers advice labeled "not provided solely in the financial interest of the shareholders" does not open itself up to liability. *See* Compl. ¶ 155; Wieck Decl. ¶ 47. As the Response says, fiduciaries must confirm that the proxy advisors' advice is "consistent with the fiduciaries'" obligations, which include acting "solely in accordance with the economic interest of the plan and its participants and beneficiaries." Resp. 20.

ERISA expressly "supersede[s] any and all State laws insofar as they . . . relate to any employee benefit plan." 29 U.S.C. § 1144(a). Because S.B. 2337 relates to employee benefit plans by affecting the information fiduciaries receive and how they behave, it is preempted.

## VI. Glass Lewis Will Suffer Irreparable Harm and the Equities Favor an Injunction.

Glass Lewis' Motion and evidence showed that the Act will cause irreparable harm because it compels Glass Lewis to speak a message at odds with its beliefs, stigmatizes the company's and clients' corporate governance views, and imposes unrecoverable compliance costs and reputational damage. Mot. 19-20; Wieck Decl. ¶¶ 41-49; Supp. Wieck Decl. ¶¶ 7-9, 27-30; *see Book People*, 692 F. Supp. 3d at 702 ("This irreparable harm of the violation . . . First Amendment rights alone is enough for the Court to weigh this factor in favor of Plaintiffs."); *Book People*, 91 F.4th at 341 ("Because [the Act] threatens Plaintiffs' right to be free from compelled speech, Plaintiffs have shown an irreparable injury."). Ignoring these injuries, the Response rests on the mistaken notion that all pre-enforcement harms are speculative. But Glass Lewis' harm is real and immediate: in ten days, it will be forced to broadcast Texas' wrong views denigrating Glass Lewis' own services.

The Attorney General summarily concludes that Glass Lewis must show that its costs are

unquantifiable, but the case he cites deals with lawsuits *against private parties* where damages can ordinarily be recovered in lieu of an injunction. *Brink's Inc. v. Patrick*, 2014 WL 2931824, at *6 (N.D. Tex. 2014). Here, where damages are unrecoverable due to sovereign immunity, "precedent requires only that alleged compliance costs must be more than *de minimis*." *Rest. Law Ctr. v. United States Dep't of Labor*, 66 F.4th 593, 600 (5th Cir. 2023).

The remaining two factors merge. "Neither the State nor the public has any interest in enforcing a regulation that violates federal law. Indeed, injunctions protecting First Amendment freedoms are always in the public interest." *Book People*, 91 F.4th at 341 (cleaned up).

Finally, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). As the Attorney General admits, the Act is a first-of-its-kind regulation explicitly designed to interrupt the status quo. Resp. 7. The balance of equities tips sharply in favor of preserving free expression while the Court assesses this unprecedented law.[4]

## VII.    The Court Has Options on Timing.

In *Book People*, this Court granted an oral injunction on August 31 to provide relief before a law went into effect on September 1, and then later issued a written opinion. Tr. Hr'g at 2, 5, *Book People*, No. 1:23-cv-00858-ADA (W.D. Tex.), ECF 57, 43. Glass Lewis respectfully submits that a similar procedure here would be appropriate, if necessitated by timing constraints.

### CONCLUSION

Glass Lewis requests that the Court, prior to September 1, grant the Motion and enter the requested preliminary injunction. Glass Lewis requests all other relief to which it may be entitled.

---

[4]    The Court should not reach severability. Glass Lewis' motion does not argue that the statute is inseverable because severability relates to a declaration at the final judgment stage that a law is unconstitutional. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975). Also, the Response never explains how one provision is constitutional while the other is not. Severance would be premature.

Dated: August 22, 2025

Respectfully submitted,

YETTER COLEMAN LLP

/s/ Bryce L. Callahan
Bryce L. Callahan
State Bar No. 24055248
bcallahan@yettercoleman.com
Grant B. Martinez
State Bar No. 24104118
gmartinez@yettercoleman.com
Lily E. Hann
State Bar No. 24133836
lhann@yettercoleman.com
Jared LeBrun
State Bar No. 24144647
jlebrun@yettercoleman.com
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
(713) 632-8002 (fax)

*Attorneys for Plaintiff Glass, Lewis & Co., LLC*

## Certificate of Service

I certify that on August 22, 2025, a copy of this document was served on all counsel of record using the Court's e-filing system.

/s/ Grant B. Martinez
Grant B. Martinez

- 21 -