UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| GLASS, LEWIS & CO., LLC, | ) |
|       Plaintiff, | ) ) ) |
| v. | )   Civil Action No. 1:25-cv-01153-ADA |
| KEN PAXTON, *in his Official Capacity as Attorney General of Texas,* | ) ) ) ) |
|       Defendant. | ) ) |

**SUPPLEMENTAL DECLARATION OF JOHN WIECK IN SUPPORT OF
GLASS LEWIS' MOTION FOR PRELIMINARY INJUNCTION**

1.   My name is John Wieck. I am fully competent to make this declaration and I have personal knowledge that the following facts are true and correct.

2.   I am the Chief Operating Officer of Glass, Lewis & Co., LLC ("Glass Lewis"). I have worked at Glass Lewis since 2008. I have held senior executive roles at Glass Lewis since 2008 and have served as Chief Operating Officer since 2011. In that capacity, I am familiar with the firm's proxy-advisory operations, including global research operations, client services, policy management, and regulatory compliance.

3.   This supplemental declaration is made in support of Glass Lewis' Motion for Preliminary Injunction.

4.   Since executing my initial declaration on July 25, 2025, Glass Lewis has continued preparing for the September 1, 2025, effective date of S.B. 2337 ("the Act"). Glass Lewis is actively preparing, under threat of statutory penalties and lawsuits, to attempt to comply with the Act starting September 1. If the Attorney General is not enjoined by then, Glass Lewis will incur significant, irreparable harm—both constitutional and economic harms.

**First Amendment Harms**

5. Glass Lewis intends to engage in a course of conduct protected by the First Amendment. Glass Lewis provides "proxy advisory services" within the meaning of S.B. 2337—including advice, recommendations, and proxy research. These services consist of speech. These services are at the core of Glass Lewis' business. Glass Lewis provides advice and recommendations on Texas companies that go against company management, differ among clients based on client preferences, and consider ESG, DEI, and sustainability factors when relevant. To continue to serve its clients, Glass Lewis will be providing this same speech regarding Texas companies after the Act goes into effect on September 1, 2025.

6. Glass Lewis also speaks through its internet website: https://www.glasslewis.com. On the website, Glass Lewis promotes itself and its services, and it conveys Glass Lewis' views on numerous matters of public concern.

7. Absent S.B. 2337, Glass Lewis' speech would not convey Texas' views reflected in Section 101(b) and Section 102(b). For example, Glass Lewis would not convey Texas' viewpoint—with which Glass Lewis vehemently disagrees—that consideration of governance factors makes advice not in the financial interest of shareholders. S.B. 2337 § 6A.101(b)(1). Glass Lewis' core business involves advice on corporate governance and its institutional investor clients retain it precisely because they believe that good corporate governance promotes their financial interest as shareholders of companies. It is hard to imagine statements more antithetical to Glass Lewis' views, business, and purpose than those compelled by Section 101(b).

8. Additionally, absent S.B. 2337, Glass Lewis' speech would not convey Texas' viewpoint that providing differing advice to differently situated clients is a "conflict" and necessarily means one client is not receiving advice in the financial interest of shareholders. S.B. 2337 § 6A.102(b)(2)-(3).

9.     Absent S.B. 2337, Glass Lewis certainly would not "publicly and conspicuously disclose on the home or front page of [Glass Lewis'] publicly accessible Internet website that the [Glass Lewis'] services include advice and recommendations that are not based solely on the financial interest of shareholders." S.B. 2337 § 6A.101(b)(3).

10.    The Act proscribes the course of conduct that Glass Lewis would engage in without the threat of enforcement by the Attorney General—(1) to provide advice and recommendations about Texas companies after September 1 without including Texas' views compelled by Sections 101(b) and 102(b) of the Act; and (2) to express itself on its website without including the self-denigrating statement that its "services include advice and recommendations that are not based solely on the financial interest of shareholders."

11.    The threat posed by enforcement of the Act by the Attorney General is substantial. In September 2025 alone, Glass Lewis anticipates providing to over 1,300 clients approximately ten reports on Texas companies' meetings. If each report to each client were to qualify as a violation carrying with it a $10,000 penalty, the threatened penalties for September 2025 alone would be at least $130 million.

**Present, Ongoing Changes to Glass Lewis' Speech as a Result of the Act.**

12.    Glass Lewis has already changed its speech in preparation for potential compliance with the Act. Specifically, to ensure that any required disclosures are received by the proper contact at the client, Glass Lewis has asked its clients where the disclosures should be sent. It has also diverted time and resources to send a message to its clients explaining how it plans to attempt to comply with the Act absent an injunction. Absent the threat of enforcement of the Act, Glass Lewis would not be sending such messages to its clients.

13.    The Act has already changed the cadence of Glass Lewis' proxy research reports. Glass Lewis has accelerated the issuance of reports into August to avoid their coverage by the

Act—changing how it would otherwise speak as a direct result of the threat of forthcoming enforcement of the Act.

**Imminent Changes to Glass Lewis' Speech as a Result of the Act.**

14. Absent an injunction, Glass Lewis will imminently be altering its speech to carry Texas' viewpoints with which Glass Lewis vehemently disagrees, starting September 1.

15. Absent an injunction, on September 1, 2025, Glass Lewis will begin displaying on its website homepage the self-denigrating warning required by Section 101(b)(3), with which Glass Lewis vehemently disagrees. If the law is enjoined before September 1, Glass Lewis will not post the website warning.

16. Additionally, absent an injunction, Glass Lewis will imminently be providing proxy advice accompanied by the disclosures mandated by the Act, likely in the first week of September.

17. As a matter of practice, Glass Lewis publishes its reports in the United States an average of 21 days prior to the company's annual meeting. This allows time for clients to consider Glass Lewis' recommendation, discuss it internally along with other information the client may consider, engage with the company, if necessary, and decide how to vote. Glass Lewis also allows companies to respond to its proxy reports within this window. Glass Lewis may then issue a supplemental or amended report based on the company's feedback.

18. So, a report regarding a company covered by the Act with its upcoming annual meeting on September 30, such as Howard Hughes Holdings Inc., would likely be issued on or around September 9, 2025. At a minimum, that report will take into account governance factors and therefore be subject to the Act's disclosure requirements.

19. Additionally, on September 23, 2025, the DallasNews Corporation, the holding company of *The Dallas Morning News*, will hold a special shareholder meeting to ask its shareholders to approve the merger of DallasNews and Hearst. Glass Lewis will, likely at some

point in the first week of September 2025, issue to its clients a report on this meeting analyzing the proposed merger and recommending whether its clients that are DallasNews shareholders should support it. Like nearly every report Glass Lewis issues, Glass Lewis' report on the DallasNews special meeting will take into account governance factors, such as whether the DallasNews board followed best governance practices in accepting Hearst's merger proposal and considering an alternative bid. In fact, governance considerations may be especially relevant to Glass Lewis' analysis insofar as the meeting involves the question of how the DallasNews board considered a bid that remains higher than Hearst's, but that is opposed by the company's controlling shareholder. Therefore, absent an injunction, to comply with the Act, Glass Lewis will be required to provide notices to all clients receiving this report that the advice "is not being provided solely in the financial interest of the company's shareholders because it is based wholly or partly on one or more nonfinancial factors" and that "the advice subordinates the financial interests of shareholders to other objectives." Glass Lewis emphatically disagrees with this inaccurate and misleading message. Glass Lewis would not include this message if the Act did not compel it to do so.

20.     Glass Lewis expects that many clients could misinterpret this warning. Because Glass Lewis must say that its advice "subordinates the financial interests of shareholders," clients may be wrongly led to believe that a vote the other way will result in greater financial returns. As a result, clients may risk not voting or delaying their votes due to internal approvals, which would ultimately harm the company.

21.     This pattern will continue if the Act is not enjoined. Glass Lewis anticipates providing proxy reports on approximately eight more Texas companies in September 2025 alone. Absent an injunction, Glass Lewis will provide the Act's required misleading warnings for each

of these reports. Glass Lewis would not include these messages if the Act did not compel it to do so.

**Present, Ongoing Economic Harms as a Result of the Act**

22.  Glass Lewis' preparations to comply with the Act have already imposed concrete economic harm on Glass Lewis. In undergoing these preparation efforts, Glass Lewis has been forced to divert time and resources away from its regular business.

23.  Glass Lewis has diverted time and resources away from its regular business as a result of the Act. As noted above, Glass Lewis has diverted time and resources away from its business to communicate with its clients about the Act and how it plans to attempt compliance.

24.  Glass Lewis' senior executive management team has dedicated hundreds of man-hours toward planning activities related to compliance with the Act in the event Glass Lewis' preliminary injunction is not granted by September 1. These meetings have involved Glass Lewis's entire Executive Team, including its CEO, COO, President, Chief Legal Officer, Chief Strategy Officer, Chief Financial Officer, and Chief Technology Officer. These meetings have diverted significant attention away from other pressing issues, like Glass Lewis' budgeting and strategic financial planning processes and towards our plan to comply with the law. These activities have delayed Glass Lewis' response to other pending tasks, including significant information technology initiatives that are central to its business plans.

25.  Glass Lewis has taken such significant time to develop a compliance plan in part because the Act's requirements are so vague, so there is enormous uncertainty about how to comply with the law. For example, Section 101(b)(1)(B) requires Glass Lewis to provide the "particular basis" for its recommendation but never defines what constitutes a "particular basis." Similarly, Section 102(b)(3)(B) requires a "specific financial analysis" but gives no indication as to what that entails.

26. These ongoing costs are in addition to the extensive costs Glass Lewis will incur if the law takes effect, as detailed in my initial declaration.

**Imminent Economic Harms as a Result of S.B. 2337.**

27. Already, Glass Lewis has diverted time and resources determining which upcoming votes will involve Texas companies, as defined by the Act. This has involved significant time and, in the short term, manual effort from senior employees: Glass Lewis does not have an existing business need and therefore does not have automated mechanisms to track scoping elements of S.B. 2337, such as whether a company's principal place of business is in Texas or whether the meeting involves a proposal to re-incorporate in Texas.

28. If S.B. 2337 comes into effect, Glass Lewis could be forced to spend resources to create a system to monitor whether notices are required under the Act. This would include creating a system to monitor whether a vote involves a Texas company, as defined in the Act, and if the meeting includes a proposal to re-incorporate in Texas. Developing these systems and assessing compliance would consume considerable employee hours, potentially require help from independent contractors, and cost Glass Lewis an undetermined, but significant amount on an initial and ongoing basis.

29. Absent an injunction, Glass Lewis expects to proceed with the hiring process for additional, dedicated resources to comply with S.B. 2337 in early September. These costs will be directly attributable to compliance with the Act.

30. Glass Lewis has likely already incurred reputational harm from the Act's imminent deadline. Glass Lewis has conveyed its compliance plan to clients and relayed that, beginning September 1, it will be forced to carry the State's compelled disclosures under Section 101 and 102. So, Glass Lewis has already had to warn clients that they may receive notices labeling the advice those clients requested as purportedly not in the financial interest of shareholders. Glass

- 8 -

Lewis' reputational harm will likely worsen if it is indeed required to start sending these disclosures. Reputational harm would likely lead to the loss of clients and profits.

- 9 -

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed in Toronto, Canada on August 22, 2025

_____
John Wieck