# EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| GLASS, LEWIS & CO., LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | No. 1:25-CV-01153-ADA |
| KEN PAXTON, in his official capacity as | § | |
| Attorney General of the State of Texas, | § | |
| | § | |
| Defendant. | § | |

**AMICUS CURIAE BRIEF OF
THE ALLIANCE FOR CORPORATE EXCELLENCE**

FOLEY & LARDNER LLP

Peter L. Loh
State Bar No. 24036982
ploh@foley.com
Brantley A. Smith
State Bar No. 24110375
bsmith@foley.com
2021 McKinney Ave., Suite 1600
Dallas, Texas 75201
Telephone: 214-999-3000
Facsimile: 214-999-4667

David G. Cabrales
State Bar No. 00787179
dcabrales@foley.com
600 Congress Avenue, Suite 2900
Austin, Texas 78701
Telephone: 512-542-7018
Facsimile: 512-542-7100

*Counsel for the Alliance for Corporate
Excellence*

**TABLE OF CONTENTS**

INTEREST OF  THE ALLIANCE FOR CORPORATE EXCELLENCE ........................ 1

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 3

A.   The Proxy Advisory Industry. ................................................................... 3

    1.   What is a proxy advisory firm? .......................................................... 3

    2.   How did proxy advisory firms gain prominence? ............................... 4

    3.   Glass Lewis and ISS are a duopoly exerting enormous influence over the market. ............................................................................................ 6

B.   Proxy advisory firms have historically avoided regulations. ...................... 8

C.   Problems of an unregulated proxy advising industry ............................... 11

    1.   Nonfinancial factors influencing voting recommendations. ............. 12

    2.   Conflicts of interest. ....................................................................... 17

    3.   Reporting errors. ............................................................................. 18

D.   SB 2337 is a step in the right direction. ................................................. 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                     **Page(s)**

*Chamber of Com. of United States v. Sec. & Exch. Comm'n*,
    115 F.4th 740 (6th Cir. 2024) ................................................................... 6, 10

*Institutional S'holder Services, Inc. v. Sec. & Exch. Comm'n*,
    142 F.4th 757 (D.C. Cir. 2025) ................................................................. 9, 10

*Nat'l Ass'n of Mfrs. v. United States Sec. & Exch. Comm'n*,
    105 F.4th 802 (5th Cir. 2024) ................................................................. 10, 17

**Statutes**

29 U.S.C. § 1104 ................................................................................................ 2

**Regulations**

17 C.F.R. § 240.14a–8 ....................................................................................... 4

Disclosure of Proxy Voting Policies and Proxy Voting Records by Registered Management
    Investment Companie,
    68 Fed. Reg. 6564 (Feb. 7, 2003) .......................................................... 5

Exemptions From the Proxy Rules for Proxy Voting Advice,
    85 Fed. Reg. 55,082 (Sept. 3, 2020) ..................................................... 4, 9

Proxy Voting Advice,
    86 Fed. Reg. 67,383 (Nov. 26, 2021) .................................................... 10

Proxy Voting Advice,
    87 Fed. Reg. 43,168 (July 19, 2022) ..................................................... 10

**Other Authorities**

Dominic P. Keilty, *Solving the Proxy Advisory Problem: Minimum Regulation for Maximum*
    *Competition*,
    14 MICH. BUS. & ENTREPRENEURIAL L. REV. 67 (2025) ....................... 5

*The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and*
    *Europe) Face*,
    30 Del. J. Corp. L 673 (2005) ................................................................. 3

A. De La Cruz et al., *Owners of the World's Listed Companies*, OECD Capital Market
Series, at 22 (2019) ........................................................................................... 4

Letter from Douglas Scheidt, Assoc. Dir. & Chief Couns., SEC, to Mari Anne Pisarri, Esquire,
    Pickard & Djinis LLP (Sept. 15, 2004) ................................................... 5

*Exposing the Proxy Advisory Cartel: How ISS & Glass Lewis Influence Markets*: Hearing
   Before the H. Comm. On Fin. Serv., S. Comm. on Capital Markets (statement of Elizabeth
   Ising, Partner, Gibson, Dunn & Crutcher LLP) (2025)...................................5, 7, 11, 17, 19

American Council for Capital Formation, letter to the SEC dated January 27, 2020, re: File
   No. S7-22-19 ..........................................................................................................7

*Exposing the Proxy Advisory Cartel: How ISS & Glass Lewis Influence Markets*: Hearing
   Before the H. Comm. On Fin. Serv., S. Comm. on Capital Markets (statement of Charles
   Crain, Partner, Managing Vice President, Policy, National Association of Manufacturers)
   (2025).........................................................................................7, 8, 10, 12, 17, 18

*Exposing the Proxy Advisory Cartel: How ISS & Glass Lewis Influence Markets*: Hearing Before
   the H. Comm. On Fin. Serv., S. Comm. on Capital Markets (2025) (statement of Paul
   Washington, President and CEO, Society for Corporate Governance).....................................7

Timothy M. Doyle, *The Realities of Robo-Voting*, American Council for Capital Formation
   (Nov. 9, 2018)...............................................................................................................7, 8

Paul Rose, *Proxy Advisors and Market Power: A Review of Institutional Investor Robovoting*,
   Social Science Research Network (April 2021) ..........................................................................7

Chong Shu, *The Proxy Advisory Industry: Influencing and Being Influenced*, J. FIN. ECON.,
   Apr. 2024 ..........................................................................................................................8

Chairman Mary L. Schapiro, *Opening Statement at the SEC Open Meeting*, SEC
   (July 14, 2010).......................................................................................................................9

Letter from Brenna Bird, Attorney General of Iowa to Gary Retelny, President and CEO of
   Institutional Shareholder Services, Inc. and Kevin Cameron, Executive Chairman of Glass,
   Lewis & Co. (November 29, 2023) ...........................................................................................10

Press Release, Attorney General Bailey Leads Fight Against Hidden ESG And DEI Agendas
   In Corporate America ..........................................................................................................11

Press Release, Attorney General James Uthmeier Announces Investigation Into Glass
   Lewis & Co. and Institutional Shareholder Services Inc. for ESG and DEI Policies ..............11

*What is ESG and What Does it Mean for your Business?*, Business Development Bank of
   Canada (May 2, 2022) .........................................................................................................12

Mark S. Bergman et. al, *Introduction to ESG*, HARV. L. SCH. F. ON CORP. GOVERNANCE
   (Aug. 1, 2020)......................................................................................................................12

*What is ESG Investing?*, CFA Institute (Mar. 4, 2024) .................................................................12

Hemamalini Kumaran, *What Role Can DEI & ESG Play in Corporate Responsibility?*,
   CUTTER (July 8, 2024) ........................................................................................................12

iv

Mala Chawla, *The Crucial Role of DE&I In ESG Reporting*, STANTON CHASE (Apr. 2022) ......12

John Norberg, *The Slow Death of ESG and DEI*, FIRST THINGS (Feb. 4, 2025) .........................12

Glass Lewis, *2025 Benchmark Policy Guidelines* (2025) ............................................................13

Glass Lewis, *Glass Lewis Proxy Voting Policies* .........................................................................15

ISS, *2024 ISS Proxy Voting Guidelines Benchmark Policy Recommendations* ...........................15

ISS, *ESG Corporate Ratings* ........................................................................................................16

Society for Corporate Governance, SEC File Number S7-22-19 ...........................................17, 19

Paid Proxy Firm Consulting with Issuers Is Very Bad, EGAN-JONES RATINGS
  (Aug. 21, 2020) ........................................................................................................................17

Jan Krahnen et al., *The Controversy Over Proxy Voting: The Role of Asset Managers and
  Proxy Advisors*, HARV. L. SCH. F. ON CORP. GOVERNANCE (Jan. 30, 2023).............................17

Glass Lewis, *Equity Plan Advisory Services* ................................................................................18

Kyle Isakower, *Proxy Advisors Remain a Problem*, American Council for Capital Formation
  (July 2025) ................................................................................................................................18

Frank M. Placenti, *Analysis of Proxy Advisor Factual and Analytical Errors in 2016, 2017,
  and 2018* (2018).........................................................................................................................18

American Council for Capital Formation, *Proxy Advisors Are Still a Problem* (Dec. 2021)........19

Glass Lewis, *Report Feedback Statement (RFS)* ..........................................................................19

## INTEREST OF
## THE ALLIANCE FOR CORPORATE EXCELLENCE

The Alliance for Corporate Excellence (the "Alliance") is a non-profit 501(c)(4) corporation organized under the laws of the State of Texas.[1] The Alliance specifically supports publicly traded companies doing business in Texas. For the benefit of those companies, the Alliance advocates for rules that ensure the regulatory environment in Texas is conducive to responsible corporate governance and economic growth. As part of this mission, the Alliance supported multiple legislative initiatives over this last Texas legislative session, including Senate Bill 2337 ("SB 2337"). The Alliance submits this amicus curiae brief to provide the Court with additional context and background on the proxy advisory industry and on prior attempts to regulate proxy advisory firms, and why enactment of SB 2337 is in the best interest of Texas companies.

## INTRODUCTION

A central truth of corporate law is that shareholders own corporations. In the public capital markets, many individuals do not own corporations directly; rather, they own an interest in an investment entity—like a mutual fund, pension plan, hedge fund or other investment vehicle—that invests in public corporations and is managed by a professional asset manager. Asset managers control trillions of dollars of their investors' collective wealth. In turn, many asset managers hold significant equity stakes in public companies, including public companies in Texas.

Because asset managers are responsible for making decisions with the wealth of their beneficiaries—including not only wealthy investors but also pensioners, retirees, and millions of ordinary Americans with a retirement account—they are fiduciaries under the law, obligated to act

---

[1] The Alliance does not have any parent corporation, and there is no publicly held corporation that owns 10 percent or more of its stock. The Alliance is not receiving funding from any party to this lawsuit.

in the best interests of their investors. Similarly, corporate directors, who manage corporations at the behest of the shareholders, are subject to fiduciary duties to ensure their acts are for the benefit of their corporations. Between state and federal law, asset managers, directors and other corporate decision-makers are held accountable under myriad laws, rules, regulations and agency determinations intended to ultimately benefit the individuals who invest in American enterprise. Importantly, as fiduciaries, the managers must act in the best interest of their clients and beneficiaries and avoid conflicts of interest.[2]

Despite this framework, one category of actor has avoided oversight while still having an active and influential role in corporate decision-making: proxy advisory firms. Despite the extraordinary influence proxy advisory firms hold over corporate governance in the United States, firms like Institutional Shareholder Services, Inc. ("ISS") and Glass, Lewis & Co., LLC ("Glass Lewis") operate outside of the regulatory framework that govern other key players in corporate governance. This lack of oversight has received criticism for decades, but the concern has increased in recent years as proxy advisory firms have increased their influence while implementing nonfinancial considerations into their voting recommendations.

SB 2337 is the response of Texas lawmakers to these concerns. Narrowly tailored to merely require disclosure when advice is not made solely in the financial interests of shareholders—SB 2337 allows proxy advisors to make whatever voting recommendations they desire. SB 2337 is intended to ensure that shareholders of Texas companies receive complete, accurate, and transparent information about proxy advisors' voting recommendations so that shareholders can make informed voting decisions.

---

[2] *See, e.g.*, 29 U.S.C. § 1104 (relevant to asset managers controlling pension plans).

In light of the significant and complex role that proxy advisors play in modern corporate governance, the Alliance writes to provide the Court with additional context and background on the proxy advisory industry and the importance of SB 2337 to companies and investors in the State of Texas.

## ARGUMENT

> "Powerful CEOs come on bended knee to Rockville, Maryland, where ISS resides, to persuade the managers of ISS of the merits of their views."[3]

Judge Leo E. Strine, Jr., former chief judge of the Delaware Supreme Court and Chancellor of the Delaware Court of Chancery

### A.    The Proxy Advisory Industry.

#### 1.    *What is a proxy advisory firm?*

Corporate law allocates some decisions to a board of directors and others to shareholders. While boards are typically entrusted for overseeing most corporate decision-making, state law typically requires that a corporation's shareholders vote on certain fundamental actions and fundamental business transactions, such as mergers or sales of all a corporation's assets, elections of directors, and amendments to corporate charters. In addition to state law, the federal securities laws and other regulations, including the rules of national securities exchanges, require shareholder votes to approve auditors, issue more than 20% of a corporation's shares, advise on executive compensation, and other matters. Shareholders of public corporations exercise their voting rights at annual and special shareholder meetings. At these meetings, the corporation's managers often submit proposals for vote by the shareholders, but shareholders generally also have the right to

---

[3] Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 Del. J. Corp. L 673, 688 (2005), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=893940.

propose corporate actions.[4] Most investors do not attend shareholder meetings in person; instead, they provide third parties with a proxy to vote according to their instructions. As discussed earlier, a public company's shareholders often include large institutions controlled not directly by the investors but by asset managers for the benefit of the ultimate shareholders. These asset managers often control substantial stakes in hundreds, if not thousands, of corporations. In fact, institutions controlled by asset managers hold a substantial majority of the shares issued by U.S. public corporations.[5] Those asset managers are, therefore, responsible for voting in hundreds, if not thousands, of shareholder meetings—typically concentrated over a few months.[6]

2.    *How did proxy advisory firms gain prominence?*

In the 1988 "Avon" Letter, the U.S. Department of Labor (DOL) decided that the fiduciary duties of pension plan managers includes the duty to vote the shares of the stock owned by the plan for the benefit of its ultimate shareholders. While the Avon Letter applies only in the context in which it was issued, it is looked to broadly by many classes of asset managers as guidance in

---

[4] These rights are outlined and defined by both state and federal law. *See* Rule 14a-8 of the Securities Exchange Act of 1934, 17 C.F.R. § 240.14a–8.

[5] Exemptions From the Proxy Rules for Proxy Voting Advice, 85 Fed. Reg. 55,082-01, 55,085 (Sept. 3, 2020) (citing A. De La Cruz et al., *Owners of the World's Listed Companies*, OECD Capital Market Series, at 22 (2019), available at https://www.oecd.org/corporate/Owners-of-the-Worlds-Listed-Companies.pdf ("In the United States, institutional investors hold around 72% of the domestic stock market value.").

[6] The rules promulgated by the Securities and Exchange Commission (the "SEC") allow a company to incorporate materials from its proxy statement—that is, the materials a company uses to solicit proxies for shareholder votes at its annual meetings—into its annual Form 10-K if the proxy materials are filed within 120 days after the end of the Company's fiscal year.  General Instruction G(3) to Form 10-K. As a practical matter, this means that many public companies seek to file their annual proxy statements before April 30 of any year and, because most states require not more than 60 days to pass between notice of a meeting of shareholders being given and the meeting being held, most U.S. public companies end up holding their annual meetings in April, May, or June, in what is colloquially referred to as "proxy season."

interpreting their fiduciary duties. To ensure compliance with their fiduciary duties, asset managers turned to industry experts for assistance to analyze proposals and vote the shares held by them. From here, the proxy advising business has continually grown in size and influence. The business of proxy advising grew significantly after 2003 when the SEC obligated institutional investors registered with the SEC to disclose their proxy voting policies and voting records while also making clear that institutional investors could rely on third-party firms for these decisions.[7]

Moreover, in 2004, the SEC issued a pair of no-action letters clarifying that "investment advisers can address any potential conflicts of interest they face in proxy voting by following the recommendations of an independent third party, such as a proxy advisor."[8] Testimony from an industry expert before the House Subcommittee on Capital Markets on April 29, 2025, defines their role precisely: "Proxy advisory firms assist shareholders (primarily institutional investors) by providing research, data, and voting recommendations on matters shareholders are asked to vote on, as well as providing ancillary services such as actually submitting proxy voting instructions on behalf of their clients."[9]

---

[7] Disclosure of Proxy Voting Policies and Proxy Voting Records by Registered Management Investment Companie, 68 Fed. Reg. 6564 (Feb. 7, 2003).

[8] Dominic P. Keilty, *Solving the Proxy Advisory Problem: Minimum Regulation for Maximum Competition*, 14 MICH. BUS. & ENTREPRENEURIAL L. REV. 67 (2025). Available at: https://repository.law.umich.edu/mbelr/vol14/iss1/8 (citing Letter from Douglas Scheidt, Assoc. Dir. & Chief Couns., SEC, to Kent S. Hughes, Managing Dir., Egan-Jones Proxy Servs. (May 27, 2004) (on file with the SEC); Letter from Douglas Scheidt, Assoc. Dir. & Chief Couns., SEC, to Mari Anne Pisarri, Esquire, Pickard & Djinis LLP (Sept. 15, 2004) (on file with the SEC)).

[9] *Exposing the Proxy Advisory Cartel: How ISS & Glass Lewis Influence Markets*: Hearing Before the H. Comm. On Fin. Serv., S. Comm. on Capital Markets (2025) (statement of Elizabeth Ising, Partner, Gibson, Dunn & Crutcher LLP), https://docs.house.gov/meetings/ BA/BA16/20250429/118146/HHRG-119-BA16-Wstate-IsingE-20250429.pdf ("Ising Testimony").

3.    *Glass Lewis and ISS are a duopoly exerting enormous influence over the market.*

Another factor in the rise of proxy advisory firms is the dramatic increase in the number of matters submitted to a shareholder vote. There has been a 730% growth in the number of items to be voted on by Russell 3000 companies from 2000 to 2024. [10] The growth of this market has also seen the growth of two proxy advisory firms, ISS and Glass Lewis, who as of 2024 have been estimated to control 97% of the proxy advising market.[11] This concentrated level of influence in an exponentially growing market has correspondingly led to ISS and Glass Lewis holding significant influence over the major actions of U.S. public companies.

ISS, the largest proxy advising firm, is majority-owned by a German exchange organization.[12] Its website in 2020 disclosed that it covered approximately 44,000 shareholder meetings around the world, annually, and executed about 10.2 million ballots on a yearly basis on behalf of clients representing 4.2 trillion shares.[13] As of 2025, ISS's coverage has increased to over 50,000 shareholder meetings annually on behalf of more than 2,000 clients.[14] ISS is a registered investment advisor under the Investment Advisors Act of 1940.  It also provides consulting services through "which [ISS] offers guidance to companies on the very topics that will be the

---

[10] *Id.* at 1.

[11] *Chamber of Com. of United States v. Sec. & Exch. Comm'n*, 115 F.4th 740, 746 n.1 (6th Cir. 2024); American Council for Capital Formation, letter to the SEC dated January 27, 2020, re: File No. S7-22-19, available at: https://www.sec.gov/comments/s7-22-19/s72219-6705468-206098.pdf.

[12] Deutsche Börse acquires leading governance, ESG data and analytics provider ISS, https://www.issgovernance.com/deutsche-borse-acquires-leading-governance-esg-data-and-analytics-provider-iss/ (last visited August 20, 2025).

[13] About ISS, https://www.issgovernance.com/about/about-iss/ (May 23, 2020); archived at *Wayback Machine*, http://web.archive.org/web/20200523051537/https://www.issgovernance.com/about/about-iss/ (last visited Aug. 20, 2025).

[14] About ISS, https://www.issgovernance.com/about/about-iss/ (last visited Aug. 18, 2025).

subject of ISS's voting recommendations."[15] Glass Lewis, the second largest proxy advising firm, manages approximately $40 trillion in assets on behalf of over 2,300 clients and covers over 30,000 shareholder meetings annually.[16] Glass Lewis is majority-owned by a Canadian private equity firm and is not registered with the SEC.[17]

Glass Lewis and ISS wield incredible influence over the investor market. Institutional investors usually follow their "recommendations" in lockstep.[18] A 2018 study found that 175 asset managers with over $5 trillion in assets under management voted with ISS more than 95% of the time.[19] The results of a 2021 study were even more shocking. The study identified 114 financial institutions managing $5 trillion in assets that automated their votes in alignment with ISS recommendations *99.5%* of the time.[20] This practice whereby asset managers outsource their fiduciary determinations to proxy advisory firms (referred to as "robo-voting") shows up not only in the amount of support achieved by ISS and Glass Lewis recommendations but in the speed of

---

[15] *Exposing the Proxy Advisory Cartel: How ISS & Glass Lewis Influence Markets*: Hearing Before the H. Comm. On Fin. Serv., S. Comm. on Capital Markets (2025) (statement of Charles Crain, Partner, Managing Vice President, Policy, National Association of Manufacturers at 2), https://docs.house.gov/meetings/BA/BA16/20250429/118146/HHRG-119-BA16-Wstate-CrainC-20250429.pdf ("Crain Testimony").

[16] About Glass Lewis, https://www.glasslewis.com/about-us (last visited August 18, 2025).

[17] The fact that ISS found it necessary to register under the Advisors Act but Glass Lewis has not is indicative of the lack of regulation over proxy advisors.

[18] Ising Testimony at 6.

[19] Crain Testimony at 2 (citing Timothy M. Doyle, *The Realities of Robo-Voting*, American Council for Capital Formation (Nov. 9, 2018), https://accf.org/wp-content/uploads/2018/11/ACCF-RoboVoting-Report_11_8_FINAL.pdf.

[20] *Exposing the Proxy Advisory Cartel: How ISS & Glass Lewis Influence Markets*: Hearing Before the H. Comm. On Fin. Serv., S. Comm. on Capital Markets (2025) (statement of Paul Washington, President and CEO, Society for Corporate Governance at 3), https://docs.house.gov/meetings/BA/BA16/20250429/118146/HHRG-119-BA16-Wstate-WashingtonP-20250429.pdf. ("Washington Testimony") (citing Paul Rose, *Proxy Advisors and Market Power: A Review of Institutional Investor Robovoting*, Social Science Research Network (April 2021)).

votes following the delivery of ISS and Glass Lewis voting guidance. One survey shows that 20% of shareholder votes—typically votes held by asset managers on behalf of individual investors— are cast within three days of a proxy advisory recommendation to vote against a company's proposal on an issue.[21]

In many cases institutional investors hand over authority to the proxy advisors to automatically vote on their behalf through software platforms that send in vote tabulators for shareholder meetings.[22] This process completely cuts the institutional investors and their clients out of the process.[23] The speed at which these votes are cast also deprives companies of an opportunity to correct mistakes or provide additional information before votes are cast.[24] "This degree of influence over companies' proxy voting results means that ISS and Glass Lewis . . . effectively dictate corporate governance policies for America's capital markets."[25]

**B.    Proxy advisory firms have historically avoided regulations.**

Given the vast influence of ISS and Glass Lewis, it is critical that proxy advising companies provide accurate and complete information to their clients with total transparency on how they determine those recommendations so that their clients can act as responsible fiduciaries to the clients' investors. The SEC reached the same conclusion when it tried, but ultimately failed, to apply additional regulations on the proxy advising business in 2020.[26] Indeed, despite the outsized

---

[21] Doyle, *The Realities of Robo-Voting*, at 9.

[22] Chong Shu, *The Proxy Advisory Industry: Influencing and Being Influenced*, J. FIN. ECON., Apr. 2024, at 2; Washington Testimony at 5.

[23] Crain Testimony at 4.

[24] *Id.*

[25] *Id.* at 1.

[26] *See* 85 Fed. Reg. at 55,083.

influence proxy advisors have over the market, proxy advisory firms are subject to minimal regulations compared with other industry players like asset managers, credit rating agencies, and auditing firms. This is at least partly due to proxy advisory firms successfully resisting regulatory efforts.

As early as 2010, the SEC acknowledged concerns over the influence and lack of regulations on the proxy advisory business.[27] In 2019, after nearly ten years of bipartisan effort spanning multiple presidential administrations, the SEC published a proposed rule governing proxy advisory services ("2019 Proposed Rule").[28] In 2020, the SEC published its final rule to enact the proscriptions (with some modifications) of the 2019 Proposed Rule ("2020 Rule"), which was to become effective December 1, 2021.[29]

ISS resisted these new regulations. Shortly after the publication of the 2019 Proposed Rule, ISS sued the SEC in the U.S. District Court for the District of Columbia.[30] During the litigation, the SEC revisited the 2020 Rule and, in November 2021, rescinded certain portions of the proposed

---

[27] Chairman Mary L. Schapiro, *Opening Statement at the SEC Open Meeting*, SEC (July 14, 2010), https://www.sec.gov/news/speech/2010/spch071410mls.htm.

[28] Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice, 85 Fed. Reg. 55,082 (December 4, 2019). The 2019 Proposed Rule amended the definitions of "solicitation" and "solicit" to reference proxy voting advice, thereby applying federal proxy rules to proxy voting advice.[28] The application of federal proxy rules meant that proxy advisory firms had to publish their recommendations with the SEC unless they could obtain an exemption. To obtain an exemption, a proxy advisory firm had to comply with certain conditions, which included disclosing conflicts of interest.

[29] *Id.* (citing 85 Fed. Reg. at 55,122).

[30] *Institutional S'holder Services, Inc. v. Sec. & Exch. Comm'n*, 142 F.4th 757, 762 (D.C. Cir. 2025).

regulations.[31] Then again in March 2022, the SEC rescinded the remaining conditions—mooting

several of ISS's claims.[32]

ISS obtained summary judgment on the remaining issues, which the SEC initially appealed.

In August 2024, however, "the SEC dismissed its appeal . . . (without explanation)."[33] The SEC's

withdrawal from the appeal left a trade association as the sole remaining appellant.[34] On July 1,

2025, the U.S. Court of Appeals for the District of Columbia Circuit affirmed the lower court's

summary judgment.[35] The result of this ruling is that the SEC is "effectively blocked from any

future attempt to regulate proxy advisory firms via the proxy solicitation rules."[36]

In addition to the SEC's attempts to regulate the proxy advising business, Congress has

discussed and drafted legislation to reign in the industry, but little progress has been made to put

in place an effective regulatory scheme.[37] States beyond Texas have also criticized ISS and Glass

Lewis. In 2023, twenty-one state attorney generals sent a joint letter to ISS and Glass Lewis to

demand that the companies stop prioritizing ESG initiatives.[38] More recently, the Attorney General

---

[31] Proxy Voting Advice, 86 Fed. Reg. 67,383, 67,387 (Nov. 26, 2021).

[32] *See* Proxy Voting Advice, 87 Fed. Reg. 43,168-01, 43,174 (July 19, 2022). The SEC's rescission led to two separate lawsuits challenging the SEC's action: *Chamber of Com. of United States*, 115 F.4th 740 and *Nat'l Ass'n of Mfrs. v. United States Sec. & Exch. Comm'n*, 105 F.4th 802 (5th Cir. 2024). Notably, 26 states jointly filed an *amici curiae* brief in support of the U.S. Chamber of Commerce's lawsuit against the SEC for its recissions made to the 2020 Rule. Brief of Amici Curiae State of Utah and 25 Other States at 1, *Chamber of Com. of United States v. Sec. & Exch. Comm'n*, 115 F.4th 740 (6th Cir. 2024) (No. 23-5409), 2023 WL 4366252, at *1.

[33] *Institutional S'holder Services, Inc.*, 142 F.4th at 763.

[34] *Id.* at 768.

[35] *Id.*

[36] Crain Testimony at 6.

[37] *Id.* at 8–10.

[38] Letter from Brenna Bird, Attorney General of Iowa to Gary Retelny, President and CEO of Institutional Shareholder Services, Inc. and Kevin Cameron, Executive Chairman of Glass, Lewis

for the State of Missouri has launched investigations and filed lawsuits against Glass Lewis and

ISS "to ensure their compliance with lawful demands for information related to their promotion of

radical environmental, social, and governance (ESG) and diversity, equity, and inclusion (DEI)

agendas."[39] Florida's Attorney General also announced investigations into Glass Lewis and ISS

earlier this year over the companies' ESG and DEI policies.[40]

## C.    Problems of an unregulated proxy advising industry.

ISS and Glass Lewis have abused their positions of influence and should be regulated.

While each purports to make their voting policies publicly available, "[a] review of these policies,

as well as experience with their application, demonstrates that the development and application of

these policies lacks transparency and that these policies often are based on unfounded biases and

presumptions."[41] Their advice, unlike the actions of asset managers or corporate directors who

have a *fiduciary duty* to act in the best interests of their shareholders, reflects the fact that:

> [p]roxy firms have substantive beliefs and normative agendas about how public
> companies should be run. In other words, they are not disinterested third parties;
> rather, they seek to guide corporate behavior to align with their own interests.
> Further, proxy firms do not have a fiduciary duty to the underlying investors in
> America's public companies—teachers, firefighters, and manufacturing workers
> saving for a secure retirement—so they are free to exert their outsized influence as
> they see fit. They do so by recommending that institutional investors vote in

---

& Co. (November 29, 2023), https://www.iowaattorneygeneral.gov/media/cms/Final_
Debanking_Proxy_Advisor_Lette_738F6B3D5DF65.pdf.

[39] Press Release, Attorney General Bailey Leads Fight Against Hidden ESG And DEI Agendas In
Corporate America, https://ago.mo.gov/attorney-general-bailey-leads-fight-against-hidden-esg-
and-dei-agendas-in-corporate-america/ (last visited Aug. 19, 2025).

[40] Press Release, Attorney General James Uthmeier Announces Investigation Into Glass Lewis &
Co. and Institutional Shareholder Services Inc. for ESG and DEI Policies,
https://www.myfloridalegal.com/newsrelease/attorney-general-james-uthmeier-announces-
investigation-glass-lewis-co-and (last visited Aug. 19, 2025).

[41] Ising Testimony at 7.

accordance with their pre-set, one-size-fits-all voting guidelines.[42]

In addition, Glass Lewis and ISS have a history of permitting undisclosed biases to impact voting recommendations, engaging in conflicts of interest between their proxy advising services and separate consulting services, and refusing to correct errors contained in their reports about the companies to whom they are providing recommendations.

1.    *Nonfinancial factors influencing voting recommendations.*

The impetus behind SB 2337 is the influence of nonfinancial factors over proxy advisory firms' recommendations. As examples of such nonfinancial factors, SB 2337 lists consideration of diversity, equity, and inclusion (DEI), and environmental, social, governance (ESG) policies—regardless of whether such considerations are in favor or in opposition to such policies. While both ISS and Glass Lewis argue that such terms are vague, both ESG and DEI are well known terms used when discussing corporate governance and often used as an alternative framework from corporate decision-making focused on financial returns.[43]

---

[42] Crain Testimony at 1.

[43] *See, e.g., What is ESG and What Does it Mean for your Business?*, Business Development Bank of Canada (May 2, 2022), https://www.bdc.ca/en/articles-tools/sustainability/environment/what-esg-and-what-does-mean-business ("ESG stands for environmental, social, and (corporate) governance. It is a set of practices and metrics used to evaluate a company beyond its financial performance."); Mark S. Bergman et. al, *Introduction to ESG*, HARV. L. SCH. F. ON CORP. GOVERNANCE (Aug. 1, 2020), https://corpgov.law.harvard.edu/2020/08/01/introduction-to-esg/ ("ESG, at its core, is a means by which companies can be evaluated with respect to a broad range of socially desirable ends."); *What is ESG Investing?*, CFA Institute (Mar. 4, 2024), https://www.cfainstitute.org/insights/articles/what-is-esg-investing ("ESG stands for Environmental, Social, and Governance. Investors are increasingly applying these non-financial factors as part of their analysis process to identify material risks and growth opportunities."); Hemamalini Kumaran, *What Role Can DEI & ESG Play in Corporate Responsibility?*, CUTTER (July 8, 2024), https://www.cutter.com/article/what-role-can-dei-esg-play-corporate-responsibility ("DEI is an important component of ESG."); Mala Chawla, *The Crucial Role of DE&I In ESG Reporting*, STANTON CHASE (Apr. 2022), https://www.stantonchase.com/insights/blog/the-crucial-role-of-dei-in-esg-reporting ("Diversity, equity, and inclusion (DE&I) comprises the central 'S' in ESG.") John Norberg, *The Slow Death of ESG and DEI*, FIRST THINGS (Feb. 4,

The fact that these terms have a commonly understood definition can further be seen in that ISS and Glass Lewis both explicitly consider ESG and DEI in their voting recommendation analyses. And while Glass Lewis and ISS contend they cannot define the concept of DEI or ESG ("ill-defined," a "Rorschach test," "shifting political and social interpretations"), [ECF No. 4 at 16], both companies' policy agendas belie this supposed confusion.

    a.  *Glass Lewis.*

Glass Lewis's 2025 Benchmark Policy Guidelines make very clear its own social policy preferences. Glass Lewis on "Board Gender Diversity":

> [W]e will generally recommend voting *against* the chair of the nominating committee of a board that is not *at least* 30 percent gender diverse, or all members of the nominating committee of a board with no gender diverse directors, at companies within the Russell 3000 index.[44]
>
> . . .
>
> For companies outside the Russell 3000 index, our policy *requires* a minimum of one gender diverse director.[45]

[emphasis added]. Glass Lewis continues:

> We will generally recommend *against* the chair of the nominating committee of a board with fewer than one director from an underrepresented community on the board at companies within the Russell 1000 index. We define "underrepresented community director" as an individual who self-identifies as Black, African American, North African, Middle Eastern, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, or Alaskan Native or who self-

---

2025), https://firstthings.com/the-slow-death-of-esg-and-dei/ ("Both ESG and DEI are moral frameworks that put perceived social goods before the basic financial principle of making returns on investments.").

[44] Glass Lewis, *2025 Benchmark Policy Guidelines* at 40 (2025) ("Glass Lewis 2025 Guidelines"), https://resources.glasslewis.com/hubfs/2025%20Guidelines/2025%20US%20 Benchmark%20Policy%20Guidelines.pdf.

[45] *Id.* (emphasis added).

identifies as a member of the LGTQIA+ community.[46]

[emphasis added]. How a company talks about the racial, ethnic, or gender composition of its

directors is also of concern:

> Because company disclosure is critical when measuring the mix of diverse attributes and skills of directors, Glass Lewis assesses the quality of such disclosure in companies' proxy statements. Accordingly, we reflect how a company's proxy statement presents: (i) the board's current percentage of racial/ethnic diversity; (ii) whether the board's definition of diversity explicitly includes gender and/or race/ethnicity; (iii) whether the board has adopted a policy requiring women and minorities to be included in the initial pool of candidates when selecting new director nominees (aka "Rooney Rule"); and (iv) board skills disclosure. Such ratings will help inform our assessment of a company's overall governance and may be a *contributing factor* in our recommendations when additional board-related concerns have been identified.

> At companies in the Russell 1000 index that have not provided any disclosure in any of the above categories, we will generally recommend voting *against* the chair of the nominating and/or governance committee. Further, when companies in the Russell 1000 index have not provided any disclosure of individual or aggregate racial/ethnic minority board demographic information, we will generally recommend voting *against* the chair of the nominating and/or governance committee.[47]

Similarly, Glass Lewis instructs:

> [S]hareholders *should* seek to promote governance structures that protect shareholders, support effective ESG oversight and reporting, and encourage director accountability.[48]

Glass Lewis further "evaluates environmental and social issues" within the context of ESG

"oversight and reporting," "risks," "strategy," "ambitions," and "targets."[49] Glass Lewis offers

clients further instruction in its Proxy Paper Guidelines for Shareholder Proposals & ESG Related

---

[46] *Id.* at 41.

[47] *Id.* at 42. [emphasis added].

[48] *Id* at 83. [emphasis added].

[49] *Id.* at 30, 57, 83.

Issues.[50] Glass Lewis made news last year after it recommended a vote against a re-election of ExxonMobil's lead director, Joseph Hooley, after Hooley supported a lawsuit "preventing investors from introducing allegedly climate-friendly shareholder proposals that shareholders had twice voted to reject."[51] Exxon argued that Glass Lewis prioritized its support for climate-change policies over shareholder value.[52] After a public battle between Exxon and Glass Lewis, Exxon's shareholders ultimately rejected Glass Lewis's advice and re-elected Hooley.[53]

Glass Lewis does not consider these ESG or DEI goals in terms of shareholder value, rather, it states its position that "shareholders are best served when boards make an effort to ensure a constituency that is not only reasonably diverse on the basis of age, race, gender and ethnicity, but also on the basis of geographic knowledge, industry experience, board tenure and culture."[54]

> b. *ISS.*

Like Glass Lewis, ISS has publicly disclosed for years that it considered DEI factors when providing proxy voting recommendations. In its 2024 Proxy Voting Guidelines Benchmark Policy Recommendations, ISS states that for board nominations it will consider the gender composition of the board and will recommend to:

> [g]enerally vote *against* or *withhold* from the chair of the nominating committee (or other directors on a case-by-case basis) at companies where there are no women on the company's board. An exception will be made if there was at least one woman on the board at the preceding annual meeting and the board makes a firm *commitment* to return to a gender-diverse status within a year.[55]

---

[50] Glass Lewis, *Glass Lewis Proxy Voting Policies*, www.glasslewis.com/voting-policies-current.

[51] *Chamber of Com. of United States*, 115 F.4th at 760 (Bush, J., dissenting).

[52] *Id.*

[53] *Id.*

[54] Glass Lewis 2025 Guidelines at 23.

[55] ISS, *2024 ISS Proxy Voting Guidelines Benchmark Policy Recommendations* ("ISS 2024

[emphasis added]. In addition to gender preferences, ISS has historically taken racial and ethnic diversity into consideration for board nominations:

> For companies in the Russell 3000 or S&P 1500 indices, generally vote *against* or *withhold* from the chair of the nominating committee (or other directors on a case-by-case basis) where the board has no apparent racially or ethnically diverse members. An exception will be made if there was racial and/or ethnic diversity on the board at the preceding annual meeting and the board makes a firm *commitment* to appoint at least one racial and/or ethnic diverse member within a year.[56]

ISS's guidelines consider ESG as well. The guidelines provide that ISS will recommend to "generally vote against or withhold from the incumbent chair of the responsible committee (or other directors on a case-by-case basis) in cases where ISS determines that the company is not taking the minimum steps needed to understand, assess, and mitigate risks related to climate change to the company and the larger economy" for companies it determines are significant greenhouse gas emitters.[57] ISS has entire sections of its guidelines dedicated to social and environmental issues and even rates corporations based on ESG considerations.[58]

---

Guidelines"), https://www.issgovernance.com/file/policy/2024/americas/US-Voting-Guidelines.pdf?v=1.

[56] *Id.* [emphasis added]. This year ISS released a statement acknowledging that "there recently has been increased attention on diversity, equity, and inclusion (DEI) practices" and that it will "indefinitely halt consideration of certain diversity factors in making vote recommendations with respect to directors at U.S. companies under its proprietary Benchmark and Specialty policies." ISS, *Statement Regarding Consideration of Diversity Factors in U.S. Director Election Assessments*, https://insights.issgovernance.com/posts/statement-regarding-consideration-of-diversity-factors-in-u-s-director-election-assessments/ (Feb. 11, 2025). Whether ISS ends its consideration of diversity factors is immaterial; rather, these policies show that ISS is aware of what it means to consider DEI factors and has done so.

[57] ISS, *2025 ISS Proxy Voting Guidelines Benchmark Policy Recommendations* at 17, https://www.issgovernance.com/file/policy/active/americas/US-Voting-Guidelines.pdf?v=2025.2.

[58] *Id.* at 66–80; *see also* ISS, *ESG Corporate Ratings*, https://www.issgovernance.com/sustainability/ratings/corporate-rating/ (last visited August 20, 2025).

16

It is important to note that SB 2337 does not compel opposition to or support for ESG, DEI, or any ESG or DEI principle; rather, it identifies these concepts correctly as analytical frameworks that look to something other than the financial interest of shareholders. ISS and Glass Lewis remain free to articulate whatever view of corporate governance they like, but when their view is based on policy preferences and not shareholder financial return, SB 2337 requires that they be transparent. This transparency can then allow ISS and Glass Lewis's voting recommendations to be assessed by their asset manager clients in light of the clients' own fiduciary duties.

2.    *Conflicts of interest.*

Separate from ISS's proxy voting recommendations, ISS offers consulting services to assist companies in enhancing ISS's own ratings of their governance practices.[59] Of course, the primary benefit of purchasing ISS's consulting services is to avoid adverse voting recommendations from ISS's proxy voting business.[60] In 2020, the Society for Corporate Governance conducted a survey that showed 39% of the companies polled had been solicited by ISS for consulting services following a negative vote recommendation.[61]

And while ISS claims to place a firewall between its proxy recommendation services and consulting services, there is doubt about the existence of such a barrier.[62] The effect of ISS's

---

[59] Ising Testimony at 3; *see also Nat'l Ass'n of Manufacturers*, 105 F.4th at 807.

[60] Crain Testimony at 2.

[61] Society for Corporate Governance, SEC File Number S7-22-19, https://www.sec.gov/comments/s7-22-19/s72219-6743687-207853.pdf (February 3, 2020).

[62] *See* Paid Proxy Firm Consulting with Issuers Is Very Bad, EGAN-JONES RATINGS (Aug. 21, 2020), https://www.egan-jones.com/newsletters/proxy-commentary/paid-proxy-firm-consulting-with-issuers-is-very-bad/; Jan Krahnen et al., *The Controversy Over Proxy Voting: The Role of Asset Managers and Proxy Advisors*, HARV. L. SCH. F. ON CORP. GOVERNANCE (Jan. 30, 2023) https://corpgov.law.harvard.edu/2023/01/30/the-controversy-over-proxy-voting-the-role-of-asset-managers-and-proxy-advisors/.

conflicting services is that "companies are effectively forced to pay into this broken system to understand ISS's models and methodologies (about which the firm is persistently opaque) and to avoid negative recommendations that will distract time, effort, and capital from more productive uses."[63] Garmin, an S&P 500 company, put it this way in its letter to the SEC in 2020: "Is a company that declines to engage the consulting services side of a firm's business treated fairly by the proxy advisory side of the firm when that side of the firm is making its voting recommendations? . . . How could anyone ever know for certain?"[64]

Likewise, Glass Lewis plays the same game. It markets consulting services to companies to assist with understanding how Glass Lewis will *evaluate* and *rate* their compensation proposals prior to voting on by Glass Lewis clients.[65] Unsurprisingly, provision of these services pressures companies to expend time and resources subscribing to them to fend off a negative voting recommendation.

    *3.*    *Reporting errors.*

Glass Lewis and ISS's reports routinely contain errors.[66] Data from 2016, 2017, and 2018 show that proxy advisory firms' reports on nearly 100 companies included numerous factual and analytical errors.[67] In 2019, the Society for Corporate Governance conducted another survey of its

---

[63] Crain Testimony at 3.

[64] Garmin, Comment Letter on Proposed Rule: Amendments to Exemptions From the Proxy Rules for Proxy Voting Advice, at 2 (Jan. 27, 2020).

[65] *See* Glass Lewis, *Equity Plan Advisory Services*, https://www.glasslewis.com/corporate-solutions/equity-compensation-plan-advisory.

[66] *See* Kyle Isakower, *Proxy Advisors Remain a Problem*, American Council for Capital Formation (July 2025), https://accf.org/wp-content/uploads/2025/07/ACCF-2024-Proxy-Report_7.7.25.pdf.

[67] Frank M. Placenti, *Analysis of Proxy Advisor Factual and Analytical Errors in 2016, 2017, and 2018* (2018).

members to see if they were aware of any factual errors, omissions of fact, or errors in analysis over a three-year period.[68] Of the 134 members, 42% answered in the affirmative.[69] Yet another 2021 study identified 50 instances in which public companies had to correct a proxy firm's mistake through supplemental proxy materials, a 21% increase over the year before.[70]

The problem extends beyond just publishing reports with errors. The proxy advisory firms have also been reluctant or slow to correct errors. For example, Glass Lewis once reported a company's board did not oversee cybersecurity risk. The company corrected Glass Lewis and directed it to disclosures about the board's cybersecurity oversight role. Glass Lewis did not correct itself.[71] A company can issue a "Report Feedback Statement" to Glass Lewis clients—but only if the company first purchases the report at issue from Glass Lewis.[72]

**D.     SB 2337 is a step in the right direction.**

SB 2337 provides responsible oversight of the proxy advisory industry. The law addresses long-standing concerns about transparency, accountability, and the growing influence of nonfinancial considerations in proxy voting recommendations. Corporations and shareholders alike have voiced frustration over the increasingly opaque methodologies employed by the proxy advisory firms.

---

[68] Society for Corporate Governance, SEC File Number S7-22-19, https://www.sec.gov/comments/s7-22-19/s72219-6743687-207853.pdf (February 3, 2020).

[69] *Id*.

[70] American Council for Capital Formation, *Proxy Advisors Are Still a Problem* 9 (Dec. 2021).

[71] Ising Testimony at 5.

[72] *See* Glass Lewis, *Report Feedback Statement (RFS)*, https://www.glasslewis.com/issuer-relations/report-feedback-statement-rfs.

SB 2337 responds to these concerns not by dictating the content of any recommendation by ISS, Glass Lewis, or any proxy advisor but by requiring disclosure when their recommendations are based on *any* nonfinancial factors. It does not prohibit proxy advisory firms from considering ESG or DEI, nor does it endorse or reject the concepts. Instead, the law ensures that when proxy advisory firms use such factors, they must transparently disclose their use and explain why. This disclosure allows institutional investors and shareholders to make informed decisions on proxy voting. The Alliance believes SB 2337 strengthens the integrity of corporate governance in Texas, empowers Texas shareholders, protects companies, and brings long-overdue structure to a powerful but largely unregulated industry.

Dated: August 22, 2025

Respectfully submitted,

**FOLEY & LARDNER LLP**

/s/ *Peter L. Loh*

Peter L. Loh
State Bar No. 24036982
ploh@foley.com
Brantley A. Smith
State Bar No. 24110375
bsmith@foley.com
2021 McKinney Ave., Suite 1600
Dallas, Texas 75201
Telephone: 214-999-3000
Facsimile: 214-999-4667

David G. Cabrales
State Bar No. 00787179
dcabrales@foley.com
600 Congress Avenue, Suite 2900
Austin, Texas 78701
Telephone: 512-542-7018
Facsimile: 512-542-7100

*Counsel for the Alliance for Corporate
Excellence*

21