## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| INSTITUTIONAL SHAREHOLDER SERVICES INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| KEN PAXTON, *in his Official Capacity as Attorney General of Texas,* | ) ) ) | Civil Action No. 25-cv-01160 |
| Defendant; | ) ) ) | |
| THE TEXAS STOCK EXCHANGE LLC and THE TEXAS ASSOCIATION OF BUSINESS, | ) ) ) ) | |
| Intervenor-Defendants. | ) ) ) | |

| | | |
|---|---|---|
| GLASS, LEWIS & CO., LLC, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| KEN PAXTON, *in his Official Capacity as Attorney General of Texas,* | ) ) ) | Civil Action No. 25-cv-01153 |
| Defendant; | ) ) ) | |
| THE TEXAS STOCK EXCHANGE LLC and THE TEXAS ASSOCIATION OF BUSINESS, | ) ) ) ) | |
| Intervenor-Defendants. | ) ) | |

## INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFF ISS'S AND PLAINTIFF GLASS LEWIS'S MOTIONS FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................3

    A.    THE ROLE OF PROXY ADVISORS .................................................3

    B.    THE PROBLEM OF PROXY ADVISORS ........................................5

    C.    LACK OF REGULATION OF PROXY-VOTING ADVICE ..................8

    D.    TEXAS'S SOLUTION ...................................................................9

ARGUMENT .......................................................................................................10

I.    THE PROXY ADVISORS ARE NOT LIKELY TO SUCCEED ON THE MERITS. .........................................................................................................11

    A.    THE PROXY ADVISORS HAVE NOT MET THE REQUIREMENTS FOR A FACIAL FIRST AMENDMENT CHALLENGE. .............................................................................11

    B.    SB 2337 IS NOT UNCONSTITUTIONALLY VAGUE. ...................16

    C.    ERISA DOES NOT PREEMPT SB 2337. ....................................17

    D.    EVEN IF A PROVISION OF SB 2337 IS UNCONSTITUTIONAL, THE REST OF THE LAW SURVIVES. ........17

II.    THE EQUITIES DO NOT JUSTIFY PRELIMINARY INJUNCTIVE RELIEF. ...........19

CONCLUSION ....................................................................................................20

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Bill Johnson's Restaurants, Inc. v. NLRB,*
461 U.S. 731 (1983) ........................................................................................... 12

*Bucklew v. Precythe,*
587 U.S. 119 (2019) ........................................................................................... 11

*Bolger v. Youngs Drugs Prods. Corp.,*
463 U.S. 60 (1983) ............................................................................................. 13

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
447 U.S. 557 (1980) ........................................................................................... 12

*Chamber of Commerce v. SEC,*
115 F.4th 740 (6th Cir. 2024) .............................................................................. 3

*Comm'n for Lawyer Discipline v. Benton,*
980 S.W.2d 425 (Tex. 1998) ............................................................................... 19

*Dial One of the Mid-South, Inc. v. BellSouth Telecomms., Inc.,*
269 F.3d 523 (5th Cir. 2001) .............................................................................. 12

*E.T. v. Paxton,*
19 F.4th 760 (5th Cir. 2021) ............................................................................... 20

*Fla. Bar v. Went For It, Inc.,*
515 U.S. 618 (1995) ........................................................................................... 12

*Free Speech Coalition, Inc. v. Paxton,*
95 F.4th 263 (5th Cir. 2024) .............................................................................. 13

*Friedman v. Rogers,*
440 U.S. 1 (1979) ............................................................................................... 13

*Gertz v. Robert Welch, Inc.,*
418 U.S. 323 (1974) ........................................................................................... 12

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) ........................................................................................... 16

*Ibanez v. Fla. Dep't of Business & Pro. Regul.*,
    512 U.S. 136 (1994) ................................................................................................ 12

*Illinois v. Telemarketing Assocs., Inc.*,
    538 U.S. 600 (2003) ................................................................................................ 12

*In re R.M.J.*,
    455 U.S. 191 (1982) ................................................................................................ 12

*ISS v. SEC*,
    142 F.4th 757 (D.C. Cir. 2025) ............................................................................... 9

*Johnson v. United States*,
    559 U.S. 133 (2010) ................................................................................................ 16

*Leavitt v. Jane L.*,
    518 U.S. 137 (1996) ................................................................................................ 17

*Maryland v. King*,
    567 U.S. 1301 (2012) .............................................................................................. 20

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
    559 U.S. 229 (2010) (Thomas, J., concurring in part and in judgment) ............... 11, 12, 13

*Missouri v. Glass, Lewis & Co., LLC*,
    No. 25AC-CC05436 (Mo. Cir. Ct. July 8, 2025) ..................................................... 9

*Missouri v. Institutional Shareholder Services*,
    No. 25ACC-CC05437 (Mo. Cir. Ct. July 8, 2025) ................................................... 9

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ................................................................................................ 11, 16

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995) ................................................................................................ 17

*Phi Theta Kappa Honor Society v. HonorSociety.org, Inc.*,
    2025 WL 1030240 (5th Cir. Apr. 7, 2025) ............................................................. 13

*Procter & Gamble Co. v. Amway Corp.*,
    242 F.3d 539 (5th Cir. 2001) .................................................................................. 13

*Rose v. Drs. Hosp.*,
    801 S.W.2d 841 (Tex. 1990) ................................................................................... 17

*Rutledge v. Pharm. Mgmt. Ass'n,*
    592 U.S. 80 (2020) .................................................................................................................17

*Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,*
    932 F.2d 1113 (5th Cir. 1991) ............................................................................................13

*Trump v. CASA, Inc.,*
    145 S. Ct. 2540 (2025) .......................................................................................................11

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council,*
    425 U.S. 748 (1976) ...........................................................................................................12

*Villas at Parkside Partners v. City of Farmers Branch,*
    726 F.3d 524 (5th Cir. 2013) ..............................................................................................17

*Voting for Am., Inc. v. Steen,*
    732 F.3d 382 (5th Cir. 2013) ..............................................................................................17

*Warner-Lambert Co. v. FTC,*
    562 F.2d 749 (D.C. Cir. 1977) ...........................................................................................13

*Washington v. Assoc. Builders & Contractors of S. Tex. Inc.,*
    621 S.W.3d 305 (Tex. App. 2021) ......................................................................................17

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) ...............................................................................................................10

**STATUTES**

ERISA .......................................................................................................................................17

Investment Advisers Act ............................................................................................................8

Tex. Bus. Orgs. Code Ann. § 1.051 ..........................................................................................17

Tex. Bus. Orgs. Code Ann. §§ 21.359, -363, -364 .....................................................................3

**OTHER AUTHORITIES**

68 Fed. Reg. 6564, 6565 (Feb. 7, 2003) ....................................................................................3

68 Fed. Reg. 6585, 6586 (Feb. 7, 2003) ....................................................................................3

75 Fed. Reg. 42,982 (July 22, 2010) ..........................................................................................3

75 Fed. Reg. at 43,010 ........................................................................................................... 6

Antonin Scalia & Bryan Garner, *Reading Law* 119 (2012) ........................................................ 19

## INTRODUCTION

When Americans invest their 401(k)s, college funds, and pensions in Texas businesses, they do not intend to enlist in the culture wars. Yet a foreign-owned duopoly with extensive power over the American economy has effectively conscripted them. Glass Lewis and Institutional Shareholder Services (ISS) sway thousands of shareholder votes each year by promising neutral, objective advice that maximizes shareholder value. In reality, the proxy advisors use their influence to further their own agendas based on false and misleading voting guidance that often is unsupported by any financial analysis. The legislation passed by the Texas Legislature and signed by Governor Greg Abbott is an important first step in correcting these practices. Not only is an injunction not appropriate in this case, discovery into plaintiffs' deceptive statements and methodologies is critical to understanding why the challenged law is constitutional.

Each year, institutional investors[1] vote on thousands of corporate-governance matters that affect the Texas businesses whose interests the Texas Stock Exchange and the Texas Association of Business, intervenors here, represent. Issues range from the election of directors to shareholder proposals on all manner of subjects, including current social issues that have no financial relevance to companies. To discharge their fiduciary duty to vote on these proposals, institutional investors rely on proxy advisors to review and make recommendations on how vote. Numerous studies have documented how extensively the investors depend on the proxy advisors' recommendations and vote in lockstep with them.

But ISS and Glass Lewis do not deserve their trust. Despite claiming to promote shareholder value, these proxy advisors often focus on environment, social, and governance (ESG) factors instead

---

[1] These include professionally managed entities that hold and vote shares worth trillions of dollars on behalf of fiduciaries such as public and private pension funds; mutual funds and ETFs; endowments and foundations; asset managers and hedge funds.

of providing financial analyses to support their recommendations. For example, advisors have recommended votes in favor of proposals that call for pharmaceutical companies to consider sacrificing future profits by declining to extend pharmaceutical patents; consumer goods retailers to divert resources to evaluate government policies on reproductive health care; and energy companies to sell fewer products in order to reduce Scope 3 greenhouse gas (GHG) emissions. In addition, advisors have consistently told investors to vote against companies relocating to Texas's low-tax, business-friendly environment, despite the obvious financial benefits the moves would bring. Worse, the proxy advisors do not disclose that they are subordinating shareholder value to nonfinancial considerations, deceiving institutional investors who rely on the proxy advisors' reports to vote shares on behalf of millions of Americans who have invested their savings.

SB 2337 does not restrain the ability of proxy advisors to offer their views on shareholder issues, including recommending how shareholders should vote on ESG or other social issues. SB 2337 only requires proxy advisors to speak truthfully by disclosing when their recommendations are not based on financial factors. The proxy advisors have been vocal about their disdain for the honesty that SB 2337 requires and argue that the law violates their First Amendment rights. But the First Amendment does not entitle them to deceive their clients. Because they have failed to show that SB 2337 is facially unconstitutional—a tall order, requiring them to demonstrate that any impermissible applications of SB 2337 substantially outweigh the law's constitutional ones—they are not likely to succeed on their First Amendment claims. Nor have they shown a likelihood of success on their vagueness arguments. Further, Glass Lewis's preemption argument is equally unpersuasive, for the reasons stated below. Their requests for preliminary injunctions should be denied. If the Court has any doubts about denying them on the existing record, targeted discovery into the proxy advisors' practices and reports is warranted.

## BACKGROUND

### A.  The Role of Proxy Advisors

Under Texas law, shareholders are generally entitled to vote on a variety of corporate-governance matters, including the election of directors and shareholder proposals. Tex. Bus. Orgs. Code Ann. §§ 21.359, -363, -364. That process has grown increasingly complex in recent years, as the range of issues on which shareholders must vote has ballooned in both volume and subject matter, and as institutional investors have come to own "an increasingly large share" of the stock market. *Chamber of Commerce v. SEC*, 115 F.4th 740, 745 (6th Cir. 2024).

Indeed, institutional investors "cast votes at 'potentially hundreds, if not thousands, of shareholder meetings and on thousands of proposals.'" *Id.* When institutional investors have voting authority, the SEC requires them to vote in their clients' "best interests" and have policies in place to "maximize value for their shareholders." 68 Fed. Reg. 6564, 6565 (Feb. 7, 2003); *accord* 68 Fed. Reg. 6585, 6586 (Feb. 7, 2003) ("The duty of care requires an adviser with proxy voting authority to monitor corporate events and to vote the proxies," and the duty of loyalty requires adviser to cast "the proxy votes in a manner consistent with the best interest of its client"). Fulfilling their fiduciary duties to vote on so many shareholder matters can be prohibitively time-consuming and expensive.

To address that problem, the SEC allows institutional investors to rely on proxy advisors, entities that either make voting recommendations or facilitate voting on a convenient platform that makes it easy for the investors to follow the advisors' recommendations, 75 Fed. Reg. 42,982 (July 22, 2010), which sometimes results in a practice known as "robovoting." As previously noted, the proxy-advisor industry is a massive duopoly, with ISS and Glass Lewis controlling 90-97% of the market, depending on the metric used. Declaration of M. Rasmussen in Support of Intervenors' Response in Opposition to Plaintiff ISS's and Plaintiff Glass Lewis's Motions for a Preliminary Injunction

("Rasmussen Decl.") Ex. 1.[2] Glass Lewis, the smaller of the two main advisors, claims that "its clients collectively manage $35 trillion in assets." *Id.* ISS does not disclose client asset size, but its clients "vote on 8.5 million ballots representing 3.8 trillion shares." *Id.*

The large number of shareholder votes each investor must cast ensures that, no matter how sophisticated an investor may be, it has little recourse but to trust the proxy advisors to fulfill their contractual duties when they claim to make recommendations for the right reasons. *See* Institutional Shareholder Services Inc., Complaint, No. 25-cv-01160, Dkt. 1 ("ISS Compl.") ¶ 2 (acknowledging that it is "too expensive and time-consuming" for investors "to inform themselves about thousands of shareholder votes"). That leaves proxy advisors with tremendous power and no oversight of potential abuse or omissions in their processes. "Numerous studies" have documented the "significant impact" proxy advisors' recommendations have on shareholder votes. Rasmussen Decl. Ex. 2. A 2021 study "identified 114 financial institutions managing $5 trillion in assets that automated their votes in a manner aligned with ISS recommendations 99.5% of the time." *Id.* Other studies conclude that "negative recommendations from the two proxy firms" swing votes anywhere from 17% to 36% on certain proposals. *Id.*

Proxy advisors wave away these statistics by claiming that a majority of their clients provide "custom" voting policies with which their recommendations align. Glass, Lewis & Co., LLC Complaint, No. 25-cv-01153, Dkt. 1, ("GL Compl.") ¶ 109; ISS Compl. ¶ 28.[3] But neither proxy advisor provides any detail on the level of customization these policies truly contain, and the uniform voting that results from the advisors' recommendations suggests either that customization is minimal or that the customization policy suffers from the same deficiencies as the ISS benchmark policies. The

---

[2] For the Court's convenience, Intervenors have attached true and correct copies of sources cited herein that are publicly available on the Internet. *See generally* Rasmussen Decl. Exs. 1-27.

[3] These assertions are factual issues that should be the subject of discovery.

proxy advisors also claim that their benchmark policies reflect the viewpoints of their clients because they conduct annual surveys to update their policies. GL Compl. ¶ 109; ISS Compl. ¶ 30. But the proxy advisors' most recent surveys both reflected feedback from under 10% of their institutional clients. Rasmussen Decl. Exs. 3–4.

Because the proxy advisors' recommendations can sway a substantial portion of a company's shares, the advisors also exert great influence over the companies themselves. If a company wants to accomplish even a routine corporate action, it benefits immensely from receiving the proxy advisors' support. Proxy advisors take full advantage of that influence. In addition to advising *institutional investors* on ESG-related proxy votes, ISS also markets its ESG ratings services to *companies*, boasting that—for a price—companies can "[a]ccess *the same database used by many investors* to benchmark your ESG performance against industry peers" in order to "[u]nderstand investor expectations and respond to shareholder proposals."  Rasmussen Decl. Ex. 5 (emphasis added). Glass Lewis similarly markets executive compensation services to both investors *and* companies, offering to "[i]ndependently benchmark and analyze" a company's "executive compensation programs to design plans that align with investor expectations."  Rasmussen Decl. Ex. 6; *see also* Rasmussen Decl. Ex. 7.

In other words, the proxy advisors *set* "investor expectations" and then charge companies a fee to consult on how to meet their expectations. Rasmussen Decl. Ex. 8. As a former Chief Justice of the Delaware Supreme Court put it, companies are effectively "com[ing] on bended knee … to persuade the managers of ISS of the merits of their views." Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 DEL. J. CORP. L. 673, 688 (2005). Glass Lewis wields similar power.

### B.  The Problem of Proxy Advisors

Proxy advisors have accumulated significant influence on the promise that their advice will "enable institutional clients" to fulfill their fiduciary duties and "maximize the value of their

5

investments." 75 Fed. Reg. at 43,010; *accord* Oversight of the Proxy Advisory Industry: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Fin. Servs., No. 118-39, at 25, 51 (2023) ("Oversight Hearing") (testimony by ISS and Glass Lewis representatives that their advice is focused on shareholder value). Indeed, the advisors' filings in this case claim that the "principle guiding all vote recommendations" is "how the proposal may enhance or protect shareholder value." ISS Compl. ¶ 32; *accord* Declaration of John Wieck in Support of Glass Lewis's Motion for Preliminary Injunction, GL Dkt. 5 ("Wieck Decl.") ¶ 12 (Glass Lewis reports help investors "maximize shareholder value").

But that is not true, and proxy advisors' track records belie those claims. Based ISS's own Voting Analytics database, ISS has supported many shareholder proposals that have no connection to promoting financial value in recent years. This includes, for instance, recommending votes in favor of causing pharmaceutical companies to evaluate whether to forego profits by declining to extend valuable pharmaceutical patents. It also includes supporting proposals that ask retailers to spend corporate capital to evaluate *government* policies on reproductive health care, as well as proposals that urge energy companies to sell fewer products in order to reduce Scope 3 GHG emissions. For its part, Glass Lewis illogically has attempted to promote female representation on boards by recommending a vote *against* a female director. *See* Rasmussen Decl. Ex. 9. And its policies make clear that it evaluates companies based on nonfinancial criteria, such as whether the companies promote "[f]lexible work arrangements" and a "[w]ork-life balance policy." Rasmussen Decl. Ex. 10.

More generally, the policies that determine ISS's and Glass Lewis's recommendations are full of nonfinancial criteria. For example, ISS publishes a Governance QualityScore for companies that is based on nearly 300 factors, the weights of which are unknown. Rasmussen Decl. Ex. 11. Among other things, the QualityScore considers whether the board is sufficiently diverse, Rasmussen Decl. Ex. 12—despite ISS's public representation that it "will no longer consider the gender and racial

and/or ethnic diversity of a company's board." Rasmussen Decl. Ex. 13. And because a company's Governance QualityScore is based on "the same principles that form the foundation of the ISS Benchmark Policy" for proxy voting, ISS's recommendations reflect the exact DEI factors it claims to no longer consider—disguised as "governance," no less. Rasmussen Decl. Ex. 11 at 3. To be sure, both Glass Lewis and ISS have the right to offer this nonfinancial advice to institutional investors, but they should not be allowed to falsely state that their guidance is based on financial factors as opposed their views of good governance.

ISS and Glass Lewis have also stymied efforts by companies to reincorporate in Texas, recommending against moves from other jurisdictions even though such moves come with lower taxes. Their recommendations matter: A multi-billion dollar company "pulled its management proposal to redomesticate from Delaware to Texas after receiving negative commentary on the proposal from ISS and Glass Lewis." Rasmussen Decl. Ex. 14, at 19 n.23. Because the advisors ensure the information in their reports cannot be "reproduced or disseminated, in whole or in part," Declaration of Lorraine Kelly, ISS Dkt. 14-2, 1-2; *accord* Wieck Decl., Ex. 5, GL Dkt. 5-5, 44, their explanation for how a lower tax bill was not in shareholders' interest remains hidden. However, blocking companies from relocating to the only state to pass meaningful regulation of proxy advisors is certainly in the *proxy advisors'* interest.

The proxy advisors claim that nonfinancial considerations in fact "*can* affect financial value," ISS Compl. ¶ 55 (emphasis added), and that they "*can* lead to . . . diminished shareholder value," GL Compl. ¶ 52 (emphasis added). Of course, they provide no support for that claim. Nor could they. When questioned under oath, Glass Lewis admitted that it does not perform economic analyses "[o]n a lot of the issues that we provide recommendations on." Oversight Hearing 10. And an ISS representative revealed in a CNBC interview that proposals based on ESG "are not good for – not linked to long-term shareholder value." CNBC Squawk Box, Interview with Lorraine Kelly at 7:19

A.M. (Mar. 11, 2024), https://tinyurl.com/4mhpj32x. The data confirm that inconvenient truth. "[F]unds investing in companies that publicly embrace ESG sacrifice financial returns without gaining much, if anything, in terms of actually furthering ESG interests." Rasmussen Decl. Ex. 15; *accord* Rasmussen Decl. Exs. 16–17 (reproducing data showing that ESG funds underperform the market).

The quality of the proxy advisors' work is cause for additional concern. "Factual errors, incorrect methodologies, and other problems with proxy advisory firm reports have been well-documented over the years." Rasmussen Decl. Ex. 2. Over a three-year period, "there were 107 [SEC proxy] filings from 94 different companies citing 139 significant problems" with proxy advisor recommendations "including 90 factual or analytical errors." Rasmussen Decl. Ex. 18. Another 49 filings flagged even more serious problems with the recommendations, including "support for shareholder proposals seeking to implement bylaw changes that would be illegal under the issuer's state law of incorporation [and] inconsistent recommendations with respect to the same compensation plan in multiple years." *Id.*

### C.  Lack of Regulation of Proxy-Voting Advice

Despite those many well-recognized issues, proxy-voting advice remains largely unregulated. ISS voluntarily registered under the Investment Advisers Act, but the Act's strictures have little application to ISS's false and conflicted proxy-voting advice. The Act does not, for example, solve proxy advisors' well-recognized conflict-of-interest problems, let alone provide recourse when proxy advisors' false statements shape the decisions of investors whose manage the savings that support much of the American economy. It is puzzling that ISS argues the Act preempts SB 2337 when ISS does not even provide a copy of their proxy-voting reports to the SEC for any sort of review or oversight. Indeed, the Act has such little applicability to ISS's core services that Glass Lewis—despite operating a largely identical business—is not subject to the Act.

To address that regulatory vacuum, beginning in 2010, the Securities and Exchange Commission undertook a decade-long "comprehensive review of the proxy voting infrastructure." Rasmussen Decl. Ex. 19. That review culminated in a rule that would have prohibited the proxy advisors from making materially false and misleading statements and required them to disclose conflicts of interest and give companies the opportunity to respond to the advisors' analysis. Both ISS and Glass Lewis vehemently opposed the rule. Rasmussen Decl. Exs. 20–21. And ISS could not get to court to challenge those transparency measures quickly enough. *ISS v. SEC*, 142 F.4th 757, 762 (D.C. Cir. 2025). It successfully argued that the SEC lacked authority to require even the baseline level of transparency and accuracy that the rule would have required. *See id.* at 761. So the proxy advisors' recommendation business remains effectively unregulated at the federal level.

States have recently tried to fill the regulatory gap. Earlier this year, Florida opened an investigation into potential violations by ISS and Glass Lewis of the state's consumer-protection laws. Rasmussen Decl. Ex. 22. The State expressed concern that the proxy advisors' representations of ESG as "a sound, apolitical investment strategy" were contradicted by economic data and that contrary to their representations, the advisors' recommendations were actually intended "to advance particular ideological views." *Id.* Missouri also has issued civil investigative demands to the proxy advisors "[b]ased on serious allegations of fraudulent practices," including false representations that they have "'objective and impartial offerings'" and omissions about their use of DEI and ESG criteria. Petition at 1, 3, *Missouri v. Institutional Shareholder Services*, No. 25ACC-CC05437 (Mo. Cir. Ct. July 8, 2025); *accord* Petition, *Missouri v. Glass, Lewis & Co., LLC*, No. 25AC-CC05436 (Mo. Cir. Ct. July 8, 2025).

### D. Texas's Solution

Through SB 2337, Texas took a legislative approach. Section 101 requires a proxy advisor to disclose whenever its advice "is not provided solely in the financial interest of the shareholders." § 101(b). Advice is not solely financial when, for example, it "is wholly or partly based on" nonfinancial

factors, such as ESG, DEI, or social credit scores, § 101(a)(1), or the proxy advisor makes a recommendation "inconsistent with the voting recommendation of the board of directors," § 101(a)(2). In such circumstances, the proxy advisor must acknowledge that the advice is not based "solely" on financial factors. § 101(b)(1)(A). It must also "explain[], with particularity," the basis for its advice and acknowledge that the recommendation "subordinates the financial interests of the shareholders to other objectives." § 101(b)(1) (B).

Separately, § 102 requires a distinct disclosure when proxy advisors give conflicting advice to different clients, or advice that is contrary to management's recommendation. In these cases, § 102 requires the proxy advisor to: (1) notify the company, the recipients of its advice; and the attorney general; (2) indicate whether it has performed "any specific financial analysis"; and (3) if so, identify which recommendation furthers the shareholders' financial interests. § 102(b). Notably, § 102 applies only if clients "have not expressly requested services for a nonfinancial purpose." *Id.* Thus, there is presumably no disclosure required when, for example, proxy advisors follow non-financial voting guidelines provided by its clients. *Contra* ISS Compl. ¶ 59. Rather, § 102 benefits the clients that rely on proxy advisors to act in shareholders' financial interests—and the small businesses, employees, and retirees relying on those clients to maximize their 401(k)s and pension funds.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). The proxy advisors must show that they are "likely to succeed on the merits," "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id.* at 20. But they are not likely to succeed on any of their claims, and the equities cut against them.

I.    **The Proxy Advisors Are Not Likely to Succeed on the Merits.**

    A.    **The proxy advisors have not met the requirements for a facial First Amendment challenge.**

The proxy advisors have chosen to bring a sweeping constitutional challenge to the entirety of SB 2337, arguing that "the Act" as a whole violates the First Amendment. Glass Lewis Motion for Preliminary Injunction, Dkt. 4 ("GL Mot.") 6; *accord* ISS Motion for Preliminary Injunction, ISS Dkt. 14 ("ISS Mot.") 9. As the Supreme Court recently reaffirmed, that choice "comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). They must prove "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep"— meaning that SB 2337's "unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 723–24 (cleaned up). That means asking, as to each thing covered, whether the required disclosures are constitutional. *Id.* at 725. The inquiry often requires a developed record. *Id.* at 726.

That the proxy advisors request preliminary relief only as to themselves—as they must, *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2560 (2025)—does not change the facial nature of their attacks on SB 2337. Although "[t]he line between facial and as-applied challenges can sometimes prove 'amorphous' and 'not so well defined,'" the claims in this case are classically facial: A pre-enforcement challenge to every application of a law based on a threadbare record. *Bucklew v. Precythe*, 587 U.S. 119, 139 (2019); *see also Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 258 (2010) (Thomas, J., concurring in part and in judgment) ("nominal 'as-applied' challenge appear[ed] strikingly similar to a facial challenge" because the statute "had never been enforced against" the plaintiff and it introduced virtually no evidence). The proxy advisors must satisfy the facial-challenge standard.

SB 2337 survives facial review. The law's "plainly legitimate sweep" is broad, addressing deception that receives no First Amendment protection. As discovery will demonstrate, that deception central to how the proxy advisors present themselves to potential customers. Redressing the harm the

proxy advisors' deception has caused, and the reliance their false statements have engendered, is constitutional.

**1.** Intervenors—which represent the interests of Texas public companies large and small—fully appreciate the importance of commercial speech, and the constitutional protection it receives. So it is intervenors' position that strict scrutiny applies to commercial-speech laws, including laws compelling commercial speech. *See Milavetz,* 559 U.S. at 255–56 (Thomas, J., concurring in part and in judgment).

**2.** But the First Amendment is not a shield for falsehoods. *Illinois v. Telemarketing Assocs., Inc.,* 538 U.S. 600, 612 (2003). "Neither the intentional lie nor the careless error materially advances society's interest in uninhibited, robust, and wide-open' debate on public issues." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340 (1974); *see also Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 743 (1983) ("[F]alse statements are not immunized by the First Amendment right to freedom of speech.").

That is especially true in the commercial sphere. *Dial One of the Mid-South, Inc. v. BellSouth Telecomms., Inc.,* 269 F.3d 523, 526 (5th Cir. 2001) ("[C]ommercial speech that is false does not receive First Amendment protection."). Since the Supreme Court recognized that the First Amendment protects commercial speech, it has reaffirmed time and again that those protections do not extend to false, deceptive, or misleading speech. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council,* 425 U.S. 748, 771 (1976) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake."); *see also Fla. Bar v. Went For It, Inc.,* 515 U.S. 618, 623–24 (1995); *Ibanez v. Fla. Dep't of Business & Pro. Regul.,* 512 U.S. 136, 142 (1994); *In re R.M.J.,* 455 U.S. 191, 200 (1982). Such speech is simply "unprotected." *Telemarketing Assocs.,* 538 U.S. at 612.

The government can "ban forms of communication more likely to deceive" than inform, or it can take measures short of an outright ban. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 563 (1980). That includes requiring those who are peddling lies to correct the record.

*See Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1126 (5th Cir. 1991); *Warner-Lambert Co. v. FTC*, 562 F.2d 749, 758–59 (D.C. Cir. 1977). Indeed, even those who agree with intervenors that strict scrutiny applies to commercial-speech laws "have no quarrel with the principle" that "false or misleading" statements—commercial or otherwise—fall outside the First Amendment's protection. *Milavetz*, 559 U.S. at 256 n.1 (Thomas, J., concurring in part and in judgment).

The proxy advisors argue that their reports are not themselves commercial speech. ISS Mot. 15; GL Mot. 12–13. But, wrong as that argument is, it is beside the point. The relevant falsehood at issue in this case, and the one SB 2337 seeks to correct, is the false claim that the proxy advisors use to induce clients to pay for (and then blindly follow) their recommendations in the first place: that those recommendations are based on impartial financial analysis. That deceptive claim—generated through an array of misleading statements—is commercial speech. It "relates to a particular product or service." *Friedman v. Rogers*, 440 U.S. 1, 10 (1979). And it is intended to gull prospective clients into trusting the proxy advisors with their money and votes. *See Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 280–81 (5th Cir. 2024) (website designed to drum up business is commercial speech). In that way, the proxy advisors' veneer of impartiality is similar to the trade names that Texas was allowed to prohibit in *Friedman*. There, the Justices explained that a trade name "is used as part of a proposal of a commercial transaction" because it is part of the business's self-presentation to potential customers. 440 U.S. at 11. So too here.

The *Bolger* factors that the Fifth Circuit sometimes uses to identify commercial speech point the same way. *Compare Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 552 (5th Cir. 2001) (applying them) *with Free Speech Coalition*, 95 F.4th at 279–81 (not applying them). The "distinction between commercial and noncommercial speech is a 'matter of degree.'" *Phi Theta Kappa Honor Society v. HonorSociety.org, Inc.*, 2025 WL 1030240, at *2 (5th Cir. Apr. 7, 2025). In *Bolger v. Youngs Drugs Prods. Corp.*, 463 U.S. 60 (1983)the Supreme Court identified three factors that can help indicate which side

13

of the line speech falls on: (i) whether the communication is an advertisement, (ii) whether the communication refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech. 463 U.S. 60, 66–67 (1983). There, each factor indicated that an informational pamphlet about "important public issues such as venereal disease and family planning" qualified as commercial speech because it was distributed by a condom company to drive sales of its products. *Id.* at 67–68. Here, the factors likewise indicate that the proxy advisors' false claims about their services are commercial. They are linked to the services the advisors sell institutional investors— indeed, they are an essential element of the pitch. And they are of course economically motivated.

In short, the proxy advisors' false claims that they offer objective, financially-driven advice rather than an ideological agenda are the kind of commercial deception that is unprotected by the First Amendment. That is not to say that the proxy advisors cannot attempt to drive their vision on social issues in the commercial marketplace. The First Amendment protects efforts to promote diversity quotas and climate-change pledges, just as it protects efforts to oppose those ideas. But the First Amendment does not give the proxy advisors the right to obtain clients' money and drive their votes through false claims, including the claim that their advice maximizes shareholder value when it is not based on economic analysis. SB 2337's plainly legitimate sweep targets those unprotected falsehoods.[4]

**3.** Public information about the proxy advisors illustrates their deception and SB 2337's ample constitutional applications:

---

[4] The same result would apply if SB 2337 were evaluated under strict scrutiny. Here, strict scrutiny is satisfied because Texas has a compelling interest in remedying the proxy advisors' false statements, and the required disclosures are narrowly tailored to achieve that interest (*i.e.*, they are the least restrictive means available). Requiring proxy advisors to acknowledge their actual motivations to the people and entities they have misled is the least restrictive way to correct their ongoing deception.

- The proxy advisors do not tell investors how they weigh DEI or ESG criteria or detail how those criteria impact shareholder value.

- Glass Lewis seeks to require companies to adopt a so-called "Rooney Rule," which would require "the consideration of minority candidates" when selecting directors—potentially affecting those companies' compliance with state and federal antidiscrimination laws. Wieck Decl, GL Dkt. 5-5, 13.

- The proxy advisors represent to investors that ESG criteria helps maximize shareholder value based on financial factors, ISS Compl. ¶¶ 54–55; GL Compl. ¶ 47, but data do not support their claim.

- The facts will demonstrate that plaintiffs' statements are often inaccurate or misleading. For example, despite claiming early this year that it would no longer press for diversity quotas on corporate boards, ISS still reduces companies Quality Score ratings if they do not hit a one-third "gender diversity" target.

- ISS seeks to force American companies toward the European Sustainability Reporting Standards, which it describes as "the preeminent standard." Rasmussen Decl. Ex. 23. ISS does not acknowledge that "US corporate law does not incorporate sustainability into director fiduciary duties" but in fact "rejects it." Rasmussen Decl. Ex. 24, at 12. "Legally, sustainability can only be a factor in an executive's decision if it increases long-term value for shareholders." *Id.*

Thus, the basic premise of the proxy advisors' sales pitch—that impartial financial analysis, not ideology, drives their recommendations—is exactly the kind of misleading claim that receives no constitutional protection.

**4.** All of the facts above are just what the proxy advisors openly admit. Discovery into their recommendations, which are cloaked behind confidentiality agreements, opaque methodologies, and

inconsistent advice provided to different institutional investors covering the same companies, will further prove the point. Proxy advisors' reports and recommendations are behind paywalls and not available publicly, and often may not even be available to the subject company. Again, as the Supreme Court has made clear, analyzing whether a law's "unconstitutional applications substantially outweigh its constitutional ones" requires a developed "record." *Moody*, 603 U.S. at 724, 726. Because the proxy advisors' strict confidentiality rules obscure most of their recommendations and analysis, the full breadth of SB 2337's constitutional applications is difficult to evaluate in this facial posture—especially with a limited record consisting of self-serving declarations and a single carefully selected report each. Discovery is essential to ensure that this Court possesses the tools to perform *Moody*'s comparative analysis—an issue on which the proxy advisors bear the burden. *Id.* at 723.

### B. SB 2337 is not unconstitutionally vague.

The proxy advisors fare no better on their vagueness challenge. Even where a law allegedly affects First Amendment rights, courts do not "expect mathematical certainty" from its text. *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). As long as "it is clear what the [law] as a whole" requires, the law is constitutional. *Id.*

The proxy advisors' vagueness arguments have no merit. The term "nonfinancial" itself has an obvious meaning. And the statute provides a number of illustrative categories, such as DEI and ESG, that both proxy advisors well understand. After all, "ESG" is clear enough for ISS to give companies an "ESG Corporate Rating" and an ESG QualityScore and for Glass Lewis to give companies an "ESG Score." *See* Rasmussen Decl. Ex. 25; Ex. 5 to Wieck Decl., GL Dkt. 5-5, 6. And the firms' responses to recent federal executive action addressing DEI initiatives show they clearly understand what it means too. Rasmussen Decl. Exs. 26–27. To the extent any ambiguity remains in the specific considerations SB 2337 identifies as nonfinancial, the clarity of the term "nonfinancial" resolves it. *See Johnson v. United States*, 559 U.S. 133, 140 (2010) (interpreting statutory definition based

on ordinary meaning of term defined). The proxy advisors have not met the high standard for facial vagueness.

### C.  ERISA does not preempt SB 2337.

Glass Lewis's ERISA preemption claim is also unlikely to succeed. As the Attorney General explains, Glass Lewis failed to show that requiring proxy advisors to disclose the reasons for their recommendations somehow so burdens ERISA fiduciaries that ERISA preemption applies. GL Dkt. No. 17, at 18–21. This brief will not belabor the point. Settled precedent forecloses Glass Lewis's attenuated preemption theory. *See, e.g.*, *Rutledge v. Pharm. Mgmt. Ass'n*, 592 U.S. 80, 86–88 (2020); *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 660–62 (1995).

### D.  Even if a provision of SB 2337 is unconstitutional, the rest of the law survives.

For those reasons, SB 2337 is entirely constitutional. But if this Court determines that the proxy advisors are likely to show that one or more of the challenged provisions is unlawful, it should sever and preliminarily enjoin enforcement of only those provisions, not the entire statute.

For state statutes, "[s]everability is of course a matter of state law," *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). Texas has a "strong severability statute, which preserves statutes even if in some 'applications' they are unconstitutional." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 398 (5th Cir. 2013); *see also* Tex. Bus. Orgs. Code Ann. § 1.051 (severability statute applies to all laws in that code, including SB 2337). Courts *must* sever a statute's unconstitutional applications when the remainder "'is complete in itself, and is capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected.'" *Rose v. Drs. Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990).

Given that mandate to sever, courts may find a statute inseverable only when the remainder would consist entirely of "ancillary provisions," *Washington v. Assoc. Builders & Contractors of S. Tex. Inc.*, 621 S.W.3d 305, 322 (Tex. App. 2021), or when every piece of a statute is so interconnected and interdependent that no provision can survive another's demise, *Villas at Parkside Partners v. City of*

*Farmers Branch*, 726 F.3d 524, 538 (5th Cir. 2013). Neither exception applies to SB 2337. Each provision is severable from the rest of the statute, so the normal severability rule applies. To offer a few examples:

**1.** The three disclosures that § 101 requires can survive independently. SB 2337, § 101(b)(1). *First*, a proxy advisor must disclose that the advice "is based wholly or partly on one or more nonfinancial factors." *Second*, it must disclose "the basis of the proxy advisor's advice concerning each recommendation." And *third*, the proxy advisor must disclose when advice "subordinates the financial interests of the shareholders to other objectives." Any potentially offending disclosure requirement can be cleanly removed, leaving a coherent notice requirement intact, as the below table illustrates:

| Example 1 | Example 2 | Example 3 |
|---|---|---|
| (1) include a disclosure … that: | (1) include a disclosure … that: | (1) include a disclosure … that: |
| (A) conspicuously states ~~that the service is not being provided solely in the financial interest of the company's shareholders because it is based wholly or partly on one or more nonfinancial factors; and~~ | (A) conspicuously states that the service is not being provided solely in the financial interest of the company's shareholders because it is based wholly or partly on one or more nonfinancial factors; and | (A) conspicuously states that the service ~~is not being provided solely in the financial interest of the company's shareholders because it~~ is based wholly or partly on one or more nonfinancial factors; and |
| (B) explains, with particularity, the basis of the proxy advisor's advice concerning each recommendation and that the advice subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking other additional investment risk to promote one or more nonfinancial factors; | (B) explains, ~~with particularity, the basis of the proxy advisor's advice concerning each recommendation and~~ that the advice subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking other additional investment risk to promote one or more nonfinancial factors; | (B) explains, with particularity, the basis of the proxy advisor's advice concerning each recommendation ~~and that the advice subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking other additional investment risk to promote one or more nonfinancial factors;~~ |

This would also be consistent with legislative intent: The enacted statement of purpose confirms that the Legislature sought to require proxy advisors to provide their reasoning *and* wanted them to acknowledge when, contrary to their assertions, they are in fact not performing financial analysis. *See* § 1(3)–(5). The same is true of the notices § 102 requires. § 102(b)(3)(A) & (B).

**2.** If the Court determines that the notice required by one section is likely unconstitutional in its entirety, it should leave the other section in place. The statute itself confirms that §§ 101 and 102 are wholly independent: § 102(b)(1) recognizes that § 101's "disclosure requirements" may or may not be separately "applicable" in circumstances triggering a § 102 disclosure. Plainly, one section could be enforced without the other. Further, the two sections each serve an important purpose: the Legislature indicated that it wanted to bring to light recommendations based on nonfinancial interests *and* conflicting advice. *See* SB 2337 § 1(4).

**3.** The examples in § 101(a)'s definition of advice "not provided solely in the financial interest of the shareholders" are joined by the word "or," which indicates that each example independently triggers the disclosure requirement. § 101(a)(3); *see* Antonin Scalia & Bryan Garner, *Reading Law* 119 (2012). Accordingly, eliminating one example necessarily cannot bring down the rest. *See Comm'n for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 429, 441 (Tex. 1998) (statute prohibited lawyers from "harass[ing] or embarrass[ing] [a] juror or … influenc[ing] his actions in future jury service"; court severed embarrassment provision).

These examples illustrate the severability analysis that Texas law requires if this Court concludes that any provision of SB 2337 is unconstitutional. And in each, the invalidity of one aspect of SB 2337 would not affect the coherence and enforceability of its other substantive provisions.

## II.    The Equities Do Not Justify Preliminary Injunctive Relief.

Because the proxy advisors have no viable claim, they also have not shown irreparable harm. Both failures preclude a preliminary injunction. Moreover, if this Court agrees that discovery is

necessary before the proxy advisors' First Amendment argument can be addressed, the equities cut decidedly against enjoining the law in the interim. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up); *accord E.T. v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021) ("Texas's public officials are charged with carrying out Texas's public policy, and enjoining those officials and that policy injures the state."). At the very least, those considerations weigh in favor of allowing enforcement until discovery has been taken and there is sufficient information to definitively resolve the proxy advisors' facial constitutional challenge.

## CONCLUSION

The motion for a preliminary injunction should be denied.

Dated:  August 22, 2025

JONES DAY

By:  _/s/ Mark W. Rasmussen_
Mark W. Rasmussen
Attorney-in-charge
Texas State Bar No. 24086291
Sidney Smith McClung
Texas State Bar No. 24083880
Timothy M. Villari
Texas State Bar No. 24125870
JONES DAY
2727 N. Harwood St., Suite 500
Dallas, Texas 75201
mrasmussen@jonesday.com
smcclung@jonesday.com
tvillari@jonesday.com
Telephone: +1.214.220.3939
Facsimile: +1.214.969.5100

Noel J. Francisco (admitted _pro hac vice_)
D.C. Bar No. 464752
Brinton Lucas (admitted _pro hac vice_)
D.C. Bar No. 1015185
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
njfrancisco@jonesday.com
blucas@jonesday.com
Telephone: +1.202.879.3939
Facsimile: +1.602.626.1700

**CERTIFICATE OF SERVICE**

I certify that on September 5, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States District Court for the Western District of Texas.

_/s/ Mark W. Rasmussen_
Mark W. Rasmussen