## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| INSTITUTIONAL SHAREHOLDER SERVICES INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| KEN PAXTON, *in his Official Capacity as Attorney General of Texas,* | ) ) ) ) | Civil Action No. 25-cv-01160 |
| Defendant; | ) ) | |
| THE TEXAS STOCK EXCHANGE LLC and THE TEXAS ASSOCIATION OF BUSINESS, | ) ) ) ) | |
| Intervenor-Defendants. | ) ) | |
| GLASS, LEWIS & CO., LLC, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| KEN PAXTON, *in his Official Capacity as Attorney General of Texas,* | ) ) ) ) | Civil Action No. 25-cv-01153 |
| Defendant; | ) ) | |
| THE TEXAS STOCK EXCHANGE LLC and THE TEXAS ASSOCIATION OF BUSINESS, | ) ) ) ) | |
| Intervenor-Defendants. | ) ) | |

## DECLARATION OF MARK W. RASMUSSEN IN SUPPORT OF INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFF ISS'S AND PLAINTIFF GLASS LEWIS'S MOTIONS FOR A PRELIMINARY INJUNCTION

1.     My name is Mark W. Rasmussen. I am over the age of 18 years old and competent to testify about the matters asserted herein. I am an attorney in the Jones Day Dallas office.

2.     The information listed below is available to the public via the Internet. I voluntarily downloaded or captured the information listed below and have provided true and correct copies of the publicly available documents as Exhibits to this Declaration.

3.     Attached hereto as Exhibit 1 is a screen capture of David F. Larcker et al., *The Big Thumb on the Scale: An Overview of the Proxy Advisory Industry*, HARV. L. SCH. FORUM ON CORP. GOVERNANCE (June 14, 2018), available at https://tinyurl.com/4kzcymc5.

4.     Attached hereto as Exhibit 2 is a screen capture of Paul Washington, *Testimony in House Hearing: "Exposing the Proxy Advisory Cartel: How ISS & Glass Lewis Influence Markets,"* HARV. L. SCH. FORUM ON CORP. GOVERNANCE (May 5, 2025), available at https://tinyurl.com/bd2a4w6m.

5.     Attached hereto as Exhibit 3 is a screen capture of ISS, *2024 Global Benchmark Policy Survey* 3 (Oct. 10, 2024), available at https://tinyurl.com/5n84ermf.

6.     Attached hereto as Exhibit 4 is a screen capture of Glass Lewis, *Policy Survey 2024*, available at https://tinyurl.com/2622sm4b.

7.     Attached hereto as Exhibit 5 is a screen capture of ISS-Corporate, *Corporate Sustainability* (last visited Aug. 18, 2025), available at https://tinyurl.com/5f7cz8a8.

8.     Attached hereto as Exhibit 6 is a screen capture of Glass Lewis, *Model Pay-for-Performance Scenarios* (last visited Aug. 18, 2025), available at https://tinyurl.com/cr44e6hs.

9.     Attached hereto as Exhibit 7 is a screen capture of Glass Lewis, *Actionable Data on*

*Company Compensation Programs* (last visited Aug. 18, 2025), available at https://tinyurl.com/mpmyckns.

10.     Attached hereto as Exhibit 8 is a screen capture of The Editorial Board, *Cracking the Proxy Advisory Duopoly*, WALL ST. J. (July 12, 2023), available at https://tinyurl.com/5r3fs7cc.

11.     Attached here is Exhibit 9 is a screen capture of Stockinsights.ai, *Gentex Corporation (NASDAQ:GNTX) Q1 2025 Earnings Call Transcript* (Apr. 26, 2025), available at https://tinyurl.com/3kr7nnea.

12.     Attached hereto as Exhibit 10 is a screen capture of ESG Book, *Risk Score Methodology* (2025), available at https://tinyurl.com/3p2yd2s8.

13.     Attached hereto as Exhibit 11 is a screen capture of ISS, *Governance QualityScore: Methodology Fundamentals*, 8 (Dec. 6, 2024), available at https://tinyurl.com/tk5r64s5.

14.     Attached hereto as Exhibit 12 is a screen capture of ISS, *Governance QualityScore: Issuer Frequently Asked Questions* 11 (May 5, 2025), available at https://tinyurl.com/bdepm4hd.

15.     Attached hereto as Exhibit 13 is a screen capture of Press Release, ISS, *Statement Regarding Consideration of Diversity Factors in U.S. Director Election Assessments* (Feb. 11, 2025), available at https://tinyurl.com/48pp6276.

16.     Attached here is Exhibit 14 is a screen capture of Sullivan & Cromwell, *2025 Proxy Season Review: Part I* (Aug. 11, 2025), available at https://tinyurl.com/twskxcdx.

17.     Attached here is Exhibit 15 is a screen capture of Sanjai Bhagat, *An Inconvenient Truth About ESG Investing*, HARV. BUS. REV. (Mar. 31, 2022), available at https://tinyurl.com/297tte64.

18.     Attached here is Exhibit 16 is a screen capture of Tim Quinson, *Big ESG Funds Are Doing Worse Than the S&P 500*, BLOOMBERG (Dec. 7, 2022), available at https://tinyurl.com/w4bta2a3.

19.     Attached here is Exhibit 17 is a screen capture of Mahi Roy & Alyssa Stankiewicz, *ESG Fund Returns Recover, But Still Trail Conventional Peers by a Small Margin*, MORNINGSTAR (Feb. 5, 2024), available at https://tinyurl.com/3zr7yzwy.

20.     Attached here is Exhibit 18 is a screen capture of Frank M. Placenti, *Are Proxy Advisors Really a Problem?*, HARV. L. SCH. FORUM ON CORPORATE GOVERNANCE (Nov. 7, 2018), available at https://tinyurl.com/bcrerv5s.

21.     Attached here is Exhibit 19 is a screen capture of Mary L. Schapiro, *Speech by SEC Chairman: Opening Statement at the SEC Opening Meeting* (July 14, 2010), available at https://tinyurl.com/ysvmtbz5.

22.     Attached here is Exhibit 20 is a screen capture of ISS Comment Re: Amends. To Exemptions from the Proxy Rules for Proxy Voting Advice (Jan. 31, 2020), available at https://tinyurl.com/6usd9awt.

23.     Attached here is Exhibit 21 is a screen capture of Glass Lewis Comment Re: Amends. To Exemptions from the Proxy Rules for Proxy Voting Advice (Feb. 3, 2020), available at https://tinyurl.com/mr2nmxmu.

24.     Attached here is Exhibit 22 is a screen capture of Press Release, *Attorney General James Uthmeier Announces Investigation into Glass Lewis & Co. and Institutional Shareholder Services Inc. for ESG and DEI Policies* (Mar. 20, 2025), available at https://tinyurl.com/4bkj9ju5.

25.     Attached here is Exhibit 23 is a screen capture of ISS Insights, *Materiality Assessments: Expectations and Best Practices* (Sept. 25, 2024), available at https://tinyurl.com/53juvesj.

26.     Attached here is Exhibit 24 is a screen capture of Jeff Schwartz, *The Levers of Sustainability: The EU Directive on Corporate Sustainability Due Diligence in Comparison to US Law*, PODJETJE IN DELO (COMPANY AND LABOUR): A JOURNAL FOR COMMERCIAL, LABOUR, AND SOCIAL LAW (forthcoming), available at https://tinyurl.com/4txxrphe.

4

27.     Attached here is Exhibit 25 is a screen capture of ISS, *ESG Corporate Rating*, available at https://tinyurl.com/r49539ka.

28.     Attached here is Exhibit 26 is a screen capture of Press Release, ISS, *Statement Regarding Consideration of Diversity Factors in U.S. Director Election Assessments* (Feb. 11, 2025), available at https://tinyurl.com/48pp6276.

29.     Attached here is Exhibit 27 is a screen capture of Glass Lewis, *Supplemental Statement on Diversity Considerations at U.S. Companies* 2 (Mar. 2025), available at https://tinyurl.com/53e9dv9e.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on August 22, 2025, in Dallas, Texas.


By: */s/ Mark W. Rasmussen*

Mark W. Rasmussen

**<u>EXHIBIT 1</u>**

# Harvard Law School Forum on Corporate Governance

## The Big Thumb on the Scale: An Overview of the Proxy Advisory Industry

*Posted by David F. Larcker (Stanford Graduate School of Business), Brian Tayan (Stanford Graduate School of Business), and James R. Copland (Manhattan Institute), on Thursday, June 14, 2018*

**Tags:** **Boards of Directors**, **Glass Lewis**, **Institutional Investors**, **Institutional voting**, **ISS**, **Proxy advisors**, **Proxy voting**, **Shareholder activism**, **Shareholder rights**, **Shareholder voting**
**More from:** **Brian Tayan**, **David Larcker**, **James Copland**

> **Editor's Note: David F. Larcker** is James Irvin Miller Professor of Accounting and **Brian Tayan** is a Researcher with the Corporate Governance Research Initiative at Stanford Graduate School of Business; and **James R. Copland** is the director of the Manhattan Institute's Center for Legal Policy. This post is based on their recent **paper**.

Proxy advisory firms have significant influence over the voting decisions of institutional investors and the governance choices of publicly traded companies. However, it is not clear that the recommendations of these firms are correct and generally lead to better outcomes for companies and their shareholders. We recently published a paper on SSRN ("The Big Thumb on the Scale: An Overview of the Proxy Advisory Industry") that provides a comprehensive review of the proxy advisory industry and the influence of these firms on voting behavior, corporate choices, and outcomes, and it outlines potential reforms for the industry. **[1]**

## Shareholder Voting

In the United States, the shareholders of most publicly traded corporations receive voting rights with their purchase of common shares. Although there are exceptions, voting rights are typically granted on a "one share, one vote" basis. Corporations grant shareholders voting rights to allow them to voice their preferences on corporate matters and protect their economic interests as owners.

Some matters that require shareholder approval are mundane, such as the routine approval of the board, ratification of the auditor, and changes to bylaw provisions. Others are controversial, such as:

- *Contested Election*. An activist investor or competitor attempting to seize control of a company will nominate its own slate of directors as an alternative to the company's proposed slate. The winner determines the strategic direction of the company, with the potential for very different economic outcomes.

- *Approval of a Major Acquisition or Sale*. Takeover offers and certain acquisitions require shareholder approval. Investors determine whether acceptance of a deal is in their financial best interest.

- *Approval of Employee Equity Programs*. Companies cannot issue equity awards to employees (restricted shares or stock options) without first gaining shareholder approval to establish an equity program, because these programs dilute the ownership interest of investors. The structure of these plans can be complicated but they nevertheless provide important incentives to employees and executives. Shareholder approval or rejection has ramifications for employee motivation, workplace culture, strategy, and risk taking.

- *Advisory Approval of CEO Pay*. The Dodd-Frank Act of 2010 gives shareholders an advisory vote on the compensation plans offered to named executive officers (NEOs), including the CEO ("say on pay"). While the

results of this vote are nonbinding, they send an important signal about shareholder satisfaction with CEO pay and performance.

## Impact of Voting on Corporate Decisions

Proxy voting serves as an important vehicle for shareholders to communicate their preferences to the board. While companies do not always take action in response to a shareholder vote—particularly when the vote is *advisory* rather than binding—research suggests that corporate directors pay attention to voting outcomes and, in many cases, incorporate the results of the vote in future decisions. This is particularly the case when shareholders register a strong "protest vote"— a material vote in opposition to a proposed action.

Fischer, Gramlich, Miller, and White (2009) find that protest votes in uncontested director elections are associated with higher board turnover, higher management turnover, and increased corporate activity (such as major asset sale or acquisition) in the year following the vote. Martin and Thomas (2005) find that when shareholders protest against executive-only stock option plans directors respond by reducing executive salaries. Ferri and Marber (2013) study the impact of "say-on-pay" voting and find that companies that receive low levels of shareholder support are more likely to amend their executive compensation plans to make them more shareholder friendly.

Research also shows that activist investors use the shareholder voting process to influence corporate policies. Klein and Zur (2009) find that activist hedge funds have a 60 percent success rate in using their ownership position (including the threat of proxy contests) to meet their stated objectives, including board representation, replacing the CEO, increasing cash distributions to owners, altering strategy, terminating pending acquisitions, or agreeing to a proposed merger. Together, these findings indicate that shareholder voting is an effective means of shaping corporate policy.

## Institutional Investors and Proxy Advisory Firms

Shareholder voting is dominated by institutional investors. Broadridge and PricewaterhouseCoopers (2017) show that institutional investors—such as mutual funds, index funds, pensions, and hedge funds—own 70 percent of the outstanding shares of publicly traded corporation in the United States. Individual (or "retail") investors own only 30 percent. Institutional investors also have significantly higher voting participation rates, casting votes that represent 91 percent of the shares that they hold compared with only 29 percent for retail investors. The combination of these factors gives institutional investors a disproportionately large influence over voting outcomes.

Two factors—one economic and one regulatory—have opened the door for third-party proxy advisory firms to play a substantial role in the proxy voting process.

*Economic Demand for Proxy Advisory Firms*. The proxy voting process is costly and requires significant time, expertise, and personnel. While large institutional investors—such as BlackRock and the American Funds—can dedicate significant resources to developing proprietary proxy voting guidelines and researching company-specific issues, most small and mid-sized funds lack the resources to conduct these activities. Third-party proxy advisory firms satisfy a market demand by centralizing these costs so they do not need to be duplicated across multiple investment firms.

*Regulatory Demand for Proxy Advisory Firms*. In 2003, the Securities and Exchange Commission began to require that registered institutional investors (including mutual funds and index funds) develop and disclose their proxy voting policies, and disclose their votes on all proxy items. The rule was intended to create greater transparency into the voting process and to ensure that institutional investors act without conflict of interest. Furthermore, the SEC clarified that institutional investors could satisfy this obligation by relying on voting policies developed by an independent, third-party agency—such as a proxy advisor.

The use of a proxy advisory firm has therefore become a cost-effective means of satisfying fiduciary and regulatory voting obligations for institutional investors.

Case 1:25-cv-01153-ADA   Document 39-1   Filed 09/05/25   Page 9 of 495

## Proxy Advisory Industry

There are five primary proxy advisory firms in the United States:

- *Institutional Shareholder Services (ISS)*. ISS is the largest proxy advisory firm in the United States and globally. Founded in 1985, ISS is based in Rockville, Md., and maintains offices in 13 countries. The firm employs approximately 1,000 individuals, serves 1,700 institutional clients, and provides proxy recommendations on 40,000 shareholder meetings in 117 countries. It is owned by Genstar, a private equity firm.

- *Glass Lewis & Co*. Glass Lewis is the second largest proxy advisory firm in the U.S. and globally. Founded in 2003, the company is headquartered in San Francisco, Ca. It employs 1,200 people and provides voting recommendations on 20,000 shareholder meetings in 100 countries. It is jointly owned by two Canadian pension funds: Ontario Teachers' Pension Plan and Alberta Investment Management Corporation.

- *Egan-Jones Proxy Services*. Egan-Jones Proxy Services was founded in 2002 and is based in Haverford, Pa. The company is a subsidiary of the Egan-Jones Ratings Company, a credit-rating agency. It does not disclose the number of clients it serves or meetings it covers.

- *Segal Marco Advisors*. Segal Marco Advisors was formed in 2017 by the merger of Segal Rogerscasey and Marco Consulting Group. Based in New York City, the organization is an investment consulting firm that provides proxy advisory services, with an emphasis on multiemployer benefits plans (ERISA compliant). It has 600 clients.

- *ProxyVote Plus*. ProxyVote Plus was established in 2002. Based in Northbrook, Il., it provides proxy voting services to 150 clients.

Proxy advisory firms also exist that specialize in non-U.S. markets. Examples include Pensions & Investments Research Consultants (United Kingdom), Manifest (United Kingdom), Proxyinvest (France), GES Investment Services (Sweden), Nordic Investor Services (Sweden), and Institutional Investor Advisory Services (India).

ISS and Glass Lewis are by far the largest proxy advisory firms globally in terms of the number of corporate issuers covered, proxy voting recommendations, and the number and size of institutional investors served. Glass Lewis claims its clients collectively manage $35 trillion in assets. ISS does not disclose client asset size but discloses that its clients vote on 8.5 million ballots representing 3.8 trillion shares. Researchers at George Mason University estimate that these two firms together have a 97 percent market share.

## Proxy Advisory Firm Guidelines

Given the reach and market share of ISS and Glass Lewis, it is important that shareholders know whether their voting guidelines and recommendations are accurate. Accurate recommendations are those that successfully differentiate between good and bad future outcomes and are aligned with shareholder interests to maximize long-term value.

ISS and Glass Lewis publicly disclose their policy guidelines. ISS also discloses information about the process by which its policy guidelines are updated. The ISS policy development processes includes the following steps:

1. *Survey*. ISS conducts a survey of institutional investors and corporate issuers asking their preferences on selected policy positions. In 2017, they received responses from 121 investors and 382 corporate issuers.

2. *Roundtable*. ISS conducts roundtable discussions with a subset of investors and issuers to discuss ways to enhance policy guidelines. In 2016, they conducted three roundtables in the U.S.

3. *Comment Period*. ISS posts draft recommendations and solicits feedback from stakeholders.

4. *Final Guidelines*. ISS releases final policy guidelines for the subsequent proxy season.

Some researchers have questioned the rigor and objectivity of the ISS policy development process. Larcker, McCall, and Tayan (2013) argue that the ISS data collection process relies on too few participants and that the composition of the respondent pool is not well disclosed. They identify survey design errors that are "likely to confuse and/or bias

respondents." They also question the extent to which final policy guidelines are based on the extensive body of peer-reviewed, third-party research on governance.

In a 2016 report, the United States Government Accountability Office (GAO) highlights the concern that "although input is obtained from both corporate issuers and institutional investors, it does not necessarily make its way into the final general policy guidelines." The report cites a corporate issuer as saying "there has been a noticeable increase in outreach (a lack of outreach was evident in the past). But … there is a difference between proxy advisory firms soliciting input and using input to modify policies." Another corporate issuer is cited as saying that "it seemed like policies were sometimes developed in a vacuum."

This suggests that ISS has room to either improve the rigor and objectivity of its policy development process or increase transparency about the steps it takes to review and incorporate evidence and feedback to demonstrate its rigor and objectivity.

Glass Lewis does not disclose the process for updating its policy guidelines. A 2018 proxy update report from Glass Lewis only states that, "Glass Lewis evaluates these guidelines on an ongoing basis and formally updates them on an annual basis." According to the GAO, "Glass Lewis officials said that they work with an independent advisory council that provides guidance in the development and updating of its voting policies." The proxy firm also solicits user feedback through an online form on its website. Beyond this, the process by which Glass Lewis formulates and revises policy guidelines is not disclosed.

The most important issue is whether the proprietary models of these firms are effective in identifying companies with governance problems. Neither ISS nor Glass Lewis discloses whether its voting guidelines or historical voting recommendations have been tested to ensure that they are associated with positive future corporate performance, in terms of operating results or stock price returns. This is a notable omission because it is standard practice for research firms to apply back-testing to validate the assumptions in their models. Without comprehensive evidence it is difficult to know whether their voting guidelines are consistent with increased shareholder or stakeholder value.

## Influence of Proxy Advisory Firms on Institutional Voting

There is considerable evidence that proxy advisory firms influence proxy voting outcomes. Nevertheless, there is disagreement about the *degree* to which they influence these outcomes.

The reason is largely due to measurement: It is impossible to know how institutional investors *would have voted* on the same ballot if proxy advisors did not issue a recommendation or if they made a different recommendation.  Furthermore, it is impossible to know the degree to which institutional investors take into account *the same information* that ISS and Glass Lewis use to arrive at their recommendations, thereby reaching the same conclusion about how to vote on specific issues.

Choi, Fisch, and Kahan (2010) argue that researchers overstate the influence of proxy advisory firm recommendations for these reasons. Controlling for observable factors related to governance quality, they estimate that the recommendations of ISS shift 6 percent to 10 percent of investor votes. They conclude, "To the extent that the information provided by a proxy advisor affects the shareholder vote, the proxy advisor has some limited influence, but inferring from this correlation that the advisor has power over the shareholder vote is an overstatement."

Institutional investors claim that they refer to but do not rely on the voting recommendations of proxy advisory firms. According to Rivel Research Group (2016), only 7 percent of institutional investors say that proxy advisory firms are the "most influential" contributors to their policies. Instead, they claim to be guided by "generally established best practices." McCahery, Sautner, and Starks (2015) reach similar conclusions. Using a sample of 143 institutional investors, they find that just over half (55 percent) agree or strongly agree that proxy advisory firms help them make more informed voting decisions. The authors conclude that institutional investors rely on the advice of proxy advisors to *complement* their decision making, rather than rely on them exclusively as a substitute for their decision making.

Actual voting outcomes, however, suggest that proxy advisors likely have a material influence over voting behavior, contradicting investors' self-assessment of their reliance on these firms. An extensive sample of the voting records of 713

institutional investors in 2017 shows that institutional investors are significantly likely to vote in accordance with proxy advisor recommendations across a broad spectrum of governance issues. For example, 95 percent of institutional investors vote in favor of a company's "say on pay" proposal when ISS recommends a favorable vote while only 68 percent vote in favor when ISS is opposed (a difference of 27 percent). Similarly, equity plan proposals receive 17 percent more votes in favor; uncontested director elections receive 18 percent more votes in favor; and proxy contests 73 percent more votes in favors when ISS also supports a measure. While the evidence shows that ISS is the more influential proxy advisory firm, Glass Lewis also has influence over voting outcomes. Glass Lewis favorable votes are associated with 16 percent, 12 percent, and 64 percent increases in institutional investor support for say on pay, equity plan, and proxy contest ballot measures. Furthermore, some individual funds vote *in near lock-step* with ISS and Glass Lewis recommendations, correlations that suggest that the influence of these firms is substantial.

Survey data also supports this conclusion. A 2015 report by RR Donnelly, Equilar, and the Rock Center for Corporate Governance at Stanford University finds that portfolio managers are only moderately involved in voting decisions. Among large institutional investors with assets under management greater than $100 billion, portfolio managers are involved in only 10 percent of voting decisions. This demonstrates that the individuals within investment firms who have the most detailed knowledge of specific companies are not very involved with actual proxy voting decisions.

In 2013, former SEC commissioner Daniel Gallagher expressed concern that "it is important to ensure that advisors to institutional investors … are not over-relying on analyses by proxy advisory firms." He cautioned that institutional investors should not "be able to outsource their fiduciary duties."

From his position as long-time vice-chancellor (and now chief justice) of the Delaware Supreme Court, Leo Strine characterized the influence of proxy advisory firms as follows:

 *[P]owerful CEOs come on bended knee to Rockville, Maryland, where ISS resides, to persuade the managers of ISS of the merits of their views about issues like proposed mergers, executive compensation, and poison pills. They do so because the CEOs recognize that some institutional investors will simply follow ISS's advice rather than do any thinking of their own.*

The evidence therefore suggests that proxy advisors have a material, if unspecified, influence over institutional voting behavior and therefore also voting outcomes. An extensive review of the empirical evidence shows that an against recommendation is associated with a reduction in the favorable vote count by 10 percent to 30 percent. A detailed review of the research by governance topic is provided below.

## Proxy Influence on Plan Design and Governance Choices

Empirical studies have also examined the extent to which proxy advisory firm recommendations influence *corporate* choices. This is a different question from their influence on institutional voting patterns and seeks to measure the degree to which companies make governance decisions—pay structure, board structure, the adoption of antitakeover defenses, etc.—explicitly with the voting guidelines of proxy advisory firms in mind and in order to win their approval. **[2]**

The evidence suggests that that proxy advisors have significant influence over corporate choices, particularly compensation choices.

A 2012 survey by The Conference Board, NASDAQ, and the Rock Center for Corporate Governance at Stanford University finds that approximately three-quarters (72 percent) of publicly traded companies review the policies of a proxy advisory firm or engage with a proxy advisory firm to receive feedback and guidance on their proposed executive compensation plan. Companies report making a broad range of changes in response to proxy advisory firm policies:

- 32 percent change disclosure practices
- 24 percent reduce or eliminate certain severance benefits
- 16 percent reduce other benefits
- 13 percent adopt stock ownership guidelines or retention guidelines

Case 1:25-cv-01153-ADA    Document 89-1    Filed 09/05/25    Page 12 of 495

- 9 percent introduce performance-based equity awards (as opposed to straight equity-grants).

Larcker, McCall, and Ormazabal (2015) examine the influence of proxy advisor guidelines on executive pay design in the first year that "say on pay" took effect. They find that a substantial number of firms change their compensation design to be more consistent with the published guidelines of ISS and Glass Lewis "in an effort to avoid negative voting recommendations" by these firms.

Furthermore, Gow, Larcker, McCall, and Tayan (2013) study the influence of ISS on equity compensation plan design. They analyze 4,230 equity compensation plans between 2004 and 2010 and find that companies design their plans to closely meet the limits for the maximum number and value of shares included (i.e., dilution limit) and still earn ISS approval. Over a third (34 percent) of plans include shares that are within 1 percent of ISS limits. Furthermore, company plans are significantly more likely to be *just below* the limits rather than just above them. Specifically, 96 percent of equity plans that are within 1 percent of ISS limits are just below the limit while only 4 percent are just above. The authors note that this is highly unlikely to occur based on chance alone. These results are even more surprising because ISS dilution limits are not publicly disclosed. A company needs to *pay* ISS to access their equity plan limits. The authors conclude, "These figures suggest that companies are acquiring their allowable cap figure from ISS and designing their equity plans to fall just below this number." **[3]**

The evidence therefore suggests that proxy advisory firm guidelines not only affect the voting behavior of institutional investors but also the governance decisions that companies make, particularly in regards to compensation.

## Influence of Proxy Advisors by Governance Topic

The influence of ISS and Glass Lewis is not uniform and instead appears to vary depending on the matter put before shareholders. Bethel and Gillan (2002) study the impact of ISS recommendations on proxy voting across governance issues. Using a sample of over 1,300 companies in the S&P 1500 Index, they find that an unfavorable recommendation from ISS is associated with 13.6 percent to 20.6 percent fewer affirmative votes for management proposals, depending on the type of proposal. They include in their analysis proposals about compensation, antitakeover protections, mergers, and other bylaw-related items but do not disclose the details.

### *Director Elections*

The research generally shows that proxy advisory firms have a modest influence on uncontested director elections.

Cai, Garner, and Walkling (2009) study the impact of ISS recommendations on director elections. They use a sample of over 13,300 uncontested director elections (i.e., they exclude proxy contests) between 2003 and 2005. They find that directors who do not receive a positive recommendation from ISS receive 19 percent fewer shareholder votes (77 percent versus 96 percent). They do not estimate how much of this reduction is due to the impact of ISS's recommendation versus overall poor performance by the director or company that might lead to a negative ISS recommendation.

Choi, Fisch, and Kahan (2010) also study the impact of proxy advisory firm recommendations on uncontested director elections. As noted earlier, they control for external factors (such as director attendance or company performance) that might trigger a negative recommendation. In doing so, they aim to isolate the influence of proxy firm recommendations by excluding factors that might confound the results. Before controlling for these factors, they find that a negative recommendation from ISS is associated with a 20.3 percent reduction in "for" votes; a negative recommendation from Glass Lewis with a 6.2 percent drop; and a negative recommendation from Egan Jones with a 4.7 percent drop. However, when controlling for governance factors, the ISS influence is much less. They estimate that a negative recommendation from ISS is associated with a 6 percent to 13 percent reduction in shareholder support. They find similar reductions to the influence of the other proxy-advisor recommendations.

### *Say on Pay*

The research generally shows that proxy advisors have a moderate to large impact on shareholder votes approving executive compensation packages. It also shows that they have a significant influence on pay design and that this

Case 1:25-cv-01153-ADA    Document 89-1    Filed 09/05/25    Page 13 of 495

influence is harmful to shareholders.

Ertimur, Ferri, and Oesch (2013) examine the impact of proxy advisory firm recommendations on say-on-pay votes. Using a sample of companies from the S&P 1500 Index in 2011, they find that a negative recommendations from ISS is associated with a 24.7 percent reduction in shareholder support, a negative recommendation from Glass Lewis is associated with a 12.9 percent reduction in support, and a negative recommendation from both firms with a 38.3 percent reduction in support. The authors argue that much of this decline is due to the fact that proxy firms aggregate useful information about a company and its pay plan, and not because they are actually influencing the vote to this extent. Controlling for factors, they estimate that the influence of ISS might be as low as 5.7 percent. According to the authors:

*"Our findings suggest that, rather than identifying and promoting superior compensation practices, [proxy advisory firms] play a key economic role in processing a substantial amount of executive pay information on behalf of institutional investors, hence reducing their cost to making informed voting decisions."*

Malenko and Shen (2016) also examine the impact of ISS recommendations on say-on-pay votes. The authors focus of the impact of ISS recommendations on companies whose pay packages and historical performance put them just around (above or below) certain thresholds that subject them to additional scrutiny. They find that for similar firms near the cutoff a negative recommendation from ISS leads to a 25 percent reduction in voting support. Furthermore, they find that the influence of ISS is stronger in firms that have higher institutional investor ownership and less concentrated shareholder base. They conclude that "the recommendations of proxy advisory firms are a major factor affecting shareholder votes" and that investors "rely on ISS instead of performing independent governance research."

As discussed above, Larcker, McCall, and Ormazabal (2015) study the impact of proxy advisory firm recommendations on pay design. Because the policy guidelines of the proxy advisory firms were published prior to the first say-on-pay votes in 2011, they were also known to boards of directors and those who advise corporations on executive pay design. The authors find that companies that were likely to receive a negative recommendation from ISS made changes to their pay plan to make them more consistent with ISS guidelines. Furthermore, they find that shareholders react negative to these changes. They conclude that:

*"[The influence of] proxy advisory firms appears to have the unintended economic consequence that boards of directors are induced to make choices that decrease shareholder value."*

### Equity Compensation Plans

The research shows similar proxy-advisory influence over equity compensation plans.

Morgan, Poulsen, and Wolf (2006) study the influence of ISS recommendations on equity compensation plans for executives and directors. They find that an unfavorable recommendation from ISS is associated with a 20 percent decrease in shareholder support.

Larcker, McCall, and Ormazabal (2013) examine the impact of ISS guidelines on stock option repricing plans. Not all decisions to reprice stock option awards require shareholder approval. The authors find that plans that require shareholder approval are significantly more likely to conform to ISS criteria than those that the board can implement without a shareholder vote. Furthermore, they find that shareholders react negatively to the disclosure of plans that meet ISS criteria, and that companies whose plans conform to ISS criteria exhibit lower future operating performance and higher employee turnover. According to the authors, "These results are consistent with the conclusion that proxy advisory firm recommendations … are not value increasing for shareholders."

### Proxy Contests

The research generally finds that proxy advisory firm recommendations are beneficial to shareholders in the area of corporate control. Alexander, Chen, Seppi, and Spatt (2010) study the role of ISS recommendations in proxy contests. Their sample includes 198 proxy contests between 1992 and 2005. In 55 percent of cases, ISS recommends in favor of management's nominations to the board; in 45 percent, they recommend in favor of the dissident slate. The authors find that ISS recommendations for the dissident slate increase the probability of victory by 14 percent to 30 percent. They also

find that ISS recommendations in these situations are associated with positive shareholder returns. The authors conclude that "proxy advice may facilitate informed proxy voting."

***Research Summary***

The research literature therefore shows mixed evidence on the degree to which proxy advisory firms influence firm voting and the impact they have on corporate behavior and shareholder returns. For the most part, their influence on voting is shown to be—at a minimum—moderate and their influence on corporate behavior and shareholder value is shown to be negative. Nevertheless, conflicting evidence exists.

The contradictions in this evidence can be reconciled. It might be the case that proxy advisory firms customize their standards and use research teams with greater expertise when evaluating complex proxy issues, such as proxy contests and mergers and acquisitions. When it comes to general issues common across the broad universe of companies—such as compensation design and director elections—resource and time constraints might compel proxy advisory firms to employ more rigid and therefore arbitrary standards that are less accommodating to situational information that is unique to a company's situation, industry, size, or stage of growth.

## Additional Issues Regarding the Proxy Advisory Industry

Market participants and researchers have raised additional concerns about the proxy advisory industry, beyond their direct influence over voting and corporate behavior:

- *Fiduciary Duty*. Proxy advisory firms are not held to a fiduciary standard, which would require them to demonstrate that their recommendations are in the best interest of shareholders and the corporation. Furthermore, proxy advisory firms do not have financial incentive to issue accurate or correct recommendations because they do not have an economic interest in the outcome of votes.

- *Conflicts of Interest*. Some proxy advisory firms, such as ISS, receive consulting fees from the same companies whose governance practices they evaluate. The terms of these arrangements are not disclosed, including whether paid clients are given special access to information about the models underlying the firm's recommendations.

- *Resource Constraints*. Proxy advisory firms might have insufficient staff to accurately evaluate the full scale of proxy items on which they provide recommendations each year. ISS, which is the largest firm, employs 1,000 individuals company-wide including non-research (administrative) personnel. By contrast, Moody's Corporation, which includes the agency that rates credit instruments worldwide, employs 11,700 individuals. Small proxy advisory firms are likely more resource constrained.

There is little research to evaluate the validity of these claims. One study shows that conflicts of interest within proxy advisory firms are a legitimate concern. Li (2016) finds that proxy advisory firms that also engage in consulting arrangements with corporate issuers exhibit favoritism toward management. The author shows that when a competitor firm initiates recommendations on these company, the original firm becomes tougher on management in future recommendations. Li concludes that the evidence "is consistent with our theory [that] the incumbent is subject to conflicts of interest by serving both investors and corporations."

## Policy Considerations

Proxy advisory firms are not subject to material oversight by the Securities or Exchange Commission or other regulatory bodies in the U.S. Nevertheless, regulation of the proxy advisory industry might improve their contribution to the voting process. The dominance of ISS and Glass Lewis, *despite* evidence that their recommendations are not necessarily accurate or value-enhancing, suggests that a market failure has occurred. In a properly functioning market, companies with a poor service record are driven from the market. Proxy advisory firms, however, are insulated from these forces, primarily because many institutional investors rely on their services as a cost-effective method to satisfy the obligation imposed by the Securities and Exchange Commission to develop guidelines that are free from conflict and to vote all items on the proxy. Institutional investors do not appear to use their services to improve investment decisions.

Two means of correcting this market failure suggest themselves:

One, regulators could take steps to compel proxy advisory firms to improve the quality of their product. Examples include requirements to:

- Maintain adequate resources
- Improve the reliability of recommendations
- Require reliability testing
- Provide past recommendation data for third-party evaluation **[4]**
- Increase transparency about model and guideline development
- Develop reliable mechanisms for incorporating market feedback on models and guidelines
- Disclose commercial relationships with issuers
- Impose an explicit fiduciary-duty standard

Two, the SEC could eliminate the requirement that institutional investors vote all items on the proxy. This action would free investors to decide whether to pay for the voting recommendations of proxy advisory firms based on an evaluation of their price and value.

These reforms need not be mutually exclusive.

## Why This Matters

1. Research shows that proxy advisory firms are influential over the voting decisions of institutional investors and the governance choices of corporations. However, there is little empirical evidence to suggest that their voting recommendations lead to improved future value for shareholders. Just how accurate are the voting recommendations of these firms? How influential are they over corporate choices? Should steps be taken to reduce this influence, or to improve the reliability of their recommendations?

2. Proxy advisory firms are not transparent about the process they use to develop their guidelines, the models they use to determine recommendations, the accuracy of their recommendations, or potential conflicts of interest. Would greater transparency improve the functioning of the market for proxy advisory services?

3. Proxy advisory firms do not disclose their historical recommendation data, arguing that this data is proprietary. Over time, however, the value of historical data greatly diminishes and perhaps approaches zero. Should they be required to release this data after a sufficient amount of time has elapsed? Would back-testing by independent third parties improve the validity of proxy advisory firm models? Would it lead to more reliable future recommendations and improved shareholder outcomes?

4. Impact of proxy advisory firms recommendations on shareholder value and corporate actions appears at least in some situations to be direct and significant. Should these firms be held to a fiduciary standard to insure their recommendations are in the best interest of shareholders

The complete paper is available **here**.

### Endnotes

[1] This paper is based on a report by the Manhattan Institute titled "Proxy Advisory Firms: Empirical Evidence and Case for Reform," (May 21, 2018). David Larcker and Brian Tayan contributed research and writing to the report under a grant from the Manhattan Institute.
**(go back)**

[2] Note that the issue of proxy advisory firm influence over corporate decisions is predicated on the board of director and management belief that these firms influence institutional investor voting decisions. If proxy advisory firms have no

influence over voting, they likely would also have no influence over corporate choices.

**(go back)**

[3] The cost to access ISS equity-plan models is between $23,500 and $29,500, according to proxy filing disclosures, depending on the size of the company. Firms are prohibited by the terms of the contract with ISS from disclosing to shareholders that they used ISS models to determine their plan design.

**(go back)**

[4] Proxy advisory firms consider their recommendations proprietary because they sell them. However, over time their value extinguishes. Proxy advisory firms could disclose past recommendations after a certain amount of time has elapsed so that third parties can study the effects of these recommendations and determine their impact on shareholder value. Credit rating agencies engage in this type of activity, which has contributed to the improvement of their models over time.

**(go back)**

**<u>EXHIBIT 2</u>**

# Harvard Law School Forum on Corporate Governance

## Testimony in House Hearing: "Exposing the Proxy Advisory Cartel: How ISS & Glass Lewis Influence Markets"

*Posted by Paul Washington, Society for Corporate Governance, on Monday, May 5, 2025*

**Tags:** **Corporate governance**, **Proxy advisory**, **Proxy voting**, **SEC**
**More from:** **Paul Washington**, **Society for Corporate Governance**

> **Editor's Note: Paul Washington** is President and CEO of the Society for Corporate Governance. This post is based on his testimony in a hearing of the Subcommittee on Capital Markets of the House Committee on Financial Services.

Chair Wagner, Ranking Member Sherman, and Members of the Subcommittee, my name is Paul Washington, and I am the President and Chief Executive Officer of the Society for Corporate Governance ("Society"). The Society appreciates the opportunity to present its views on proxy advisory firms' roles in, and impact on, corporate governance in the United States.

Founded in 1946, the Society is a professional membership association of more than 3,700 corporate and assistant secretaries, chief legal officers and other in-house counsel, outside counsel, and other governance professionals who serve approximately 1,700 entities, including about 1,000 public and private companies of almost every size and industry.

The Society's members support the work of corporate boards and executive management regarding corporate governance and disclosure, compliance with corporate and securities laws and regulations, and adherence to stock exchange listing requirements.

The Society's mission is to support corporate governance professionals through education (including programs, content, and benchmarking), peer-to-peer connections and professional development, and advocacy with federal, state, and international policymakers, with the ultimate goal of creating long-term shareholder value through better governance.

## The Society's Public Policy Goals

A fundamental goal of the Society is to support corporations, as they, under the direction of the informed and independent judgment of their boards, develop and execute their individual strategies in the context of their specific circumstances. In furtherance of that goal, the Society advocates for policies that promote effective governance, appropriate disclosure, and, as especially relevant for the Subcommittee, capital formation – including facilitating the ability of companies to become and remain public companies.

There is a wide range of forces that discourage investors and the companies they own from going and remaining public. In 1997, there were approximately 7,100 public companies in the United States. Now there are fewer than 3,600.

The decline in public ownership of corporations should concern every American. Growing wealth inequality has many drivers, but fewer public companies means fewer investment opportunities for average American investors.

The Subcommittee is rightly examining the role of proxy advisory firms in the U.S. corporate governance ecosystem, including their impact on corporation decisionmaking, shareholder voting, and, more broadly, the environment for public ownership of corporate shares.

# Background on Proxy Advisory Firms

The proxy advisory market essentially consists of two firms—Institutional Shareholder Services, or ISS, and Glass Lewis. Proxy advisory firms play an important role in capital markets by advising investors how they should vote at companies' annual and special shareholder meetings. This involves preparing recommendations for institutional investors in companies about how they should vote with respect to, for example, particular board members, equity plans, company "say-on-pay" proposals, significant corporate transactions, and shareholder proposals.

The proxy advisory firms' recommendations have a significant impact on shareholder votes. Numerous studies have documented the significant influence of these firms in corporate governance and the proxy voting process:

- A 2015 study found that 25 percent of institutional investors vote "indiscriminately" with ISS [1].

- In 2016, a study estimated that a negative recommendation from ISS leads to a 25-percentage point reduction in voting support for say-on-pay proposals [2].

- A 2018 study demonstrated that a negative recommendation from ISS was associated with a reduction in support of 17 percentage points for equity-plan proposals, 18 points for uncontested director elections, and 27 points for say-on-pay [3].

- In 2021, a study examining "robo-voting"—the practice of fund managers voting in lockstep with the recommendations of ISS—identified 114 financial institutions managing $5 trillion in assets that automated their votes in a manner aligned with ISS recommendations 99.5% of the time [4].

- A 2022 study provided further evidence that institutional investors are highly sensitive to an opposing recommendation from a proxy advisory firm. Opposition from ISS was associated with a 51 percent difference in institutional voting support compared with only a 2 percent difference among retail investors [5].

- During the 12 months ending June 30, 2024, negative recommendations from the two proxy advisory firms were associated with (1) a 17-percentage point difference in support for directors in uncontested elections at the S&P 500 (96.9% with the firms' support vs. 79.7% without); (2) a 35-percentage point gap for say-on-pay proposals (92.8% vs. 58.0%); and (3) a 36-percentage point difference for shareholder proposals (42.4% vs. 6.6%) [6].

The proxy advisory firms' impact is two-fold. First, it can determine the outcome of votes where shareholders have decision-making power, such as in the election of directors or approval of significant corporate transactions. Second, even when a shareholder vote is merely precatory—as is the case with say-on-pay proposals or many shareholder proposals—it often affects board decision-making. This is because proxy advisory firms will recommend votes against board members based on the company's response to prior precatory shareholder votes. For example, if a company's say-on-pay proposal passes but receives less than 70% support, ISS may recommend that shareholders vote against the re-election of the company's compensation committee members at the next annual meeting unless the company is, in ISS's view, sufficiently responsive to the shareholder vote. Similarly, Glass Lewis may recommend votes against directors if a say-on-pay proposal receives less than 80% support. This places a board in the position of choosing between (1) standing by its prior decision on executive compensation that it believed was in the best interests of shareholders, which received super-majority support from its shareholders, or (2) taking potentially suboptimal actions to accommodate the proxy advisory firm's views that are inconsistent with the views of investors holding a majority of the company's shares.

In addition to providing voting recommendations to investors, the proxy advisory firms also own and control the software platforms that send votes by investors to the tabulators for a shareholder meeting. In some cases, the proxy advisory firms, and not the investors, actually decide how to vote and submit the ballot for their clients. And, as discussed below, the proxy advisory firms offer other services to investors and corporate clients.

The influence of proxy advisory firms is only likely to increase. A number of large U.S. asset managers are implementing programs that will allow their clients to decide how to vote their shares rather than having the asset manager make that determination. This "client-directed" or "pass-through" voting has attractive features for asset managers and their clients, but in some cases the voting options provided to clients are based on the proxy advisory firms' policies or recommendations, thereby effectively increasing the influence of the proxy advisory firms [7].

8/22/25, 5:27 PM    Testimony in House Hearing Exposing the Proxy Advisory Cartel: How ISS & Glass Lewis Influence Markets"

Case 1:25-cv-01153-ADA    Document 39-1    Filed 09/05/25    Page 20 of 495

The influence, impact, and multiple roles played by proxy advisory firms are why it is so important not only for these firms to "get it right," but also for those who rely on, and are affected by, proxy firm recommendations to have appropriate insight in the processes that these firms use in developing their positions and in potential conflicts of interest.

## The Need for Common-Sense Regulation of Proxy Advisory Firms

The Society supports what we term "light touch" regulation of the proxy advisory firms designed to (1) help ensure that shareholders are provided with accurate information before casting votes, and (2) increase transparency regarding proxy advisory firms, thereby enhancing confidence in the proxy voting system.

In supporting common sense regulation, the Society is mindful of the legitimate and important role that proxy advisors play. Institutional investors cast votes on tens of thousands of items each year and thousands of shareholder meetings, and the Society supports their ability to enlist outside assistance in deciding how to vote and in casting their votes. At the same time, proxy advisors comprise the one component of the proxy voting system that is currently unregulated. Given the longstanding and continuing concerns described herein, we believe that light-touch regulation is appropriate.

## SEC Jurisdiction

As a threshold matter, we believe that the Securities and Exchange Commission currently has authority to regulate proxy advisory firms. But as discussed below, it would be helpful—and may indeed become necessary—for Congress to confirm that authority.

The largest proxy advisory firm, ISS, has chosen to register under the Investment Advisers Act of 1940. However, the SEC's rules for investment advisers do not reflect the unique role that proxy advisory firms perform in the proxy voting process. Proxy advisory firms do not select securities for their clients, nor provide investment advice in the way a typical asset manager does. Instead, these firms recommend how to vote at shareholder meetings and facilitate the voting process for their clients.

The other major proxy advisory firm, Glass Lewis, is not registered under the Investment Advisers Act (or under any other securities statute). As a non-registered entity, Glass Lewis is not subject to the provisions of the Investment Advisers Act, or any other SEC regulation.

For many years, the SEC has considered the activities of proxy advisory firms to be within the scope of a proxy solicitation, and, therefore, subject to the Commission's rules under Section 14(a) of the Securities Exchange Act of 1934 [8]. In 2020, the SEC promulgated a final rule to codify this long-standing interpretation [9]. This 2020 SEC Final Rule also amended the exemptions to the proxy solicitation rules in order to provide SEC oversight of certain proxy advisory firm activities and practices [10].

The 2020 SEC Final Rule was largely vacated by new leadership at the SEC in 2022 [11]. Additionally, ISS challenged the SEC's interpretation of its solicitation rules in a lawsuit brought in the U.S. District Court for the District of Columbia [12].

The District Court's decision in this ISS lawsuit is on appeal to the U.S. Court of Appeals for the District of Columbia Circuit [13]. The Society and the National Investor Relations Institute ("NIRI") filed an amicus brief explaining how the District Court erred in its analysis. If ISS nonetheless prevails—and it is determined that the SEC lacks authority to regulate proxy advisory firms under its solicitation rules—Congress should enact legislation to confirm the SEC's authority to provide oversight of these firms and their activities.

## The Need for Pre-Publication Review of Proxy Advisory Firm Reports

The Society supports requiring proxy advisory firms to provide advance copies of their reports to the companies that are the subject of the report, on a complimentary basis, with a reasonable amount of time for companies to identify any factual, analytical, or other errors. In addition, in its relevant report, the proxy advisory firms should provide clients with a hyperlink to the company's response to the proxy advisory firm's analysis and recommendations.

Proxy advisory firms make proxy recommendations on thousands of public companies in the United States and thousands of public companies in Europe and Asia. Reading, digesting, and analyzing thousands of proxy statements, annual reports, and

8/22/25, 5:27 PM  Testimony in House Hearing Exposing the Proxy Advisory Cartel: How ISS & Glass Lewis Influence Markets"

Case 1:25-cv-01153-ADA  Document 39-1  Filed 09/05/25  Page 21 of 495

other corporate publications, and then preparing written analyses, is a large and labor-intensive task. The challenge is compounded by the compressed meeting schedule during the spring U.S. proxy season, the limited number of full-time research analysts at the two major proxy advisory firms, the breadth of industries represented by the companies subject to the proxy advisors' recommendations, and the complexity of issues being addressed at shareholder meetings such as executive compensation programs.

Given the more than 25,000 ballot items at companies in the Russell 3000 Index that proxy advisory firms opine on each year, it is inevitable that proxy reports will have some factual errors or misunderstandings about corporate disclosures.

Factual errors, incorrect methodologies, and other problems with proxy advisory firm reports have been well-documented over the years. For example, a 2020 comment letter to the SEC by the Society included the results from a December 2019 Society member survey, in which 42 percent of respondents answered affirmatively when asked if they were "aware of any factual errors, omissions of material facts, or errors in analysis in the last three years" [14]. This Society comment letter also included a lengthy list of examples of errors, analytical flaws, and omissions reported by our members [15].

A November 2024 survey of Society members confirmed that these problems still exist. Of the 52 respondents in this later survey: (1) 26.92% reported that they had to ask ISS to make a correction or clarification after a proxy research report was published; (2) 11.54% had to make a supplemental SEC filing to alert their investors about flaws in an ISS report; and (3) 19.23% had to engage directly with their investors to alert them about flaws in an ISS report. In addition, Society members often report that (1) the proxy advisory firms do not consistently issue corrections, and (2) even if they do, it is difficult for companies to correct misconceptions among their shareholders after the proxy advisory firm's erroneous report has been issued and, in some cases, shareholder votes have already been cast.

The Society's survey results are supported by American Council for Capital Formation's ("ACCF") examination of public filings in at least three recent proxy seasons. In 2020, the ACCF found a total of 42 supplemental filings by public companies in the SEC's EDGAR database attempting to correct the record regarding a vote recommendation by a proxy advisory firm [16]. In the 2021 proxy season, the ACCF found 50 examples of supplemental filings to correct the record regarding inaccurate voting recommendations by proxy advisory firms, a 21% increase [17]. And, in a study conducted during the 2023 proxy season, the ACCF found 64 instances where proxy advisors formulated recommendations based on data or analysis disputed by the companies themselves, a 28% increase from the 2021 results [18].

For many years, the Society and others within the public company community have advocated for a requirement that proxy advisory firms provide each public company with a copy of its draft report in advance of dissemination to their clients. This "advance review and comment" process would permit a company to review and correct any inaccurate factual information and remark on any other flaws contained in these reports. Indeed, for several years, ISS did provide draft reports (albeit on a very brief turnaround basis) to public companies that are members of the S&P 500 Index. While it discontinued this practice for U.S. companies after the promulgation of the 2020 SEC Final Rule, ISS still offers an advance review and comment process to companies in various markets abroad:

- In Canada, drafts are provided to Canadian companies in the S&P/TSX Composite Index for the purpose of reviewing the factual accuracy of the data in ISS's draft proxy analyses [19].

- In France, ISS provides corporate issuers with an opportunity to review the factual accuracy of the data included in ISS's draft proxy analyses [20].

- In other markets, ISS permits companies to make individual requests for a review of draft reports. The requests are typically made by the earlier of the filing of their shareholder meeting materials, or 30 days prior to the meeting. The request needs to be made annually and may be accommodated at ISS' sole discretion [21].

In addition, the SEC previously recognized the appropriateness of providing pre-publication review. In a 2019 Proposed Rule, the SEC would have required proxy advisory firms to provide each company with a copy of its draft report—in advance of dissemination to their clients—to permit a company to review and inform the proxy advisory firm about any inaccurate factual information and comment on any other flaws in a report [22].

This advance review and comment process can operate very efficiently and does not impact the independence of a proxy advisory firm, as each firm retains its exclusive right to determine whether to make any changes to a company report before

8/22/25, 5:27 PM	Testimony in House Hearing Exposing the Proxy Advisory Cartel: How ISS & Glass Lewis Influence Markets"

Case 1:25-cv-01153-ADA	Document 39-1	Filed 09/05/25	Page 22 of 495

disseminating it to its investor clients. Moreover, because these reports are distributed electronically, it would be a simple additional step to add a hyperlink on the front page of a report, permitting investors with easy access—if they so choose—to any comment letter submitted by a company that is the subject of the report.

## The Benefits of Increased Disclosure

The Society also supports increased disclosure of proxy advisory firms' processes and assumptions for developing their voting policies. The proxy advisory firms engage in multi-stage processes in preparing their voting policies. This includes soliciting input from several constituencies, including public companies, and the Society has regularly participated in the firms' policy development surveys. As the Society has highlighted in its responses to these surveys, however, the survey questions and response choices are often worded in a biased manner and, of even greater concern, the policies adopted by the proxy advisory firms are often not grounded in empirical evidence supporting the connection between their policies and shareholder value, or even to prevailing industry practice. For example, ISS once told a large-cap Society member its proxy access bylaw that was the subject of a shareholder proposal did not comport with "best practices" and that it would recommend its clients vote against management, even though over 90% of such bylaws have the same provisions as the one on the ballot. When pressed why ISS refused to identify this bylaw amendment as a best practice, the ISS corporate sales team member said that "for ISS, best practice is the preferred practice by ISS."

The Society believes that proxy advisors should disclose the empirical basis for their voting policies. This is critical because (1) *institutional investors* with fiduciary duties to their shareholder clients rely (to varying degrees) on proxy advisor recommendations, and (2) as more *retail* investors participate in client-directed voting programs, in which their votes follow proxy advisor recommendations, those investors should know whether, and to what extent, those recommendations have a solid empirical basis.

The Society also believes that proxy advisory firms should, at a minimum, provide increased information regarding actual or potential conflicts of interest that arise from the multiple roles performed by the proxy advisory firms. As an example, ISS provides corporate governance and executive compensation consulting services to public companies, in addition to providing voting recommendations to its institutional clients on the same companies and with respect to the same proxy items. A common experience is for a company to get a sales call from the ISS corporate consulting team with a pitch that ISS can help the company address low or lower than desired shareholder support associated with a previous vote without acknowledging that the proxy advisor's recommendation likely influenced (in some cases, significantly) the voting outcome. Indeed, for an even higher price, a company can get even more service, including language explaining the elements of an annual bonus plan in the Compensation Discussion and Analysis section of the company's proxy statement. More recently, ISS introduced an environmental and social scorecard it pitches to companies showing negative results, and, when asked what forms the basis of the score, companies are told they can learn about it if they pay a significant consulting fee to ISS.

Another apparent conflict that exists is proxy advisory firms providing voting recommendations on shareholder proposals submitted to companies by the proxy advisory firms' institutional investor clients. This should be specifically and prominently disclosed to clients of proxy advisory firms so that they may evaluate this information in the context of a firm's voting recommendations.

## Automated Voting

The Society also supports the regulation of automated voting, sometimes called "robo-voting."

Society research indicates that many mid-size and smaller investment advisers have chosen to outsource their voting decisions to ISS and Glass Lewis [23]. This delegation of voting authority permits ISS and Glass Lewis to vote their clients' shares as recommended in their individual company reports. This outsourcing of the shareholder voting process to a non-fiduciary is well-documented in public disclosures made by these mid-size and smaller investment advisers [24]. This automated outsourcing is of particular concern because, as noted above, the proxy advisors' voting policies may not have an empirical basis and may conflict with the views of the board of directors which, unlike the proxy advisory firm, has a fiduciary duty to make decisions in the best interest of the corporation and its shareholders.

The ISS and Glass Lewis voting systems are completely automated, with an electronic ballot that is pre-populated with voting instructions based on: (1) a client's general voting guidelines; and/or (2) ISS and Glass Lewis voting

recommendations. The ballot for each shareholder meeting is then automatically submitted by ISS or Glass Lewis to the relevant tabulators, without any requirement that the client review and approve the ballot being submitted.

The SEC has acknowledged that ISS and Glass Lewis offer these automated voting services:

> One way a proxy voting advice business may assist clients with voting execution is through an electronic vote management system that allows the proxy voting advice business to (1) populate each client's ballot with recommendations based on that client's voting instructions to the business ("pre-population"); and (2) submit the client's ballots to be counted **[25]**.

The Commission also confirmed that "[c]lients utilizing such [voting] services may choose to review the proxy voting advice business's pre-populated ballots before they are submitted or have them submitted automatically, without further client review ('automatic submission')" **[26]**.

The Society believes that a proxy advisory firm should not be permitted to offer an automated voting service that allows the proxy advisory firms to make and execute voting decisions on behalf of investment advisers without any ongoing oversight by these clients, aside from the approval of general guidelines and policies before proxy season begins.

In advancing this position, the Society does not oppose the use of technology to pre-populate individual ballots for ISS and Glass Lewis clients based on a client's general guidelines or policies. However, each investment adviser client should be required to review every pre-populated ballot and provide affirmative consent by expressly authorizing and directing its voting decisions for each individual ballot prepared by the proxy advisory firm.

Investment advisers that do not review and specifically approve (or modify) each ballot cast on their behalf are not fulfilling the fiduciary responsibilities they owe to their clients, investors, and beneficiaries.

## Legislation to Address Proxy Advisory Firm Issues

The Society is supportive of the goals of the legislation being considered by the Subcommittee at today's hearing. These bills address many of the concerns raised by public companies and other participants in the U.S. proxy system. Among other things, the proposed legislation would:

- Require proxy advisory firms to register with the SEC;
- Require these firms to be more transparent about their internal standards, procedures, and methodologies;
- Provide public companies with a mechanism to review and comment on draft reports before they are issued;
- Authorize the SEC to regulate and/or prohibit proxy advisory firm conflicts of interest; and
- Prohibit automated or "robo-voting" by these firms.

As noted above, the Society understands the need of institutional investors to have summaries and analyses of their proxy materials, particularly for those who hold many U.S. equities and vote thousands of meetings each year. The Society is also mindful of compliance cost concerns and is more than willing to work with the Subcommittee on Capital Markets and others on the proposed legislation to ensure reasonable and cost-effective regulation of these firms and their business practices.

## Conclusion

Thank you for the opportunity to present the views of the Society on the role and impact of proxy advisory firms in the United States and the areas in which appropriate federal legislation and regulation can help promote effective governance, transparent markets, informed investor decision-making, and capital formation. I am happy to answer any questions you may have about these issues.

---

[1]  Peter Iliev and Michelle Lowry, "Are Mutual Funds Active Voters?" Review of Financial Studies (2015).
**(go back)**

**2**  Nadya Malenko and Yao Shen, "The Role of Proxy-Advisory Firms: Evidence from a Regression-Discontinuity Design," Review of Financial Studies (2016).
**(go back)**

**3**  James R. Copland, David F. Larcker, and Brian Tayan, "The Big Thumb on the Scale," Stanford Closer Look Series (May 30, 2018).
**(go back)**

**4**  Paul Rose, "Proxy Advisors and Market Power: A Review of Institutional Investor Robovoting," Social Science Research Network (April 2021).
**(go back)**

**5**  Alon Brav, Matthew Cain, and Jonathan Zytnick, "Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement, and Voting," Journal of Financial Economics (2022). See also David F. Larcker and Brian Tayan, "Seven Questions About Proxy Advisors," Stanford Closer Look Series (April 29, 2024).
**(go back)**

**6**  Society for Corporate Governance, based on data provided by Proxy Analytics (April 2025). Similar gaps were observed in shareholder votes for Russell 3000 companies (96.8% vs. 77.6% for directors; 94.8% vs. 67.5% for say-on-pay; and 42.2% vs. 6.7% for shareholder proposals).
**(go back)**

**7**  Moreover, the labeling of such voting options can be misleading. ISS's "board-aligned policy," is not, in fact, consistently aligned with the board's recommendations. See **https://www.issgovernance.com/file/policy/active/specialty/Global-Board-Aligned-US-VotingGuidelines.pdf?v=1**
**(go back)**

**8**  See, e.g., Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice, 84 Fed. Reg. 47,416 (Sept. 10, 2019).
**(go back)**

**9**  Exemptions From the Proxy Rules for Proxy Voting Advice, 85 Fed. Reg. 55,082, at 55,091 (Sept. 3, 2020) (hereinafter "2020 SEC Final Rule").
**(go back)**

**10**  Id.
**(go back)**

**11**  Proxy Voting Advice, 87 Fed. Reg. 43,168 (July 19, 2022).
**(go back)**

**12**  Institutional Shareholder Services v. Securities and Exchange Commission, No. 19-3275 (D.D.C. filed Oct. 31, 2019) (hereinafter "ISS v. SEC").
**(go back)**

**13**  ISS v. SEC, 718 F. Supp. 3d 7 (D.D.C. 2024), appeal docketed, No. 24-5105 (D.C. Cir. Apr. 23, 2024).
**(go back)**

**14**  Letter from Darla Stuckey, President and CEO, Society for Corporate Governance, to Vanessa A. Countryman, Secretary, U.S. Securities and Exchange Commission, at 4-5 (Feb. 3, 2020), available at **https://www.sec.gov/comments/s7-22-19/s72219-6743687-207853.pdf**
**(go back)**

8/22/25, 5:27 PM    Testimony in House Hearing Exposing the Proxy Advisory Cartel: How ISS & Glass Lewis Influence Markets"

Case 1:25-cv-01153-ADA   Document 39-1   Filed 09/05/25   Page 25 of 495

**15** Id. at 5-7.
[go back]

**16** American Council for Capital Formation, "Proxy Advisors Are Still a Problem," at 9 (December 2021), available at **https://accf.org/wp-content/uploads/2021/12/ACCF_proxy_advisor_rule_report_2021FINAL.pdf**
[go back]

**17** Id. at 10.
[go back]

**18** American Council for Capital Formation, "Proxy Advisors Remain a Problem," at 2 (November 2023), available at **https://accf.org/wp-content/uploads/2023/11/ACCF-2023-Supplemental-Filings-ReportFINAL.pdf**.
[go back]

**19** Institutional Shareholder Services, **https://www.issgovernance.com/iss-draft-review-process-canadian-issuers/** (last visited Apr. 22, 2025).
[go back]

**20** Institutional Shareholder Services, **https://www.issgovernance.com/policy-gateway/french-market-engagement-disclosure** (last visited Apr. 22, 2025) ("ISS believes that this review process helps improving the accuracy and quality of its analyses, an outcome that is in the best interests of both the institutional investors for whom the analyses are prepared, as well for the issuers that are the subject of these reports.").
[go back]

**21** Institutional Shareholder Services, **https://www.issgovernance.com/contact/faqs-engagement-on-proxy-research/#1574276867038-b204d1c3-a920** (last visited Apr. 22, 2025).
[go back]

**22** Amendments to Exemptions From the Proxy Rules for Proxy Voting Advice, 84 Fed. Reg. 66,518 (Dec. 4, 2019) (hereinafter "2019 SEC Proposed Rule"). In its 2020 Final Rule, the SEC also provided an option for proxy advisory firms to engage in a "concurrent review" process, whereby final versions of their reports would be sent to public companies at the same time the reports are distributed to their clients. Companies would then have the opportunity to provide any comments on the report; and each proxy advisory firm would notify its clients about such comments. See 2020 SEC Final Rule at 55,110-55,114.
[go back]

**23** See, e.g., Letter from Niels Holch, Executive Director, Shareholder Communications Coalition, to Vanessa A. Countryman, Secretary, Securities and Exchange Commission (Feb. 3, 2020), available at **https://www.sec.gov/comments/s7-22-19/s72219-6744360-207909.pdf**.
[go back]

**24** Id.
[go back]

**25** 2019 SEC Proposed Rule at 66,519-66,520.
[go back]

**26** Id. at 66,520.
[go back]

**<u>EXHIBIT 3</u>**

**ISS GOVERNANCE** ▷

# 2024 ISS Global Benchmark Policy Survey

## Summary of Results

Published: October 10, 2024

Compiled by

Renata Schmitt

Emanuele Cicalese



I S S G O V E R N A N C E . C O M
© 2024 | Institutional Shareholder Services and/or its affiliates

# TABLE OF CONTENTS

Overview of Process and Response ........................................................................................................ 3

    *Number and category of respondents to online benchmark policy survey* ...................................... 3

Key findings .......................................................................................................................................... 4

    *U.S. Poison Pills* ............................................................................................................................... 4

    *U.S. Executive Compensation* ......................................................................................................... 5

    *Continental Europe (France) – General Share Issuances* ................................................................. 6

    *Continental Europe (All countries) - Virtual Meetings* ..................................................................... 6

    *Continental Europe (All countries) - Auditor Rotation* ..................................................................... 6

    *Middle East and North Africa – Cumulative Voting Elections* ........................................................... 6

    *Global Environmental & Social Questions* ....................................................................................... 7

    *Scope 3* ............................................................................................................................................ 7

    *Climate-related Shareholder Proposal* ............................................................................................ 7

    *Workforce Diversity* ......................................................................................................................... 7

Detailed survey questions and summary of statistical responses ........................................................ 8

    Market-Specific Questions .............................................................................................................. 8

        U.S. - Poison Pill ........................................................................................................................... 8

        Continental Europe (All) - Virtual Meetings ................................................................................ 15

        Continental Europe (All) – Auditor Rotation .............................................................................. 16

        Middle East and North Africa – Cumulative Voting .................................................................... 17

    Global Environmental & Social Questions ..................................................................................... 18

        Scope 3 ........................................................................................................................................ 18

        Climate-related Shareholder Proposal ........................................................................................ 19

        Workforce Diversity .................................................................................................................... 20

**ISS**GOVERNANCE▷

# Overview of Process and Response

This document summarizes the results of the ISS 2024 Global Benchmark Policy Survey, which opened on Aug. 1st and closed on Sept. 5th, 2024.

The survey is part of ISS' annual global policy development process and was, as is the case every year, open to all interested parties to solicit broad feedback on areas of potential ISS policy change for 2025 and beyond.

We received 325 responses to the survey, 199 from investors and investor-affiliated organizations (compared to 239 investors' responses received last year), and 126 non-investor respondents (compared to 216 non-investor responses received last year). Responses that lacked a valid email address were not accepted. Duplicate responses from the same person were also not accepted; only the response completed last was counted.

## Number and category of respondents to online benchmark policy survey

| Category of Respondent | Number of Respondents |
|---|---:|
| **"Investor" Total** | **199** |
| Asset Manager | 125 |
| Asset Owner | 57 |
| Advisor to Institutional Investors | 6 |
| Other Investor-related organizations | 11 |
| **"Non-Investor" Total** | **126** |
| Public corporation | 95 |
| Board Member of a Public Corporation | 3 |
| Advisor to public corporation | 19 |
| Other Non-Investors | 9 |
| **Grand Total** | **325** |

Of the 199 investor respondents, approximately 63 percent represented asset managers and 29 percent represented asset owners.

Of the 126 non-investor participants, responses from representatives of public corporations were the most prevalent, representing approximately 78 percent, including those from board members of public corporations.

Responses from non-profit organizations were categorized as "investor" responses in cases where the organization was considered to be investor-related and representing investor interests or views.

A few institutional investors and other stakeholders provided additional feedback to ISS through avenues other than the online survey. These responses were not aggregated in the survey results but will be considered qualitatively during the policy development process.



Consistent with prior years, over half of the 199 investor respondents to the survey represented organizations that cover most or all global markets. Of the non-investor respondents, just over half, declared the U.S. as their primary market of focus.

| Primary Market of Focus (as declared by respondent) | % of Investor Respondents to Online Survey | % of Non-Investor Respondents to Online Survey |
|---|---|---|
| Global (most or all of the below) | 57.79% | 19.05% |
| U.S. | 27.14% | 50.79% |
| Continental Europe | 6.03% | 19.84% |
| U.K. and/or Ireland | 1.51% | 1.59% |
| Canada | 3.02% | 5.56% |
| Asia-Pacific | 2.01% | 2.38% |
| Developing/Emerging markets generally | 2.51% | 0.79% |

The breakdown of investors by the size of assets owned or assets under management is as follows:

| Asset Size (as declared by respondent) | % of Investors Respondents to Online Survey |
|---|---|
| Under $100 million | 5.03% |
| $100 million - $500 million | 6.03% |
| $500 million - $1 billion | 4.02% |
| $1 billion - $100 billion | 42.71% |
| Over $100 billion | 32.66% |
| Not Applicable | 9.55% |

Some respondents answered every survey question; others skipped one or more questions. Throughout this report, response rates are calculated as a percentage of the valid responses received on each question by category, excluding blank and/or questions not answered. Survey participants who filled out the "Respondent Information" but did not answer any of the survey questions, and those who did not provide valid identifying information, have been excluded from the analysis and are not part of the count or the statistical summaries above.

For questions that asked respondents to "choose all that apply" or "choose up to three", rankings are based on the percentage of responses for each answer choice (percentages indicate what percentage of that category of respondent selected that answer – they will not total 100 percent). Percentages for other questions may potentially not equal 100 percent due to rounding.

The comments received in the survey, under "Other" or "It depends" answer options and including the comments/letters received by email related to the survey, are assessed qualitatively by the ISS Benchmark research team and are not included in the statistical results provided in this survey summary report.

## Key findings

### U.S. Poison Pills
Poison pills (also known as "shareholder rights plans") were first developed in the 1980s as a defense against unsolicited takeovers and have historically been justified as a way to place the board in a stronger negotiating position *vis-à-vis* a would-be acquirer. When asked if the adoption by a board of a short-term poison pill to defend against an activist campaign was acceptable, most investors who responded to this question, representing approximately 52 percent of the investors' answers, replied "generally, no", while almost two-

thirds of the non-investors who responded to this question, representing approximately 65 percent, replied "generally, yes".

A number of follow up questions were included in the survey to gather more granular feedback on different features of short-term poison pills. Specifically, when asked whether pre-revenue or other early-stage companies should be entitled to greater leeway than mature companies when adopting short-term poison pills, the majority of investors (with the support of approximately 56 percent of the responses) and a substantial minority of non-investors (with support of 43 percent of the responses) were generally aligned on answering that such companies should be entitled to greater leeway on the adoption of a short-term poison pill, as long as "their governance structures and practices ensure accountability to shareholders."

When asked about whether a short-term poison pill trigger set by a board below 15 percent would be acceptable, investors and non-investors diverged in their responses. The most common response among investor respondents was "No", representing 39 percent, while the largest number of non-investor respondents, representing 38 percent, considered that "yes, the trigger level should be at board's discretion." The survey also asked whether a "two-tier trigger threshold, with a higher trigger for passive investors (13G filers) would be considered a mitigating factor in light of a low trigger. Non-investor respondents overwhelmingly (close to 78 percent of the responses received) answered that "yes, it should prevent the pill from being triggered by a passive asset manager who has no intention of exercising control." On the investor side, the largest number (48 percent) considered that "no, all investors can be harmed when a company erects defenses against activist investors whose campaigns can create value, so the lowest trigger is the relevant datapoint." However, it is worth noticing that a significant number of investor respondents, representing close to 41 percent, supported the answer option "yes", considering that a two-tier trigger threshold would prevent the pill from being triggered by a passive asset manager with no intention of exercising control, more aligned with the non-investors' preferred response.

Lastly on this topic, the survey asked for views about the relevance of the inclusion of a "qualifying offer clause" in a poison pill, giving shareholders the ability to bypass the pill in the event of an offer deemed beneficial. Close to 60 percent of the investor respondents considered this feature important and that poison pills should always have a qualifying offer clause, while 52 percent of the non-investor respondents considered this feature "sometimes important", depending on the trigger threshold and other terms of the pill.

### U.S. Executive Compensation

The survey questions asked for respondents' views regarding the ratio of performance-based to time-based equity awards in the event of a quantitative pay-for-performance misalignment. ISS' qualitative review in the U.S. pay-for-performance (P4P) analysis generally views a predominance of performance-conditioned equity awards as a positive mitigating factor, while the predominance of time-vesting equity awards is generally considered a negative exacerbating factor in the event of such a P4P misalignment. When asked whether ISS policy should continue with the current approach, "which considers a predominance of time-based equity awards to be a negative factor, irrespective of if such awards have extended vesting periods (i.e. longer than four years)", 43 percent of investors' responses chose the option to "continue with the current approach". Non-investors, however, displayed a strong preference (70 percent) for a revised policy approach, whereby time-based equity awards with extended vesting periods should be considered a positive mitigating factor, similar to performance awards.

For those who selected the option to "revise the current approach" in light of an extended vesting period, the survey asked what length of extended vesting period for time-based equity awards would be sufficient to consider such a feature as a positive mitigating factor in the context of a P4P misalignment. In this case, strong support was displayed by both investors (66 percent) and non-investors (58 percent) for a vesting period of "at least five years". When asked whether a meaningful post-vesting holding period should be present to consider such awards a positive mitigating factor, more than two-thirds (68 percent) of investor respondents said "yes" to such post-vesting holding provisions, with non-investors responding in the opposite direction with 73 percent choosing the answer option that "no, a post-vesting holding period requirement is not necessary."

More than half of the investors respondents (approximately 52 percent) said "yes" to the question on whether largely discretionary annual incentive programs, such as the ones adopted by some large financial sector companies, would be problematic, even if the underlying program structure were to be consistent with industry and/or peer practice. Meanwhile, non-investor respondents were split between "no, discretionary programs are not problematic…", which received support from close to 38 percent of the responses submitted to this question and "sometimes, discretionary programs are only problematic if pay is not aligned with company performance", which was chosen by 31 percent of the non-investors who responded to the question. Lastly on this topic, the U.S. compensation question sought to ascertain views on whether ISS policy should consider a different approach towards award structure or quantum of distributions representing profits from managed funds, particularly in niche industries, including alternative asset managers. Investors overwhelmingly (69 percent) said "no, ISS should analyze the magnitude and structure of such awards as it would for regular incentive pay". Non-investor respondents, on the other hand, were split between the same "no" answer option with 46 percent support and the 44 percent of non-investor respondents who selected the answer "yes,…" ,indicating a preference for a different approach regarding such managed funds' distributions.

*Continental Europe (France) – General Share Issuances*
In light of recent changes in French law (June 2024), which removed the maximum discount limit (10 percent) for the main issuance of shares without preemptive rights, the survey asked stakeholders whether ISS policy should maintain such maximum discount limit for French companies in the event of an issuance without preemptive rights. The investor respondents were generally in favor of maintaining the existing policy framework of a maximum of 10 percent discount in the event of such issuances, which received support from 58 percent of investors' responses. Non-investors, representing 47 percent of the responses, stated a preference to allow companies to choose the discount levels.

*Continental Europe (All countries) - Virtual Meetings*
The policy survey sought to assess the views and the general experience related to virtual-only meetings in Continental Europe, where there are a range of practices and regulations. Investor responses generally stated that the experience has been "mixed, depending on company practice…", which was selected by 29 percent of the investors responding to this question, and "somewhat negative", which was selected by another 25 percent of investor respondents. Meanwhile, non-investors stated that virtual-only meetings have been "positive" and "should always be allowed", which was supported by 47 percent of the non-investor respondents, followed by the answer option that such meetings are "somewhat positive, the decision is best left to the board", which was supported by another 26 percent of non-investor respondents.

*Continental Europe (All countries) - Auditor Rotation*
The policy survey sought views on whether ISS should consider the introduction of an auditor rotation policy for companies that are not subject to mandatory auditor rotation rules under the European Union (EU) legislation, specifically companies that are not considered Public Interest Entities within the EU member states. More than 70 percent of investor respondents strongly supported "yes", that mandatory EU rules regarding auditor rotation represent good practice that could benefit shareholders in all European countries. Meanwhile, the majority of non-investor respondents favored the opposite view, with 60 percent of the responses provided to this question selecting the option "no, if a company is not subject to the mandatory EU rules, this is not necessary".

*Middle East and North Africa – Cumulative Voting Elections*
Publicly-traded companies in Middle Eastern and North African countries, such as Saudi Arabia, United Arab Emirates, Egypt, and Qatar generally hold director elections under the cumulative voting system, as determined by local laws and regulations. Such director election systems potentially allow for a greater number of nominees than board seats. Timely disclosure of director nominee information, such as the company's independence classification and biographical information, specifically related to new nominees (as opposed to incumbent directors), remains inconsistent in such markets and shareholders are generally asked to elect director candidates in the absence of full and detailed information on all proposed nominees. Under the current ISS Middle East and North Africa voting guidelines, in the event there is insufficient disclosure of

any director candidate, the policy recommendation would be to generally abstain from supporting any and all candidates under the cumulative election. The question included in this year's survey sought to ascertain whether this policy should be reviewed to at least allow for the potential support of director candidates presented under cumulative voting about whom sufficient information has been disclosed regarding their independence classification and were assessed as independent by ISS. According to the survey results, both investors and non-investor respondents were aligned against a potential change in policy. Specifically, 47 percent of investor respondents and approximately 41 percent of non-investor respondents stated that ISS should maintain its current policy, which signals the expectation that sufficient information should be disclosed for the assessment of all director candidates presented under cumulative election, including both new nominees and incumbent candidates. This was the most prevalent response from each category of respondents.

*Global Environmental & Social Questions*

*Scope 3*
As environmental and social practices and regulations evolve around the globe, the policy survey sought to ascertain the general market appetite and expectations regarding the disclosure of Scope 3 greenhouse gas (GHG) emissions reduction targets. The responses reflected the different views on such evolving topics with investors primarily favoring the disclosure of targets for companies' scope 3 emissions reductions, with support of approximately 48 percent of the respondents, while 61 percent of the non-investor respondents answered that companies should not be required to set scope 3 emission reduction targets.

For those who supported the setting of scope 3 emission reduction targets, a follow up question sought additional information on what targets were expected to be disclosed. On the investor side, responses overwhelmingly favored the disclosure of both mid-term and net zero scope 3 targets, which was supported by 88 percent of the investors who responded to this question. On the non-investor side, although the majority of responses, representing close to 68 percent, favored the same answer option for the disclosure of both mid-term and net zero scope 3 targets, it should be noted that only 32 non-investor respondents, from a total of 126 non-investor participants in the survey (more information on the number of respondents can be found under the Detailed Survey Questions and Responses section, included below), responded to this follow up Scope 3 question.

*Climate-related Shareholder Proposal*
The survey also sought to explore what market participants would consider the most relevant factors for the analysis and evaluation of shareholder proposals requesting the publication of a report or the taking of action regarding climate-related matters. A number of answer options were provided, and survey participants could select multiple answers, to best reflect their organizations' views. The most commonly selected option by investor respondents, selected by approximately 33 percent, stated that they would "generally, do not view such requests as overly burdensome and,..., tend to support them if shortcomings are identified in the company's current approach"); another 15 percent of the investor responses to this question stated that they would be "less likely to support" shareholder proposals when "the technology necessary to achieve full value chain net-zero goals is not yet cost competitive."

Non-investors who responded to this question pointed to concerns regarding shareholder proposals and the lack of technology availability, which was selected by 20 percent of the non-investor respondents, followed by concerns related to shareholder resolutions including target requirements related to supply chain emissions (Scope 3), which also received 20 percent of the non-investors' responses.

*Workforce Diversity*
Lastly in this section, the policy survey explored views on metrics and existing disclosure practices on workforce diversity (assuming such metrics and disclosures are legal and reflective of societal norms in the relevant markets), and which are considered the most relevant ones for the analysis of shareholder proposals related to human capital management. A total of nine answer options were provided (including "Other") and respondents were asked to select their preferred top three answers.

The following top three answers were selected by the majority of the investor respondents when asked about the most relevant metrics/disclosure for the analysis of human capital management shareholder proposals: (i) Racial/Ethnic Diversity and Gender Representation Data (such as EEO-1 data in the U.S.), which received 22 percent support; (ii) Board oversight of the human capital management issue raised in the respective shareholder proposal, with 19 percent support; and (iii) Adjusted (accounting for factors such as job role, education, and experience) Gender Pay Gap Disclosure, with 14 percent support.

For non-investors, the top three answers selected in the context of most relevant metrics/disclosure for the analysis of human capital management shareholder proposals were: (i) Management oversight of the human capital management issue raised in the respective shareholder proposal – approximately 25 percent support; and, with the same level of support – 20 percent each, the (ii) Racial/Ethnic Diversity in Gender Representation Data and the (iii) Board oversight of the human capital management issue raised in the respective shareholder proposal, with the latter two illustrating significant overlap between investors and non-investor respondents.

# Detailed survey questions and summary of statistical responses

## Market-Specific Questions

### U.S. - Poison Pill

**Q8.** Poison pills (also known as "shareholder rights plans") were first developed in the 1980s as a defense against unsolicited takeovers and have historically been justified as a way to place the board in a stronger negotiating position vis-à-vis a would-be acquirer. Over time, as the number of hostile takeover attempts declined dramatically in the United States, pills have morphed into a defense against shareholder activism, and are frequently adopted in response to accumulation of shares by a known activist, even when the activist has stated they have no intention of acquiring a controlling stake. When it comes to trigger thresholds, some companies and their advisors have attempted to normalize triggers of 12.5 percent, 10 percent, or even lower levels; compared to the 15-20 percent that used to be considered standard. Most newly-adopted pills in the US have an initial duration of one year or less (though boards often renew them), and are rarely put to a shareholder vote. Concerned investors must therefore evaluate the board's decision to unilaterally adopt a poison pill and determine whether it was reasonable or whether the board's actions may constitute a material governance failure. Under ISS Benchmark policy, unilateral adoption of a pill is evaluated with reference to, among other things, the terms of the pill (duration, trigger threshold etc.), the board's stated rationale for adopting it, and the context in which it was adopted. This context includes market and industry conditions, company-specific performance, sudden or opportunistic accumulations of shares, and the company's overall track record of corporate governance and responsiveness to shareholders.

In the view of your organization, is the adoption by a board of a short-term poison pill to defend against an activist campaign acceptable?

| Responses* | Investor (178 respondents) | Non-Investor (88 respondents) |
|---|---|---|
| Generally, no | **52.25%** | 13.64% |
| Generally, yes | 22.47% | **64.77%** |
| It depends | 25.28% | 21.59% |
| *Excludes "Did not answer" | | |



**Q10.** Should pre-revenue or other early-stage companies be entitled to greater leeway than mature companies when it comes to the adoption of a short-term poison pill?

| Responses* | Investor (177 respondents) | Non-Investor (79 respondents) |
|---|---|---|
| Generally, no | 37.29% | 25.32% |
| Generally, yes | 6.78% | 31.65% |
| Yes, but only if their governance structures and practices ensure accountability to shareholders | **55.93%** | **43.04%** |
| *Excludes "Did not answer" | | |



**Q11.** Is it ever acceptable for a board to set the trigger of a short-term poison pill below 15 percent?

| Responses* | Investor (173 respondents) | Non-Investor (78 respondents) |
|---|---|---|
| Yes, the trigger level should be at board's discretion | 3.47% | **38.46%** |
| Yes, if the board believes there is a specific reason that a higher trigger would leave shareholders exposed to the threat of a loss of value | 19.65% | 33.33% |
| Yes, but only in extraordinary circumstances, such as the global pandemic, that cause companies to temporarily trade below their long-term fair value | 11.56% | 10.26% |
| No | **39.31%** | 6.41% |

**2024 Global Benchmark Policy Survey**
Summary of Results

**ISS GOVERNANCE** ▷

| | | |
|---|---|---|
| It depends on factors specific to each company | 26.01% | 11.54% |
| *Excludes "Did not answer" | | |



**Q13.** Some companies have adopted a two-tier trigger threshold, with a higher trigger for passive investors (13G filers). Do you consider this to be a mitigating factor for a low trigger?

| Responses* | Investor (169 respondents) | Non-Investor (76 respondents) |
|---|---|---|
| Yes, it should prevent the pill from being triggered by a passive asset manager who has no intention of exercising control | 40.83% | **77.63%** |
| No, all investors can be harmed when a company erects defenses against activist investors whose campaigns can create value, so the lowest trigger is the relevant datapoint | **48.52%** | 9.21% |
| It depends | 10.65% | 13.16% |
| *Excludes "Did not answer" | | |



**Q14.** How important is it that a poison pill include a "qualifying offer clause", giving shareholders the ability to bypass the pill in the event of an offer that is deemed beneficial?

| Responses* | Investor (159 respondents) | Non-Investor (73 respondents) |
|---|---|---|
| Important - poison pills should always have a qualifying offer clause to prevent them from being used as an entrenchment mechanism | **59.12%** | 20.55% |
| Sometimes important - it depends on the trigger threshold and other terms of the pill | 33.96% | **52.05%** |
| Not important - because of the rarity of unsolicited takeovers, qualifying offer clauses are no longer relevant | 6.92% | 27.40% |
| *Excludes "Did not answer" | | |



## U.S. - Executive Compensation

**Q15.** The ratio of performance-based to time-based equity awards has long been a focal point of ISS' qualitative review in the pay-for-performance analysis. When a company exhibits a quantitative pay-for-performance misalignment, ISS' qualitative review usually views a predominance of performance-conditioned equity awards as a positive mitigating factor, while a predominance of time-vesting equity awards is generally considered a negative exacerbating factor. This longstanding approach was first adopted based on investor views that the use of performance vesting criteria for a majority of equity pay, when well-designed and disclosed, strengthens the alignment of interests between executives and shareholders. However, in recent years a growing number of investors have become skeptical, or even critical, of performance equity practices in US executive pay. These investors have raised various concerns, including that such programs are often complex and that non-rigorous performance goals often result in vesting of significantly more than the target value. Such investors believe that replacing performance-conditioned equity awards with time-based equity awards that have extended vesting periods could eliminate some of the problems they see with performance equity and still provide long-term alignment between executives and shareholders.

Do you consider that ISS' qualitative review in the context of a pay-for-performance misalignment should:

| Responses* | Investor (174 respondents) | Non-Investor (96 respondents) |
|---|---|---|
| Continue with the current approach, which considers a predominance of time-based equity awards to be a negative factor, irrespective of if such awards have extended vesting periods (i.e. longer than four years)? | **43.10%** | 20.83% |
| Revise the current approach, whereby time-based equity awards with extended vesting periods are considered a positive mitigating factor, similar to performance-based awards? | 31.03% | **69.79%** |
| Other | 25.86% | 9.38% |
| *Excludes "Did not answer" | | |



**Q17.** If you answered, "Revise the current approach...", what length of extended vesting period for time-based equity awards would you consider sufficient for ISS to view such awards as a positive mitigating factor in the context of a pay-for-performance misalignment?

| Responses* | Investor (53 respondents) | Non-Investor (67 respondents) |
|---|---|---|
| The awards should vest over at least seven (7) years | 24.53% | 4.48% |
| The awards should vest over at least five (5) years | **66.04%** | **58.21%** |
| Other | 9.43% | 37.31% |
| *Excludes "Did not answer" | | |



**Q19.** Should a meaningful post-vesting holding period be required for ISS to view such awards as a positive mitigating factor in the context of a pay-for-performance misalignment?

| Responses* | Investor (155 respondents) | Non-Investor (90 respondents) |
|---|---|---|
| Yes, a post-vesting holding period requirement should be applicable | **67.74%** | 17.78% |
| No, a post-vesting holding period requirement is not necessary | 18.71% | **73.33%** |
| Other | 13.55% | 8.89% |
| *Excludes "Did not answer" | | |

**ISS GOVERNANCE** ▷



**Q21.** ISS policy maintains a positive view of annual incentive programs that are primarily based on the achievement of quantified, pre-set goals with disclosed targets and weightings. Conversely, annual incentive programs that are heavily reliant on discretionary determinations, or which lack key disclosures such as target goals and weightings, are viewed negatively. Programs that incorporate a limited discretionary element are generally not viewed negatively based on this factor alone. The vast majority of S&P500 companies have adopted annual incentive programs that are primarily based on the achievement of specific metrics with weightings and quantified, pre-set goals, with any discretionary components being clearly defined and limited.

However, some companies, including many large financial firms, deviate from broader market standards by maintaining an annual incentive program that is based entirely on year-end discretionary performance assessments. Such companies sometimes disclose various factors the board considered when arriving at the discretionary award determination, but the key disclosures noted above are often absent. These companies usually contend that a discretionary structure is necessitated by company- and/or industry-specific considerations, such as peer practices, macroeconomic factors, and risk management.

Does your organization believe that largely discretionary annual incentive programs, such as those adopted by some large financial sector companies, are problematic, even if the program structure is consistent with industry and/or peer practice?

| Responses* | Investor (177 respondents) | Non-Investor (93 respondents) |
|---|---|---|
| Yes, largely discretionary annual incentive programs are problematic, and companies should primarily utilize preset goals and limit the impact of discretion | **51.98%** | 23.66% |
| No, discretionary programs are not problematic when the structure is consistent with industry and/or peer practice, and the company discloses the main factors considered | 7.34% | **37.63%** |
| Sometimes, discretionary programs are only problematic if pay is not aligned with company performance | 24.29% | 31.18% |
| Other | 16.38% | 7.53% |
| * Excludes "Did not answer" | | |



**Q23.** Companies in certain niche industries, including alternative asset managers, will sometimes make awards or distributions that represent a share of the profits from managed funds. In many cases these distributions are not capped, the calculation formula is complex, and the values drive exceedingly high reported compensation. For these reasons, fund distributions are often viewed negatively under ISS' qualitative pay-for-performance analysis. Companies that maintain this compensation element often cite industry practice and competition concerns with privately held competitors.

Does your organization believe that ISS policy should consider a different approach towards award structure or quantum of distributions that represent profits from managed funds?

| Responses* | Investor (165 respondents) | Non-Investor (71 respondents) |
|---|---|---|
| Yes, such awards reflect managed fund performance and ISS should not apply the same considerations of award structure and quantum as it would to regular incentive pay | 21.21% | 43.66% |
| No, ISS should analyze the magnitude and structure of such awards as it would for regular incentive pay. | **69.09%** | **46.48%** |
| Other | 9.70% | 9.86% |
| *Excludes "Did not answer" | | |



## Continental Europe (France) – General Share Issuances

**Q25.** Until June 2024, French law contained a limit on the maximum discount for the main issuances of shares without preemptive rights set at 10 percent of the market price over the previous three days. Following the removal of this requirement under French law, do you believe it is appropriate for ISS policy to maintain a maximum limit for French companies on the possible discount for issuances without preemptive rights?

| Responses* | Investor (137 respondents) | Non-Investor (38 respondents) |
|---|---|---|
| Yes, in line with previous law (at 10 percent) | **58.39%** | 31.58% |
| No, companies should be able to choose the level of discount | 24.82% | **47.37%** |
| Other | 16.79% | 21.05% |
| *Excludes "Did not answer" | | |



## Continental Europe (All) - Virtual Meetings

**Q27.** Based on your experience with virtual-only meetings since they have been allowed and implemented in Continental Europe, what is your organization's current view of virtual-only meetings?

| Responses* | Investor (157 respondents) | Non-Investor (57 respondents) |
|---|---|---|
| Positive, it should always be allowed | 10.83% | **47.37%** |
| Somewhat positive, the decision is best left to the board | 12.10% | 26.32% |
| Somewhat negative, only permissible in extraordinary circumstances, with authorization limited in time | 25.48% | 8.77% |
| Mixed, it depends on company practice (e.g., frequency, rationale, conduct of previous meetings, etc.) | **29.30%** | 10.53% |
| Negative, not supportive under any circumstance | 5.73% | 1.75% |
| Other | 16.56% | 5.26% |
| *Excludes "Did not answer" | | |



## Continental Europe (All) – Auditor Rotation

**Q29.** All Public Interest Entities* within EU member states are bound by mandatory auditor rotation rules, which allow for maximum audit firm tenures of 20 years if a tender is conducted after an initial 10-year period or 24 years if joint audits are performed after an initial 10-year period. Should ISS consider the introduction of an auditor rotation policy for companies that are not subject to these EU rules?

* Definition of a Public Interest Entity under EU legislation: All entities that are both governed by the law of a member state and listed on an EU regulated market.

| Responses* | Investor (149 respondents) | Non-Investor (55 respondents) |
|---|---|---|
| Yes, the mandatory EU rules represent good practice regarding auditor rotation that could benefit shareholders in all European countries | **70.47%** | 32.73% |
| No, if a company is not subject to the mandatory EU rules, this is not necessary | 20.13% | **60.00%** |
| Other | 9.40% | 7.27% |
| *Excludes "Did not answer" | | |



## Middle East and North Africa – Cumulative Voting

**Q31.** In a number of Middle East and North African markets such as Saudi Arabia, United Arab Emirates, Egypt, and Qatar, publicly listed companies use the cumulative voting system to elect the board of directors as stipulated by their local laws and regulations. Under a cumulative voting system, each share gives a number of votes equal to the size of the board that will be elected. These votes may be apportioned equally among the candidates or concentrated only on specific candidates.

When directors are elected through a cumulative voting system, when the number of nominees exceeds the number of board vacancies, if the company's disclosure about the nominees is sufficient to allow an assessment of the independence of all proposed candidates (both incumbent and new ones), all relevant disclosed factors are considered in the ISS analysis to identify the nominees best suited to add value for shareholders- such as their independence classification, professional background, executive positions/directorships at other listed companies and any other relevant factors.

However, in the above-mentioned markets, and specifically in Saudi Arabia where cumulative voting elections are most common, companies often do not disclose information on their assessments of the independence of all the director candidates prior to the annual general meeting (AGM). Generally, disclosures are provided only for the incumbent nominees. Under the ISS Middle East and North Africa policy, in the event of insufficient disclosure on any candidate(s), ISS currently recommends to ABSTAIN from voting on all candidates submitted under cumulative voting.

However, in some of these cases, the number of incumbent independent candidates for whom sufficient information is provided to assess may be adequate to meet the required one-third board independence threshold for the upcoming term. In addition, the incumbent independent candidates know the specificities of the company and may bring valuable experience to the board.

Given this context, ISS is considering amending its current policy for Middle East and North African companies in cases where only the incumbent directors' disclosures and independence classifications are available at the time of analysis.

As such, in your organization's view, should ISS consider recommending support for incumbent directors presented for board elections under cumulative voting, if assessed as independent, even if not all candidates are covered by sufficient disclosures to be assessed?

| Responses* | Investor (134 respondents) | Non-Investor (29 respondents) |
|---|---|---|
| Yes | 5.22% | 13.79% |
| Yes, if the required one-third board independence will be satisfied for the upcoming term | 38.06% | 20.69% |
| No, ISS should maintain its current approach under existing policy where the disclosure of the company is not sufficient to allow the assessment of all candidates on equal terms | **47.01%** | **41.38%** |
| Other | 9.70% | 24.14% |
| *Excludes "Did not answer" | | |



## Global Environmental & Social Questions

### Scope 3

**Q33.** As a stakeholder, does your organization believe that Scope 3 GHG emission reduction targets should be disclosed?

| Responses* | Investor (193 respondents) | Non-Investor (101 respondents) |
|---|---|---|
| Yes, companies should be setting targets for their Scope 3 emissions | **47.67%** | 9.90% |
| Yes, but only those companies for which Scope 3 emissions are significant in their carbon footprint | 21.76% | 13.86% |
| Yes, but only high emitting companies should be setting targets for their scope 3 emissions | 2.07% | 5.94% |
| No, companies should not be required to set targets for their Scope 3 emissions | 16.58% | **61.39%** |
| Other | 11.92% | 8.91% |
| *Excludes "Did not answer" | | |



**Q35.** If your answer to the previous question is one of the options that starts with "Yes", does your organization believe that those targets should be:

| Responses* | Investor (131 respondents) | Non-Investor (32 respondents) |
|---|---|---|
| Both Mid-term AND Net Zero Scope 3 targets | 88.15% | 67.86% |
| Mid-term Scope 3 targets only | 7.41% | 17.86% |
| Net zero Scope 3 targets only | 4.44% | 14.29% |
| *Excludes "Did not answer" | | |



## Climate-related Shareholder Proposal

**Q36.** In evaluating climate-related shareholder resolutions asking companies to report on or establish targets or plans to reduce emissions, ISS analysis takes into consideration many factors, including adequacy of climate-related disclosure, existing and potential legal and regulatory risks, comparison between the company and its peers, and board and management oversight disclosure. There seemingly is a more diverse set of opinions on what criteria make a proposal more or less burdensome. ISS Benchmark Policy's current approach generally does not view such requests as overly burdensome and tends to recommend support if shortcomings are identified in the company's current approach to signal that actions lowering GHG-related risk are likely in shareholders' interest, even if they don't achieve full value chain net zero emissions. As a market participant, which - if any - of these factors would your organization consider most relevant when addressing proposals asking for a report on or to take climate-related actions. Please select the one(s) that most reflect your organization views.

| Responses* | Investor (187 respondents) | Non-Investor (79 respondents) |
|---|---|---|
| Less relevant (or less likely to support, if an investor) if the resolution explicitly asks to align with the Paris Agreement's 1.5 degree Celsius goal | 8.75% | 13.51% |
| Less relevant (or less likely to support, if an investor) when the resolution includes target requirements for supply chain emissions (Scope 3) | 10.94% | **20.00%** |
| Less relevant (or less likely to support, if an investor) when the horizon term for targets includes short- or medium-term | 5.94% | 11.35% |

| | | |
|---|---|---|
| Less relevant (or less likely to support, if an investor) when the technology necessary to achieve full value chain net-zero goals is not yet cost-competitive | 15.31% | **20.00%** |
| Less relevant (or less likely to support, if an investor) if the resolution asks for the adoption of a target rather than reporting on the adoption of targets | 10.63% | 14.59% |
| Generally, do not view such requests as overly burdensome and, if an investor, tend to support them if shortcomings are identified in the company's current approach | **33.44%** | 9.73% |
| Other | 15.00% | 10.81% |
| **Total responses provided (including multiple answer options)** | **320** | **185** |
| *Excludes "Did not answer" | | |



Climate-related shareholder proposals

■ Investor (320 total responses provided)    ■ Non-Investor (185 total responses provided)

## Workforce Diversity

**Q38.** Which - if any- of the following human capital management metrics or disclosure topics do you consider that investors should support, if requested in a shareholder proposal; assuming they are related to markets where such metrics are legal and reflective of societal norms? If more than three, please select your organization's top three (3) options.

Please select 3 options

| Responses* | Investor (184 respondents) | Non-Investor (65 respondents) |
|---|---|---|
| Racial/Ethnic Diversity and Gender Representation Data for different categories of positions across an organization (such as EEO-1 data in the U.S.) | **22.14%** | **20.00%** |
| Promotion Velocity Data by Race/Ethnicity and Gender (examining whether sex and race/ethnicity differences exist in promotions) | 6.90% | 3.59% |
| Retention Rates by Race/Ethnicity and Gender | 5.81% | 8.21% |
| Hiring Rates by Race/Ethnicity and Gender | 2.36% | 3.59% |
| Board oversight of the human capital management issue raised in the proposal | **19.24%** | **20.00%** |

**ISS GOVERNANCE** ▷

| | | |
|---|---|---|
| Management oversight of the human capital management issued raised in the proposal | 10.34% | **24.62%** |
| Adjusted (accounting for factors such as job role, education, and experience) Gender Pay Gap Disclosure | **14.34%** | 11.28% |
| Unadjusted Gender Pay Gap Disclosure. | 8.35% | 3.08% |
| Other | 10.53% | 5.64% |
| **Total responses provided (including three answer options)** | **551** | **195** |
| *Excludes "Did not answer" | | |





# We empower investors and companies to build for long-term and sustainable growth by providing high-quality data, analytics, and insight.

## GET STARTED WITH ISS GOVERNANCE

Email sales@issgovernance.com or visit issgovernance.com for more information.

Copyright © 2024 Institutional Shareholder Services Inc. and/or its subsidiaries ("ISS STOXX"). All rights reserved.

This report and all of the information contained in it, including without limitation all text, data, graphs and charts, is the property of ISS STOXX and/or its licensors and is provided for informational purposes only. The information may not be modified, reverse-engineered, reproduced or disseminated, in whole or in part, without prior written permission from ISS STOXX.

This report and the recommendations, ratings and/or other analytical content in the report has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body.

The user of this report assumes all risks of any use that it may make or permit to be made of the information. While ISS STOXX exercised due care in compiling this report, ISS STOXX makes no express or implied warranties or representations with respect to the information in, or any results to be obtained by the use of, the report. In particular, the recommendations, ratings and other analytical content in the report are not intended to constitute an offer, solicitation or advice to buy or sell securities nor are they intended to solicit votes or proxies.  ISS STOXX shall not be liable for any losses or damages arising from or in connection with the information contained herein or the use of, reliance on, or inability to use any such information.

Please note the issuer(s) mentioned within this report and/or material may have a commercial relationship with ISS Corporate Solutions, Inc. ("ISS-Corporate"), a wholly owned subsidiary of Institutional Shareholder Services Inc., or ISS-Corporate may have provided advisory or analytical services to the issuer(s) in connection with the information described in this report. No employee of ISS-Corporate played a role in the preparation of this report. If you are an institutional client of ISS STOXX, you may inquire about any issuer's use of products and services from ISS-Corporate via ProxyExchange or by emailing disclosure@issgovernance.com.

Additionally, the issuer(s) mentioned within this report and/or material may be a client of ISS STOXX, or the parent of, or affiliated with, a client of ISS STOXX.  One or more of the proponents of a shareholder proposal at an upcoming meeting may be a client of ISS STOXX, or the parent of, or affiliated with, a client of ISS STOXX. None of the sponsors of any shareholder proposal(s) played a role in preparing this report.

ISS STOXX is majority owned by Deutsche Börse AG ("DB"), an international exchange organization. Both ISS STOXX and DB have established standards and procedures to protect the integrity and independence of the research, recommendations, ratings and other analytical offerings ("Research Offerings") produced by ISS STOXX.

Further information about conflict mitigation can be found here.

© 2024 | Institutional Shareholder Services and/or its affiliates

**EXHIBIT 4**



# Policy Survey 2024

## Results & Key Findings

www.glasslewis.com



# Table of Contents

About Glass Lewis ........................................................................................................ 4

Introduction ................................................................................................................ 5

Methodology & Demographics .............................................................................. 7

Results & Findings ..................................................................................................... 8

General Approaches .......................................................................................... 8

Assessment of Multijurisdictional Companies ........................................... 8

Auditor Rotation ...................................................................................... 10

Insufficient Disclosure ............................................................................ 12

Board Oversight & Performance ................................................................... 13

Related Party Transaction Disclosure ..................................................... 13

AI Governance and Ethics ....................................................................... 15

Cybersecurity Oversight ......................................................................... 18

Consideration of Director Performance on Other Boards ...................... 22

Voting Based on Board Skills Gaps ......................................................... 24

Executive Pay ..................................................................................................... 25

Make-Whole Awards ............................................................................... 25

Time-Based vs Performance-Based Incentives ....................................... 27

Workplace Safety & Pay Outcomes ........................................................ 29

Equity Plans and Shareholder Dissent .................................................... 30

Executive Perquisites .............................................................................. 31

Median Pay Disclosure ............................................................................ 32

Transatlantic Pay Gap ............................................................................. 33

Structural Issues in Advisory 'Pay Implementation' Votes ..................... 35

Pay Benchmarking ............................................................................................ 36

Competitiveness as a Rationale for Pay Increases ................................. 36

Views on Benchmarking .......................................................................... 37

Shareholder Consultation Regarding Pay ............................................... 38

Peer Groups ............................................................................................ 39

Global Peers ............................................................................................ 40

GLASS LEWIS

ESG Issues ..................................................................................................................41

    Voting on Non-Financial Reporting ...........................................................................41

    B-Corporations ..........................................................................................................43

    Sustainability Audits..................................................................................................44

    Climate Transition .....................................................................................................45

    Say on Climate Voting ...............................................................................................47

    Approach to Shareholder Proposals .........................................................................49

Responsiveness to Shareholder Opposition ..............................................................51

    Board Response to Failed Advisory Proposal...........................................................51

    Defining 'Significant' Opposition ..............................................................................53

    Company Responsiveness to Binding/Advisory Votes ..............................................54

    Investor Escalation on Binding/Advisory Pay Votes .................................................55

Shareholder Rights...................................................................................................56

    Virtual vs In-Person Meeting Format.........................................................................56

    Exclusive Forum .......................................................................................................57

    Reincorporation ........................................................................................................58

Connect with Glass Lewis .......................................................................................61

# About Glass Lewis

Glass Lewis is the world's choice for corporate governance solutions. We enable institutional investors and publicly listed companies to make informed decisions based on research and data. We cover 30,000+ meetings each year, across approximately 100 global markets. Our team has been providing in-depth analysis of companies' corporate governance policies, practices and performance since 2003.

Our customers include the majority of the world's largest pension plans, mutual funds, and asset managers, collectively managing over $40 trillion in assets. We also help companies understand corporate governance best practices and how investors view them.  We have teams located across the United States, Europe, and Asia-Pacific giving us global reach with a local perspective on the important governance issues.

Investors around the world rely on Glass Lewis to inform their proxy voting policies and to support them in executing on their proxy voting responsibilities.

## Join the Conversation

Glass Lewis is committed to ongoing engagement with all market participants.

info@glasslewis.com    |    www.glasslewis.com



# Introduction

This document provides an overview of Glass Lewis' 2024 Policy Survey, conducted to inform our annual "benchmark" policy guideline updates.

In developing and updating our market-specific benchmark policies, we consider a diverse range of perspectives and inputs, with ongoing analysis of regulatory developments, academic research and evolving market practices as a starting point. We incorporate insights gained from discussions with institutional investors, trade groups and other market participants, as well as meetings of the Glass Lewis Research Advisory Council. Further, our corporate issuer engagement program helps to shape our guidelines by adding essential market- and industry-specific context.

For the past two years, we have augmented our policy review process by gathering feedback via the policy survey, providing investors, corporate issuers and other stakeholders with the opportunity to weigh in on various corporate governance matters. The goal of this survey was to formalize our existing processes for incorporating client and market perspectives. It is not exhaustive, but focuses on policy areas where we have recently observed new practices or where our previous discussions and engagements with investors, corporate issuers and other stakeholders have not yielded a clear consensus.

We are pleased that the Glass Lewis Policy Survey generated strong interest from a range of market participants, and we are deeply grateful to all respondents who took the time to share their views. Thank you. We encourage any interested parties to contact us if they have questions or feedback.

**Glass Lewis Benchmark Policy Updates**

Glass Lewis' benchmark policy guidelines form the basis of our analysis and voting recommendations for companies traded in each applicable geographic region. They are available to clients on our Viewpoint and Governance Hub platforms, and publicly on our website.

The benchmark policy guidelines generally reflect the current, predominant views of institutional investor clients on corporate governance best practices and incorporate the evaluation of material environmental and social issues through the lens of long-term shareholder value. In conducting our analysis, we also review each company and proposal on a case-by-case basis, considering the company's performance, industry, stock exchange, place of incorporation and other factors.

Glass Lewis evaluates the benchmark policy guidelines on an ongoing basis. We update them annually, and when material changes to regulation or market practice occur during the year. For markets that conduct their "proxy season" in the first half of the calendar year, annual policy updates are published in November and December, taking effect at the start of the next calendar year. For markets that hold their proxy season later in the calendar year (Australia, India, New Zealand and South Africa), annual policy updates are published one-to-two months ahead of the season.

**Beyond the Benchmark**

It is important to note that the Glass Lewis benchmark policy is just one voting option Glass Lewis clients can choose, either to adopt as their own or to use as a starting point for the creation of their own custom policy.



Glass Lewis serves a global client base with a broad range of views on corporate governance issues. In fact, our clients' varied perspectives of governance best practices are illustrated throughout the survey results that follow. For this reason, Glass Lewis offers its clients a menu of other "thematic" policy options, which are distinct from the benchmark policy, and which reflect different perspectives on investment and share ownership strategies.

For more information on our thematic voting policy options or to inquire about implementing your own custom policy, please contact us.

GLASS LEWIS

# Methodology & Demographics

### Types of Respondents

| Investors | Asset Managers | 76 |
|---|---|---|
| | Pension fund | 26 |
| | Other | 11 |
| | *Sub-Total* | *113* |
| Non-Investors | Corporate Issuer | 313 |
| | Stakeholder | 61 |
| | *Sub-Total* | *374* |
| | ***Total*** | ***487*** |

### Investor Assets Under Management

| AUM (US$) | Number of Respondents |
|---|---|
| Over $1 trillion | 8 |
| $500 billion to $1 trillion | 11 |
| $100 to $500 billion | 34 |
| $10 billion to $100 billion | 32 |
| $5 billion to $10 billion | 4 |
| Under $5 billion | 24 |

### Principal Location of Organization

| Region | Investors | Non-Investors |
|---|---|---|
| United States | 44% | 45% |
| Europe | 26% | 25% |
| Canada | 12% | 7% |
| United Kingdom | 11% | 12% |
| Oceania | 4% | 3% |
| Asia | 2% | 4% |
| Central/South America | - | 1% |
| Middle East/Africa | - | 1% |
| Other | 1% | 3% |



# Results & Findings

*The results presented in this report are calculated as a percentage of valid responses for that question, or, for choices allowing multiple selections, as a percentage of valid responses for that selection. This calculation excludes respondents who did not answer the question. Investor and non-investor responses are calculated separately. Percentages have been rounded.*

## General Approaches

### Assessment of Multijurisdictional Companies

Local regulations and best practices typically have a strong impact on company governance practices, and investor expectations. But companies traded in multiple jurisdictions, or that trade in a jurisdiction that is different from their country of incorporation, may not be subject to the same requirements.

When we asked what governance regime multijurisdictional companies should be held to, there was a clear divide between investors and non-investors. Both groups expressed a clear top preference, with over 40% of investors opting for the regime with the highest standards, and nearly half of non-investors opting for the country of incorporation. These comments were representative of many investor respondents' views:

> *"Multijurisdictional companies should ideally be held to the governance regime with the higher standards, as this promotes a "race to the top" in terms of corporate governance, transparency, and accountability."*  (Canadian investor)

> *"We want to avoid companies cherry-picking the regulatory framework they have to comply with, for instance benefiting from the exposure to a US listing but choosing to follow the lower standards of their country of incorporation."* (European investor)

A non-investor from the U.S. stated that:

> *"Multijurisdictional companies should adhere to their home country's governance standards but provide enhanced disclosures to meet the requirements of any foreign markets in which they operate. They should benchmark their practices against international best standards, comply with the minimum standards of stricter host countries, and aim to harmonize their governance to balance transparency and accountability across all jurisdictions."*

GLASS LEWIS

**In your view, to what governance regime should multijurisdictional companies be held?**



|  | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 99 | 283 |
| *Total Comments* | 37 | 60 |

GLASS LEWIS

## Auditor Rotation

A majority of investors were firm about the need for regular rotation of the external auditor firm, with the remaining responses fairly evenly split. Among non-investors, there was not a clear preference, and these respondents were more likely to view a regular tender process and/or rotation of the lead audit partner as sufficient to mitigate any concerns. For example, a Canadian non-investor stated that:

> *"Rotation of the lead audit partner/team is sufficient.  Companies will have significant difficulties rotating audit firms due to complex independence rules and the fact that we use the audit firms that are not our independent auditor for consulting and support work."*

A European non-investor concurred:

> *"It is not a question of firm rotation. The key point here is the audit partner and the team. Is is proved that a rotation of the audit partner and team is enough to protect the auditor independence. If the firm procedures for independence are robust, then this is not an issue."*

Notably, among respondents who specified a maximum tenure, non-investors (8.1 years) were stricter than investors (12.9 years). While some respondents advocated for a maximum tenure as low as three years, many highlighted the potential for over-rotation to cause disruption, with 10 and 20 years the most common responses. One U.S. investor shared that:

> *"At 30 years, we take a closer look at independence. At some point, inertia is not a sufficient reason to continue the relationship."*

There was also a significant geographical split amongst both groups, with North American respondents far less likely to call for mandatory auditor rotation (38.5% among North American investors, vs 76.3% for investors from other markets; and 6.1% vs 54.1% among non-investors).

GLASS LEWIS

**For markets in which rotation of the company's financial auditor is not mandatory, should there be a maximum period for which a firm should serve as a company's auditor?**



| | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 91 | 295 |
| *Total Comments* | 37 | 60 |



## Insufficient Disclosure

In cases where a company has not disclosed sufficient information to make an informed proxy voting decision, investors were far less comfortable deferring to the board (2.0%, vs 50.4% among non-investors). Instead, the most popular response was to vote against the proposal, with "abstain" and "it depends" also receiving significant support. Among non-investors, North American respondents were far more likely to follow the board's recommendation (62.3%, vs 37.0% for other non-investors).

Many investors said that they would typically reach out to the company before making a decision, a practice that many companies also suggested.

Other considerations included:

> *"In theory we would vote against the proposal in this situation. However, this will also depend on the market practices as we try to avoid voting against all proposals in a market."* (European investor)

> *"We would generally abstain on a proposal where we perceive it as being likely non-contentious (e.g. an uncontested board election at a reasonably well-run company) but would vote against if we perceived the proposal as being higher risk (e.g. undisclosed article amendments)."* (UK investor)

> *"How critical is the issue? Is information available other than via the board? Repeat behavior? How arrogant is the board acting?"* (U.S. investor)

**In some instances, companies do not disclose sufficient information on a voting item for shareholders to make an informed proxy voting decision. What is your general approach in these situations?**



| | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 99 | 115 |
| *Total Comments* | 63 | 81 |

GLASS LEWIS

# Board Oversight & Performance

## Related Party Transaction Disclosure

When a company engages in transactions with entities controlled or affiliated with inside directors, the board's rationale for why the transaction is necessary to the company's ordinary day-to-day operations is an important component in assessing whether it serves the best interests of all stakeholders.

While there was a general consensus that companies should provide disclosure regarding related party transactions, investors were more likely to view this as a standing requirement for any transactions (65.5%, vs 31.5% among non-investors) whereas a majority of non-investors only feel it is necessary for material transactions (60.2%, vs 29.9% among investors). Non-investor responses were fairly consistent across regions; however, there was a geographical split amongst investors, with North American respondents more comfortable limiting this requirement to material transactions (52.4% vs 34.2% for other markets), and investors from other markets seeing it necessary for all transactions (63.2% vs 40.2% for North American investors).

Several non-investors highlighted the potential additional disclosure requirements to create new problems:

> *"Overcommunication of every topic works against shareholder interests, so materiality should govern here. Shareholders should be able to take comfort through review of the company's more general policies and Code of Conduct that immaterial matters are also proper and justifiable, even if not worthy of detailed disclosure. The prevalent assumption that more disclosure is always good for the shareholders is (interestingly) not universally true and reliance on ethics and governance structure is appropriate. If investors lose faith in those elements, they should disinvest."* (U.S. non-investor)

A Canadian non-investor suggested a new approach:

> *"Materiality is too high a threshhold, but "all" such transactions is too low a threshhold.  A $1,000 fee should not create an issue.  Suggest something like: companies should disclose a detailed rationale only for transactions that are greater than 3% of materiality or $30,000, whichever is LESS."*



**What are your expectations regarding disclosure of the rationale for related party transactions?**



|  | Investors | Non-Investors |
|---|---|---|
| **Total Responses** | 88 | 251 |
| *Total Comments* | 9 | 20 |

GLASS LEWIS

## AI Governance and Ethics

Many companies are rapidly embracing the use of artificial intelligence ("AI"), which includes machine learning, deep learning, and generative AI. In response, investors are increasingly expecting that boards confirm safeguards are in place to mitigate associated risks, assess the impact of AI on company operations, and ensure the ethical use of AI.

Investors were more likely to view board oversight of AI issues as relevant, particularly in relation to the provision of disclosure regarding this oversight, and its formal codification. Overall, whereas a majority of non-investors felt it was too early to hold the board of any company accountable for AI issues, over three-quarters of investors rejected this notion.

Many respondents, of all types, felt an option for any company where AI is a material issue would best reflect their current approach/thinking. For example:

> *"Because this is a rapidly developing issue area, it is too early to penalize companies outside of the sector for being behind at this point. However, companies at the forefront should be acutely focused on related risks.'* (U.S. investor)

> *"We believe that the board of directors should be accountable for companies' responsible development and use of AI. Boards play a key role in overseeing that corporate governance and strategy balance competitive deployment of new technology against potential risks. This requires board expertise and resources that are proportionate to the company's risk exposure and business model. We do not expect individual board directors to have expertise on AI, but rather for the board to have or gather that expertise as a whole."* (European investor)

The emphasis on overall board familiarity, rather than individual expertise, was fairly consistent among investors, a majority of whom do not expect an AI specialist on all boards right now. It was echoed by a Canadian non-investor:

> *"AI is quite broad and think it is unlikely we will find directors that have the right AI experience. Think it is more about Board education and a component of risk management."*

Several other non-investors similarly placed AI oversight in the context of broader risk management:

> *"Important for risk management, ethical use of AI, implementing and adjustments for regulators"* (European non-investor)

> *"Board oversight of AI governance issues and ethics should be considered as part of a company's enterprise risk management program."* (U.S. non-investor)

# GLASS LEWIS

**Please use the options below to indicate your expectations for each of the following statements:**





| | Investors | Non-Investors |
|---|---|---|
| ***Total Responses*** | 89 | 250 |
| *Total Comments* | 40 | 66 |

A majority of investors and non-investors alike considered disclosure on AI data security and privacy-related vulnerabilities to be very important. While non-investors were much less likely to view these factors as "Very Important", notably, social and ethical issues and the potential for reputational harm received the second-most "Very Important" responses among both groups.

Overall, investors were more likely to view all elements of risk assessment disclosure on AI and AI ethics as "Somewhat" or "Very Important" (47.9% overall, vs 39.9% among non-investors). A European investor shared that:

> *"We expect companies to be able to explain how the AI system they develop or use have been designed, trained and tested, and how they align with human values and intent. Disclosures should enable stakeholders to assess the potential impacts of AI systems and understand their accuracy, efficiency and reliability."*



Many respondents, particularly non-investors, were wary of a one-size-fits-all approach:

> *"Governance and ethics are most important.  Details of integration should be reported on based on the level of risk which will be different for each company"* (UK non-investor)

> *"All these are important, of course, but making it part of a disclosure would actually backfire and heavily affect competition."* (European non-investor)

> *"This type of disclosure often results in a boilerplate document that is not particularly helpful to me as an investor. Companies also need to be careful not to release proprietary competitive information."* (U.S. investor)

While we did not observe a significant geographical split among investors, among non-investors, North American respondents appear to be less focused on AI issues than those from other markets.

**In your opinion, how important are the following components of a company's risk assessment disclosure on AI and AI ethics?**





|  | Investors | Non-Investors |
|---|---|---|
| ***Total Responses*** | 86 | 221 |
| *Total Comments* | 16 | 41 |



## Cybersecurity Oversight

There was also a significant contrast in how investors and non-investors view oversight of cybersecurity issues, with 62.5% of investors on average seeing this as "Very Important", vs just 39.4% of non-investors. Investors were particularly concerned about the number/cost of attacks and remediation efforts (viewed as Very Important by 89.0%) and director expertise and ongoing training (69.0%). Similar to AI issues, there was a geographical split among non-investors, with North American respondents less concerned with cyber oversight; on average, 16.7% of North American non-investors viewed these issues as "Not Important", vs 8.3% for other respondents.

Many respondents again felt that, while potentially critical to certain companies, these issues were not necessarily relevant to all. However, not all respondents agreed.

> *"Cyber threats are a universal, growing risk for all corporations. Robust disclosure of the items listed above would provide decision-useful information for shareholders."* (U.S. investor)

> *"Board expertise is key. We want at least one board director to have relevant skills and experience related to cybersecurity, from their previous career history. The company should disclose how they have assessed the director has the relevant experience and skills to tackle this challenge. It is not sufficient for the company to rely on training the board receives from execs and consultants as it won't provide adequate oversight."* (UK investor)

How to implement that oversight was again a point of contention. Notably, many non-investors expressed a preference for board-wide education rather than the appointment of specific experts:

> *"Board members are not supposed to be experts of everything. Besides, having super-experts at the board tends to …give [the other directors] a feeling … that they are not responsible for that question because they are not as legitimate as the expert is. The role of a board member is to raise the good questions and to exercise his/her best judgment. His/her responsibility is to ask the management to hear AI experts, internal or external. CEOs are not AI experts for instance, yet they are required to handle AI implications as an expert would do."* (European non-investor)

> *"Having the right technical expertise available to the Board is key.  Directors need to know what questions to ask and have access to expertise but they do not need to be the technical experts"* (UK non-investor)

> *"Companies are wise to seek out experts and smart frameworks to help manage this complex work. The idea that directors need to be experts is folly. Directors need to be able to ask for the right help, but in the end, they do not do the work. In this important risk area, companies should disclose information about their exposure, and they are smart if the utilize outside frameworks and expertise. An investor should be concerned if the risk is high and there is a lack of discussion about the approach."* (U.S. non-investor)

GLASS LEWIS

**In assessing the board's oversight of cybersecurity issues, how important are the following factors?**

### Investors



### Non-Investors



■ Very Important  ■ Somewhat Important  ■ Not Important

|  | Investors | Non-Investors |
|---|---|---|
| **Total Responses** | 85 | 244 |
| *Total Comments* | 8 | 25 |

GLASS LEWIS

When we asked about opposing directors on the basis of a cyberattack, the most common response among both investors and non-investors was to only vote on this basis if there were existing concerns about cybersecurity (67.9% among investors, vs 69.6% among non-investors). Non-investors were far more likely to reject the notion entirely (18.8%, vs 2.4% among investors).

**Would you consider opposing the election/re-election of directors following a significant cybersecurity attack?**



|  | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 84 | 112 |
| *Total Comments* | 13 | 19 |



We also asked how important certain factors were as 'red flags' in assessing cybersecurity oversight. The timeliness of remediation and disclosure on the board's response to the attack, along with the extent of financial harm, were the most likely to be very important in investors' voting decisions.

While investors and non-investors were somewhat aligned on many factors, there was a notable split with regard to director qualifications/training, which was viewed as "Not Important" by 20% of non-investors, vs just 4% of investors. Like with other emerging technology issues, North American non-investors were significantly less likely to see relevance. On average, 21% of non-investors from North America viewed these issues as "Not Important", vs 6% among non-investors from other markets.

**If yes, how important are the following factors in making your vote decision?**



### Investors

| Factor | Very Important | Somewhat Important | Not Important |
|---|---|---|---|
| Type of attack | 44.6% | 44.6% | 10.8% |
| How systems were breached | 54.1% | 41.9% | |
| Disclosure on board response | 87.0% | | 13.0% |
| Timeliness of remediation | 88.0% | | 12.0% |
| Cost of remediation | 37.8% | 52.7% | 9.5% |
| Estimated extent of financial harm | 74.3% | 23.0% | |
| Structure of oversight | 53.2% | 39.0% | 7.8% |
| Director qualifications/training | 46.1% | 50.0% | |

### Non-Investors

| Factor | Very Important | Somewhat Important | Not Important |
|---|---|---|---|
| Type of attack | 42.0% | 40.6% | 17.4% |
| How systems were breached | 59.4% | 30.4% | 10.1% |
| Disclosure on board response | 59.2% | 29.6% | 11.3% |
| Timeliness of remediation | 73.2% | 18.3% | 8.5% |
| Cost of remediation | 23.2% | 56.5% | 20.3% |
| Estimated extent of financial harm | 57.4% | 35.3% | 7.4% |
| Structure of oversight | 50.0% | 34.3% | 15.7% |
| Director qualifications/training | 35.2% | 45.1% | 19.7% |

■ Very Important   ■ Somewhat Important   ■ Not Important

|  | Investors | Non-Investors |
|---|---|---|
| **Total Responses** | 77 | 72 |
| *Total Comments* | 3 | 15 |



## Consideration of Director Performance on Other Boards

Investors were far more open to voting against a director based on their performance at other boards. Once again, there was a notable geographical split among non-investors, with North American respondents significantly less likely to view performance at other boards as relevant (36.1%, vs 61.1% for other markets).

**When shareholders hold material concerns with the performance of a director at one company, should they consider opposing the election/reelection of that director at different companies on this basis?**



| | Investors | Non-Investors |
|---|---|---|
| **Total Responses** | 85 | 241 |
| *Total Comments* | 32 | 54 |

GLASS LEWIS

We followed up to ask in what areas of performance they considered, and found notable gaps in how investors and non-investors viewed the relevance of responsiveness to shareholders (54.8% of investors viewed this as a potential voting reason, vs just 26.3% of non-investors) and strategic decisions (61.6% vs 42.1%); however, both groups were fairly consistent in their consideration of egregious circumstances (54.8% vs 54.6%), and in putting a relatively low weighting on financial performance (23.3% vs 21.7%).

**If yes, under what circumstances would this be appropriate?**



| | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 73 | 152 |
| *Total Comments* | 20 | 35 |

GLASS LEWIS

## Voting Based on Board Skills Gaps

Responses were relatively consistent for investors and non-investors regarding the appropriateness of holding the nomination/governance committee chair responsible for board skills gaps. However, non-investors were somewhat more likely to view voting as a second step, only appropriate if prior engagement on the topic was unproductive (38.6%, vs 28.9% among investors).

There was a notable geographical split among investors, with North American respondents significantly more likely to limit voting on this basis to cases where the company had experienced a material incident in the relevant area (23.1%, vs 7.9% among investors from other markets); and investors from the rest of the world more likely to vote on this basis regardless of other circumstances (50%, vs 36.5% among North American investors).

**Would you consider voting against the election of the nominating/governance committee's chair or members if there are no directors on the board with clear skills and/or expertise in an area that is relevant to the company (e.g. AI, cybersecurity, ESG, supply chain)?**



| | Investors | Non-Investors |
|---|---|---|
| ***Total Responses*** | 91 | 113 |
| *Total Comments* | 13 | 19 |



# Executive Pay

## Make-Whole Awards

For executive recruitment, companies sometimes agree to provide "make -whole" grants to compensate for awards that the candidate must forfeit upon leaving their current employer. There is a significant gap in investor and non-investor expectations regarding disclosures related to "make-whole" grants. On average, 63.4% of investors expect disclosure of the terms of the award, along with explicit confirmation that awards are time-restricted and the same size as those forfeited, vs 30.1% among non-investors. By contrast, nearly half of non-investors responded that companies should only need to provide minimum disclosure (48.4%, vs 15.5% of investors).

One U.S. investor stated:

> "We would prefer a detailed breakdown, but often that is not made available. …[W]e will try to reconcile the terms and value of the award with any previous public disclosures made at the executive's prior employer. Failing that, we will generally take the company at their word, but would engage if we hold a material position."

Comments left by U.S. non-investors indicate the opposition was mainly to general rules for disclosure, favoring instead board discretion:

> "We use guidelines, but if it is material enough as compared to prior or other similar employee grants, then a fuller explanation is warranted."

> "If a company feels a make whole payment is necessary and that it might raise investor questions, they should disclose what will help explain that decision. Why would we apply a general rule here?"

> "In the best case,….investors should simply agree that the company had all the elements to make the best decisions, and no reason to waste money."

**When a company provides an executive with a make-whole grant or grants, what should the company demonstrate in its disclosure?**





|  | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 71 | 184 |
| *Total Comments* | 12 | 28 |



## Time-Based vs Performance-Based Incentives

Some market participants advocate for granting non-performance-based awards subject to extended time-based vesting periods, but no performance conditions. The vesting period for these time-based grants is typically at least five years.

Investors were far more likely to disagree that performance conditions are unnecessary for long-term incentives (73.0% vs 39.5% among non-investors), or too complicated (85.1% vs 62.7%). However, there was a consensus that performance-based equity plays an important role in directing executives (90.9% of investors agreed, vs 87.0% of non-investors). Notably, a majority of investors would consider supporting time-based awards in specific circumstances, but generally prefer performance-based awards.

While investors were generally aligned in their views across different regions, North American investors were more willing to consider supporting time-based awards if the award size is reduced (61.5%, vs 41.9% for other investors).

> *"There should be an appropriate discount to the more leveraged nature of performance-based pay, given the increased certainty of reward."* (U.S. investor)

Several investor comments underscored concerns regarding PSU structure while still supporting their use:

> *"We believe incentive compensation should be primarily long-term and performance-based…That said, we have been giving extra scrutiny to PSUs, the issues are surrounding complexity of the design, appropriateness of targets, dilution and gearing impacts."* (U.S. investor)

> *"We agree that many equity plans have become too complicated to assess and/or monitor. Generally, plans should include and disclose clear performance-based criteria, longer horizon vesting periods and post-employment holding periods."* (U.S. investor)

> *"There is no one size fits all answer. Companies should not obfuscate and enrich management with murky performance metrics and formulae."* (Canadian investor)

Non-investors highlighted practical difficulties with performance-based awards:

> *"[G]oal setting is a lot less precise and more difficult than is recognized by academics and advisory services…. However, extending the vesting period for time-based grants ignores the reality of executive tenure and duration. Longer vesting periods create larger issue upon separation and they actually exceed the time horizon that is incentivizing (if we believe these are really incentives at all). The structure of overlapping grants over say a 3-year period provides a continual and practical incentive to manage beyond the current quarter. This is a solution in search of a problem."* (U.S. non-investor)

In contrast to that last comment, many non-investors highlighted the importance of long-term alignment:

> *"Companies should have the flexibility to award equity vehicles that align with the business strategy and culture.  Companies can better meet their goals, motivate employees, and maintain a culture that supports their mission and values. With that said, having a strong stock ownership guideline would help with long-term alignment between shareholders and executives."* (U.S. non-investor)

> *"Suggest consideration of equity awards with not only long vesting period but long overall holding periods (vesting + post vesting holding)."* (U.S. non-investor)



One European investor who expressed a strong preference for time-based awards over performance-based awards clarified that:

> *[Our responses] apply to CEOs and not necessarily other executives. The CEO has a unique and comprehensive role in the company which is different from the other executives who tend to have more sectoral or process-focussed roles. The terms and incentives of other executives will normally be strongly influenced by the CEO, and are sometimes seen as largely the remit of the CEO. In our perspective, shareholder views on compensation are therefore mostly relevant for the CEO.*

**Please select your level of agreement with the following statements:**



| | Investors | Non-Investors |
|---|---|---|
| **Total Responses** | 78 | 176 |
| *Total Comments* | 14 | 39 |


GLASS LEWIS

## Workplace Safety & Pay Outcomes

Workplace safety is a common component of executives' annual bonus opportunity, particularly among companies in sectors with significant operational exposure, such as energy, manufacturing, mining and utilities. Typically, payouts are decreased by a certain range (5-15% in some markets) for poor safety performance.

Investors appear to take a stricter line regarding the treatment of fatalities in the workplace safety component of short-term incentives. The most popular response among investors was that significant penalties should be applied that go beyond the typical adjustment range (30.7%, vs 15.5% among non-investors), whereas the most common response among non-investors was to limit penalties to the typical adjustment range (34.2%, vs 25.3% among investors). Notably, North American investors were more likely to call for significant penalties (38.6%, vs 19.4% for investors from other markets). However, among investor comments, context is important:

> *"i.e., to what extent could better training/procedures etc have prevented the fatalities…We are not opposed to other H&S metrics being included in the incentive structure, but we need to see strong evidence that they actually result in improved practices."* (U.S. investor)

> *"It depends on the nature of the incident, the culpability of the company and the level of disclosure from the company about the incident."* (U.S. investor)

**When overall safety performance has improved but the company records a fatality for which it may be at fault, how should annual bonus payouts be impacted?**



| | Investors | Non-Investors |
|---|---|---|
| ***Total Responses*** | 76 | 162 |
| *Total Comments* | 23 | 44 |



## Equity Plans and Shareholder Dissent

In most markets, binding shareholder approval is required for equity incentive plans and some individual equity incentive awards. Where companies implement equity incentive plans or awards despite significant shareholder dissent, investors were far more likely to view escalation to other agenda items as appropriate regardless of other circumstances (63.7% overall, vs 33.9% among non-investors).

Notably, investors from outside North America were much more likely to consider voting against the executive pay proposal in the year that plan awards vest (60.0%, vs 34.2% among North American investors), while North American investors were more likely to limit escalation to cases where ultimate payouts are concerning (39.5%, vs 20% among other investors).

**Assume an equity incentive plan or equity award received significant shareholder dissent but was nonetheless implemented without modification upon a passing level of support. Is it appropriate for shareholders to escalate this issue to other agenda items:**



|  | Investors | Non-Investors |
|---|---|---|
| **Total Responses** | 68 | 116 |
| *Total Comments* | 12 | 35 |



## Executive Perquisites

In recent years, the annual value of CEO perquisites (such as personal use of the company aircraft or country club fees) has dramatically increased among U.S. companies. Compared to pre-pandemic levels (2019), 2023 CEO perquisites was an average 28% higher among S&P 500 companies, topping $1 million in many cases.

Investors were more likely to view perquisites as indicative of broader executive pay issues (55.8%, vs 28.7% among non-investors), whereas the most common response among non-investors was that concerns with perquisites should be handled via engagement rather than proxy voting (35.3%, vs 11.7% among investors).

Notably, non-North American investors were more likely to vote against a pay proposal based solely on perquisite concerns (63.6%, vs 50.0% among North American investors), whereas North American investors were more likely to include perquisites as a consideration, but not the primary reason for voting (34.1%, vs 15.2% among other investors).

**What is your opinion on how perquisites should be considered in voting?**



|  | Investors | Non-Investors |
|---|---|---|
| ***Total Responses*** | 78 | 168 |
| *Total Comments* | 13 | 22 |



# Median Pay Disclosure

Investors were more than twice as likely to view median pay level disclosure as "necessary" (43.8%, vs 19.2% among non-investors). The most popular response among non-investors was that companies should not disclose this information if it is not required by local regulations (33.5%, vs 6.3% among investors). To understand why, one European non-investor explained:

> *"the median employee pay is meaningless in companies having an international footprint. Its mixing apples and carrots."*

A U.S. non-investor concurred:

> *"…pay ratio depends on which countries the majority of your employees live in, or which type of jobs they have. This ratio has very little value in our opinion."*

More broadly, we observed a geographical split; among both investors and non-investors, respondents from outside North America were more likely to view median pay level disclosure as important. Half of investors from other regions viewed this disclosure as "necessary", compared to 39.1% of North American investors; as did 29.6% of non-investors from other regions, compared to 10.0% among North American non-investors.

**Do you agree that the median employee pay level should be disclosed by the company, regardless of applicable regulatory reporting requirements?**



| | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 81 | 189 |
| *Total Comments* | 8 | 25 |

GLASS LEWIS

## Transatlantic Pay Gap

Perhaps surprisingly, investors were more likely to view the so-called Transatlantic pay gap as 'problematic' (60%, vs 42% among non-investors). While different respondents interpreted the nature, severity and causes of the 'problem' differently, by and large there was a consensus that, as a U.S. investor put it:

> *"Such a gap is evidence of the excessive executive pay common in North America."*

A counterpart at another U.S. investor states:

> *"The problem is overblown. We will provide some leeway if the company genuinely needs to compete for talent in the U.S. (e.g. senior executives are based there, significant operations/revenue derived there). However, we do not agree with the notion that a mid-cap European or U.K.-based company needs to pay in line with U.S. benchmarks. We are highly skeptical of the idea that increasing executive compensation would significantly improve the competitiveness of the U.K./Europe capital markets vis-à-vis the U.S."*

European investors concur:

> *"…high remuneration for US peers shouldn't be reason for European companies to significantly increase remuneration. US remuneration should rather decrease as pay inequality is also already high within European companies."*

Perhaps unsurprisingly, North American non-investors were much less likely to view the pay gap as a problem (31.0%, vs 53.9% among non-investors in other markets). As one U.S.-based non-investor noted:

> *"Compensation Committees are independent and have their own independent advisors. There are different reasons different people at different positions are paid as they are. Not every difference in pay means it is problematic. People have different roles and impact at a company and they are compensated accordingly after reviewing the relevant data."*

Among investors, there was not a significant geographical split.

**Do you believe that the executive pay gap is problematic?**



| | Investors | Non-Investors |
|---|---|---|
| **Total Responses** | 76 | 163 |
| *Total Comments* | 21 | 32 |

GLASS LEWIS

In terms of what is causing the pay gap, investors were particularly more likely to view the influence of both investor bodies/engagement, and of regulators and governments, in establishing local market norms and promoting shareholder interests as a "Strong" or "Moderate Factor". Culture was also seen as a strong factor, and cited in several comments:

> *"Perhaps the most important factor is social and cultural - the mistaken impression that top management "deserves" and is entitled to excessive compensation because their peers in other companies are rewarded excessively."* (U.S. non-investor)

**For each item, please indicate the magnitude of its influence on the pay gap.**





|  | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 69 | 128 |
| *Total Comments* | 7 | 5 |



## Structural Issues in Advisory 'Pay Implementation' Votes

Among investors, the most common response was that structural issues should only be considered for context when implementation decisions have already raised concerns (41.3%, vs 33.7% among non-investors). Investor and non-investor totals for "Always" (22.2% vs 5.4%) and "Never" (4.8% vs 20.7%) were roughly inverse. Notably, there was a significant split between UK and European investors, with no UK respondents answering "Always" (vs 21.1% of European respondents) and a majority only taking structural issues into account when they were egregious (57.1%, vs 21.1% among European investors).

**Where shareholders get separate votes on remuneration policy and policy implementation (UK and Europe), should structural concerns ever affect votes on the approval of a remuneration report (advisory remuneration vote)?**



|  | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 64 | 93 |
| *Total Comments* | 5 | 11 |

GLASS LEWIS

# Pay Benchmarking

## Competitiveness as a Rationale for Pay Increases

Perhaps unsurprisingly, non-investors were most likely to defer to the board on whether the need to attract and retain executive talent justifies pay increases (49.4%, vs 16.9% of investors); this option was particularly popular among North American non-investors (58.2%, vs 37.8% for other markets). Two U.S.-based non-investors stated:

> *"No amount of compensation is too high, if the executive can deliver superior results. However, failure to deliver superior results when the compensation was relatively high, should result in negative votes for the say-on-pay vote or the compensation committee members."*

> *"There are multiple reasons why a board may conclude that it needs to increase pay to enhance the likelihood of it attracting and retaining key talent. It is fair for investors to expect a convincing rationale and sufficient background information; however, given the sensitivities of this issue, a company may not always be able to provide extensive detail on specific circumstances. "*

By contrast, a majority of investors prefer to see explicit evidence of the need to make increases (57.7%, vs 31.4% of non-investors), with this option particularly popular among investors outside of North America (70%, vs 48.8% among North American investors). Notably, investors were more than twice as likely to view retention risk as overrated (22.5% vs 9.9%), particularly North American investors (26.8%, vs 16.7% among other investors).

**In what situations is the need to attract and retain executive talent a valid rationale for increases to overall pay opportunity?**



| | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 71 | 172 |
| *Total Comments* | 11 | 20 |

GLASS LEWIS

## Views on Benchmarking

While a majority of non-investors agreed or strongly agreed that higher pay opportunity generally drives higher shareholder returns (53.7%), nearly three-quarters of investors disagreed or strongly disagreed (72.9%). Said one U.S.-based investor:

> *"However, higher pay opportunity alone is not going to guarantee better performance, rather, this ensures companies can compete against their peers. This may result in overpaying which we would obviously take issue with."*

There were similar views about whether the potential benefit to shareholders of higher executive pay is overrated. However, strong majorities of both investors and non-investors agreed or strongly agreed that the location of the executive and the region they oversee should define their pay structure. Among investors, there was a notable geographic split on this last point – whereas just 58.3% of North American respondents agreed or strongly agreed, in other markets this rose to 93.3%.

**Rate your agreement with the following statements, assuming the peer group comprises companies of similar valuations, financial properties and scope.**

### Investors



### Non-Investors



Legend: ■ Strongly Agree  ■ Agree  ■ Disagree  ■ Strongly Disagree

|  | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 72 | 169 |
| *Total Comments* | 6 | 17 |

GLASS LEWIS

## Shareholder Consultation Regarding Pay

There is a significant gap between investor and non-investor expectations on the necessity of consulting with shareholders prior to pay changes and benchmarking. The following comments were representative of North American non-investors' views on the subject:

> *"Shareholder feedback can be obtained through Say-on-Pay votes."*

> *"Boards and Executive teams need to have the flexibility to address this directly. Shareholders already have a mechanism by which they can have input - a vote against."*

> *"The Board/Compensation Committee is in the best position to determine appropriate pay design and quantum that best aligns shareholder and executive interests. Appropriate and adequate checks and balances are already in place for Board members (typically annual say-on-pay vote and annual voting for Board members)."*

**Should shareholders expect companies to seek and disclose their feedback in the following circumstances:**



| | Investors | Non-Investors |
|---|:---:|:---:|
| ***Total Responses*** | 72 | 161 |
| *Total Comments* | 7 | 24 |

# GLASS LEWIS

## Peer Groups

Across the board, investors were more likely to view the inclusion of companies with each of the attributes we asked about as inappropriate. In particular, there were significant gaps regarding companies of different size or operational scope (74.2% investors agreed or strongly agreed that their inclusion is inappropriate, vs 59.1% among non-investors) and companies that had experienced significant shareholder opposition (70.3%, vs 52.8% among non-investors).

Investor views were broadly aligned across regions, with respondents from outside North America generally somewhat more likely to agree. However, a significantly higher proportion of North American investors viewed companies with a different ownership structure as problematic (60%, vs 42.9% for other markets).

**Would you view the inclusion of companies with the following attributes within a compensation peer group as inappropriate?**

### Investors



### Non-Investors



■ Strongly Agree   ■ Agree   ■ Disagree   ■ Strongly Disagree

|  | **Investors** | **Non-Investors** |
| --- | --- | --- |
| *Total Responses* | 68 | 154 |
| *Total Comments* | 7 | 17 |

# GLASS LEWIS

## Global Peers

With regard to the inclusion of global (non-local market) peers in executive pay benchmarking, investors were more likely to always view this as a consideration (47.9%, vs 25.5% among non-investors). One U.S. investor felt that it:

> "Depends on the justification and appropriateness. If a UK company explains that the majority of its employees are based or revenues are generated in the US, then we will typically be more flexible than for a UK company that is only competing in the UK."

The most common response among non-investors was "Not usually a consideration" (46.2%, vs 35.6% among investors), and non-investors were more likely to respond "Never a consideration". Notably, there was a geographic split among both groups. North American respondents were more likely to respond "Not usually a consideration" (41.9% vs 26.7% for other markets), whereas investors from other markets were more likely to view the inclusion of global peers as "Always a significant consideration" (23.3% vs 9.3%). Similarly, whereas over three-quarters of North American non-investors responded that global peers were "Never" or "Not usually a consideration", it is "Always" a consideration for a majority of non-investors from other markets.

**If a company benchmarks against global peers, how does that influence your voting decision on executive pay proposals?**



| | Investors | Non-Investors |
|---|---|---|
| ***Total Responses*** | 74 | 39 |
| *Total Comments* | 10 | 19 |



# ESG Issues

## Voting on Non-Financial Reporting

In Spain and Switzerland, companies are now required to prepare a report on non-financial matters (i.e., environmental, social, and employment-related matters, respect for human rights, and anti-corruption) on an annual basis, and submit that reporting to a shareholder vote.

Across the board, investors were more likely to consider voting against, with expectations particularly higher regarding the timeliness, completeness and/or quality of reporting.

> *"If the non-financial report fails to align with globally recognized reporting standards and frameworks, like the TCFD and GRI, a vote against may be warranted. If the report doesn't adequately disclose the company's relevant impact areas, dependencies and risks, and how these issues impact its long term strategy, a vote against is also warranted."* (European investor)

> *"This would need to be applied in a case of extremes. But if one company only provides high-level, boilerplate statements with respect to its ESG policies and initiatives without any meaningful data to assess performance -- whereas peers are all much more developed -- then that report should not be supported."* (Global investor)

> *"Specifically on reporting, when the company does not report conform widely adopted market esg reporting standards, for example a company with material climate risk exposure does not report according tcfd or cdp standards"* (U.S. investor)

Many non-investors offered a different view:

> *"ESG should be an area for engagement"* (Canadian non-investor)

> *"Let's apply the same logic as for the financial reporting: shareholders do not vote against a financial reporting because the performance is poor!"* (European non-investor)

There appear to be different approaches to non-financial reporting based on geography. Whereas 12% of North American investors would never consider voting against a company's non-financial reporting under any circumstances, no investors from other markets provided this response. There was a similar gap between non-investors, 30.9% for North Americans and 10.2% for other markets.

GLASS LEWIS

**Under what circumstances should shareholders consider voting against a company's non-financial reporting?**



| | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 76 | 156 |
| *Total Comments* | 20 | 26 |

GLASS LEWIS

## B-Corporations

Adopting a B Corporation structure certifies that a business is meeting high standards of verified performance, accountability, and transparency on factors from employee benefits and charitable giving to supply chain practices and input materials.

Among both investors and non-investors, the most popular response was that adopting a B corporation form is unnecessary, as companies are already able to consider stakeholders and environmental factors; however, this only accounted for roughly four in ten investors, vs a majority of non-investors. Investors were more likely to respond that boards should take whatever corporate form they deem appropriate (32.4% vs 14.5% among non-investors). There was a notable geographic split among investors, with respondents from outside North America more likely to be open to the B corp form (66.7%, vs 46.3% among North American investors).

**Should companies consider changing their corporate form to become B Corporations?**



| | Investors | Non-Investors |
|---|---|---|
| **Total Responses** | 70 | 124 |
| *Total Comments* | 13 | 14 |



## Sustainability Audits

A majority of both investors and non-investors either find it reasonable for all companies to retain the same external audit firm to provide both financial and sustainability assurance, or don't think it matters (58.3% of investors, vs 54.4% of non-investors).

Investors were nearly three times more likely to view it as acceptable for a transition period, but generally prefer separate auditors (29.2%, vs 10.6% among non-investors).

**In markets where the assurance of sustainability reporting is mandatory, do you find it reasonable that a company's statutory financial auditor is also tasked with providing sustainability reporting assurance?**



|                   | Investors | Non-Investors |
|-------------------|-----------|---------------|
| *Total Responses* | 74        | 160           |
| *Total Comments*  | 10        | 28            |

GLASS LEWIS

## Climate Transition

Of the minority of investor respondents who do not currently evaluate climate transition strategies when making decisions on director elections, roughly a quarter indicated that they plan to begin doing so in future. Among those that answered "Yes", there were a range of approaches. Some look at the overall quality and robustness of the company's climate strategy and reporting, but many cited more specific factors (see below).

Several commented that they only apply climate transition considerations to director voting at certain companies, assessed either sector-by-sector, based on the Climate Action 100 list, or on an ad hoc basis. Another consideration is engagement; many investors stated that they only turn to director voting if the company has not been responsive to discussions on the topic. For example:

> *"Yes, dependent on sector and engagement strategy. We will escalate votes against directors for climate reasons if the company is in a high-emitting sector and/or as a next step in an engagement plan for the company."* (Canadian investor)

> *"Yes. Materiality of the risk is first (whether or not they are CA100+ list names), and then the robustness of the proposed approach given that materiality"* (European investor)

Some were more specific about their voting policies.

> *"For CO2 intensive companies, we vote against the chairman of the E&S (responsible) committee if the company does not have SBTi certified emission reduction targets. Alternatively, if there is no E&S (responsible) committee, we vote against the chairman of the Board."* (European investor)

> *"We will vote against the entire board of directors if they have not disclosed scope 1 and scope 2 emissions or if they do not have a climate report aligned with TCFD recommendations/or meet requirements of IFRS S2. For high emitting companies (for example, companies in CA100+) we also expect them to have established GHG emissions reductions goals or we will vote against the entire board. We make exceptions for directors with less than 1 year tenure"* (U.S. investor)

While there were substantially fewer responses from non-investors on this proxy voting-centric question, some did share their comments. For example, a U.S. non-investor opined that:

> *"Director votes should focus on the Directors' expertise to oversee climate transition strategies and related risks and opportunities."*

**Are you evaluating companies' climate transition strategies when making decisions on director elections? If so, what factors are you using to make this assessment?**





## Most Frequently-Cited Factors



Other factors that were cited included the company's level of disclosure (particularly regarding progress updates), scenario analysis, asset impairment testing, and verification/certification of targets and results.

|  | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 58 | 21 |

GLASS LEWIS

## Say on Climate Voting

There was a notable geographic split on investors' approach to Say on Climate. While a slightly greater proportion of North American investors would consider voting against a proposal where the link to financial and shareholder returns is unclear, for all other factors, investors from other markets were more likely to consider voting against, in some cases by a wide margin. In particular, alignment of capital expenditures with long-term climate strategy, alignment with a 1.5-degree scenario, and the presence of a net zero strategy were all seen as significantly more important by non-North American investors.

> *"Our voting on Say on Climate proposals is based on company plans meeting our core climate change expectations and our further guidance on transition plans.    In the former we look for:  board oversight of climate risks and opportunites, climate risk disclosures, greenhouse gas reporting, net zero and interim targets and transition plans. On transition plans specifically we look for time-bound and quantified decarbonisation strategies, including the specific abatement measures needed to reach their interim emission reduction targets, including internal abatement measures, divestments, output changes, carbon credits and contractual instruments such as RECs."* (European investor)

> *"[I]f the company's climate strategy doesn't adequately address the material climate-related risks the company faces."* (UK investor)

> *"A lack of engagement with net zero goals would also increase our expectations around scenario analysis (i.e. business reliance assessment) and disclosure of physical climate risk planning. We would consider voting against if this is not present and our evaluation of Say on Climate proposals are highly influenced by the energy intensity of the company's activities."* (U.S. investor)

> *"The company has recently stepped back from their initial targets without providing sufficient rationale for such a change in direction"* (U.S. investor)

Notably, respondents from both segments raised concerns with the use of Say on Climate votes:

> *"It is our expectation that management have a climate strategy that is approved by the Board and that details are provided to shareholders. However, an advisory vote on climate is not ideal in our view and if a company does not meet our expectations on its approach to climate change, we will vote against the election of directors."* (U.S. investor)

> *"The Fund does not find Say on Climate proposals to be beneficial to shareholders."* (U.S. investor)

> *"SoC is unrelated to real action or progress on emissions and should not be a vehicle for use in proxy statements."* (U.S. non-investor)

GLASS LEWIS

**What factors would make you consider opposing a company's Say on Climate proposal?**



|  | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 77 | 62 |
| *Total Comments* | 26 | 25 |

GLASS LEWIS

## Approach to Shareholder Proposals

How respondents approach shareholder proposals were generally aligned across different segments, with all or a significant majority viewing each component as "Very" or "Somewhat Important". Of the three components we asked about, proponent identity was the most divisive, but was nonetheless viewed as "Very" or "Somewhat Important" by over 70% of investors. Notably, more North American investors view the identity of the proponent as "Not Important" (37.0%, vs 18.2% for other markets).

Despite the broad alignment, investors expressed a range of views on how to approach shareholder proposals:

> *"The text of the resolution and supporting statement are important in that they can make a compelling case as to why a certain action builds long term shareholder value. BUT we cannot forget that these proposals are non-binding. Support for a less-than-perfectly-worded climate-related proposal still warrants support at a company with lagging climate ambition/performance. Instead of furrowing our brows over how reasonable an ask is, we should see the forest for the trees."* (Global investor)

> *"Many anti ESG proposals lately so having identity of the proponent is important. We currently don't vote in spirit of proposals and read them to the letter, so the text and the supporting statement are important."* (U.S. investor)

Some investors noted other considerations:

> *"Another important piece of information is the success of a proposal in previous years, as well as a company's response and any actions taken, if it has been tabled at prior company AGMs."* (Canadian investor)

**When analyzing and voting on a shareholder proposal, how important are the following factors:**



Investors



Non-Investors



|  | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 83 | 86 |
| *Total Comments* | 12 | 18 |

We followed up on how the proponent's identity is considered, and found that far fewer investors view the number of shares held as "Very" or "Somewhat Important" (50%, vs 78.5% of non-investors).

**If you view the identity of the proponent as very important or somewhat important, how important are the following in making your assessment:**

### Investors



### Non-Investors



|  | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 62 | 67 |
| *Total Comments* | 7 | 8 |

GLASS LEWIS

# Responsiveness to Shareholder Opposition

## Board Response to Failed Advisory Proposal

Investors and non-investors expressed very different expectations for how a board should respond when an advisory management proposal does not receive majority support. The most popular answer among investors was that the board should generally refrain from the requested action (41.1%, vs 9.0% among non-investors). As one Canadian investor put it:

> *"Why put it to shareholder opinion if you aren't going to follow their views?"*

Other investors took a more balanced view:

> *"This would depend on the ask and the level of shareholder opposition."* (U.S. investor)

> *"In some cases, not proceeding may be impractical. For example, refusing to pay a CEO their new salary or trying to clawback bonuses will destabilize the business and may result in legal action against the company. But a majority vote against should still send a clear message to the Board that it must take action on the main issues raised."* (U.S. investor)

Meanwhile, non-investors were far more likely to defer to the board's judgment (23.9%, vs 5.5% among investors).

> *"The Board should consider the views of the shareholders, particularly as it solicited those views, but shouldn't be required to go ask a subset of shareholders for permission, and should implement the action if the Board believes it is appropriate."* (U.S. non-investor)

> *"I think a lot depends.  Remember that a meeting typically only requires a majority of shares to be present.  And to pass typically requires a majority of those shares.  I think more context is required."* (U.S. non-investor)

Although responses were generally aligned across regions, non-investors from outside North America appear to put more emphasis on consultation with shareholders (32.0%, vs 22.0% among North American non-investors).

**GLASS LEWIS**

**What are your expectations when an advisory management proposal does not receive majority support from shareholders?**



| | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 74 | 155 |
| *Total Comments* | 15 | 15 |



## Defining 'Significant' Opposition

The most popular answer among both types of respondent was "20-30%" (49.4% among investors, vs 31.3% among non-investors); however, investors were twice as likely to view shareholder opposition of 30% or less as significant (80.5%, vs 39.9% among non-investors), and non-investors were much more likely to see no need for a response so long as the proposal is approved (23.9%, vs 1.3% among investors).

Notably, respondents from both groups highlighted the relevance of ownership & voting structure:

> "depends on the company shareholding structure. Eg. if 40% of the company voting rights are controlled by a shareholder then 20% is a significant dissent. If the largest shareholders has less than 5%, then 30% is a significant dissent." (European non-investor)

> "Where there is a multi-class structure, dissent should be calculated to reflect the views of non-affiliated shareholders." (Canadian investor)

> "Degree of opposition from non-controlling shareholders is also relevant." (U.S. investor)

**What level of dissent do you generally consider to be significant enough to warrant a response?**



|  | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 78 | 163 |
| *Total Comments* | 12 | 17 |



## Company Responsiveness to Binding/Advisory Votes

Across different regions and types of respondent, there appears to be a general consensus that expectations for how a company responds to significant levels of shareholder dissent are not influenced by whether the proposal is binding or advisory.

**Do you have different expectations on a company's response when a proposal is advisory rather than binding?**



|  | Investors | Non-Investors |
|---|---|---|
| **Total Responses** | 75 | 145 |
| *Total Comments* | 3 | 6 |

GLASS LEWIS

## Investor Escalation on Binding/Advisory Pay Votes

Similarly, nearly three-quarters of investors do not approach escalation of the executive pay vote differently based on whether that proposal is binding or advisory (72.4%). Notably, this response was more common among North American investors (78.7%) than other markets (62.1%). Looking specifically at regions where a mix of binding and advisory pay proposals are standard, this view was more common in the UK (85.7%), and less so on the European continent (56.3%).

**When you have significant pay concerns, do you approach escalating those issues beyond the company's executive pay vote to other relevant proposals differently, depending on whether the company's executive pay proposal is advisory or binding?**



|  | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 77 | 38 |
| *Total Comments* | 2 | 9 |

GLASS LEWIS

# Shareholder Rights

## Virtual vs In-Person Meeting Format

There is a significant gap in expectations when it comes to meeting format. Whereas a majority of investors feel shareholder meetings should typically allow for in-person participation (52.7%, vs 21.5% among non-investors), the most popular non-investor response was that shareholders should defer to the board (47.3%, vs 8.1% among investors). Investors' desire for a physical meeting was particularly strong outside of North America (60%, vs 47.7% among North American investors), and particularly so in Europe (70.6%) and the UK (71.4%).

> *"When boards unilaterally limit shareholder participation, we may take those actions into account when voting."* (U.S. investor)

> *"A virtual meeting which includes safeguards allows for cost savings and potentially greater shareholder participation; but the safeguards for shareholder rights are paramount."* (U.S. investor)

However, not all investors agreed:

> *"In the past … we would advocate for hybrid meetings. However, we are now more minded to support virtual-only meetings if a company can evidence that they can easily replicate the provisions of an in-person meeting. The opposite applies to advocates of in-person or hybrid meetings – we need to see evidence where virtual only meetings have not been in shareholders best interests' such as where shareholders haven't been able to ask or get a response on a question. Until we see that, it is becoming increasingly difficult to push back against virtual-only meetings."* (UK investor)

**In normal circumstances, do you believe that it is acceptable for companies to hold virtual-only shareholder meetings at which in-person attendance is not permitted?**



|  | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 75 | 186 |
| *Total Comments* | 17 | 33 |

GLASS LEWIS

## Exclusive Forum

Investors and non-investors were starkly divided on the topic of exclusive forum. Over three-quarters of investors feel that such clauses should always go to a shareholder vote, whereas over two-thirds of non-investors feel there is no need for shareholder approval.

**Exclusive forum provisions are clauses included in a company's governing documents which stipulate that a certain state or federal jurisdiction is the exclusive forum for specified legal matters. Do you believe it is appropriate for companies to adopt such provisions without shareholder approval?**



| | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 56 | 106 |
| *Total Comments* | 4 | 9 |

GLASS LEWIS

## Reincorporation

Views on factors that impact a reincorporation were broadly aligned, with investors more likely to view the impact on shareholder rights and governance issues as "Very" rather than "Somewhat Important". Notably, non-investors put more weight on financial benefits, and the impact on director and officer protections. Investors from outside of North America were much more likely to view those factors, as well as the impact on anti-takeover provisions, as "Not Important".

Many investors stated that they take a balanced approach, emphasizing long-term considerations:

> *"We will evaluate reincorporation proposals based on the long-term best interests of the company, including the financial and strategic rationale for the proposed move, as well as the comparative corporative governance and shareholder rights available in the current and proposed jurisdictions."* (Canadian investor)

A UK investor highlighted ESG factors:

> *"Would also add a focus on worker rights and other ESG considerations - if reincorporation was a way to avoid obligations, regulations, or legislation."*

**Please indicate how important the following factors are to you when evaluating a reincorporation:**

### Investors



### Non-Investors



■ Very Important   ■ Somewhat Important   ■ Not Important

GLASS LEWIS

|  | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 67 | 106 |
| *Total Comments* | 10 | 13 |

A higher proportion of investors expect companies to align their corporate governance practices to the new local market immediately or within a year post-reincorporation (80.7%, vs 55.4% among non-investors); notably, investors were split geographically along roughly the same lines (82.2% among non-North American investors, vs 63.9% among North American investors). Non-investors were more likely to view two years as a reasonable timeframe (29.5%, vs 12.3% among investors); again, the geographic split between North American and other investors was roughly the same (23.7% vs 10.7%).

**When companies opt to redomicile/reincorporate in a different country, how much time should they be afforded to align with the new local market's corporate governance practices?**



|  | Investors | Non-Investors |
|---|---|---|
| *Total Responses* | 58 | 112 |
| *Total Comments* | 7 | 7 |



# Thank You

Again, we sincerely thank everyone who took the time to provide informed and thoughtful input through our Policy Survey.  Updates to our Benchmark Policy guidelines will be released in the November/December timeframe and will be accessible through our web site.



# Connect with Glass Lewis

Corporate Website   | [www.glasslewis.com](www.glasslewis.com)

Email                      | [info@glasslewis.com](info@glasslewis.com)

Social                     |  @glasslewis    in  Glass, Lewis & Co.

Global Locations

**North America**

**United States**
*Headquarters*
100 Pine Street, Suite 1925
San Francisco, CA 94111
+1 415 678 4110

New York, NY
+1 646 606 2345

2323 Grand Boulevard
Suite 1125
Kansas City, MO 64108
+1 816 945 4525

**Asia Pacific**

**Australia**
*CGI Glass Lewis*
Suite 5.03, Level 5
255 George Street
Sydney NSW 2000
+61 2 9299 9266

**Japan**
Shinjuku Mitsui Building
11th floor
2-1-1, Nishi-Shinjuku, Shinjuku-ku,
Tokyo 163-0411, Japan

**Europe**

**Ireland**
15 Henry Street
Limerick V94 V9T4
+353 61 534 343

**United Kingdom**
80 Coleman Street
Suite 4.02
London EC2R 5BJ
+44 20 7653 8800

**France**
*Proxinvest*
6 Rue d'Uzès
75002 Paris
+33 ()1 45 51 50 43

**Germany**
*IVOX Glass Lewis*
Kaiserallee 23a
76133 Karlsruhe
+49 721 35 49622

GLASS LEWIS

## DISCLAIMER

© 2024 Glass, Lewis & Co., and/or its affiliates. All Rights Reserved.

This document is intended to provide an overview of Glass Lewis' 2024 Client Policy Survey. This document should be read and understood in the context of other information Glass Lewis makes available concerning, among other things, its research philosophy, approach, methodologies, sources of information, and conflict management, avoidance and disclosure policies and procedures, which information is incorporated herein by reference. Glass Lewis recommends all clients and any other consumer of this report carefully and periodically evaluate such information, which is available at: http://www.glasslewis.com.

None of the information included herein has been set or approved by the U.S. Securities and Exchange Commission or any other regulatory body nor should it be relied upon as investment advice. The content of this document has been developed based on Glass Lewis' experience with proxy voting and corporate governance issues, engagement with clients and issuers, and review of relevant studies and surveys, and has not been tailored to any specific person or entity. Moreover, it is grounded in corporate governance best practices, which often exceed minimum legal requirements. Accordingly, unless specifically noted otherwise, a failure to meet certain guidelines set forth herein should not be understood to mean that the company or individual involved has failed to meet applicable legal requirements.

No representations or warranties express or implied, are made as to the accuracy or completeness of any information included herein. In addition, Glass Lewis shall not be liable for any losses or damages arising from or in connection with the information contained herein or the use, reliance on or inability to use any such information. Glass Lewis expects its subscribers to possess sufficient experience and knowledge to make their own decisions entirely independent of any information contained in this document.

All information contained in this document is protected by law, including but not limited to, copyright law, and none of such information may be copied or otherwise reproduced, repackaged, further transmitted, transferred, disseminated, redistributed or resold, or stored for subsequent use for any such purpose, in whole or in part, in any form or manner or by any means whatsoever, by any person without Glass Lewis' prior written consent.

**<u>EXHIBIT 5</u>**

Corporate Sustainability

## The right intelligence to define your sustainability strategy

Develop targeted sustainability strategies that align with stakeholder expectations and satisfy regulations, while supporting business growth and attracting capital.



Jump To ›

## Making sustainability part of an effective, long-term strategy

Our platform gives you the tools to not only meet the demands and reporting requirements of consumers, regulators, employees and business partners, but to attract capital from investors who prioritize ESG and sustainability. In turn, you can align with sustainable finance regulations and stakeholder expectations. With advanced analytics, you'll be able to assess risks and impacts, identify opportunities, and confidently navigate the evolving business landscape, positioning your company for long-term success and resilience.

Request a Demo

**Resilient businesses understand that sustainability isn't just a trend—it's a key component of a successful, long-term strategy.**

## Solutions to empower you to take charge of your sustainability journey

### Understand where you stand in the market

» Access the same database used by many investors to benchmark your ESG performance against industry peers

» Draw from our sector-specific expertise to gain insights and identify areas of improvement

» Understand investor expectations and respond to shareholder proposals



### Develop a roadmap for sustainability management and reporting

» Identify material impacts, risks, and opportunities to inform your sustainability strategy

» Conduct gap analysis against key sustainability disclosure and due diligence requirements

» Make data-driven decisions about your organization's practices



### Strengthen your sustainability efforts in specialized areas

» Enhance your organization's programs in priority areas such as climate risk management or value chain due diligence

» Leverage support from our experts in conducting targeted analytics

» Align your programs with regulatory requirements



## Optimize your reporting and disclosures

» Review best-in-class examples to understand best practices as you develop your own disclosure strategies, polices, and targets

» Align your disclosures with sustainability regulations and standards

» Get feedback on your draft disclosures from experienced advisors



## Our approach to corporate sustainability

We believe that sustainability is a natural result of a resilient organization with a long-term outlook. Investors and market stakeholders are increasingly seeking businesses that integrate sustainability into their core practices. Our approach combines advanced SaaS solutions for analytics and reporting with expert advisory services—empowering you to develop and implement effective sustainability strategies. By strengthening sustainability practices across your organization, you'll not only meet market demands but also build a foundation for long-term success.



See how industry leaders implement corporate sustainability practices globally.

Request a Demo

## We are uniquely positioned to customize the right suite of solutions to meet your specific needs



Sustainability Solutions - ISS-Corporate

| Materiality Assessment | › |
| --- | --- |
| Benchmarking Intelligence | |
| Climate Services | |
| Sustainability Reporting | |

**Materiality Assessment**

Use our data-driven solution to conduct materiality assessments that cover impact, financial, or double materiality perspectives.

**Learn More →**

**ISS-Corporate licenses and applies the SASB Standards in our work.**



## 0 +

companies with ESG performance data and factor-level mapping you can access

## 0 +

entities covered in ESG controversy news and Norm-Based Research

## 0 +

issuers covered with comprehensive climate data

**Our advisors are here to help**

Access to our dedicated team of experienced sustainability advisors and regulation specialists is included with our platform. They can guide you in the use of our SaaS and are available to educate, train, and provide thematic insights and industry trends throughout your sustainability management cycle.

## Explore the latest trends and practices in sustainability

Corporate Sustainability                    Corporate Sustainability                    Corporate Sustainabi

August 15, 2025                              August 15, 2025                              August 5, 2025

EU Sustainability Reporting Updates – July   Why Human Rights Are Now a Business         Circling Back to Square One: Revisiting
2025                                         Imperative: Global Trends in Corporate      Circularity from a Financial Materiality
                                             Responsibility                              Perspective

Blog • 7 min read                            Blog • 3 min read                           Report

←    →

## Case Studies

**Client Profile**

Industry: Software & Services
Location: United States

> " Thank you so much for your support throughout our sustainability journey! The continuous engagement has helped us improve our strategy and reporting significantly.
>
> **Learn More →**

## Sometimes seeing is believing.

Fill out the form below to get a live demonstration of the platform from one of our sustainability experts

First Name *

Last Name *

Email *





Primary Role *
Please Select

Business Type *
Please Select

Company Name *

Country *
Please Select

☐ By submitting this form and clicking the Email Opt-In box, you consent and opt-in to receiving emails with the information you requested as well as marketing communications from us. Any information we collect will be processed for communication and marketing purposes. Additional details about how we collect and use your personal data including information on your rights are set out in our Privacy Statement and Terms of Use. You may unsubscribe from these emails at any time by clicking the unsubscribe link in these emails. *

Request a Demo



**COMPANY**

About Us

Contact Us

Press

Careers

Office Locations

Corporate Responsibility

**RESOURCES**

Reports

Blog

Guides

Webinars

Data Verification

See Your Rating

Subscribe to News Digest

**SOLUTIONS**

Corporate Governance

Executive Compensation

Corporate Sustainability

Cyber Risk

Sustainable Finance

**PRIVACY & LEGAL**

Privacy Policy

Modern Slavery Statement

Fraudulent Website and Phishing Warning

© 2025 ISS-Corporate. All Rights Reserved.

in Follow us on LinkedIn



**<u>EXHIBIT 6</u>**



About Us      Careers      Issuer
Relations      Login

**GLASS LEWIS**

Investor Solutions ⌄      Corporate Solutions ⌄      Who We Serve ⌄

EXECUTIVE COMPENSATION  ›
PAY-FOR-PERFORMANCE MODEL

# Model Pay-for-Performance Scenarios

Independently benchmark and analyze your executive compensation programs to design plans that align with investor expectations.



Book a Discovery Call

Balancing shareholder expectations with internal pay objectives is a significant challenge. Our Pay for Performance Model facilitates independent benchmarking and pay-for-performance modelling to help you build programs that meet company objectives and increase your chances of shareholder support.



GLASS LEWIS

Investor Solutions ⌄        Corporate Solutions ⌄        Who We Serve ⌄



## Benchmark Pay and Performance Against Peers

Ensure your pay programs are competitive using our flexible pay-for-performance modeler to gain a 360-degree view of pay alignment.



## Anticipate Investor Say-On-Pay Views

Anticipate potential pay concerns using the Glass Lewis model relied upon by major investors to face say-on-pay votes with confidence



## Test Potential Pay Scenarios

Forecast how your company's pay alignment might be affected by various pay outcomes or future changes to compensation plans.

# 1

# Benchmark



Investor Solutions ⌄     Corporate Solutions ⌄     Who We Serve ⌄



## 2

## Planning for Board Meetings

Provide insight to your Compensation Committee on how pay programs will be assessed by Glass Lewis and institutional investors.

## 3

## Preparing for Annual Meetings

Anticipate possible say-on-pay challenges months before your next annual meeting and model any planned adjustments.



Investor Solutions ⌄     Corporate Solutions ⌄     Who We Serve ⌄

## Related Products and Services

### Governance Hub

Flexible stewardship solutions, ranging from custom services to active engagement, backed by an advanced reporting platform.

Learn More →

### Equity Compensation Advisory

Timely, in-depth governance research and recommendations for proactive decision-making.

Learn More →     

### Engagement Meetings

Expert analysis and vote recommendations to navigate critical corporate events with confidence.

Learn More →

## Explore Our Insights

Visit Our Resource Center

### Regul Matte

**Glass Lewis Respon...**

### Product

**Q1 2025 Active Stewards...**

### Regulat Matters

**Glass Lewis Submission on APRA's...**

### Controv Roundu

**Fuji Media & Keisei Electric...**



Investor Solutions ⌄     Corporate Solutions ⌄     Who We Serve ⌄

About Us
Careers
Issuer

Investor
Relations
Careers
Login
Issuer

Blog
Article

Learn
More →

Guides

Reports &
Surveys

Learn More →

Blog Article

Learn More →

Blog Article

Learn More →



Privacy
Statement

Compliance

Terms of Use

Policy Guidelines

Issuer Resources

Careers

FOLLOW US ON
SOCIAL

  

Glass Lewis provides
independent corporate
governance research and proxy
voting services, helping
investors and corporations
make informed decisions.

© 2025 Glass, Lewis & Co. LLC, and/or its affiliates. All Rights Reserved.

**<u>EXHIBIT 7</u>**



About Us          Careers          Issuer
Relations          Login

Investor Solutions ⌄          Corporate Solutions ⌄          Who We Serve ⌄

CORPORATE GOVERNANCE AND ESG DATA  ❯
EXECUTIVE COMPENSATION DATA

# Actionable Data on Company Compensation Programs

Our comprehensive executive compensation data and models enable investors to cast more informed 'say-on-pay' votes and enhance their engagements.



Request More Information

Executive pay is closely examined by investors to ensure practices are aligned with shareholder interest.
Glass Lewis' Executive Compensation data and tools provide



Investor Solutions ⌄     Corporate Solutions ⌄     Who We Serve ⌄

# Key Features and Benefits



### Benchmark Companies Against Market and Industry Peers

Contextualize compensation programs within each company's operating environment to better assess effectiveness and appropriateness. Compare pay quantum using flexible calculation methodologies and monitor relative pay-for-performance alignment based on your preferred metrics.



### Assess Incentive Plan Design

Understand which award vehicles are used in company incentive plans, and the selection and rigor of performance metrics used. Compare pay outcomes with disclosed target pay levels by award.



### Strengthen Engagements

Equip your team with the insights needed to ask informed questions and engage effectively with companies about their compensation practices during meetings.



### Analyze Share Requests and Equity Plan Proposals

Assess strengths and potential misalignments of current and future equity plans before casting critical votes using our proprietary Equity Compensation Model.



About Us    Careers    Issuer
Relations    Login

Investor Solutions ⌄    Corporate Solutions ⌄    Who We Serve ⌄

## Compensation Modeling

Access the governance data, analytics and flexible models behind Glass Lewis' global research, recommendations, equity compensation model, and voting policies.

Learn More →



## Proxy Research (Proxy Paper)

Expert independent analysis and recommendations on all the proposals put to a vote at tens of thousands of shareholder meetings around the world each year.

Learn More →



## Stewardship Solutions

Streamline and extend your team's engagement efforts and meet evolving reporting requirements with solutions to accommodate a range of needs, from software-based tracking to fully customized engagement campaigns.

Learn More →



# Explore Our Insights

Visit Our Resource Center

Regul Matte

Product

Regulat Matters

Controv Roundu

**Glass Lewis Respon...**

**Q1 2025 Active Stewards...**

**Glass Lewis Submission on APRA's...**

**Fuji Media & Keisei Electric...**



Investor Solutions ⌄          Corporate Solutions ⌄          Who We Serve ⌄

Blog
Article                    Guides

                           Reports &           Blog Article            Blog Article
                           Surveys

Learn    →                 Learn More  →       Learn More  →           Learn More  →
More



Privacy              Policy Guidelines         FOLLOW US ON
Statement                                      SOCIAL
                     Issuer Resources
Compliance
                     Careers                       
Terms of Use

Glass Lewis provides
independent corporate
governance research and proxy
voting services, helping
investors and corporations
make informed decisions.

© 2025 Glass, Lewis & Co. LLC, and/or its affiliates. All Rights Reserved.

**EXHIBIT 8**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/opinion/proxy-advisory-firms-glass-lewis-institutional-shareholder-services-esg-investing-761e044f

**OPINION**   REVIEW & OUTLOOK   Follow

# *Cracking the Proxy Advisory Duopoly*

Glass Lewis and ISS have a 97% market share and conflicts of interest.

By The Editorial Board   Follow

July 12, 2023 6:24 pm ET



PHOTO: GETTY IMAGES/ISTOCKPHOTO

Corporations these days face an onslaught of environmental, social, and governance (ESG) proxy resolutions from progressive investors. But the real driving force behind this campaign is the proxy advisory duopoly, Glass Lewis and Institutional Shareholder Services (ISS). On Thursday the House Financial Services Committee will shine a much-needed spotlight on these firms and their conflicted business models.

Proxy advisory firms can provide valuable services to investors. Yet Glass Lewis and ISS, both foreign-owned, boast outsize clout in U.S. corporate elections and make up an estimated 97% of the proxy advisory market. A 2018 article in the Harvard Law School Forum on Corporate Governance found the two firms can swing between 10% and 30% of shareholder votes. Another study by the American Council for Capital Formation found that 175 asset managers, controlling more than $5 trillion in assets, voted with ISS more than 95% of the time.

Both firms supported a shareholder resolution this year by New York City's pension funds requesting an audit of Starbucks's labor practices. It passed with 52% support. Last year they lent critical support to a resolution for an independent racial equity audit at McDonald's, which carried with 55%.

Both proxy firms disclose general guidelines on how they develop recommendations, but they give themselves wide discretion. Glass Lewis says "we may recommend voting against responsible directors" where it finds climate disclosures "to be absent or significantly lacking." What qualifies as "significantly lacking"?

ISS says it will "generally vote against" directors "in cases where ISS determines that the company is not taking the minimum steps needed to understand, assess, and mitigate risks related to climate change to the company and the larger economy."

Companies are left guessing what they need to do to win the duopoly's blessing. One solution: Pay ISS for advice on how to satisfy ISS. The firm has a consulting arm that advises corporations on how to "manage investor expectations" and design "ESG programs to align with company goals, reduce risk, and manage the needs of diverse stakeholders."

ISS Corporate Solutions says it helps companies "maximize your appeal to investors" and "deliver insight into what institutional investors are looking for." Its consultants know what institutional investors are looking for because its advisory firm directs them. This would be like Harvard flogging services to parents on how to get junior into Harvard.

Glass Lewis says it provides "active ownership engagement" to institutional investors "to collectively influence your companies, ensuring the highest standards of transparency and best practices in ESG are maintained." Shareholder activists also pay Glass Lewis to boost their campaigns. It's hard to believe its activist clients don't influence the firm's recommendations.

There's also a broader conflict between the financial interests of the advisory firms and those of its clients that aren't pursuing ESG goals. The latter include public pension funds that under state law are required to pursue the financial best interest of retirees.

"Each of you offers a substantial number of services related to ESG investing," 21 state Attorneys General wrote to the duopoly firms in January. "The value of these services would be undermined if you were to admit in your advisory services that ESG factors are not material to a firm's financial performance."

Glass Lewis says it discloses to clients when "there is a significant actual, potential, or perceived conflict." ISS says it maintains a firewall between its advisory and consulting services, but it permits communications between consulting and research teams on general policy development and "new solutions."

\*\*\*

Former Securities and Exchange Commission Chairman Jay Clayton sought to rein in the duopoly by defining proxy advisory recommendations as "solicitations" under securities laws. This would have allowed them to be sued for making factual errors or misleading statements. His rules also required the firms to disclose their conflicts of interest.

ISS sued to block the rule, but why oppose the rules if it is as transparent as it claims? In any case, the Democratic SEC majority under Chairman Gary Gensler rescinded the rules in 2022. The duopolists want to impose onerous reporting burdens on public companies, ranging from climate to racial equity, while avoiding accountability and disclosure themselves.

All of which means there's an opening for Congress to codify Mr. Clayton's reforms. The states are also on the case, with AGs noting in their letter that proxy firms may be violating their contractual obligations to pension funds to maximize the "economic value of the investments." Strive has launched a competing proxy advisory service, and antitrust action might be warranted.

ISS CEO Gary Retelny recently wrote an apologia in the Harvard Law School Forum on Corporate Governance claiming that "our proxy advice is apolitical." That's not what the public record shows. Corporate boards and investment advisers can be sued if they violate their fiduciary duty. Why should the duopoly get a pass?

## Videos

**<u>EXHIBIT 9</u>**

## Title

Gentex Corporation (NASDAQ:GNTX) Q1 2025 Earnings Call Transcript

## Presentation

Gentex Corporation reports earnings inline with expectations. Reported EPS is $0.43 EPS, expectations were $0.43.

**Operator:** Good day, and thank you for standing by. Welcome to the Gentex Corporation Reports First Quarter 2025 Financial Results. At this time, all participants are in a listen-only mode. After the speakers' presentation, there will be a question and answer session. To ask a question during the session, you will need to press 11 on your telephone. You will then hear an automated message advising your hand is raised. To withdraw your questions, please press 11 again. Please be advised that today's conference is being recorded. I would now like to hand the conference over to your speaker today, Josh O'Berski, Director of Investor Relations. Please go ahead. Thank you.

**Josh O'Berski:** Good morning, and thank you for joining us today for our first quarter 2025 earnings conference call. I'm Josh O'Berski, Gentex Corporation Director of Investor Relations. And with me today are Steve Downing, President and CEO, Neil Boehm, COO and CTO, and Kevin Nash, Vice President of Finance and CFO. Please note that a replay of this conference call webcast and edited transcripts will be available after the call in the Investors section of our website located at ir.gentex.com. As a reminder, many of the comments today contain forward-looking statements based on current expectations. These forward-looking statements are subject to known and unknown risks, including those set forth in our first quarter 2025 earnings press release and our annual report on Form 10-Ks for the year ended 12/31/2024, as well as other general economic factors.

Should one or more of these risks or uncertainties materialize, or should underlying assumptions or estimates prove incorrect, actual results may vary materially from those that we expressed today. Before we jump into our prepared remarks, I wanted to take a moment to address the upcoming annual shareholder meeting and the proxy vote. As in prior years, Glass Lewis has recommended the shareholders vote against our Nominating and Corporate Governance Committee Chair, Ms. Leslie Braun, due to a lack of female representation on our board. And so once again, we encourage shareholders to ignore Glass Lewis. In their explanatory documents, Glass Lewis claims to provide a comply or explain approach in their recommendations. In prior years, we have attempted to explain our stance by reiterating our support for Ms. Braun, who is an exemplary member of our community and our board.

We have also pointed to the continuing progress Gentex Corporation has made in increasing the diversity of our board's demographic background since 2016, when Ms. Braun first joined our board. This form of explanation does not seem to have hit home with Glass Lewis, so this year, I will attempt a more direct approach. Recommending shareholders vote against a female board member is an illogical approach to increasing female representation on boards. If Glass Lewis is in fact seeking to increase diversity on boards, Glass Lewis needs to update their policy to take into consideration the Nominating and Corporate Governance Chair's gender and demographic background before recommending a vote against. Glass Lewis also noted difficulty in identifying our board's reported demographic breakout.

While NASDAQ no longer requires this breakout, we continue to follow Nasdaq's prior guidelines for disclosure. As such, this information is easily found on our website in the Board of Director section at IR.Gentex.com and also included each year at the back of our annual reports. Our hope is that shareholders who use Glass Lewis' services would reach out to them to express support for this logical approach and, at the same time, continue to support Ms. Braun's role on our board. I would welcome any calls with investors who use Glass Lewis for their proxy voting recommendations, and I'm happy to clarify Gentex Corporation's position on items contained within these reports. I will now hand the call over to Steve Downing for our prepared remarks.

Steve?

**Steve Downing:** Thanks, Josh. Deep breath. Deep breath. For the first quarter of 2025, the company reported net sales of $576.8 million compared to net sales of $590.2 million in the first quarter of last year. In the first quarter, global light vehicle production increased by 1% compared to the first quarter of last year, but decreased 3% quarter over quarter in the company's primary markets of North America, Europe, Japan, and Korea. Also during the first quarter, trim mix within the light vehicle production build remained weak versus forecast across all major regions, but especially in our primary markets. The trim mix impacted take rates for several features, but especially our exterior mirror unit shipments, which were down 15% quarter over quarter in North America and 8% internationally.

Overall, the weakness resulted in a sales shortfall of approximately $25 million to $30 million for the quarter. For the first quarter, the gross margin was 33.2%, compared to a gross margin of 34.3% for the first quarter of last year. Compared to the first quarter of 2024, the gross margin declined as a result of lower revenue, unfavorable product mix, and new tariff costs that began in the first quarter of this year. Sequentially, the gross margin improved by 70 basis points as a result of purchasing cost reductions and higher sales levels versus the fourth quarter of 2024. Overall, despite the lower than anticipated revenue, and the weaker than anticipated mix, our sequential margin improvement in the first quarter resulted in a solid start to this calendar year.

In addition to the revenue headwinds, the gross margin was also impacted by new tariff expenses of approximately $650,000 in the quarter that were not reimbursed during the quarter. We remain committed to the cost improvement initiatives already underway and we are actively expanding this program to help identify additional efficiencies to help offset the margin pressures that are likely to be created due to the pending tariff impact. Operating expenses for the first quarter increased by 8% to $78.7 million compared to operating expenses of $72.9 million in the first quarter of last year. Total operating expenses for the first quarter of 2025 were impacted by severance-related expenses of $2.9 million versus zero severance charges in the first quarter of last year.

Operating expenses are moderating in 2025, which is in line with our expectations. During the first quarter, the severance-related expenses of $2.9 million were primarily related to early retirement incentives offered to long-tenured employees. Additionally, the company incurred one-time expenses during the first quarter related to the VOXX merger of approximately $900,000. In total, the severance and merger-related expenses accounted for nearly two-thirds of the quarter-over-quarter operating expense growth, which means the core expense growth was less than 3% for the quarter. Income from operations for the first quarter was $113 million compared to income from operations of $129.3 million for the first quarter of last year. Other income was $600,000 during the first quarter compared to other loss of $1.7 million in the first quarter of last year.

The quarter-over-quarter change was driven by increased investment income as well as reduced losses on other investments versus the first quarter of last year. During the first quarter, the company had an effective tax rate of 16.5% compared to an effective tax rate of 0.2% during the first quarter of last year. The quarter-over-quarter change in the effective tax rate was driven by lower tax benefits on stock-based compensation compared to the first quarter of 2024. Net income for the first quarter was $94.9 million compared to net income of $108.2 million for the first quarter of last year. The change in net income for the first quarter was primarily driven by the changes in net sales and income from operations compared to the first quarter of last year.

Earnings per diluted share for the first quarter were $0.42 compared to earnings per diluted share of $0.47 for the first quarter of last year. Earnings per diluted share for the first quarter of 2025 decreased as a result of a decrease in net sales and operating income, partially offset by an increase in other income on a quarter-over-quarter basis. Thank you, and I'll hand the call over to Kevin for some further financial details.

**Kevin Nash:** Thank you, Steve. For the quarter, automotive net sales in the first quarter were $563.9 million compared to $577.6 million in the first quarter of last year. Auto-dimming mirror unit shipments decreased by 7% during the first quarter compared to the first quarter of last year. Other net sales in the first quarter, which includes dimmable aircraft windows, fire protection products, and medical devices, were $12.9 million compared to other net sales of $12.6 million in the first quarter of last year. Fire protection product sales were $6.7 million in the first quarter compared to $6.8 million for the first quarter of last year. Aircraft window sales were $4.9 million compared to $5.8 million for the first quarter of last year.

And other net sales for the first quarter also included biometric product sales of $900,000 as well as $400,000 in sales of the Ecyte Go medical device, which is in comparison to no sales for either of those products last year. Share repurchases. During the first quarter of 2025, the company repurchased 3.1 million shares of its common stock at an average price of $24.52 per share. As of March 31, 2025, the company has approximately 6.3 million shares remaining available for repurchase pursuant to previously announced stock repurchase plan. The company intends to continue to repurchase additional shares of its common stock in the future in support of the previously disclosed capital allocation strategy, but share repurchases will vary from time to time and will take into account macroeconomic issues, market trends, and other factors the company deems appropriate.

Shifting over to the balance sheet. The balance sheet comparisons mentioned today are as of March 31, 2025, compared to December 31, 2024. Cash and cash equivalents were $286.6 million compared to $233.3 million. Short-term and long-term investments combined were $321.2 million, down from $361.9 million, which includes fixed income investments as well as the company's equity and cost method investments. Accounts receivable was $330.6 million, up from $295.3 million due to the size and timing of sales during the quarter. Inventories were $408.9 million, down from $436.5 million. And accounts payable decreased to $162.9 million, a decrease from $168.3 million. Looking at preliminary cash flow items for the quarter, First quarter 2025 cash flow from operations was $148.5 million compared to $129.9 million for the first quarter of last year.

Capital expenditures were $36.7 million compared with $31.9 million for the first quarter of last year, and depreciation and amortization for the first quarter was $25.5 million compared with $24 million for the first quarter of 2024. I'll now hand the call over to Neil for a product update.

**Neil Boehm:** Thank you, Kevin. In the first quarter of 2025, there were 21 net new nameplate launches of our interior and exterior auto-dimming mirrors and electronic features. It was again a busy launch quarter with approximately 60% of these net launches being advanced feature launches. For the advanced features in the quarter, full display mirror, HomeLink, and outside auto-dimming mirrors led the way. We're pleased to announce that we are shipping a full display mirror and camera to a forward and rearward digital video recorder to Ford on the Transit and Pormeo vehicles. This is a great and challenging launch for the Gen six team since it was the first commercialization of our full display mirror product through the addition of new feature content, new display technology, and diving deeper into the user experience. This product has been a great growth driver for us these past few years, and we continue to invest in its evolution to stay ahead of the competition. Additionally, we're excited to announce that our first driver monitoring system launched is now available and has been shipping on the Rivian R1T and R1S vehicles.

For this program, Gentex Corporation packages the camera, infrared illuminators, and some local processing in the mirror, while the overall driver monitoring algorithms are contained in a different module outside the mirror. This is the first of four different launches of driver monitoring we've been discussing. The other launches are still on plan to go into production later in 2025 and into early 2026. Gentex Corporation is an excellent innovation and technology company with a strong launch pipeline of automotive and non-automotive products. Even with the market conditions we're facing today, we are still seeing strong demand for full display mirror, HomeLink, and several other new and exciting products we displayed at CES earlier this year, like large area devices.

So even though there are challenges, all of the R&D we've been investing in over the past few years will help us to recover and drive growth into the future. I'll now hand the call back over to Steve for guidance and closing remarks.

**Steve Downing:** Thanks, Neil. The company's current forecast for light vehicle production for the second quarter of 2025 and full years 2025 and 2026 are based on the mid-April 2025 S&P Global Mobility forecast for light vehicle production in North America, Europe, Japan, Korea, and China. As a result of the current and expected tariff escalation in the China market, the company has proactively halted production of interior and exterior mirrors destined for customers in the China market. Subsequently, many of our customers based in China have canceled or paused orders at this time while we work these customers to better understand their ability and willingness to pay the elevated prices resulting from the new tariff rates.

Currently, global light vehicle production is expected to be down 2% for the second quarter of 2025 compared to the second quarter of last year. Light vehicle production in our primary markets of North America, Europe, Japan, and Korea is expected to be down approximately 6% in the second quarter of 2025 compared to the second quarter of last year. Light vehicle production estimates for 2025 in North America, Europe, Japan, and Korea have weakened significantly since the beginning of the year and is currently forecasted to decline approximately 5% compared to light vehicle production in calendar year 2024. The latest forecast for light vehicle production in North America estimates that the last three quarters of 2025 will be down approximately 11% versus the same period last year.

Lastly, light vehicle production for calendar year 2026 is now forecasted to be flat in our primary markets compared to calendar year 2025. Second quarter 2025 and calendar years 2025 and 2026 forecasted light vehicle production volumes from S&P Global Mobility are shown in our press release from earlier this morning. Based on the current light vehicle production forecast, and actual results for the first three months of 2025, as well as the proactive decision of the company to halt production and sales of product intended for the China market until customer agreements can be reached, the company is making certain changes to its previously provided guidance for calendar year 2025 as follows. Revenue for the year in our primary markets is now expected to be $2.3 billion and $2.2 billion.

Revenue for 2025 in China is expected to be between $50 and $120 million, of which $43 million was shipped to the China market during the first quarter of this year. Gross margins for the year are expected to be between 33-34%. Operating expenses are expected to be between $30-310 million. Our estimated annual tax rate is forecasted to be between $10-125 million, and depreciation and amortization is forecasted to be $85-90 million. The company's revenue guidance has been updated based on the current tariff environment and provides additional detail regarding revenue from the company's primary markets while separately identifying revenue from the China market. This additional detail regarding the company's revenue is included for the time being to allow investors to better understand the company's exposure in the China market due to the impact that tariffs are expected to have on this market.

Additionally, the revenue estimates above do not include any revenue from the recently completed merger with VOXX. At this time, the company is withdrawing revenue guidance for calendar year 2026 due to the significant uncertainty surrounding the China market, as a result of the impact of incremental tariffs on company exports to China, the economic impact of import and export tariffs on the company's primary markets, and works being done to finalize a more complete financial picture of the recently completed merger with VOXX. The company anticipates providing updated financial guidance for calendar year 2026 once there is further clarity in the overall tariff landscape. On 04/01/2025, the company closed on the strategic merger of VOXX, a global supplier of automotive and consumer electronics, as well as premium audio equipment.

As of April 1, the company expected to add between $325 and $375 million in revenue from the merger on an annualized basis and an expected revenue contribution to calendar year 2025 of approximately $240 million to $280 million any impact from tariffs. As a result of recent tariff increases, the company has notified its new customers from the VOXX merger of future price increases that will take effect throughout the balance of calendar year 2025. These price increases may create uncertainty in consumer demand for this year, which could affect the expected revenue contribution from the VOXX merger. The company is also undertaking strategic sourcing decisions that will take place throughout the next six to twelve months, which are designed to significantly reduce tariff expenses on incoming products from the China market.

The last few months have been undeniably chaotic as we work to understand the impact that tariffs will have on our supply chain and sales channels. The extent of the impact to revenue for the year depends on how much sales into the China market will be limited by the counter tariffs that are in place for our exports, as well as how much additional cost our OEM customers and company will be willing to pay for the additional import tariffs. While the tariffs will create some headwinds for the company, we still believe that the product portfolio and the new technologies in development will provide a strong revenue trajectory over the next five years. In terms of profitability, we have made good strides in our gross margin recovery efforts, and we'll continue to execute the plan as well as additional opportunities that the team has identified to improve the long-term profitability of the business.

In the short term, however, as we secure reimbursement for tariffs on imports, the gross margin guidance will be impacted as we add costs and reimbursements that don't include margin dollars. As we move through the year, we will be monitoring revenue closely, adjusting expenses to align to the market conditions. Lastly, the strength of the company's balance sheet puts us in a favorable position to capitalize on the pullback in our share price as we consider higher levels of share repurchases. That completes our prepared comments for today, and we can now proceed to questions.

**Operator:** Thank you. To ask a question, you need to press 11 on your telephone and wait for your name to be announced. To withdraw your question, please press 11 again. Please standby while we compile the Q&A roster. One moment for our first question. Our first question will come from the line of Luke Junk from Baird. Your line is open.

**Luke Junk:** Good morning, everyone. I want to start with the topic of the day, Steve, on tariffs and maybe if you could just walk us through what is contemplated in the current guidance in terms of top-line impacts specifically. I would assume those are mostly production in nature. And then from a margin and a cost standpoint, what's in guidance right now? And, clearly, there's some things out there right now in terms of tariffs on electronics and semiconductors. Have you contemplated any of those things yet, or maybe if you could just comment on what the exposure might look like there as well? Thank you.

**Steve Downing:** Yeah. So if you look at the I will start with the revenue. If you look at the China revenue that we provided in the press release, so that $50 to $120 million range for the China market, you know, that's down about $100 million versus what our beginning of the year forecast was for the China market before the tariffs. So that one kind of encapsulates I mean, we're really, we are somewhere in the $220 to $240 million range is what we had estimated for China at the beginning of the year. And so pretty significant impact there. Like we mentioned, of that low end, $50 million, $43 million of it's what we already shipped in Q1. So we're basically kind of taking almost a worst-case scenario saying on the low end, it would be as if we really didn't ship anything else the rest of the year.

And so on the high end and saying it's definitely not going to be what we expected the year to be. On the flip side of that, you look at our primary markets, that overall revenue came down roughly about $100 million, $150 million versus our beginning of the year into where we are today looking forward. And that's really driven by the deterioration in the North American market. I mean, really, Europe and Japan, Korea are struggling too, but the North American market down 11% through the remainder of the year is where most of that impact is happening. A lot of it in the OEC side, definitely some on the FDM side our beginning of the year forecast. On the margin side, what we're looking at and the reason why we lowered the margin range for the year by 50 basis points is if you look. If you run the numbers on what it anticipated tariffs could look like for the year and you add that cost in, and you add in the reimbursement for it, but then you back calculate your margin profile, it drops at 50 to 100 basis points if we're only getting we're only getting reimbursement and no margin dollars, which is obviously what we expect after going through this you know, few the last few years.

We kind of know how these are going to be handled with our OEM customers. And that's kind of our expectation is that they all don't go away. And that they do put about a 50 basis point at least headwind on our overall margin profile. That helped, Luke.

**Luke Junk:** Okay. And then in terms of the VDXX specific impacts, understand there's a lot of unknowns there right now, but maybe if you could just help you understand the footprint and what's going to need to navigate is that mostly China related?

**Steve Downing:** Yeah. Correct. So most of it is imports from China on the supply side. And so, what we're working through right now in the in the VDXX team's done a really good job of this is proactively looking for alternative suppliers you know, globally to help replace the supply chain that is in China market. Obviously, when you look at VDXX, the interesting part is, you know, their part of their business is just like ours, you know, automotive requirements, and so that takes a little longer. On the consumer audio side, that's where they have some advantages. They can move quicker because of the ability to be self-sufficient and really your own quality and improvement performance standards are what drives your ability to change locations. And so they have a little more flexibility to move faster on the audio side than what we have on the automotive side.

**Luke Junk:** Got it. And then lastly, just the, on the updated FDM outlook, Steve Borneo, if you could just walk us through the permutations there, how much of it is Trimix related? Versus just the underlying volumes in North America? Thank you.

**Neil Boehm:** Yeah. I think for at this point, the majority of that, Luke, is attributed to the volume impact that we're seeing. Especially in the North America, as Steve mentioned, as that's significantly reducing in this last three quarters. From what we saw beginning of the year into where we are today looking forward. That volume reduction has a correlating impact to what we're seeing on the actual FDM potential. We still definitely seeing growth. I think that's a really important part. Right? Even with all the chaos and with the reductions, we're still seeing some decent growth of up to, let's say, a hundred thousand units, but we do see some pullback a little bit just due to that reduction.

**Luke Junk:** Got it. I'll leave it there for now. Thank you.

**Operator:** Excellent. Thanks, Luke. One moment for our next question. Our next question will come from the line of Ryan Brinkman from JPMorgan. Your line is open.

**Ryan Brinkman:** Great. Thanks for the comments on China. That was my first question, you know, how you think your focused business model may be holding up or how you expect it to hold up in the current environment. On one hand, you import relatively little, but as we see, you're subject to these retaliatory tariffs. So is China the only region where you've experienced that so far? I think maybe there were some tariffs from Canada on parts that were suspended. And I recall in 2017, you had maybe, you know, during the section 301 tariffs, you'd repurposed an existing warehouse in China. Primarily distribution to also include some final assembly. Do you have any flexibility to do anything similar or the tariff rates maybe just prohibitively high in comparison to 2017 for that to help?

**Steve Downing:** Yeah. So you're exactly right. Back then, what we had done was worked on a localization plan, meaning that what we are buying locally were plastics, metals, you know, more of the commodity-based products. We are shipping, you know, board and element or especially elements, so the auto-dimming element itself to China. And then our team in Shanghai was actually doing the final assembly to help lower the tariff rates and stay competitive in that market. Unfortunately, given the extreme level that these tariffs are at now, that's not going to be enough to really be competitive or at least temporarily, there may be OEMs who are willing to pay somewhat of a higher pay that higher price these tariffs. But if these stay in place longer term, it will have a very severe negative impact on our ability to export out of the US into the China market.

**Ryan Brinkman:** That's another question I had was the comment about ceasing oil production for the China market. Did I hear that right? Because I think it's because there's inventory in the market that is interchangeable between OEMs and some are canceling, you can repurpose that because I would have thought that for, like, some of the high-end German luxury brands, there would be that elasticity of demand there, for to pay, that for that product. Are some of the customers maybe willing to pay, or what are you seeing?

**Steve Downing:** Yeah. I mean, what we're seeing is some of them are starting to. But at the beginning, or we're working through those agreements right now. What all we're saying at that point with our customers saying, hey, given this new very high level of tariffs, we're not going to put we're not going to put blood, sweat, and tears into turning raw material into finished products. And then have you sell us in a month that you're not able to pay the higher tariff rate. So before we continue to expend resources into producing those parts, we want a confirmation from OEMs before we'll spend that money. And so, you know, we're ready. We have the inventory. We can make them as soon as, customer wants them, but we're not going to continue to build if they're unwilling to pay.

On the flip side of that, we do have we do have the tariff rate started, we have parts already in transit, and we have parts in our warehouse there. And so we do we did have several weeks of goods already available to them. And give us enough time to reach and hopefully, reach an agreement. And then if we do get those agreements, we're ready to start back production right away.

**Ryan Brinkman:** Okay. And then just lastly, I'm curious, what you might be hearing or think might happen on May 3. I think we're going to, you know, recut some of the section 232 tariffs and you know, there's been some discussion of being able to net, you know, exports against imports, and I don't know how that works. It's you're you know, importing, you know, different components other than main components. I'm not sure. But do you think that these tariffs might get better over term? Are you cautiously optimistic on that front? Or

**Steve Downing:** Well, I think given the extreme levels, especially you I mean, if you talk about the vast majority of this, I mean, the other tariffs, you know, you can work your way through. Really, what we're talking about on the severe impact side is the US-China trade war. And so if you look at those, I think we're cautiously optimistic that it's better than what the rates are right now that are being discussed. But one of the challenges it's been is, like you mentioned, there's verbal communication. There's rumors, innuendos. And so one of the things we're very focused on is we can't you can't fight against an aberration. And so we're trying to make sure before we make any permanent decisions, what is actually gone into law, what's happening, and then we'll move based on the finality of those positions.

I would say it seems unlikely to me that this continues to be at the rates that they're technically at right now for a long period of time. But you know, months are possible. And so that's where why we're just treading carefully and trying to be in constant communication with our customers about what they want us to do. So it's not a very threatening position by any stretch. It's saying, hey, we don't want to put you as a customer in a position where we're spending your money unwisely and we're definitely not going to do that with our own resources.

**Ryan Brinkman:** Very helpful. Thank you.

**Steve Downing:** Thanks, Ron.

**Operator:** Thank you. One moment for our next question. Our next question comes from the line of Ron Jewsikow from Guggenheim. Your line is open.

**Ron Jewsikow:** Yeah. Good morning, and thanks for taking my question. Take care. Yeah. Just a point of clarification on the section 232 tariffs on electronics, the I think the 50 to 100 basis points of margin pressure. Is that in the guide or incremental to the guide just as a point of clarification?

**Steve Downing:** That's in the guide.

**Ron Jewsikow:** Okay. And was that impact on the full year or annualized? The 50 to 100?

**Steve Downing:** That was the impact of 2025.

**Ron Jewsikow:** Okay. No. That's helpful. Just as we think about the tap over. And I guess just stepping back on kind of the China electrochromics market more broadly, I know there is some local competition, but any sense of what your market share is in China specifically? And I guess is enough local supply in China to offset whatever mirror shipment volumes you may lose? Or will those products just have to go without ECs?

**Steve Downing:** There's definitely a lot of knock-off competition in the China market domestically. There's not enough supply right now inside the China market to make up the volumes that we're producing. Especially on the OEC side. And so more than likely, if this continues, you'll probably see a lot of in the China market for those domestic Chinese OEMs. Because the supply base there wouldn't be able to pick up, you know, I mean, we're talking I forget what it is, three and a half million mirrors or so that's you know, going into the outside mirrors that are going into the China market from Gentex Corporation today. So that's where, you know, unfortunately, I think, you know, if this continues the way it's going without any relief on certain components, it's probably a decontenting that'll have to happen inside the China market on our technology.

**Ron Jewsikow:** Yeah. And I imagine exports of would prefer Gentex Corporation as the mirror supplier. Not to put words in your mouth, but given the

**Steve Downing:** Yeah. Yeah. We've always done better with JVs or global OEMs. That are doing business in the China market. Definitely higher take rates and mix. But we're also selling to domestic Chinese OEMs as well. And the knock-off guys will absolutely be able to pick up some of that volume, but nowhere near these I mean, this is a tremendous amount of capacity you have to have in place to produce that volume of mirrors. And so they won't be able to pick that up in the short run very easily.

**Ron Jewsikow:** Okay. And then on just VDXX, any kind of guardrails for dilution for this year and for 2026? Or should we still just kind of refer back to the potential cost savings from the initial announcement?

**Steve Downing:** I mean, if you look at their margin expectations, I think their post-acquisition high twenties gross margin and probably close to breakeven from a net profitability. Pre-tariff, you know, before the conclusion or the consideration of what tariffs that we have to consider. So not a from a net profitability or EPS perspective, not really a dilutive impact. I think the plan is in the July call to have better guidance in terms of, you know, side by side, what was Gentex Corporation as a standalone, what really a diluted where it'll be and then you'll get to see a little more clarity on the impact of VDXX on overall and what that roll-up. So, you know, for now, we're going to be, you know, pretty full disclosure in terms of the two different operating companies and what each of them mean.

**Ron Jewsikow:** Yeah. No. That's really appreciate the color, and thanks for taking my questions.

**Steve Downing:** Thanks, Rob.

**Operator:** Thanks, Rob. One moment for our next question. Our next question comes from the line of Joseph Spak from UBS. Your line is open.

**Joseph Spak:** Thanks. Good morning, gentlemen. Sorry to do this, but can we just be a little bit clearer on what tariffs are actually assumed for like, are you assuming the $232 electronic and semis tariff go in or not? Like, what about, you know, I know there were some sort of counter tariffs from Europe. And maybe you could just help us understand on a COGS dollar or percentage basis, like, what figure we're talking about here on the potential electronics or semi towers. I don't think that's going to be, you know, passed through, but I just want to sort better get a better framework around what you really are thinking about here.

**Steve Downing:** Yeah. So to be clear, yes. We're assuming that, yes, the tariff expenses are in there. And we're assuming right now it's probably going to be it's not going to be the worst-case scenario. It's definitely not going to be a best-case scenario. Kind of what we're modeling is somewhere in that $50 million range, and incremental cost of goods sold for the year, but we'll get reimbursement on those. So if you run an extra $50 million through the top line and through the cost section, why you see the margin pulled back by 50 basis points. On a full-year basis.

**Joseph Spak:** Okay. And that's on the electronics as if that includes a potential tariff on electronics? That's our import. Yep. That's in our direct imports. Yeah. That's on our direct imports. There's a little bit of there's some nuance there that's much more difficult saying, hey, if someone's a tier three or tier four supplier out of the China market to one of our sub-suppliers, you know, it's that takes a little more time to calculate exactly what your exposure to that as well. But that's kind of what our thumb in the wind is right now for our estimate that we built these financials off of. And the European tariff primarily impacts the customers as well, but that's been also delayed. Right. And that wouldn't hit that won't hit COGS.

That's going to be in sale selling expense because it would be either the customer having to pay it or a little bit of our exports, you know, the European market were responsible. But the vast majority of those are the OEM would be on the hook to pay those.

**Joseph Spak:** Okay. And then just on VDXX, and it sounds like, you know, in response to the prior question, like, we'll get a lot more details in the future. But like, if you look, it's like, it seems like VDXX is running about $35 million a quarter OpEx. Is that about right? And then, you know, how preliminarily are you thinking about, you know, elasticity for some of that VDXX product to potentially having to raise prices. It's you know, I know you're probably still working through, but think on our side, we have, you know, very little familiarity with that business. So any commentary would be helpful.

**Steve Downing:** Yeah. I mean, you look at operating expenses, a lot of that has to do with being a public company, things like insurance. And so you have a bunch of synergies that happen right away in the operating side, and we're going through a lot of those things right now, not to mention DNA from previous acquisitions. And so some of that stuff will get cleaned up, is why we're not comfortable to give you a straight-up OpEx number. And then on the revenue side, you're absolutely right. The elasticity of what is a price increase to a consumer product like that. The fortunate part that we have is that many of the competition of the VDXX market, or they're in the same boat. Their supply chain is exactly the same.

So you know, it's not like one price increase of a product is not going to be met by a competitive price increase somebody else. So yeah, I mean, that's the thing that is the million-dollar question of what is the price increase due to your ultimate forecast demand. So you may have increased revenue from the price, but reduced units. So the team, the VDXX team, to their credit, has been pretty thorough that already. Really pretty much in advance. So that's why we took on working something through in July.

**Joseph Spak:** Okay. Maybe I could just sneak one more. And I know you always provide the S&P outlook, but I think you sort of do that as a guide. You historically, I think, have sort of made some of your own internal assumptions, especially for sort of the quarter

other level ___ in with your company's thinking?... to the forward ___ cross-hair on what happens from a tariff perspective in line with your company's thinking?

that, like, the assumptions they are making on what happens from a tariff perspective in line with your company's thinking?

**Steve Downing:** Yes. I'd start with you're exactly right. Historically, we've taken that as a kind of starting point. We would have told you that coming into Q1, that we were a little more pessimistic than the S&P, beginning of the year forecast. Because of tariffs at the time, just in general economically. Since that time, this one's really wild. Right? I mean, it is incredibly difficult. We kind of using it more as like a guidepost right now anything else just because it's impossible to predict these economic moves do to overall consumer demand. And pricing. And so, there's not a whole lot of choice. We are probably a hair negative as it relates to the impact that this will have on trim. Packaging going forward.

In other words, if these tariffs stick, you know, a lot of vehicles are going to see 20, 30% price increases. And what does that mean for our type of products? Right? Which in essence are consumer discretionary products inside of the automotive market. And so, we're probably a little even a little more negative than what S&P is. On their new forecast. Fortunately, though, they did take a pretty strong position on their adjustment into the North American market, which we would have absolutely agreed with question is, is it slightly worse than that even?

**Joseph Spak:** Yeah. Fair enough. Obviously, a lot of uncertainty, so I just wanted to understand your point of view. But thank you.

**Operator:** One moment for our next question. Our next question will come from the line of Josh Nichols from B. Riley.

**Josh Nichols:** Yeah. Thanks for taking my question. Obviously, it's tumultuous times in the automotive space, but good to see the company taking advantage of it on some very significant share buybacks. Just for a little bit of clarity, like, piecing it all together, if you kind of take what you have for the core business plus some rollbacks of some of these tariffs or pauses at the very least, and there's it's hard to say because there's no definitive agreement issue. Right? And there's nothing else really being done in China. I guess, like, we have seen some rollbacks of some of these tariffs or pauses at the very least, and there's it's hard to say because there's no definitive agreement issue. Mentioned. But if there is, you know, a significant alleviation in the tariff rate between the US and China. I would assume that that's not really built into the forecast. Today that you have and that that would be kind of an upside optionality. How should we think about that? Seems like what you have out there right now is kind of more a pretty bare case scenario. Is that accurate?

**Steve Downing:** Very accurate. I would say we cut we felt like we needed to rip the Band-Aid off because this is technically what the rates are as we stand. So we're trying to do our best to represent we think the financials are under that scenario. And so if like you said, if these push out, and continue to push out or come down significantly, that should provide some upside to this forecast.

**Josh Nichols:** Perfect. And then just we haven't touched on there's been so much focus on tariffs. But you did mention so you're still growing FDM. Despite all the headwinds there, but also the driver monitoring solution that's initially being rolled out. Could you talk about the expectations? I know probably not much revenue. Year given everything that's going on, but next year, longer term, you've talked about that being a multi-hundred million dollar a year business over a multiyear time frame. Is it still the expectation? And what are you seeing in the market in terms of interest for the product?

**Neil Boehm:** Yeah. That's still the expectation is driving the growth. With the launch, this year, we've got two of them coming up late this year into the beginning of '26. That's another one launching in early '26, so that'll be the four that we've been working on. And talking about. The launches will take a couple of years as they go across multiple platforms. So when you get through '26 and into '27 and '28, that's where you're starting to hit something that's significantly more material into the numbers that we've talked about before.

**Josh Nichols:** Appreciate the clarification there, and we are that. I'll hop back in the queue. Thanks.

**Steve Downing:** Great. Thanks, Josh.

**Operator:** Thank you. One moment for our next question. Next question comes from the line of Mark Delaney from Goldman Sachs. Your line is open.

**Mark Delaney:** Yes. Good morning. Thanks very much for taking my questions. You mentioned that you expect to offset the higher costs of tariffs for imports into the US with pricing. Maybe you can help us better understand your confidence in being able to fully offset those higher tariff costs and how far along are you in your negotiations toward that with your auto OEM customers?

**Steve Downing:** Yeah. We're making really good progress. In fact, several OEMs very and we've been through this before. Right? So over the last few years, right or wrong, we've developed a little bit of muscle memory as it relates to how to handle these. So this isn't the first time. A couple of years ago, it was more difficult because we hadn't really dealt with this problem before. And so several of the OEMs are being very proactive as reaching out, talking about monthly updates on what we're seeing. Others are going to be a little more challenging, but, you know, our posture is, this is a cost of doing business, and this isn't something that the supply base can afford to eat on its own. This is pretty much a standard response from most of the almost every supplier to OEMs as well.

So we feel like the model's there. The messaging's loud and clear. There won't be I'm not saying it's going to be easy or perfect, but I don't think it's going to be as challenging as it was last time. Because our customers understand the fragile nature of our supply base. And the fact that, you know, with these rates, no one can afford to absorb any of this type of, like, level of cost.

**Mark Delaney:** It's helpful, Steve. Did want to follow-up as well on what you're seeing with industry production. And thanks for all the detail you provided and how you're trying to forecast the core business. Could you talk though about what you're seeing with customer schedules at this point? Are you seeing OEMs adjust their build plans, and is that part of your thought process? And I know you referred to the S&P forecast as the guidepost, and there's a lot of uncertainty, but do you understand what you've seen so far with customer schedules?

**Steve Downing:** Yeah. I would say, you know, it's interesting. If you look at most of Europe and North America, the schedules have actually been, you know, pretty stable. There's not been a ton of, you know, movement there. Really, most of what we're seeing has been with the China market. And so it's, like we've we kind of proactively stopped. And then within a week or so, a week or two of that is when we start to see, you know, order cancellations or at least pauses and orders sliding out a few weeks. As our Chinese customers try to address what their demand is to us. So, fortunately, that was good. I mean, we were able to proactively get in front of it. I mean, just we're most worried about is we build all these products and then we have them sitting on the dock and there's never a whole lot of demand for it. So, fortunately, that was good. I mean, we were able to proactively get in front of it. I mean, just we're most worried about is we build all these products and then we have them sitting on the dock and there's never a whole lot of demand for it. So, fortunately, that was good. I mean, we were able to proactively get in front of it that it hasn't I mean, that was good. I mean, just we're most worried about is we build all these products and then we have them sitting on the dock and there's never a whole lot of demand. That's never sell.

Right? Which would be a worst-case scenario for us. So right now, the customer communication has been really good. I mean, so whatever the message is good, but at least the dialogue is happening. And so we feel like we're not wasting money right now building products that'll never sell.

**Mark Delaney:** So just one last one for me, if I could please. You mentioned you saw some deterioration of trim mix in the first quarter, and you imagine that from tariffs because they generally hadn't taken effect yet. Why do you think trim mix was softening in the quarter? Is that something broader macroeconomic trends, just the state of the consumer even tariffs? Some of market share or what might be behind that in your opinion? Thank you.

**Steve Downing:** Yeah. That's a great question. I think for us, one of the things we always watch or things like incentives and what's happening with our OEM customers. And, obviously, you know, if you look in the North American market right now, most OEMs are offering some type of incentive package. Right? Rebates, you name it. That's usually one of the early indicators that OEMs also are going to move into a cost-cutting mode. So, unfortunately, for a lot of our products, especially outside mirrors, a lot of OEMs will look for a way to, you know, cut the cost of a vehicle by removing some content. And hopefully, consumers not noticing it. Passenger side auto-dimming mirrors are one of those classic parts that OEMs will look to remove if they think they can get away with it without the customers getting upset.

So we saw a lot of that in Q1, which was obviously disappointing because we put a lot of capital in place to support OEC production levels. And so, it's not an efficient operating environment to say the least.

**Mark Delaney:** Thank you.

**Operator:** Thank you. One moment for our next question. Our next question will come from the line of Charlie Sloan from Oak Family Advisors. Your line is open.

**Charlie Sloan:** Good morning, guys. And, I need to not talk about tariffs but I'm going to try to avoid that conversation. Josh, are you saying then that the chairperson nominee is a woman? Can you believe it?

**Josh O'Berski:** Yes. I am. Yeah. Yeah. Thanks for clarifying, Travis.

**Charlie Sloan:** I was I just wasn't sure of the definition, but okay. That's helpful. And then secondly, you know, I noticed that there was a change in tone regarding you know, I would have thought that you guys would have talked about, you know, in the past about maybe increasing your line of credit make sure that you have available. And but this time, it's more about you guys feel pretty secure in your financial position to actually use some of the capital that you've created because of your excellent operating manufacturing capability and buy things that are really cheap like your own stock. And is that a change in tone that you sense yourself, or is that just a change in board direction or something?

**Steve Downing:** Yeah. I think it's really the change in tone is really we feel like I mean, understanding the market we're in, we understand some of the pullback in the industry, but we think this is way overdone in terms of our share price. And that's why you see us get a little more aggressive on the share repurchase side. On the of credit piece, we haven't drawn on it yet because even with finalizing the VOXX acquisition, we're still in a great spot from an overall cash standpoint. We're open drawing on that even if that even if that were to mean share repurchases. So we have an existing line of credit that's already available to us that's more than enough for what we need, and we're definitely in a position to be ready to become more aggressive if the stock continues to linger. At kind of in this range.

**Charlie Sloan:** Excellent. And then secondly, on the VOXX acquisition, that closes when?

**Steve Downing:** It closed now? It closed on April 1.

**Charlie Sloan:** Okay. April 1. Okay. And then what product are you most excited about as you look forward in terms of material contribution to the revenues, you know, two years in.

**Steve Downing:** From the VOXX or from in total?

**Charlie Sloan:** Actually, each.

**Steve Downing:** From Gentex Corporation, I'll call it old-fashioned Gentex Corporation to the VOXX.

**Charlie Sloan:** Yep.

**Steve Downing:** So I'll start with the kind of the core Gentex Corporation. So our primary things that we look at and say are very exciting from a long-term growth standpoint are the driver monitoring systems that Neil was talking about. And then we move into large area devices. Visors, sunroof, side windows, you know, core electrochromic technology, basically replacing a lot of the glass surfaces and substrates that you see in a vehicle today. All exciting. I would say our new place products or our new line of fire protection devices that are designed to go direct to consumer. It's kind of our first time going direct to consumer with an all-new feature set that no one's seen in the fire protection or security space before.

We just launched that now. And longer term, you know, you look at some of our work in the medical space, so the eSight Go, the wearables, for people with centralized vision loss, and then some of the other partnerships that we put in place, starting to expand our capability and, like you mentioned, our manufacturing expertise, in the medical and very exciting. On the VOXX side, one of the things that we're excited about is there's that biometric technology that they had that we've been working on for a while. And so getting a deeper tech base into the biometric space that we think will be very Some of the automotive electronics are also very exciting. One of them in particular is, VOXX was a supplier for the USPS postal trucks.

For vision systems. We believe there's a lot of opportunity to come up with a Gentex Corporation version of that product, which is USG alogy, guaranteeing security and electronic made in the US for that vehicle. And then also the premium audio space. As we talk about our play in home automation with our place product, home audio, we think, is a big part of that that we can help expand kind of a HomeLink brand and what we call our HomeLink smart home solutions brand into the home.

**Charlie Sloan:** Okay. That's great. I hate to not talk about tariffs, but the business is long as can. Break. Yeah. Right.

**Steve Downing:** Well, because we don't talk about products. Yeah. There's no way to forecast any of this. I mean, you guys have laid out pretty much a barricade. In our mind. In correct terms. You know? That's you guys can't forecast what the next week's going to be. You have to rely on the line. Right?

**Steve Downing:** That's correct.

**Charlie Sloan:** Yeah. So, anyway, great quarter. Keep up the good work. Thank you.

**Steve Downing:** Thank you, Charlie.

**Operator:** Thanks, Charlie. One moment for next question. Our next question will come from the line of James Picarriello from BNP Paribas. Your line is open.

**James Picariello:** Hey. Good morning, everybody.

**Steve Downing:** Morning. Morning.

**James Picariello:** I've got I'm heading back to the China question real quick. I apologize. You're guiding to the $85 million in sales for the full year. You recorded $43 million in the first quarter. So I just I assume what's baked in is another $42 million in the second quarter before you halt production. My ultimate question is, like, has Gentex Corporation shipped any units to China since the April 11 trigger date? Of the 100% plus tariff? Like do you have tariff costs that you already need to fight for recoveries?

**Steve Downing:** Yeah. There might have been one shipment that was already kind of in process that happened technically after that date, but we haven't actively shipped anything since then. But remember, we have a warehouse in China and so it has usually anywhere from seven to ten, twelve days of inventory on. And then, usually, there's another week or so of inventory in transit. That's on the surface or in the air, by the time these things go into effect. So that's where we look at and say, hey. We, you know, we know there's some amount of that. That stuff should be able to sell. Easily because it was already in before the date. And then we know there'll be some demand to despite the tariffs even if they stick around at this level where OEMs will need some parts just to get through a few week period until they can have a workaround.

And so that's where we come up with that estimate. It's kind of, like we mentioned before, kind of a I would say, it's probably a worst-case scenario.

**James Picariello:** Yep. Okay. That makes sense. That's pretty that's very clear. And then based on last year's $208 million or so in revenue in China, is there any way to size up just what constituted interior versus exterior mirrors mix and if there were any FDM shipments to the region?

**Steve Downing:** Yeah. That should have been roughly fifty-fifty, I think. I'm definitely taking a hip shot with that one. But if you look at it, it should have been somewhere in probably a million and a half IECs and probably 3 million or so OEC I think, would be my estimate there. Kevin's I'm looking for further detail to prove I'm wrong, but, that's just kind of a rough breakout. And we can follow-up with you too. If you would like that detail.

**James Picariello:** The FDM?

**Steve Downing:** Virtually none. Yeah. Yeah. Yeah.

**James Picariello:** Alright. Thank you, guys.

**Steve Downing:** Thanks. Nice, Jim.

**Operator:** Thanks. Thank you. And this concludes our question and answer session. I will now turn it back over to Josh for any closing remarks.

**Josh O'Berski:** Thank you, everyone, for your time and attention today and the good questions. Hope everyone has a good weekend.

**Operator:** Thank you for your participation in today's conference. This does conclude the program. You may now disconnect. Everyone, have a great day.

**<u>EXHIBIT 10</u>**

**esg**book

# Risk Score

## Methodology

## 2025

# Table of Contents

Overview ........................................................................................................................................2

Methodology .................................................................................................................................3

  Risk Score CORE .........................................................................................................................3

    Data Collection ..........................................................................................................................3

    Data Processing .........................................................................................................................3

    Principle Score Calculation ........................................................................................................6

    Pillar and Total Scores Calculation ............................................................................................7

  Risk Score PLUS ..........................................................................................................................7

    Principle News Signal .................................................................................................................9

    Adjust Category Scores ...........................................................................................................10

    Adjust Materiality Scores .........................................................................................................10

  Risk Score Exposure Flags .......................................................................................................11

  Appendix A: Principle Scores and Inputs .................................................................................. 12

  Disclaimer ...................................................................................................................................24

# Overview

The Risk Score provides investors and corporates with a transparent and systematic assessment of the sustainability exposure of corporate entities. The Risk Score measures company exposures, using a normative assessment, relative to universal principles of corporate conduct as defined by the ten principles of the UN's Global Compact (GC).

The Risk Score comes with a transparent methodology and full disclosure of the underlying data. This allows users to understand the performance drivers, explain score changes at each level of the assessment, and drill down to the associated raw data. The score is designed with both investors and corporates in mind. Investors can use the score as a universe selection tool by identifying companies that are more exposed to critical sustainability issues. Corporates can use the score to systematically assess their own exposures, conduct peer comparisons, and identify disclosure gaps.

The Risk Score has two complementary offerings:

1. **Risk Score - CORE**: Scores showing the alignment of company practises and actions to the UNGC and their resulting sustainability exposure, based on publicly available company reported data. Scores are derived using a transparent aggregation methodology.
2. **Risk Score - PLUS**: The PLUS score is the CORE score including Media and NGO coverage. It accounts for incidence and risk evident in news sources and NGO reports. Combined, CORE and PLUS scores allow users to differentiate performance based on company reported data (annual) and global news (daily).

The Risk Score includes the following components in both "Core" and "Plus" offerings:

- Total Scores – Aggregated Score from the 4 Pillars.
- Pillar Scores – Aggregated Scores for the 4 GC Pillars, from the 10 Principles.
- Principle Scores – 10 GC Principle Scores.

The Risk Score additionally includes the following component in the "Plus" offering:

- Exposure Flags – Flags showing poor performance in the 10 GC Principles



*Figure 1. Risk Score at a glance*

# Methodology

### Risk Score CORE

The Risk Score CORE uses publicly available company data to show the alignment of company policies, practises and actions to the principles of corporate conduct represented in the UN Global Compact. It can be used by investors and corporates for screening and universe selection, risk modelling, peer benchmarking, and identification of disclosure gaps. The Risk Score CORE is calculated in four steps:



*Figure 2. Risk Score CORE Calculations*

### Data Collection

The Risk Score is powered by ESG Book's proprietary data. ESG Book's proprietary data includes 450+ indictors across two data modules – ESG Raw Data and Emissions Plus – and cover 9,000+ companies. This data is collected in-house by sustainability experts and validated using more than 110 checks including checks on completeness, conformity, validity, accuracy, consistency, uniqueness, reasonableness, and timelines.

Upon collection, data points are standardized to SI units (for quantitative metrics), USD Thousands (for monetary metrics), and Tonnes CO2 Equivalent (for Kyoto Gases).

### Data Processing

The standardized data is used to create additional metrics including intensities, proportions, and growth rates. These derived metrics are calculated by integrating one or multiple metrics. Examples include Scope 3 disclosure, which results from the existence of Scope 3 quantitative data, and renewable energy consumption proportion, which results from dividing the total amount of renewable energy consumed by the total amount of energy consumed.

**Insights: Intensities, Ratios, and Growth Rates**

Absolute numbers of quantitative metrics can be misleading because they are related to company characteristics, particularly size. For example, it is reasonable to assume that, for any given industry, larger companies tend to have higher emissions, a larger amount of waste produced, and more injuries compared to smaller companies. Using absolute numbers in scores, would lead to systematic bias with larger companies receiving higher or lower scores, depending on the metric. However, if we look at the emissions per US Dollar revenue generated or per unit produced, we can control for the difference in company size. These intensities, ratios or growth rates are more suitable to measure sustainability performance because they capture efficiency of resource use rather than reflecting absolute amounts and company size.

The Risk Score is powered by 202 metrics from the ESG Raw Data and Emissions Plus modules, as well as our proprietary set of derived metrics. These metrics include quantitative metrics (e.g., injury rate) as well as categorical metrics (e.g., presence of GHG emissions reduction targets). The metrics measure preparation, i.e., what a company is doing to achieve sustainability goals (e.g., health and safety training), as well as outcomes, i.e., the actual sustainability achievements (e.g., injury rates). The comprehensive list of metrics can be found in Appendix A.



*Figure 3. Overview data selection*

Most companies report sustainability data on a yearly basis. To enable daily-updated scores, we forward-fill the data. During historical calculation we add a lag of six months to the reporting period end date to accommodate for the time needed to publish reports. This ensures that our scores reflect market knowledge at any point in time. We consider sustainability data valid for a period of up to two years. After this period, the data expires and

is no longer used in scores. Our live scores are powered by the most recent disclosures available. Hence, as soon as new data from a more recent disclosure is captured, it is used in our scores.

These metrics are transformed to a uniform scale ranging from 0 to 100. This is done using a relative scoring approach. Relative scoring expresses company performance relative to all other companies in a universe. This is achieved through kernel density estimation and percentile rank techniques. Put simply, the transformed data indicates where a company stands within a universe. A score of 100 indicates best and 0 indicating worst performance. A value of 50 indicates that the company's performance is average - meaning that about 50% of companies perform worse and 50% perform better.

### Insights: Relative Scoring

Relative scoring refers to techniques that standardize metrics based on (a) the reported value of a company and (b) the reported values of all other companies in the universe. The standardized metric is an expression on how well the company performs relative to all companies in the universe. Relative scoring allows us to identify 'best-in-class' performance and account for global trends and developments. Users can quickly spot changes in the positioning of companies that result from both companies' conduct as well as developments in the industry, sector, or universe, more broadly. An illustrative example of the latter is a push towards more sustainable practices in an industry that are missed by a particular company. The sustainability data of this company does not change. However, the standardized metrics and hence Risk Score will change as the company is losing its place against its peers. Hence, users can assess where a company stands in the field by looking at its score and without having to perform extensive comparative analyses.

### Insights: What is Kernel Density Estimation?

Kernel Density Estimation (KDE) is most easily understood by taking a step back and first looking at probability density functions (PDF). PDF are functions (or curves) that show the likelihood of a specific value for a certain sample space. A commonly known example is flipping a biased coin. We might repetitively flip the coin and record the outcomes. This gives us a 'likelihood' curve, which in this case consists of only two outcomes. This is the PDF. We can use this now to determine the likelihood of heads and tails for future flips. This is a simple example using discrete data. The same is possible for continuous data. PDF functions are constructed using observed data. As observed data is often not smooth, the resulting curves have undesired hills and valleys. This is where KDE is used. KDE is a way to create smoothened PDF functions for more accurate and consistent likelihood estimations.

How is this relevant for our scores? These functions – or, more specifically, the likelihood to achieve a certain value given a sample space – can be used to assess performance. Using KDE, we can calculate the likelihood for a company to have, for example, injuries that are 3.18 per million hours worked or lower. This can be used as a performance indicator. If this is unlikely given our sample space (which corresponds to the universe of scored companies), then that indicates good performance. If this is very likely given our sample space, then this indicates bad performance.

> **Insights: What are Percentile Rank Techniques?**
>
> Percentile Ranking is an approach to determine the 'likelihood' of a certain outcome, given a certain sample space. An easy example relates to university grades. These grades are sometimes expressed as a percentage value. The value indicates the likelihood to achieve this outcome given the specific cohort – or, more simply, how well a student performed in comparison to the students in their cohort. A value of 95 indicates that the student scored as good as or better than 95% of the cohort or put differently, there are only 5% of students who are better than this student. The underlying concept and application of Percentile Ranking Techniques are similar to that of KDE. Both are used to express an outcome, or performance, relative to a given sample universe as a likelihood or percentage value.

**Principle Score Calculation**

The Principle Scores offer a nuanced perspective on companies' sustainability exposure relative to 10 GC Principles (see  for detailed definitions of the issues). The Principle Scores are based on the UN Global Compact and provide the foundation for the higher-level Pillar and Total Scores.

> **Insights: The UN Global Compact**
>
> The Risk Score is built around the well-established UN Global Compact, the world's largest corporate responsibility initiative joined by over 17,000 businesses. The 10 Principles of the UN Global Compact outline basic principles of corporate conduct and serve as a guideline for all members on how to run their business sustainably.
>
> The UN's Global Compact categorizes the 10 Principles into 4 Pillars, which cover the major themes of corporate responsibility.  As such, the Risk Score reflects this framework in the hierarchy of its own scores, with the ten pillar scores rolling up into the four pillar scores, which roll up into the overall score.

The 10 Principle Scores are calculated based on the input metrics. Metrics are mapped to the respective categories under consideration of the following guiding principles:

a)  Topics are comprehensively operationalized. Key aspects of the underlying GC Principle are reflected in the selected metrics.
b)  Select metrics that cover all dimensions of risk management and prevalence as defined by the UNGC: Commitment, Monitoring & Assessment, Integration & Remediation, Communication, Action, and Evidence.
c)  Select metrics according to the specificity of the principle definition. Principles based on a specific issue (e.g. Child Labour) will have fewer metrics selected than Principles based on a broader there (e.g. Human Rights Support).

The list of underlying metrics for the 10 Principles is available in Appendix A.

Principle Scores are calculated as the weighted average of the underlying transformed metrics, ignoring missing values. Weights are determined by classifying metrics as either primary or secondary. Primary metrics are determined as :

1)  The policy metric on the central theme of the principle (e.g., Human Rights policy for principle 1: Human Rights Support)
2)  Evidence metrics that show that the company is acting against the theme of the principle (e.g., Money Laundering Lawsuits for principle 10: Anti-corruption).

Primary metrics receive twice as much weight as secondary metrics.

To receive a Principle Score, companies need to be part of our scoring universe (see *Insights: Universe Creation*) and report at least three metrics of the respective principle. The resulting scores range from 0 to 100 with higher values corresponding to better performance.

The resulting weighted averages are rescaled for better visibility of performance difference. This is done such that 50 still corresponds to average performance. The same scaling factor is applied to all principles

> **Insights: Universe**
>
> The Risk Score is powered by ESG Book's proprietary data. ESG Book's data universe includes 9,000+ companies and follows the constituents of MSCI ACWI IMI with additional sustainability disclosure relevant filters applied. The universe of the Risk Score is derived from this universe and corresponds to all companies who fulfil certain disclosure requirements. Notably, companies are included in the Risk Score universe if they disclose sufficient material information – i.e., at least four data points for two separate industry-material categories.

**Pillar and Total Scores Calculation**

The higher-level scores encompass two levels of abstraction. The Total Score provides a condensed view of a company's sustainability exposure in a single number, while the Pillar Scores provide insights into the risk relative to specific areas of corporate responsibility. The calculation of these scores follows a hierarchical logic. The Pillar Scores are calculated as the average of all underlying principle scores. The Total Score is calculated as the average of the four Pillar Scores. A company must have all four Pillar Scores in order to receive an overall Score.

# Risk Score PLUS

The Risk Score PLUS provides media and NGO coverage corrected scores that account for recent sustainability events. The Risk Score PLUS calculations include four steps:



*Figure 4. Risk Score PLUS Calculations*

Risk Score Plus systematically integrates publications of 3,000+ news and NGO sources across 170 countries. The processing of this data encompasses three steps:

**1. Article Tagging**

For each article, the corporate entities and topics covered are identified. This tagging process is done using Natural Language Processing (NLP; for details see *Insights: What Is Natural Language Processing?*). Topics are selected from a list of pre-defined sustainability issues. The result is a dataset that shows for each article the topics covered and the entities associated with them.

> **Insights: What Is Natural Language Processing?**
>
> Natural Language Processing (NLP) refers to a set of algorithms used to process, analyze, and structure large amounts of written or spoken data. Using techniques from linguistics, computer science, and artificial intelligence, NLP enables computers to 'understand' texts including contextual relations and gradations. The algorithms enable users to automatize the extraction of information – such as sustainability issue or corporate entity – from texts and the categorization of documents, such as positive, negative, or neutral news (see *Insights: What Is Sentiment Analysis?*).

**2. Sentiment Analysis**

Sentiment analysis is an NLP technique used to determine the emotional tone conveyed in a text. Applying this technique to the news articles provides insights as to whether the publication reports on good or bad corporate performance relative to the sustainability issue.

> **Insights: What Is Sentiment Analysis?**
>
> Sentiment analysis is an NLP technique that involves data mining, machine learning, artificial intelligence, and computational linguistics to determine the emotional tone conveyed in a body of text. There are different sentiment analysis techniques and outputs. The approach applied to the news and NGO data used in the Risk Score PLUS focuses on polarity of publications. Put simply, it classifies articles as either positive, negative, or neutral.

## 3. Source value

News and NGO outlets differ in their reach, reputation, and public influence, among others. The Risk Score PLUS accounts for these differences through source values. Source values quantify the impact and visibility of articles from a news and NGO outlet.

For each publication, we determine the source value of the underlying outlet. This information is subsequently added to our dataset. The resulting dataset shows, for each news article, the topics and entities covered, the sentiment conveyed, and the impact of the source. This data set undergoes a de-duplication process where we ensure that articles are represented only once. For articles that are *the same* and published by the same source, only the first publication is kept. For *similar* articles, both versions are retained.

## Principle News Signal

This data is used to calculate news signals for each of the 10 principles. Principle news signals reflect sustainability events and risk through systematic analysis of news and NGO report coverage patterns. They allow us to draw conclusions on current company risk relative to the principles. The signals are calculated for each entity and each day. They consolidate the news coverage across all outlets for the day and consider the conveyed sentiments and the impact of the publishing sources. The signals also consider coverage history. Put simply, principle news signals tell us what, if any, current events relevant to a company's sustainability risk there are. Negative publications are given higher weights than positive publications. Similarly, recent publications are weighted higher. In the absence of new news data, a company's signal will decay asymptotically towards zero. Hence, news signals emphasize negative events and assume that the 'outside' perspective has some memory, which fades as we move back in time (for details see *Insights: News Signals in Practice*).

**Insights: News Signals in Practice**

The following graph shows the news coverage of a company from the *Mining* Sector. The graph shows the negative (red) and positive (green) news coverage on the company and the resulting correction (blue) for the category *Human Rights Non-Complicity*. The correction is the number applied to the Category Score to derive the New Adjusted Category Score. The graph shows several instances of considerable negative news coverage, evident in the long red bars. These 'spikes' in negative news were related to data security issues, including legal action. As a consequence of the negative coverage, there is a significant negative correction (blue) and hence the Principle Score gets 'pulled down'. The correction decreases slowly – and hence the score 'recovers' – as no (or little) additional negative news is published.



## Adjust Principle Scores

The Principle News Signals are used to calculate correction factors. Correction factors indicate how much principle scores need to be adjusted to account for company risk as evident in the media discourse. These correction factors are subsequently applied to the CORE principle scores to arrive at the Adjusted Principle Scores. To prevent undue influence of news and NGO publications, the amount of score change is limited, i.e., scores cannot decrease more than 30 and increase more than 10 points.

## Adjust Pillar and Overall Scores

Finally, the Adjusted Principle Scores are used to calculate Adjusted Pillar and Total Scores. The methodology corresponds with the CORE weighting and aggregation methodology outlined in the previous chapter. The Risk Score PLUS integrates long-term company actions, performance outcomes, and media coverage.

## Risk Score Exposure Flags

Exposure Flags are calculated at the level of the 10 Principles. Companies who belong to the bottom 2% of the universe for a specific principle, based on PLUS scores, will receive an Exposure Flag for that principle. Exposure flags, once given, will last for three months from the day the company's score last fell into the bottom 2%. Each company will then receive an Exposure Flag Count between 0 and 10, showing the number of principles for which they have an Exposure Flag.

### Insights: Exposure Flags in Practice

The following graphs shows the Plus score distributions for Principles 2: *Human Rights Non-Complicity* and 9: *Environmental Technology*, for a specific date. The red sections of the graph show the thresholds for receiving an exposure flag for each principle, below which the flag is raised.



# Appendix A: Principle Scores and Inputs

*Table 2. UN Global Compact Principles and Definitions*

| | Category | DESCRIPTION |
|---|---|---|
| Human Rights | **Human Rights Support & Respect** | Principle 1 ensures that a company adheres to a 'do no harm' philosophy. Human rights must be considered by the company at every level and integrated into the company's culture and actions with proper due diligence. This means, for example, setting out appropriate policies on human rights issues, providing training, tracking and assessing performance, as well as taking positive actions to support human rights both within the company and beyond. |
| | **Human Rights Non-complicity** | Principle 2 focusses on the evidence that suggests a company may be complicit in human rights abuses. Complicity can be direct (the company's goods or services are used to carry out the abuse), beneficial (the company benefits from human rights abuses), or silent (the company is inactive in the face of systematic/continuous abuse). Here the focus is on quantitative data that implies wrongdoing, lawsuits brought against the company, and poor supply chain management. Supply chain management is included here rather than in Principle 1 as this is the highest risk area for human rights abuses to take place and poor management in the supply chain dramatically increases the risk of beneficial & silent complicity. |

| | Category | DESCRIPTION |
|---|---|---|
| Labour | **Freedom of Association** | Principle 3 looks for evidence that a company allows its employees to participate in collective bargaining and to associate freely. This could be found via a company policy, company membership to organisations that uphold labour standards, or through direct evidence of collective negotiation/action of employees. |
| | **Forced Labour** | Principle 4 ensures that a company acts to keep all forms of forced labour out of its operations. This includes policies on forced labour, modern slavery, and fair compensation, company membership & commitment to organisations that uphold labour standards, and proper management of a company's supply chain. |
| | **Child Labour** | Principle 5 ensures that a company acts to keep all forms of forced labour out of its operations. This includes policies on child labour and modern slavery, company membership & commitment to organisations that uphold labour standards, and proper management of a company's supply chain. |
| | **Discrimination in Labour** | Principle 6 looks at discrimination in the workplace and in work-related activities. This covers treating anyone differently or less-favourably for any reason that does not relate to their ability to perform their job. This includes, but is not limited to, any social, physical, racial, political or religious reason. For the company, this means setting out thorough policies on discrimination, transparency through proper disclosure of the make-up of the workforce and taking action to integrate & enact policies at all levels of the company. Evidence of company performance regarding gender pay/bonus gaps, ethnic/gender breakdowns, and maternity/paternity leave is also considered. |

| | Category | DESCRIPTION |
|---|---|---|
| **Environment** | **Environmental Precaution** | Principle 7 focusses on a company acknowledging, assessing, and communicating its environmental impacts and associated risks, as well as implementing and integrating systems to manage and reduce those risks. This covers appropriate supervision of environmental issues, the use of environmental management systems and certifications wherever possible, and the taking of proactive actions, be that through R&D, stakeholder engagement, or multi-organisation collaborations and partnerships. |
| | **Environmental Responsibility** | Principle 8, similar to Principle 1, ensures that a company adheres to a 'do no harm' philosophy but with regards to the environment. Environmental sustainability must be considered by the company at every level and integrated into the company's culture and actions with proper due diligence. This means, for example, setting out appropriate policies on environmental issues, providing training, tracking and assessing performance, as well as taking positive actions to promote environmental responsibility both within the company and beyond. There is a particular focus on emissions, water, and waste related issues, although other topics relating to, for example, biodiversity and land use, are considered as well. |
| | **Environmentally Friendly Technology** | Principle 9 considers the processes companies use to produce and deliver their products and services. It focusses on companies' use of technologies that reduce waste, are less polluting, use resources more sustainably, and allow for increased recycling of input or output materials. As well as looking at actions a company has taken to use and/or produce such products, this principle also considers intensity ratios regarding waste, pollution, and resource use to assess which companies are making use of the best processes and technologies available. |

| | Category | DESCRIPTION |
|---|---|---|
| **Anti-corruption** | **Anti-Corruption** | Principle 10 commits companies to avoid corruption, such as bribery, extortion and money-laundering, both within their operations and supply chain. Companies should develop thorough policies and concrete programmes to address corruption-related issues at all levels of the company. This principle also considers whether companies are transparent on issues such as tax, supply-chains, ownership and remuneration, and take actions to reduce fraud, particularly at the executive level. |

*Table 3. Report-based inputs, their topic and focus.*

| Metric Name | Metric Code | Module | Principle Name | Pillar Name | Metric Type |
|---|---|---|---|---|---|
| UN Global Compact signatory | esg_01501 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| LGBTQIA+ support | esg_23631 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Community infrastructure programs | esg_01801 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Local purchasing | esg_02251 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Senior management hired locally | esg_02221 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Reserve service and veterans | esg_23621 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Refugee support | esg_23641 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Human rights collaborations | esg_34611 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Healthcare coverage | esg_36001 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Community food support | esg_37501 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Access to education | esg_37421 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Access to healthcare | esg_37701 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Access to housing | esg_37601 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Access to WASH-services | esg_37511 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Community engagement programs | esg_02241 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Health and safety certifications | esg_35901 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Customer data protection | esg_38501 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Industry organisation membership (labour rights) | esg_35611 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Community engagement policy | esg_02231 | ESG | Human Rights Support & Respect | Human Rights | Primary |
| Universal Declaration of Human Rights guidelines | esg_34601 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| Voluntary Principles on Security and Human Rights | esg_33801 | ESG | Human Rights Support & Respect | Human Rights | Secondary |

| | | | | | |
|---|---|---|---|---|---|
| **UN Guiding Principles on Business and Human Rights** | esg_33811 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| **Supply chain health and safety** | esg_36901 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| **Stakeholder privacy protection policy** | esg_39601 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| **Human rights policy** | esg_33901 | ESG | Human Rights Support & Respect | Human Rights | Primary |
| **ILO Labour Standards** | esg_34711 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| **Modern Slavery Act statement** | esg_35011 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| **Human rights inspections or audit results** | esg_34331 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| **Labour rights data disclosure** | esg_34721 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| **Community program management** | esg_01601 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| **Community grievance mechanisms** | esg_02001 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| **Human rights project financing** | esg_33921 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| **Human rights training** | esg_34301 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| **Employee safety training** | esg_36401 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| **Current or expected impacts on communities and local economies** | esg_01921 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| **Product impact monitoring** | esg_39101 | ESG | Human Rights Support & Respect | Human Rights | Secondary |
| **Supplier human rights negligence** | esg_34501 | ESG | Human Rights Non-complicity | Human Rights | Secondary |
| **Supplier code of conduct** | esg_34731 | ESG | Human Rights Non-complicity | Human Rights | Secondary |
| **Supplier inspections or audit results** | esg_35401 | ESG | Human Rights Non-complicity | Human Rights | Secondary |
| **Supply chain transparency** | esg_35621 | ESG | Human Rights Non-complicity | Human Rights | Secondary |
| **Operations in low ranking TICP Index countries** | esg_00311 | ESG | Human Rights Non-complicity | Human Rights | Secondary |
| **Community grievances** | esg_02010 | ESG | Human Rights Non-complicity | Human Rights | Primary |
| **Grievances involving indigenous peoples** | esg_02020 | ESG | Human Rights Non-complicity | Human Rights | Primary |

| | | | | | |
|---|---|---|---|---|---|
| **Supply chain lawsuits or offenses** | esg_35600 | ESG | Human Rights Non-complicity | Human Rights | Primary |
| **Violence or harassment lawsuits or offenses** | esg_34740 | ESG | Human Rights Non-complicity | Human Rights | Primary |
| **Health and safety lawsuits** | esg_36600 | ESG | Human Rights Non-complicity | Human Rights | Primary |
| **Customer data breaches** | esg_38910 | ESG | Human Rights Non-complicity | Human Rights | Primary |
| **Customer related lawsuits or offences** | esg_38700 | ESG | Human Rights Non-complicity | Human Rights | Primary |
| **Business disruption from strikes** | esg_33000 | ESG | Human Rights Non-complicity | Human Rights | Primary |
| **Supplier human rights criteria integration** | esg_34401 | ESG | Human Rights Non-complicity | Human Rights | Secondary |
| **Supplier code of conduct training** | esg_35201 | ESG | Human Rights Non-complicity | Human Rights | Secondary |
| **Supply chain safety training** | esg_36131 | ESG | Human Rights Non-complicity | Human Rights | Secondary |
| **Human rights monitoring** | esg_34201 | ESG | Human Rights Non-complicity | Human Rights | Secondary |
| **Supplier monitoring** | esg_35501 | ESG | Human Rights Non-complicity | Human Rights | Secondary |
| **Industry organisation membership (labour rights)** | esg_35611 | ESG | Freedom of Association | Labour | Secondary |
| **Employee freedom of association policy** | esg_34901 | ESG | Freedom of Association | Labour | Primary |
| **ILO Labour Standards** | esg_34711 | ESG | Freedom of Association | Labour | Secondary |
| **OECD Guidelines for MNEs** | esg_02101 | ESG | Freedom of Association | Labour | Secondary |
| **Supplier human rights negligence** | esg_34501 | ESG | Forced Labour | Labour | Secondary |
| **Industry organisation membership (labour rights)** | esg_35611 | ESG | Forced Labour | Labour | Secondary |
| **Supplier code of conduct** | esg_34731 | ESG | Forced Labour | Labour | Secondary |
| **ILO Labour Standards** | esg_34711 | ESG | Forced Labour | Labour | Secondary |
| **Modern Slavery Act statement** | esg_35011 | ESG | Forced Labour | Labour | Primary |
| **Forced labour policy** | esg_35001 | ESG | Forced Labour | Labour | Primary |
| **Employee compensation policy** | esg_02801 | ESG | Forced Labour | Labour | Secondary |
| **OECD Guidelines for MNEs** | esg_02101 | ESG | Forced Labour | Labour | Secondary |
| **Supplier inspections or audit results** | esg_35401 | ESG | Forced Labour | Labour | Secondary |
| **Supply chain transparency** | esg_35621 | ESG | Forced Labour | Labour | Secondary |

| | | | | | |
|---|---|---|---|---|---|
| **Supplier human rights criteria integration** | esg_34401 | ESG | Forced Labour | Labour | Secondary |
| **Supplier code of conduct training** | esg_35201 | ESG | Forced Labour | Labour | Secondary |
| **Human rights monitoring** | esg_34201 | ESG | Forced Labour | Labour | Secondary |
| **Supplier monitoring** | esg_35501 | ESG | Forced Labour | Labour | Secondary |
| **Supplier human rights negligence** | esg_34501 | ESG | Child Labour | Labour | Secondary |
| **Industry organisation membership (labour rights)** | esg_35611 | ESG | Child Labour | Labour | Secondary |
| **Supplier code of conduct** | esg_34731 | ESG | Child Labour | Labour | Secondary |
| **ILO Labour Standards** | esg_34711 | ESG | Child Labour | Labour | Secondary |
| **Modern Slavery Act statement** | esg_35011 | ESG | Child Labour | Labour | Primary |
| **Child labour policy** | esg_34801 | ESG | Child Labour | Labour | Primary |
| **OECD Guidelines for MNEs** | esg_02101 | ESG | Child Labour | Labour | Secondary |
| **Supplier inspections or audit results** | esg_35401 | ESG | Child Labour | Labour | Secondary |
| **Supply chain transparency** | esg_35621 | ESG | Child Labour | Labour | Secondary |
| **Supplier human rights criteria integration** | esg_34401 | ESG | Child Labour | Labour | Secondary |
| **Supplier code of conduct training** | esg_35201 | ESG | Child Labour | Labour | Secondary |
| **Human rights monitoring** | esg_34201 | ESG | Child Labour | Labour | Secondary |
| **Supplier monitoring** | esg_35501 | ESG | Child Labour | Labour | Secondary |
| **Supplier diversity criteria integration** | esg_24001 | ESG | Discrimination in Labour | Labour | Secondary |
| **Employs individuals who are differently abled** | esg_23401 | ESG | Discrimination in Labour | Labour | Secondary |
| **Paid Internships** | esg_23651 | ESG | Discrimination in Labour | Labour | Secondary |
| **Employee satisfaction survey** | esg_33301 | ESG | Discrimination in Labour | Labour | Secondary |
| **Flexible work arrangements** | esg_33501 | ESG | Discrimination in Labour | Labour | Secondary |
| **Employee day care services** | esg_33201 | ESG | Discrimination in Labour | Labour | Secondary |
| **Parental leave** | esg_33711 | ESG | Discrimination in Labour | Labour | Secondary |
| **Employee career development** | esg_40001 | ESG | Discrimination in Labour | Labour | Secondary |
| **Performance/career development reviews** | esg_40521 | ESG | Discrimination in Labour | Labour | Secondary |
| **Board diversity policy** | esg_09701 | ESG | Discrimination in Labour | Labour | Primary |

| Equal opportunity and diversity policy | esg_23501 | ESG | Discrimination in Labour | Labour | Primary |
|---|---|---|---|---|---|
| Work-life balance policy | esg_33701 | ESG | Discrimination in Labour | Labour | Secondary |
| Gender and or ethnic minority disclosure | esg_23611 | ESG | Discrimination in Labour | Labour | Secondary |
| Maturity of workforce disclosure | esg_23911 | ESG | Discrimination in Labour | Labour | Secondary |
| Employee training disclosure | esg_40501 | ESG | Discrimination in Labour | Labour | Secondary |
| Discrimination lawsuits or offences | esg_23300 | ESG | Discrimination in Labour | Labour | Primary |
| Highest paid executive breakdown (gender) | esg_04990 | ESG | Discrimination in Labour | Labour | Secondary |
| Female employees | esg_23810 | ESG | Discrimination in Labour | Labour | Secondary |
| Females in management level positions | esg_23200 | ESG | Discrimination in Labour | Labour | Secondary |
| Females on the board | esg_23900 | ESG | Discrimination in Labour | Labour | Secondary |
| Maternity leave weeks | esg_33730 | ESG | Discrimination in Labour | Labour | Secondary |
| Paternity leave weeks | esg_33720 | ESG | Discrimination in Labour | Labour | Secondary |
| Proportion of employees with performance/career development reviews | esg_40530 | ESG | Discrimination in Labour | Labour | Secondary |
| Diversity training | esg_23511 | ESG | Discrimination in Labour | Labour | Secondary |
| Relevant training for employees | esg_40601 | ESG | Discrimination in Labour | Labour | Secondary |
| Equal opportunity and diversity targets | esg_23601 | ESG | Discrimination in Labour | Labour | Secondary |
| Environmental collaborations | esg_25401 | ESG | Environmental Precaution | Environment | Secondary |
| ISO 14000 series or EMS guidelines | esg_24601 | ESG | Environmental Precaution | Environment | Secondary |
| EMAS certification | esg_24811 | ESG | Environmental Precaution | Environment | Secondary |
| Environmental investments | esg_25101 | ESG | Environmental Precaution | Environment | Secondary |
| Environmental policy | esg_24101 | ESG | Environmental Precaution | Environment | Primary |
| TCFD signatory | esg_29111 | ESG | Environmental Precaution | Environment | Secondary |

| | | | | | |
|---|---|---|---|---|---|
| Equator Principles signatory | esg_32801 | ESG | Environmental Precaution | Environment | Secondary |
| Stakeholder engagement on environmental issues | esg_28801 | ESG | Environmental Precaution | Environment | Secondary |
| Proportion of environmental management system certified sites | esg_24900 | ESG | Environmental Precaution | Environment | Secondary |
| Environmental supervision | esg_24401 | ESG | Environmental Precaution | Environment | Secondary |
| Environmental grievance mechanism | esg_25501 | ESG | Environmental Precaution | Environment | Secondary |
| Climate change risk/opportunity acknowledgement | esg_27201 | ESG | Environmental Precaution | Environment | Secondary |
| Water risk/opportunity acknowledgement | esg_32641 | ESG | Environmental Precaution | Environment | Secondary |
| Employee travel emissions reduction | esg_26601 | ESG | Environmental Responsibility | Environment | Secondary |
| Carbon pricing | esg_27011 | ESG | Environmental Responsibility | Environment | Secondary |
| Protected areas (operations) | esg_29831 | ESG | Environmental Responsibility | Environment | Secondary |
| IUCN Red List (operations) | esg_29821 | ESG | Environmental Responsibility | Environment | Secondary |
| Biodiversity impact reduction initiative | esg_29811 | ESG | Environmental Responsibility | Environment | Secondary |
| Habitat protection or restoration | esg_29701 | ESG | Environmental Responsibility | Environment | Secondary |
| Products sourced from responsibly managed forests | esg_29201 | ESG | Environmental Responsibility | Environment | Secondary |
| Real estate sustainability certification | esg_30811 | ESG | Environmental Responsibility | Environment | Secondary |
| Waste reduction program | esg_31201 | ESG | Environmental Responsibility | Environment | Secondary |
| Waste recycling | esg_31501 | ESG | Environmental Responsibility | Environment | Secondary |
| Water resource management programs | esg_32221 | ESG | Environmental Responsibility | Environment | Secondary |
| Supplier waste management | esg_32031 | ESG | Environmental Responsibility | Environment | Secondary |
| Supplier water resource management | esg_32691 | ESG | Environmental Responsibility | Environment | Secondary |
| Emissions reduction policy | esg_26301 | ESG | Environmental Responsibility | Environment | Primary |
| Product/service environmental impact policy | esg_27301 | ESG | Environmental Responsibility | Environment | Secondary |

| | | | | | |
|---|---|---|---|---|---|
| Biodiversity impact policy | esg_29801 | ESG | Environmental Responsibility | Environment | Secondary |
| Property assets emissions reduction policy | esg_30601 | ESG | Environmental Responsibility | Environment | Secondary |
| Renewable energy use policy | esg_30211 | ESG | Environmental Responsibility | Environment | Secondary |
| Energy efficiency policy | esg_29901 | ESG | Environmental Responsibility | Environment | Secondary |
| Recycled/reused raw materials policy | esg_27601 | ESG | Environmental Responsibility | Environment | Secondary |
| Waste management policy | esg_30901 | ESG | Environmental Responsibility | Environment | Secondary |
| Water resource management policy | esg_32201 | ESG | Environmental Responsibility | Environment | Secondary |
| GHG emissions data disclosure | esg_26701 | ESG | Environmental Responsibility | Environment | Secondary |
| Environmental targets progress update | esg_24501 | ESG | Environmental Responsibility | Environment | Secondary |
| Environmental inspections or audits | esg_25001 | ESG | Environmental Responsibility | Environment | Secondary |
| Land assets sustainability | esg_30801 | ESG | Environmental Responsibility | Environment | Secondary |
| Energy efficiency disclosure | esg_30011 | ESG | Environmental Responsibility | Environment | Secondary |
| Recycled/reused raw materials disclosure | esg_27621 | ESG | Environmental Responsibility | Environment | Secondary |
| Renewable energy use disclosure | esg_30111 | ESG | Environmental Responsibility | Environment | Secondary |
| Hazardous waste related data disclosure | esg_31801 | ESG | Environmental Responsibility | Environment | Secondary |
| Waste related data disclosure | esg_31301 | ESG | Environmental Responsibility | Environment | Secondary |
| Water usage disclosure | esg_32401 | ESG | Environmental Responsibility | Environment | Secondary |
| Scope 3 (total) disclosure | derived_n61 | Emissions+ | Environmental Responsibility | Environment | Secondary |
| GHG emissions | derived_n29 | ESG | Environmental Responsibility | Environment | Secondary |
| Environmental lawsuits or offenses | esg_25600 | ESG | Environmental Responsibility | Environment | Primary |
| Environmental fines binary | derived_n39 | ESG | Environmental Responsibility | Environment | Primary |
| Oil spills | esg_32010 | ESG | Environmental Responsibility | Environment | Primary |

| | | | | | |
|---|---|---|---|---|---|
| **Water discharge non-compliance** | esg_32630 | ESG | Environmental Responsibility | Environment | Primary |
| **Hydraulic fracturing** | esg_32680 | ESG | Environmental Responsibility | Environment | Primary |
| **Waste related targets** | esg_31001 | ESG | Environmental Responsibility | Environment | Secondary |
| **GHG emissions reduction targets** | esg_26401 | ESG | Environmental Responsibility | Environment | Secondary |
| **Supplier environmental inspections or audits** | esg_29011 | ESG | Environmental Responsibility | Environment | Secondary |
| **Energy efficiency targets** | esg_30001 | ESG | Environmental Responsibility | Environment | Secondary |
| **Renewable energy use targets** | esg_30101 | ESG | Environmental Responsibility | Environment | Secondary |
| **Recycled/reused raw materials targets** | esg_27611 | ESG | Environmental Responsibility | Environment | Secondary |
| **Water related targets** | esg_32211 | ESG | Environmental Responsibility | Environment | Secondary |
| **Noise emissions reduction product development** | esg_28701 | ESG | Environmentally Friendly Technology | Environment | Secondary |
| **Clean technology financing** | esg_32711 | ESG | Environmentally Friendly Technology | Environment | Secondary |
| **Product/service enables environmentally responsible use** | esg_27401 | ESG | Environmentally Friendly Technology | Environment | Primary |
| **Recyclable/reusable product design** | esg_27501 | ESG | Environmentally Friendly Technology | Environment | Secondary |
| **Product return and recycling programs** | esg_27701 | ESG | Environmentally Friendly Technology | Environment | Secondary |
| **Energy efficient products** | esg_28401 | ESG | Environmentally Friendly Technology | Environment | Secondary |
| **Sustainable water products** | esg_28301 | ESG | Environmentally Friendly Technology | Environment | Secondary |
| **Renewable energy production/distribution** | esg_32811 | ESG | Environmentally Friendly Technology | Environment | Secondary |
| **Clean technology development** | esg_28201 | ESG | Environmentally Friendly Technology | Environment | Secondary |
| **Hybrid vehicles or engines** | esg_28601 | ESG | Environmentally Friendly Technology | Environment | Secondary |
| **Water recycling/reuse** | esg_32601 | ESG | Environmentally Friendly Technology | Environment | Secondary |
| **Supplier environmental negligence** | esg_29101 | ESG | Environmentally Friendly Technology | Environment | Secondary |
| **Renewable energy consumption proportion** | derived_n9 | ESG | Environmentally Friendly Technology | Environment | Secondary |

| | | | | | |
|---|---|---|---|---|---|
| **Recycled/reused raw materials proportion** | esg_27630 | ESG | Environmentally Friendly Technology | Environment | Secondary |
| **Proportion of waste recycled** | esg_31600 | ESG | Environmentally Friendly Technology | Environment | Secondary |
| **Supplier environmental criteria integration** | esg_29001 | ESG | Environmentally Friendly Technology | Environment | Secondary |
| **Environmental project financing** | esg_32701 | ESG | Environmentally Friendly Technology | Environment | Secondary |
| **Whistleblowing support functions** | esg_00201 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Restrictions on gifts** | esg_00611 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Director re-election** | esg_10901 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Malus and clawback provision** | esg_03601 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Chairperson independence** | esg_10801 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Effective board functions** | esg_03701 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Uncontested elections** | esg_09930 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Director term limits** | esg_09801 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Fair competition policy** | esg_00801 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Political involvement policy** | esg_00911 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Related party transaction policy** | esg_41851 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Whistleblowing policy** | esg_00771 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Anti-money laundering policy** | esg_00711 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Tax-evasion policy** | esg_00751 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Insider trading policy** | esg_07901 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Anti-bribery/corruption policy** | esg_00101 | ESG | Anti-Corruption | Anti-Corruption | Primary |
| **Country specific tax disclosure** | esg_00781 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Corporate statutes disclosure** | esg_41001 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Ownership disclosure** | esg_41841 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Director remuneration disclosure** | esg_41501 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Board background disclosure** | esg_40901 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Director RPTs** | esg_41870 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Competition related lawsuits** | esg_00500 | ESG | Anti-Corruption | Anti-Corruption | Primary |
| **Bribery/corruption related lawsuits** | esg_00600 | ESG | Anti-Corruption | Anti-Corruption | Primary |
| **Money laundering related lawsuits** | esg_00740 | ESG | Anti-Corruption | Anti-Corruption | Primary |
| **Tax related lawsuits** | esg_00760 | ESG | Anti-Corruption | Anti-Corruption | Primary |
| **Ex-CEO/EXCO chairperson** | esg_07501 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **CEO is director** | esg_10200 | ESG | Anti-Corruption | Anti-Corruption | Secondary |

| | | | | | |
|---|---|---|---|---|---|
| **Audit committee financial expertise binary** | derived_n32 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Director independence** | esg_02501 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Audit committee independence** | esg_09500 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Compensation committee independence** | esg_02710 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Nomination committee independence** | esg_11000 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Risk committee independence** | esg_07720 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Anti-bribery/corruption training** | esg_00701 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Anti-money laundering training** | esg_00731 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Corporate governance committee** | esg_10401 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Supplier bribery/corruption inspections or audits** | esg_00301 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Bribery/corruption monitoring** | esg_00401 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **Money laundering monitoring** | esg_00721 | ESG | Anti-Corruption | Anti-Corruption | Secondary |
| **FPIC of indigenous peoples** | esg_02271 | ESG | Human Rights Non-complicity | Human Rights | Secondary |

# Disclaimer

ESG Book is a limited liability company (Gesellschaft mit beschränkter Haftung) incorporated in Frankfurt am Main and organised under the laws of Germany with registered number HRB 113087 in the commercial register of the local court with its seat and business address at Junghofstraße 16, 60311 Frankfurt am Main, Germany (hereinafter "ESG Book"). ESG Book, with its UK branch and local subsidiaries, is a provider of sustainability data and advisory services and operates the sustainability data platform ESG Book. ESG Book does not offer any regulated financial services nor products. This document is provided on a confidential basis by ESG Book and is for information purposes only; accordingly, it is not a solicitation or an offer to buy any security or instrument or to participate in any trading activities nor should it be construed as a recommendation or advice on the merits of investing in any financial product. THIRD PARTY INFORMATION. Certain information contained in this document has been obtained from sources outside ESG Book. While such information is believed to be reliable for the purposes used herein, no representations are made as to the accuracy or completeness thereof and neither ESG Book nor its affiliates take any responsibility for such information. To the extent this document contains any links to third party websites, such links are provided as a convenience and for informational purposes only; they do not constitute an endorsement or an approval by ESG Book of any of the products, services or opinions of the corporations or organization or individual operating such third-party websites. ESG Book bears no responsibility for the accuracy, legality or content of the external site or for that of subsequent links. RELIANCE – ESG Book makes no representation or warranty, express or implied, as to the accuracy or completeness of the information contained herein, and accepts no liability for any loss, of whatever kind, howsoever arising, in relation thereto, and nothing contained herein should be relied upon. CONFIDENTIALITY. This document contains highly confidential information regarding ESG Book's strategy and organization. Your acceptance of this document constitutes your agreement to keep confidential all the information contained in this document, as well as any information derived by you from the information contained in this document and not disclose any such information to any other person. This document may not be copied, reproduced, in any way used or disclosed or transmitted, in whole or in part, to any other person.

**EXHIBIT 11**



# GOVERNANCE QUALITYSCORE:

## METHODOLOGY FUNDAMENTALS

Published: December 6, 2024



© 2024 | Institutional Shareholder Services and/or its affiliates

# TABLE OF CONTENTS

Overview ..................................................................................................................3

Coverage ................................................................................................................4

    Coverage Adjustments ....................................................................................6

Framework ............................................................................................................8

    Categories and Subcategories.........................................................................8

    Scoring................................................................................................................9

    Data Verification .............................................................................................10

    Real-Time Updates.........................................................................................11



## Overview

**Governance QualityScore** is a data-driven scoring and screening solution designed to enable quality reviews of corporate governance across four key categories: *Board Structure, Compensation, Shareholder Rights,* and *Audit & Risk Oversight.* Companies under Governance QualityScore Coverage are assigned to a Governance QualityScore region based on the ISS-determined Country of Coverage. Each company is compared against all other companies within its region and is assigned deciles scores as integers from 1 through 10 and category scores using the same scale that together provide a clear understanding of the drivers of a company's corporate governance risk. A score in the 1st decile (GQS = 1) indicates higher quality and relatively lower governance risk, while a score in the 10th decile (GQS = 10) indicates relatively lower quality and higher governance risk. Historical scores and data provide greater context and trend analysis to understand a company's approach to corporate governance over time.

**Governance QualityScore** calls upon a library of more than 290 governance factors across the coverage universe, of which up to 202 are used for any one company as defined by region, highlighting both potentially shareholder-adverse practices at a company and mitigating factors that help tell a more complete story. Each factor is based on the same principles that form the foundation of the ISS Benchmark Policy and is tailored to address appropriate variations in corporate governance practices across global capital markets. Developed through an extensive, transparent, and inclusive process, these policies reflect corporate governance standards and best practices across jurisdictions, as well as the views of institutional investors, issuers, and corporate governance practitioners worldwide.

**Governance QualityScore** draws from companies' proxies, annual reports, 10-Ks, circulars, meeting notices, and other publicly disclosed materials related to their annual general meeting. Additionally, it leverages proprietary ISS analytics, analyses, interpretations, proxy voting policies, and resulting Benchmark Policy voting recommendations.

## Coverage

Governance QualityScore global coverage comprises approximately 7,400+ companies in 31 markets, aligning with local market indices, including but not limited to constituents of the S&P 1500, Russell 3000, S&P/TSX Composite, S&P/TSX Small Cap, STOXX600, and JPX-Nikkei 400, augmented with widely held companies. All markets are assigned to a Governance QualityScore region.

*Table 1: Americas Coverage*

| GOVERNANCE QUALITYSCORE REGION | COUNTRY | COVERAGE |
|---|---|---|
| Canada | Canada | S&P/TSX Composite Index+ |
| Canada Small Cap | Canada | S&P/TSX Small Cap Index+ |
| Latin America | Brazil | Ibovespa+ |
| US - R3K | United States | S&P400, S&P600, and FTSE Russell 3000 Indices (excluding S&P 500)+ |
| US - S&P500 | United States | S&P 500 Index |

*Table 2: Asia-Pacific Coverage*

| GOVERNANCE QUALITYSCORE REGION | COUNTRY | COVERAGE |
|---|---|---|
| AsiaPac | China | Widely held companies |
| AsiaPac | Hong Kong | Widely held companies |
| AsiaPac | Singapore | Straits Times Index (STI)+ |
| AsiaPac | Taiwan | Widely held companies |
| Australasia | Australia | S&P/ASX 300 Index+ |
| Australasia | New Zealand | S&P/NZX 50 Index+ |
| India | India | Widely held companies |
| Japan | Japan | JPX-Nikkei 400+ |
| South Korea | South Korea | KRX 100+ |

*"+" denotes the inclusion of widely held companies based on market capitalization or ISS client holdings*



**Table 3: EMEA Coverage**

| GOVERNANCE QUALITYSCORE REGION | COUNTRY | COVERAGE |
|---|---|---|
| Africa | South Africa | FTSE JSE-40 and JSE-MidCap Indices+ |
| Anglo | Ireland | ISEQ 20 Index+ ⚲ |
| Anglo | United Kingdom | FTSE All-Share Index+ ⚲ |
| Germanic | Austria | ATX 20 Index+ ⚲ |
| Germanic | Germany | DAX40/MDAX50/SDAX70/TecDAX30+ ⚲ |
| Germanic | Switzerland | SMI 20 and SMIM 30 Indices+ ⚲ |
| Nordic | Denmark | OMX Copenhagen 25 and Nasdaq Nordic Large Cap+ ⚲ |
| Nordic | Finland | OMX Helsinki 25 and Nasdaq Nordic Large Cap+ ⚲ |
| Nordic | Norway | OBX 25 and Nasdaq Nordic Large Cap+ ⚲ |
| Nordic | Sweden | OMX Stockholm 30 Index+ ⚲ |
| Russia[1] | Russia | RTS 50 Index+ |
| Southern Europe | Greece | FTSE ATHEX Large Cap Index 25+ |
| Southern Europe | Italy | FTSE-MIB and FTSE-Midcap Indices+ ⚲ |
| Southern Europe | Portugal | PSI 20 Index+ ⚲ |
| Southern Europe | Spain | IBEX 35 Index+ ⚲ |
| Western Europe | Belgium | BEL 20 Index+ ⚲ |
| Western Europe | France | CAC All- Tradable and SBF 120 Indices+ ⚲ |
| Western Europe | Luxembourg | LuxX Index+ ⚲ |
| Western Europe | Netherlands | AEX25 and AMX25 Indices+ ⚲ |

"+" denotes the inclusion of widely held companies based on market capitalization or ISS client holdings
" ⚲ " denotes the inclusion of STOXX 600 Index companies

---

[1] Region is temporarily unavailable

## Coverage Adjustments

Governance QualityScore global coverage rebalances every calendar quarter to reflect changes in the underlying index constituents and company status. Newly covered companies will enter Governance QualityScore coverage after their first ISS Benchmark Report has been published as a Governance QualityScore-covered company. However, Governance QualityScore-eligible companies may be excluded for various reasons that would not allow for proper relative comparability.

*Table 4: Exclusions*

| GOVERNANCE QUALITYSCORE REGION | COMPANY STRUCTURE | COUNTRY OF COVERAGE NOT IN SCOPE | FOREIGN PRIVATE ISSUER | FUND | NO ANNUAL MEETING | TRUSTS |
|---|---|---|---|---|---|---|
| Anglo | | | * | * | | ❄ ⚡ ✕ |
| AsiaPac | * | | * | * | * | ❄ ⚡ ✕ |
| Australasia | | | | * | * | ⚡ |
| Canada | * | | | | * | |
| Germanic | * | * | * | * | * | ⚡ |
| India | * | | * | * | * | ⚡ |
| Japan | | | * | * | | ⚡ |
| Latin America | | | * | * | * | ⚡ |
| Nordic | * | * | * | * | * | ❄ ⚡ |
| Russia | * | * | * | * | * | ⚡ |
| South Africa | | | | * | | ❄ ✕ |
| South Korea | | | | | | |
| Southern Europe | | * | * | * | * | ⚡ |
| US | * | | * | | * | |
| Western Europe | *[2] | | * | * | * | ⚡ |

[2] Excluding France



- Company Structure: The company has an uncommon ownership structure or non-trading voting stock.
- Country of Coverage Not in Scope: The company's ISS-determined country of coverage is outside the scope of Governance QualityScore.
- Foreign Private Issuer: The company is not a domestic issuer.
- Fund: The company is an externally-managed fund.
- No Annual Meeting: The company does not have a recent annual meeting.
- Trusts: The company is considered one of the following:
    - ✳ (Closed-Ended) Investment Trust
    - ⟋ Real Estate Investment Trust
    - ✖ (Closed-Ended) Venture Capital Trust

# Framework

The Governance QualityScore framework relies on the organization of factors into Categories and Subcategories, Scoring, Data Verification, and Real-Time Updates. Each area is pivotal to ensuring that companies can be evaluated on their corporate governance risk on a relative basis in real-time. Annual methodology updates ensure corporate governance standards and best practices are reflected, as well as the views of institutional investors, issuers, and corporate governance practitioners worldwide.

## Categories and Subcategories

Governance QualityScore evaluates corporate governance risk across four categories: *Board Structure, Compensation, Shareholder Rights,* and *Audit & Risk Oversight.* Each category is further divided into subcategories, and factors are assigned to the appropriate Category-Subcategory.

All categories will be applicable to all Governance QualityScore regions. However, not all subcategories will be applicable to all regions. Subcategory applicability depends on whether a factor is applicable to a respective region. For example, Shareholder Rights-Litigation Rights is only applicable in the US and is not applicable in any other Governance QualityScore region.

*Table 5: Categories and Subcategories*

| BOARD STRUCTURE | COMPENSATION | SHAREHOLDER RIGHTS | AUDIT & RISK OVERSIGHT |
|---|---|---|---|
| Board Commitments | Communications and Disclosure | Litigation Rights | Audit and Accounting Controversies |
| Board Composition | Compensation Controversies | Meeting and Voting-related Issues | Audit - Other Issues |
| Board Policies | Equity Risk Mitigation | One Share, One Vote | Environmental and Social Risk Management |
| Board Practices | Non-Executive Pay | Shareholder Rights - Other Issues | Environmental and Social Risk Oversight |
| Board Structure Controversies | Non-Performance-based Pay | Takeover Defenses | External Auditor |
| Diversity, Equity, and Inclusion | Pay-For-Performance | | Information Security Risk Management |
| Key Committee Composition | Termination | | Information Security Risk Oversight |
| Related-Party Transactions | Use of Equity | | Risk Oversight - Other Issues |

## Scoring

Governance QualityScore uses a numeric, decile-based score that indicates a company's governance risk relative to their index or region. A score in the 1st decile (GQS = 1) indicates relatively higher quality governance practices and relatively lower governance risk. Conversely, a score in the 10th decile (GQS = 10) indicates relatively lower quality governance practices and relatively higher governance risk. Companies receive an overall Governance QualityScore and also receive a Category Score.

Each factor is assigned a weight based on Governance QualityScore region and proprietary ISS analytics and expertise. Factors may have different weights depending on the region. A company's corporate governance profile will determine how many points it will receive for each factor. Each company's factor scores are aggregated at the category level and overall to generate the Raw Category Score and the Raw Overall Score, respectively. To generate the Category Score, companies are ordered within their regions based on their Raw Category Score and assigned a decile ranking. To generate the Governance QualityScore, companies are ordered within their regions based on their Raw Overall Score and assigned a decile ranking. Governance QualityScore performs this rebalancing process daily at approximately 5am ET (10 AM UTC).

In South Korea and Japan, the Audit & Risk Oversight Category Score differs from the other three categories. While the methodology is reviewed on an ongoing basis to strengthen the analysis of corporate governance risk, there are a limited number of prevalent risk factors or controversies in the Audit & Risk Oversight category. Consequently, Governance QualityScore neither assigns a decile ranking for companies where practices are similar nor does it "force rank" to ensure companies are in each of the deciles. In those regions, the Audit & Risk Oversight Score is limited to a few relevant deciles only.

*Table 6: Scoring Example*

| CATEGORY | CATEGORY RAW SCORE | CATEGORY SCORE |
|---|---|---|
| Board Structure | 25.0 | 7 |
| Compensation | 19.5 | 10 |
| Shareholder Rights | 28.0 | 5 |
| Audit & Risk Oversight | 56.5 | 4 |
| | OVERALL RAW SCORE | GOVERNANCE QUALITYSCORE |
| Total | 129.0 | 8 |



## Data Verification

Companies can submit Governance QualityScore Data Verification requests at any point in the year except during the **Annual Meeting Blackout Period** and the **Governance QualityScore Methodology Release Blackout Period**.

The **Annual Meeting Blackout Period** begins when the company files its proxy or meeting materials and ends twenty-four hours after the publication of a company's ISS Benchmark report. During this time, the company's Governance QualityScore profile is frozen and will not reflect the latest information.

The **Governance QualityScore Methodology Release Blackout Period** has two phases: Phase 1 is the week *before* the Governance QualityScore Methodology Data Verification Period. Phase 2 is the week *after* the Governance QualityScore Methodology Data Verification Period. During these two phases, the company's Governance QualityScore profile will be live and will continue to reflect the latest information.

The **Governance QualityScore Methodology Data Verification Period** is a two-week period preceding the annual methodology release in which companies are invited to verify their Governance QualityScore data for *new* factors in addition to existing factors. This would be the first time in which companies will have the ability to review and verify answers for new factors prior to the release of the new methodology.

Governance QualityScore profiles are updated daily at approximately 5am ET (10 AM UTC). After the ISS Benchmark Report has been published, the Governance QualityScore profile will be available twenty-four hours later.

## Real-Time Updates

Outside of companies' annual meetings, ISS reviews new filings, updates companies' corporate governance profile, and ensures Governance QualityScore is up-to-date. These filings include changes to bylaws, adoptions and redemptions of poison pills, mid-year director appointments, and other significant company events disclosed by the company, regulator, or other government agency. For most markets, ISS will review *ad hoc* disclosures on a quarterly basis and update company corporate governance profiles when necessary. However, for the US and Canada, ISS will review as companies file with EDGAR and SEDAR, respectively.

For mid-year director appointments or resignations in the US, ISS will review 8-K filings to ensure company boards are up-to-date. Typically, 8-K filings of mid-year director appointments contain insufficient information for ISS to determine the independence classification of the appointed director. In these cases, directors are deemed as "unclassified." As a result, Governance QualityScore factors relying on the independence classification of directors will ignore "unclassified" directors. Specifically, Governance QualityScore factors calculating any board or committee percentages will not consider directors deemed as "unclassified."

However, US companies may receive a preliminary ISS independence classification if they are able to provide the following information about the appointed director(s):

1. Current position;
2. The company's determination of whether the director is independent under its listing standards;
3. Any previous employment at the company;
4. Any transaction (per Item 404a of Regulation S-K) in the most recently concluded fiscal year and the current fiscal year-to-date between the company and the following:
   a. The director,
   b. The director's employer, or
   c. The director's immediate family members' current employer

Preliminary independence classifications are subject to change at the company's next annual meeting. For more information on independence classification criteria, please see the ISS Policy Gateway.



Mid-year director appointments or resignations in Canada operate similarly to the US except ISS will also review news releases and other related sources.

Canadian companies may receive a preliminary ISS independence classification if they are able to provide the following information about the appointed director(s):

1. The board's determination of whether the director is independent as required to be disclosed in the Management Information Circular;
2. All transactions in the most recently concluded fiscal year between the company and the following:
   a. The director,
   b. The director's employer,
   c. An immediate family member, or
   d. An immediate family member's employer (in the last three calendar years)

   Companies must state the percentage that the amount represents of the recipient's revenues. There is no *de minimis* threshold.
3. Family relationships;
4. Compensatory arrangements;
5. Beneficial stock ownership;
6. Any previous employment with the company, a former parent company, or an acquired company;
7. Whether the director is a party to a voting agreement to vote in line with management on proposals being brought to a shareholder vote;
8. Whether the director is a founder of the company but not currently an employee and the extent of the director's operational involvement with the company;
9. Whether there is any other connection with the company other than a board seat.

Preliminary independence classifications are subject to change at the company's next annual meeting. For more information on independence classification criteria, please see the ISS Policy Gateway.



We empower investors and companies to build
for long-term and sustainable growth by providing
high-quality data, analytics, and insight.

### SUCCEED WITH ISS ESG SOLUTIONS

Visit iss-esg.com for more information.

ISS ESG is the responsible investment arm of Institutional Shareholder Services Inc., the world's leading provider of environmental, social, and governance solutions for asset owners, asset managers, hedge funds, and asset servicing providers. With more than 30 years of corporate governance expertise and 25 years of providing in-depth responsible investment research and analytics, ISS ESG has the unique understanding of the requirements of institutional investors. With its comprehensive offering of solutions, ISS ESG enables investors to develop and integrate responsible investing policies and practices, engage on responsible investment issues, and monitor portfolio company practices through screening solutions. It also provides climate data, analytics, and advisory services to help financial market participants understand, measure, and act on climate-related risks across all asset classes. In addition, ISS ESG delivers corporate and country ESG research and ratings enabling its clients to identify material social and environmental risks and opportunities.

This document and all of the information contained in it is the property of Institutional Shareholder Services Inc. ("ISS") or its subsidiaries. The Information may not be reproduced or redisseminated in whole or in part without prior written permission of ISS. ISS MAKES NO EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE INFORMATION.

© 2024 | Institutional Shareholder Services and/or its affiliates

**EXHIBIT 12**



# GOVERNANCE QUALITYSCORE:

## Issuer Frequently Asked Questions

Published: May 5, 2025

New or materially updated questions highlighted in yellow


© 2022 | Institutional Shareholder Services and/or its affiliates


# Contents

General Questions ................................................................................................................. 5

    1.   How can I find more information about Governance QualityScore? ...................................... 5

    2.   What are valid sources ISS will consider for Governance QualityScore? ............................... 5

    3.   How can I request a correction to my Governance QualityScore? .......................................... 5

    4.   I requested a correction to my Governance QualityScore through Compass. When will I
        receive a response? .............................................................................................................. 5

    5.   I requested a correction to my Governance QualityScore through Compass, and ISS
        responded that there are no changes to be made based on the information provided. ...... 5

    a.   However, I still have additional information to present for further consideration. Can I re-
        submit? ................................................................................................................................. 5

    b.   However, I do not understand the additional details from ISS. How can I receive additional
        information? .......................................................................................................................... 5

    6.   I requested a correction to my Governance QualityScore through Compass, and ISS
        responded that changes have been made. Why are the changes not reflected in my
        profile? .................................................................................................................................. 5

    7.   I requested a correction to my Governance QualityScore through Compass, and I disagree
        with the response from ISS. To whom can I escalate the issue(s)? ........................................ 6

    8.   What is the Governance QualityScore "Blackout Period"? ..................................................... 6

    9.   Our ISS Benchmark Research Report was published today. Why did our Governance
        QualityScore not update on Compass? ................................................................................. 6

    10.  Why can't I request a correction to my Governance QualityScore through Compass? ......... 6

    11.  What is the weight or score of a category, subcategory, or factor? ...................................... 6

    12.  What is the difference between Governance QualityScore Data Verification and ISS Data
        Verification? .......................................................................................................................... 7

    13.  We already filed our Annual Report. When will ISS update our Governance QualityScore? . 7

    14.  We filed our Preliminary Proxy Statement (PRE14A). When will ISS update our Governance
        QualityScore? ........................................................................................................................ 7

    15.  I requested a correction to my Governance QualityScore through Compass based on our
        latest proxy statement/notice of meeting. When will ISS update our Governance
        QualityScore profile? ............................................................................................................ 7

    16.  I requested a correction to my Governance QualityScore through Compass regarding
        information not publicly disclosed. Why didn't ISS update our Governance QualityScore
        profile? .................................................................................................................................. 7

    17.  Does Governance QualityScore affect the ISS Benchmark Vote Recommendation? ............ 7

    18.  Why did my answers change when I didn't do anything? ...................................................... 7

    19.  Does Governance QualityScore perform amplification? ....................................................... 8

Board Structure ..................................................................................................................... 9

    20.  How does Governance QualityScore define independence? ................................................. 9



21. We appointed an independent director outside of the annual general meeting. Why didn't the independence of the board change? ................................................................. 9

22. How do former employees impact independence calculations? ............................................ 9

23. Why does Governance QualityScore say that my committee independence is not yet known, *i.e.*, "Due to changes in the board, the percentage of the <insert committee here> committee that is independent is not yet known."? ............................................ 9

24. We have a woman executive as a named executive officer. When will this be reflected in Governance QualityScore? .................................................................................. 9

25. What are the thresholds for material related party transactions? .......................................... 9

26. What are the requirements for Governance QualityScore to make a preliminary determination for the newly appointed director's classification outside of the annual general meeting? ................................................................................................ 10

a. US ..................................................................................................................... 10

b. Canada .............................................................................................................. 10

27. How is director tenure calculated? ................................................................................ 11

28. How does Governance QualityScore compute standard deviation for applicable factors? . 11

29. How does Governance QualityScore evaluate if a director is overboarded? ..................... 11

30. How does ISS compute percentage of vote support? ....................................................... 11

31. Why is the country law, index requirements, or exchange requirements regarding the gender diversity policy for our board and/or executives not reflected in our profile? ....... 11

32. How does Governance QualityScore compute average percentage of director skills? ........ 11

33. What does Governance QualityScore consider for average percentage of director skills? . 11

34. What does Governance QualityScore consider for board leadership positions? ................ 11

35. What does Governance QualityScore consider for board ethnic diversity? ....................... 11

36. What is the impact of classified boards to director election vote support? ...................... 12

37. How is the percentage of outstanding stock of directors and executives calculated? ....... 12

38. What is the impact of having a Higgsian Chair to board independence? ........................... 12

39. Why is the percentage of the board independence flowing as a number instead of a percentage? ......................................................................................................... 12

Compensation ......................................................................................................................... 13

40. What does Governance QualityScore consider as a pay-for-performance misalignment and problematic pay practice or policy? ................................................................... 13

41. Are all types of equity grants considered in evaluating director and executive stock ownership guidelines? ......................................................................................... 13

42. What does Governance QualityScore consider as special grants? ..................................... 13

43. What does Governance QualityScore consider for the short-term incentive plans or the long-term incentive plans for executives? ............................................................ 13

44. What does Governance QualityScore consider for equity plan vesting periods? ............... 14

a. US ..................................................................................................................... 14



b.    Canada ......................................................................................................14

45.  What awards does Governance QualityScore consider in evaluating long-term incentive plans? ..............................................................................................................14

46.  What does Governance QualityScore consider as "modifiers"? ...........................................14

47.  How does Governance QualityScore evaluate disclosures for the short-term incentive plans or the long-term incentive plans for executives? ..................................................................14

48.  What does Governance QualityScore consider in evaluating holding period for executives? ........................................................................................................................15

Shareholder Rights .........................................................................................................16

49.  What does Governance QualityScore consider material restrictions to call a special meeting? ...........................................................................................................16

50.  How does Governance QualityScore treat companies that have only one provision that requires a supermajority vote requirement to approve amendments to the charter or bylaws? ...................................................................................................................16

51.  What is the difference between majority vote standard and majority vote policy in the US market? .................................................................................................................16

Audit & Risk Oversight .........................................................................................................17

52.  When will we be untagged for an investigation or enforcement action? ...........................17

53.  When will we be untagged for late filings? .........................................................................17

54.  What is considered as information security expert? ..............................................................17

55.  What is considered as externally audited or certified by top information security standards? ..................................................................................................................17

56.  The company disclosed that they have not experienced a material cybersecurity breach, attack, or incident. Why is the disclosure not considered as immaterial breach? ..............17

57.  The board has oversight over sustainability/climate. Why is the board not considered for the sustainability/climate committee? ..................................................................................17

58.  Why does a financially literate member of the audit committee is not considered as a financial expert? ..................................................................................................18



# General Questions

**1.  How can I find more information about Governance QualityScore?**

Please see the Governance QualityScore Methodology Fundamentals.

**2.  What are valid sources ISS will consider for Governance QualityScore?**

Governance QualityScore considers any publicly disclosed filing or document such as (1) company regulatory filings, (2) company press releases, and (3) any filing, document, or report posted in the company's website. Please note that some factors use specific filings, such as Annual Reports or equity plan documents, as sources. Meeting materials, such as Annual Reports and proxy statements, will be covered during the company's meeting profile.

**3.  How can I request a correction to my Governance QualityScore?**

Governance QualityScore Data Verification requests should be submitted through Compass.

**4.  I requested a correction to my Governance QualityScore through Compass. When will I receive a response?**

If there are no issues regarding the Governance QualityScore Data Verification request, expect a response between 1-2 weeks.  If there are issues, ISS will respond through Governance QualityScore Data Verification after the issue has been adequately reviewed.

**5.  I requested a correction to my Governance QualityScore through Compass, and ISS responded that there are no changes to be made based on the information provided.**

**a.  However, I still have additional information to present for further consideration. Can I re-submit?**

Yes. Please note that re-submissions through Governance QualityScore Data Verification with additional information following ISS feedback is highly recommended.

**b.  However, I do not understand the additional details from ISS. How can I receive additional information?**

The company may re-submit their follow-up questions or clarifications through Governance QualityScore Data Verification.

**6.  I requested a correction to my Governance QualityScore through Compass, and ISS responded that changes have been made. Why are the changes not reflected in my profile?**

Changes will be reflected 24 hours after the ISS response. If the 24-hour period has passed, please re-submit.

**7. I requested a correction to my Governance QualityScore through Compass, and I disagree with the response from ISS. To whom can I escalate the issue(s)?**

The company may re-submit a request with additional detail through Governance QualityScore Data Verification. Please note that ISS has its own data collection methodology to ensure consistency and comparability.

If ISS has responded and there are still further inquiries, please contact the ISS Help Center.

**8. What is the Governance QualityScore "Blackout Period"?**

Governance QualityScore has two "Blackout Periods": the Annual Meeting Blackout Period and the Governance QualityScore Methodology Release Blackout Period.

The Annual Meeting Blackout Period begins when the company files its proxy or meeting materials and ends twenty-four hours after the publication of a company's ISS Benchmark report. During this time, the company's Governance QualityScore profile is frozen and will not reflect the latest information.

The Governance QualityScore Methodology Release Blackout Period has two phases: Phase 1 is the week before the Governance QualityScore Methodology Data Verification Period. Phase 2 is the week after the Governance QualityScore Methodology Data Verification Period. During these two phases, the company's Governance QualityScore profile will be live and will continue to reflect the latest information.

Governance QualityScore profiles are updated daily at approximately 5am ET (10 AM UTC). After the ISS Benchmark Report has been published, the Governance QualityScore profile will be available twenty-four hours later.

**9. Our ISS Benchmark Research Report was published today. Why did our Governance QualityScore not update on Compass?**

The Governance QualityScore that reflects in the ISS Research Report may differ from the one shown on Compass prior to report publication. See Item 8 regarding the Governance QualityScore "Blackout Period".

Governance QualityScore profiles are updated daily at approximately 5am ET (10 AM UTC). After the ISS Benchmark Report has been published, the Governance QualityScore profile will be available twenty-four hours later.

**10. Why can't I request a correction to my Governance QualityScore through Compass?**

See Item 8 regarding the Governance QualityScore "Blackout Period".

**11. What is the weight or score of a category, subcategory, or factor?**

Governance QualityScore weights and scores are proprietary. However, some factors are unscored. Please see the Governance QualityScore Methodology Fundamentals.



**12. What is the difference between Governance QualityScore Data Verification and ISS Data Verification?**

Governance QualityScore Data Verification allows companies that are part of the Governance QualityScore universe to review, verify, and provide feedback on the individual factors that comprise their respective Governance QualityScore. ISS Data Verification allows a specific set of companies to review, verify, and provide feedback on data points, not factors.

**13. We already filed our Annual Report. When will ISS update our Governance QualityScore?**

Governance QualityScore will be updated after the Annual General Notice of Meeting has been publicly filed, and the ISS Benchmark Research Report has been published.

**14. We filed our Preliminary Proxy Statement (PRE14A). When will ISS update our Governance QualityScore?**

For the US, ISS will only consider the Definitive Proxy Statement (DEF14A) for the company's annual general meeting.

**15. I requested a correction to my Governance QualityScore through Compass based on our latest proxy statement/notice of meeting. When will ISS update our Governance QualityScore profile?**

In cases when the company submits a Governance QualityScore Data Verification request immediately after filing their latest proxy statement/notice of meeting and before the Governance QualityScore "Blackout Period" begins, Governance QualityScore will not consider the request while meeting profiling and analysis are in progress.

**16. I requested a correction to my Governance QualityScore through Compass regarding information not publicly disclosed. Why didn't ISS update our Governance QualityScore profile?**

ISS will only consider publicly disclosed information when updating a company's Governance QualityScore profile. See Item 2 regarding valid sources ISS will consider for Governance QualityScore.

**17. Does Governance QualityScore affect the ISS Benchmark Vote Recommendation?**

No. The ISS Benchmark Report analysis can influence Governance QualityScore but not conversely.

**18. Why did my answers change when I didn't do anything?**

Outside of companies' annual meetings, ISS reviews new filings, updates companies' corporate governance profile, and ensures Governance QualityScore is up-to-date. These filings include changes to bylaws, adoptions and redemptions of poison pills, mid-year director appointments, and other significant company events disclosed by the company, regulator, or other government agency. Meeting materials, such as annual reports and proxy statements, are not covered by the real-time update. For most markets, ISS will review ad hoc disclosures on a quarterly basis and update company corporate governance profiles when necessary. However, for the US and Canada, ISS will review as companies file with EDGAR and SEDAR, respectively.



Please see Governance QualityScore Methodology Fundamentals for more information.

### 19. Does Governance QualityScore perform amplification?

No. Generally, the governance of a subsidiary or an affiliated company can be substantially different from the governance of its parent company. Many aspects of a company's governance disclosure and practices are specific to the company being assessed. These differences are exacerbated when the subsidiary or the affiliated company is not listed or is listed in another region because applicable governance standards and best practices can vary across markets and company types.



## Board Structure

### 20. How does Governance QualityScore define independence?

Independence determination of Governance QualityScore is based on the ISS classification of independence, which may differ from the company's or exchange's rules. Please see the ISS policy documents in the Policy Gateway for more information.

### 21. We appointed an independent director outside of the annual general meeting. Why didn't the independence of the board change?

For mid-year director appointments or resignations in the US, ISS will review 8-K filings to ensure company boards are up-to-date. Typically, 8-K filings of mid-year director appointments contain insufficient information for ISS to determine the independence classification of the appointed director. In these cases, directors are deemed as "unclassified." As a result, Governance QualityScore factors relying on the independence classification of directors will ignore "unclassified" directors. Specifically, Governance QualityScore factors calculating any board or committee percentages will not consider directors deemed as "unclassified."

Mid-year director appointments or resignations in Canada operate similarly to the US except ISS will also review news releases and other related sources.

Please see Governance QualityScore Methodology Fundamentals for more information.

### 22. How do former employees impact independence calculations?

Former employees are considered affiliated with the company. Former Interim CEO position will not be considered as former employment. Please see the ISS policy documents in the Policy Gateway for more information.

### 23. Why does Governance QualityScore say that my committee independence is not yet known, *i.e.*, "Due to changes in the board, the percentage of the <insert committee here> committee that is independent is not yet known."?

Governance QualityScore will reflect that a committee's independence is not yet known in cases when the future composition of the committee is not yet known, *e.g.*, the chair of the committee did not stand for re-election at the company's meeting with no public announcement on the replacement or the resignation of a committee member with no definite replacement resulted in a vacant seat.

### 24. We have a woman executive as a named executive officer. When will this be reflected in Governance QualityScore?

Governance QualityScore will consider women executives whose compensation (remuneration) is disclosed in the company's latest annual proxy, management information circular, or annual report, per each market's regulatory guidelines.

Please see Governance QualityScore Methodology Fundamentals for more information.

### 25. What are the thresholds for material related party transactions?

Please see the ISS policy documents in the Policy Gateway for more information.



### 26. What are the requirements for Governance QualityScore to make a preliminary determination for the newly appointed director's classification outside of the annual general meeting?

Governance QualityScore requires all of the relevant details a company would disclose in the proxy statement or meeting materials. Please see the ISS policy documents in the Policy Gateway for more information regarding the ISS Classification of directors. For US and Canada, see the requirements below:

#### a. US

US companies may receive a preliminary ISS independence classification if they are able to provide the following information about the appointed director(s):

1. Current position;
2. The company's determination of whether the director is independent under its listing standards;
3. Any previous employment at the company;
4. Any transaction (per Item 404a of Regulation S-K) in the most recently concluded fiscal year and the current fiscal year-to-date between the company and the following:
   a. The director,
   b. The director's employer, or
   c. The director's immediate family members' current employer

#### b. Canada

Canadian companies may receive a preliminary ISS independence classification if they are able to provide the following information about the appointed director(s):

1. The board's determination of whether the director is independent as required to be disclosed in the Management Information Circular;
2. All transactions in the most recently concluded fiscal year between the company and the following:
   a) The director,
   b) The director's employer,
   c) An immediate family member, or
   d) An immediate family member's employer (in the last 3 calendar years)
   Companies must state the percentage that the amount represents of the recipient's revenues. There is no *de minimis* threshold.
3. Family relationships;
4. Compensatory arrangements;
5. Beneficial stock ownership;
6. Any previous employment with the company, a former parent company, or an acquired company;
7. Whether the director is a party to a voting agreement to vote in line with management on proposals being brought to shareholder vote and a brief summary of the agreement;
8. Whether the director is a founder of the company, but not currently an employee and the extent of the director's operational involvement with the company;
9. Whether there is any other connection with the company other than a board seat.

### 27. How is director tenure calculated?

Tenure is calculated based on the director's start date, which includes the month and year the director joined the board.

### 28. How does Governance QualityScore compute standard deviation for applicable factors?

Governance QualityScore uses a sample standard deviation for the factors requiring standard deviation.

### 29. How does Governance QualityScore evaluate if a director is overboarded?

Governance QualityScore will evaluate if a director is overboarded based on ISS policy. Please see the ISS policy documents in the Policy Gateway for more information.

### 30. How does ISS compute percentage of vote support?

Governance QualityScore will calculate the vote support based on the disclosed shares voted FOR the proposal divided by the sum of the shares voted FOR and AGAINST, multiplied by 100. Abstentions and broker non-votes are not included in the calculation.

### 31. Why is the country law, index requirements, or exchange requirements regarding the gender diversity policy for our board and/or executives not reflected in our profile?

Governance QualityScore will collect as disclosed despite country law, index requirements, or exchange requirements.

### 32. How does Governance QualityScore compute average percentage of director skills?

Governance QualityScore will evaluate the average percentage of director skills by calculating the geometric mean of percentage of each director's skills.

### 33. What does Governance QualityScore consider for average percentage of director skills?

Governance QualityScore will consider the following director skills: Leadership, Global Expertise, Industry-relevant experience, Financial/Investment expertise, Technology/Engineering, Risk Management, Government/Military, Audit/Accounting, Sales/Marketing/Public Relations, Academia, Legal/Government Affairs, Human Resources, Strategic Planning/Development, Operations, Mergers and Acquisitions, ESG, and Information Security.

### 34. What does Governance QualityScore consider for board leadership positions?

Governance QualityScore will consider the following board leadership positions: Board Chair, Audit Committee Chair, Compensation Committee Chair, Nominating Committee Chair, Senior Independent Director, Non-Employee Vice Chair, Lead Director, or Higgsian Chair.

### 35. What does Governance QualityScore consider for board ethnic diversity?

Governance QualityScore will consider boards that include one or more of the following ethnicities as exhibiting diversity: Black/African American, Hispanic/Latin American, Asian, Indian/South Asian, Middle Eastern/North African, Native American/Alaskan Native, or Native Hawaiian/Other Pacific Islander.



### 36. What is the impact of classified boards to director election vote support?

For classified boards, Governance QualityScore will evaluate the lowest percentage of vote support received by management nominees regardless of when the director was elected at a company's annual general meeting.

### 37. How is the percentage of outstanding stock of directors and executives calculated?

For the US, this Governance QualityScore factor will display the total level of stock holdings of directors and executives as a percentage of outstanding shares. Non-voting shares are not included in the calculation.

### 38. What is the impact of having a Higgsian Chair to board independence?

For Anglo, Governance QualityScore will include the Higgsian Chair, considered as non-independent, in the overall board independence calculation.

### 39. Why is the percentage of the board independence flowing as a number instead of a percentage?

For Anglo, Governance QualityScore will output a percentage for companies who are constituents of the FTSE 350 or ISEQ 20, and a number for companies who are non-constituents.



## Compensation

### 40. What does Governance QualityScore consider as a pay-for-performance misalignment and problematic pay practice or policy?

Pay-for-performance misalignments include but are not limited to the rigor of performance conditions on incentive plans, the percentage of performance-based equity pay, whether termination provisions may enable "pay for failure," the presence of retention or other discretionary awards, "realizable" pay relative to granted pay, and other features of the pay design as deemed appropriate to the company's specific circumstances.

Problematic pay practices or policies include but are not limited to issues on non-performance-based compensation elements, *e.g.*, excessive perquisites; incentives that may motivate excessive risk taking; and specific problematic practices such as options backdating or repricing held by top executives and/or directors or repricing any options without shareholder approval.

Please see the ISS policy documents in the Policy Gateway for more information.

### 41. Are all types of equity grants considered in evaluating director and executive stock ownership guidelines?

No. For the US, unexercised appreciation awards, unvested stock awards, and unearned performance awards are not considered as these awards remain highly subject to forfeitures and cancellations.

Please see U.S. Procedures & Policies (Non-Compensation) FAQ for more information.

### 42. What does Governance QualityScore consider as special grants?

Governance QualityScore considers equity awards that are outside the scope of a compensation program as special grants. These out-of-program equity awards include new-hire grants, new employment agreements (or retention grants), and all other one-time grants.

### 43. What does Governance QualityScore consider for the short-term incentive plans or the long-term incentive plans for executives?

Governance QualityScore considers disclosures for the Short-Term Incentive (STI) plans and Long-Term Incentive (LTI) plans from either the most recently concluded fiscal year (retrospective) or for the upcoming fiscal year (prospective). Specific regions such as Anglo, Africa, Germanic, and Southern Europe apply a priority for prospective disclosures over retrospective disclosures.



**44. What does Governance QualityScore consider for equity plan vesting periods?**

Governance QualityScore considers the minimum (or shortest) vesting periods mandated in equity awards as disclosed in equity plan documents, remuneration policy, or remuneration report. Specific regions apply other considerations such as a hierarchy of sources, priority of the plan participants, and etc.

For US and Canada, see additional considerations below:

**a. US**

1. Examines disclosures from the company's active broad based equity plan document(s);
2. Looks into both time- and performance-based awards;
3. Prioritizes equity plans applicable to majority of the plan participants;

**b. Canada**

1. Examines full vesting period for actual award grants to executives within the last three fiscal years;
2. Prioritizes CEO performance-based grants over time-based grants

**45. What awards does Governance QualityScore consider in evaluating long-term incentive plans?**

Governance QualityScore considers stock options, stock appreciation rights, full value awards, warrants, cash awards, and other equity awards. The scope of awards may differ by Governance QualityScore region.

**46. What does Governance QualityScore consider as "modifiers"?**

Modifiers are performance conditions that positively or negatively adjust the bonus payouts by a certain percentage or amount. For the US, Governance QualityScore considers "modifiers" under the Short-Term Incentive (STI) plans and Long-Term Incentive (LTI) plans if these: (1) have disclosure of a pre-determined metric name and defined percentage/amount of payout adjustment, or (2) are explicitly called modifier/s and included in the formula of the STI or LTI program.

**47. How does Governance QualityScore evaluate disclosures for the short-term incentive plans or the long-term incentive plans for executives?**

Governance QualityScore evaluates the level of disclosure of performance measures for Short-Term Incentive (STI) plans and Long-Term Incentive (LTI) plans depending on the performance hurdles disclosed.



### 48. What does Governance QualityScore consider in evaluating holding period for executives?

Governance QualityScore considers the existence of a mandatory holding or retention period requiring executives to hold a meaningful portion of the shares acquired after the vesting of stock awards or after the exercise of appreciation awards. A policy that contains a selling restriction for the shares acquired prior to the satisfaction of the executives' stock ownership guidelines is also considered.

For US and Canada, actual grant or vesting practices for any issued equity awards are not considered.



# Shareholder Rights

### 49. What does Governance QualityScore consider material restrictions to call a special meeting?

Material restrictions include those that prohibit special meetings more than 90 days from the prior (or planned future) annual meeting date, those that may be interpreted to preclude director elections or other significant business, those that require a unanimous vote, and those that effectively raise the ownership threshold required.

### 50. How does Governance QualityScore treat companies that have only one provision that requires a supermajority vote requirement to approve amendments to the charter or bylaws?

Companies will be considered to have a supermajority vote requirement to approve amendments to the charter or bylaws if at least one section requires it.

### 51. What is the difference between majority vote standard and majority vote policy in the US market?

A "majority vote standard" requires that directors must receive support from holders of a majority of shares voted to be elected (or re-elected) to serve on the company's board. For the US, a "majority vote policy" is a term sometimes used to describe a director resignation policy, which is the post-election process to be followed if a director does not receive a majority of votes cast. Such resignation policies can accompany either a majority or a plurality vote standard.



# Audit & Risk Oversight

### 52. When will we be untagged for an investigation or enforcement action?

The company will be untagged for an investigation after the matter is settled or closed. The company will be untagged for an enforcement action after two years since the settlement. Settlement or enforcement actions must be publicly disclosed for the company to be untagged for investigations.

### 53. When will we be untagged for late filings?

The company will be untagged for late filings for the next annual general meeting after two years have passed since the period end date of the late filing. Alternatively, if two years have passed since the period end date of the late filing, the company may request a Governance QualityScore Data Verification.

### 54. What is considered as information security expert?

A director with information security experience will have any of the following:
- o Current or previous employment with companies in information security or relevant industries,
- o Current or previous employment positions relevant to information security,
- o Certifications in information security or similar, or
- o Explicit disclosure of information security expertise.

### 55. What is considered as externally audited or certified by top information security standards?

Governance QualityScore will consider whether companies have been audited to Federal Risk and Authorization Management Program (FedRamp) or System and Organization Controls 2 (SOC 2), have ISO 27001, Federal Information Security Management Act of 2002 (FISMA), or Health Information Trust Alliance (HITRUST) certification in the relevant industry, or have Trusted Information Security Assessment Exchange label. Following a certain guideline or a specific framework is not considered.

### 56. The company disclosed that they have not experienced a material cybersecurity breach, attack, or incident. Why is the disclosure not considered as immaterial breach?

Governance QualityScore will consider confirmed breaches and material incidents. Unclear disclosures like "we have not experienced any material breach" are not considered.

### 57. The board has oversight over sustainability/climate. Why is the board not considered for the sustainability/climate committee?

Governance QualityScore will evaluate the percentage of directors on the sustainability/climate committee who are independent according to the ISS definition of director independence. If a standalone sustainability/climate committee does not exist, ISS will evaluate the committee that has primary responsibility of sustainability/climate oversight.





### 58. Why does a financially literate member of the audit committee is not considered as a financial expert?

For the US, Canada, and Latin America, Governance QualityScore will only consider Audit Committee members who are explicitly disclosed as financial expert by the company.



# We empower investors and companies to build for long-term and sustainable growth by providing high-quality data, analytics, and insight.

## SUCCEED WITH ISS ESG SOLUTIONS

Email sales@iss-esg.com or visit iss-esg.com for more information.

ISS ESG solutions enable investors to develop and integrate responsible investing policies and practices, engage on responsible investment issues, and monitor portfolio company practices through screening solutions. It also provides climate data, analytics, and advisory services to help financial market participants understand, measure, and act on climate-related risks across all asset classes. In addition, ESG solutions cover corporate and country ESG research and ratings enabling its clients to identify material social and environmental risks and opportunities.

This document and all of the information contained in it is the property of Institutional Shareholder Services Inc. ("ISS") or its subsidiaries. The Information may not be reproduced or redisseminated in whole or in part without prior written permission of ISS. ISS MAKES NO EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE INFORMATION. ISS is part of the ISS STOXX GmbH group of companies.

© 2024 | ISS STOXX GmbH and/or its affiliates

**EXHIBIT 13**



(https://insights.issgovernance.com)

&#9776;    &#128269;

TOPIC

## ISS NEWS, EVENTS, & COMMENTARY (HTTPS://INSIGHTS.ISSGOVERNANCE.COM/TOPICS/ISS-NEWS-EVENTS-COMMENTARY/)

FEBRUARY 11, 2025

# Statement Regarding Consideration of Diversity Factors in U.S. Director Election Assessments

*Tags: Benchmark Policy (https://insights.issgovernance.com/tags/benchmark-policy/), DEI (https://insights.issgovernance.com/tags/dei/), Specialty Policy (https://insights.issgovernance.com/tags/specialty-policy/)*



8/22/25, 5:43 PM
Case 1:25-cv-01153-ADA   Document 39-1   Filed 09/05/25   Page 201 of 495
Statement Regarding Consideration of Diversity Factors in U.S. Director Election Assessments

Institutional Shareholder Services (ISS) annually conducts a thorough, rigorous, and transparent policy review to consider updates to its Benchmark policy and its Specialty policies for the upcoming proxy season.  On an exceptional basis, ISS also considers updates to its policies in light of relevant legal and regulatory changes and/or other emerging issues affecting investors and their portfolio companies.

In the United States, there recently has been increased attention on diversity, equity, and inclusion (DEI) practices, including the issuance last month of Presidential Executive Orders on DEI.  We anticipate that institutional investors and U.S. companies will have a range of perspectives on DEI, including whether and how companies can or should adapt their specific policies and practices to the evolving market and governmental activity.

In light of these developments, ISS will indefinitely halt consideration of certain diversity factors in making vote recommendations with respect to directors at U.S. companies under its proprietary Benchmark and Specialty policies.  Specifically and for shareholder meeting reports published on or after February 25th, ISS will no longer consider the gender and racial and/or ethnic diversity of a company's board when making vote recommendations with respect to the election or re-election of directors at U.S. companies under its Benchmark and Specialty policies.  Assessments and vote recommendations on directors of U.S. companies will continue to be evaluated under the other considerations outlined in the Benchmark and Specialty voting guidelines (accessible here (https://www.issgovernance.com/policy-gateway/voting-policies/)) including independence, accountability and responsiveness.

ISS will continue to review its Benchmark and Specialty guidelines as appropriate.

###

SHARE THIS

## RELATED POSTS

**EXHIBIT 14**

SULLIVAN & CROMWELL

Report    August 11, 2025

# 2025 Proxy Season Review: Part 1

*Rule 14a-8 Shareholder Proposals*

BEIJING | BRUSSELS | FRANKFURT | HONG KONG | LONDON | LOS ANGELES
MELBOURNE | NEW YORK | PALO ALTO | PARIS | SYDNEY | TOKYO | WASHINGTON, D.C.

sullcrom.com

SULLIVAN & CROMWELL

## KEY TOPICS

**Submission of Rule 14a-8 proposals fell (▼13%) for first time since 2020**

- Environmental, social and political ("ESP") submissions fell by a more significant margin (▼20%), offset in small part by an increase (▲3%) in governance proposals

- Submissions from "anti-ESG" proponents continued to increase, representing 15% of all proposals and 4.5x the number in 2021; submissions focused on social issues but also included new proposals on cryptocurrency

**Voted proposals decreased (▼24%); only 55% of submissions reached a vote**

- Volume of no-action requests continued to increase (▲42%), resulting in 17% of submitted proposals being excluded through SEC no-action process

- With new guidance issued mid-season, SEC granted 72% of no-action requests; success rates increased for ESP proposals (▲22%) but decreased for governance proposals (▼11%)

- Voted social/political proposals decreased significantly (▼45%) due to high levels of no-action relief and shareholder withdrawals obtained

**Overall shareholder support (22%) was consistent with 2024, but average support for ESP proposals decreased (▼31%) to 11% of votes cast**

- Trump administration policies and new SEC guidance impacted policies and engagement practices of institutional investors and proxy advisors this season, particularly on ESP

- Average shareholder support for DEI proposals fell to a record low of 6%, with ISS recommending in favor of only one proposal (vs. 29 in H1 2024)

- Classic "good governance" proposals that have been widely adopted—majority voting for directors, board declassification and elimination of supermajority vote—received high support levels, in each case averaging >70% of votes cast

**Six management proposals seeking approval of corporate redomestication passed, including three "DExit" proposals opposed by ISS**

SULLIVAN & CROMWELL

## INTRODUCTION

Our annual proxy season review memo summarizes significant developments relating to the 2025 U.S. annual meeting proxy season. Our review comprises three parts. Part 1 covers Rule 14a-8 shareholder proposals and other "hot topics" (e.g., companies seeking redomestication and developments related to proxy advisors and institutional investors). We expect to issue Part 2—which will cover say-on-pay voting and equity compensation plan voting—and Part 3—which will cover shareholder activism trends—in the coming weeks. We will also host our annual webinar in September to discuss 2025 proxy season developments.

The Rule 14a-8 shareholder proposals we discuss are those submitted to and/or voted on at annual meetings of the U.S. members of the S&P Composite 1500, which covers approximately 90% of U.S. market capitalization, at meetings held on or before June 30, 2025. We estimate that around 90% of U.S. public companies held their 2025 annual meetings by that date.

The data on submitted, withdrawn and voted-on shareholder proposals derives, in part, from Institutional Shareholder Services' ("ISS") voting analytics with respect to known shareholder proposals submitted this year to U.S. members of the S&P Composite 1500. We have supplemented the ISS data with information published by proponents and companies, and based on our independent research, experience and knowledge. The number of proposals submitted includes proposals that were excluded from a company's proxy statement as a result of the U.S. Securities and Exchange Commission's ("SEC") no-action process or withdrawn after being included in a company's proxy statement (usually following engagement with the company). The data on submitted proposals understates the number of proposals actually submitted, as it does not include proposals that were submitted and then withdrawn unless either the proponent or the company disclosed the proposal (e.g., referenced in the company's proxy statement, reported to ISS or posted on their websites).

For a comprehensive discussion of U.S. public company governance, disclosure and compensation, see the *Public Company Deskbook: Complying with Federal Governance and Disclosure Requirements* (Practising Law Institute) by our colleagues Marc Trevino and Benjamin Weiner, available at http://www.pli.edu, or by calling 1-800-260-4754 (1-212-824-5700 from outside the United States).

SULLIVAN & CROMWELL

## TABLE OF CONTENTS

Part I. Rule 14a-8 Shareholder Proposals ........................................................................... 1
    A.    Overview ........................................................................................................... 1
    B.    Who Makes Shareholder Proposals ................................................................. 3
    C.    Targets of Shareholder Proposals ................................................................... 5
    D.    Updates to SEC's Rule 14a-8 Guidance ......................................................... 7
    E.    Social/Political Proposals ................................................................................. 9
        1.    Increasing Polarization on Diversity-Related Proposals ..................... 10
        2.    Fewer Political Spending/Lobbying Proposals Reaching a Vote ....... 13
        3.    Continued Focus on Artificial Intelligence ......................................... 13
    F.    Governance Proposals .................................................................................. 15
        1.    Continued Focus on Structural Governance ...................................... 16
        2.    Low Submissions on Board Composition Topics ................................ 18
        3.    Shareholder and Management Evaluating Viability of
            Redomestication ............................................................................... 18
        4.    Cryptocurrency Proposals Emerge .................................................... 20
    G.    Environmental Proposals ............................................................................... 21
        1.    Decreasing Submission and Success of Climate Proposals ............. 22
        2.    Nature Proposals Growing ................................................................. 25
    H.    Compensation Proposals ............................................................................... 26
        1.    Surge in Proposals Opposing ESG-Linked Compensation ............... 26
        2.    Low Support for Clawback Proposals ................................................ 27
        3.    Increasing ISS and Shareholder Support for Severance Proposals .. 28
    I.    Exempt Solicitation ........................................................................................ 28
    J.    Other Recent Developments .......................................................................... 28
        1.    Intensifying Scrutiny on Proxy Advisors ............................................ 28
        2.    13G Guidance and Impact on Institutional Investor Engagement ..... 30

## SULLIVAN & CROMWELL

# PART I.  RULE 14A-8 SHAREHOLDER PROPOSALS

## A.  OVERVIEW

| Type of Proposal | Submitted | | Voted On | | Average Support | | Passed | |
|---|---|---|---|---|---|---|---|---|
| | H1 2025 | H1 2024 | H1 2025 | H1 2024 | H1 2025 | H1 2024 | H1 2025 | H1 2024 |
| **Social/Political** | 289 ▼ | 365 | 137 ▼ | 249 | 11% ▼ | 15% | 3 ▲ | 1 |
| *Diversity/Anti-Discrimination* | 94 ▼ | 100 | 51 ▼ | 73 | 6% ▼ | 13% | 0 = | 0 |
| *Social Capital Management* | 79 ▼ | 97 | 33 ▼ | 61 | 10% ▼ | 12% | 0 = | 0 |
| *Political Spending/Lobbying* | 59 ▼ | 81 | 22 ▼ | 62 | 28% ▲ | 21% | 3 ▲ | 1 |
| *Human Capital Management* | 29 ▼ | 54 | 15 ▼ | 29 | 13% ▼ | 17% | 0 = | 0 |
| *Charitable Contributions* | 16 ▲ | 4 | 9 ▲ | 3 | 1% ▼ | 4% | 0 = | 0 |
| *Artificial Intelligence* | 6 ▼ | 13 | 5 ▼ | 10 | 8% ▼ | 20% | 0 = | 0 |
| *Reproductive Rights* | 6 ▼ | 10 | 2 ▼ | 7 | 10% ▲ | 7% | 0 = | 0 |
| *Voting Alignment* | 0 ▼ | 6 | 0 ▼ | 4 | — | 8% | 0 = | 0 |
| **Governance** | 260 ▲ | 252 | 160 ▲ | 157 | 38% ▼ | 40% | 39 ▼ | 41 |
| *Structural Governance* | 175 ▲ | 157 | 121 ▲ | 95 | 43% ▼ | 51% | 39 = | 39 |
| *Board Composition* | 36 ▼ | 53 | 28 ▼ | 46 | 27% ▲ | 26% | 0 = | 0 |
| *Cryptocurrency* | 5 ● | 0 | 1 ● | 0 | 0% ● | — | 0 ● | 0 |
| *Misc. Governance[1]* | 44 ▲ | 42 | 10 ▼ | 16 | 0% ▼ | 14% | 0 ▼ | 2 |
| **Environmental** | 132 ▼ | 162 | 68 ▼ | 80 | 10% ▼ | 18% | 0 ▼ | 2 |
| *Climate* | 74 ▼ | 101 | 45 ▼ | 55 | 10% ▼ | 19% | 0 ▼ | 2 |
| *Nature* | 42 ▲ | 36 | 20 ▲ | 13 | 12% ▼ | 14% | 0 = | 0 |
| *Supply Chain Sustainability* | 8 ▲ | 6 | 0 ▼ | 5 | — | 12% | 0 = | 0 |
| *Just Transition* | 2 ▼ | 16 | 2 ▼ | 6 | 13% ▼ | 19% | 0 = | 0 |
| *Misc. Environmental* | 6 ▲ | 3 | 1 = | 1 | 2% ▼ | 18% | 0 = | 0 |
| **Compensation** | 66 ▼ | 79 | 49 ▼ | 60 | 17% ▲ | 14% | 0 = | 0 |
| **Total** | 747 ▼ | 858 | 414 ▼ | 546 | 22% ▼ | 23% | 42 ▼ | 44 |

▼ Down from H1 2024      ▲ Up from H1 2024      = Consistent with H1 2024      ● New

The 2025 proxy season unfurled against a rapidly shifting political and regulatory backdrop. The dizzying pace of developments from courts, as well as lawmakers, regulators, and other political actors, resulted in an unpredictable and volatile proxy season for companies, investors, proxy advisors and other stakeholders. Broadly speaking, for H1 2025 annual meetings, companies (1) received shareholder proposals during the period between the presidential election and inauguration, (2) explored no-action relief as the SEC was revising its Rule 14a-8 guidance to increase the availability of exclusionary relief (see Section D) and (3) received proxy advisor recommendations and shareholder votes after the Trump administration issued Executive Orders and took other measures on prevalent Rule 14a-8 topics, such as diversity, equity and inclusion ("DEI").

***Submitted Proposals.*** The number of submitted proposals declined for the first time since 2020, decreasing by 13% compared to H1 2024. Although environmental, social and political ("ESP") proposals continued to represent the majority of submissions (57% vs. 62% in H1 2024), proposals on ESP topics decreased in H1 2025 while governance proposals increased, narrowing the gap between the categories.

---

[1]    In addition to company-specific proposals, this includes 19 proposal submitted by Chris Mueller focused on Computershare-related administrative matters, all of which have been excluded through the no-action process.

# SULLIVAN & CROMWELL



**Submission Trends by Category**

***Voted Proposals.*** Compared to submissions, the number of voted proposals declined by a more significant margin, down 24% compared to H1 2024. Only 55% of proposals reached a vote, compared to 64% during the same period last year. In particular, the number of voted social/political proposals decreased by 45% compared to H1 2024.



**Overall Submission/Voting Trends**

***Excluded Proposals.*** The decrease in voted proposals reflected the high volume and success of no-action requests, consistent with a marked change in the SEC's position. Companies requested no-action relief with respect to 45% of submissions for H1 2025 meetings (vs. 28% for H1 2024). This represented a 42% year-over-year increase in the volume of requests (335 vs. 236 for H1 2024, more than doubling the number for H1 2023). The percentage of requests granted by the SEC increased by only 5% overall (72% vs. 67% for H1 2024), but a category-by-category examination reveals more meaningful trends. The percentage of successful requests increased by 24% for social/political proposals and 16% for environmental proposals, but decreased by 11% for governance proposals and 18% for compensation proposals. These year-over-year statistics also obscure the effect of withdrawn no-action requests by companies, which occurred with respect to 46% of no-action requests made for H1 2025 (vs. 22% for H1 2024).[2] Overall, 17% of all proposals submitted for H1 2025 meetings were excluded through the SEC process (vs. 15% for H1 2024).

---

[2] *See* <u>Section D</u>.

2025 Proxy Season Review
Part 1 – Rule 14a-8 Shareholder Proposals

SULLIVAN & CROMWELL

***Shareholder Support.*** Although overall shareholder support for voted proposals remained level, average shareholder support for ESP proposals decreased by 31% compared to H1 2024. Generally consistent with the 2024 proxy season, only around 10% of voted proposals passed,[3] almost all in the governance category.

### B.  WHO MAKES SHAREHOLDER PROPOSALS

| | *Named Filers* | *H1 2025* *(vs. H1 2024)* | *Social/* *Political* | *Governance* | *Environmental* | *Compensation* |
|---|---|---|---|---|---|---|
| 1 | John Chevedden | **256** (199) ▲ | 45 ▲ | 160 ▲ | 8 = | 43 ▼ |
| 2 | As You Sow | **44** (70) ▼ | 11 ▼ | 1 ▲ | 31 ▼ | 1 ▼ |
| 3 | National Center for Public Policy Research | **37** (54) ▼ | 24 ▼ | 8 ▼ | 5 ▼ | 0 = |
| 4 | National Legal and Policy Center | **28** (29) ▼ | 8 ▼ | 5 = | 6 ▲ | 9 ▲ |
| 5 | Green Century Capital Management | **20** (32) ▼ | 0 ▼ | 0 ▼ | 20 ▼ | 0 = |
| 6 | Chris Mueller | **19** (4) ▲ | 0 = | 19 ▲ | 0 = | 0 = |
| 7 | The Accountability Board | **19** (19) = | 1 ▼ | 11 ▲ | 7 ▲ | 0 = |
| 8 | Carpenters Pension Fund | **17** (38) ▼ | 0 = | 16 ▼ | 0 = | 1 ▲ |
| 9 | NYC/NYS Retirement | **17** (30) ▼ | 7 ▼ | 2 ▼ | 7 ▼ | 1 ▼ |
| 10 | Mercy Investment Services | **12** (37) ▼ | 6 ▼ | 2 ▲ | 4 ▼ | 0 = |

▢ Individual Proponents      ■ Social Investment Entities      ■ "Anti-ESG" Proponents      ▢ Other Proponents

▼ Down from H1 2024      ▲ Up from H1 2024      = Consistent with H1 2024

***Decreasing Submissions from "Traditional" Proponents.*** Proposals from the top 10 proponents once again accounted for a substantial majority of submissions. Other than John Chevedden, who maintained his position as the top proponent and whose submissions increased this year (256 vs. 199 last year, representing over one-third of all submissions and half of all governance submissions), submissions from other "traditional" proponents decreased. For example, submissions from religious organizations, which continued to focus on social/political topics, fell by 19%. Submissions from social investment entities, which remained the primary drivers of environmental proposals, also decreased by close to 10%. Whereas the 2024 proxy season was marked by a high level of union activity, unions submitted only 27 proposals for H1 2025 meetings (compared to 75 for H1 2024).

***Submissions from "Anti-ESG" Proponents Remain High.*** Proposals from "anti-ESG" proponents grew from 25 in full-year 2021 to over 100 for the first time in H1 2024.[4] In H1 2025, the number of these proposals further increased to 114, representing 15% of all proposals (compared to 13% in H1 2024).

---

[3]    In this publication, we refer to a proposal as "passing" if it received a majority of votes cast, regardless of whether this is the threshold for shareholder action under state law or the company's organizational documents.

[4]    In this publication, we refer to a proponent as an "anti-ESG" proponent if the proponent's official website states that it is asking companies to reconsider "ESG" or a "woke/liberal" agenda.

SULLIVAN & CROMWELL

Many high-profile companies received proposals calling for diverging approaches on the same topic, particularly where DEI was concerned. For example, after a number of companies rescinded or reduced their DEI commitments in 2024 (including in response to campaigns from social media activist Robby Starbuck), social investment entities (i.e., ESG funds and other institutions with a mandate to make "socially responsible" investments) submitted proposals demanding that companies expand or reinstate corporate DEI initiatives. Meanwhile, "anti-ESG" proponents called for companies to consider the legal and commercial risks associated with DEI initiatives, citing recent Supreme Court decisions in *Harvard* and *Groff*.[5] In some cases, after initially submitting their proposals in late 2024, these proponents followed up with exempt solicitations or other statements when President Trump issued Executive Orders in January outlining the administration's position on potentially illegal DEI practices.

Consistent with last year, companies requested to exclude proposals from "anti-ESG" proponents at a higher rate than for proposals from other proponents, with no-action requests submitted for 63% of proposals from "anti-ESG" proponents (vs. 44% of other proposals). The success rate for requests to exclude proposals from "anti-ESG" proponents continued to decrease (to 34% vs. 41% for H1 2024 proposals), in stark contrast with the 2023 proxy season, when proposals from "anti-ESG" proponents were more than twice as likely to be excluded than other proposals (76% success rate for requests to exclude proposals from "anti-ESG" proponents vs. 49% for other proposals).

Settlements with "anti-ESG" proponents remained rare, and proposals from these proponents went to a vote in almost all cases where they were not excluded. When voted, these proposals continued to garner very low levels of support, generally less than 3% of the vote.

---

[5]    On June 29, 2023, the Supreme Court issued its opinion in *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, holding that the race-based admission programs of Harvard and the University of North Carolina violated the Equal Protection Clause of the Fourteenth Amendment and, by extension, Title VI of the Civil Rights Act of 1964 (which applies to programs receiving federal assistance). On the same day, the court held in *Groff* v. *DeJoy* that Title VII requires an employer who denies a religious accommodation to an employee to show that the burden of granting an accommodation would impose an "undue hardship on the conduct of the employer's business" and that the hardship is "substantial in the overall context of the employer's business."

# SULLIVAN & CROMWELL

| Type of Proposal | Submitted | | Voted On | | Average Support | | Passed | |
|---|---|---|---|---|---|---|---|---|
| | H1 2025 | H1 2024 | H1 2025 | H1 2024 | H1 2025 | H1 2024 | H1 2025 | H1 2024 |
| **Social/Political** | **289**▼ | 365 | **137**▼ | 249 | **11%**▼ | 15% | **3**▲ | 1 |
| *"Anti-ESG" Proponents* | 78▲ | 69 | 46▼ | 59 | 2%= | 2% | **0**= | 0 |
| *Other Proponents* | 211▼ | 296 | 91▼ | 190 | 16%▼ | 19% | **3**▲ | 1 |
| **Governance** | **260**▲ | 244 | **160**▲ | 157 | **38%**▼ | 40% | **39**▼ | 41 |
| *"Anti-ESG" Proponents* | 15= | 15 | 5▼ | 6 | 5%▼ | 10% | **0**= | 0 |
| *Other Proponents* | 245▲ | 229 | 155▲ | 151 | 41%▼ | 43% | **39**▼ | 41 |
| **Environmental** | **132**▼ | 170 | **68**▼ | 80 | **10%**▼ | 18% | **0**▼ | 2 |
| *"Anti-ESG" Proponents* | 12▼ | 20 | 9▼ | 18 | 2%= | 2% | **0**= | 0 |
| *Other Proponents* | 120▼ | 150 | 59▼ | 62 | 11%▼ | 21% | **0**▼ | 2 |
| **Compensation** | **65**▲ | 79 | **49**▼ | 60 | **17%**▲ | 14% | **0**= | 0 |
| *"Anti-ESG" Proponents* | 9▲ | 4 | 4▲ | 3 | 1%= | 1% | **0**= | 0 |
| *Other Proponents* | 57▼ | 75 | 45▼ | 57 | 29%▲ | 15% | **0**= | 0 |
| *Total* | 747▼ | 858 | 414▼ | 546 | 22%▼ | 23% | 42▼ | 44 |
| *"Anti-ESG" Proponents* | 114▲ | 108 | 65▼ | 86 | 3%▲ | 2% | **0**= | 0 |
| *Other Proponents* | 633▼ | 750 | 349▼ | 460 | 26%= | 26% | 42▼ | 44 |

▼ Down from H1 2024     ▲ Up from H1 2024     = Consistent with H1 2024

## C.  TARGETS OF SHAREHOLDER PROPOSALS

***Fewer Voted Proposals at Large-Cap Companies.*** Large-cap companies continued to receive the vast majority of shareholder proposals, but proposals at the S&P 500 accounted for a lower portion of all voted proposals (78% vs. 88% in H1 2024), partly due to higher numbers of successful no-action requests and withdrawals at large-cap companies.[6] Unlike last year, proposals were more likely to reach a vote at small- and mid-cap companies than at large-cap companies, with 57% of submissions reaching a vote at small- and mid-cap companies (vs. 52% for large-cap companies). Similar to prior years, voted proposals at small- and mid-cap companies received higher support (37% of votes cast vs. 19% for large-cap companies).



Shareholder Proposals Voted On

---

[6]    In this publication, we refer to S&P 500 companies as "large-cap," the next largest S&P 400 companies as "mid-cap" and the next largest S&P 600 companies as "small-cap."

SULLIVAN & CROMWELL

Once again, "anti-ESG" proponents focused almost exclusively on large-cap companies, submitting all but three proposals to companies in the S&P 500 (vs. six in H1 2024). Several large-cap companies faced multiple proposals from "anti-ESG" proponents. Consistent with 2024, "anti-ESG" proponents focused their attention on financial services companies (which received 28% of these proponents' submissions), consumer goods/retail companies (24%) and technology companies (20%).

***Focus on Retail, Tech and Financial Sector Companies.*** Consistent with last year, consumer goods/retail companies received the largest number of proposals overall. These companies received 30% of overall submissions (vs. 27% in H1 2024), a disproportionately high portion relative to their representation among the S&P Composite 1500 (19%). Consumer goods/retail companies also far surpassed all other industries in terms of ESP proposals. Consistent with last year, technology companies received the second-largest number of proposals overall (17% in both years) and companies in the financials sector received the third-largest number of proposals overall (15% vs. 17% in H1 2024). The number of proposals submitted at industrial companies decreased (11% vs. 14% in H1 2024), driven by a decrease in the environmental submissions. Environmental proposals comprised 3% of total submissions at industrial companies (vs. 24% in H1 2024).



Overall Submissions by Industry

* Represents share of S&P 1500

***Targets of Multiple Proposals.*** In H1 2025, 34 companies received five or more proposals (vs. 40 companies in H1 2024) and five companies[7] received 10 or more proposals (vs. 11 companies in H1 2024).

---

[7]    Alphabet, Amazon, JPMorgan, Meta and Mondelez.

2025 Proxy Season Review
Part 1 – Rule 14a-8 Shareholder Proposals

SULLIVAN & CROMWELL

### D. UPDATES TO RULE 14A-8 GUIDANCE

***Staff Legal Bulletin No. 14M ("SLB 14M").*** On February 12, 2025, the SEC published SLB 14M regarding the exclusion of Rule 14a-8 shareholder proposals under Rule 14a-8(i)(5) ("economic significance") and Rule 14a-8(i)(7) ("ordinary business"). SLB 14M broadened the ability to exclude shareholder proposals on these bases by (1) rescinding Staff Legal Bulletin No. 14L ("SLB 14L"), which was issued on November 3, 2021 and narrowed the ability to exclude proposals with "broad societal impact" and (2) reinstating guidance previously rescinded by SLB 14L.[8]

The SEC issued SLB 14M mid-proxy season, after many companies' deadlines for making a no-action request had passed. Nonetheless, the new guidance had a significant impact on this proxy season, in part because SLB 14M specifically noted that the SEC staff will consider the publication of the new guidance to be "good cause" for making a late request so long as the legal arguments in the request relate to the new guidance.

***Increase in No-Action Requests.*** For the 2025 proxy season, no-action requests citing "ordinary business" increased by 44% (135 vs. 94 in H1 2024), comprising 41% of all no-action requests submitted, up from 26% in H1 2024. Requests citing "economic relevance," which historically has been an infrequently used exclusionary basis, comprised 5% of all no-action requests this year, compared to just 1% during each of the last two proxy seasons. However, the success rates under both exclusionary bases decreased. Success rate for requests citing "ordinary business" fell from 71% for H1 2024 meetings to 65% for this proxy season. Whereas all three requests citing "economic relevance" for H1 2024 meetings were granted, the SEC concurred with only 15% of such requests for H1 2025 meetings. It remains to be seen whether success rates on these bases will increase in future years as companies and the SEC staff continue to adjust to the new guidance. In addition, while the release of the new guidance mathematically correlated with high withdrawal rates this proxy season,[9] it is difficult to quantify the extent to which the new guidance actually caused proponents to withdraw their submissions.

***No-Action Requests on Social/Political Proposals.*** The rescission of SLB 14L also seemed to impact companies' willingness to request no-action relief with respect to social/political proposals. SLB 14M shifted the focus from whether a proposal raises an issue with "broad societal impact" to an analysis of the company-specific significance of the issue.[10] As a result, with respect to proposals on social and

---

[8]    In July 2022, the SEC also proposed to narrowed the "substantial implementation," "duplication" and "resubmission" bases for excluding shareholder proposals under Rule 14a-8. On June 12, 2025, the SEC withdrew its proposed rulemaking, stating that it did not intend to issue final rules with respect to this proposal.

[9]    Companies withdrew 46% of no-action requests after obtaining a withdrawal from the proponent (vs. 22% for H1 2024). Based on public information, it is more difficult to accurately quantify the number on withdrawals of proposals where companies did not seek to exclude via the SEC.

[10]   Whereas SLB 14L emphasized the consideration of whether a proposal "raises issues with broad society impact," SLB 14M focuses on a more company-specific approach. With respect to "economic relevance," SLB

2025 Proxy Season Review
Part 1 – Rule 14a-8 Shareholder Proposals

SULLIVAN & CROMWELL

political topics, companies requesting no-action relief did not need to demonstrate that the topic lacked general society significance, but could instead focus their analysis on the specific circumstances of the company. For H1 2025 meetings, requests to exclude social/political proposals more than doubled (155 vs. 77 for H1 2024 meetings), whereas those to exclude governance proposals remained level (95 vs. 94 in H1 2024). We observed similar trends in the success rates of social/political and governance proposals, with the percentage of successful requests increasing by 24% for social/political proposals but decreasing by 11% for governance proposals.

| Type of Proposal | Proposals Submitted | | No-Action Submitted | | No-Action Granted | | Success Rate | |
|---|---|---|---|---|---|---|---|---|
| | H1 2025 | H1 2024 | H1 2025 | H1 2024 | H1 2025 | H1 2024 | H1 2025 | H1 2024 |
| Social/Political | 289▼ | 365 | 155▲ | 77 | 61▲ | 30 | 74%▲ | 51% |
| Governance | 260▲ | 244 | 95▲ | 94 | 38▼ | 60 | 73%▼ | 85% |
| Environmental | 132▼ | 170 | 53▲ | 42 | 22▲ | 18 | 69%▲ | 53% |
| Compensation | 66▲ | 79 | 32▲ | 23 | 8▼ | 15 | 57%▼ | 75% |
| *Total* | 747▼ | 858 | 335▲ | 236 | 129▲ | 123 | 72%▲ | 67% |

▼ Down from H1 2024      ▲ Up from H1 2024      = Consistent with H1 2024

**SEC Response Time.** Notwithstanding the high volume of no-action requests and significant SEC staff reductions, the SEC's average no-action response time this proxy season was 71 days, an increase of only one day from 2024. However, this average obscures the substantial variation throughout the season, particularly the slower response times in the first two months following the release of SLB 14M.

---

14M states that, for proposals that "raise social or ethical issues," a proponent "would need to tie those matters to a significant effect on the company's business" in order to avoid exclusion under Rule 14a-8(i)(5), and "[t]he mere possibility of reputational or economic harm alone will not demonstrate that a proposal is 'otherwise significantly related to the company's business.'" In contrast, the Staff "would generally view substantive governance matters to be significantly related to almost all companies." With respect to "ordinary business," SLB 14M states that the SEC staff "will take a company-specific approach in evaluating significance, rather than focusing solely on whether a proposal raises a policy issue with broad societal impact or whether particular issues or categories of issues are universally 'significant.'"

2025 Proxy Season Review
Part 1 – Rule 14a-8 Shareholder Proposals

## SULLIVAN & CROMWELL

### E. SOCIAL/POLITICAL PROPOSALS

| Type of Proposal | Submitted | | Voted On | | Average Support | | Passed | |
|---|---|---|---|---|---|---|---|---|
| | H1 2025 | H1 2024 | H1 2025 | H1 2024 | H1 2025 | H1 2024 | H1 2025 | H1 2024 |
| **Diversity/ Anti-discrimination** | **94**▼ | 100 | **51**▼ | 74 | **6%**▼ | 13% | 0 = | 0 |
| *Anti-discrimination* | **42**▼ | 48 | **27**▼ | 38 | **5%**▼ | 8% | 0 = | 0 |
| *DEI Efforts* | **43**▲ | 28 | **19**▲ | 16 | **5%**▼ | 15% | 0 = | 0 |
| *Wage Gap* | **5**▼ | 20 | **3**▼ | 18 | **4%**▼ | 23% | 0 = | 0 |
| *EEO-1 Reporting[11]* | **4** = | 4 | **2**▲ | 0 | **33%**▲ | — | 0 = | 0 |
| **Social Capital Management** | **79**▼ | 97 | **33**▼ | 61 | **10%**▼ | 12% | 0 = | 0 |
| *Human Rights* | **28**▲ | 25 | **14**▼ | 19 | **12%**▲ | 10% | 0 = | 0 |
| *Animal Welfare* | **6**▼ | 24 | **5**▼ | 13 | **8%**▼ | 18% | 0 = | 0 |
| *Access to Medical Products* | **12**▲ | 9 | **1**▼ | 4 | **12%** = | 12% | 0 = | 0 |
| *Operations in China* | **0**▼ | 4 | **0**▼ | 4 | — | 3% | 0 = | 0 |
| *Other SCM[12]* | **33**▼ | 35 | **13**▼ | 20 | **9%**▼ | 12% | 0 = | 0 |
| **Political Spending/Lobbying** | **59**▼ | 81 | **22**▼ | 61 | **28%**▲ | 21% | 3▲ | 1 |
| **Human Capital Management** | **29**▼ | 54 | **15**▼ | 29 | **13%**▼ | 17% | 0 = | 0 |
| *Employee Health/Safety* | **18**▲ | 17 | **10**▲ | 8 | **14%**▼ | 17% | 0 = | 0 |
| *Collective Bargaining* | **9**▼ | 17 | **4**▼ | 11 | **11%**▼ | 36% | 0 = | 0 |
| *Living Wage* | **1**▼ | 8 | **0**▼ | 5 | — | 9% | 0 = | 0 |
| *Other HCM* | **1**▼ | 12 | **1**▼ | 4 | **15%**▲ | 10% | 0 = | 0 |
| **Charitable Contributions** | **16**▲ | 4 | **9**▲ | 3 | **1%**▼ | 4% | 0 = | 0 |
| **Artificial Intelligence** | **6**▼ | 13 | **5**▼ | 10 | **8%**▼ | 20% | 0 = | 0 |
| **Reproductive Rights** | **6**▼ | 10 | **2**▼ | 7 | **10%**▲ | 7% | 0 = | 0 |
| **Voting Alignment** | **0**▼ | 6 | **0**▼ | 4 | — | 8% | 0 = | 0 |

▼ Down from H1 2024        ▲ Up from H1 2024        = Consistent with H1 2024

***Submitted Proposals.*** Although overall submissions on social/political topics decreased by 21% year-over-year, submissions by "anti-ESG" proponents increased by 13% year-over-year in this category, representing 27% of all social/political proposals submitted (vs. 19% in H1 2024). There were significant declines across prevalent topics such as social capital management (down by 19%), political spending/lobbying (down by 28%) and non-diversity-related human capital management (down by 46%, corresponding with the year-over-year decrease in union activity). Diversity/anti-discrimination-related submissions also decreased, but only by 6%, with the decrease in "pro-DEI" proposals largely offset by an increase in proposals from "anti-ESG" proponents. AI-related proposals also decreased compared to last year, but companies, investors and regulators continued to focus on this topic as further discussed below.

---

[11]  In addition to shareholder proposals, about 15,000 employers across all market sectors received requests to release EEO-1 reports under the Freedom of Information Act in December 2024. These requests were made by As You Sow and the University of Utah.

[12]  Generally company-specific proposals (e.g., proposals related to company products).

2025 Proxy Season Review
Part 1 – Rule 14a-8 Shareholder Proposals

SULLIVAN & CROMWELL

***Voted, Excluded and Withdrawn Proposals.*** The number of voted social proposals decreased by 45% compared to H1 2024, resulting from both increased success of no-action requests and increased withdrawals by proponents. Out of the H1 2025 submissions that did not reach a vote, 40% were excluded through the no-action process. The other non-voted submissions were generally withdrawn by proponents. Anecdotally, many of this season's withdrawals on social/political topics occurred without a significant concession from the company; proponents seemed willing to withdraw in light of the SEC's changing no-action posture and/or other regulatory developments, including Presidential Executive Orders.

***Shareholder Support.*** Average shareholder support for social/political proposals continued to decrease. Although the overall decrease in average shareholder support was only four percentage points (11% of votes cast vs. 15% in H1 2024),[13] support for diversity/anti-discrimination proposals fell by a greater margin, dropping below 10% for the first time in recent years. The only three social/political proposals that passed were political contribution proposals.

### 1.  Increasing Polarization on Diversity-Related Proposals

The polarization of diversity-related proposals is not a new phenomenon. While proposals to increase corporate diversity initiatives have remained prevalent since 2015, "anti-DEI" proposals have been submitted in meaningful numbers in recent years, particularly in 2024, the first full proxy season after the Supreme Court's decision in *Harvard*. However, recent legal developments have amplified the divergence in stakeholder expectations on DEI.

This year, diversity-related proposals constitute 29% of all social/political proposals, compared to 21% during H1 2024. Proposals from "anti-ESG" proponents comprised a larger portion of diversity-related proposals, representing 38% of all social/political proposals, up from 25% in H1 2024. Across the board, shareholder support for diversity-related proposals decreased, falling to an average of only 6%. This downward trend holds even after excluding proposals from "anti-ESG" proponents, which continued to receive lower than average support (less than 2% of votes cast, consistent with prior years). Proposals from other proponents averaged 14% of votes cast this year, compared to 22% last year. All diversity-related proposals failed to achieve majority support.

***DEI Executive Orders.*** Amidst the core 2025 proxy season, after many companies' Rule 14a-8 submission deadlines, President Trump issued Executive Orders signaling that combating "illegal DEI" would be a focus for his administration. For example, on January 21, 2025, President Trump signed an Executive Order directing all executive departments and agencies to "terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions,

---

[13]   Not counting proposals from "anti-ESG" proponents, which received approximately 2% of votes cast on average in both years, support in this category fell from 19% to 16% in H1 2025.

# SULLIVAN & CROMWELL

consent orders, and requirements." In addition, all agencies were ordered to "enforce [the United States's] longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." In connection with this Executive Order, on February 5, 2025, the U.S. Attorney General Pam Bondi issued a memorandum titled "Ending Illegal DEI and DEIA Discrimination and Preferences," which tasked the Civil Rights Division and Office of Legal Policy of the U.S. Department of Justice ("DOJ") with the responsibility of preparing a report that addresses issues raised by the President's Executive Order, including identifying key sectors of concern and the "egregious and discriminatory DEI practitioners" in each sector.[14] More recently, on July 29, 2025, the DOJ issued guidance on the application of federal civil rights laws to entities receiving federal funds, providing specific examples of programs, policies, and initiatives that the DOJ has determined violate federal antidiscrimination laws, as well as non-binding suggestions to federally funded entities to minimize legal risk.

Although the DEI Executive Orders and subsequent developments had a limited impact on the submission of H1 2025 proposals, these developments impacted companies' strategies and disclosures in response to diversity-related proposals, as well as proxy advisor and institutional investor approaches.

***Institutional Investor and Proxy Advisor Policies.*** After the abovementioned developments, BlackRock, Vanguard and State Street reversed or limited the application of their diversity policies for this proxy season. However, these institutional investors have noted that they may continue to vote against boards that are deemed to be "off-market" in terms of the mix of professional and personal characteristics represented.

After the Executive Orders were issued, ISS revised its proxy voting guidelines, stating in a press release that it "will indefinitely halt consideration of certain diversity factors in making vote recommendations with respect to directors at US companies under its proprietary Benchmark and Specialty policies." ISS also announced that it would no longer consider the gender and racial and/or ethnic diversity of a company's board when making vote recommendations with respect to the election or re-election of directors at U.S.

---

[14]  On January 23, 2025, the attorney general of Texas, along with the attorneys general of Alabama, Nebraska, Idaho, South Carolina, Indiana, Utah, Iowa, Virginia and Montana, issued a letter to Bank of America, BlackRock, Citigroup, Goldman Sachs, J.P. Morgan and Morgan Stanley asserting that each financial institution (i) unlawfully advances discriminatory employment quotas, unlawfully pursues discriminatory board quotas through its proxy voting, (ii) uses discriminatory supplier quotas and (iii) appears to be violating fiduciary duties and duties of loyalty and prudence. The letter set forth a list of questions for each financial institution to respond to within 45 days. In contrast, on February 13, 2025, the attorneys general of the Commonwealth of Massachusetts and the State of Illinois jointly, along with the attorneys general of California, Connecticut, Delaware, Hawaii, Maine, Maryland, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island and Vermont, issued guidance confirming the "continued viability and important role of diversity, equity, inclusion and accessibility efforts in creating and maintaining legally compliant and thriving workplaces" and asserted that DEI helps businesses prevent workplace discrimination.

2025 Proxy Season Review
Part 1 – Rule 14a-8 Shareholder Proposals

SULLIVAN & CROMWELL

companies under its Benchmark and Specialty policies. In H1 2025, ISS recommended in favor of only one diversity-related proposal,[15] compared to 29 in H1 2024.

After indicating that its diversity-related policy was under consideration, Glass Lewis issued a supplemental statement on diversity on March 4, 2025, stating that "[w]e continue to believe that diversity contributes to improved company performance and long-term shareholder value. In the case of board elections, our US Benchmark Policy takes the view that a board can best protect and enhance the interests of shareholders if it is sufficiently independent, has a record of positive performance, and consists of individuals with diverse backgrounds and relevant experience." Glass Lewis will provide a "For Your Attention" flag on any proxy report with a negative director recommendation based on its diversity policy, "pointing clients to a supporting rationale they can leverage if their preference is to vote differently from the recommendation."

***Nasdaq Diversity Rule and Diversity-Related Disclosures.*** On December 11, 2024, the Court of Appeals for the Fifth Circuit, sitting *en banc*, issued its opinion in *Alliance for Fair Board Recruitment* v. *SEC*, striking down Nasdaq rules that required Nasdaq-listed companies to: (i) disclose statistical information regarding the diversity composition of their boards of directors; (ii) have at least two directors that Nasdaq considered "diverse" or, alternatively, explain why they did not; and (iii) offer companies who did not meet those "aspirational diversity objectives" complimentary access to a "recruiting solution" which "provid[ed] access to a network of board-ready diverse candidates."

In light of this decision and the DEI Executive Orders, many companies considered eliminating or reducing diversity-related disclosures in their 2025 proxy statements and other public filings concerning their boards and management teams.[16] Companies' disclosures on this topic ranged widely this season. On the one hand, some companies have significantly streamlined their disclosures on this topic to mitigate risk from government authorities and other stakeholders. On the other hand, some companies, particularly those subject to European sustainability disclosure requirements and other non-U.S. regulations, maintained fairly robust disclosures on board and/or workforce diversity. In light of increasing polarization on this topic, both approaches can attract stakeholder scrutiny. Furthermore, anecdotally, a number of companies that failed to include proxy disclosures on the gender and racial composition of their boards received negative recommendations from Glass Lewis this year, consistent with the proxy advisor's current policy.

---

[15]    While the proposal (requesting a civil rights audit at Deere & Company) ultimately failed, it was the most highly supported proposal on this topic.

[16]    In addition to the Presidential Executive Orders and the *Alliance for Fair Board Recruitment* decision, a recent Supreme Court anti-discrimination ruling reflects a changing view of discrimination and may, consequently, chill discussion of diversity in proxies and disclosures. The Supreme Court in *Ames* v. *Ohio Department of Youth Services* held that plaintiffs who bring Title VII claims and who belong to a majority group cannot be held to a heightened evidentiary standard relative to plaintiffs belonging to a minority group.

-12-

SULLIVAN & CROMWELL

### 2. Fewer Political Spending/Lobbying Proposals Reaching a Vote

Political spending and lobbying proposals continued to be one of the most prevalent topics in H1 2025. However, the volume of submissions decreased (59 vs. 81 in H1 2024), consistent with other proxy seasons that immediately followed a Presidential election year. In a notable departure from prior years, companies demonstrated unprecedented willingness to seek SEC relief with respect to these proposals, and there was a dramatic decline in the number of proposals that went to vote (22 vs. 61 in H1 2024).

*No-Action Relief.* In November 2024, the SEC granted no-action relief to Air Products with respect to a typical political spending/lobbying proposal that requested a detailed annual report on the lobbying expenditures and memberships in trade associations of the company. The SEC concurred with Air Products that the proposal was excludable on the grounds that it pertained to ordinary business operations and attempted to micromanage the company.

The Air Products precedent signaled a departure from the SEC's prior decisions on similar proposals. This decision and the SEC's subsequent guidance in SLB 14M seemed to impact both the submission and success rate of no-action requests on this topic in the 2025 proxy season. Companies requested no-action relief with respect to 33 such proposals for H1 2025 meetings (compared to eight for H1 2024 meetings) and were more successful in obtaining relief (14 requests granted for H1 2025 meetings vs. three for H1 2024 meetings). In some cases, proponents agreed to withdraw their proposals after the SEC granted relief to Air Products, usually after a company has submitted a no-action request citing similar arguments. In future seasons, companies receiving proposals on political spending and lobbying should explore the possibility of seeking no-action relief.

*Shareholder Support.* Outside of the no-action process, proposals on this topic are rarely withdrawn without a concession from the company. Voted proposals continue to receive significant support (average of 28% votes cast vs. 21% in H1 2024). A notable exception are "alignment/congruency" proposals, i.e., proposals calling for disclosure on the alignment between publicly disclosed values and policies and political activities, which has failed to receive meaningful support in recent years. As a result, only two "alignment/congruency" proposals were submitted for H1 2025 (compared to 12 in H1 2024 and 15 in H1 2023).

### 3. Continued Focus on Artificial Intelligence

In H1 2025, there were only six AI-related proposals, an over 50% decrease from the 13 submitted in H1 2024. Only three proposals submitted in H1 2025 went to a vote, receiving an average support of 8%. While the number of AI-related proposals remains low, investor and stakeholder scrutiny of corporate policies related to the use of AI remained at a high level. Accordingly, in planning for the 2026 proxy season, public companies may want to take into account the following considerations (among others) relating to AI.

2025 Proxy Season Review
Part 1 – Rule 14a-8 Shareholder Proposals

SULLIVAN & CROMWELL

***New Proxy Advisor Policies.*** In its 2025 Benchmark Policy Guidelines, Glass Lewis included a new section regarding AI-related board oversight. According to the voting policy, Glass Lewis will expect companies to provide "clear disclosure concerning the role of the board in overseeing issues related to AI, including how companies are ensuring directors are fully versed on this rapidly evolving and dynamic issue," while generally refraining from making voting recommendations on requests surrounding AI oversight disclosures. Where there is material evidence indicating inadequate management of AI-related issues, Glass Lewis will evaluate the company's practices and associated disclosures and make voting recommendations accordingly.

***Regulatory and Legal Landscape.*** As AI continues to develop at an exponential pace, regulatory and legislative bodies are increasingly focused on the complex issues raised by AI. On January 23, 2025, President Trump issued an Executive Order titled "*Removing Barriers to American Leadership in Artificial Intelligence,*" which directed federal agencies to develop an action plan with the goal of promoting U.S. leadership in AI, and to suspend or revise policies or actions taken during the Biden administration that are inconsistent with this goal.

In addition, at the state and local levels, government actors are developing laws and regulations focused on AI transparency, accountability, anti-discrimination, consequential decision-making, consumer protection, and safety. For example, in March 2025, Utah enacted SB 226 and SB 271 to address some of these issues. SB 226, among other things, generally prohibits a defendant from asserting as a defense that a violation of state consumer protection laws was caused by AI. SB 271 expands protections for individuals whose likeness, photograph or voice is reproduced through AI without authorization. In June 2025, Texas enacted HB 149 and SB 2373. HB 149, among other things, prohibits developing or deploying AI systems with the intent to discriminate. SB 2373 addresses AI-generated phishing scams. U.S. Congress rejected a moratorium on state enforcement of AI regulation that had been proposed to be included in the One Big Beautiful Bill Act. Therefore, at least in the near future, state and local governments are likely to continue to propose, adopt and enforce AI-related regulations. At the international level, in February 2025, requirements under the EU AI Act came into effect, with additional provisions coming into force in August 2025.

## SULLIVAN & CROMWELL

### F. GOVERNANCE PROPOSALS

| Type of Proposal | Submitted | | Voted On | | Average Support | | Passed | |
|---|---|---|---|---|---|---|---|---|
| | H1 2025 | H1 2024 | H1 2025 | H1 2024 | H1 2025 | H1 2024 | H1 2025 | H1 2024 |
| **Structural Governance** | **175▲** | 157 | **121▲** | 95 | **43%▼** | 51% | **39 =** | 39 |
| *Special Meetings* | **78▲** | 28 | **56▲** | 23 | **33%▼** | 43% | **9▲** | 4 |
| *Majority Voting for Directors* | **35▲** | 5 | **24▲** | 3 | **77%▲** | 10% | **18▲** | 0 |
| *Declassify Board* | **18▲** | 7 | **12▲** | 5 | **74%▲** | 60% | **9▲** | 4 |
| *Director Resignation Bylaw* | **17▼** | 43 | **11 =** | 11 | **20%▲** | 17% | **0 =** | 0 |
| *Written Consent* | **11▲** | 6 | **8▲** | 6 | **26%▼** | 37% | **1▲** | 0 |
| *Dual Class* | **6 =** | 6 | **4 =** | 4 | **20%▼** | 33% | **0 =** | 0 |
| *Eliminate Supermajority Vote* | **5▼** | 47 | **2▼** | 40 | **73% =** | 73% | **2▼** | 30 |
| *Advance Notice Bylaw* | **0▼** | 11 | **0▼** | 1 | **—** | 2% | **0 =** | 0 |
| *Proxy Access* | **0▼** | 3 | **0▼** | 1 | **0%▼** | 99% | **0▼** | 1 |
| *Other Structural* | **5▲** | 1 | **4▲** | 1 | **9%▲** | 0% | **0 =** | 0 |
| **Board Composition** | **36▼** | 53 | **28▼** | 46 | **27%▲** | 26% | **0 =** | 0 |
| *Independent Chair* | **31▼** | 42 | **24▼** | 36 | **31% =** | 31% | **0 =** | 0 |
| *Board Oversight* | **4▼** | 8 | **4▼** | 7 | **3%▼** | 8% | **0 =** | 0 |
| *Board Diversity/Skills* | **1▼** | 2 | **0▼** | 2 | **—** | 25% | **0 =** | 0 |
| *Employee Director* | **0▼** | 1 | **0▼** | 1 | **—** | 6% | **0 =** | 0 |
| **Cryptocurrency** | **5 ●** | 0 | **1 ●** | 0 | **0% ●** | — | **0 ●** | 0 |
| **Misc. Governance** | **44▲** | 42 | **10▼** | 16 | **0%▼** | 14% | **0▼** | 2 |

▼ Down from H1 2024    ▲ Up from H1 2024    = Consistent with H1 2024    ● New

***Submitted Proposals.*** Submissions on governance topics continued to increase this year, albeit by a small margin (3%). Individual proponents continued to dominate governance submissions, and "anti-ESG" proponents once again submitted only a small fraction (6%) of proposals in this category.



Governance Proposals as a Percentage of Total Submissions

Over 70% of the governance submissions targeted S&P 500 companies, an approximately 10% decrease from H1 2024.

***Voted Proposals and Shareholder Support.*** The percentage of governance proposals that reached a vote remained level with H1 2024, although sharply down from the preceding three years. For proposals that reached a vote, even though shareholder support decreased compared to H1 2024, governance continued to be the most successful category this year with average support of 38%. It was the only category with average shareholder support exceeding 20%. Once again, the number of passing

2025 Proxy Season Review
Part 1 – Rule 14a-8 Shareholder Proposals

SULLIVAN & CROMWELL

proposals in this category far exceeded those in any other category, although the percentage of passing proposals saw a 2% year-over-year decrease.

| Governance Proposals | H1 2018 | H1 2019 | H1 2020 | H1 2021 | H1 2022 | H1 2023 | H1 2024 | H1 2025 |
|---|---|---|---|---|---|---|---|---|
| % Voted | 56% | 64% | 71% | 72% | 78% | 86% | 62% | 62% |
| Average % of Votes Cast in Support | 37% | 37% | 33% | 40% | 35% | 29% | 40% | 38% |
| % Passing | 14% | 21% | 12% | 18% | 12% | 8% | 26% | 24% |

### 1. Continued Focus on Structural Governance

After years of significant focus on board composition topics, submissions on these topics reached a 10-year low last year. This year, submissions on board composition topics decreased by a further 32%, representing just 14% of proposals in the governance category. At the same time, submissions on structural governance topics increased, representing 67% of submissions on governance topics. Structural governance proposals were much more successful than board composition proposals this year, garnering 43% of votes cast on average (vs. 27% for board composition proposals). All passing governance proposals this proxy season were structural governance proposals. Much of the increases in average support and passing proposals are attributable to proposals on majority voting for directors, which has now been widely adopted by almost all large U.S. public companies.



Structural vs. Board Composition Proposals

**Special Meetings.** The number of special meeting proposals nearly tripled (78 vs. 28 in H1 2024), reclaiming the top spot after several years of being overtaken by other structural governance topics. John Chevedden submitted almost all of these proposals. Of these proposals, 33 asked companies to adopt new special meeting rules, and 45 asked companies to amend the existing threshold of shareholder votes needed to call a special meeting. Of the 56 proposals that went to a vote, nine passed overall but only two were proposals requesting an amendment to an existing special meeting right. Average shareholder support was 33% (vs. 43% in H1 2024). While average support decreased compared to H1 2024, the increase in submissions suggests access to special meetings remains an important issue for shareholders.

-16-

SULLIVAN & CROMWELL

***Majority Voting and Board Declassification.*** Last year, after director resignation proposals (see below) failed to gain meaningful traction, governance proponents indicated they would focus on other mechanisms for increasing director accountability. This year, the number of proposals calling for the adoption of a majority (rather than plurality) voting standard in director elections, or for more stringent versions of existing provisions, was seven times the number in H1 2024. Similarly, the number of proposals seeking to declassify boards more than doubled (18 vs. 7 in H1 2024).

Both proposals garnered significant support. Majority voting proposals received 77% average shareholder support (vs. 10% in H1 2024), and 18 of the 24 voted proposals on this topic passed (none did in H1 2024). Board declassification proposals received 74% average shareholder support (vs. 60% in H1 2024), and nine of the 12 voted proposals on this topic passed (vs. four in H1 2024). The high level of shareholder support on both topics suggests that shareholder participation in board elections remains an important issue for shareholders.

***Director Resignation Bylaws.*** The number of director resignation bylaw submissions decreased by over 60% (17 vs. 43 in H1 2024). Consistent with 2024, the New York City, North Atlantic States and Mid-America carpenters unions remained the primary proponents of these proposals, submitting all 17 of the proposals on this topic. Eleven union-led director resignation proposals reached a vote. None passed, with support ranging from 10% to 39%, averaging 20% of votes cast. Given the decrease in the number of submitted proposals and low support levels, it remains uncertain whether proponents will continue to submit similar proposals in the coming proxy seasons.

***Eliminate Supermajority Vote.*** After a resurgence last year, proposals requesting the elimination of supermajority voting requirements in charters and bylaws returned to single digits (five vs. 47 in H1 2024). Three were submitted by John Chevedden, who introduced a new variation of this proposal, which requested companies disclose on Form 8-K the amount of money spent soliciting shareholders to attend meetings to vote on these supermajority proposals. The other two proposals on this topic were submitted by The Accountability Board. Two supermajority proposals went to a vote and both passed, with shareholder support averaging 79%.

***Advance Notice Bylaws.*** On July 11, 2024, the Delaware Supreme Court found in *Kellner* v. *AIM Immunotech* that several modern and fairly broad shareholder information requirements in a company's advance notice were facially valid and not "contrary to law." This decision may have contributed to the lack of proposals on advance notice bylaws this proxy season, after James McRitchie and his co-filers submitted 11 proposals on this topic in H1 2024. Furthermore, during this proxy season, the Delaware Court of Chancery issued an opinion in *Siegel* v. *Morse* that should further alleviate some of the pressure on companies that have adopted advance notice bylaws on a "clear day" (i.e., not in connection with a proxy fight). In *Siegel*, the court dismissed a challenge to The AES Corporation's advance notice bylaw as unripe because it was adopted on a "clear day." In light of these judicial developments, it is likely that

-17-

SULLIVAN & CROMWELL

shareholder proponents may move on from this topic. However, companies should consider reviewing their advance notice bylaws to ensure that they provide appropriate protections in light of *Kellner* and *Siegel*.

### 2.  Low Submissions on Board Composition Topics

The two most prevalent board composition topics in prior years—independent chair and board diversity—continued to decline. With the percentage of S&P 500 companies with independent chairs plateauing at just below 40% for the last few years, submission of independent chair proposals continued to decrease (by 26% year-over-year).

Only one board diversity proposal was submitted this year. It remains to be seen whether, as a reaction to companies' DEI strategies and disclosures following the DEI Executive Orders and the overturn of the Nasdaq rules, proponents will increase submissions on this topic in future years. Some proponents may ask companies that have reversed their board diversity commitments or streamlined their disclosures to reinstate them in future years, while others may ask companies that have maintained such commitments or disclosures to report on the risks of their approach.

No board composition proposals passed this year, as was the case in H1 2024.

### 3.  Shareholders and Management[17] Evaluate Viability of Redomestication[18]

The topic of redomestication—particularly moving the state of incorporation away from Delaware ("DExit"), typically to Nevada or Texas—has garnered meaningful media attention since 2024, but has not been a focus of shareholder proposals. Among the U.S. S&P Composite 1500, there was one shareholder proposal on the relocation of a company's headquarters,[19] but no public shareholder proposals on "DExit."

***2025 Management Proposals.*** Instead, companies continued to make management proposals on redomestication, which drew general attention from the public and exempt solicitation filings (both those

---

[17]   Another focus of a governance "hot topic" in recent years has been companies' adoption of officer exculpation provisions as permitted by the August 2022 <u>amendments</u> to the Delaware General Corporation Law. This proxy season, management proposals adopting exculpation provisions were a common occurrence. In H1 2025, 73 management proposals on the topic were submitted and 70 of those were successfully adopted. ISS recommended in favor of 66 of the proposals. The proposals passed with an average of 89% of votes cast. Since the August 2022 amendments, approximately 250 Delaware-incorporated companies in the S&P Composite 1500 adopted charter amendments to permit officer exculpation.

[18]   Unlike reincorporation which is a transaction in which the old legal entity is dissolved and a new legal entity is created, redomestication is a direct transfer of the corporation's legal home to a new state without dissolution of the existing company.

[19]   Salesforce received a shareholder proposal on redomestication. The proposal was from an "anti-ESG" proponent, which requested that the company relocate its corporate headquarter out of San Francisco. The proposal focused on the "anti-business" policies in California and was excluded through the SEC no-action process.

2025 Proxy Season Review
Part 1 – Rule 14a-8 Shareholder Proposals

## SULLIVAN & CROMWELL

in favor of and against redomestication) from shareholders. Of the six management proposals on redomestication in H1 2025, three were "DExit" proposals. As was the case last proxy season, ISS recommended against all "DExit" proposals that contemplated redomestication in Nevada, but recommendations were case-by-case for other states. Whereas last year, all "DExit" proposals that received a negative recommendation from ISS failed to gain sufficient shareholder support to pass, this year, all redomestication management proposals passed, including all three "DExit" proposals[20] (vs. one "DExit" proposal[21] in H1 2024). It is also notable that one company managed to pass its "DExit" proposal this year after failing to do so in 2024, despite receiving negative ISS recommendations in both years.[22]

*Emerging Playbook.* The limited dataset of redomestication proposals this year[23] makes the extraction of any clear trend premature. However, we expect the topic of redomestication to remain at the forefront of discussion, particularly in light of the significant corporate law updates adopted by each of Delaware, Nevada and Texas in order to establish a clear and efficient corporate legal framework and encourage companies to incorporate there. Whether or not a company ultimately decides to redomesticate, it is important to assess the pros and cons of different state corporate laws against a company's particular business and circumstances. The decision to redomesticate requires a company-specific analysis, including whether that decision is likely to be supported by shareholders, proxy advisors and other key constituencies.[24] Institutional investors and proxy advisors have focused on factors such as the corporate laws in each state (including recent changes), whether a company has any controlling shareholders, and the company's connection to the destination jurisdiction. For example, ISS has criticized companies for failing to articulate a compelling rationale for redomestication when they are not headquartered in the destination jurisdiction. Companies that are interested in evaluating a potential redomestication should carefully evaluate the complicated dynamics at play, taking into account the lessons learned from the recent redomestication proposals.

*Glass Lewis Guidelines.* Ahead of this proxy season, Glass Lewis announced that it will review proposals to redomesticate to a new state or country on a case-by-case basis. Glass Lewis will review

---

[20]  Fidelity National Financial passed a proposal to reincorporate in Nevada with 66% of outstanding shares; Madison Square Garden Sports Corp. passed a proposal to reincorporate in Nevada with 83% of outstanding shares; and Simon Property Group, Inc. successfully passed a proposal to reincorporate in Indiana (where it is headquartered) with 65% of outstanding shares.

[21]  In the 2024 proxy season, Tesla passed a proposal to reincorporate in Texas (where it is headquartered) with 87% of outstanding shares.

[22]  In the 2024 proxy season, Fidelity National Financial failed to pass a proposal to reincorporate in Nevada. The proposal received the support of 40% of outstanding shares.

[23]  While our proxy season review focuses on companies within the S&P 1500, there are further examples of companies outside of the S&P 1500 who have also successfully redomesticated, as well as at least one prominent example of a company, MercadoLibre, which pulled its management proposal to redomesticate from Delaware to Texas after receiving negative commentary on the proposal from ISS and Glass Lewis.

[24]  *See also* Section J for a discussion of key developments that may impact the decisions of shareholders and proxy advisors in future proxy seasons.

2025 Proxy Season Review
Part 1 – Rule 14a-8 Shareholder Proposals

SULLIVAN & CROMWELL

proposals based on (i) changes to a company's existing corporate governance provisions, especially those related to shareholder rights; (ii) whether a jurisdiction allows for director and officer exculpation and exclusive forum provisions; (iii) the fiduciary duties applicable to directors in the new jurisdiction; (iv) material differences in legal regimes, corporate statutes and case law in the new jurisdiction and (v) whether the new jurisdiction is categorized as a tax haven.

With the increase in the number of redomestication proposals this proxy season and as more companies consider redomestication in future years, it remains to be seen how and to what extent proxy advisors will impact redomestication proposals going forward.

***Delaware Deference for Redomestication Decisions Following 2024 Uncertainty.*** In *Maffei* v. *Palkon*,[25] the Delaware Supreme Court held in February 2025 that a decision to redomesticate from Delaware to Nevada was subject to the business judgment rule because no member of the board, nor the company's controller, received a material non-ratable benefit from the conversion. [26] The court emphasized that "Delaware policy has long recognized the values of flexibility and private ordering," and this policy is furthered by allowing directors discretion in choosing a corporation's state of incorporation and by declining to second-guess reincorporation decisions absent well-pled allegations of a material, non-ratable benefit to directors or controllers.[27] This decision overturned the *Palkon* v. *Maffei* decision that came out of the Delaware Chancery Court in January 2024, which subjected TripAdvisor's and Liberty TripAdvisor Holdings Inc.'s redomestications to Nevada to the more exacting entire fairness review.

### 4. Cryptocurrency Proposals Emerge

This proxy season, "anti-ESG" proponent National Center for Public Policy Research submitted five proposals (at Amazon, Dell, McDonalds, Salesforce and Meta) requesting an assessment to determine whether Bitcoin should be included in the corporate treasury to hedge against inflation. All proposals other than the one at Meta were successfully excluded through the SEC no-action process. The Meta proposal received 0% of votes cast.

These new cryptocurrency proposals appear to correlate with the increased focus of the Trump administration on cryptocurrencies. For example, on January 23, 2025, President Trump issued an Executive Order titled "Strengthening American Leadership in Digital Financial Technology," which outlines the administration's goal to "make America the world capital in crypto." In addition, the SEC established a Crypto Task Force on January 21, 2025, and has provided guidance signaling its openness to engaging with issuers on crypto-related issues. On July 18, 2025, President Trump signed into law the

---

[25]    ___ A.3d ____, 2025 WL 384054 (Del. Feb. 4, 2025).

[26]    *Id.* at *1, *16.

[27]    *Id.* at *30.

SULLIVAN & CROMWELL

"Guiding and Establishing National Innovation for U.S. Stablecoins Act" or the "GENIUS Act," which established a regulatory framework for "payment stablecoins" and their issuers. Furthermore, the U.S. Congress has been considering "market structure" legislation, which seeks to clarify the authority of the SEC and the Commodity Futures Trading Commission to regulate cryptocurrency.

### G. ENVIRONMENTAL PROPOSALS

| Type of Proposal | Submitted | | Voted On | | Average Support | | Passed | |
|---|---|---|---|---|---|---|---|---|
| | H1 2025 | H1 2024 | H1 2025 | H1 2024 | H1 2025 | H1 2024 | H1 2025 | H1 2024 |
| **Climate** | **74▼** | 101 | **45▼** | 55 | **10%▼** | 19% | **0▼** | 2 |
| *GHG Target* | **23▼** | 47 | **13▼** | 32 | **12%▼** | 19% | **0▼** | 1 |
| *Scope 3 Included* | **15▼** | 24 | **9▼** | 13 | **13%▼** | 23% | **0 =** | 0 |
| *Scope 3 Excluded/Unspecified* | **8▼** | 11 | **4▼** | 8 | **10%▼** | 31% | **0▼** | 1 |
| *Impact of Target* | **0▼** | 12 | **0▼** | 11 | — | 2% | **0 =** | 0 |
| *GHG Reporting* | **23▼** | 28 | **15▲** | 9 | **8%▼** | 29% | **0▼** | 1 |
| *Scope 3 Included* | **18▲** | 14 | **14▲** | 7 | **10%▼** | 20% | **0 =** | 0 |
| *Scope 3 Excluded/Unspecified* | **4▼** | 12 | **1 =** | 1 | **1%▼** | 52% | **0▼** | 1 |
| *Methane* | **1▼** | 2 | **0▼** | 1 | — | 16% | **0 =** | 0 |
| *Financing Activity* | **9▼** | 10 | **9▲** | 3 | **12%▼** | 26% | **0 =** | 0 |
| *Lobbying* | **6▼** | 12 | **5▼** | 9 | **10%▼** | 24% | **0 =** | 0 |
| *Scenario Analysis* | **2▲** | 0 | **1▲** | 0 | **1% ●** | — | **0 ●** | 0 |
| *Misc. Climate* | **11▲** | 4 | **2 =** | 2 | **7%▲** | 1% | **0 =** | 0 |
| **Nature** | **42▲** | 36 | **20▲** | 13 | **12%▼** | 14% | **0 =** | 0 |
| *Plastics/Packaging* | **18▼** | 21 | **10▲** | 9 | **10%▼** | 13% | **0 =** | 0 |
| *Waste* | **12▲** | 2 | **7▲** | 1 | **9%▼** | 21% | **0 =** | 0 |
| *Biodiversity Impact Assessment* | **5▼** | 7 | **3▲** | 2 | **14%▼** | 17% | **0 =** | 0 |
| *Water* | **4▲** | 2 | **0 =** | 0 | — | — | **0 =** | 0 |
| *Deforestation* | **3▼** | 4 | **0▼** | 1 | — | 3% | **0 =** | 0 |
| *Misc. Nature* | **0 =** | 0 | **0 =** | — | — | — | **0 =** | 0 |
| **Supply Chain Sustainability** | **8▲** | 6 | **0▼** | 5 | — | 12% | **0 =** | 0 |
| **Just Transition** | **2▼** | 16 | **2▼** | 6 | **13%▼** | 19% | **0 =** | 0 |
| **Misc. Environmental** | **6▲** | 3 | **1 =** | 1 | **2%▼** | 18% | **0 =** | 0 |

▼ Down from H1 2024        ▲ Up from H1 2024        = Consistent with H1 2024

***Submitted Proposals.*** Submissions in this category decreased by 17% year-over-year. "Anti-ESG" proponents submitted only 8% of proposals in this category, compared to 12% in H1 2024. As in H1 2024, energy companies received 26 environmental proposals in H1 2025. Given the smaller overall number of environmental submissions this year, those at energy companies represented 19% of all environmental proposals, a larger portion than last year. Five proposals from "anti-ESG" proponents were focused on energy companies, asking them to remove or reduce their climate commitments.

***Voted Proposals and Shareholder Support.*** In H1 2025, 49% of submissions reached a vote, level with H1 2024 notwithstanding a 26% increase in the volume and a 16% increase in the success rate of no-action requests in this category. Average shareholder support dropped sharply to 10%, compared to 18% support last proxy season. Environmental proposals from "anti-ESG" proponents averaged 2% of votes cast, compared to 11% for other proposals.

Last year, two environmental proposals passed. This year, none did.

2025 Proxy Season Review
Part 1 – Rule 14a-8 Shareholder Proposals

SULLIVAN & CROMWELL

### 1.  Decreasing Submission and Success of Climate Proposals

Compared to last proxy season, the number of climate-related proposals dropped by 25%. Greenhouse gas ("GHG") target proposals, i.e., proposals to set or enhance GHG emissions reduction goals, decreased most significantly, falling by over 50% year-over-year. Submissions in other climate-related areas, including GHG reporting, climate-related impacts of financing or underwriting activities at financial institutions and climate-related lobbying, also decreased, but by smaller margins. The only two climate-related topics that saw year-over-year increase in submissions were proposals to enhance Scope 3 (i.e., value chain) emissions reporting and proposals related to scenario analysis.

This proxy season, companies demonstrated increased willingness to seek no-action relief on climate-related proposals, particularly on the basis of micromanagement. In particular, a number of companies made the argument that the granular target-setting or climate lobbying report proposals that proliferated in prior years constituted attempts to micromanage the company. Eight climate target proposals were challenged at the SEC this year, compared to two last year. The success of climate-related no-action requests varied from company to company, perhaps due to the mid-season change in SEC guidance. We expect no-action outcomes on these proposals to continue evolving in future proxy seasons.

Ultimately, 57% of climate-related proposals reached a vote, representing a slight increase over the percentage of voted H1 2024 proposals on this topic. Shareholder support fell across the board, particularly significantly in areas such as GHG reporting (average support of 8% vs. 29% in H1 2024), financing activity impacts (average support of 12% vs. 26% in H1 2024), and climate-related lobbying (average support of 10% vs. 24% in H1 2024). Support for GHG target-setting proposals also fell (average support of 12% vs. 19% in H1 2024), even though "anti-ESG" proponents—whose proposals traditionally garnered lower support—did not submit a meaningful number of proposals in this area as they had done in prior years. No climate-related area achieved average shareholder support exceeding 15%, whereas all did in H1 2024.

Changes in climate-related regulation and investor expectations underscored the 2025 proposal trends on this topic, including the developments discussed below. It remains to be seen how and to what extent future proxy seasons will be impacted by the rapidly shifting national and international landscape in this area.

***U.S. and International Climate-Related Regulation.*** In March 2025, the SEC voted to end its judicial defense of its climate-related disclosure rules for public companies. The rules, which the SEC adopted on March 6, 2024, would have significantly expanded the climate-related information that U.S. public companies and foreign private issuers would be required to disclose in their periodic reports and registration statements, including with respect to GHG emissions and any material climate targets. On April 4, 2024, the SEC stayed the effectiveness of the Climate Rules pending completion of judicial review of legal challenges against the rules, which were consolidated for review by the U.S. Court of Appeals for

-22-

SULLIVAN & CROMWELL

the Eighth Circuit.[28] In addition, in January 2025, the Department of Defense, General Services Administration, and National Aeronautics and Space Administration announced the withdrawal of a 2022 proposed rule that would have required thousands of federal contractors to disclose Scope 1 and Scope 2 emissions, and would have required "major" contractors to set Paris-aligned GHG emissions reduction targets.

Although the federal government has rescinded climate reporting and climate target-setting requirements, states are continuing their policymaking activities in these areas. During the core 2025 proxy season, California Air Resources Board ("CARB") began its rulemaking to implement the requirements under California's climate reporting laws, which were enacted in 2023 and require GHG and climate risk reporting from U.S. companies "doing business" in California exceeding certain revenue thresholds. As CARB and the stated senators who sponsored these laws recently reiterated, in-scope companies will be required to report climate risks by January 1, 2026. In-scope companies will also be required to report on, and obtain third-party verification at limited assurance level over, FY 2025 GHG emissions in 2026 on a timeline to be set by CARB. (CARB has stated that it expects to issue additional guidance on both laws, and that it intends to publish "draft regulations" on the GHG reporting law by the end of 2025.) Over the course of this proxy season, several other states—including New York, New Jersey, Illinois and Colorado—considered the adoption of similar laws, which would likewise apply to companies "doing business" in the state regardless of whether the company is organized or headquartered there.[29]

At the international level, more jurisdictions continued to adopt climate and sustainability reporting requirements based on the framework developed by the International Sustainability Standards Board ("ISSB"). As of March 31, 2025, 15 jurisdictions have adopted the ISSB standards on a voluntary or mandatory basis, and 21 other jurisdictions have announced plans to adopt them in the near future. Similarly, many companies are preparing for reporting (and some companies have started reporting this year) under the EU's Corporate Sustainability Reporting Directive ("CSRD"). The EU is currently in the process of finalizing an "Omnibus Package" to simplify the requirements under CSRD and other EU sustainability laws.

The existence and continued evolution of these regulatory requirements likely impacted the submission of climate-related proposals this proxy season. Many of the companies that received these proposals referenced the regulatory developments in this area, and noted that the proposals—particularly those related to climate reporting—were unnecessary in light of regulatory mandates and would hinder

---

[28]    On April 4, 2025, a group of 18 intervening states and the District of Columbia filed a Motion to Hold Case in Abeyance requesting the Eighth Circuit temporarily pause or delay the proceedings, which was granted.

[29]    At the same time, Texas considered but ultimately did not adopt a law that would penalize companies "doing business" in Texas that "directly or indirectly expend resources to track, calculate, measure, assess, or estimate the greenhouse gas emissions in this state directly or indirectly attributable to the company for the purpose of complying with a federal or state law or regulation or a law or regulation of a foreign country."

2025 Proxy Season Review
Part 1 – Rule 14a-8 Shareholder Proposals

SULLIVAN & CROMWELL

companies' ability to respond to the rapidly shifting global regulatory landscape. The meaningful decline in shareholder support on this topic seems to indicate that investors are more willing to give companies flexibility to navigate complex compliance considerations, and less willing to endorse prescriptive approaches in this area. It also reflects sharply reduced support from institutional investors and proxy advisors, which are confronting the issues discussed below.

***Exits from Climate Action 100+.*** Climate Action 100+ ("CA 100") is "an investor-led initiative to ensure the world's largest corporate greenhouse gas emitters take appropriate action on climate change in order to mitigate financial risk and to maximize the long-term value of assets." It and its members have faced significant scrutiny from U.S. lawmakers in recent years. In November of 2024, a coalition of state attorneys general, led by the Texas attorney general, sued BlackRock, Vanguard and State Street. The attorneys general claimed that these firms were violating antitrust and state consumer protection laws by using their voting power to reduce coal output, citing among other things their participation in CA 100 and the Net Zero Asset Managers Initiative ("NZAM").[30] In response to this and other state and federal developments, many asset managers exited CA 100 before or during the core 2025 proxy season.

There were also significant exits from UN Net Zero alliances during the 2025 proxy season. Asset managers withdrew from NZAM after a series of state and federal activities targeting NZAM members, including December 2024 letters from House Judiciary Committee Chair Jim Jordan to 60 asset managers. These letters focused on the asset managers' engagement and voting policies, asking how these policies may have changed after the asset managers became members of NZAM, as well as how these polices align with NZAM's goal of achieving "net zero emissions by 2050 or sooner across all assets under management."

The heightened scrutiny on current and former members of net zero alliances this proxy season correlated with reduced shareholder support of climate-related proposals, particularly on GHG target-setting proposals that cited global net zero standards.

Investor voting practices on climate-related issues are likely to remain a regulatory focus area under the Trump administration. For example, in May 2025, the new chair of the Federal Trade Commission ("FTC") said that the FTC is "looking at" whether "businesses are agreeing not to invest in fossil fuels" to advance ESG goals. In July 2025, Florida Attorney General James Uthmeier announced that his office has issued subpoenas to investigate whether the CDP (formerly the Climate Disclosure Project) and the Science Based Targets Initiative violated state consumer protection or antitrust laws by coercing companies into disclosing proprietary data and paying for access under the guise of environmental transparency. However, companies should also note that different stakeholders may have diverging expectations on

---

[30]    On August 1, 2025, the court denied, with limited exceptions, the defendants' motion to dismiss.

2025 Proxy Season Review
Part 1 – Rule 14a-8 Shareholder Proposals

## SULLIVAN & CROMWELL

corporate climate strategies. For example, the New York City Comptroller has stated that he intends to engage with companies that have withdrawn from CA 100 on (1) their rationale for withdrawal and (2) potential greenwashing concerns.

***Executive Order and Impact on Future U.S. Climate Regulations.*** On April 8, 2025, President Trump issued an Executive Order titled "Protecting American Energy From State Overreach," which requires federal agencies to identify state and local laws and actions that "burden[] the identification, development, siting, production, or use of domestic energy resources" and "are or may be unconstitutional, preempted by Federal law, or otherwise unenforceable." The order directs the agencies to prioritize the identification of laws and actions purporting to "address 'climate change' or involving 'environmental, social, and governance' initiatives, 'environmental justice,' carbon or 'greenhouse gas' emissions, and funds to collect carbon penalties or carbon taxes," and to expeditiously take all appropriate action to stop the enforcement of these laws. The order also directs the U.S. Attorney General to recommend any "additional Presidential or legislative action necessary to stop the enforcement" of the identified laws and actions.

It remains to be seen how this Executive Order and any related federal actions may impact U.S. climate regulation in the future, both at the federal and state levels. So far, the DOJ has implemented the Executive Order by challenging recently adopted "climate superfund laws" in New York and Vermont that will require fossil fuel companies to make payments into a state-administered fund in proportion to each company's prior emissions. (Similar bills have been proposed in Oregon, Maryland, Massachusetts, and California.) The DOJ also filed lawsuits against the states of Hawaii and Michigan "to prevent each state from suing fossil fuel companies in state court to seek damages for alleged climate change harms."

### 2. Nature Proposals Growing

There was a 17% increase in the number of nature-related proposals. The plurality of these proposals focused on the impact of packaging pollution and other waste on nature, an issue that is gaining regulatory attention in the United States. Five states are considering legislation for imposing enhanced requirements regarding how companies handle pollution related to packaging. Internationally, the ISSB has also begun to evaluate the development of nature-related disclosure standards. Given the declining average shareholder support this proxy season (12% vs. 14% in H1 2024), as well as the high percentage of withdrawal and excluded proposals (52% of submissions in H1 2025), it remains to be see whether investors interested in nature-related issues will continue to engage with companies on this topic through shareholder proposals, or whether they will take a "wait-and-see" approach next proxy season.

SULLIVAN & CROMWELL

## H.  COMPENSATION PROPOSALS

| Type of Proposal | Submitted | | Voted On | | Average Support | | Passed | |
|---|---|---|---|---|---|---|---|---|
| | H1 2025 | H1 2024 | H1 2025 | H1 2024 | H1 2025 | H1 2024 | H1 2025 | H1 2024 |
| Severance | 32 = | 32 | 29 = | 29 | 23% ▲ | 15% | 0 = | 0 |
| Compensation – ESG | 17 ▲ | 15 | 7 ▼ | 12 | 2% ▼ | 8% | 0 = | 0 |
| Clawbacks | 14 ▲ | 12 | 10 ▲ | 8 | 7% ▼ | 17% | 0 = | 0 |
| Stock Retention | 3 ▼ | 6 | 3 ▼ | 6 | 34% ▲ | 28% | 0 = | 0 |
| Compensation – Other | 0 ▼ | 14 | 0 = | 0 | — | N/A | 0 = | 0 |

▼ Down from H1 2024          ▲ Up from H1 2024          = Consistent with H1 2024

**Submitted Proposals.** Compensation proposals remained the smallest category in H1 2025. Whereas the prior two proxy seasons saw year-over-year growth in this category as a result of John Chevedden's focus on the "2.99x severance" proposal, submissions decreased by 18% this year, even though Chevedden and his co-filers submitted the same number of severance proposals.

**Voted Proposals and Shareholder Support.** Compensation proposals continued to be difficult to exclude and unlikely to be withdrawn. Consistent with H1 2024, over 75% of all compensation submissions reached a vote, the highest proportion across all categories. Overall, average shareholder support increased slightly from 14% to 17%. However, not counting proposals from "anti-ESG" proponents, which averaged 1% shareholder support and constituted 14% of proposals in this category (vs. 5% in H1 2024), support for compensation proposals increased significantly (from 15% in H1 2024 to 29% in H1 2025). No proposals passed.

### 1.  Surge in Proposals Opposing ESG-Linked Compensation

**Historical Trends.** Since 2017, proponents have requested that companies adopt ESG-linked performance measures (e.g., diversity, social, sustainability and environmental impact) in their executive compensation. Between 2017 and 2022, ESG-linked compensation became the most prevalent topic for compensation proposals. Between the 2021 and 2024 proxy seasons, in both the S&P 500 and Russell 3000, use of ESG performance metrics in strategic scorecards had almost doubled.[31] As of 2024, 315 of the S&P 500 linked compensation to ESG goals.[32]

**Focus on Social-Linked Metrics.** This proxy season saw a similar increase in submissions as H1 2024, indicating a renewed focus on this topic after submissions fell in 2023. However, the focus and tone of this year's proposals differed from last year's proposals. The majority of last year's submissions were

---

[31]  Matteo Tonello, *ESG Performance Metrics in Executive Compensation Strategies*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE (Jan. 7, 2025), https://corpgov.law.harvard.edu/2025/01/07/esg-performance-metrics-in-executive-compensation-strategies/.

[32]  Adam Badawi & Robert Bartlett, *ESG Overperformance? Assessing the Use of ESG Targets in Executive Compensation Plans*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE (Sept. 23, 2024), https://corpgov.law.harvard.edu/2024/09/23/esg-overperformance-assessing-the-use-of-esg-targets-in-executive-compensation-plans/.

SULLIVAN & CROMWELL

environmental-linked, focusing in particular on GHG metrics in executive performance awards. This year, the majority of submissions centered on social topics (whereas none did in H1 2024). In H1 2025, nine proposals were related to social-linked compensation metrics, and only one was focused on environmental-linked metrics.[33]

***Proposals to Rescind Adopted Metrics.*** Last year, we saw for the first time proposals from "anti-ESG" proponents to rescind or reevaluate ESG-linked incentives. There were three such proposals in H1 2024, and the focus was on GHG emissions. This year, "anti-ESG" proponents were responsible for all ESG-linked compensation proposals. The proposals focused on narrowing or eliminating DEI goals in executive pay incentives.

The National Legal and Policy Center ("NLPC") led submissions on this topic. The proposals cited recent Supreme Court cases, and argued that DEI-linked compensation leaves companies "ripe for regulatory, reputational and litigation risk." NLPC also referenced the "sharp uptick in litigation challenging corporate DEI programs and initiatives" following the June 2023 U.S. Supreme Court decision in *Harvard*.

These proposals averaged 2% votes cast, consistent with overall shareholder support for proposals from "anti-ESG" proponents.

### 2. Low Support for Clawback Proposals

Following the SEC's adoption of its mandatory clawback rule in October 2022, we saw a sharp increase in clawback proposals last proxy season. Generally, these proposals demanded that companies go beyond mandatory clawback requirements in their corporate clawback policies. This proxy season, ISS added a new FAQ specifying that it would not consider a clawback policy to be "robust" unless it "extend[s] beyond minimum Dodd-Frank requirements and explicitly cover[s] all time-vesting equity awards."[34]

This proxy season, the number of submitted clawback proposals remained fairly level with H1 2024. Chevedden submitted 13 of the 14 clawback proposals in H1 2025 (vs. nine of the 12 in H1 2024). These proposals achieved significantly lower shareholder support (averaging 7% of votes cast vs. 17% in H1 2024). Similar to last proxy season, none passed.

SEC Chair Paul Atkins indicated that the SEC may be considering changes to its 2022 clawback rule. If the rule is revised or rescinded, we may see an increase in proposals on this topic in future seasons.

---

[33]   The proposal was from an "anti-ESG" proponent and requested elimination of metrics linked to GHG emissions at Dominion Energy.

[34]   ISS, *United States Executive Compensation Policies: Frequently Asked Questions* (updated December 13, 2024), FAQ 46.

SULLIVAN & CROMWELL

### 3. Increasing ISS and Shareholder Support for Severance Proposals

Although no severance proposals passed this proxy season, and the number of submitted and voted proposals remained the same, average shareholder support for severance proposals increased to 23% from 15% in H1 2024. This increase in shareholder support correlated with ISS's increased support of these proposals, which rose from a third of voted proposals last year to 59% in H1 2025. In its most recent policy update, ISS signaled its focus on this topic and specified certain factors for how it will evaluate severance-related shareholder proposals, including "whether the proposal is overly prescriptive."[35]

## I. EXEMPT SOLICITATION

Exempt solicitation notice filings decreased to 220 filings this proxy season, with voluntary submissions continuing to account for a substantial majority of filings. This decrease may be partially explained by the new and revised CD&Is on exempt solicitations from SEC Staff issued on January 27, 2025. These new CD&Is required written solicitation materials to be distributed to various security holders before the exempt solicitation notice is filed and emphasize that these notices are subject to liability under rule 14a-9 of the Exchange Act. This year, frequent filers of exempt solicitation notices included As You Sow (25 submissions), John Chevedden (23 submissions) and Green Century (22 submissions). The proportion of exempt solicitation notices from "anti-ESG" proponents increased meaningfully, with NLPC (24 submissions) and Bowyer Research (19 submissions) leading the pack.

## J. OTHER RECENT DEVELOPMENTS

### 1. Intensifying Scrutiny on Proxy Advisors

This year, proposals on politically sensitive environmental and social topics saw lower support from proxy advisors. This correlated with intensifying scrutiny on ISS and Glass Lewis from state and federal officials, particularly regarding these firms' policies and recommendations on environmental and social proposals.

*Litigation of SEC Proxy Advisor Rules.* In 2019, the SEC published an interpretation and guidance under Section 14(a) of the Securities Exchange Act of 1934 stating that proxy advisor vote recommendations constituted "solicitations" under the proxy rules and are subject to the anti-fraud provisions. Then, in 2020, the SEC adopted rules based on this interpretation, requiring proxy advisory firms to (1) make proxy voting advice about a company available to the company in advance of or

---

[35]   ISS notes that it will consider such factors as: (i) "the company's severance or change-in-control agreements in place, and the presence of problematic features (such as excessive severance entitlements, single triggers, excise tax gross-ups, etc.)."; (ii) "any existing limits on cash severance payouts or policies which require shareholder ratification of severance payments exceeding a certain level"; (iii) "any recent severance-related controversies"; and (iv) "whether the proposal is overly prescriptive, such as requiring shareholder approval of severance that does not exceed market norms." ISS, *Proxy Voting Guidelines: Benchmark Policy Recommendations* (updated February 25, 2025).

SULLIVAN & CROMWELL

concurrently with disseminating it to their clients and (2) have a mechanism for making clients aware of the company's response statement before they vote.

ISS challenged the 2020 notice-and-awareness rules. In February 2024, the U.S. District Court for the District of Columbia vacated the 2020 rules, holding in *ISS* v. *SEC* that the SEC "acted contrary to law and in excess of statutory authority" when it amended the proxy rules' definitions of "solicit" and "solicitation" to include paid proxy voting advice. Both the National Association of Manufacturers ("NAM") and the SEC appealed the ruling in April 2024, but the SEC later withdrew, leaving NAM as the sole appellant. On July 1, 2025, the U.S. Court of Appeals for the D.C. Circuit affirmed the district court's ruling.

There are also lawsuits that have challenged the SEC's 2022 amendments to its 2020 notice-and-awareness rules. In 2022, the SEC adopted amendments to remove its 2020 notice-and-awareness requirements for proxy advisors. Several industry groups challenged the 2022 amendments. On June 26, 2024, a three-judge panel of the U.S. Court of Appeals for the Fifth Circuit ruled in *NAM* v. *SEC* that the SEC acted arbitrarily and capriciously in removing these requirements, and therefore violated the Administrative Procedure Act. The U.S. Chamber of Commerce, the Business Roundtable and the Tennessee Chamber of Commerce & Industry also challenged the 2022 amendments in the U.S. Court of Appeals for the Sixth Circuit. Unlike the Fifth Circuit, the Sixth Circuit upheld the 2022 amendments in its September 2024 decision.

Further judicial and regulatory developments on SEC requirements for proxy advisors could have a substantial impact on the role of proxy advisors in the future.

**Congressional Scrutiny.** On April 24, 2025, the Subcommittee on Capital Markets held a hearing titled "Exposing the Proxy Advisory Cartel," which focused on concerns about ISS's and Glass Lewis's market power and potential conflicts of interest, as well as the impact of their recommendations on companies and investors.

**New Texas Proxy Advisor Law.** On June 22, 2025, Texas Governor Greg Abbott signed Texas SB 2337, which is scheduled to go into effect on September 1, 2025. The law will affect recommendations made by proxy advisory services such as ISS and Glass Lewis when they provide advice concerning public companies that are incorporated under the laws of Texas, have their principal place of business in Texas, or have proposed redomiciling to Texas from other jurisdictions. If the proxy advisory firms do not base a recommendation "solely on the financial interests of shareholders," they must provide detailed disclosures explaining the basis of their advice. The statute enumerates several factors that are not "solely based on the financial interests of shareholders," including environmental, social or governance goals, or DEI initiatives. In late July, both ISS and Glass Lewis sued the Attorney General of the State of Texas seeking injunctions to prohibit the enforcement of this new law on various constitutional grounds.

SULLIVAN & CROMWELL

### 2. 13G Guidance and Impact on Institutional Investor Engagement

In February 2025, the SEC updated its guidance on the circumstances in which investors engaging with companies may lose their eligibility to report beneficial ownership on the "short-form" Schedule 13G and be required to report on the "long-form" Schedule 13D.

Under the updated C&DIs, the SEC expanded the examples of the types of engagement that may constitute an investor's attempt to influence control. The new examples include circumstances where an investor "recommends that the issuer remove its staggered board, switch to a majority voting standard in uncontested director elections, eliminate its poison pill plan, change its executive compensation practices, or undertake specific actions on a social, environmental, or political policy and, as a means of pressuring the issuer to adopt the recommendation, explicitly or implicitly conditions its support of one or more of the issuer's director nominees at the next director election."

After the SEC released its new 13G guidance, many large institutional investors initially paused engagement meetings with companies. Although meetings have resumed, at least some institutional investors have shifted to a more "listen-only" approach in engagement meetings. Anecdotally, at least some companies have reported receiving less clear feedback from their largest U.S. institutional investors this year.

If this trend continues in future proxy seasons, companies may need to work more closely with internal teams and external advisors to make sure they continue to anticipate and address institutional investor concerns even when an investor has not clearly outlined their concerns. As institutional investors continue to expand their "pass through" or "voting choice" programs, companies may also need to reevaluate their strategies for annual meeting shareholder engagements to account for the possibility that votes of shares owned by their largest institutional investors may be split on particular proposals and director candidates.

### 3. Future of Rule 14a-8 Proposals

Several sitting SEC Commissioners, including Chair Atkins,[36] have previously expressed concern with the current Rule 14a-8 shareholder proposal process. It remains to be seen what measures, if any, the SEC will take to modify the Rule 14a-8 process or related guidance, in addition to its recent issuance of SLB 14M and withdrawal of the 2022 proposed Rule 14a-8 amendments. Regardless of any additional changes that may come on the federal level, companies should be aware that states such as Texas are seeking to make changes to the shareholder proposal framework.

---

[36] *See, e.g.*, Commissioner Paul S. Atkins, U.S. Securities and Exchange Commission, Shareholder Rights, the 2008 Proxy Season, and the Impact of Shareholder Activism (July 22, 2008) ("So we must be vigilant that the shareholder proposal process does not result in the tyranny of the minority.").

SULLIVAN & CROMWELL

On May 19, 2025, Governor Abbott signed into law Texas SB 1057, which is set to take effect on September 1, 2025. Under SB 1057, Texas organized corporations that are both "[n]ationally listed corporations" and have their principal place of business in Texas can elect in their governing documents to be governed by new Section 21.373 of the TBOC, which limits shareholders who can submit proposals for approval at shareholder meetings. The shareholder or group of shareholders must hold an amount of voting shares equal to at least (A) $1 million in market value (tested as of the date of submission of the proposal) or (B) three percent of the corporation's voting shares. The shareholder or group of shareholders must have held such shares for a continuous period of at least six months before the date of the meeting and throughout the entire duration of the meeting; and the shareholder or group of shareholders must solicit the holders of shares representing at least 67% of the voting power of shares entitled to vote on the proposal.[37] It remains to be seen if and to what extent SB 1057 will impact the submission and exclusion of Rule 14a-8 proposals in future proxy seasons.

*　　　*　　　*

---

[37]    Tex. S.B. 1057 § 1, 89th Leg., R.S. (2025) (enacted).

2025 Proxy Season Review
Part 1 – Rule 14a-8 Shareholder Proposals

# SULLIVAN & CROMWELL

**ABOUT SULLIVAN & CROMWELL LLP**

Sullivan & Cromwell LLP is a global law firm that advises on major domestic and cross-border M&A, finance, corporate and real estate transactions, significant litigation and corporate investigations, and complex restructuring, regulatory, tax and estate planning matters. Founded in 1879, Sullivan & Cromwell LLP has more than 900 lawyers on four continents, with four offices in the United States, including its headquarters in New York, four offices in Europe, two in Australia and three in Asia.

**CONTACTING SULLIVAN & CROMWELL LLP**

This publication is provided by Sullivan & Cromwell LLP as a service to clients and colleagues. The information contained in this publication should not be construed as legal advice. Questions regarding the matters discussed in this publication may be directed to any of our lawyers or to any Sullivan & Cromwell LLP lawyer with whom you have consulted in the past on similar matters. If you have not received this publication directly from us, you may obtain a copy of any past or future publications by sending an e-mail to SCPublications@sullcrom.com.

**EXHIBIT 15**



**Investment Management**

# An Inconvenient Truth About ESG Investing

by Sanjai Bhagat

March 31, 2022



John Scott/Getty Images

**Summary.**   Investing in sustainable funds that prioritize ESG goals is supposed to help improve the environmental and social sustainability of business practices. Unfortunately, close analysis suggests that it's not only not making much difference to... **more**

As of December 2021, assets under management at global exchange-traded "sustainable" funds that publicly set environmental, social, and governance (ESG) investment objectives amounted to more than $2.7 trillion; 81% were in European based funds, and 13% in U.S. based funds. In the fourth

quarter of 2021 alone, $143 billion in new capital flowed into these ESG funds.

How have investors fared? Not that well, it seems.

To begin with, ESG funds certainly perform poorly in financial terms. In a recent Journal of Finance paper, University of Chicago researchers analyzed the Morningstar sustainability ratings of more than 20,000 mutual funds representing over $8 trillion of investor savings. Although the highest rated funds in terms of sustainability certainly attracted more capital than the lowest rated funds, none of the high sustainability funds outperformed any of the lowest rated funds.

That result might be expected, and it is possible that investors would be happy to sacrifice financial returns in exchange for better ESG performance. Unfortunately ESG funds don't seem to deliver better ESG performance either.

Researchers at Columbia University and London School of Economics compared the ESG record of U.S. companies in 147 ESG fund portfolios and that of U.S. companies in 2,428 non-ESG portfolios. They found that the companies in the ESG portfolios had worse compliance record for both labor and environmental rules. They also found that companies added to ESG portfolios did *not* subsequently improve compliance with labor or environmental regulations.

This is not an isolated finding. A recent European Corporate Governance Institute paper compared the ESG scores of

companies invested in by 684 U.S. institutional investors that signed the United Nation's Principles of Responsible Investment (PRI) and 6,481 institutional investors that did not sign the PRI during 2013–2017. They did not detect any improvement in the ESG scores of companies held by PRI signatory funds subsequent to their signing . Furthermore, the financial returns were lower and the risk higher for the PRI signatories.

Why are ESG funds doing so badly? Part of the explanation may simply be that an express focus on ESG is redundant: in competitive labor markets and product markets, corporate managers trying to maximize long-term shareholder value should *of their own accord* pay attention to employee, customer, community, and environmental interests. On this basis, setting ESG targets may actually distort decision making.

There's also some evidence that companies publicly embrace ESG as a cover for poor business performance. A recent paper by Ryan Flugum of the University of Northern Iowa and Matthew Souther of the University of South Carolina reported that when managers underperformed the earnings expectations (set by analysts following their company), they often publicly talked about their focus on ESG. But when they exceeded earnings expectations, they made few, if any, public statements related to ESG. Hence, sustainable fund managers who direct their investments to companies publicly embracing ESG principles may be over-investing in financially underperforming companies.

The conclusion to be drawn from this evidence seems pretty clear: funds investing in companies that publicly embrace ESG sacrifice financial returns without gaining much, if anything, in terms of actually furthering ESG interests.

**EXHIBIT 16**

Green | ESG & Investing

# Big ESG Funds Are Doing Worse Than the S&P 500

In a tough year for equity investors, ESG funds haven't offered a safe haven from market turmoil.



*Photographer: Bloomberg*

By <u>Tim Quinson</u>
December 7, 2022 at 5:00 AM CST

> 🔒  This article is for **subscribers only**.

Funds linked to environmental, social and governance principles are by definition supposed to minimize risks tied to those three factors. In 2022, the approach did little to help protect investors from the brutal slide in the financial markets.

The 10 largest ESG funds by assets have all posted double-digit losses, with eight of them falling even more than the S&P 500's 14.8% decline. The laggards include BlackRock Inc.'s $20.7 billion iShares ESG Aware MSCI USA

exchange-traded fund (ESGU) and Vanguard Group's $5.9 billion ESG US Stock ETF (ESGV).

## Large ESG Funds Mixed vs S&P 500 in 2022

Majority in top 10 by assets underperformed index



■ YTD Losses

| | |
|---|---|
| -28.1% | Brown Adv Sus Growth (BAFWX) |
| -20.6 | Vanguard FTSE Social (VFTNX) |
| -20.6 | Vanguard ESG US Stock (ESGV) |
| -18.9 | Parnassus Mid-Cap (PARMX) |
| -16.9 | iShares ESGA MSCI USA (ESGU) |
| -16.5 | Pioneer A (PIODX) |
| -15.6 | Parnassus Core Equity (PRBLX) |
| -14.8 | TIAA-CREF SocCh Equity (TISCX) |
| -14.8 | S&P 500 (SPX) |
| -13.8 | iShares ESGA MSCI EAFE (ESGD) |
| -13.0 | TIAA-CREF Core Im Bond (TSBIX) |

Source: Bloomberg
Note: Data measures total return, through Dec. 5

The $6 billion Brown Advisory Sustainable Growth Fund (BAFWX) was the worst performer of the bunch, having slumped 28.1% this year as of the close of business on Dec. 5. The fund had more than two-fifths of its assets in software, semiconductor and internet stocks as recently as the end of October. The once high-flying technology sector has been particularly hard hit this year amid rising interest rates, inflationary concerns and the possibility of a US recession.

## Bloomberg Green

### Forests in Certain Areas of the World Can Add to Global Warming

### Trump Halts Orsted Wind Project in Another Blow to Industry

### Brazil Secures Amazon Allies for $125 Billion Global Forest Fund

Trump EPA Waives Refiners From Biofuel-Blending Mandate

It's been a "bad year for growth stocks" and the Brown Advisory fund is the most "growth-oriented" of the 10 funds on the list, said Jon Hale, director of sustainability research for the Americas at Morningstar Inc. The Parnassus Core Equity, Pioneer and TIAA Social Choice Equity are more "value" focused, seeking shares that trade at low levels relative to earnings and other financial metrics. As a result, this group reported slightly smaller losses, he said.

The fund declines are occurring during the most turbulent period 🖵 for the S&P 500 since the global financial crisis of 2008. The US index has posted a move of at least 1%–both up and down–on almost half of trading days since the start of the year.

While few of the biggest funds measure their performance against the S&P 500, the index is the most widely followed stock benchmark in the US. Of the 10 largest ESG funds by assets, just one is a fixed-income fund, according to data compiled by Morningstar Direct. The $5.9 billion TIAA-CREF Core Impact Bond Fund (TSBIX) has dropped 13% this year, less than the equity funds.

The performance of the 10 largest funds compares with the average 12% decline 🖵 of ESG-labeled stock funds with more than $500 million of assets so far in 2022, according to data compiled by Bloomberg.

Despite the losses, a paper released this month by the National Bureau of Economic Research said that investors are willing to be charged "higher fees for ESG-oriented index funds in exchange for their financial and non-financial benefits."

The Harvard Business School professors who helped write the study entitled *How Do Investors Value ESG* found that investors will–on average–pay 20 basis points more a year for funds with an ESG mandate as opposed to funds without an ESG mandate.

"When we incorporate the possibility that investors are willing to accept lower financial returns in exchange for the psychic and societal benefits of ESG, we find that the implicit value that investors place on ESG stocks is higher still," the authors wrote.

For ESG optimists, the NBER report helps explain why money keeps rolling into ESG funds despite the bad performance. This year, a net $44 billion ⌨ has gone into ESG-labeled ETFs, Bloomberg data show.

Whether that trend continues almost definitely depends on how much patience investors have if losses keep mounting.

*Bloomberg Green publishes Good Business every week, providing unique insights on ESG and climate-conscious investing.*

Contact us:
**Provide news feedback or report an error**

Site feedback:
**Take our Survey** ⤢

Confidential tip?
**Send a tip to our reporters**

Before it's here, it's on the Bloomberg Terminal

©2025 Bloomberg L.P. All Rights Reserved.

**EXHIBIT 17**

⚠ We are currently experiencing download issues with our one-page PDF reports. We're working quickly to address this problem and thank you for your patience.

Morningstar brands and products ⌄      Company ⌄

☰   🏠  ›  Sustainable Investing  ›  ESG Fund Returns Recover, but Still Trail Conventional Peers by a Small Margin

# ESG Fund Returns Recover, but Still Trail Conventional Peers by a Small Margin

The tech stocks that helped ESG funds and the utilities that hurt them in 2023.

  Mahi Roy and Alyssa Stankiewicz • Feb 5, 2024

Share ⬈



## Securities in This Article

Eversource Ene... (ES) ⋯    Constellation E... (CEG) ⋯    Shopify Inc Reg...(SHOP) ⋯

Parnassus Core... (PRBLX) ⋯    Palo Alto Netwo...(PANW) ⋯    +9 More ⌄

Sustainable funds performed much better in 2023 compared with 2022, but results were mixed across asset classes. Large-blend equity funds held up better than

traditional peers. Tech provided a boost. Below are some highlights from 2023 Sustainable Funds Landscape.

## Sustainable Equity Funds Lagged in 2023 but Performed Well Over the Trailing Five Years

On the whole, sustainable funds lagged their conventional peers by a small margin, with 53% of sustainable funds landing in the bottom half of their respective categories.

## Sustainable Funds 2023 Return Rank by Morningstar Category Quartile



Source: Morningstar Direct Data as of Dec 31, 2023.

Equity funds suffered the worst. Roughly one third of sustainable equity funds dropped to the bottom quartile relative to peers. Some of the macroeconomic pressures that contributed to their modest performance—such as high interest rates, inflation, and supply chain disruptions—continue to feature in market outlooks for 2024.

In fixed income, roughly one third of sustainable funds landed in the third quartile relative to peers. They did a better job than peers at avoiding the lowest returns, and only 15% landed in the bottom quartile.

Streamline your portfolio with Morningstar Investor. Learn more.

Over the trailing three years, the distribution of sustainable funds across their respective categories looks similar to 2023.

However, in terms of trailing five-year returns, they held up better than conventional peers. Some 60% of sustainable funds landed in the top half of their respective categories during this time period. Strong performance during 2019 and 2020 contributed.

## Sustainable Funds Three-and Five-Year Trailing Performance by Morningstar Category Quartile



Source Morningstar Direct Data as of Dec 31, 2023.

On the other hand, over the trailing three-year and five-year periods, sustainable bond funds found themselves in the bottom half of their respective categories more often than not.

## A Handful of Sustainable Funds Stack Up Well on Multiple Morningstar Metrics

Looking ahead, we can consult forward-looking ratings to identify those funds that Morningstar's manager research team believes will outperform. More than 300 sustainable funds earn our higher ratings under the Morningstar Medalist Rating system. Of those, 11 are offered by asset managers that earn top marks on the Morningstar ESG Commitment Level. The ESG Commitment Level is a qualitative measure of the extent to which asset managers incorporate ESG considerations into their investment processes. The scale runs from best to worst as follows: Leader, Advanced, Basic, and Low.

## Top Sustainable Gold, Silver, and Bronze Funds

| Name | Ticker | Morningstar Category | Morningstar Medalist Rating | Morningstar Medalist Rating Analyst Driven Percentage (%) | Morningstar ESG Commitment Level | Inception Date | Fund Size ($ Mil) | 2023 Total Return | 2023 % Rank Category | Morningstar Sustainability Rating | Prospectus Adjusted Expense Ratio |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Parnassus Core Equity | PRBLX | Large Blend | Gold | 100 | Leader | 8/31/1992 | 27,806 | 24.9 | 43 | ⊕⊕⊕⊕⊕ | 0.82 |
| Boston Trust Walden Small Cap | BOSOX | Small Blend | Gold | 100 | Leader | 12/16/2005 | 1,294 | 10.1 | 91 | ⊕⊕⊕⊕⊕ | 1.00 |
| Brown Advisory Sustainable Growth | BAFWX | Large Growth | Silver | 100 | Advanced | 6/29/2012 | 8,750 | 39.1 | 46 | ⊕⊕⊕⊕⊕ | 0.64 |
| Parnassus Mid-Cap | PARMX | Mid-Cap Blend | Silver | 100 | Leader | 4/29/2005 | 5,401 | 12.7 | 78 | ⊕⊕⊕⊕⊕ | 0.96 |
| TIAA-CREF Core Impact Bond | TSBIX | Intermediate Core Bond | Bronze | 100 | Advanced | 9/21/2012 | 6,194 | 6.0 | 32 | ⊕⊕⊕⊕⊕ | 0.37 |
| TIAA-CREF Social Choice Equity | TISCX | Large Blend | Bronze | 100 | Advanced | 7/1/1999 | 6,125 | 22.5 | 59 | ⊕⊕⊕⊕⊕ | 0.18 |
| Impax Global Environmental Markets | PGINX | Global Large-Stock Blend | Bronze | 100 | Leader | 3/27/2008 | 2,447 | 16.9 | 63 | ⊕⊕⊕⊕⊕ | 0.91 |
| TIAA-CREF Social Choice International Equity | TSONX | Foreign Large Blend | Bronze | 100 | Advanced | 8/7/2015 | 1,577 | 19.3 | 14 | ⊕⊕⊕⊕⊕ | 0.37 |
| Parnassus Mid Cap Growth | PARNX | Mid-Cap Growth | Bronze | 100 | Advanced | 12/27/1984 | 829 | 36.6 | 5 | ⊕⊕⊕⊕ | 0.80 |
| TIAA-CREF Green Bond | TGRNX | Intermediate Core-Plus Bond | Bronze | 100 | Advanced | 11/16/2018 | 153 | 6.4 | 43 | ⊕⊕⊕⊕ | 0.45 |
| Impax Global Opportunities | PXGOX | Global Large-Stock Growth | Bronze | 100 | Leader | 6/27/2018 | 122 | 15.5 | 84 | ⊕⊕⊕⊕⊕ | 0.98 |

Source: Morningstar Data as of Dec. 31, 2023.

Parnassus Core Equity PRBLX leads the pack in terms of assets and earns the highest merit under both ratings systems. Small but mighty, Boston Trust Walden Small Cap BOSOX also fares well under both assessments. In terms of sustainability performance, seven of the top 11 earn High Morningstar Sustainability Ratings, a sign that their portfolios are exposed to little ESG risk compared with peers.

Streamline your portfolio with Morningstar Investor. Learn more.

## ESG Large-Blend Equity Funds Bounce Back From 2022's Lows

In 2023, both sustainable large-blend equity funds and conventional peers lagged the Morningstar US Market Index, but the median shortfall was smaller for sustainable funds than for conventional peers. The top-performing sustainable large-blend equity fund was IQ Candriam U.S. Large Cap Equity ETF IQSU, which gained 32 percentage points during the year, nearly 6 percentage points better than the index.

Case 1:25-cv-01153-ADA          Document 39-1          Filed 09/05/25          Page 254 of 495

## Large-Blend Funds: Median Annualized Excess Return vs. the Morningstar US Market Index



Source: Morningstar Direct. Data as of Dec. 31, 2023. 1 Year sample includes 82 sustainable and 526 conventional funds. 3 Year sample includes 58 sustainable and 459 conventional funds. 5 Year sample includes 45 sustainable and 410 conventional funds. Does not include obsolete funds.

In 2022, sustainable funds underperformed their conventional peers, in part because they didn't participate as fully in the energy rally that followed Russia's invasion of Ukraine. This is reflected in the trailing three-year comparison, where the median sustainable fund lagged the index by roughly 10 basis points and conventional funds outperformed.

## A Look Inside Portfolios: Tech Stocks Helped

In 2023, the median sustainable large-blend equity fund outperformed conventional peers but lagged the Morningstar US Market Index. To understand what drove sustainable funds' performance in 2023, we compared the sector profiles for nearly 90 sustainable large-blend equity funds with that of the Morningstar US Market Index.

## Sustainable Funds Sector Exposure vs. the Morningstar US Market Index Going Into 2023



Source: Morningstar Direct. Data as of Dec. 31, 2023. Sample includes 87 large-blend equity funds. Sector exposures reference portfolios from December 2022 (before the start of the 2023 annual return period).

## Equity Sector Annual Returns in 2023



Source: Morningstar Direct. Data as of Dec. 31, 2023. Returns reflect Morningstar sector indexes, whose parent index is the Morningstar US Market Index.

## One Fund's Top Tech Picks

Entering into 2023, two thirds of the universe held a relative overweighting to technology, which trounced all other sectors with its 59% gain in 2023. Eventide Large Cap Focus ETLAX maintained a 40% allocation to technology, nearly 26 percentage points higher than the benchmark. Because the sector bested all others in 2023, this helped the fund's returns. Additionally, stock picks such as Palo Alto Networks PANW, CrowdStrike CRWD, Shopify SHOP, and Dlocal DLO contributed significantly to the fund's success. Each of these carries Low or Medium levels of ESG risk compared with peers.

## Eventide Large Cap Focus: Top 5 Technology Bets Going Into 2023

| Name | Ticker | Weighting in Portfolio (%) | Morningstar Rating Overall | 2023 Return (%) | Selection Effect | ESG Risk Rating Assessment |
|---|---|---|---|---|---|---|
| Palo Alto Networks | PANW | 5.4 | ★★ | 111.3 | 2.0 | ⬤⬤⬤⬤ |
| CrowdStrike Holdings | CRWD | 2.2 | ★★ | 142.5 | 1.7 | ⬤⬤⬤⬤ |
| Shopify | SHOP | 0.9 | ★★ | 124.4 | 1.1 | ⬤⬤⬤⬤ |
| Dlocal | DLO | 1.2 | ★★★ | 13.6 | 1.7 | ⬤⬤⬤⬤ |
| Apple | AAPL | 0.0 | ★★ | 49.0 | 1.0 | ⬤⬤⬤⬤ |

Source: Morningstar Direct. Data as of Dec. 31, 2023, except for the Morningstar Rating, which is effective as of Jan. 29, 2024. Stocks shown are those with the most positive selection effect relative to the Morningstar U.S. Market index in 2023. In the ESG Risk Rating Assessment, 5-globes are equivalent to Negligible ESG Risk, and 1-globe is equivalent to Severe ESG Risk.

Because of the firm's values-based approach, Apple AAPL did not make the cut into the portfolio. In this case, the exemption of Apple helped, as the fund reallocated its capital to other higher-performing technology names.

## How Utilities Hurt an iShares Fund

On the other hand, nearly one fourth of the group maintained an overweighting to utilities stocks, compared with the market index. Since the sector lost 7% in 2023, funds with a relative overweighting were punished. IShares ESG MSCI USA Min Vol Factor ETF ESMV entered 2023 with a roughly 5-percentage-point overweighting in utilities. Because this sector was the worst performer in 2023, the additional exposure hurt the fund's performance relative to the benchmark.

## iShares ESG MSCI USA Min Vol Factor ETF: Main Utilities Detractors Going Into 2023

| Name | Ticker | Weighting in Portfolio (%) | Morningstar Rating Overall | 2023 Return (%) | Selection Effect | ESG Risk Rating Assessment |
|---|---|---|---|---|---|---|
| Eversource Energy | ES | 1.3 | ★★★★★ | -23.3 | -0.3 | ⬤⬤⬤⬤ |
| Constellation Energy | CEG | 0.0 | ★★★ | 37.2 | -0.1 | ⬤⬤ |
| NextEra Energy | NEE | 1.2 | ★★★★★ | -25.3 | -0.1 | ⬤⬤⬤⬤ |
| Vistra | VST | 0.0 | ★★ | 70.7 | -0.1 | ⬤⬤ |
| Southern Co | SO | 0.0 | ★★★ | 2.3 | -0.1 | ⬤⬤⬤ |

Source: Morningstar Direct. Data as of Dec. 31, 2023, except for the Morningstar Rating, which is effective as of Jan. 29, 2024. Stocks shown are those with the most negative selection effect relative to the Morningstar U.S. Market index in 2023. In the ESG Risk Rating Assessment, 5-globes are equivalent to Negligible ESG Risk, and 1-globe is equivalent to Severe ESG Risk.

Stock picks within the utilities sector hurt, too. Compared with the benchmark, the fund held higher allocations to Eversource Energy ES and NextEra Energy NEE, each of which lost more than 20% during the year and ate on the fund's returns.



On the flip side, Constellation Energy CEG and Vistra VST gained 37% and 71%, respectively. Both companies court High levels of ESG risk and were excluded from the portfolio, so the fund missed out on their wins.

For more on flows, assets, performance, and sustainability characteristics, download the full report here.

**The 2025 PitchBook Sustainable Investment Survey is live! Calling on LPs, GPs, wealth advisors, family offices, consultants, and other advisors, and anyone else involved with private market activities to provide their thoughts on various ESG and Impact-related topics.**

Complete the survey

The author or authors own shares in one or more securities mentioned in this article. Find out about **Morningstar's editorial policies**.

Share ⧉

## More in Sustainable Investing

View All ›

### Amid New Curbs on ESG Shareholder Resolutions, Companies May Lose Useful Signals from Investors

The number of proxy voting proposals with near-zero support continues to increase.

Lindsey Stewart, CFA  •  Aug 19, 2025



### Top Mid-Cap Stocks Widely Owned by ESG Funds

GE Vernova, McCormick, Xylem, First Solar, and Trane are popular with sustainable investors in mid-cap funds.

Liz Angeles and Frances Aufderheide  •  Aug 18, 2025



### Top Small-Cap Stocks Widely Owned by ESG Funds

Aptar, Clearway Energy, and Wyndham are among sustainable holdings.

Frances Aufderheide  •  Aug 15, 2025



## About the Authors

View All Authors ›



### Mahi Roy

Analyst

More from Author

Mahi Roy is an ESG analyst for Morningstar.

| The Modern 529 Plan | Amid Outflows, Fidelity and Vanguard a Bright Spot for US Sustainabl... | 16 Water Stocks and Funds to Consider |



8/22/25, 5:45 PM
Case 1:25-cv-01153-ADA   Document 39-1   Filed 09/05/25   Page 260 of 495
ESG Fund Returns Recover, but Still Trail Conventional Peers by a Small Margin | Morningstar

Mabi Roy • Jun 5, 2025          Mabi Roy • Apr 24, 2024          Mabi Roy • Mar 19, 2024



## Alyssa Stankiewicz
Associate Director

More from Author

Alyssa Stankiewicz is an associate director of parent research for Morningstar.

---

### Women Account for a Smaller Percentage of Managers Today,...

Alyssa Stankiewicz • Mar 7, 2025

### 5 Funds for Investing in Racial and Ethnic Diversity

Alyssa Stankiewicz • Feb 3, 2025

### These 2 Fund Families Earned the Most Overall Ratings Upgrades in...

Alyssa Stankiewicz • Dec 27, 2024



---



 United States

© Copyright 2025 Morningstar, Inc. All rights reserved. Dow Jones Industrial Average, S&P 500, Nasdaq, and Morningstar Index (Market Barometer) quotes are real-time.

**EXHIBIT 18**

# Harvard Law School Forum on Corporate Governance

## Are Proxy Advisors Really a Problem?

*Posted by Frank M. Placenti, Squire Patton Boggs (US) LLP, on Wednesday, November 7, 2018*

Tags: **BlackRock**, **Boards of Directors**, **Glass Lewis**, **Institutional Investors**, **ISS**, **Proxy advisors**, **Proxy voting**, **SEC**, **Securities regulation**, **Shareholder voting**, **Stewardship**
More from: **Frank Placenti**, **Squire Patton Boggs**

---

Editor's Note: **Frank M. Placenti** is partner at Squire Patton Boggs (US) LLC. This post is based on a recent paper by Mr. Placenti that was commissioned by the American Council for Capital Formation.

---

Proxy advisory firms have been a feature of the corporate landscape for over 30 years. Throughout that time, their influence has increased, as has the controversy surrounding their role.

In Blackrock's July 2018 report on the *Investment Stewardship Ecosystem*, [1] the country's largest asset manager noted that, while it expends significant resources [2] evaluating both management and shareholder proposals, many other investor managers instead rely "heavily" on the recommendations of proxy advisors to determine their votes, and that proxy advisors can have "significant influence over the outcome of both management and shareholder proposals."

That "significant influence" has been a source of discomfort for many public company boards and executives, as well as organizations like the American Council for Capital Formation, the Society for Corporate Governance and the Business Roundtable. They have charged that proxy advisors employ a "one-size-fits all" approach to governance that ignores the realities of differing businesses. Some have also complained that the advisors' reports are often factually or analytically flawed, and that their voting recommendations increasingly support a political and social agenda disconnected from shareholder value.

Academics have written that there is no empirical evidence that proxy advisors' benchmark governance policies promote shareholder value, effective governance or any meaningful advancement of the advisors' championed social causes. Indeed, a 2009 study by three Stanford economists concluded that, when Boards altered course to implement the compensation policies preferred by proxy advisors, shareholder value was measurably damaged. [3] A second Stanford study reported that those charged with making investment decisions within an investment manager were involved in voting decisions only 10% of the time, suggesting a troubling de-coupling of voting decisions from any investment selection or the company performance that motivates that selection. [4]

While proxy advisors have had a raft of detractors, some institutional investor groups have defended the proxy advisors' role, asserting that the outsourcing service they provide is indispensable if institutional investors are to fulfill their perceived regulatory responsibility to vote on every issue presented for shareholder action at the hundreds of companies in which they hold positions.

For their part, proxy advisors contend that complaints about the quality of their analysis are overblown, that they make few material errors, and that disputes with companies most often represent mere "differences of opinion," as recently claimed in a May 30, 2018 letter from Institutional Shareholder Services (ISS) to six members of the Senate Banking, Housing, and Urban Affairs Committee. [5]

As in many such debates, where you stand depends on where you sit, and the absence of data has hindered an informed discussion.

## Concerns About Over-Reliance on Proxy Advisors

Among the principal laments about proxy advisors has been that many institutional investors essentially delegate their voting decisions to these advisors. Investors generally deny any such delegation and argue that while they are guided by the advisors' recommendations, they make their own voting decisions. ISS has made similar assertions. [6]

ISS and Glass Lewis have contended that the close correlation between their recommendations and their clients' voting records should not be of concern because most clients have their own "custom" voting guidelines that are the basis for their voting recommendations. [7] However, practitioners who have examined those "custom" guidelines have often remarked that that many contain only minor deviations from the advisors' benchmark standards that give rise to the "one-size-fits-all" criticism.

In the midst of this debate, newly-published empirical evidence makes clear that, while the recommendations of ISS are not followed by their clients 100% of the time, they are followed _nearly_ 100% of the time by many of the largest fund managers in the country.

An independent review of reported _Proxy Insight_ data for the published by the American Council for Capital Formation (ACCF) in October 2018 examined the historical voting records of 175 asset managers with more than $5.0 trillion in assets under management. Links to the ACCF reports are available **here** and **here** . The statistics reported by ACCF can fairly be viewed as evidence that, despite their protests to the contrary, for all practical purposes, some funds have delegated the exercise of their fiduciary voting obligations to their proxy advisors.

The ACCF analysis reveals that:

- 175 asset managers managing over $5.0 trillion in assets have historically voted consistently with ISS recommendations 95% of the time, whether the matter at issue was a management proposal or a shareholder proposal, and

- 82 of the asset managers with over $1.3 trillion of assets under management voted consistently with ISS' recommendations 99% of the time, whether the matter in question was a management proposal or a shareholder proposal.

The ACCF data was designed to evaluate whether the advisor's voting percentages were consistent whether the matter under consideration was a management proposal or a shareholder proposal. The consistency of the results for those two categories, regardless of the routine or contested nature of the issue, suggests that these firms are effectively outsourcing their ultimate voting decisions.

Moreover, the ACCF data does not seem to be reflect that large institutions are doing it "right" while smaller funds are forced to resort to reliance on third party advice due to economic necessity. Large and small firms are equally represented in the ACCF findings. The asset managers in the 99% category include some large, well-known and very successful asset managers, as reflected in the list below:

| Asset Manager | Mgmt. Proposals | Sh. Proposals |
|---|---|---|
| Blackstone | 100.0% | 100.0% |
| AQR Capital Management LLC | 99.9% | 99.6% |
| United Services Automobile Association | 99.9% | 99.5% |
| Arrowstreet Capital | 100.0% | 99.9% |
| Virginia Retirement System | 99.9% | 99.8% |
| Los Angeles County Employees Retirement Association | 99.7% | 99.5% |
| Baring Asset Management | 99.9% | 99.6% |
| Numeric Investors, LLC | 100.0% | 100.0% |
| PanAgora Asset Management, Inc. | 99.8% | 99.5% |
| First Trust Portfolios Canada | 99.9% | 99.3% |
| ProShares | 100.0% | 99.6% |
| Kentucky Teachers' Retirement System | 99.7% | 99.6% |
| Stone Ridge Asset Management | 100.0% | 99.8% |
| Pensionskasse SBB | 99.7% | 99.5% |
| Euclid Advisors LLC | 99.6% | 99.9 |
| Rafferty Asset Management, LLC | 100.0% | 100.0% |
| Driehaus Capital Management LLC | 99.9% | 99.7% |
| Alameda County Employees' Retirement Association | 99.9% | 99.6% |
| DSM Capital Partners LLC | 99.6% | 100.0% |
| Weiss Multi-Strategy Advisers LLC | 99.9% | 99.80% |

*All voting and Assets Under Management data reported by ACCF was derived from Proxy Insight reports dated October 13, 2018 and was filtered to include only those funds that had voted on more than 100 resolutions. ACCF derived assets under management data, noted with an asterisk, from IPREO data for that same period due to the unavailability of that data from Proxy Insights. ISS alignment data on the platform reflects all data available for each investor, which generally dates back as early as July 1, 2012 through the date it was pulled.*

While it is clear many substantial investment funds rely on ISS for virtually all of their voting decisions, that is not true for all institutional investors. Several of the nation's largest funds like Vanguard, State Street, Blackrock and others have chosen to implement their own internal proxy voting analysis and have increased the size of their internal corporate governance teams. The *Financial Times* has reported:

> "New York-based BlackRock now has the largest corporate governance team of any global asset manager, after hiring 11 analysts for its stewardship division over the past three years, bringing total headcount to 31. Vanguard, the Pennsylvania-based fund company that has grown quickly on the back of its low-cost mantra, has nearly doubled the size of its corporate governance team over the same period to 20 employees. State Street, the US bank, has almost tripled the size of the governance team in its asset management division to 11. Both Vanguard and State Street said their governance teams will continue to grow this year." [8]

These efforts are to be applauded as they reflect a commitment of significant resources to making informed and independent voting decisions. Moreover, in the experience of most practitioners, those funds that employ their own internal resources tend to show a greater willingness to engage in dialogue with companies who feel the need to express disagreement with their initial voting decisions.

## Concerns About Electronic Default Voting and Its Impact

For years, companies have anecdotally reported an almost immediate spike in voting after an advisor's recommendation is issued, with the vote demonstrating near lock-step adherence to the recommendation.

A few companies have been bold enough to contend that the immediacy of the vote reveals that institutional investors are not taking time to digest the information in the advisors' often-lengthy reports, only to experience the sting of investor backlash.

Moreover, it is now known that many of these votes are cast through electronic ballots with default mechanisms. These default settings must be manually overridden for the investor to vote differently than the advisor recommends. [9] This immediate default voting allows no time for companies to digest the advisor's report and effectively communicate to their investors any objections they may have to it. The combination of default electronic voting and the speed with which votes are cast has been dubbed "robo-voting."

Public companies who do not receive the advisors' reports in advance are caught flat-footed by an adverse recommendation and are left to scramble to file supplemental proxy materials and otherwise struggle to communicate their message to investors. When those investors have already cast their vote by default electronic ballot, getting them to engage in a discussion of the issues, let alone reverse their vote, has proven to be practically impossible in most cases. [10]

## Is Robo-Voting Real?

Although many public companies and even proxy solicitation firms have anecdotally reported the existence of an immediate spike in voting in the wake of ISS and Glass Lewis recommendations, the size and prevalence of that spike have not been empirically examined in published reports.

In an effort to generate relevant data, four major U.S. law firms including Squire Patton Boggs recently collaborated on a survey of public companies seeking information about the existence, size and nature of the voting spike in the wake of an adverse proxy advisor recommendation. An adverse recommendation was defined as one urging a vote against a management proposal or in favor of a shareholder proposal opposed by the company's board of directors.

One hundred companies were asked about their experiences in the 2017 and 2016 proxy seasons. In particular, they were asked to report on the number of adverse recommendations they had received from proxy advisors in those years.

Thirty-five companies in 11 different industries reported an adverse proxy advisor recommendation during that period, totaling 93 separate instances. Responses ranged from one to 11 adverse recommendations in a single year. A summary of the survey is available **here**.

More specifically, companies were asked to quantify the amount of advance notice they received from the relevant proxy advisor regarding adverse recommendations. Almost 37% of companies reported that ISS did not provide them the

opportunity to respond at all. Companies indicated that Glass Lewis was even worse—with 84% of respondents indicating they did not receive any notice from the advisor before an adverse recommendation.

When a company did receive notice, it was often not enough time to generate a response. Nearly 85% of companies that were given notice from ISS indicated they received less than 72 hours to respond to the adverse recommendation, with roughly 36% of these companies indicating they received less than 12 hours-notice from ISS.





Companies were also asked to report the increase in shares voted within one, two and three business days of the publication of the advisors' adverse recommendation. Results varied depending on a variety of factors, including whether the recommendation in question was issued by ISS (which broadly employs electronic default voting) or Glass Lewis, (which seems to delay voting until much closer to the time of the annual meeting.)

For the 2017 proxy season, the participating companies reported an average of 19.3% of the total vote is voted consistent with the adverse recommendations within three business days of an adverse ISS recommendation. For the 2016 proxy season, the companies reported an average 15.3% of the total vote being consistent with the adverse recommendations during the same three-day period.



Comparing the data for the voting spike for ISS and Glass Lewis recommendations provided an interesting contrast. Unlike ISS, Glass Lewis does not make extensive use of default electronic voting [11] and reports that it often delays casting votes until much closer to the annual meeting at the instruction of its clients. [12] While the average 3-day spike for ISS was 17.7% for the 2017 proxy season, for Glass Lewis the comparable number was 11.8%.



Companies were also asked to state the time period they believed they would require to effectively communicate with shareholders to respond to an adverse recommendation. One hundred percent of companies stated they would need at least three business days while 68% stated they would need at least five business days to do so. This number must be viewed in the context that nearly 85% of respondents indicated that they received less than 3 days-notice of an adverse recommendation.

While the relatively small data set (and the non-random survey methodology) do not allow statistically significant conclusions to be drawn, the survey does provide empirical data to support the following conclusions:

- There is a discernible voting spike in the near aftermath of an adverse advisory recommendation that is consistent with the recommendation.
- The percentage of shares voted in the first three days represent a significant portion of the typical quorum for public company annual meetings.
- Companies need more time than they are being given to respond to adverse recommendations.

## Is This Lack of Response Time Really a Problem?

Should we care that so many shares are being voted before companies can effectively communicate their disagreements with a proxy advisors' recommendations?

There are two immediate answers to that question.

First, as noted in the July 2018 Blackrock report, many institutional investors rely "heavily" on those recommendations. Indeed, the ACCF report shows that, for at least 175 funds, "heavily" actually means "almost always."

These institutional investors have fiduciary duties to their beneficiaries or retail investors to have all relevant information, including a company's response to a proxy advisor's recommendation, before voting. While a company's original proxy statement performs a portion of that function, it cannot respond (in advance) to errors or flaws in a proxy advisor's recommendation.

That leads to the second reason we should care about the lack of time to respond. Proxy advisor recommendations are not always right.

## How Prevalent are Errors in Proxy Advisor Reports?

As far back as 2010, the Securities and Exchange Commission (SEC) highlighted concerns that "proxy advisory firms may…fail to conduct adequate research and base [their] recommendations on erroneous or incomplete facts." [13]

In the years since that observation, public companies have continued to complain about errors in proxy advisor recommendations and have sometimes voiced those concerns in supplemental proxy filings with the SEC.

A review of supplemental proxy filings during 2016, 2017 and a partial 2018 proxy seasons (through September 30, 2018) provides some insight on the nature of this problem.

In conducting that review, we established four categories of filings in which companies challenged a proxy advisor's recommendation:

- <u>No Serious Defects</u>. Filings specifying no serious defect in the report, but simply expressing a disagreement. Often, these filings sought to justify poor company performance by reference to external market or economic forces. (These filings were not further tabulated.)
- <u>Factual Errors</u>. Filings claiming that the advisor's reports contained identified factual errors.
- <u>Analytical Errors</u>. Filings claiming that the advisor's reports contained identified analytical errors, such as the use of incongruent compensation peer group data or the use of peer groups that inexplicably varied from year to year.
- <u>Serious Disputes</u>. Filings that identified specific problems with the advisors' reports often stemming from the "one-size-fits-all" application of the proxy advisors' general policies. These included support for shareholder proposals seeking to implement bylaw changes that would be illegal under the issuer's state law of incorporation, inconsistent recommendations with respect to the same compensation plan in multiple years, and other serious disputes.

We contend that supplemental proxy filings should be regarded as a reliable source of data because, like all proxy filings, they are subject to potential liability under SEC Rule 14a-9 if they contain statements that are false or misleading, or if they omit a material fact. In short, if a company claims that an advisors' recommendation is factually or analytically wrong, it must be prepared to substantiate that claim. **[14]**

Moreover, it is probably fair to say that the number of supplemental proxy filings contesting proxy advisor recommendations represent the "tip of the iceberg" since many companies with objections to an advisor's recommendations decide not to make supplemental filings either because default electronic voting or other timing issues limit their impact on voting, or because they know they have to face the recommendations of the proxy advisor in future years. **[15]**

During the period examined, there were 107 filings from 94 different companies citing 139 significant problems including 90 factual or analytical errors in the three categories that we analyzed. There were 39 supplemental filings claiming that the advisors' reports contained factual errors, while 51 filings cite analytical errors of varying kinds. Serious disputes were expressed in 49 filings. Some filings expressed concerns in more than one category, with several expressing objections in all three categories. A hyperlink to the tabulated results appears **here**.

Perhaps the most ironic filing was made on June 1, 2017 by Willis Towers Watson. **[16]** The company took issue with an ISS report challenging the design of its executive compensation program. In short, Willis Towers Watson objected when ISS sought to substitute its judgment about compensation plan design for that of a company widely regarded as a leading expert on that very topic. The filing cited a litany of factual errors and laid bare the lack of depth in the ISS analysis–demonstrating that ISS had perhaps unwisely brought a knife to a gun fight.

Other filings were less entertaining, but often no less troubling. Standing back and looking at the body of these supplemental filings leads to the conclusion that a meaningful number of public companies have been willing to go on the record identifying real problems in their proxy advisory reports.

# Conclusion

The report and the surveys discussed in this post strongly suggest that the concerns expressed by public companies and industry groups about proxy advisors should not be dismissed. Policy makers should explore and implement legislative or regulatory measures to assure that:

- Funds with fiduciary duties to their beneficiaries are not placing undue reliance on the recommendations of third parties;
- Institutional investors are making fully-informed voting decisions;
- Investors have more transparency into how their votes are to be cast on a default basis; and
- Public companies are allowed a reasonable opportunity to identify and respond to defects in the analysis of third-party proxy advisors.

## Endnotes

[1] Available at: **https://www.blackrock.com/corporate/literature/whitepaper/viewpoint-investment-stewardship-ecosystem-july-2018.pdf**
**(go back)**

[2] Blackrock reports that it employs over 30 professionals dedicated to reviewing proxy proposals. The investment made by Blackrock and similar companies should serve as a model for the type activity needed for investment managers to exercise their fiduciary voting duties.
**(go back)**

[3] Rating the Ratings: How Good are Commercial Governance Ratings: Robert Daines, Ian D. Goe and David F. Larcker, Journal of Financial Economics, December 2010, Vol. 98. Issue 3, pages 439-461.
(go back)

[4] 2015 Investor Survey: Deconstructing Proxy Statements—What Matters to Investors, David F. Larcker, Ronald Schneider, Brian Tayan, Aaron Boyd. Stanford University, RR Donnelley, and Equilar. February 2015.
(go back)

[5] Available at: https://www.issgovernance.com/file/duediligence/20180530-iss-letter-to-senate-banking-committee-members.pdf 📄
(go back)

[6] See, ISS March 5, 2014 letter to the SEC, available at: https://www.sec.gov/comments/4-670/4670-13.pdf 📄
(go back)

[7] See ISS letter to SEC dated August 7, 2018 available at: https://www.sec.gov/comments/s7-09-18/s70918-4184213-172552.pdf 📄
(go back)

[8] Marriage, Madison. "BlackRock, Vanguard and State Street bulk up governance staff," *Financial Times*, 28 Jan. 2017.
(go back)

[9] This robo-voting procedure was described in detail in the August 3, 2017 letter of the National Investor Relations Institute to SEC Chair Jay Clayton, available at: https://www.niri.org/NIRI/media/NIRI-Resources/NIRI-SEC-Letter-PA-Firms-August-2017.pdf 📄
(go back)

[10] Testimony of Darla C. Stuckey, President & CEO, Society for Corporate Governance, Committee on Banking, Housing , and Urban Affairs Hearing on "Legislative Proposals to Examine Corporate Governance" (June 28,2018), U.S. Senate, available at: https://www.banking.senate.gov/imo/media/doc/Stuckey%20Testimony%206-28-18.pdf 📄.
(go back)

[11] Glass Lewis Response To SEC Statement Regarding Staff Proxy Advisory Letters, (September 14, 20188), available at: http://www.glasslewis.com/glass-lewis-response-to-sec-statement-regarding-staff-proxy-advisory-letters/
(go back)

[12] Testimony of Katherine H. Rabin, CEO, Glass Lewis & Co, Subcommittee on Capital Markets and Government Sponsored Enterprises, U.S. House of Representatives, (May 17, 2016) available at: http://www.glasslewis.com/wp-content/uploads/2016/05/2016_0517_Glass-Lewis-HFSS-Testimony_FINAL.pdf 📄.
(go back)

[13] SEC Request for Comments, July 14, 2010, available at: https://www.sec.gov/news/press/2010/2010-122.htm
(go back)

[14] This accountability stands in stark contrast to the fact that ISS and GL have experienced no regulatory consequences for issuing incorrect reports.
(go back)

[15] Picker, L & Lasky, A. "A congressman calls these Wall Street proxy advisory firms 'Vinny down the street' for their power to pressure companies," CNBC, 28 June 2018.
(go back)

[16] Willis Towers Watson Public Limited Company, Proxy Statement to the SEC, June 1, 2017
**https://www.sec.gov/Archives/edgar/data/1140536/000119312517189751/d380806ddefa14a.htm**
**(go back)**

**EXHIBIT 19**



Home | Previous Page

## Speech by SEC Chairman:
## Opening Statement at the SEC Open Meeting

*by*

**Chairman Mary L. Schapiro**

*U.S. Securities and Exchange Commission*

Washington, D.C.
July 14, 2010

Good Morning. This is an open meeting of the U.S. Securities and Exchange Commission on July 14, 2010.

Today we consider issuing a concept release that will seek input from the public on a wide variety of issues involving the infrastructure that supports the U.S. proxy voting system. This infrastructure, through which more than 600 billion shares are voted at more than 13,000 shareholder meetings each year, is an integral component of our country's corporate governance.

The proxy is often the principal means for shareholders and public companies to communicate with one another, and for shareholders to weigh in on issues of importance to the corporation. To result in effective governance, the *transmission* of this communication must be — and must be *perceived* to be — timely, accurate, unbiased, and fair.

It has been nearly 30 years since the Commission last conducted a comprehensive review of the proxy voting infrastructure. Since then obviously, much has changed — shareholder demographics, the structure of share holdings, technology, and the potential economic significance of each proxy vote. With all of these changes, it is time to once again ask the fundamental policy questions that led to the development of the current infrastructure, as well as to examine issues that, three decades ago, either did not exist or were not considered significant.

### Elements of the Release

As our staff will explain in greater depth in a moment, the concept release focuses on the accuracy and transparency of the voting process, the manner in which shareholders and corporations communicate, and the relationship between voting power and economic interest. The release includes in-depth analyses of, and questions concerning, a number of specific issues:

- **First, the over-voting and under-voting of shares**, which may occur when there is (for a variety of reasons) a mismatch between the number of an issuer's shares held by a broker-dealer at the Depository Trust Company and the total number of those shares credited to the broker-dealer's customers' accounts.

- **Second, vote confirmation**, which currently only exists in limited circumstances but is an objective shared by both many investors and

many issuers.

- **Third, proxy voting in the context of securities lending.** Rather than passing judgment on the merits of securities lending, this release examines the relatively narrow question of whether the lenders of securities need information sooner about the content of upcoming shareholder meetings than they now generally receive it. Such earlier notification could allow an investor to decide whether to recall their shares and regain their right to vote these shares. Also, the release explores whether mutual funds and closed-end funds should be required to disclose the number of shares that a fund votes at a particular meeting, in addition to how that fund votes.

- **Fourth, proxy distribution fees.** These fees, which are charged to issuers, are required to "reasonably reimburse" broker-dealers for the costs of forwarding proxy materials. Maximum fees are set by stock exchange rules and, since they have not been revised since 2002, we believe it is appropriate to re-examine the fee structure.

- **Fifth, issuers' ability to communicate with beneficial owners of securities**. It has been 25 years since the creation of the "OBO/NOBO" system which provides the ability of shareholders to keep their identities confidential from the issuer. With fresh insights, we will examine whether those policies still represent the most appropriate regulatory response to the competing interests of privacy versus effective shareholder-corporation communications.

- **Sixth, removing barriers or disincentives to retail investor voting participation,** including:

  - Improving investor education.

  - Enhancing brokers' Internet platforms.

  - Permitting advance voting instructions for retail investors.

  - Enhancing investor-to-investor communications.

- **Seventh, data-tagging proxy-related materials**. At the suggestion of the Commission's Investor Advisory Committee, the concept release seeks comment on whether data-tagging proxy-related data, such as information relating to executive compensation and director qualifications, might enhance a shareholder's ability to analyze issuer disclosures and to make informed voting decisions, and what such efforts might cost.

- **Eighth, the phenomenon of "empty voting,"** which generally occurs when the right to vote is disconnected from the economic interest in the outcome of that vote. This can occur as a result of certain hedging strategies; the sale of one's shares after the record date but before the annual meeting; voting of unallocated shares in an ESOP; and certain stock lending. The release requests input on the scope and significance of "empty voting" in our markets; the costs versus benefits of these practices; whether certain issuers are more vulnerable to "empty voting" than others; and whether regulatory responses (such as increased transparency) are warranted.

- **And finally, the role of proxy advisory firms** will be examined. Both companies and investors have raised concerns that proxy advisory firms may be subject to undisclosed conflicts of interest, may fail to conduct adequate research, or may base

Case 1:25-cv-01963-ADA    Document 39-1    Filed 09/05/25    Page 275 of 495

recommendations on erroneous or incomplete facts. The release will fully probe these issues.

Before we hear more details about the release, I have a very long list of staff members to thank for their contributions:

From the Division of Trading and Markets, thank you to Jamie Brigagliano, David Shillman, Tom McGowan, Jerry Carpenter, Sharon Lawson, Susan Petersen, Terri Evans, and Andrew Madar. From the Division of Investment Management, thanks to Susan Nash, Sarah Bessin, David Grim, Mark Uyeda, Ned Rubenstein, Dan Kahl, Brian Murphy, Holly Hunter-Ceci, and Alberto Zapata. From the Division of Risk, Strategy, and Financial Innovation, thank you to Henry Hu, Josh White, Scott Bauguess, Ayla Kayhan, and Alex Lee. Thank you also to Lori Schock, Rich Ferlauto and Judy Burns with the Office of Investor Education and Advocacy, and to Timothy Geishecker from the Office of International Affairs. Thank you to our colleagues in the Office of General Counsel, specifically David Fredrickson, Lori Price, and Sarah Buescher. And to the Division of Corporation Finance, thank you to Meredith Cross, Brian Breheny, Tom Kim, Mauri Osheroff, Michele Anderson, Paul Dudek, Larry Hamermesh, Mark Green, Anne Krauskopf, Heather Maples, Nick Panos, Ray Be, Greg Belliston, Sebastian Gomez Abero, Steve Hearne, and Kim McManus.

*http://www.sec.gov/news/speech/2010/spch071410mls.htm*

Home | Previous Page                                    Modified: 07/14/2010

**EXHIBIT 20**



Institutional Shareholder Services Inc.
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

--------------------------------------------------------------------------------

**Filed Electronically**

January 31, 2020

Ms. Vanessa A. Countryman, Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549-1090

> Re: Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice;
> *File No. S7-22-19*

Dear Ms. Countryman:

Institutional Shareholder Services Inc. (ISS) submits these comments in response to the above-referenced proposal to regulate proxy advice as a proxy solicitation under the Securities Exchange Act of 1934 (Exchange Act).[1]

Over the past several years, proxy advisers have become surrogates in the debate over how much say shareholders should have in the companies they own. On one side of this debate are shareholders and their representatives, who see proxy voting as an integral part of their fiduciary responsibilities and a duty of good corporate citizenship and who believe proxy advisers play a critical role in aggregating and synthesizing the vast array of data found in proxy statements and providing independent research, analysis and advice that help shareholders make well-informed voting decisions. On the other side are certain corporate representatives who appear to resent shareholders' ability to disagree with management and who have launched a volley of attacks against proxy advisers based mostly on anecdote, faulty reasoning and the occasional fabricated news. In issuing the current rule proposal, the SEC has put its finger firmly on the issuers' side of the scale, a departure from its stated mission. Distilled to its essence, the proposal would give the managers of U.S. public companies an unprecedented and unconstitutional editorial role in the production of the research and vote recommendations that institutional investors engage proxy advisers to provide.

The proposal has three core components.

The first is a definitional component. Here, the Commission proposes to amend Exchange Act Rule 14a-1(*l*) to classify expert proxy voting advice, including advice rendered by investors' fiduciaries, as a "solicitation" subject to the Exchange Act proxy rules, depending on how the adviser markets its services and structures its fees. The proposed changes to Rule 14a-1(*l*) would codify a modified version of the new definition of solicitation the SEC adopted this past August when it issued an "Interpretation and Guidance" regarding proxy advisers.[2] Concluding that the SEC lacks the

---

[1] *Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice,* Exchange Act Rel. No. 87457 (Nov. 5, 2019), 84 Fed. Reg. 66518 (Dec. 4, 2019), available at https://www.sec.gov/rules/proposed/2019/34-87457.pdf.

[2] *Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice,* Exchange Act Rel. No. 86721 (Aug. 21, 2019), 84 Fed. Reg. 47416 (Sept. 10, 2019), available at https://www.sec.gov/rules/interp/2019/34-86721.pdf (Interpretation and Guidance).



Institutional Shareholder Services Inc.
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

authority to regulate proxy voting advice as though it were a solicitation, ISS has asked a federal court to invalidate the Interpretation and Guidance on both substantive and procedural grounds.[3]

The second component of the proposal is exemptive. Here, the Commission proposes to amend two exemptions from the information and filing requirements of the proxy solicitation rules. One exemption, found in Rule 14a-2(b)(1), was originally designed for certain shareholders and other parties who do not seek to act as a proxy for a security holder and who have a limited interest in the outcome of a shareholder vote, consent or authorization. The other exemption, found in Rule 14a-2(b)(3), was designed for certain financial advisors who voluntarily supply proxy voting advice to parties who have not asked for it, which the SEC traditionally has called "unsolicited" advice. Under the current proposal, a proxy adviser seeking to rely on either exemption would be required to provide the subject of its advice with a review and feedback right, the timing of which would vary depending on when the company files its definitive proxy statement. In addition, no later than two business days prior to delivery of the proxy advice to its clients, the proxy adviser would be obliged to provide the subject of the research and advice with a final notice of voting advice, which would have to contain a copy of the proxy voting advice that will be delivered to its clients. If the subject of the advice is not satisfied with the proxy adviser's finished product, it could force the adviser to include in the proxy advice (and on any electronic medium used to distribute the advice), a hyperlink directing the recipient of the advice to the subject's views on the advice. The adviser would effectively be barred from responding to the subject's statement, regardless of how objectionable, baseless or inaccurate it might be. These review, feedback and content-insertion benefits would be guaranteed to issuers of securities registered under Section 12 of the Exchange Act and certain other parties engaging in a solicitation, but not to shareholder proponents of ballot proposals.

The Commission also proposes to duplicate the substance of proxy advisers' existing conflict of interest disclosures, but with additional twists: Now advisers would have to disclose the new conflicts created by the unprecedented editorial rights the proposal would grant to the subjects of the proxy voting advice. In addition, the prescriptive requirements in the proposal for how disclosure is made do not align with the disclosure requirements in existing regulations.

The third aspect of the SEC's proposal is a litigation risk component. In this regard, the SEC seeks to build on the new liability theory it adopted in the Interpretation and Guidance with regard to Exchange Act Rule 14a-9, which prohibits material misstatements or omissions of fact in proxy solicitations. There, the Commission said that proxy advisers' "opinions, reasons, recommendations, or beliefs" can be "statements of material facts" actionable under 14a-9.[4] In a nod to those public companies who do not want to be judged by anything other than the lowest standards required by law, the Commission now proposes to force proxy advisers to make granular disclosure about how the voting guidelines their clients create or select differ from minimum market standards the SEC sets or approves.

ISS submits that there is no legal basis for any aspect of the proposal and that Congress never authorized the SEC to regulate either proxy advisers or proxy advice under the Exchange Act proxy rules. ISS further submits that the proposal to grant public companies and certain other solicitors the right to review, comment on and insert content into the advice proxy advisers render

---

[3] *ISS v. SEC et al.,* 1:19-cv-03275 (D. D.C. filed 10/31/19). This case has been held in abeyance until the earlier of January 1, 2021 or the promulgation of final rules in this rulemaking.

[4] Interpretation and Guidance, *supra* note 2, at 11, 84 Fed. Reg. at 47419.

2



Institutional Shareholder Services Inc.
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

to their clients is unconstitutional, since it infringes on advisers' First Amendment rights of free speech. By forcing proxy advisers to give their intellectual property to the subjects of their advice, the proposal also violates the Takings Clause of the Fifth Amendment of the Constitution and destroys ISS' reliance interests in maintaining the independence and integrity of its adviser-client relationships.

Furthermore, the proposal rests on the erroneous assertion that there are problems with the accuracy and integrity of proxy voting advice and ignores statements by the consumers of proxy advice that contradict that baseless assertion. The reality is that we at ISS go to great lengths to ensure the accuracy of the information that underpins our proxy research and recommendations and it is clear to us—after looking at the unsupported claims of "evidence" of pervasive errors—that most "errors" are actually differences over subjective interpretations or differing opinions on methodological frameworks.

The proposal is also unworkable. The suggested review, feedback and response-insertion provisions would severely impede proxy advisers' ability to deliver research and voting recommendations for U.S. corporations to investor clients in a timely fashion. We estimate that the review and feedback rights provided to registrants and certain other soliciting parties alone could reduce our report delivery time by between 45 and 65 percent, thus reducing the time available for shareholders to make the well-informed decisions that the proposals purport to encourage.

The proposal arbitrarily fails to explain why investors cannot be adequately protected under the fiduciary regime established under the Investment Advisers Act of 1940 (Advisers Act); nor does the proposal acknowledge, as it should have, that the suggested amendments to the proxy rules would duplicate, overlap and conflict with applicable Advisers Act rules.

The proposal's cost/benefit analysis is also seriously deficient. Among other things, it selects as a baseline the Interpretation and Guidance that the Commission adopted last August without undertaking any cost-benefit analysis, and without assessing the proposal's effect on competition. The proposal underestimates the operational costs of complying with the revised proxy rule exemptions and fails to calculate the costs to proxy advisers and their clients of managing and monitoring the new requirements resulting from the review, feedback and content-insertion provisions. The proposal also ignores the costs to proxy advisers of having to defend baseless lawsuits by disgruntled registrants under Rule 14a-9. With regard to impact on the capital markets, the proposal fails to recognize the likely diminution of competition and loss of diverse thought among proxy advisers, and the increased insider trading risks caused by proxy advisers' forced disclosure of material nonpublic information to registrants and certain other solicitors. On the other hand, the proposal's benefits, which are largely illusory, are grossly overstated.

The attached appendix examines these legal, factual, and economic deficiencies in detail. Because of these deficiencies, ISS strongly urges the Commission to withdraw this flawed proposal.



Institutional Shareholder Services Inc.
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

We would be happy to supply the Commission or the staff with additional information regarding any of the matters discussed herein.  Please direct questions about these comments to the undersigned, to our General Counsel, Steven Friedman, who can be reached at ▮▮▮▮▮▮▮, or to our outside counsel, Mari-Anne Pisarri, who can be reached at ▮▮▮▮▮▮.

Respectfully submitted,

Gary Retelny
President and CEO


cc:     The Honorable Jay Clayton, Chairman
        The Honorable Robert J. Jackson, Jr.
        The Honorable Hester M. Peirce
        The Honorable Elad L. Roisman
        The Honorable Allison H. Lee
        Dalia Blass, Director, Division of Investment Management
        William Hinman, Director, Division of Corporation Finance
        Rick Fleming, Office of the Investor Advocate

4



Comments on Proposed Amendments to Exemptions from the
Proxy Rules for Proxy Voting Advice, File No. S7-22-19

January 31, 2020

# TABLE OF CONTENTS[*]

BACKGROUND.....................................................................................................................1

    A. ISS' Proxy Voting Services ........................................................................................1

    B.  ISS' Regulatory Status ..........................................................................................3

ANALYSIS ........................................................................................................................4

    A.  The Definitional Component;
    Proposed Changes to Rule 14a-1(*l*) ......................................................................4

        1. Congress did not authorize the SEC to
        regulate proxy advice as a proxy solicitation. .........................................5

            a.  The Plain Meaning of "Solicit" ............................................................6

            b.  Legislative History ...............................................................................8

            c.  Case Law .............................................................................................9

        2.  The SEC has historically acknowledged that applying the
        term "solicit" to disinterested persons who do not
        intend to ask shareholders to grant, revoke or with-
        hold a proxy leads to a "distortion of the purposes
        of the proxy rules." .................................................................................11

        3.  Proxy advisers are properly regulated
        under the Advisers Act. .........................................................................16

            a.  General Definition of Investment Adviser ..............................................16

            b.  Exceptions to the Definition of Investment Adviser .............................18

            c.  Qualifying for Registration with the Commission .................................19

        4.  The proposal's perfunctory treatment of the Advisers Act
        is inconsistent with existing law, rules and prior Commission
        statements, and is antithetical to the professed objectives
        of this rulemaking. .................................................................................19

            ❍  How the Advisers Act Addresses the
            Professed Objectives of this Rulemaking .................................................21

31 January 2020

i

5.   In seeking to justify the proposed rule amendments, the Commission seems to have ignored the findings of its own Roundtable and relied on fraudulent public comments ...........................................23

6.   Additional Comments on Proposed Changes to Rule 14a-1(*l*)........................27

B.   The Exemptive Component;
Proposed Changes to Rule 14a-2(b) ....................................................................30

1.   This rulemaking is a solution in search of a problem.........................................31

a.   Conflicts of Interest  ...............................................................31

i. Conflicts of Interest in Connection with Affiliated Corporate Services  .......................................32

ii. Conflicts of Interest in Connection with ISS' Owner and Directors  .............................................33

iii. Conflicts of Interest Within the Institutional Advisory Business  ...................................33

iv. Conflicts of Interest at the Employee Level  ............................33

v.   Conflicts of Interest in Connection with Issuers' Review of Draft Reports  ...................................34

vi. Disclosure Regarding Potential Conflicts of Interest  ...............34

b.   Accuracy  .........................................................................38

2.   The proposal is unconstitutional........................................................................43

a.   Proxy advisers' research, analysis, opinions and recommendations are core speech protected by the First Amendment....................................43

b.   The inserted response provision of proposed Rule 14a-2(b)(9) imposes content-, speaker- and viewpoint-based burdens on protected speech that cannot satisfy any level of First Amendment scrutiny  ........................................................44

c.   The review and feedback provisions of proposed Rule 14a-2(b)(9) also cannot satisfy any level of First Amendment scrutiny...........................................................50

31 January 2020

       d.   The review, feedback and response provisions of the proposed rule amendments cannot be saved from unconstitutionality on the ground that they involve merely eligibility for an "exemption" ...........................................................53

       e.   The review and feedback provisions violate the Takings Clause of the Fifth Amendment and interfere with proxy advisers' client relationships and legitimate reliance interests ...........................................................54

       f.   At a minimum, the Exchange Act should not be construed to authorize the Commission's constitutionally defective proposed rule amendments ...........................................................56

    3.   The proposal upends almost ninety years of federal securities regulation.........................................................56

    4.   The proposal is inconsistent with proxy advisers' existing regulatory obligations ....................................................59

    5.   The proposal is unworkable. ..................................................62

    6.   Additional Comments on Proposed Rule 14a-2(b)(9)(i) ..................62

    7.   Additional Comments on Proposed Rule 14a-2(b)(9)(ii) and (iii).....................66

C.  The Liability Component; Proposed Changes to Rule 14a-9 ...............................................70

    ❍   Additional Comments on Proposed Changes to Rule 14a-9 ...........72

  D.   The Economic Analysis ...............................................72

    1.   The economic analysis uses the wrong baseline ...............................72

    2.   The benefits of the proposed rule amendments are illusory at best. ...................................................73

    3.   The costs of the proposal on proxy advisers have been grossly underestimated .........................................76

       a.   The costs of satisfying the review, feedback and response provisions..................................................76

       b.   The costs of amending existing compliance programs ...............................................77

       c.   Litigation costs ...............................................78

31 January 2020

4.  The costs of the proposal on consumers
of proxy advice have been grossly underestimated ...............................................78

5.  The proposal's burdens on the U.S.
capital markets have been grossly underestimated. ............................................79

E.  Reasonable Alternatives  ......................................................................................80

CONCLUSION  ...............................................................................................................80

\*  **Note on citations and terminology:**  Unless otherwise indicated, references to the Securities Exchange Act of 1934 ("Exchange Act") mean 15 U.S.C. § 78a of the United States Code, where the Exchange Act is codified and references to Exchange Act Rules mean Title 17, Part 240 of the Code of Federal Regulations [17 CFR 240].  References to the Investment Advisers Act of 1940 ("Advisers Act") mean 15 U.S.C. § 80b, where the Advisers Act is codified, and references to Advisers Act rules mean Title 17, Part 275 of the Code of Federal Regulations [17 CFR 275].

As used in these comments, the term "adviser" refers to a fiduciary adviser, such as a proxy adviser or other registered investment adviser.  "Advisor" is a broader term, encompassing both fiduciary advisers and non-discretionary financial professionals, including broker-dealers.

31 January 2020

iv

ISS submits that the Commission's proposal to amend certain Exchange Act proxy rules in order to regulate proxy advice as though it were a proxy solicitation[1]—like the "Interpretation and Guidance" on which this rulemaking is based[2] —is defective in many respects.  ISS urges the Commission to withdraw this proposal in its entirety.

## BACKGROUND

### A. ISS' Proxy Voting Services

ISS is a full-service proxy adviser, whose services help institutional investors make informed proxy voting decisions, manage the complex process of voting their shares, and report their votes to their stakeholders and regulators. The company was founded in 1985, in an era of aggressive corporate practices such as raiding, greenmail and poison pills, when investors were seeking a meaningful voice in corporate governance.  Today, ISS covers approximately 44,000 shareholder meetings a year in over 110 developed and emerging markets worldwide.

As part of its core offerings, ISS provides extensive corporate governance data and research as well as proxy voting recommendations.  These voting recommendations are based on specific policy frameworks created or selected by institutional investors.  ISS currently implements more than 400 custom voting policies on behalf of its clients.  As of October 1, 2019, approximately 88% of ISS' top 100 clients used a custom proxy voting policy.  Investors who choose not to create their own proxy voting policies may select among a range of policy options offered by ISS.  These include benchmark policies focused on promoting long-term shareholder value creation, good governance and risk mitigation at public companies, and thematic policies that evaluate governance and voting issues from the perspective of sustainability, socially responsible investing, public funds, labor unions or mission and faith-based investing. By offering research and voting recommendations based on these different policies, ISS enables investors who may not have the need or resources to craft custom policies to tailor their proxy voting

---

[1] *Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice,* Exchange Act Rel. No. 87457 (Nov. 5, 2019), 84 Fed. Reg. 66518 (Dec. 4, 2019), available at https://www.sec.gov/rules/proposed/2019/34-87457.pdf ("PA Proposal").

[2] *Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice,* Exchange Act Rel. No. 86721 (Aug. 21, 2019), 84 Fed. Reg. 47416 (Sept.10, 2019), available at https://www.sec.gov/rules/interp/2019/34-86721.pdf ("Interpretation and Guidance").

decisions to the specific investment objectives of their clients, thereby satisfying their fiduciary duty to act in their clients' best interests.  Just as investors may have different investment time horizons, risk tolerances and investment strategies, so too, they may have different ways of assessing how proxy voting serves their investment goals.  Although certain public companies seem to think otherwise, there is no "correct" way to vote a proxy; a shareholder's vote necessarily turns on that shareholder's particular goals and priorities.

ISS does not provide proxy voting advice to any shareholder who has not specifically engaged us for this purpose and selected the policy(ies) and services they require.  Once engaged, we are obliged, by contract, to analyze and provide a voting recommendation for each agenda item related to every equity security held in the client's portfolio, and to do so in accordance with the policy or policies the client designates.  ISS does not determine which issues appear on a proxy ballot, nor does it choose the ballots or agenda items on which it renders advice.  It does not furnish research or make vote recommendations at the behest of any issuer or shareholder proponent of a ballot proposal.  ISS is agnostic as to whether its clients support a proposal, reject a proposal or abstain from voting altogether.  In sum, ISS' role is not to advocate for the passage or defeat of any particular ballot proposal but instead to help its clients make fully informed voting decisions in light of their chosen voting policies and their own goals and priorities.

Due to the diversity of policies and guidelines its clients employ, ISS may issue different recommendations to different clients on any given issue.  For example, ISS may advise clients using its benchmark voting policy guidelines to vote "FOR" a certain proposal, while advising clients who employ faith-based or sustainability-based voting criteria to vote "AGAINST" that same proposal.  ISS may also furnish divergent recommendations to investors on different sides of a proposed transaction such as a merger, with a "FOR" recommendation made to investors in one party to the merger, and an "AGAINST" recommendation made to investors in the other party, if ISS concludes that the former would benefit from the transaction, but the latter would not.[3]

In addition to supplying data, research and vote recommendations, ISS also provides an electronic platform that automates the operational aspects of proxy voting and allows institutional investors to focus their resources on the fiduciary task of making their voting decisions. In this regard, ISS' ProxyExchange platform enables investors to prepopulate their custom or other selected voting guidelines, flag issues of their choosing for manual review, override any particular vote recommendation and, notably, change any vote already cast, up to the issuer's vote cut-off deadline

---

[3] *See* U.S. Gov't. Accountability Office, *GAO-17-47, CORPORATE SHAREHOLDER MEETINGS, Proxy Advisory Firms' Role in Voting and Corporate Governance Practices, 27* (2016) ("2016 GAO Report").

(which, for U.S. issuers, is typically the day of the shareholder meeting). ProxyExchange also provides clients with issuer-specific information about potential conflicts of interest and does so in a way that protects the firewall ISS has established to mitigate such conflicts.[4] Moreover, ProxyExchange's sophisticated recordkeeping and reporting features facilitate an investor's testing of its own proxy voting decisions and practices and compliance with its vote disclosure obligations.

## B. ISS' Regulatory Status

ISS has been registered with the SEC as an investment adviser since 1997. In this capacity, the company is subject to the extensive fiduciary regulatory regime established under the Advisers Act. This entails a range of requirements reasonably designed to ensure that ISS renders advice in its clients' best interests and that it does not place its own interests ahead of those of its clients. These requirements include (i) an obligation to maintain and regularly test a comprehensive compliance program, including policies and procedures relating to proxy voting, and policies and procedures designed to eliminate, or manage and disclose, conflicts of interest;[5] (ii) a duty to make full disclosure to clients of the methodologies it uses in rendering advice and any actual or potential conflicts of interest it might have;[6] and (iii) a duty to maintain a comprehensive set of books and records and to submit to the SEC's periodic examination of same.[7]

Where ISS renders advice to clients who are subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), ISS has a fiduciary obligation to discharge its duties solely in the interest of the ERISA plan's participants and their beneficiaries, and to act with the care, skill, prudence and diligence under the circumstances that a prudent person acting in a like capacity would use in a similar situation.[8]

ISS is proud of the fiduciary bond it has forged with its investor clients over the years. Unfortunately, the current rule proposal would corrode that bond in several ways, as explained below.

---

[4] See *infra* at 32.

**[5]** *See* Advisers Act Rules 206(4)-7 and 206(4)-6.

[6] Advisers Act Rules 203-1 and 204A-1 and Form ADV. *See infra* at 31-37 for more information on ISS' conflict of interest procedures and disclosures.

**[7]** Advisers Act Rule 204-2.

[8] ERISA § 404(a), 29 U.S.C. § 1104(a).

## ANALYSIS

### A.  The Definitional Component;
### Proposed Changes to Rule 14a-1(*l*)

In the Interpretation and Guidance, the SEC redefined the term proxy "solicitation" under the Exchange Act proxy rules, without giving the public notice and an opportunity to comment.  In so doing, the Commission, for the first time ever, decreed that the proxy voting advice that a professional adviser renders in the course of a fiduciary relationship with a shareholder is the type of "unsolicited" advice that constitutes a proxy solicitation.  This novel reading of the Exchange Act was premised on the illogical assertion that because proxy advisers "[market] . . . their expertise in researching and analyzing proxy issues for purposes of helping clients make proxy voting determinations",[9] they should be regulated like parties who communicate with shareholders for the purpose of effectuating a particular outcome in a matter requiring a shareholder vote, consent or authorization.  This is so, said the Commission, even where the fiduciary voting advice is based on "the client's own tailored voting guidelines."[10]  In the current rule proposal, the Commission cites the Interpretation and Guidance (which ISS is currently challenging in court)[11] as an articulation of the existing state of the law.[12]

Perhaps recognizing that this expansive approach could capture any financial advisor who holds itself out as being willing and able to provide proxy voting advice to its clients,[13] the Commission proposes to codify a modified version of the definition of "solicitation" it adopted in the Interpretation and Guidance.  The proposed definition would narrow the earlier definition so that it captures only a handful of firms—most notably, ISS and Glass, Lewis & Co., LLC ("Glass Lewis")—who have been the subject of a long-running campaign by certain issuers and their

---

[9] Interpretation and Guidance, *supra* note 2, at 10, 84 Fed. Reg. at 47419.

[10] *Id.*, at 9, 84 Fed. Reg. at 47418.

[11] *ISS v. SEC et al.,* 1:19-cv-03275 (D. D.C. filed 10/31/19).  This case is being held in abeyance until the earlier of January 1, 2021 or the promulgation of final rules in this rulemaking.

[12] PA Proposal, *supra* note 1 at 11 n. 21, 84 Fed. Reg. at 66520 n. 21 and accompanying text.

[13] For example, registered investment advisers who manage client portfolios frequently undertake to vote proxies on their clients' behalf.  Those who do not offer this service may instead offer to make voting recommendations to clients so they can vote their own proxies.  All registered investment advisers willing to provide these services must publicly say so, which could be construed as "marketing their expertise" in providing this type of investment advice.  *See* Advisers Act, § 203(c), Rule 203-1 and Form ADV, Part 2A, Item 17.  Full-service broker-dealers, although not fiduciaries, may also let clients know that they are willing and able to make proxy vote recommendations about securities held in clients' accounts.  Where retail investors are involved, this service may be described in the broker's Form CRS, a public disclosure document that will be implemented in May 2020.  *See* Exchange Act Rule 17a-14.

representatives to muzzle proxy advisers and hinder shareholders' ability to have a meaningful voice in corporate governance.  In order to ring-fence this targeted subset of advisers, the Commission proposes to rebrand such firms—traditionally known as "proxy advisers" or "proxy advisory firms"—as "proxy voting advice businesses," a term that has never been used in law or commerce.

As proposed, the definitions of "solicit" and "solicitation" under Exchange Act Rule 14a-1(*l*) would be amended to include any

> *proxy voting advice that makes a recommendation to a security holder as to its vote, consent, or authorization on a specific matter for which security holder approval is solicited, and that is furnished by a person that markets its expertise as a provider of such proxy voting advice, separately from other forms of investment advice, and sells such proxy voting advice for a fee.*[14]

For purposes of this definition, "proxy voting advice" would include proxy advisers' vote recommendations, along with the research and analysis they provide to enable their clients to evaluate the recommendations and make informed voting decisions.  The term would not include advice furnished in response to an "unprompted" request, which seems to be a new twist on the Commission's historic concept of "unsolicited" advice, as discussed in more detail below.[15]

Although the SEC cites various provisions of the Exchange Act as the legal basis for its proposed amendment of Rule 14a-1(*l*),[16] none of the cited provisions authorizes the Commission to regulate proxy advice as a proxy solicitation.  For example, while Section 3(b) generally authorizes the SEC to define terms, this power must be exercised "consistently with the provisions and purposes of this title."  Likewise, Section 23(a) authorizes the agency to promulgate rules and regulations classifying persons, statements or reports, but only "as may be necessary or appropriate to implement the provisions of this title."  The Commission's authority to define "solicit" or "solicitation" in this rulemaking, therefore, turns solely on the scope of the authority conferred by Section 14(a).  This authority is nowhere near as broad as the Commission suggests.

**1.  Congress did not authorize the SEC to regulate proxy advice as a proxy solicitation.**

A federal agency "literally has no power to act . . . unless and until Congress confers power upon it."[17] Here, Congress simply has not authorized the Commission to regulate proxy advice as

---

[14] Proposed Rule 14a-1(*l*)(1)(iii)(A).

[15]  Proposed Rule 14a-1(*l*)(2)(v).  *See infra* at 12–13 and 29-30.

[16]  PA Proposal at 129, 84 Fed. Reg. at 66555.

[17]  *La. Pub. Svc. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

a proxy solicitation. Section 14(a) of the Exchange Act makes it unlawful to solicit or to permit the use of one's name to solicit a proxy, consent or authorization in contravention of the rules and regulations prescribed by the SEC.  The statute does not define the term "solicit."

In an effort to demonstrate that Congress authorized the Commission to define "solicit" to mean "advise," the proposal disregards the statute's plain text, distorts the legislative history, mischaracterizes the case law, and offers a highly curated rendition of the SEC's own rulemaking in this area over the years.

We are pleased to address each of these topics.

### a. The Plain Meaning of "Solicit"

In the absence of a statutory definition of the term "solicit," the word must be construed in light of its ordinary meaning at the time Section 14(a) was enacted.[18]  Under a plain-text interpretation of the Exchange Act, a person who "solicits" a proxy is distinct from a person who "advises" about a proxy.  At the time Congress enacted Section 14(a), "solicit" meant "[t]o ask for with earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, or to invite"; and "solicitation" was defined as, "[a]sking; enticing; urgent request."[19]  These definitions make clear that a solicitor necessarily has a certain *objective* or *goal* (*e.g.*, make a sale, win a vote, raise money for charity) and engages in solicitation (*e.g.*, appeals, requests, petitions, campaigns, etc.) in an attempt to *achieve* that objective.  The phrase "solicit any proxy" thus has a clear and unambiguous meaning:  to seek authority or ask a shareholder to vote a certain way in order to achieve a specific outcome in a matter requiring shareholder approval.

No reasonable user of the English language would confuse the concepts of "solicitation" and "advice."  Whereas a solicitor urges another person to action to achieve a certain outcome or result, an adviser provides advice or counsel merely to help inform another person's decision. The contemporaneous definition of "advise" was "[t]o give an opinion or counsel, or recommend a plan or course of action. . . . 'Advise' imports that it is discretionary or optional with the person addressed

---

[18] *Perrin v. United States,* 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute ….").

[19] Black's Law Dictionary 1639 (3d ed. 1933); see also the Concise Oxford Dictionary of Current English 1150 (1931) (defining "solicit" as "[i]nvite, make appeals or requests to, importune"); Funk and Wagnalls New Standard Dictionary of the English Language 2315 (1932) (defining "solicit" as "[t]o ask for with some degree of earnestness; seek to obtain by persuasion or entreaty").  The proposal quotes an alternative definition of "solicit" in the Funk and Wagnalls Dictionary as "influence to action" [PA Proposal at 19 n. 48, 84 Fed. Reg. at 66523 n.48], but neglects to add the rest of this definition:  "specif., to entice (one) to an unlawful act."  ISS hopes that both sides of the corporate governance debate can agree that proxy voting is not such an act.

whether he will act on such advice or not."[20]  The distinction between soliciting and advising is just as strong today as it was in the 1930s.  Contemporary synonyms for "solicit" are "beg," "beseech," "implore" and "supplicate," while synonyms for "advise" include "caution," "point out" "recommend" and "suggest."[21]

The distinction between a person who solicits and one who advises is reflected in industry custom and usage as well.  According to the 2016 GAO Report, a proxy solicitor is commonly understood to mean a "[s]pecialist (firm) hired to gather proxy votes," whose role is to "[h]elp public companies identify, locate, and communicate with shareholders to secure votes."[22]  A proxy advisory firm, by contrast, is commonly understood to mean a "[t]hird-party that provides services to institutional investors that include research and vote recommendations on proposals."[23]

The Commission asserts that proxy advisers are engaged in solicitation because they "[market] . . . their expertise in researching and analyzing proxy issues for purposes of helping clients make proxy voting determinations."[24]  But that theory is doubly flawed as a textual matter.  First, the statutory text applies only to persons who "solicit any proxy."  To the extent ISS markets its expertise to potential clients, ISS may be soliciting new clients and business, but it is not soliciting "any proxy."  ISS' business marketing activities thus provide no basis for the Commission to assert jurisdiction over ISS under Section 14(a). Second, even assuming the Commission had some statutory authority to regulate proxy advisers based on their solicitation of new clients (which it does not), that still could not be used to justify aspects of this proposal, such as the issuer pre-review and response requirements.  Those aspects have nothing to do with ISS' marketing of its expertise and everything to do with directly regulating (and interfering with) ISS' provision of fiduciary advice and recommendations to its clients.  Thus, even under the Commission's own theory, there is a fundamental mismatch between the statutory authority it claims and the rules it has proposed.

---

[20] *Black's Law Dictionary, supra* at 68 (internal citations omitted); *see also The Concise Oxford Dictionary of Current English* (1931) (defining "advise" as "[o]ffer counsel to" and "adviser" as a "person habitually consulted").

[21] *Roget's 21st Century Thesaurus* (3d ed. 2013), *available at* https://www.thesaurus.com/browse/solicit?s=t.

[22] 2016 GAO Report, *supra* note 3 at 6.

[23] *Id.*

[24]  Interpretation and Guidance, *supra* note 2, at 10, 84 Fed. Reg. at 47419; *see also* PA Proposal at 16, 84 Fed. Reg. at 66522.

By the same token, the fact that proxy advisers, for a fee, provide vote recommendations and analysis to investors in advance of shareholder meetings does not make them proxy solicitors.[25]  As noted above, a proxy adviser has no interest (financial or otherwise) in the outcome of any proxy vote and is indifferent to how its clients ultimately vote; indeed, a proxy adviser may offer different recommendations to different clients about the same vote depending on each investor's particular voting criteria and investing goals.  These activities may be related to proxy votes, but they emphatically do not involve a "solicitation" under the ordinary meaning of that word.

The Commission's attempt to stretch the phrase "solicit any proxy" to cover independent, disinterested proxy voting advice contravenes not only the plain text the statute but also Congress' clearly-stated intent in enacting Section 14(a).

### b. Legislative History

Selectively quoting words and phrases from congressional reports, the SEC contends that Congress gave the Commission the broad power to regulate *any* communication directed at shareholders concerning a matter as to which shareholder approval is required.  ISS respectfully submits that looking at those words and phrases in context tells a much different story.

Congress enacted Section 14(a) in 1934 to eliminate the kinds of abuses that were deemed to have contributed to the stock market crash of 1929 and the Great Depression.  Section 14(a) reflects the lawmakers' belief that, "A renewal of investors' confidence in the exchange markets can be effected only by a clearer recognition upon the part of the corporate managers of companies whose securities are publicly held of their responsibilities as trustees for their corporations."[26]  Under the heading,  "CONTROL OF UNFAIR PRACTICES BY CORPORATE INSIDERS," the House Committee on Interstate and Foreign Commerce said:

> Fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange.  Managements of properties owned by the investing public should not be permitted to perpetuate themselves by the misuse of corporate proxies. Insiders having little or no substantial interest in the properties they manage have often retained their control without an ***adequate disclosure*** of their interest and without an adequate ***explanation*** of the management policies they intend to pursue.  Insiders have at times solicited proxies without fairly informing the stockholders of the purposes for which the proxies are to be used and have used such proxies to take from the stockholders for their own selfish advantage valuable property rights.  Inasmuch as only the exchanges make it possible for securities to be widely distributed among the investing public, it follows as a corollary that the use of the exchanges should involve a corresponding duty of according to shareholders fair suffrage. For this reason the proposed bill gives the [Commission] ***power to control the conditions under which proxies may be solicited*** with a view to preventing

---

[25]  *Id.* at 16, 84 Fed. Reg. at 66522.

[26]  H.R. Rep. No. 73-1383, at 13 (1934).

the recurrence of abuses which have frustrated the free exercise of the voting rights of stockholders.[27]

(Emphasis indicates the portions of this paragraph that are quoted in the proposal.)[28]  The congressional record is replete with tales of such abuses, including instances in which proxies solicited ostensibly for a benign purpose were used for a nefarious purpose instead.[29]

The only parties other than corporate insiders who were on Congress' radar when it adopted Section 14(a) were outsiders who might misuse the proxy process to gain control over public companies:

> It is contemplated that the rules and regulations promulgated by the Commission will protect investors from promiscuous solicitation of their proxies, on the one hand, by irresponsible outsiders seeking to wrest control of a corporation away from honest and conscientious corporation officials; and, on the other hand, by unscrupulous corporate officials seeking to retain control of the management by concealing and distorting facts.[30]

There is not one shred of evidence in the congressional record to suggest that Congress authorized the SEC to use Section 14(a) to regulate persons who were not seeking to achieve a particular outcome in a proxy vote, such as independent, third-party advisers.  Examining what the courts have said about this provision leads to the same conclusion.

### c.  Case Law

Over the years, the courts have confirmed that Congress designed Section 14(a) to cover persons who seek "to maintain or gain control of a corporation through solicitation of the corporate voting rights of the shareholders."[31] The courts have further recognized the purpose of this provision

---

[27] *Id.* at 13-14.

[28] PA Proposal at 13 nn. 27 and 28, 84 Fed. Reg. at 66521 nn. 27 and 28.

[29] *See e.g.,* 78 Cong. Rec. 7923 (1934) (discussing abuses at American Tobacco; "His stockholders had no idea of what they were doing when they authorized proxies to vote to approve a plan which permitted [self-dealing by the president].  It is such things as that that this bill is designed to prevent."); S. Rep. No. 73-1455 at 74-75 (1934) (discussing abuses at American Commercial Alcohol Corporation).  Although the PA Proposal quotes this Senate Report's statement about the importance of enlightening shareholders "as to the major questions of policy, which are decided at stockholders' meetings" [PA Proposal at 13 n. 27], the quotation omits the follow-on sentence, *viz.*  "Too often proxies are solicited without explanation to the stockholder of the real nature of the matters for which authority to cast his vote is sought."  S. Rep. No. 73-1455 at 74.  An omitted discussion of the same corporate malfeasance precedes the proposal's quotation of another Senate Report for the proposition that "The committee recommends that the solicitation and issuance of proxies be left to regulation by the Commission."  S. Rep. No. 73-792 at 12 (1934) *quoted in* PA Proposal at 13 n. 28, 84 Fed. Reg. 66521 n. 28.

[30] S. Rep. No. 73-1455 at 77.

[31] *Greater Iowa Corp. v. McLendon,* 378 F.2d 783, 795 (8th Cir. 1967).

is "to protect a shareholder's investment from self-serving designs of those at odds with the best interests of the corporation."[32]   Although courts have adopted a broad reading of the term "solicitation" in a vertical sense—covering a chain of communications leading to a request for shareholder action by a party whose ultimate goal was to effect a particular outcome for the corporation[33]—courts have never stretched the concept horizontally to encompass parties who were completely indifferent to the outcome of the matter as to which shareholder approval was sought.

The Commission cites *Union Pacific R.R. Co. v. Chicago and North Western Ry. Co*.,[34] for the proposition that the proxy rules can lawfully be applied to financial advisers' reports, but reliance on this case is misplaced.   The report at issue in *Union Pacific,* which favored the bid of one suitor over another in a contested merger, was written by an analyst employed by a broker-dealer that owned stock in the target company.   The analyst prepared the report with the assistance of the favored suitor, and gave a draft of the report to that suitor for review and comment before its release.   The report was mass-distributed to shareholders of the target company, including customers of the broker-dealer who issued the report and customers of other broker-dealers.   The favored suitor and its proxy solicitors also distributed copies of the report, but did not file the report with the SEC.   On these facts a Section 14(a) violation was alleged *not* against the broker, but against the suitor, who "candidly and repeatedly admitted in open court" that its use of the report violated the proxy rules.[35]   Absolutely nothing about this case supports the proposal's treatment of independent proxy advice as a proxy solicitation under the Exchange Act.

In all cases where a proxy solicitation has been found, the "solicitor" had an identifiable interest in the outcome of the shareholder action.[36]   This is so even where the communication in

---

[32] *Cowin v. Bresler*, 741 F.2d 410, 427 (D.C. Cir. 1984). *See also Lynch v. Fulks*, 1980 U.S. Dist. LEXIS 16099 at *9 (D. Kan. 1980) ("The more fundamental purpose of [Section 14(a)] is to protect the investment of the corporate shareholder from those whose inclination to use the corporation for their own selfish ends conflict with the best interests of the corporation and its owners as a whole").

[33] *See Long Island Lighting Co. v. Barbash*, 779 F.2d 793 (2d Cir. 1985) (advertisement backed by parties interested in effecting changes at a public utility could be a solicitation if it constituted a step in a chain leading to a request to furnish, revoke or withhold proxies);   *SEC v. Okin*, 132 F.2d 784, 786 (2d Cir. 1943) (letter by shareholder asking fellow shareholders to withhold or revoke proxies so he could get himself elected as an officer of the company held to be a solicitation because it was "part of a continuous plan ending in solicitation and which [prepared] the way for its success").

[34] 226 F. Supp. 400 (E.D. Ill. 1964), cited in PA Proposal at 14 n. 31.

[35]   226 F. Supp. at 408.

[36] *See Bender v. Jordan*, 439 F. Supp. 2d 139 (D. D.C. 2006) (solicitation made by bank employee who sent a letter to shareholders to reject a dissident shareholder); *Canadian Javelin, Ltd. v. Brooks*, 462 F. Supp. 190, 194 (S.D.N.Y. 1978) (solicitation made by shareholders' committee formed to oust current management).

question was authored by a disinterested party.[37]  While an issuer's deliberate misstatement of a proxy advisory firm's vote recommendation has formed the basis for a Section 14(a) claim against the company and its nominees for the board of directors,[38] no court has ever found a proxy adviser or other independent fiduciary itself to have "solicited" a proxy within the meaning of Section 14(a) and related rules.

In fact, no court has ever suggested that *any* party who advises one shareholder to vote for, and another shareholder to vote against, the same ballot proposal could be engaged in a solicitation. On the contrary, because solicitors communicate for the purpose of effecting a particular outcome, all the recommendations at issue in the Section 14(a) cases were unidirectional.  Finally, no court has ever found that a shareholder was "solicited" by a communication he or she selected and paid to receive.

### 2. The SEC has historically acknowledged that applying the term "solicit" to disinterested persons who do not intend to ask shareholders to grant, revoke or withhold a proxy leads to a "distortion of the purposes of the proxy rules."

The SEC characterizes the proposal as a natural progression of the evolution of proxy regulation under the Exchange Act.  ISS respectfully disagrees.

The Commission initially exercised its authority under Section 14(a) by adopting a narrow definition of "solicitation" that covered only a request to shareholders for a proxy, consent or authorization, or the furnishing of any form of proxy.[39]  The Commission gradually expanded this definition to include a request for a proxy, whether or not such request was accompanied by or included in a form of proxy,[40] and a request not to execute or to revoke a proxy.[41]  In 1956, the Commission adopted the current definition of "solicitation," which includes the furnishing of any "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy.[42]

---

[37] *See Crouch v. Prior,* 905 F. Supp. 248 (D. V.I. 1995) (research analyst note imputed to member of the board of directors seeking shareholder consent to change the composition of the board; author of the note not alleged to have solicited a proxy or to have permitted the use of her name for that purpose).

[38] *Burkle v. OTK Assocs., LLC*, 2 F. Supp. 3d 519 (S.D.N.Y. 2014).

[39] Exchange Act Rel. No. 378 (Sep. 24, 1935), 1935 SEC LEXIS 1877.

[40] Exchange Act Rel. No. 1823 (Aug. 11, 1938), 3 Fed. Reg. 1991-92 (Aug. 13, 1938).

[41] *Solicitation of Proxies Under the Act,* Exchange Act Rel. No. 3347 (Dec. 18, 1942), 7 Fed. Reg. 10653, 10656 (Dec. 22, 1942).

[42] *Adoption of Amendments to Proxy Rules,* Exchange Act Rel. No. 5276 (Jan. 17, 1956), 21 Fed. Reg. 577 (Jan. 26, 1956) ("1956 Release").  This definition is now found in Exchange Act Rule 14a-1(*l*).

Although the proposal suggests that the 1956 amendment did away with the notion that a person who solicits a proxy must have some interest in the outcome of the action requiring shareholder approval,[43] that is not so.    When it adopted this amendment, the Commission made it clear that it was expanding the *range of communications* covered by the definition, but not the *class of people* considered to be solicitors.  In this regard, the Commission explained that

> statements made for the purpose of inducing security holders to give, revoke, or withhold a proxy with respect to a matter to be acted upon by security holders of an issuer, including an election of directors, *by any person who has solicited or intends to solicit proxies*, whether or not such statements are accompanied by an express request to give, revoke, or withhold a proxy may involve a solicitation within the meaning of the regulation, depending upon the particular facts and circumstances.[44]

The use of the word "procurement" in the 1956 definition confirms that a party who "solicits" has an interest in the outcome of the vote, because "procure" means "to get possession of," "obtain by particular care and effort," "to bring about" or "achieve."[45]  Although a literal reading of the 1956 amendment thus comports with Congress' intent that a "solicitation" involves a concerted effort to achieve a desired result, the SEC eventually realized that the amendment could also be misread "potentially to turn almost every expression of opinion concerning a publicly-traded corporation into a regulated proxy solicitation", which would distort the purpose of Section 14(a).[46]  The path to this realization was as follows:

In 1964, the Commission released an opinion addressing whether the participation of broker-dealers in the proxy process could constitute a solicitation under the 1956 definition.[47]  This opinion stated that the proxy rules might, under appropriate circumstances, apply to any person, not just management or the opposition engaged in a struggle for corporate control.  Noting that broker-dealers are "particularly likely to become involved in proxy solicitations both because they may have an interest in the matters to be voted on and because they may have connections with management, opposition, or other participants", the opinion suggested that a broker-dealer who

---

[43]  PA Proposal at 14-15, 84 Fed. Reg. at 66521.

[44]  1956 Release, 21 Fed. Reg. at 577 (emphasis supplied).

[45]  *Webster's Ninth New Collegiate Dictionary* 938 (1987); *see also Black's Law Dictionary* 1372 (4th ed. 1951) (defining "procuration" as "[t]he act by which one person gives power to another to act in his place, as he could do himself").

[46]  *Regulation of Communications Among Shareholders,* Exchange Act Rel. No. 31326 (Oct. 16, 1992) 57 Fed. Reg. at 48276, 48278 (Oct. 22, 1992) ("1992 Release").

[47]  *Broker-Dealer Participation in Proxy Solicitations*, Exchange Act Rel. No. 7208 (Jan. 7, 1964), 29 Fed. Reg. 341 (Jan. 15, 1964) ("1964 Release").

"goes beyond [his] advisory function" and "voluntarily" distributes solicitation-type material "to persons who have not asked for it"—which the SEC called "unsolicited" advice—could be subject to the proxy rules.[48]  On the other hand, the rules would not apply to a broker-dealer who merely gave proxy voting advice "in his capacity as adviser to the customer."[49]

Recognizing that it would be inconsistent with the purpose of Section 14(a) to subject all financial professionals who furnish unsolicited proxy advice to the full panoply of the proxy rules, the Commission in 1979 exempted certain financial advisors from the information and filing requirements of the proxy rules under specified conditions.[50]  The purpose of this exemption, which today resides in Exchange Act Rule 14a-2(b)(3), was "to provide greater opportunities for shareholders to exercise their right of suffrage and to obtain information and advice with respect to matters on which they vote."[51]

In adopting this exemption, the Commission confirmed that not all persons who furnish proxy voting advice need relief from the proxy rules, because the rules apply only to "those who participate in the solicitation of proxies."[52]  Under ordinary circumstances, this population excludes those who render advice in the course of a fiduciary relationship with an investor, such as attorneys or accountants.  Furthermore, by titling its discussion of the exemption "Unsolicited Voting Advice Furnished by Financial Advisors,"[53] the SEC confirmed that the exemption was designed for those who "voluntarily" distribute soliciting material "to persons who have not asked for it," because those who in act in their "capacity as adviser to the customer" are not proxy solicitors in the first place.[54]

In 1992, recognizing that its reading of the solicitation definition was still too broad, the Commission adopted another package of reforms designed to remove "unnecessary government interference in discussions among shareholders" and to make it easier for shareholders to challenge

---

[48]  *Id.*

[49]  *Id.*

[50]  Shareholder Communications, Shareholder Participation in the Corporate Electoral Process and Corporate Governance Generally, Exchange Act Rel. No. 16356 (Nov. 21, 1979), 44 Fed. Reg. 68764 (Nov. 29, 1979) ("1979 Release").

[51]  1979 Release, 44 Fed. Reg. at 68764.

[52]  *Id.* at 68767 n. 11.

[53]  *Id.* at 68766.

[54]  1964 Release, *supra* note 47.

management through the proxy voting process.[55]  The Commission took this action with the support of the shareholder community and over the objections of the corporate community.

In undertaking these reforms, the Commission traced the history of its definition of "solicitation," starting with a recognition of the agency's mandate "'to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitations.'"[56]  The Commission singled out the 1956 amendment of the solicitation definition as the point at which the proxy rules began to have unintended consequences:

> In adopting the sweeping 1956 definition, the Commission sought to address abuses by persons who were actually engaging in solicitations of proxy authority in connection with election contests.[fn]  The Commission does not seem to have been aware, or to have intended, that the new definition might also sweep within all the regulatory requirements persons who did not 'request' a shareholder to grant or to revoke or deny a proxy, but whose expressed opinions might be found to have been reasonably calculated to affect the views of other shareholders positively or negatively toward a particular company and its management or directors.[57]

The SEC candidly acknowledged the "excessive regulatory reach" of this construction of the term "solicitation" and admitted that this construction led to a "distortion of the purposes of the proxy rules."[58]  However, instead of amending the definition to make sure it aligned with Congress's intent, the Commission simply adopted another limited exemption from the information and filing requirements of the proxy rules.  This exemption covers a person who does not seek proxy authority and who does not have a substantial interest in the matter subject to shareholder action, other than a general interest as a shareholder (including a shareholder proponent of a ballot proposal), and, in some cases, an employee of the registrant.[59]

Recognizing that the parties for whom the exemption was designed may not be engaged in proxy solicitations at all, the Commission confirmed that the existence of the exemption was not meant to broaden the pool of communications subject to the proxy rules.  Instead, the Commission explained, the exemption was intended to protect a person who does not seek proxy authority and

---

[55] 1992 Release, *supra* note 46, 57 Fed. Reg. at 48276.

[56] *Id.* 57 Fed. Reg. at 48277, *quoting J.I. Case v. Borak*, 377 U.S. 426, 431 (1964).

[57] *Id.* 57 Fed. Reg. at 48277-78.  The internal citation in this passage explains that in 1956, "the Commission was principally concerned with communications 'by any person who has solicited or intends to solicit proxies' prior to the formal commencement of the solicitation."  *Id.* at 48277 n. 22.  In other words, this was intended to be a vertical expansion of the concept of "solicitation," not a horizontal one.

[58] *Id.*  57 Fed. Reg. at 48278.

[59] Rule 14a-2(b)(1).

who does not have a substantial interest in the matter subject to shareholder action from the vagaries of an imprecise and overly broad definition that exposed them to the risk of baseless litigation for criticizing the quality of a company's management, thereby chilling discussion of management performance, in contravention of Congress's intent.[60]

It was not until the SEC adopted the Interpretation and Guidance in August 2019, that the proxy rules were ever deemed to apply to a financial advisor who did not go beyond its advisory function and distribute solicitation-type material to shareholders who did not ask for it.[61]    Nor, until then, had the SEC ever said that the proxy rules apply to advice rendered by a disinterested party in the context of a fiduciary relationship.  Therefore, the Interpretation and Guidance was not part of the natural evolution of proxy regulation but was a jarring break with the past instead.

The SEC cites four factors to justify its determination that independent proxy advice is a proxy solicitation for purposes of Section 14(a): (i) proxy advisers typically provide a vote recommendation for specific proposals that will be presented at a shareholder meeting; (ii) proxy advisers market their expertise in researching and analyzing shareholder ballot proposals in order to help investors make informed voting decisions; (iii) institutional investors engage proxy advisers to render expert proxy advice for a fee; and (iv) proxy advisers make vote recommendations to shareholders shortly before a shareholder meeting or authorization vote.[62]  None of these factors, alone or in combination, has any grounding in the statutory text or any bearing whatsoever on the proper application of the proxy rules.  In fact, they highlight just how inapposite these rules are to proxy advisers.

"Unscrupulous corporate officials" and "irresponsible outsiders seeking to wrest control of a corporation" from honest management[63] do not market their expertise in researching and analyzing shareholder ballot proposals.    Parties who seek to use the proxy process to "maintain or gain control" of a company[64] do not provide vote recommendations for every ballot proposal relating to

---

[60] 1992 Release, 57 Fed. Reg. at 48279.

[61]  The proposal cites the *Concept Release on the U.S. Proxy System*, Exchange Act Rel. No. 62495 (July 14, 2010), 75 Fed. Reg. 42982 (July 22, 2010) ("Concept Release") as an earlier articulation of the possibility that the proxy rules could apply to proxy advisers.  PA Proposal, *supra* note 1 at 15 n. 37. However, the brief discussion of the proxy rules in the Concept Release was premised on the 1964 Release, which indicates that the discussion was limited to proxy advice that is voluntarily distributed to shareholders who have not asked for it. Concept Release at 108, 75 Fed. Reg. at 43009 and n. 244.

[62]  PA Proposal at 16, 84 Fed. Reg. at 66522.

[63]  S. Rep. No. 73-1455 *supra* note 29 at 77.

[64]  *Greater Iowa Corp. v. McLendon, supra* note 31, 378 F.2d at 795.

an investor's entire securities portfolio, and certainly do not provide different vote recommendations to different investors based on each investor's chosen voting criteria.  And institutional investors do not engage such self-interested parties to render expert proxy advice for a fee.  No matter which path you take—legislative, judicial or administrative—the conclusion is the same:  Congress did not authorize the SEC to regulate proxy advisers or proxy advice under Section 14(a).

That does not mean, however, that proxy advice is free from SEC oversight.  On the contrary, Congress provided a specific way to regulate those who perform this important function.

### 3.  Proxy advisers are properly regulated under the Advisers Act.

The last in the series of post-Depression-era statutes governing the U.S. financial markets, the Advisers Act addressed concerns about the nascent investment counsel industry.  The increased complexity of the securities markets following World War I and concomitant rise in demand for professional advisory services led to the development and explosive growth of this new industry.[65]  Congress designed the Advisers Act to eliminate "tipster" services who masqueraded as bona fide investment counsellors rendering competent and impartial investment advice.[66]

In particular, the Advisers Act established a federal fiduciary standard of conduct for investment advisers based on equitable common law principles.[67]  This fiduciary standard is comprised of duties of care and loyalty, which, taken together, oblige an adviser to act in the best interests of its clients and not to place its own interests ahead of its clients' interests.

The first step in analyzing whether proxy advisers are subject to regulation under the Advisers Act is to determine whether such firms fit the general statutory definition of "investment adviser."   If the answer is yes, the second step is to determine if proxy advisers qualify for a statutory exception to the investment adviser definition.  If that answer is no, the final step is to determine whether such advisers are properly regulated by the SEC or the states.

### a.  General Definition of Investment Adviser

Section 202(a)(11) of the Advisers Act defines the term "investment adviser" to mean "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues

---

[65] SEC, "Investment Counsel, Investment Management, Investment Supervisory, and Investment Advisory Services," H.R. Doc. No. 76-477 at 1, 23 (1939).

[66] *Id.* at 28.

[67] *Transamerica Mortg. Advisors, Inc. v. Lewis,* 444 U.S. 11, 17 (1979); *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 194 (1963) ("Capital Gains").

or promulgates analyses or reports concerning securities." This broad definition encompasses not only those who manage client portfolios, but anyone who is paid to provide advice about securities, unless an exception applies.

A proxy vote appurtenant to shares held in a portfolio is itself an asset to be managed with the same care and skill as any other portfolio asset.[68] The SEC has long recognized that through their proxy voting authority, investment managers are in a position "to significantly affect the future of corporations and, as a result, the future value of corporate securities held by their clients."[69] Proxy advisers render advice *as to the value of securities* when they advise their clients on ballot measures that could affect share prices, such as mergers and acquisitions and director elections, particularly in contested director elections. In addition, when proxy advisers opine on ballot items such as mergers or acquisitions, they may render advice as to the *advisability of purchasing* (for the acquiring company) *or selling* (for the company being acquired) *securities*.

Proxy advisers also issue research reports about companies, their boards and management and their securities, so that their investor clients can understand and assess the vote recommendations. In so doing, proxy advisers *issue or promulgate analyses or reports concerning securities*. The SEC has recognized that in addition to assisting in the making of proxy voting determinations, these reports and analyses may also assist in the making of investment decisions, which is a core function of investment advisers.[70]

Although performing any one of the functions described in Section 202(a)(11) is enough to characterize a party as an investment adviser, proxy advisers perform all three. Because they do so for compensation and as part of a regular business, there is no doubt that proxy advisory firms fit the general definition of "investment adviser" for purposes of the Advisers Act. The Commission reached the same conclusion in the 2010 Concept Release, when it said:

---

[68]  Letter from Alan D. Lebowitz, Deputy Assistant Secretary, U.S. Dept. of Labor to Mr. Helmuth Fandl, Chairman of the Retirement Board, Avon Products, Inc. (February 23, 1988), 1988 ERISA LEXIS 19, *5-6, *codified* in 29 C.F.R. 2509.2016-01 ("The fiduciary act of managing plan assets which are shares of corporate stock would include the voting of proxies appurtenant to those shares of stock").

[69] *Proxy Voting by Investment Advisers,* Advisers Act Rel. No. IA-2106 (Jan. 31, 2003) at 2, 68 Fed. Reg. 6585, 6586 (Feb. 7, 2003) ("Advisers Act Proxy Rule Release"). *See also Disclosure of Proxy Voting Policies and Proxy Voting Records by Registered Management Investment Companies*, Investment Company Act Rel. No. 25922, 68 Fed. Reg. 6564, 6566 (Feb. 7, 2003) ("Proxy voting decisions by funds can play an important role in maximizing the value of the funds' investments").

[70] *Commission Guidance Regarding Client Commission Practices Under Section 28(e) of the Securities Exchange Act of 1934,* Exchange Act Rel. No. 54165 (July 18, 2006) at 37, 71 Fed. Reg. 41978, 41988 (July 24, 2006).

*[P]roxy advisory firms receive compensation for providing voting recommendations and analysis on matters submitted for a vote at shareholder meetings. . . . We understand that typically proxy advisory firms represent that they provide their clients with advice designed to enable institutional clients to maximize the value of their investments.  In other words, proxy advisory firms provide analyses of shareholder proposals, director candidacies or corporate actions and provide advice concerning particular votes in a manner that is intended to assist their institutional clients in achieving their investment goals with respect to the voting securities they hold.  In that way, proxy advisory firms meet the definition of investment adviser because they, for compensation, engage in the business of issuing reports or analyses concerning securities and providing advice to others as to the value of securities.[71]*

### b. Exceptions to the Definition of Investment Adviser

Over the years, it has been suggested that proxy advisers might qualify for a statutory exception to the investment adviser definition, thereby relieving them of the need to register under the Advisers Act.  The exception most often cited—for "the publisher of any *bona fide* newspaper, news magazine or business or financial publication of general and regular circulation"[72]—does not apply.

The Supreme Court has interpreted the "publisher's" exception to require, among other things, that the publication render *impersonal* advice, as opposed to advice tailored to the specific needs or objectives of the subscriber.[73]  In applying this interpretation the SEC staff has taken the view that interactive communication between the provider and recipient of investment advice is not "impersonal" and that interactivity destroys the availability of the publisher's exception.[74]

Judged by this standard, proxy advisers are clearly not publishers.  As part of their suite of services, proxy advisory firms help institutions adopt and implement proxy voting policies that best serve the needs of their underlying investor clients.[75]  Furthermore, in addition to issuing research reports and vote recommendations based on the different, proprietary proxy voting guidelines that can be selected by their clients, proxy advisers provide many clients with

---

[71] Concept Release, *supra* note 61 at 109-110, 75 Fed. Reg. at 43010.

[72] Advisers Act, § 202(a)(11)(D).

[73] *Lowe v. SEC*, 472 U.S. 181 (1985).

[74] *See* Reuters Information Services, Inc. 1991 SEC No-Act. LEXIS 96 (Jan. 17, 1991).

[75] *See, e.g., Egan-Jones Proxy Services*,  https://www.ejproxy.com/services/ (last visited Jan.22, 2020) ("Egan-Jones reviews the client's research and voting requirements including voting guidelines. If desired, Egan-Jones suggests modification to the client's proxy voting guidelines to facilitate fulfillment of fiduciary obligations.")

individually customized vote recommendations based on a client's specific (or custom) voting guidelines.[76]  Not only are custom vote recommendations "personalized" by their very nature, but they also entail a high degree of interactive discussion between proxy advisers and their investor clients.  Moreover, because a custom vote recommendation is provided only to the client who owns the policy on which the recommendation is based, it is abundantly clear that such recommendations fail to satisfy the publisher's exception requirement that advice be of "general and regular circulation."[77]

### c.  Qualifying for Registration with the Commission

By virtue of the National Securities Markets Improvement Act of 1996 ("NSMIA"),[78] an investment adviser is precluded from registering with the SEC, and is subject instead to state jurisdiction, unless that adviser qualifies for federal registration under Section 203A of the Advisers Act or Rule 203A-2 thereunder.  Today, three of the five U.S. proxy advisers, including ISS, are registered as investment advisers with the SEC in reliance on the category for pension consultants found in Rule 203A-2(a).[79]  While the other two proxy advisers are not registered at either the federal or state level, at least one, and possibly both, of these firms also qualify for SEC registration under this NSMIA category.[80]

This three-part analysis leaves no room for doubt that the proper regulatory regime for proxy advisory firms is the one Congress created in the Advisers Act.

### 4.  The proposal's perfunctory treatment of the Advisers Act is inconsistent with existing law, rules and prior Commission statements, and is antithetical to the professed objectives of this rulemaking.

---

[76] *See* 2016 GAO Report, *supra* n. 3; Transcript of the Roundtable on the Proxy Process at 193 (Nov. 15, 2018) *available at* https://www.sec.gov/files/proxy-round-table-transcript-111518.pdf, ("2018 Roundtable Transcript").

[77]  The definitional exception for Nationally Recognized Statistical Rating Organizations (NRSROs), found in Advisers Act § 202(a)(11)(F) is also unavailable to proxy advisers.  This exception, adopted in 2006, was designed to relieve credit rating agencies who opt to register under a voluntary regulatory regime found in Section 15E of the Exchange Act from the need also to register as investment advisers under the Advisers Act.  By its terms, the exception is limited to credit rating activities.  An NRSRO that also makes recommendations as to purchasing or selling securities—such as a proxy adviser—cannot avail itself of the NRSRO exception.

[78] Pub. L. No. 104-290, 110 Stat. 3416 (1996).

[79] PA Proposal, *supra* note 1 at 86, 88-89, 84 Fed. Reg. at 66543.

[80]  *Id.* at 10 n. 18, 84 Fed. Reg. 66520 n. 18.  Note that § 203A(c) of the Advisers Act authorizes the Commission to exempt advisers from the prohibition on registration if the prohibition would be "unfair, a burden on interstate commerce, or otherwise inconsistent with the purposes" of NSMIA. This provides another avenue for SEC registration.

While the proposal acknowledges that the Commission already regulates a majority of U.S. proxy advisers as investment advisers,[81] the proposal is devoid of any substantive discussion of the applicability of the Advisers Act regulatory regime to proxy advisory firms. Nor is there any discussion of the ability of this regime to address the concerns that purportedly underlie this rulemaking. The Commission's silence here is inexplicable, given the agency's previous determination that proxy advisers meet the statutory definition of "investment adviser," and given the proposal's focus on investor protection.[82]

The proposal dismisses the relevance of the Advisers Act to the question of whether the proxy rules serve as a legitimate basis for regulating proxy advisers by noting that "it is not unusual for a registrant under one provision of the securities laws to be subject to other provisions of the securities laws when engaging in conduct that falls within the other provisions."[83] ISS does not find this observation applicable to the question at hand. While different activities may be governed by different provisions of the securities laws, the SEC does not regulate a single activity twice.[84] In fact, the Advisers Act has been designed expressly to avoid such regulatory overlap.

In this regard, the statute provides exceptions to the definition of "investment adviser" and an exemption from the registration requirements for parties whose advisory activities are already governed by, or are incidental to financial services governed by, another regulatory regime.[85] Furthermore, in adopting NSMIA, Congress divided jurisdiction over investment advisers between the SEC and the states for the express purpose of eliminating duplicative regulation.[86] And the SEC itself has taken steps to mitigate duplication with regard to investment advisers who are also registered as broker-dealers.[87]

---

[81] *Supra* note 79.

[82] PA Proposal at 27, 84 Fed. Reg. at 66525.

[83] *Id.* at 18 n. 47, 84 Fed. Reg. at 66522 n.47.

[84] For example, a firm that both effects securities transactions and provides more than incidental investment advice may be governed by the Exchange Act for its brokerage business and the Advisers Act for its advisory business, but neither statute broadly regulates both activities.

[85] The Advisers Act provides such definitional exceptions to banks (Section 202(a)(11)(A)); broker-dealers (Section 202(a)(11)(C)); and registered credit rating agencies (Section 202(a)(11)(F)). A registration exemption is provided to certain advisers who are registered as commodity trading advisers with the Commodity Futures Trading Commission. Section 203(b)(6).

[86] *See supra* note 78.

[87] *See e.g.* Advisers Act Rule 204-2(h).

Respecting the boundaries between different provisions of the securities laws is not the exclusive province of the Advisers Act. In 1992, the SEC rejected calls by the issuer community to regulate certain shareholder communications under the proxy rules because Congress provided another Exchange Act provision for that purpose:

> *When and under what circumstances a large shareholder, or group of shareholders acting together, must reveal to the SEC, the company, other shareholders, and the market its plans and proposals regarding the company has been addressed by Congress, but not through the provisions governing proxy solicitations. Section 13(d) of the Exchange Act, as implemented by the Commission in its regulations adopted thereunder, sets forth the circumstances when public disclosure of plans and proposals by significant shareholders, as well as agreements among shareholders to act together with respect to voting matters, must be disclosed to the market.[88]*

By parity of reasoning, it is inappropriate to regulate the advice rendered by proxy advisers under Section 14(a) of the Exchange Act because Congress provided the Advisers Act for that purpose.

- o **How the Advisers Act Addresses the Professed Objectives of this Rulemaking**

In proposing this package of rule amendments, the Commission emphasizes its interest in protecting investors and says that "concerns" have been expressed about the "accuracy and soundness" of proxy advisers' vote recommendations, as well as conflicts of interest that could potentially affect those recommendations.[89] Given this motivation, the short shrift the proposal gives to the Advisers Act is puzzling, because these are precisely the types of issues this regulatory regime was designed to address.

As previously explained, the Advisers Act establishes a federal fiduciary standard of conduct that imposes duties of care and loyalty on investment advisers; obliges advisers to act in the best interests of their clients; and forbids advisers to place their own interests ahead of the interests of their clients.[90] The Commission has previously acknowledged the applicability of this standard to proxy advisers, saying that "[a]s investment advisers, proxy advisory firms owe fiduciary duties to their advisory clients."[91]

In the 2019 Fiduciary Standard Release, the Commission confirmed that the fiduciary duty of care obliges an adviser to reasonably ensure the accuracy and soundness of the advice it

---

[88]  1992 Release, *supra* note 46, 57 Fed. Reg. at 48278 (internal citation omitted).

[89]  PA Proposal at 10-11, 84 Fed. Reg. at 66520.

[90]  *See supra* at 16.

[91]  Concept Release, *supra* note 59 at 110, 75 Fed. Reg. at 43010.

renders.  In this regard, the Commission cited the Concept Release, which said,

> [A]s a fiduciary, the proxy advisory firm has a duty of care requiring it to make a reasonable investigation to determine that it is not basing its recommendations on materially inaccurate or incomplete information.[92]

The Commission further explained that the duty of loyalty requires an adviser to "eliminate or at least expose through full and fair disclosure all conflicts of interest which might incline [the] investment adviser – consciously or unconsciously -- to render advice [that is] not disinterested."[93]

In order to enforce these duties, the Advisers Act regulatory regime imposes a host of specific obligations on advisers. These include a requirement to implement and maintain a comprehensive compliance program and to test the sufficiency and effectiveness of that program at least annually;[94] a requirement to implement procedures to prevent the misuse of material nonpublic information as well as a written code of ethics;[95] and a requirement to disclose both the methods of analysis and policies and procedures used in formulating proxy voting advice, along with meaningful information about conflicts of interest and their mitigation.[96]

The Advisers Act further prohibits advisers from engaging in fraudulent or deceptive conduct.[97]  This antifraud provision and the SEC's rules thereunder apply to any person who falls within the definition of investment adviser, whether that person is required to register under the statute or not.[98]

Registered investment advisers also have extensive recordkeeping requirements,[99] and they must make those records available for inspection by the SEC's Office of Compliance Inspections and Examinations (OCIE).  In 2015, this office designated proxy advisers as a priority

---

[92] *Id.* at 119, 75 Fed. Reg. at 43012 cited in *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Advisers Act Rel. No. 5248 (June 5, 2019) at 16 and n. 40, 84 Fed. Reg. 33669, 33674 and n. 40 (July 12, 2019) ("Fiduciary Standard Release").

[93] *Id.* at 23, 84 Fed. Reg. at 33676, *citing Capital Gains, supra* note 67, 375 U.S. at 191.

[94] Rule 206(4)-7.

[95] Section 204A and Rule 204A-1.

[96] Rule 203-1; Form ADV.

[97] Section 206.

[98]  Concept Release *supra* note 61 at 110, 75 Fed. Reg. at 43010; *Applicability of the Investment Advisers Act to Financial Planners, Pension Consultants, and Other Persons Who Provide Investment Advisory Services as a Component of Other Financial Services,* Advisers Act Rel. No. 1092 (Oct. 8, 1987), 52 Fed. Reg. 38400 (Oct. 16, 1987).

[99] Rule 204-2.

in its National Examination Program.  Among the issues OCIE identified for inspection were how proxy advisers make recommendations on proxy voting and how they disclose and mitigate potential conflicts of interest.[100]

Other than noting that proxy advisers "that are investment advisers are already required to identify conflicts and to eliminate or make full and fair disclosure of those conflicts,"[101] the proposal ignores the relevance of the Advisers Act regime and makes no attempt to explain why this framework is inadequate to address the Commission's purported concerns about proxy advice.  ISS respectfully submits that this silence does a disservice to investors, who deserve sound, accurate and independent proxy voting advice from appropriately regulated sources.  It also undercuts the purported justification for this regulatory undertaking, as do questions about the integrity of the public record on this issue to date.

### 5. In seeking to justify the proposed rule amendments, the Commission seems to have ignored the findings of its own Roundtable and relied on fraudulent public comments.

In the 2018 Roundtable on the Proxy Process, the Commission convened a special panel to address issues relating to proxy advisers.  Participating in this panel were institutional investors who use proxy advisory services, public company representatives, proxy advisers themselves, a law professor and a former U.S. Senator.  A few striking aspects of this session of the roundtable merit attention.

First, there was no discussion whatsoever of whether proxy *advice* constitutes a proxy *solicitation* or whether a proxy *adviser* should be regulated as a proxy *solicitor*.  The issue never came up, just as it never came up at the roundtable on proxy adviser issues the SEC hosted in 2013.[102]  Second, as discussed more fully below, none of the investors on the panel expressed the conflict-of-interest and accuracy concerns the Commission cites to justify the proposed rule amendments.  Finally, and relatedly, not one single participant at this session saw a need to impose

---

[100] SEC, OCIE, National Exam Program, *Examination Priorities for 2015 at 4*, available at https://www.sec.gov/ about/offices/ocie/national-examination-program-priorities-2015.pdf.

[101] PA Proposal at 105, 84 Fed. Reg. at 66548.

[102] Transcript of the Roundtable on Proxy Advisory Services (Dec. 5, 2013) *available at* www.sec.gov/spotlight/proxy-advisory-services/proxy-advisory-services-transcript.txt  ("2013 Roundtable Transcript").

additional regulation on proxy advisers, a fact that seemed to surprise the SEC staff moderating the panel.[103]

Lacking any support for change from the panel it convened to examine proxy adviser issues, the Commission turns instead to some written comments it received in connection with the roundtable.  Here, the most vocal advocates for new regulation were public companies and their well-financed representatives.[104]  Given that Congress enacted 14(a) of the Exchange Act to control unfair practices by corporate insiders, these parties are odd spokespersons indeed for the shareholder community.   The Commission also relies on comments it received from groups calling themselves "Main Street Investors Coalition" and "60 Plus Association" and a handful of individuals claiming to be retail investors with grave concerns about proxy advisers.

The provenance of these investor comments was called into question in a November 19, 2019 Bloomberg article.[105]  According to this article, the "Main Street Investors Coalition" was formed in part and funded in large measure by the National Association of Manufacturers, while the 60 Plus Association, a member of the Main Street Investors Coalition, "routinely takes money from corporations and advocates for their causes."[106]  The legitimacy of the individual investor letters cited in the proposal is also in doubt.  Most or all of these letters reportedly were orchestrated by these disguised corporate advocates, and some investors have disavowed any knowledge of letters submitted in their names.[107]

The problem of "astroturf" comments was the subject of a recent U.S. Senate Staff report.[108]  Noting that it "is a federal crime to 'knowingly and willfully' make 'any materially false,

---

[103]  Remarks of Michelle Anderson, Moderator, 2018 Roundtable Transcript, *supra* note 76 at 250 ("I can't believe [it].  Is there anyone on the panel that thinks there should be additional regulation?  I haven't heard it yet, and I'm kind of surprised").

[104]  PA Proposal at 11 n. 24 and 26 n. 70.  These include the Society for Corporate Governance, Center on Executive Compensation, Wachtell Lipton, Rosen & Katz, the National Association of Manufacturers, the Business Roundtable, the National Investor Relations Institute, the U.S. Chamber of Commerce and Exxon Mobil Corporation.

[105]  Zachary R. Mider & Benjamin Elgin, SEC Chairman Cites Fishy Letters in Support of Policy Change, Bloomberg (Nov. 19, 2019).

[106]  *Id.*

[107]  *Id.*

[108]  Staff of S. Perm. Subcomm. On Investigations, Comm. On Homeland Sec. and Gov'tal. Affairs, 116th Cong., Rep. on, *Abuses of the Federal Notice-and-Comment Rulemaking Process* (Subcomm. Print 2019)  The report defines "astroturfing" as "organized activity that is intended to create a false impression of a widespread, spontaneously arising, grassroots movement in support of or in opposition to something . . .

fictitious, or fraudulent statement or representation' to the federal government,"[109] the report recommends that federal agencies refer allegations of fraudulent comments to the appropriate law enforcement agencies, and that they not make such comments available for public viewing.[110]

ISS believes that the cynical misuse of the public comment process in the instant matter should not go unaddressed. We urge the Commission to undertake a thorough investigation into the allegations made in the Bloomberg article and take whatever steps are necessary to safeguard the integrity of the agency's rulemaking.

If the Commission is looking for honest input on the best way to protect retail investors, it need look no further than its own Office of the Investor Advocate ("OIA"). Created in 2014 under Section 915 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, the OIA is charged with identifying areas in which investors would benefit from changes in the regulations of the Commission; identifying problems that investors have with financial service providers and investment products; analyzing the effects of rulemaking on investors; and, where practicable, proposing to the Commission any legislative, administrative, or personnel changes that may be appropriate to promote the interests of investors.[111]

In its "Report on Objectives" for Fiscal Year 2020,[112] the OIA confirmed that it is "very focused" on issues related to proxy voting. While it recognized a general consensus regarding reforms in areas such as accurate vote counts, vote reconciliations and vote confirmations—popularly known as "proxy plumbing" issues—the OIA was much less sanguine about rulemaking developments relating to proxy advisory firms. In this latter regard, it noted investors' concerns that efforts to give companies more input into the advice rendered by proxy advisory firms could weaken the integrity of that advice.[113]

---

but that is in reality initiated and controlled by a concealed group or organization . . . ." *Id.* at 6 n. 12, quoting Merriam-Webster, https://www.merriam-webster.com/dictionary/astroturfing.

[109] *Id.* at 17, *quoting* 18 U.S.C. § 1001(a) (2018).

[110] Id. at 3-4. See also U.S. Gov't. Accountability Office, GAO-19-483, Federal Rulemaking: Selected Agencies Should Clearly Communicate Practices Associated with Identity Information in the Public Comment Process 27(June 2019) ("if [SEC] officials are able to confirm that a comment was submitted by someone falsely claiming to be the commenter . . . the comment may not be made available to the public").

[111] 15 U.S.C. § 78d(g)(4).

[112] SEC Investor Advocate Rep. on Objectives for FY 2020 (June 27, 2019), *available at* https://www.sec.gov/files/sec-office-investor-advocate-report-on-objectives-fy2020.pdf ("OIA Objectives Report"). Section 4(g) of the Exchange Act requires the Investor Advocate to file an annual Report on Objectives and an annual Report on Activities with the Senate Committee on Banking, Housing and Urban Affairs and the Committee on Financial Services of the House of Representatives.

[113] OIA Objectives Report at 7.

The OIA addressed these issues again in its recent "Report on Activities" for Fiscal Year 2019.[114]  Here the Investor Advocate described the controversy over the role of proxy advisory firms as follows:

> [C]orporate executives sometimes disagree with the voting recommendations of proxy advisory firms that institutional investors have engaged to provide research and assistance with voting in annual and special meetings. Corporate lobbying groups calling for greater regulation of proxy advisory firms claim that those firms' voting recommendations contain errors and undisclosed conflicts of interest.  In an April 8, 2019 speech, the Investor Advocate summarized the prevailing view of institutional investors, which is that the proxy advisory firms perform essential services relatively well, and that there is no market failure warranting further regulatory intervention. . . . Nevertheless, the Commission waded into the fray.  On August 21, 2019, the Commission published guidance clarifying the fiduciary obligations of investment advisers in fulfilling their proxy-voting responsibilities. The Commission also published an interpretation concluding that proxy-voting advice provided by proxy advisory firms generally constitutes a "solicitation" under the federal proxy rules, and providing related guidance about the application of the antifraud rule to voting advice. We believe that these interpretive releases may have the effect of inhibiting investment advisers' engagement in proxy voting and, arguably, should have been subject to a notice and comment process.[115]

ISS is troubled by the fact that the proposal completely ignores the views the Investor Advocate expressed in his April 2019 speech and in the OIA Objectives Report.  We urge the Commission to rectify this oversight and accord the Investor Advocate's assessment of investor protection in the proxy adviser context the consideration and respect that Congress intended.

Likewise, we ask the Commission to consider carefully the views of the  Investor Advisory Committee ("IAC") which has recommended that the Commission reconsider the Interpretation and Guidance and that it revise and republish this rule proposal to make it more balanced and compliant with the agency's guidance on economic cost-benefit analysis in  rulemaking.[116]

* * * * *

---

[114] SEC Office of the Investor Advocate, Rep. on Activities for FY 2019, (Dec. 19, 2019), *available at* https://www.sec.gov/advocate/reportspubs/annual-reports/sec-investor-advocate-report-on-activities-2019.pdf  ("OIA Activities Report").

[115]  *Id.* at 5-6 (internal citations omitted).

[116] Recommendation from the SEC Investor Advisory Committee (IAC) Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals (Jan. 24, 2020) at 5, *available at* https://www.sec.gov/comments/s7-22-19/s72219-6698769-206000.pdf (noting that instead of showing that a problem with proxy advisers does exist, the PA Proposal merely suggests that problems may or could exist because "some corporate managers and their lawyers and trade group representatives" claim that to be the case).  Also created by the Dodd-Frank Act, the IAC is tasked with advising and consulting with the Commission on initiatives to protect investor interests, Exchange Act § 39(a), 15 U.S.C. § 78pp(a).

The text, purpose, history and structure of the Exchange Act and the Advisers Act confirm that proxy advice and proxy solicitation are fundamentally distinct activities that are regulated in different ways. The Commission lacks authority to regulate proxy advice as though it were a solicitation, and its proposed amendment of Exchange Act Rule 14a-1(*l*) is contrary to law. ISS urges the Commission to withdraw this proposal.

### 6. Additional Comments on Proposed Changes to Rule 14a-1(*l*)

Without waiving or diminishing our challenge to the Commission's authority to regulate proxy advisers under Section 14(a), ISS offers the following comments on certain questions the Commission has asked about its proposed amendment of Rule 14a-1(*l*):[117]

2. The SEC proposes to define "proxy voting advice" to include the analysis and research that underlie a vote recommendation and that are delivered to the proxy adviser's clients. However, this term is proposed to exclude research reports and data that are not used to formulate the voting recommendations.[118] It is unclear how the proposal would treat data and research that may inform a proxy analysis and which may be described in a proxy voting research report but are marketed separately to investors. For example, ISS' analytics arm provides investment and governance professionals with a range of content and tools to identify and manage extra-financial risk and fulfill fiduciary obligations involved in active ownership, while its responsible investment arm provides services that help clients integrate responsible investing policies and practices into their strategy and shareholder voting decisions.[119] It would be highly inappropriate to include these stand-alone products and services in the proposed definition of "proxy voting advice" whether or not they play a role in ISS' formulation of vote recommendations.

It is also unclear whether the SEC proposes to stretch the definition of proxy solicitation to cover only advice based on a proxy adviser's benchmark and specialty voting policies, or whether the Commission also intends to cover advice based on investors' custom voting policies. On the one hand, the proposal seems to suggest that

---

[117] PA Proposal at 22 - 23, 84 Fed. Reg. at 66523-24. The numbers used herein correspond to the numbering used in the proposal.

[118] *Id.* at 8, n. 11, 84 Fed. Reg. at 66519, n. 11.

[119] These services are described in ISS' Form ADV, which is available through the SEC's website at www.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=579250.

only the benchmark and specialty policies would be swept into the new definition,[120] but the proposal's statements about the importance of advice based on a client's custom voting policy guidelines suggest that the Commission might have a broader interpretation in mind.[121]

Subjecting to issuer oversight our clients' proprietary proxy voting policies and the custom vote recommendations that flow from those policies would add a new dimension to our already strenuous objection to this rulemaking.  ISS does not own, and is prohibited from disclosing, clients' proprietary custom voting policies and the recommendations based thereon.  Furthermore, there is not even an imaginary trace of investor protection to be gained by allowing issuers to vet the methodologies and assumptions institutional investors choose to implement for their own portfolios.  If this ill-advised rulemaking goes forward, we urge the Commission to confirm that proxy voting recommendations and reports based on clients' custom policies are excluded from Rule 14a-1(*l*)(1)(iii)(A).

4.  All forms of fiduciary investment advice, including proxy voting advice, should be governed exclusively by the Advisers Act regulatory regime, unless the advice is expressly excepted or exempted from that regime.  The Commission's failure to enforce the Advisers Act against a minority of proxy advisers does not justify applying the Exchange Act proxy rules to the whole industry.

5.  As explained earlier in this letter, a proxy "solicitation" involves a concerted effort by an interested party to achieve a desired outcome in a matter that is subject to a shareholder vote, consent or authorization.  Consequently, the definition of "solicit" and "solicitation" in Rule 14a-1(*l*) should exclude any advice that is rendered to advance the best interest of the shareholder being advised and not to achieve a particular outcome for the corporation in question.  This would exclude any voting recommendation made in the context of a fiduciary relationship, including a recommendation that is incidental to an investment adviser's management of a client's portfolio.  It also would exclude a recommendation made by a non-fiduciary financial advisor, including a broker-dealer, if that advisor is acting in the customer's best interest.  On the other hand, a recommendation made with the intent or purpose of advancing the speaker's own interests

---

[120]  PA Proposal at 18, 84 Fed. Reg. at 66522.

[121]  *Id.* at 8, 84 Fed. Reg. at 66519.

or the interests of a third party seeking to "maintain or gain control" of the company, should be treated as a "solicitation" for purposes of Rule 14a-1(*l*).

6.  In the Interpretation and Guidance, the Commission tried to reconcile its desire to regulate proxy advisers under Section 14(a) with its long-standing view that a financial advisor acts as a proxy solicitor only if it issues "unsolicited" vote recommendations. Although "unsolicited" in this context has always been defined to mean "over-the-transom" (*i.e.,* advice given to people who have not asked for it), the Interpretation and Guidance said that whether advice is "unsolicited" should depend instead on whether the party rendering that advice markets its expertise in the matter at hand.[122]  Perhaps realizing that this construction is at odds with the transactional approach the SEC takes to identifying unsolicited communications in other contexts under the Exchange Act,[123] the Commission now proposes to abandon the concept of unsolicited proxy advice altogether.  In its place, the Commission introduces the concept of "unprompted" advice and proposes to except such advice from the definition of "solicitation" under the proxy rules.[124]  There are at least three problems with this idea.

First, it is unnecessary, because a party that furnishes voting advice only in response to an "unprompted" client request would not fall under the revised solicitation definition in the first place.  Stated otherwise, a party that advises solely in response to unprompted requests, does not market its expertise and sell voting advice for a fee.

Second, it is unworkable, because an investment adviser who announces its willingness to provide voting advice to its managed accounts (as Form ADV requires it to do), or a broker-dealer who makes a similar disclosure to retail investors in Form CRS, would run the risk of having the SEC determine that it has "invited and encouraged" its clients to ask for advice.

---

[122]  Interpretation and Guidance, *supra* note 2 at 10, 84 Fed. Reg. 47419.

[123]  For example, Regulation Best Interest imposes a heightened standard of conduct on a broker-dealer who recommends securities transactions to retail customers. Exchange Act Rule 15*l*-1.  In adopting this rule, the Commission confirmed that the duty to act in a retail customer's best interest does not apply to "unsolicited orders," even if the broker has made other recommendations to the same client.  *Regulation Best Interest: The Broker-Dealer Standard of Conduct,* Exchange Act Rel. No. 86031 (June 5, 2019) at 76-77, 84 Fed. Reg. 33318, 33334-33335 (July 12, 2019).  The Commission did not condition this position on a broker's eliminating or restricting its sales and marketing activities.  Likewise, certain Exchange Act transaction reporting requirements differentiate between "solicited" and "unsolicited" customer orders without regard to how the customer relationship was established.  Rule 17a-25(a)(2)(ii).

[124]  Proposed Rule 14a-1(*l*)(2)(v); PA Proposal at 20, 84 Fed. Reg. at 66523.

Finally, it is counterproductive. Subjecting experts who have the skill and resources to provide accurate and independent proxy advice to additional regulation, while allowing others, with no relevant expertise, to furnish *ad hoc*, "drive-by" advice belies the asserted investor protection goal of this rulemaking,

For these reasons, the proposed amendment of Rule 14a-1(*l*)(2) should be dropped.

## B. The Exemptive Component;
   Proposed Changes to Rule 14a-2(b)

The Commission proposes to add three new conditions to two existing exemptions from the filing and information requirements of the proxy rules. The first exemption (found in Rule 14a-2(b)(1)) is the one the SEC adopted in 1992 as a safe harbor for shareholders and others who do not seek proxy authority on their own or another's behalf and who do not have a substantial interest in the matter subject to shareholder action beyond their interest as shareholders or employees.[125] The second exemption (found in Rule 14a-2(b)(3)) is the one the Commission adopted in 1979 for financial advisors who go beyond their advisory function and voluntarily distribute proxy voting advice to persons who have not asked for it.[126] Although the SEC contends that proxy advisers have traditionally relied on these exemptions, that is not so. Until the Commission issued the contested Interpretation and Guidance in August 2019, fiduciary proxy advice furnished to investors pursuant to contract and for a fee was not deemed to be a proxy solicitation. Thus, proxy advisers have never needed an exemption from the filing and information requirements of the proxy rules.

The conditions the Commission proposes to add to these exemptions would apply exclusively to proxy advisers and would be housed in a new subsection (b)(9) of Rule 14a-2. The first condition—to be added as 14a-2(b)(9)(i)—relates to conflict of interest disclosures. The second condition—to be added as 14a-2(b)(9)(ii)—would give public companies two opportunities to review proxy advisers' advice and one opportunity for feedback before that advice is delivered to the clients who paid for it. The final condition—to be added as 14a-2(b)(9)(iii)—would give public companies the right to have hyperlinks to their own views on the proxy advice inserted into the body of that advice and any electronic medium used to deliver the advice. The condition on conflicts largely duplicates existing requirements under the Advisers Act. The issuer review and

---

[125] *See supra* at 13 -15.

[126] *Supra* at 13.

content insertion are the real purposes of this rulemaking, and are designed to provide corporate insiders with the editorial control over proxy advice they have sought for so long.

Although the SEC claims that these changes are necessary to address "concerns" about the integrity and accuracy of proxy advisers' analyses and recommendations, there are no legitimate concerns in either of these areas.

### 1. This rulemaking is a solution in search of a problem.

#### a. Conflicts of Interest

ISS strongly agrees that proxy advisers should take meaningful steps either to eliminate, or to manage and disclose all conflicts of interest that might incline the proxy adviser to render advice that is not disinterested.  As discussed above, conflict elimination, management and disclosure are the heart and soul of an investment adviser's fiduciary duty of loyalty.[127]  The SEC addressed the application of this duty in the context of proxy voting and the use of third-party proxy advisers when it adopted Advisers Act proxy rule in 2003[128] and again in 2019 when it issued extensive guidance on this topic.[129]

ISS addresses conflicts of interest, first and foremost, by being a transparent, policy-based organization.  Its use of a series of published voting policies provides a very practical check and balance that ensures the integrity and independence of ISS' research and vote recommendations. The existence of a published analytical framework, coupled with the fact that vote recommendations are based on publicly-available information, allows ISS clients to continuously monitor the integrity and consistency of ISS advice.

Furthermore, ISS has undertaken comprehensive risk assessments to identify specific conflicts of interest related to its operations and has adopted controls reasonably designed to

---

[127] *Supra* at 22.

[128] Advisers Act Proxy Rule Release, *supra* note 69.

[129] *Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers,* Advisers Act Rel. No. 5325 (Aug. 21, 2019), 84 Fed. Reg. 47420 (Sept. 10, 2019), available at http://www.sec.gov/rules/interp/2019/ia-5325.pdf.  Over the years, the SEC Staff have also provided guidance on investment advisers' obligations to address conflicts in connection with proxy advisory services.  Letter from Douglas Scheidt, Assoc. Dir., SEC Div. of Inv. Mgmt. to Mari-Anne Pisarri, Pickard and Djinis LLP, Counsel for Institutional Shareholder Services Inc., 2004 SEC No-Act. LEXIS 736 (Sept. 15, 2004) at *4-5, *withdrawn by* IM Information Update, Statement Regarding Staff Proxy Advisory Letters, IM-INFO 2018-02 (Sept. 2018) available at: https://www.sec.gov/divisions/investment/imannouncements/im-info-2018-02.pdf; SEC Div. of Inv. Mgmt., Div .of Corp. Fin., *Proxy Voting:  Proxy Voting Responsibilities of Investment Advisers and Availability of Exemptions from the Proxy Rules for Proxy Advisory Firms,* Staff Legal bulletin No. 20 (June 30, 2014), *available at* http://www.sec.gov/interps/legal/cfslb20.htm.

manage each of those risks.[130] ISS conducts a range of transactional and forensic tests to assess the sufficiency of its compliance procedures and the effectiveness of their implementation.

### i. Conflicts of Interest in Connection with Affiliated Corporate Services

The most talked-about ISS potential conflict of interest relates to the fact that one of our subsidiaries, ISS Corporate Solutions, Inc. ("ICS"), provides governance tools and services to corporate issuer clients.  Without adequate safeguards, this could potentially result in vote recommendations that are biased in favor of corporate management.  However, the fact that the most vocal critics of ISS in this area are those who speak on behalf of corporate management, and not the investors who rely on ISS' research and vote recommendations, indicates that ISS is managing this potential conflict extremely well.  The primary control for this risk is the firewall ISS maintains between the core institutional business and the ICS business. This firewall includes the physical and functional separation between ICS and ISS, with a particular focus on the separation of ICS from the ISS Global Research team.  A key goal of the firewall is to keep the ISS Global Research team from knowing the identity of ICS' clients, thereby ensuring the objectivity and independence of ISS' research process and vote recommendations.  The firewall mitigates potential conflicts via several layers of separation:

- ❍ ICS is a separate legal entity from ISS.
- ❍ ICS is physically separated from ISS, and its daily operations are separately managed.
- ❍ ISS Global Research team works independently from ICS.
- ❍ ICS and ISS staff are forbidden to discuss the identity of ICS clients.
- ❍ Institutional analysts' salaries, bonuses and other forms of compensation are not linked to any specific ICS activity or sale.
- ❍ ICS explicitly tells its corporate clients and indicates in their contracts that ISS will not give preferential treatment to, and is under no obligation to support, any proxy proposal of an ICS client.  ICS further informs its clients that ISS' Global Research team prepares its research and vote recommendations independently of, and with no involvement from, ICS.

ISS maintains a robust training and monitoring program regarding the firewall.  This program includes quarterly tests of the firewall's integrity, new-hire orientation, and review of certain marketing materials and disclosures.  There also is an ethics hotline available to both ICS and ISS staff for reporting issues of potential concern.

---

[130] See Advisers Act Rule 206(4)-7; *Compliance Programs of Investment Companies and Investment Advisers,* Advisers Act Rel. No. 2204 (Dec. 17, 2003) at 5, 68 Fed. Reg. 74714, 74716 (Dec. 24, 2003) ("Each adviser, in designing its policies and procedures, should first identify conflicts and other compliance factors creating risk exposure for the firm and its clients in light of the firm's particular operations, and then design policies and procedures that address those risks").  *See also* 2016 GAO Report, *supra* note 3 at 9.

### ii. Conflicts of Interest in Connection with ISS' Owner and Directors

ISS is a privately-held company, whose owner, along with company management, is Genstar Capital, LLC, a private equity firm. ISS has complete independence from Genstar Capital in the development and application of its voting policies, the preparation of proxy research and the formulation of vote recommendations. The Board of Directors of ISS has formally adopted a Policy on Potential Conflicts of Interest Related to Genstar Capital and its affiliated funds.[131]

In addition, as a private equity firm that owns or controls a number of operating companies, some of which may become publicly traded and may thereafter be the subject of ISS research, actual or potential conflicts of interest, or the appearance of conflicts, could arise in the production of research and vote recommendations with respect to coverage of such a Genstar company (i.e., a "Genstar Affiliated Company"). ISS therefore provides disclosure of these relationships on its website and will include information about any such relationship in the research report for an issuer that is a Genstar Affiliated Company. Similarly, the ISS Board of Directors has adopted procedures and safeguards to identify and disclose any actual or potential conflict of interest situations involving service by an ISS Director on the board of a publicly-traded issuer, or in another capacity (relative to an issuer), that could present the potential for a conflict.[132]

### iii. Conflicts of Interest Within the Institutional Advisory Business

Potential conflicts of interest also may arise where an ISS institutional investor client is, itself, a public company whose shareholder meetings are the subject of research and voting recommendations or where ISS is called upon to analyze and make vote recommendations on shareholder proposals propounded by an ISS client. ISS' fiduciary commitment to act in the best interests of each investor client, its development of vote recommendations in accordance with applicable published or custom voting policies, and the ongoing scrutiny it receives from its institutional clients effectively address this potential conflict, as does the disclosure of "significant relationships" as described in more detail below.

### iv. Conflicts of Interest at the Employee Level

Potential conflicts of interest also may arise in connection with an employee's personal securities investments, the receipt or giving of gifts and entertainment, or contacts with proxy solicitors and other interested parties. ISS has implemented specific policies and procedures in each of these areas to manage any potential conflicts. These include procedures for preclearance of

---

[131]  https://www.issgovernance.com/file/duediligence/ISS-Conflicts-Policy-Regarding-Genstar.pdf.

[132]  https://www.issgovernance.com/file/duediligence/ISS-Board-of-Directors-Conflicts-Policy.pdf.

personal trades, blackout periods for trading in stocks of issuers whose meetings are currently being analyzed or acted upon, and extensive personal trade reporting requirements.[133]  ISS also restricts employees' ability to give or receive business-related gifts and entertainment, and it has a strict policy addressing interactions between ISS staff and proxy solicitors or other parties that represent issuers, dissident shareholders or other external parties soliciting proxies from shareholders, in order to ensure that such interactions do not compromise the independence of the advice ISS renders to its clients.[134]

### v.  Conflicts of Interest in Connection with Issuers' Review of Draft Reports

In select markets and under certain circumstances, ISS currently and voluntarily affords some issuers an opportunity to review draft reports for factual accuracy prior to publication.  This practice presents a risk (which would be magnified many times over by the proposed rule amendments) that the subjects of ISS' advice will have an undue influence on the content of that advice.  In order to ensure the propriety of all such interactions between an issuer and ISS analysts, any decision by an analyst to change a draft vote recommendation based on an issuer's notification of one or more factual errors in a draft report must be reviewed by a senior analyst and appropriate records must be kept of the communication from the issuer and the voting decision.  These records are subject to the Chief Compliance Officer's periodic review.

### vi.  Disclosure Regarding Potential Conflicts of Interest

ISS already provides its investor clients with an extensive array of information to ensure that they are fully informed of potential conflicts and the steps ISS has taken to address them.  In addition to making full disclosure in the Form ADV brochure it delivers to each client, ISS supplies a comprehensive due diligence compliance package on the "Compliance" section of its web site to assist clients and prospective clients in fulfilling their own obligations regarding the use of proxy advisory services.[135]  This package includes a copy of ISS' Code of Ethics, a description of other policies, procedures and practices regarding potential conflicts of interest and a description of the ICS business.

---

[133] *See Personal Trading Policy* in ISS Code of Ethics at 8, *available at* https://www.issgovernance.com/file/duediligence/code-of-ethics-nov-2019.pdf.

[134] See  ISS, Policy on Interactions and Communications with Proxy Solicitors and Other Proxy Advisory Companies, Id. at 14.

[135] *See* ISS, *Due Diligence Package: Proxy Research and Voting Services* (last updated October 14, 2019) available at: https://www.issgovernance.com/compliance/due-diligence-materials/ ("Due Diligence Package").

Moreover, each proxy analysis and research report ISS issues contains a legend indicating that the subject of the analysis or report may be a client of or affiliated with a client of ISS, ICS or another ISS subsidiary.  Each analysis and report also notes that one or more proponents of a shareholder proposal may be a client of ISS or one of its affiliates, or may be affiliated with such a party.  Although investment advisers typically disclose conflict of interest information at a macro level,[136] ISS goes further.  Any institutional client that wishes to learn more about the relationship, if any, between ICS and the subject of a particular report may access this information through the ProxyExchange platform and/or by contacting ISS' Legal and Compliance Department for relevant details.  These processes allow ISS' proxy voting clients to receive the names of ICS clients, the amount that any ICS client has paid ICS and the particular products/services they purchased, and all this is done without revealing that information to ISS' research analysts as they prepare the research and vote recommendations.  Were the ICS relationship identified on the face of a proxy research report, this critical information barrier would be destroyed.

Research reports also contain disclosure regarding any engagement ISS may have had with the company or other relevant market participant as part of the analysis.  This may include key information disclosed in dialogue with companies, shareholder proponents or other stakeholders, including the date(s) of dialogue, the topic(s) covered, the initiator of the dialogue and the outcome of the dialogue.

Furthermore, detailed disclosure of potential conflicts of interest is available to clients through ISS' ProxyExchange platform in a way that both seamlessly integrates with clients' workflows and protects the critical firewall between ISS and its ICS subsidiary.  In this regard, the platform reveals the existence of any "significant relationship" between ISS and a registrant, an institutional client affiliated with a registrant or a primary shareholder proponent of a proposal subject to ISS' advice, and users can click through on a link to get more information about that relationship.  For purposes of this disclosure, ISS deems any paying client relationship between ICS and a corporate issuer, where ISS provides proxy vote recommendations and research regarding that issuer to be "significant."  A relationship with an ISS institutional client who is itself, or who is related to, a corporate issuer will be deemed "significant" if annual revenues from that client are in excess of 5% of ISS' total, consolidated revenues for the most recently completed fiscal year.  The same 5% test applies in the case of relationships with clients who act as primary filers of shareholder proposals.

In addition to obtaining report-by-report conflict information, institutional clients of ISS can obtain lists of all ICS clients.  Some clients receive such lists on a monthly basis, while others receive

---

[136]  *See, e.g.* Form ADV, Part 2A, Item 11.

the lists on a quarterly or annual basis. This is just one of the many steps institutional investors take to reassure themselves that ISS is appropriately mitigating conflicts. They also obtain a range of additional information regarding our information barriers, our information security program, and other aspects of our operations. Many clients meet with ISS staff on an annual basis to discuss conflict mitigation policies and practices and other due diligence matters.

ISS' careful attention to conflict mitigation and disclosure appears to be effective.

The issue of proxy adviser conflicts of interest was extensively discussed at the 2018 Roundtable on the Proxy Process. Participants acknowledged the importance of monitoring the steps proxy advisory firms take to ensure the integrity of their reports and recommendations, and the consensus among the consumers of proxy advice was that this process is working as it should. For example, Jonathan Bailey, Managing Director and Head of ESG Investing, Neuberger Berman, LLC, said:

> *We have seen no evidence that there has been any impact from conflicts of interest on the services provided to us, and we feel comfortable with the level of disclosure that we get. And on an annual basis, we review that with our chosen service providers, and will continue to do so.[137]*

Likewise, Patti Brammer, Corporate Governance Officer, Ohio Public Employees Retirement System said:

> *I would just say that I can speak to -- our experience has been that yes, the conflict disclosure is very easy to understand. It's not boilerplate language. It does provide sufficient detail, and it is an element that we use and consider.[138]*

And Scot Draeger, Vice President, Director of Wealth Management, General Counsel and Chief Compliance Officer, R.M. Davis Private Wealth Management agreed, noting:

> *I would say, as a practical matter, to speak as a user of the service, for a proxy advisory firm service, the disclosures are ones that are easy to understand at present, and aren't dissimilar from an auditor independence.*
> *......*
>
> *[T]he transparency of the conflicts themselves are disclosed seemingly pretty well. If you're a user -- for ISS, anyway, is what I can speak to -- there's a dashboard that you go into. It's a very technical point. But when you're looking down and you're making decisions about votes or categories of votes, with respect to every issuer there's a box on the dashboard that says "Conflict" that you can literally click on and get the information that was described.[139]*

---

[137] 2018 Roundtable Transcript, *supra* note 76 at 212.

[138] *Id.* at 213.

[139] *Id.* at 211.

Although the SEC acknowledges that proxy advisers have implemented extensive policies and procedures to identify, manage and disclose conflicts of interest, and that proxy advisers' clients have expressed satisfaction with advisers' practices in this regard, the agency says more regulation is needed because certain issuers and their paid representatives are still not satisfied.[140]   It is an understatement to say that public companies' views on conflicts of interest in this context should be taken with a grain of salt.

Unlike institutional investors who choose to use proxy advisory services to help fulfill their fiduciary duties to shareholders and beneficiaries, certain public companies view proxy advisers as adversaries whose vote recommendations can sometimes interfere with management's views or economic self-interest.  Furthermore, because investor subscribers to proxy advisory services have access to detailed disclosures of potential conflicts of interest and the opportunity to conduct comprehensive due diligence on their proxy advisers' policies and procedures, they are far better equipped than issuers are to assess whether existing regulations are sufficient to protect investors.

Finally, given that certain issuers, their corporate advisers and lobbyists are the source and most vocal advocates of the proposal to inject a grave new conflict of interest into proxy advisers' research and advice through compelled issuer review of not only factual statements but also of proxy advisers' methodologies and opinions, issuers' "concern" about conflicts of interest has a hollow ring.  And their much-ballyhooed interest in transparency is belied by the apparent orchestration by some of a campaign of sham comments from "retail investors."

The SEC states that its primary concern in proposing these amendments is with the recipients of proxy voting advice,[141] but then it largely ignores the views of those parties (and the fact that such advice is already regulated under the Advisers Act).  ISS respectfully submits that basing this rulemaking on concerns expressed by a group of self-interested corporate insiders and their lobbyists, while dismissing the views of the fiduciaries who use proxy advice to serve the best interests of their shareholder clients would be arbitrary, capricious and an abuse of the Commission's discretion.

---

[140]  PA Proposal at 28, n. 76, 29 n. 78 and 30 n. 82, 84 Fed. Reg. at 66525 n. 76 and 66526 nn. 78 & 82.  The Commission also asserts that new regulation under the Exchange Act is necessary because there is "no uniform set of standards" applicable to the policies and procedures proxy advisers adopt to address the risks posed by conflicts of interest.  *Id.* at 28 n. 76, 84 Fed. Reg. 66525 n. 76.  This statement assiduously ignores the robust set of fiduciary standards that today govern 60% of U.S. proxy advisers and should be applied to the whole industry.  As amply demonstrated above, the regulatory regime established under the Advisers Act needs no help from the Exchange Act proxy rules.

[141] *Id.* at 34, n. 91, 84 Fed. Reg. at 66527, n.91.

### b.  Accuracy

As it stands today, the overwhelming majority of proxy votes are cast in favor of corporate management.  Certain public companies seek to close even the modest window of dissent by urging the Commission to let them play an active role in crafting the advice investors receive from their chosen proxy advisory firms.  In order to justify this extraordinary request, these members of the registrant community and their cadre of overt and concealed representatives have launched a campaign of concern about "factual errors, incompleteness, or methodological weaknesses" in the advice proxy advisers render to their clients.[142]  These concerns are no more legitimate than are issuers' claims  of concerns about proxy advisers' conflicts of interest.

In 2016, the GAO examined the issue of accuracy at the behest of Congress and reported:

*Both corporate issuers and institutional investors we interviewed said that the data errors they found in the proxy reports were mostly minor.*[143]

The consumers of proxy voting advice offered the same assessment at the 2018 Roundtable, with one participant saying:

*I think there's a very important distinction to be made between objective factual errors and subjective interpretation and policy.  And we find a small, very small, number of objective factual errors, and we think those are dealt with and need to be dealt with.*[144]

The SEC's Investor Advocate recently told Congress:

*[W]e reviewed many of the alleged 'errors' and determined that most would be more appropriately characterized as differences of opinion.*[145]

And one corporate issuer, who also operates in the financial services industry, echoed similar sentiments:

*Proponents of additional regulatory requirements for proxy advisory firms have raised concerns regarding the accuracy of proxy advisor reports, and suggested that issuers should be permitted to review and comment on proxy reports before the reports are shared with the proxy advisors' clients. From T. Rowe Price' s perspective as a corporate issuer, we appreciate having effective ways to address factual errors in proxy advisor research reports and find current practices, including the ability to file amended proxy*

---

[142] *Id.* at 39, 84 Fed. Reg. at 66528.

[143] 2016 GAO Report, *supra* note 3 at 29.

[144] Remarks of Jonathan Bailey, 2018 Roundtable Transcript, *supra* note 76 at 238.

[145] OIA Activities Report, *supra* note 114 at 5 - 6.  *See also* Remarks of Anne Sheehan, Director of Corporate Governance, CalSTRS, 2013 Roundtable Transcript, *supra* note 102 at 155 ("What I have found, that many times the errors are really differences of opinion").

*statements with the SEC, to be sufficient. As described during the roundtable, both ISS and Glass Lewis, the largest proxy advisory firms operating in the US, have transparent mechanisms in place for issuers to address any factual errors in their data analyses.*[146]

The extremely low error rate for proxy advice is not an accident.  As with conflict mitigation and disclosure, proxy advisers go to great lengths to ensure the accuracy of the information that underpins their advice; it is in their interest to do so.  Among the many steps ISS has taken to ensure quality and minimize errors in its published research are the following:

- o  Reports and recommendations are driven by publicly available information and based on publicly disclosed and detailed voting policy guidelines.

- o  Issuer data used by ISS is consistently collected, classified and subject to quality control review before it is used by ISS' analysts.

- o  Prior to finalization and delivery to clients, each proxy research report is subject to internal review for accuracy, quality and to ensure that the relevant voting policy has been correctly applied.

- o  ISS maintains a data verification platform which allows issuers to verify key data underlying ISS' evaluation of equity-based compensation plans, thereby providing ISS clients with greater assurance of data integrity.

- o  In select markets and under certain circumstances, companies may receive an opportunity to review a draft analysis for factual accuracy prior to publication of the analysis.[147]

- o  All issuers may request and receive, at no charge, a copy of the published ISS benchmark research report, including the vote recommendations in advance of its shareholder meeting.

- o  In the event new material public information becomes available or if ISS finds that a report contains a material error, ISS promptly issues a  Proxy Alert ("Alert") to inform clients of any corrections and, if necessary, any resulting changes in the vote recommendations.  Alerts are distributed to ISS' investor clients through the same ProxyExchange platform used to distribute the regular research and voting recommendations.  This ensures that the clients who received an original report will also receive the related Alert, which is attached to the relevant original company meeting report.  Even if a client has cast its vote before receiving an Alert, the client may cancel and change its vote at any time before the meeting cut-off date, if the client determines that such a change is warranted by the new information.

---

[146] Letter from Donna F. Anderson and Eric Veiel, T. Rowe Price, to Brent J. Fields, Esq., Secretary, SEC (Dec. 13, 2018) ("2018 T. Rowe Price Letter") at 2.

[147] See *infra* at 61-62.

o ISS maintains a Feedback Review Board ("FRB"), which I oversee as ISS' President and CEO. The FRB serves as an additional channel for issuers or others to communicate with ISS any unresolved concerns regarding accuracy of research, accuracy of data, policy application and general fairness of ISS policies, research, and recommendations.

o ISS conducts regular SSAE 18 audits to check compliance with internal control processes. Controls around ISS' research process are included in these audits.

Many supporters of the proposed rulemaking rely on a 2018 study by the American Council on Capital Formation ("ACCF") to bolster their "concerns" about inaccurate proxy advice,[148] but this study has been thoroughly discredited. After painstakingly analyzing each of the 139 purported "proxy advisor errors" identified by the ACCF, the Council of Institutional Investors ("CII")—a nonprofit, nonpartisan association of U.S. asset owners with combined assets of $4 trillion—concluded that:

> [I]t is clear that most of the claimed 'errors' actually are disagreements on analysis and methodologies, and that some other alleged proxy advisory firm errors derive from errors in the company proxy statements.[149]

The CII also reviewed claims about inaccurate proxy advice made by parties such as the Business Roundtable, the National Investor Relations Institute, the National Association of Manufacturers and the U.S. Chamber of Commerce Center for Capital Markets Competitiveness and found "evidence of pervasive proxy advisor inaccuracy [to be] extraordinarily weak."[150]

On the subject of errors, we note the January 16, 2020 Memorandum from the SEC's Division of Economic and Risk Analysis ("DERA") which explains the methodology behind a table DERA purportedly created to "provide a tabular approximation of the number of instances registrants indicated 'concerns' over the 2016-2018 period with respect to proxy voting advice in the additional soliciting materials reviewed by the staff."[151] The DERA Memorandum rightfully

---

[148] Frank Placenti, *Are Proxy Advisors Really A Problem?,* American Council for Capital Formation (Oct. 29, 2018) 10-11 *available at* http://accf.org/2018/10/29/are-proxy-advisors-really-a-problem/. Even taken at face value, this study identifies an error rate of only 0.4%, which hardly justifies this rulemaking.

[149] Letter from Kenneth A. Bertsch, Executive Director, CII (Oct. 24, 2019, incorporating Oct. 25, 2019 corrections) ("2019 CII Letter"), at 2.

[150] *Id.* at 7.

[151] DERA, Memorandum to File S-7-22-19 regarding "Data analysis of additional definitive proxy materials filed by registrants in response to proxy voting advice" (Jan. 16, 2020), *available at* https://www.sec.gov/comments/s7-22-19/s72219-6660914-203861.pdf ("DERA Memorandum").

recognizes that reviewers of the various filings may reach different conclusions about the classifications of the concerns. This critical observation underscores a key point that we have witnessed directly at ISS and which other commentators have expressed as noted above, namely the critical distinction between objective factual errors and issues of subjective interpretation or differences of opinions on methodological frameworks. To test this observation in the context of the table in the rulemaking proposal and given the limited time afforded to us after the issuance of the DERA Memorandum, ISS performed a focused assessment of the 84 filings cited by DERA that were made in 2018. Of the 84 filings, five related exclusively to proxy research reports issued by Glass Lewis and so we did not assess those. Of the remaining 79, over 90% of the cited filings did not even state a claim of factual errors but instead reflected an issuer's disagreement with the opinions reached by ISS and/or the methodological framework(s) used by ISS to analyze the issue at hand. In fact, only 4 of the identified filings articulated a clear claim by an issuer of a factual error or inaccuracy on the part of ISS; after carefully reviewing those claims, ISS respectfully disagrees with those issuers' assertions.

Issuers' argument that without the ability to intervene in the production of proxy advice they have no "timely and effective way" to express their disagreement with that advice[152] is also extraordinarily weak. Companies make their views known to investors in a myriad of ways, including in initial and supplemental proxy statements,[153] by hiring proxy solicitors and through individual engagements. As professor John C. Coates, a member of the SEC's Investor Advisory Committee, remarked at a hearing before the Senate Committee on Banking, Housing and Urban Affairs, "[The issuer] has its own mouth too."[154]

Professor Coates went on to rebut the contention that issuer oversight of proxy research is necessary to ensure that accurate information enters the marketplace, saying:

---

[152] PA Proposal at 39, 84 Fed. Reg. at 66529.

**153**   In fact, issuers "get unlimited space in the proxy statement" to voice their opposition to shareholder proposals, while the proponents of such proposals have a maximum of 500 words to explain their point of view. Remarks of Michael Garland, Assistant Comptroller, Office of the New York City Comptroller, 2018 Roundtable Transcript *supra* note 76 at 160; 17 CFR § 240.14a-8(d).

[154] *Legislative Proposals to Examine Corporate Governance:* Hearing Before the S. Comm. on Banking Housing, and Urban Affairs, 115th Cong. (2018) (Statement of John C. Coates).

> *Anyone giving advice in a public way . . . is subject to anti-fraud rules enforced by the SEC. So, if ISS were to put out a report knowingly falsely, or negligently falsely, they would have liability for it. So I just want to be clear that if they deliberately misrepresent facts, they are going to be subject to liability. . . . On basic factual disputes we have an amply robust system for getting the information out there for investors.[155]*

This is not the first time some issuers have tried to interfere with shareholders' ability to communicate about their proxy votes. In opposing the Commission's 1992 shareholder-friendly package of reforms, the corporate community argued that management should have "'a role to play' in rebutting any misstatements or mischaracterization" in shareholder communications in order to ensure "that proxies are executed on the basis of 'correct' information." The Commission rejected that argument, observing that

> *much commentary concerning corporate performance, management capability or directorial qualifications or the desirability of a particular initiative subject to a shareholder vote is by its nature judgmental. As to such opinions, there typically is not a 'correct' viewpoint.[156]*

The proposal addresses this inconvenient truth by admitting that this rulemaking is not really about accuracy after all, but about giving registrants a say in the methodologies proxy advisers use and the opinions they express:

> *The registrant and certain other soliciting person [sic] may have disagreements that extend beyond the accuracy of the data used, such as differing views about the proxy advisor's methodological approach or other differences of opinion that they believe are relevant to the voting advice.[157]*

This admission reveals a far more serious infirmity with the proposal, which the Commission also identified in 1992:

> *A regulatory scheme that inserted the Commission staff and corporate management into every exchange and conversation among shareholders, their advisors and other parties on matters subject to a vote certainly would raise serious questions under the free speech clause of the First Amendment, particularly where no proxy authority is being solicited by such persons.[158]*

It is not clear why the SEC has had such a radical change of heart between 1992 and now, but one thing is certain: Proposed Rules 14a-2(b)(9)(ii) and (iii) are blatantly unconstitutional.

---

[155] *Id.*

[156] 1992 Release, supra note 46, 57 Fed. Reg. at 48278.

[157] PA Proposal at 43-44, 52, 84 Fed. Reg. at 66530, 66533.

[158] 1992 Release, 57 Fed. Reg. at 48279.

### 2. The proposal is unconstitutional.

Proxy advisers engage in speech at the core of the First Amendment by offering research, analysis, opinions, and recommendations to their clients about matters of critical public importance. Yet the proposal—which, remarkably, does not even *mention* the First Amendment— would commandeer proxy advisers' speech to serve the interests of issuers, and would grant issuers an extraordinary right to review proxy advisers' speech *before they communicate to their own clients*. The proposal also violates the Fifth Amendment's Takings Clause and eviscerates advisers' (and their clients') reliance interests by forcing proxy advisers to share valuable, confidential intellectual property with companies and other parties who have not paid for this information and have no contractual or other relationship with the advisers. The proposed rule amendments flout bedrock constitutional principles and would never pass judicial review if they were to be adopted. The government "may not, under the guise of prohibiting professional misconduct, ignore constitutional rights;"[159] yet that is precisely what the Commission proposes to do.

#### a. Proxy advisers' research, analysis, opinions and recommendations are core speech protected by the First Amendment.

When proxy advisers provide independent research, analysis, opinions and recommendations to their clients, they engage in speech and expressive activity protected by the First Amendment. The Supreme Court has made clear that "professional speech"—expert advice that clients receive from regulated entities—is not "a separate category of speech that is subject to different rules."[160] The Court's "precedents have long protected the First Amendment rights of professionals."[161] Because professionals may have "a host of good-faith disagreements, both with each other and with the government, on many topics in their respective fields," the government cannot pick winners and losers by burdening only one type of speech or speaker it deems disfavored.[162] Moreover, "when the government polices the content of professional speech," it unconstitutionally stifles the "'uninhibited marketplace of ideas in which truth will ultimately prevail.'"[163]

---

[159] *NAACP v. Button*, 371 U.S. 415, 439 (1963).

[160] *NIFLA v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

[161] *Id.* at 2374.

[162] *Id.* at 2374-75.

[163] *Id.* at 2374 (quoting *McCullen v. Coakley*, 573 U.S. 464, 476 (2014)).

Proxy advisers' speech and expression are at the core of the First Amendment's protections. Before proxy advisers like ISS entered the market, institutional investors often followed the so-called Wall Street Rule ("vote with management or sell") because it was too expensive and time-consuming to inform themselves about thousands of shareholder votes across all the companies in their investment portfolios.[164] Proxy advisers offer investors independent research, analysis, and recommendations to empower them to make better-informed decisions about how to vote on matters requiring shareholder approval, and to ensure they have "the information needed to hold corporations … accountable."[165]

Proxy advisers' speech, research, analysis, opinions and recommendations address matters of critical importance, including corporate transactions such as mergers and acquisitions, executive compensation, and a company's corporate governance policies. Proxy advisers may also offer their views about the extent to which corporate ballot measures comport with an investor's selected voting priorities regarding sustainability, labor relations, social responsibility, or other investor-specific criteria. In short, proxy advisers' research, analysis, opinions, recommendations and advice to their clients regarding corporate ballot proposals are unquestionably "form[s] of expression protected by the Free Speech Clause of the First Amendment."[166]

### b.  The inserted response provision of proposed Rule 14a-2(b)(9) imposes content-, speaker- and viewpoint-based burdens on protected speech that cannot satisfy any level of First Amendment scrutiny.

Proposed Rule 14a-2(b)(9)(iii) would force proxy advisers to include a hyperlink in their advice to clients directing the client to "a written statement prepared by the registrant that sets forth its views on the advice."[167] The assumption behind this proposal is that the issuer's views

---

[164] George W. Dent, Jr., *A Defense of Proxy Advisors*, 2014 Mich. St. L. Rev. 1287, 1288 (2014).

[165] *Citizens United v. FEC*, 558 U.S. 310, 370 (2010).

[166] *Sorrell v. IMS Health*, 564 U.S. 552, 557 (2011); *see also NIFLA*, 138 S. Ct. at 2371-75 (crisis pregnancy centers had First Amendment right in the messages they conveyed, or did not convey, to their patients); *Button*, 371 U.S. at 438 (First Amendment protects advice from attorneys to potential litigants about seeking legal assistance); *Legal Svcs. Corp. v. Velasquez*, 531 U.S. 533, 545 (2001) (a ban on "the analysis of certain legal issues" effectively "prohibits speech and expression"); *id.* at 546 (First Amendment implicated by law that impaired "the adequacy and fairness of professional representations"); *Bhd. of R.R. Trainmen v. Va. State Bar*, 377 U.S. 1, 7 (1964) (injunction prohibiting union from advising injured workers to obtain legal advice violated First Amendment); *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002) ("physician speech is entitled to First Amendment protection").

[167] PA Proposal at 53, 84 Fed. Reg. at 66533.

will *contradict* those of the proxy adviser; after all, the issuer would have no incentive to add a statement to advice it agreed with. The Commission expressly anticipates that publicly traded companies will use the hyperlink to voice "disagreements over facts and opinions" and to address purported "factual errors and methodological weaknesses" in the proxy adviser's advice.[168] The purpose of the hyperlink requirement, the Commission explains, is "ensuring that [investors] are able to consider registrants' views.[169] The Commission's attempt to commandeer proxy advisers' reports and systems in order to relay information that *contradicts* the advisers' own recommendations is an extraordinary burden on protected speech that cannot withstand any level of First Amendment scrutiny.

The First Amendment "requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message that it conveys.'"[170] Similarly, a law must satisfy strict scrutiny if it is "directed at certain content" or "aimed at particular speakers."[171] Strict scrutiny of the proposed response provision would be warranted because the provision targets particular *speakers* (proxy advisers) and particular *content* (proxy research and voting recommendations) based on the Commission's disagreement with the *message* or *viewpoint* of that speech (*e.g.*, its assumption that proxy advisers' speech is somehow inaccurate or insufficient and needs to be corrected or supplemented by issuers and certain other solicitors). That is the very definition of a content-based and speaker-based restriction on speech.[172] The fact that the regulated speech "results from an economic motive," does not reduce the level of scrutiny that applies to a content- and speaker-based restriction.[173]

Moreover, the Supreme Court has held that laws or regulations that force speakers to include supplemental notices or disclaimers are "content-based regulation[s] of speech."[174] "By compelling individuals to speak a particular message," such requirements "'alte[r] the content of

---

[168]  *Id.* at 56, 67, 84 Fed. Reg. 66534, 66537.

[169]  *Id.* at 53, 84 Fed. Reg. at 66333.

[170]  *Sorrell*, 564 U.S. at 566, (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989)).

[171]  *Id.* at 567.

[172]  *Id.*; *see also Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226, 2227 (2015) (law is content-based if it "target[s] speech based on its communicative content" or "defin[es] regulated speech by particular subject matter").

[173]  *Sorrell*, 564 U.S. at 567.

[174]  *NIFLA*, 138 S. Ct. at 2371.

… speech.'"[175]  Coerced speech is every bit as unconstitutional as coerced silence, as "the First Amendment guarantees … the decision of both what to say and what *not* to say."[176]  "Whenever the Federal Government … compels [individuals] to voice ideas with which they disagree," it "undermines" both "our democratic form of government" and "the search for truth."[177] Indeed, coercive disclosure requirements are particularly suspect under the First Amendment because they allow the government to favor certain speakers or messages over others.[178]  Requirements that speakers convey certain messages also "impermissibly require[] [individuals] to associate with speech [and speakers] with which [they] may disagree."[179]

Content-based disclosure requirements such as the one the SEC proposes to add to Rule 14a-2(b) must satisfy "strict scrutiny."[180]  Such laws "'are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.'"[181] Forcing a speaker to include *opposing viewpoints* within its own speech could never satisfy strict scrutiny. Because a "[g]overnment-enforced right of access inescapably 'dampens the vigor and limits the variety of public debate,'" "any such compulsion" to "print that which [the speaker] would not otherwise print" is "unconstitutional."[182]

Forcing proxy advisers to facilitate the distribution of issuers' opposing views alongside their own speech is strikingly similar to other laws and regulations that courts have struck down under the First Amendment.  The government can no more require proxy advisers to include within their own speech criticisms of their advice than it can

---

[175] *Id.* (*quoting Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)).

[176] *Riley*, 487 U.S. at 796-97.

[177] *Janus v. AFSCME*, 138 S. Ct. 2448, 2464 (2018).

[178] *NIFLA*, 138 S. Ct. at 2378; *Reed*, 135 S. Ct. at 2229.

[179] *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Calif.*, 475 U.S. 1, 15 (1986).

[180] *NIFLA*, 138 S. Ct. at 2371 (citing *Reed*, 135 S. Ct. at 2226); *accord Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994) ("Laws that compel speakers to utter or distribute speech bearing a particular message are subject to [strict] scrutiny.").  Note that compelling proxy advisers to disclose dissenting views in their proxy voting research reports is readily distinguishable from mandating conflict of interest disclosures under the federal securities, which, under some circumstances, may receive a lower level of First Amendment scrutiny. *SEC v. Wall Street Publishing Institute,* 851 F.2d 365, 372-73 (D.C. Cir. 1988).

[181] *NIFLA*, 138 S. Ct. at 2371 (quoting *Reed*, 135 S. Ct. at 2226).

[182] *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 256-57 (1974).

- require a utility company to "include in its billing envelopes speech of a third party with which the utility disagrees;"[183]

- require a newspaper to "grant[] a political candidate a right to equal space to reply to [its] criticism and attacks on his record."[184]

As Justice Kennedy emphasized in *NIFLA*, "[g]overnments must not be allowed to force persons to express a message contrary to their deepest convictions," and "it is not forward thinking to force individuals to 'be an instrument for fostering public adherence to an ideological point of view [they] fin[d] unacceptable."[185]

The Commission's goal of "offer[ing] … a greater variety of views" by "assist[ing] groups … that challenge" proxy advisers' advice is not a compelling state interest; it is unconstitutional viewpoint discrimination.[186]  That is because "[t]he variety of views that the Commission seeks to foster cannot be obtained by including speakers whose speech agrees with [the proxy adviser's]. [It] exists only where the relevant groups … disagree with [the proxy adviser's] views."[187] While the government might have a legitimate interest in "making a variety of views available" via regulations that are "content neutral," it does not have a legitimate interest in "abridg[ing] [one side's] rights in order to 'enhance the relative voice' of its opponents."[188]

The response provision cannot be justified on the grounds that it merely requires proxy advisers to publish *additional* or *supplemental* information provided by issuers and thus does not limit their *own* speech.  The Supreme Court has flatly rejected the notion that coerced speech can be justified on the ground that the compelled speaker "'is not prevented … from saying anything it wishe[s].'"[189] As the Court explained, a law that requires speakers to include certain messages within their speech "operates as a command in the same sense as a statute or regulation forbidding [the speaker] to publish specified matter."[190]

---

[183]  *Pac. Gas*, 475 U.S. at 4.

[184]  *Miami Herald*, 418 U.S. at 243.

[185]  *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring).

[186]  *Pac. Gas*, 475 U.S. at 12-13.

[187]  *Id.* at 13.

[188]  *Id.* at 20, 14.

[189]  *Miami Herald*, 418 U.S. at 256.

[190]  Id.

Nor can the response provision be saved by analogizing it to the so-called "fairness doctrine," a now-defunct policy imposed by the Federal Communications Commission that required broadcasters to present both sides of controversial issues.[191] The fairness doctrine was premised on the "scarcity" of broadcast frequencies at the time.[192] This "scarcity rationale" has been "criticized … since its inception."[193] Abridging First Amendment rights based on the scarcity of frequencies rests on "a distinction without a difference;"[194] "makes no sense" in light of technological developments;[195] and "lacks any textual basis in the Constitution."[196]

Many government entities over the years have attempted to expand the fairness doctrine to contexts other than over-the-air broadcasting, but the Supreme Court has consistently rejected those requests.[197] As the Court explained, the "special justifications for regulation of the broadcast media" are simply "not applicable to other speakers."[198]

The First Amendment would not tolerate the Commission's attempt to impose a "fairness doctrine" for proxy advice because "the rationale for applying a less rigorous standard of First Amendment scrutiny to broadcast regulation, whatever its validity in the cases elaborating it, does not apply in [this] context."[199] No "scarcity" problem exists here, because there is "no requirement to buy [proxy advisers'] services; [investors] can buy from one, all, or none."[200] Thus, unlike regulations of broadcasters, regulations of proxy advisers are subject to the "settled principles of

---

[191] *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 369 (1969).

[192] *Id.* at 390.

[193] *Turner Broad.* 512 U.S. at 638 & n.5.

[194] *Telecomm'ns Res. & Action Ctr. v. FCC*, 801 F.2d 501, 508 (D.C. Cir. 1986) (Bork, J.).

[195] *Action for Children's Television v. FCC*, 58 F.3d 654, 673 (D.C. Cir. 1995) (Edwards, C.J., dissenting).

[196] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 532 (2009) (Thomas, J., concurring).

[197] *See, e.g., Miami Herald*, 418 U.S. at 256-58 (print media); *Riley*, 487 U.S. at 795-98 (personal solicitation); *Pac. Gas*, 475 U.S. at 10 (mail); *Sable Comm'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 127-28 (1989) (telephone); *Turner Broad.*, 512 U.S. at 637 (cable television); *Reno v. ACLU*, 521 U.S. 844, 867-70 (1997) (internet).

[198] *Reno*, 521 U.S. at 868.

[199] *Turner Broad.*, 512 U.S. at 637.

[200] Nell Minow, *Regulating Proxy Advisors Is Anticompetitive, Counterproductive, and Possibly Unconstitutional*, Harv. L. Sch. Forum on Corp. Governance & Fin. Reg. (Mar. 2, 2018), bit.ly/2tYfGMZ.

our First Amendment jurisprudence"—including "the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message."[201]

Any attempt to defend proposed Rule 14a-2(b)(9)(iii) under the more lenient First Amendment standard of *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio* must also fail.  The *Zauderer* standard, which applies to laws that require disclosures of "purely factual and uncontroversial information about the terms under which … services will be available,"[202] is confined to "'commercial speech'"[203]—*i.e.*, "'speech that does no more than propose a commercial transaction.'"[204]  Because proxy advice "does much more than that,"[205] it is not the kind of purely commercial speech subject to *Zauderer*.[206]  Nor is the proposed response provision under 14a-2(b)(9) limited to disclosures of "purely factual and uncontroversial information."[207]  To the contrary, it requires proxy advisers to include within their speech issuers' *disagreements* with proxy advisers' research, analysis, and recommendations about how their clients should vote in upcoming shareholder votes. These disclosures are thus neither "factual" nor "uncontroversial."  Even if the response provision were subject to the *Zauderer* standard rather than strict scrutiny, *Zauderer* could not justify a rule forcing a speaker to supplement its own speech with another party's contradictory opinions on sharply contested issues.

Finally, regardless of the level of scrutiny that applies here, the proposal to allow issuers to insert content into independent proxy advice would violate the First Amendment because "more benign and narrowly tailored options are available."[208] As explained at length elsewhere in these comments,[209] proxy advice is already regulated exhaustively under the Advisers Act, which imposes the highest fiduciary duties of care and loyalty on investment advice.  The Commission

---

[201] *Turner Broad.*, 512 U.S. at 639; *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

[202] 471 U.S. 626, 651 (1985).

[203] *NIFLA*, 138 S. Ct. at 2372.

[204] *Harris v. Quinn*, 573 U.S. 616, 648 (2014).

[205] *Id.*

[206] *See NIFLA*, 138 S. Ct. at 2372; *Riley*, 487 U.S. at 796; *Pac. Gas*, 475 U.S. at 8-9.

[207] *Zauderer*, 471 U.S. at 651.

[208] *Riley*, 487 U.S. at 800.

[209] *Supra* at 21-23.

has not even tried to explain why robust enforcement of those requirements is insufficient to address any alleged concerns about the quality or accuracy of proxy advice without the need for coercive and burdensome restrictions on speech.

The Commission argues that its proposal is justified because it is "more efficient and timely" than other alternatives, such as having issuers communicate directly with shareholders if they disagree with a proxy adviser's analysis or recommendation.[210] But the Supreme Court has rejected an almost-identical argument even under intermediate scrutiny. As the Court explained in *McCullen v. Coakley*,[211] regardless of the level of scrutiny, there must be "a close fit between ends and means," and the government may not "too readily 'sacrific[e] speech for efficiency.'" The Commission's invocation of "efficiency" thus provides no basis for commandeering proxy advisers' speech. Supreme Court precedent is clear that the government may not "co-opt" a person's speech "to deliver [a] message" from someone else.[212] In sum, the Commission's "prophylactic, imprecise, and unduly burdensome rule … to reduce its alleged [investor] misperception,"[213] cannot survive tailoring analysis under any level of First Amendment scrutiny.

### c. The review and feedback provisions of proposed Rule 14a-2(b)(9) also cannot satisfy any level of First Amendment scrutiny.

To facilitate issuers' and certain other parties' ability to rebut proxy advisers' speech, the Commission also proposes to impose not one, but two, issuer reviews—a draft review and feedback period and a final review opportunity—on the proxy advice process.[214] These requirements would force proxy advisers to delay giving their research and recommendations to their clients until the issuer and certain other types of solicitors can first review and provide feedback on the draft advice, and then for another two business days so they can review the final research report and voting advice. The Commission hopes that these extraordinary intrusions and delays will improve the "accuracy and soundness of the information and methodologies used

---

[210] PA Proposal at 53, 84 Fed. Reg. at 66533.

[211] 573 U.S. at 486.

[212] *NIFLA*, 138 S. Ct. at 2376; *see also Mills v. Alabama*, 384 U.S. 214, 219-20 (1966) (rejecting the state's complaint that "'as a practical matter, because of lack of time, [inaccurate statements] cannot be answered or their truth determined until after the election is over'").

[213] *Riley*, 487 U.S. at 800.

[214] PA Proposal at 44-53, 84 Fed. Reg. at 66530-33.

to formulate proxy [advisers'] recommendations"—or at least give companies and other covered solicitors enough time to prepare the response that the proxy adviser must include in its report.[215]

Like proposed Rule 14a-2(b)(9)(iii), the review and feedback provisions proposed to be added as 14a-2(b)(9)(ii) impose speaker-based, content-based, and viewpoint-based burdens on protected speech and association. This provision imposes unique burdens on one category of speech (proxy advice) and speakers (proxy advisers) based on the Commission's belief that this speech needs to be improved to public companies' (and the Commission's) satisfaction. Proposed 14a-2(b)(9)(ii) is thus a mechanism through which the Commission seeks to *alter the message and content* of one specific category of speech provided by one category of disfavored speakers. This is unquestionably a content-based restriction under cases such as *Reed*, *NIFLA*, and *Sorrell*.[216]

The review and feedback provisions would also unconstitutionally compel speech and association by forcing proxy advisers to share their confidential research reports, analysis, opinions, and recommendations with issuers and other covered solicitors *before they may share it with their own clients.* This information is typically kept confidential because it contains not only the proxy adviser's proprietary analysis and methodologies, but also the client's confidential information (in the case of client custom voting criteria or policies). Under the First Amendment, a person's decisions whether to speak and with whom are beyond the government's control.[217] And "'forced associations that burden protected speech are impermissible.'"[218]

Proposed Rule 14a-2(b)((9)(ii) is a paradigmatic example of compelled speech and association, as it would force a speaker to *share* confidential, sensitive, draft information with a third party while *withholding* that information from the parties with whom the speaker does wish to communicate. The Commission's proposal is no different analytically from a patently unconstitutional law requiring that all news stories be shown to the subject of those stories anywhere from 5-7 business days before publication to improve "accuracy" and facilitate "review and feedback."

The review and feedback provisions would severely burden proxy advisers' speech and association in other ways as well. By forcing advisers to submit their draft proxy research and

---

[215] *Id.* at 11, 84 Fed. Reg. at 66520.

[216] *See supra* at 44 *et seq.*

[217] *Janus*, 138 S. Ct. at 2463.

[218] *Id.* (quoting *Pac. Gas*, 475 U.S. at 12).

recommendations for review by companies who are the subject of that research, this requirement "necessarily burdens [proxy advisers'] expression."[219] "[T]here can be little doubt that [proxy advisers] will feel compelled to respond to arguments and allegations made by [the companies]" and, thus, "alter [their] own message as a consequence of the government's coercive action."[220] "That kind of forced response is antithetical to the free discussion that the First Amendment seeks to foster."[221]

Even beyond this chilling compulsion for "feedback", the proposal would directly restrict proxy advisers' own speech and association. The proposed requirements would ban proxy advisers from releasing their research reports and recommendations to their clients for a set period of time—*i.e.*, until the issuer who is the subject of the research and voting recommendation first has the opportunity to review and critique the proxy adviser's draft report over either 3 or 5 business days, and then again until it has had a further two business days to review the finished report. But the First Amendment puts the decision of "when to speak" in the hands of the speaker, not the government.[222]

The burden on proxy advisers' First Amendment rights is further magnified by the fact that, under the proposal, proxy advisers would be forbidden to *change* or update their advice after the final review without starting the two-step review process all over again (which, of course, would be totally impracticable)—even to respond to the criticisms in the company's hyperlinked statement.[223] By "singl[ing] out [proxy advisers] and den[ying] them the right to address their chosen audience on matters of public importance," the proposed requirements are "'the purest example of a "law … abridging the freedom of speech."'"[224] Ironically, this would also lead to less accurate advice in cases where underlying facts changed during the lengthy and prescriptive process proposed. Proxy advisers would be at worst prohibited from, and at best hindered in, providing updates to their advice.

---

[219] *Pac. Gas*, 475 U.S. at 15.

[220] *Id.* at 16.

[221] Id.

[222] *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 747 (8th Cir. 2019); *see, e.g.*, *Mills,* 384 U.S. at 219 (invalidating law that prohibited electioneering on election day).

[223] PA Proposal at 48, 84 Fed. Reg. at 66531 n.121; *see Mills*, 384 U.S. at 220; *Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1008-09 (9th Cir. 2003); *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 431 (5th Cir. 2014).

[224] *FCC v. League of Women Voters of Calif.*, 468 U.S. 364, 384 (1984).

The proposed review and feedback provisions fail any level of First Amendment scrutiny, as there are numerous less-restrictive alternatives that do not require the compulsion or suppression of speech. Issuers are free to communicate as much information as they would like to investors to urge them to support or oppose a certain proposal.[225] To the extent an issuer's analysis or recommendations diverge from the analysis or recommendations provided by a proxy adviser, the investor can review the competing information and decide for itself which recommendation and analysis to follow. The Supreme Court has rejected the "highly paternalistic notion" that the government should be deciding how information is presented to the public.[226] The First Amendment assumes "that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them."[227] If issuers and the Commission dislike the content of proxy advisers' speech, the answer is more direct speech from issuers and the Commission, not a misguided attempt to manipulate the content or timing of proxy advisers' speech.

Moreover, as noted above, any purported concerns about the quality of proxy advice (although still unburdened by any reasonable proof or evidence) can be fully addressed through the Advisers Act's duties of care and loyalty without imposing a convoluted and burdensome preclearance requirement on proxy advisers' speech. Because these "more benign and narrowly tailored options are available," the Commission's "prophylactic, imprecise, and unduly burdensome rule … to reduce its alleged [investor] misperception" cannot survive scrutiny.[228]

> **d.    The review, feedback and response provisions of the proposed rule amendments cannot be saved from unconstitutionality on the ground that they involve merely eligibility for an "exemption."**

This rulemaking cannot be salvaged by the fact that proxy advisers are not *required* to claim exemptions under 14a-2(b)(1) and (b)(3).  The Supreme Court "has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely."[229]  Most notably, the government "may not deny a benefit to

---

[225] *See supra* at 41.

[226] Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 770 (1976).

[227]  Id.

[228] *Riley*, 487 U.S. at 800.

[229] *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."[230] In other words, the government cannot withhold an otherwise available benefit in order to "produce a result which it could not command directly."[231]

Those principles squarely control here. For all the reasons set forth above, the First Amendment flatly prohibits the Commission from adopting Rule 14a-2(b)(9)(ii) and (iii). The Commission cannot circumvent that constitutional prohibition by depriving proxy advisers of a valuable exemption unless they "voluntarily" give up their First Amendment rights. In sum, nothing about the First Amendment defects with the proposal changes depending on whether the speech restrictions are set forth in a mandatory "rule" or as preconditions to obtaining an "exemption."

### e. The review and feedback provisions violate the Takings Clause of the Fifth Amendment and interfere with proxy advisers' client relationships and legitimate reliance interests.

In addition to violating the First Amendment, proposed Rule 14a-2(b)(9)(ii) violates the Takings Clause and flouts proxy advisers' legitimate reliance interests in their longstanding advisory relationships with their clients. "A regulation" that "impedes the use of property" can be "so burdensome as to become a taking," even "without depriving the owner of all economically beneficial use."[232] The constitutional inquiry turns on "'a complex of factors,' including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action."[233]

Those factors all point to a regulatory taking here. Proxy advisers like ISS have developed proprietary methods for researching, analyzing, and providing voting recommendations on a variety of proxy issues, and taking a variety of different approaches reflecting different investor requirements—methods that are implemented and revealed in their advice to clients.[234] This research and advice (and the proprietary information it contains) is normally subject to confidentiality agreements between the proxy adviser and its clients. The proposal, however, would force proxy advisers to share this valuable, proprietary, confidential information with the

---

[230] *Id.*

[231] *Id.* (cleaned up).

[232] *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017).

[233] *Id.* (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)).

[234] *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984) (holding that "trade secrets" and "other kinds of intangible interests" are "property for purposes of the Fifth Amendment's Taking Clause").

subject of the adviser's analysis. That company or other covered solicitor is not only outside the professional relationship between the proxy adviser and client, but, as the Commission recognizes, may *disagree* with the proxy adviser.  The commenter thus has every incentive to attack and discredit its recommendations (especially when those recommendations differ from those of management).

The Takings concerns with this proposal are profound:  The Commission would be ordering advisers to share confidential, proprietary information with potentially disagreeing (and sometimes hostile) third parties who are the subjects of the research and therefore inherently conflicted before sharing it with their own clients, thereby destroying the confidentiality of this information and interfering with the adviser-client relationship. The proposal also severely upsets proxy advisers' legitimate reliance interests.[235] If finalized, the proposal would undermine the independence of proxy advice by injecting interested third parties in between the adviser and its clients. In this way, the proposal would not only mandate the disclosure of sensitive and confidential information but could also undermine proxy advisers' independence and threaten their ability to offer neutral, disinterested and independent advice to their clients. Those provisions would harm proxy advisers' ability to compete and upend their longstanding reliance interests and investment-backed expectations.[236]

That the proposal would allow proxy advisers to insist that companies sign confidentiality agreements does not in any way alleviate these concerns. The confidentiality agreements would "cease to apply once the proxy [adviser] provides its advice to one or more recipients."[237] And, regardless, courts refuse to presume that confidentiality agreements will protect sensitive business information "when the person to whom the information is disclosed is involved in 'competitive decision-making.'"[238] Proxy advisers and companies are in that competitive position, as the Commission concedes. Thus, the risk that the proposed regulations will expose proxy advisers' proprietary, confidential information presents a grave risk of an unconstitutional taking and interferes with proxy advisers' legitimate reliance interests in their adviser-client relations.

---

[235] *See, e.g.*, *Encino Motorcars v. Navarro*, 136 S. Ct. 2117, 2126-27 (2016) (holding that agency acted arbitrarily and capriciously in violation of the APA and was entitled to no deference where it failed to give due consideration to regulated industry's "serious reliance interests at stake").

[236] *See Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670 (1st Cir. 1998).

[237] PA Proposal at 140, 84 Fed. Reg. at 66558.  The proposal remarkably makes no provision for the subject of the advice to return or destroy the furnished draft and final proxy reports or to refrain from using them for the recipient's own purposes once the confidentiality agreement expires.

[238] *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 299 F.R.D. 498, 500 (W.D. Va. 2014) (collecting cases).

### f. At a minimum, the Exchange Act should not be construed to authorize the Commission's constitutionally defective proposed rule amendments.

At a minimum, the constitutional concerns about the proposed amendments to exemptions from the proxy rules for proxy voting advice are sufficiently serious that the Commission would not be deemed to have statutory authority to implement these regulations. For all the reasons set forth above, the best interpretation of the statute is that the Commission lacks *any* authority to regulate proxy advice as proxy solicitation.[239]  But even if the Commission has some statutory authority in this area, any such authority would not extend to regulations that require compelled speech, the taking of valuable intellectual property, and the commandeering of proxy advisers' communications with their clients.

The judiciary "must rightly presume that Congress acts consistent with its duty to uphold the Constitution," and "courts must make every effort to construe statutes so as to find their constitutional foundations and thus avoid needless constitutional confrontations."[240]  As the D.C. Circuit has explained, "[t]his canon of constitutional avoidance trumps *Chevron* deference, and we will not submit to an agency's interpretation of a statute if it 'presents serious constitutional difficulties[.]'"[241]

The constitutional avoidance canon applies with full force here. Even assuming—contrary to the plain text of the statute—the Commission has some limited authority to regulate proxy advice as proxy solicitation, there is not the slightest indication in the relevant statutes that Congress intended to grant the agency authority to push the constitutional bounds of the First Amendment and Takings Clause by micromanaging proxy advisers' speech and destroying their valuable intellectual property.

### 3. The proposal upends almost ninety years of federal securities regulation.

In response to the "perception of many registrants" that "they lack an adequate opportunity to review proxy voting advice before it is disseminated" to shareholders, and that they "need" to "conduct a meaningful assessment of the advice and communicate any concerns or errors regarding the advice,"[242] the Commission proposes to force proxy advisers to give registrants and

---

[239] See *supra* at 5-16.

[240]  Nat'l Mining Ass'n v. Kempthorne, 512 F.3d 702, 711 (D.C. Cir. 2008) (quoting Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988); Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 348 (1936) (Brandeis, J., concurring)).

[241]  *Nat'l Mining Ass'n*, 512 F.3d at 711.

[242]  PA Proposal at 39 and 52, 84 Fed. Reg. at 66529, 66533.

certain other parties two chances to review research and voting advice before it is disseminated to shareholders, along with mandatory opportunities to provide feedback and to insert a link to the affected party's assessment of that advice into the advice and any electronic medium used to deliver the advice.[243]  In making this proposal, the SEC accepts without question the corporate community's contention that blatantly self-interested parties should have a say in the methodologies a proxy adviser employs and the opinions it conveys to the investors who are its clients.  Despite the SEC's efforts to normalize this astounding thesis, it is anything but normal.

As Commissioner Peirce has recognized, Congress' decision 87 years ago to create a disclosure-based regime over a merit-based regime is "[o]ne of the foundational principles of our federal securities laws."[244]  Thus, the Commission does not review securities offerings for fairness, conflicts of interest, or other merit-based elements, but requires issuers to make accurate disclosure of material information so offerings may be judged by investors.[245]  Likewise, the Commission does not regulate the "substance of credit ratings or the procedures and methodologies by which any [registered credit rating agency] determines credit ratings,"[246] and there is no role for merit-based review under the Advisers Act.  While the Commission does not propose to review the merits of proxy voting advice directly, it does propose to deputize registrants and certain other parties for that purpose, and to interpose them between advisers and their clients.  In this respect, the proposal is without precedent.

The U.S. securities laws have never required a financial advisor to have its research, opinions and recommendations reviewed by the subjects of its advice, nor have the securities laws ever given the subjects of advice the right to provide "feedback" to the advisor.  In fact, the opposite is true.  As explained below, broker-dealers are forbidden by FINRA Rule 2241 to afford subject companies the right of prepublication review of analyst reports for any purpose other than verification of facts.[247]  Before a draft report can be delivered to the subject company for a factual review, the research summary, research rating and price target must be removed, and a copy of the complete

---

[243] Proposed Rule 14a-2(b)(9)(ii) and (iii).  The first review would cover the proxy adviser's draft proxy advice, while the second would cover the final advice.

[244] Commissioner Hester S. Peirce, *Wolves and Wolverines: Remarks at the University of Michigan Law School* (September 24, 2018).

[245] See Commissioner Daniel M. Gallagher, *Remarks at Society of Corporate Secretaries & Governance Professionals* (July 11, 2013).

[246] Exchange Act, § 15E(c)(2),

[247] *See infra* at 65.

draft must be delivered to the firm's legal or compliance department. If the research department decides to change the proposed rating or price target after the subject company's review, the research department must provide written justification to, and receive written authorization from, legal or compliance personnel for the change.[248]

At the 2019 SEC Speaks program, the SEC's Investor Advocate noted the parallel between protecting the independence of sell-side recommendations and protecting the independence of proxy voting recommendations, saying:

> *Consider, for example, the rules currently in place for sell-side research, which generally aim to prevent issuers from influencing the research produced by investment firms. . . . I ask, why should the principle be any different when it comes to the independence of voting recommendations?"[249]*

Institutional investors who use proxy advisory services have said the same thing and have observed that allowing issuers to "police" proxy advisers would destroy the accuracy, independence and objectivity the institutions need to fulfill their own fiduciary responsibilities.[250]

The Commission's proposal to upend almost 90 years of federal securities regulation is a slippery slope to a dangerous place.

Imagine that three investment advisers—a proxy adviser, an adviser that furnishes non-discretionary investment advice, and a discretionary portfolio manager—all determine that the management of Company X is making bad decisions. The proxy adviser decides to recommend that its clients vote against the election of one or more of Company X's directors. The non-discretionary adviser decides to recommend that its clients refrain from buying shares of

---

[248] Supplementary Material .05 to FINRA Rule 2241.

[249] Statement of Rick Fleming, SEC Investor Advocate (April 8, 2019) at note 18.

[250] 2018 T. Rowe Price Letter, *supra* note 146 at 3 ("We fail to see why the independence of sell side recommendations should be afforded greater protection than the independence of proxy recommendations"). *See also* letter from Paul Schott Stevens, President and CEO, Investment Company Institute to Vanessa Countryman, Acting Secretary, SEC (March 15, 2019) at 13 ("Fund advisers expect and must receive independent, objective, and accurate information from proxy advisory firms"); and letter from Jeff Mahoney, General Counsel, Council of Institutional Investors, *et al.,* to Jeb Hensarling and Maxine Waters, Committee on Financial Services, Re: Proposed Legislation Relating to Proxy Advisory Firms, (November 9, 2017) at 3 ("Currently, proxy advisors provide equity holders of U.S. corporations with independent advice. [Proposed bills to regulate proxy advisory firms] threaten to abrogate that very independence, which is a hallmark of ownership and accountability").

Likewise, the Investment Adviser Association—a non-profit association with more than 650 federally-registered investment adviser members managing more than $25 trillion—recently characterized the Interpretation and Guidance and this rulemaking "not just as bad policy, but as a major step backwards for corporate governance and the independence of proxy advice." IAA Newsletter, Issue Number 325, January 2020 at 3.

Company X and sell the shares they already hold. The discretionary manager decides to rid its managed accounts of all Company X securities.  If the management of Company X has the right to review and provide feedback on the proxy adviser's vote recommendations before they are made to investors, why should management not have the same rights in the case of the other advisers?  What is to protect the non-discretionary manager from having to clear its research and investment recommendations through the company?  What is to protect the discretionary manager from having to submit its investment committee's decisions to the company for review and feedback before it is allowed to trade its clients' portfolios?  The Commission's differential treatment of these highly analogous scenarios would be a clear example of arbitrary decision-making if the proposed rules were finalized.

ISS urges the SEC to take a hard look at the implications of proposed Rule 14a-2(b)(9)(ii) and (iii) and to eliminate these sections from further consideration.

### 4.  The proposal is inconsistent with proxy advisers' existing regulatory obligations.

Another problem with the proposal is that compliance with Rule 14a-2(b)(9)(ii) and (iii) would interfere with a proxy adviser's obligations under the Advisers Act and, where applicable, ERISA.  As explained above, investment advisers have a fiduciary duty of loyalty which obliges them to act in their clients' best interests and not to put their own interests ahead of those of their clients.  Subjecting a proxy adviser's methodologies, research and opinions to pre-release review and comment by the subjects of the advice introduces a new conflict of interest that would be challenging and costly to mitigate.

Although the Commission says that the proposal merely empowers registrants and certain other interested parties to "suggest revisions before the distribution of the advice" and does not require proxy advisers "to accept such suggested revisions," the Commission couples this statement with a warning that failure to accept "suggested revisions" could expose the proxy adviser to liability under Rule 14a-9.[251]  This rule (about which, more below) prohibits materially misleading statements or omissions in proxy solicitations.  While the rule historically has been used in cases of factual misstatements and omissions and not for disputes over honestly-held opinions, the Commission last year expressed the unprecedented view that "opinions, reasons, recommendations, or beliefs" can be "statements of material fact" actionable under Rule 14a-9.[252]

---

[251] PA Proposal at 51, 84 Fed. Reg. 66532.

[252] Interpretation and Guidance, *supra* note 2 at 11, 84 Fed. Reg. at 47419.

Since the instant rulemaking is a thinly-veiled effort to give public companies control over proxy advice in order to quell shareholder dissent,[253] it does not take much imagination to connect the dots between a proxy adviser's rejection of a registrant's "suggested revisions" and 14a-9 litigation. Incentivizing advisers to skew their vote recommendations in management's favor in order to avoid the costs of defending baseless lawsuits contravenes the fiduciary principles that underpin the Advisers Act.

Not only would the proposal force proxy advisers to design new compliance procedures to evaluate "suggested revisions" to their benchmark, specialty and (presumably) custom[254] advice to somehow balance issuer dissatisfaction with their responsibilities to their investor clients, but the proposal would also force advisers to mitigate and disclose their own, new self-interest conflict in not getting sued for upsetting management or other interested parties.

In addition to interfering with proxy advisers' fiduciary responsibilities under the Advisers Act, the proposal also conflicts with advisers' obligation to implement reasonably effective insider trading compliance procedures.[255] Depending on the matter requiring shareholder action, a proxy vote recommendation might constitute material, nonpublic information ("MNPI"), the selective disclosure of which could diminish the fairness of the securities markets and harm investors. The SEC dismisses such concerns by pointing to a provision in the proposal that would allow proxy advisers to condition the selective release of their draft proxy research reports and vote recommendations on the recipients' agreeing to keep the materials confidential and to refrain from commenting on them until the advice has been provided to one or more of the adviser's clients. The SEC analogizes this situation to the use of confidentiality agreements to exempt the communication of MNPI from triggering the public disclosure requirements of Regulation FD.[256]

ISS does not share the Commission's confidence in this safeguard.

---

[253] In this regard, we note that one of the loudest proponents of giving registrants review and feedback rights and the right to insert content into proxy advisory reports also urged the SEC to create a fiduciary safe harbor for any portfolio manager who either votes all proxies in favor of management or refrains from voting altogether. Letter from Neil A. Hansen, Vice President, Investor Relations and Corporate Secretary, ExxonMobil, to Vanessa Countryman, Secretary, SEC (July 26, 2019), available at https://www.sec.gov/comments/4-725/4725-5879063-188728.pdf ("ExxonMobil Letter").

[254] As indicated above, it is not clear whether the SEC intends to subject advice based on clients' custom proxy voting policies to the proposed rule revisions. *See supra* at 27-28.

[255] Advisers Act, § 204A, added by the Insider Trading and Securities Fraud Enforcement Act of 1988, Pub. Law 100-704, 102 Stat. 4677.

[256] PA Proposal at note 126 and accompanying text.

The distribution to management and certain dissident shareholders of multiple vote recommendations for each ballot item on each proxy for each public company in the United States will inevitably lead to the deliberate or accidental misuse of MNPI, regardless of any non-disclosure agreements. The Regulation FD safe harbor is not analogous to the proposal, because public companies are not compelled to selectively disclose confidential, market-moving information, but rather can assess the risks of disclosure on a case-by-case basis.

By contrast, proposed Rule 14a-2(b)(9)(ii) would force a proxy adviser to disclose MNPI to any issuer or covered dissident shareholder who signs a confidentiality agreement, even if that party is a known insider trader. Forcing disclosure in such cases would interfere with the adviser's obligation under the Advisers Act to establish, maintain and enforce policies and procedures reasonably designed to ensure compliance with the insider trading laws. It also would interfere with the adviser's duty to periodically test the sufficiency of its procedures and the effectiveness of their implementation, because even if the adviser determines that its pre-published proxy advice has been misused, it must continue to selectively disclose that information to the offending party(ies).[257]

The fact that ISS currently voluntarily provides certain issuers with a limited right to review the factual accuracy of data included in pending proxy research reports does not make the proposal any less objectionable. In order to protect the integrity of ISS' proxy advice and our singular focus on the best interests of our investor clients, the existing review process remains under the control of ISS and does not elicit feedback on ISS voting policies or the interpretation and application thereof.[258] Because substantially the same data are used to produce all ISS proxy voting reports, only benchmark reports, and not specialty or custom reports are available for pre-review, thereby further safeguarding the independence of our proxy advice, and enabling timely delivery of the research and recommendations to our clients.

ISS also takes steps to safeguard MNPI by not pre-releasing potentially market-moving draft reports and vote recommendations. In this regard, ISS allows selected issuers a limited review right of draft reports only for annual meetings, not special meetings. Furthermore, drafts are not provided for any annual meeting where the agenda includes a merger or acquisition

---

[257] Advisers Act Rule 206(4)-7. The Commission does not say whether it expects proxy advisers to enforce their confidentiality agreements through litigation or otherwise, but if that is the expectation, the cost of such actions must also be factored into the Commission's economic analysis of this proposal.

[258] ISS does, however, invite issuer engagement during the formulation of annual proxy voting policies and guidelines. ISS' transparent policy development process includes a Policy Survey to identify issues that merit attention, as well as a notice and comment period designed to elicit feedback on the practical implementation of proposed policies.

proposal or proxy fight, or where it involves a situation that ISS, in its discretion, considers to be of a controversial or potentially market-moving nature, such as a "vote-no" campaign. ISS also makes it clear that any public release or redistribution of a draft analysis or the information contained therein may result in forfeiture of eligibility to review future draft reports. The proposal would mandate draft reviews in all such situations, raising significant concerns about confidentiality, selective disclosure of material non-public information, and the ability of proxy advice to be appropriately responsive to important and often fast-moving situations such as proxy fights and contested mergers and acquisitions.

### 5. The proposal is unworkable.

The proposed review, feedback and response-insertion provisions would impede proxy advisers' ability to deliver research and voting recommendations on U.S. corporations in a timely fashion. ISS estimates that the proposed review and feedback rights for registrants and certain other soliciting parties alone could reduce our report delivery time to our clients by between 45 and 65 percent. Getting confidentiality agreements in place with each registrant and other soliciting party who will have access to ISS' advice before it is transmitted to clients and arranging for active and appropriately co-ordinated hyperlinks where necessary will cause further delays. As a result, it is highly unlikely that ISS will be able to meet the high expectations of its clients to deliver research reports and vote recommendations to them sufficiently in advance of shareholder meetings to allow them ample time to review and consider our reports as they make their voting decisions. This would also reduce the time shareholders have to engage with companies after reviewing the research reports and before the meeting. These are both ironic results, given the importance the Commission places on having institutional investors carefully consider proxy advisers' recommendations before deciding to act on them.

### 6. Additional Comments on Proposed Rule 14a-2(b)(9)(i)

Without waiving or diminishing our challenge to the Commission's authority to regulate proxy advisers under Section 14(a), or any other argument made herein, ISS offers the following comments on certain questions the Commission has asked about its proposed adoption of Rule 14a-2(b)(9)(i):[259]

### 7. The text of proposed Rule 14a-2(b)(9)(i) is unnecessarily complicated and confusing. Material transactions and relationships described in subsection (B) are

---

[259] *Id.* at 35 *et seq.*, 84 Fed. Reg. at 66527 - 66528.

subsumed in the direct or indirect material interests described in subsection (A).  And both (A) and (B) can be folded into subsection (C) by eliminating the word "other" in the first line.  As so revised, the provision would require disclosure of "Any information regarding the interest, transaction, or relationship of the proxy adviser (or its affiliates) that is material to assessing the objectivity of the proxy voting advice in light of the circumstances of the particular interest, transaction, or relationship."

ISS further urges the SEC to drop the use of the term "proxy voting advice businesses" and refer to these entities as "proxy advisers" or "proxy advisory firms" instead.  There is no reason to create a new nomenclature when the marketplace already knows these entities by another name.

9.  As explained above, the feedback we receive from many of our clients and that others have commented on is that most users of proxy advisory services believe that existing disclosures address all the concerns discussed in this release.  The release does not identify any type of proxy adviser conflict that is not already being effectively disclosed.

10.  Proxy advisers should be governed by a principles-based regulatory regime. For this reason, the Commission should not require such firms to disclose specific qualitative or quantitative information or impose prescriptive standards regarding the method of conflict disclosure.  There is no reason to treat conflict disclosure by proxy advisers any differently from the way conflict disclosure by portfolio managers or any other type of investment adviser is treated.  The guiding principle for all advisers should be "full and fair" disclosure, as that concept was described in the Fiduciary Standard Release:

> In order for disclosure to be full and fair, it should be sufficiently specific so that a client is able to understand the material fact or conflict of interest and make an informed decision whether to provide consent. . . .

> Whether the disclosure is full and fair will depend upon, among other things, the nature of the client, the scope of the services, and the material fact or conflict.  Full and fair disclosure for an institutional client (including the specificity, level or detail, and explanation of terminology) can differ, in some cases significantly, from full and fair disclosure for a retail client because institutional clients generally have a greater capacity and more resources than retail clients to analyze and understand complex conflicts and their ramifications.[260]

11., 16. & 17.  Another key reason to avoid overly prescriptive conflict disclosure requirements is to avoid interfering with proxy advisers' existing conflict management

---

[260] Fiduciary Standard Release, *supra* note 92 at 24-26, 84 Fed. Reg. at 33676-77.

policies and procedures. As explained above, ISS has implemented a comprehensive and robust set of conflict controls designed to meet the fiduciary standards of the Advisers Act. These controls include a firewall which would be compromised if conflict information were required to be publicly disclosed, or if disclosure were required to be displayed in or on a research report, instead of "around" the report as is currently the case. Proxy advisers do not need to embed their conflict disclosures or their conflict mitigation policies and procedures in their advice to make those disclosures full, fair and readily accessible to the users of our reports.

14. If the SEC adds subsection (b)(9) to Rule 14a-2, there is no reason to subject proxy advisers to the "significant relationship" disclosure requirement under subsection (b)(3)(ii). As explained above, the Commission adopted that exemption for financial advisors who provide voting advice to shareholders who have not asked for it, and not for proxy advisers, whom the SEC has characterized as fiduciaries. Introducing other random or disparate standards from the proxy rules or Regulation S-K would add nothing but confusion. The standard for identifying disclosable proxy adviser conflicts should simply be "materiality" — a standard both proxy advisers and their investor clients fully understand.

19. Registered proxy advisers are already obliged to make full and fair conflict disclosure in their ADV Forms which are publicly available through the SEC's Investment Adviser Public Disclosure ("IAPD") database. The SEC should not mandate public disclosure beyond that. Furthermore, many proxy advisers voluntarily post information about their conflict mitigation practices on their websites. In so doing, they are able to decide for themselves how best to safeguard their sensitive business information. Forcing advisers to publicly disclose granular information about product sales and revenue would be anti-competitive.

20. & 21. Registered proxy advisers are already required to make conflict disclosures to clients in response to designated questions in the Form ADV; to describe their Codes of Ethics and to offer copies of those Codes to clients and prospective clients upon request. There is no reason to subject advisers who furnish non-discretionary proxy research and vote recommendations to more stringent standards than those that apply to advisers who make buy/sell recommendations or advisers who exercise investment discretion over client assets.

22.  As noted above, ISS believes that proposed subsection (b)(9)(i)(B) should be eliminated, because the principles-based language in subsection (b)(9)(i)(C) is sufficient to protect investors.  ISS also strongly objects to the proposed requirement in (b)(9)(i)(B) that proxy advisers search publicly available information to identify possible affiliates of registrants, shareholder proponents and other "soliciting persons" to determine whether or not the adviser might have a relationship, or be engaged in a transaction, with such parties. If such a search uncovers a possible affiliation ISS was not otherwise aware of, there would be no benefit to offset the cost and delay because any such relationship could not have compromised the integrity of the proxy advice in the first place.

Furthermore, ISS does not support the imposition of mandatory structural "reforms."  While ISS already has separated its proxy research/analysis activities from its other business lines, this type of separation might not be feasible or appropriate for all proxy advisory firms.  Proxy advisers come in many shapes and sizes and a one-size-fits-all approach would have a negative effect on competition and on investor choice.

Finally, ISS cannot help but note the irony of the proposal's reference to the global analyst research settlements.[261]  These settlements resulted from a series of turn-of-the-century scandals involving conflicted reports by research analysts at investment banks. In addition to structural reforms, the settling defendants agreed to make independent research available to their customers for a period of five years.  Apart from the settlement, the Commission approved a package of self-regulatory organization rules (now consolidated in FINRA Rule 2241) in order to "restore investor confidence in the analysts' work" by requiring independence in research and recommendations.[262]  In this regard, Rule 2241 requires FINRA members to establish, maintain and enforce written policies and procedures designed to identify and effectively manage conflicts of interest related to the preparation, content and distribution of research reports.  Such policies and procedures must, among other things, "*prohibit* prepublication review of a research report by the subject company for purposes other than verification of facts."[263]

The proposal to *mandate* prepublication review by the subject companies not just of

---

[261] PA Proposal at 38, n. 92 and accompanying text, 84 Fed. Reg. at 66528.

[262] Lori Richards, Director, Office of Compliance Inspections & Examinations, SEC, Speech by SEC Staff: Analysts Conflicts of Interest—Taking Steps to Remove Bias (May 8, 2002); *See also* Order Approving Proposed Rule Changes by the NASD and NYSE, Exchange Act Release No. 45908, 67 Fed. Reg. 34968 (May 15, 2002).

[263]  FINRA Rule 2241(b)(2)(N) (emphasis supplied).

facts, but also of the research, analysis, opinions and recommendations in all proxy research reports, and to afford such companies the right to insert their own content into the proxy reports would put the provision of "independent research" to the proxy advice marketplace significantly at risk, because every proxy advisory report would carry an issuer taint.

23.    Proxy voting advice is a form of investment advice.  A proxy adviser is a type of investment adviser.  Investment advisers are regulated under the Advisers Act, a regime that addresses the identification, management and disclosure of conflicts of interest. Consequently, the SEC should regulate all proxy advisers under the Advisers Act in lieu of adopting proposed Rule 14a-2(b)(9)(i).  Doing so would align proxy advisers' duties with the duties that their investment adviser clients owe to their own clients, thus providing the ultimate investors and their beneficiaries with two layers of fiduciary protection.

### 7.  Additional Comments on Proposed Rules 14a-2(b)(9)(ii) and (iii)

Without waiving or diminishing our challenge to the Commission's authority to regulate proxy advisers under Section 14(a), or any other argument made herein, ISS offers the following additional comments on certain questions the Commission has asked about its proposed adoption of Rule 14a-2(b)(9)(ii) and (iii).[264]

25.    Because there are no legitimate concerns about investors' ability to get accurate and complete proxy voting advice, there is no justification for adding the proposed conditions to the exemptions in Rules 14a-2(b)(1) and 14a-2(b)(3).

29.    Tinkering with the details of this proposal cannot rehabilitate it.  Allowing an inherently self-interested party to have a say in a proxy adviser's opinions about that party is insupportable, regardless of any ancillary disclosure about the details of the intrusion.

31.    Neither proxy advisers nor their shareholder clients should be expected to pay for issuers' intrusion into their relationship.  Having issuers pay for the privilege of influencing proxy advice would make the intrusion all the more dangerous.  The best way to protect investors is to remove the intrusion altogether.

---

[264]  PA Proposal at 60 *et seq.*, 84 Fed. Reg. at 66535 *et seq.*

32.  Congress enacted Exchange Act Section 14(a) to control unfair practices by corporate insiders.[265]  Using this provision to give issuers an inappropriate and inherently conflicted role in the production of proxy advice, while denying the same rights to shareholder proponents and persons engaged in exempt solicitations flips the congressional intent behind this provision on its head.  But to be clear, ISS does not believe that any of these parties should have a mandated say in the methodologies ISS uses or the research and opinions it renders to its clients.

33.  It is even more inappropriate to give issuers or other interested parties the right to review, comment on and insert content into proxy advice based on clients' own proprietary custom guidelines.[266]

36.  If the Commission insists on pursuing rulemaking in this area, ISS urges the Commission to harmonize the issuer pre-release review provisions with the equity analyst review provisions found FINRA Rule 2241, and with existing requirements under the Advisers Act.   For the Commission's convenience, we offer the following suggestion:

1.  *Proxy Advisory Research Reports; Identifying and Managing Conflicts of Interest*

(a) A proxy advisory firm must establish, maintain and enforce written policies and procedures reasonably designed to identify and effectively manage and disclose conflicts of interest related to the interaction between research analysts and those outside of the research department, including subject companies or other interested parties.

(b) A proxy advisory firm's written policies and procedures must be reasonably designed to promote objective and reliable research that reflects the truly held opinions of research analysts and the rendering of proxy voting advice that is in the best interests of the proxy advisory firm's clients.  Such policies and procedures must prohibit prepublication review of a proxy voting research report by a subject company or other interested party for purposes other than verification of facts.

2.  *Submission of Sections of a Draft Research Reports for Factual Review*

Consistent with the requirements of paragraph 1.(b) above, sections of a draft research report may be, but are not required to be, provided to the subject company or other interested party for factual review so long as:

---

[265] *See supra* at 8-9.

[266] *See supra* at 27-28.

(a) the sections of the report submitted do not contain the vote recommendation, or substantive analysis affecting the recommendation;

(b) a complete draft of the report is provided to legal or compliance personnel before sections of the report are submitted to the subject company or other interested party; and

(c) if, after submitting sections of the report to the subject company, the research department intends to change the proposed vote recommendation, it must first provide written justification to, and receive written authorization from a senior analyst, or legal or compliance personnel for the change. The proxy adviser must retain copies of any pre-reviewed draft and the final version of such report for five years after publication.

39.  Although confidentiality agreements may be of limited utility in the case of compulsory disclosure, proxy advisers nevertheless should be allowed to require them as a condition to giving interested parties an advance look at proxy advice.  However, requiring the terms of a confidentiality agreement with a registrant or other interested party to be no more restrictive than those of similar types of confidentiality agreements the proxy adviser uses with its clients, is unworkable, because ISS does not selectively disclose its pre-published reports and recommendations to clients.  The confidentiality arrangements ISS has with its clients are for a different purpose and not a suitable model for the pre-release of MNPI to the subjects of the proxy advice.

40.  As explained above, it is constitutionally impermissible to compel proxy advisers to link their advice to contrary (or any) statements by registrants or other interested parties.

43.  If this rulemaking does move forward, the Commission should codify the view that a proxy adviser is not liable for the content of a registrant's or other soliciting party's statement hyperlinked or otherwise inserted into proxy advice. The Commission also should affirm that a proxy adviser will not be liable if the recipient of pre-publication proxy advice misuses MNPI contained therein.  Proxy advisers who are compelled to release drafts of their advice should not be responsible for enforcing confidentiality agreements with the recipients of those drafts. The moral hazard here lies squarely on the Commission's shoulders.

44.  The Commission should not require proxy advisers to disable automated features of their voting platforms in instances where a registrant has

responded to voting advice or otherwise.  This is another bad idea from a vocal corporation seeking to stifle shareholder dissent.[267]  The principles-based regulatory regime established under the Advisers Act is flexible enough to enforce investment advisers' fiduciary duties even in a fully automated environment.[268]  The Commission should not micromanage institutional investors' operations or dictate the tools and services they use in serving their clients.

46. & 48.  Likewise, the Commission should refrain from micromanaging the interactions between proxy advisers and registrants or other covered soliciting parties.  Proxy advisers should have the flexibility to determine the best way to manage any engagement with, or review of information by, issuers—if at all—while satisfying their fiduciary duties to their clients.

47.  As discussed below, implementation of the proposed rules would require significant changes to the systems and processes currently used to prepare and deliver proxy research reports and voting recommendations.[269]  For several reasons, the current draft review process which ISS has voluntarily implemented is not an appropriate or relevant benchmark for assessing the potential impact of the fundamentally different regime that would be required under the rulemaking.  In addition to the unprecedented two-step issuer review process, a key distinguishing factor is the sheer increase in the number of proxy research reports which would be eligible for the pre-review rights.  Administering this vastly expanded and prescriptive process would necessitate increased personnel and technology enhancements.  This would include everything from the new work associated with identifying and communicating with eligible issuers, negotiating and implementing confidentiality agreements, tracking and processing the multiple rounds of issuer feedback which would vary based on issuer filing dates, and facilitating the hyperlinks to issuers' statements in response to a proxy advisors proxy research reports.

---

[267] ExxonMobil Letter, *supra* note 253 at 21.

[268] Fiduciary Standard Release, *supra* note 92 at note 27, citing Division of Investment Management, "Robo-Advisers," IM Guidance Update No. 2017-02 (February 2017), available at https://www.sec.gov/investment/im-guidance-2017-02.pdf.

[269] *See infra* at 76-77.

49. - 51.  These questions assume facts not in evidence.  There is no credible evidence of factual errors or methodological weaknesses in proxy advisers' research and advice.

## C. The Liability Component; Proposed Changes to Rule 14a-9

The SEC further proposes to amend Rule 14a-9 to include examples of information that, if omitted from proxy advice, could serve as the basis of anti-fraud claims against the proxy adviser.    Such information would include: the proxy adviser's methodology, sources of information, conflicts of interest or use of standards that materially differ from relevant standards or requirements that the Commission sets or approves.[270]   This obligation presumably would apply even where the methodologies and standards the proxy adviser uses in formulating its advice are dictated by its investor clients on a proprietary, custom basis.

The Commission bases this part of the proposal on the very shaky foundation of the Interpretation and Guidance which, in an unprecedented bending of the plain meaning of "fact," indicated that a proxy adviser could be sued for its "opinions, reasons, recommendations, or beliefs."[271]   In staking out this novel position, the Commission sought support from cases that are factually inapposite to the circumstances around proxy advisory firms.  For example, the Commission cited *Virginia Bankshares v. Sandberg,*[272] but in that case, the court confined its discussion to statements of belief and opinion that corporate directors made about a recommended course of action, knowing they did not hold the beliefs and opinions they expressed. Courts applying *Virginia Bankshares* have said, "While material statements of fact are false if they are contradicted by true facts, material statements of opinion are false only if the opinion was not sincerely held."[273]   Other courts have held that "quibbles" with the methodology used in a fairness opinion summarized in a proxy statement "cannot be the basis of a disclosure claim."[274]

Moreover, the First Amendment prohibits any rule that would impose liability based on an adviser's "opinions," "beliefs," or "recommendations," including an adviser's decision to use

---

[270]  *See* proposed note (e) to Rule 14a-9.

[271]  *See supra,* note 252.

[272]  501 U.S. 1083, 1090, 115 L.Ed. 2d 929, 944, 111 S. Ct. 2749, 2757 (1991).

[273]   *Bond Opportunity Fund v. Unilab Corp.,* 2003 U.S. Dist. LEXIS 7838 (S.D.N.Y. 2003) at *16, *quoting In re McKesson HBOC, Inc. Securities Litigation,* 128 F. Supp. 2d 1248, 1265 (N.D. Cal. 2000).

[274]  *Ridler v. Hutchinson Tech., Inc.,* 216 F. Supp. 3d 982, 989 (D. Minn. 2016) *quoting In re 3Com,* 2009 Del. Ch. LEXIS 215 (2009) at *6.

standards different from the ones set or approved by the SEC.  By definition, an opinion or recommendation cannot be proven true or false. Courts have thus consistently rejected attempts to impose liability on speakers for non-factual statements of opinion or belief.[275] A speaker's opinion, belief, or recommendation is at the very core of protected expression and cannot, consistent with the First Amendment, be subject to liability on the ground that it is somehow inaccurate or incomplete.

Undeterred by the dearth of legal support for its new interpretation or the serious constitutional concerns it entails, the Commission now proposes to use the litigation hammer of Rule 14a-9 to allay concerns expressed by the corporate community that they may be judged by anything other than the minimum corporate governance standards allowed by law.  The examples the SEC cites – director independence and the frequency of shareholder votes on executive compensation-- are at the top of registrants' list of pet peeves regarding shareholders and the parties who advise them.[276]

On the other hand, the SEC does not suggest that the clients of proxy advisory services have asked for this change, which is not surprising.  As explained above, these investors already receive extensive information about proxy advisers' conflicts of interest, and the information and methodologies they use in formulating their advice.[277]  This is certainly the case for clients of ISS. Indeed, because the consumers of proxy advice either design or select the methodologies that underlie that advice, it is they who decide whether the companies they own should be held to higher standards and requirements than the ones set or approved by the SEC.  Finally, investors who engage proxy advisory services are fully protected by the anti-fraud provision of the Advisers Act, which applies to all proxy advisers whether they are registered with the SEC or not.[278]

The Commission itself admits that proxy advisers may already be making the kinds of disclosures covered by proposed note (e) to Rule 14a-9,[279] which is yet another factor that calls the

---

[275] *See*, *e.g.*, *Hustler Magazine v. Falwell*, 485 U.S. 46, 57 (1988) (speech could not be actionable because it could not "reasonably be understood as describing actual facts"); *Leidholt v. L.F.P., Inc.*, 860 F.2d 894 (9th Cir. 1988) (article not actionable where it "telegraph[ed] to the reader that the article presents opinions, not allegations of fact"); *Jewell v. NYP Holdings*, 23 F. Supp. 2d 348 (S.D.N.Y. 1998);

[276]  PA Proposal at note 160.  *See also* Interpretation and Guidance *supra* note 2 at note 34, suggesting that in order to avoid liability under Rule 14a-9 a proxy adviser might have to explain why the peer group the adviser uses in assessing executive compensation proposals differs from the one selected by the registrant. Peer group selection is another sore point with the corporate community.

[277] *See supra* at 22.

[278]  *Supra* note 98 and accompanying text.

[279] PA Proposal at note 166.

need for this rulemaking into question.  Although the Commission confirms that proxy advisers and their clients "may use any standards or criteria for proxy voting advice" they choose,[280] the proposed amendment of Rule 14a-9 appears designed to have an *in terrorem* effect, the ultimate goal of which is to free public companies from even minor dissenting views, thereby hindering effective shareholder oversight.

ISS urges the Commission to withdraw this part of the proposal.

- o   **Additional Comments on Proposed Changes to Rule 14a-9**

Without waiving or diminishing our challenge to the Commission's authority to regulate proxy advisers under Section 14(a), or any other argument made herein, ISS offers the following comments on certain questions the Commission has asked about its proposed adoption of Rule 14a-9.[281]

54.  If the Commission believes that shareholders have the right to decide which standards or criteria to apply to their proxy voting decisions, the Commission should refrain from erecting obstacles to their decision-making process.  This means, among other things, that they and their fiduciary proxy advisers should not be constrained by standards or requirements set or approved by the SEC or any other legal or regulatory body.

55.  There is no justification for adding additional "standards or criteria" disclosure requirements to Rule 14a-2(b)(9), because adequate disclosure is already mandated by, and being provided under, the Advisers Act.

## D.  The Economic Analysis

Although the Commission appends a lengthy economic analysis to its proposal, this discussion only further confirms the deficiencies with this regulatory endeavor.

### 1.  The economic analysis uses the wrong baseline.

The Commission cites "current regulatory requirements" applicable to proxy advisers, their clients and issuers and "current industry practices" as forming the baseline against which benefits, costs and other economic impacts of the proposal are to be measured.[282]  However, the "current

---

[280]  *Id.* at 72, 84 Fed. Reg. at 66539.

[281]  PA Proposal at 73, 84 Fed. Reg. at 66539.

[282]  PA Proposal at 83, 84 Fed. Reg. at 66542.

regulatory requirements" the Commission identifies for proxy advisers are the ones articulated in the Interpretation and Guidance which the Commission adopted without the benefit of public comment or any economic analysis whatsoever.[283]  As explained above, prior to the adoption of the Interpretation and Guidance in August 2019, proxy voting advice rendered in the course of a fiduciary relationship was governed exclusively by the Advisers Act.  The only voting advice governed by the proxy rules at that time was advice voluntarily supplied to persons who did not ask for it.[284] ISS submits, therefore, that the economic consequences of this proposal should be judged against the requirements and industry practices that exist under the Advisers Act, not the post-August 2019 version of the Exchange Act proxy rules.

### 2.  The benefits of the proposed rule amendments are illusory at best.

The Commission opines that the proposed amendment to the definition of "solicitation" in Rule 14a-1(*l*) may benefit proxy advisers and their clients by codifying the definition the Commission adopted in the Interpretation and Guidance.[285]  ISS assures the Commission that having its fiduciary activities subjected to a regulatory regime that was created to protect investors from "unscrupulous corporate officials" and "irresponsible outsiders" seeking to retain or wrest control of a corporation is no benefit at all.[286]  This is especially so since the whole purpose of redefining "solicitation" apparently is to subject proxy advisers' independent research, analyses, recommendations and opinions to editorial oversight by issuers and other self-interested parties, under a threat of litigation.  For their part, many investors who are proxy advisers' clients have made it clear that they do not see any benefits—only risks and downside— in the interposition of the subjects of proxy advice into the fiduciary relationship between the clients and their proxy advisers.[287]

The Commission next describes the proposed amendment of Rule 14a-2(b) regarding conflict of interest disclosures as an enhancement of existing requirements that could benefit proxy advisers' clients by enabling them to better judge the objectivity of proxy advice.[288]  This

---

[283] *Id.* at  85, 98, 103, 104, 109,  84 Fed. Reg. at 66542-66543, 66546, 66548, 66549 .

[284]  *Supra* at 12-13.

[285] PA Proposal at 98, 84 Fed. Reg. at 66546.

[286] *Supra* at 9.

[287] *Id.* at note 250.

[288] PA Proposal at 98 - 99, 84 Fed. Reg. at 66546.

faulty assessment illustrates the importance of selecting the correct baseline for the economic analysis of this rulemaking, because while proposed Rule 14a-2(b)(9)(i) may enhance the existing requirements under the proxy rules, judged by the fiduciary standards of the Advisers Act, it is no enhancement at all.

Furthermore, while the Commission acknowledges that "some" proxy advisers have "asserted" that they have conflict of interest practices and procedures,[289] and that proxy advisers "may already provide conflicts disclosure" to their investment adviser clients,[290] the Commission grossly understates the evidence on this issue. Proxy advisers' existing disclosures in their Forms ADV and their websites, along with the transcript from the 2018 Roundtable on the Proxy Process leave no room for doubt that proxy advisers currently provide information that meets or exceeds the information covered by 14a-2(b)(9)(i).[291] The benefits of this proposal are not just "limited," as the Commission admits;[292] they are non-existent.

The same can be said for the purported benefits to be derived from the proposed review, feedback and response provisions. The SEC suggests that these provisions would benefit proxy advisers' clients by "enhancing the overall mix of information" available to them as they make their voting decisions.[293] However, if that really were the intent of this rulemaking, shareholders and others with dissenting views would be given an equal opportunity to review, provide feedback on and insert responses into proxy statements and other communications circulated by or on behalf of issuers.

The Commission also theorizes that the consumers of proxy advice could benefit if proxy advisers alter their advice in response to issuers' and other soliciting parties' feedback because such altered advice could be "more accurate and complete."[294] The SEC does not address the fact that accurate and complete advice is already provided to the general satisfaction of the clients of proxy advisers. Nor does the SEC address the possibility that the feedback from such self-

---

[289] *Id.* at 100, 84 Fed. Reg. at 66547.

[290] *Id.* at 105, 84 Fed. Reg. at 66548.

[291] *Supra* at 36. ISS questions the use of the word "may" in discussing current conflict of interest disclosure practices in light of the SEC's recent instruction that that word should not be used to describe a situation that already exists. Fiduciary Standard Release, *supra* note 92 at 25, 84 Fed. Reg. at 33676.

[292] PA Proposal at 100, 84 Fed. Reg. at 66547.

[293] *Id.* at 101, 84 Fed. Reg. at 66547.

[294] Id.

interested parties might be inaccurate or even fraudulent, or that the alteration of draft proxy advice to err on the "safe side" in complex or contentious situations might just be a response to a threat of costly litigation.

Moreover, the SEC does not even try to reconcile its estimation of the benefits of Rule 14a-2(b)(9)(ii) and (iii) with the very clear statements by investors and their legitimate representatives that they do not want their proxy advice filtered through the subject of that advice.[295] Issuers and other soliciting parties already have effective channels to communicate with shareholders.[296] It is independent thought that investors seek from their proxy advisers.

The real beneficiaries of the proposed review, feedback and response provisions would be many self-interested corporate insiders, who, after decades of trying, will finally have a "role to play" in vetting the sources of independent information shareholders use in making their proxy voting decisions.[297] The subjects of proxy voting advice are also the only ones who stand to benefit from the proposed change to Rule 14a-9, because that change will codify the Interpretation and Guidance's unprecedented and unconstitutional view that proxy advisers can be sued for their "opinions, reasons, recommendations or beliefs." Moreover, by forcing granular disclosure of any standards or requirements that materially differ from ones the SEC sets or approves, the proposal also incentivizes proxy advisers and shareholders to hold companies accountable only to the lowest standards and requirements mandated by law.

Like the rest of the proposal, the proposed amendment of Rule 14a-9 would not confer any benefit on the investors who are clients of proxy advisers, for they are already protected by the anti-fraud provision of the Advisers Act.[298] And because it is they who create or otherwise select the standards and requirements proxy advisers use in the formulation of voting advice, clients would derive no benefit from duplicative disclosure of those standards. Finally, from the proxy advisers' perspective, the proposed amendment of Rule 14a-9 is nothing more than an SEC-sanctioned weapon bestowed on the issuers who are subjects of proxy advice, to deter the issuance of any views, opinions or vote recommendations that might deviate from those of corporate management.

None of the benefits the Commission has identified justifies this rulemaking.

---

[295] *See supra* at 25-26, 58.

[296] *Id.* at 41-42.

[297] *Id.* at 42.

[298] *Id.* at 21.

### 3. The costs of the proposal on proxy advisers have been grossly underestimated.

The Commission candidly concedes that it lacks the data necessary to quantify many of the costs associated with its proposal.[299]   Given the fact that the proposal would not confer any benefits whatsoever on investors or proxy advisers, it is not necessary to calculate the costs with precision in order to conclude that the proposal is not economically justified.   Nevertheless, ISS offers the following thoughts on the real costs that the proposal has failed properly to consider.

### a. The costs of satisfying the review, feedback and response provisions

During calendar year 2019, ISS voluntarily provided approximately 450 draft reports to issuers in the United States for one round of fact-checking.   ISS estimates that the number of reports potentially required under proposed Rule 14a-2(b)(9)(ii) could range from approximately 6,500 to close to 25,000.[300]   Those extraordinary numbers would be even higher by an extreme magnitude if custom reports were also included.   Either way, ISS would incur substantial administrative costs just to track two rounds of distribution and resulting feedback for this large volume of reports.   It is completely inappropriate and off-base to suggest that the current draft review process—that ISS voluntarily implemented and for which ISS has established parameters and controls—can somehow be scaled to meet the comprehensive new requirements outlined in the proposed rule.

ISS would also incur substantial costs, including legal expenses, in creating, negotiating and implementing at least 6,000 confidentiality agreements with registrants and other soliciting parties.[301]

In addition to the 5 to 7 *business* days proposed to be given to issuers under Rule 14a-2(b)(9)(ii) (which could represent as many as 11 *calendar* days, depending when weekends fall in the process), ISS estimates that it would take an average of 2-3 additional ISS analyst working days per report for our research production team to thoroughly ingest, review, validate and address feedback on each report.   Because feedback would now cover not just factual accuracy, but also methodology, opinions and judgments, with the threat of legal liability hanging over the

---

[299] PA Proposal at 105-109, 84 Fed. Reg. at 66548-49.

[300]  In the case of ISS, including specialty draft reports in the proposed review and feedback provisions would expand the total number of reports covered by the new requirements by up to a factor of 5 per company.

[301] Because ISS does not currently pre-release reports containing material, non-public information, ISS does not have such agreements in place.

process, an unknowable number of feedback reviews would involve ISS' legal and compliance teams, and possibly outside counsel, in order to safeguard the independence and integrity of our fiduciary advice, while at the same time protecting ourselves against the threat of litigation under Rule 14a-9.  Registrants or other solicitors who are not satisfied with ISS' final proxy advice could force ISS to incur additional research, administrative, compliance and IT expenses related to the insertion of a link to their response in our reports, for which we would have no right of reply.

As noted above, the delays created by the review and feedback provisions in an already compressed time period could seriously impede ISS' ability to meet its contractual commitments to clients.[302]  While the Commission acknowledges that proxy advisers may incur costs in renegotiating client contracts,[303] the Commission does not also acknowledge the possibility that clients will terminate their contracts altogether if they find their diminished review period unacceptable.[304]

On the other hand, the Commission does acknowledge that the review, feedback and response provisions may dissuade clients from using proxy advisory services because of concerns regarding the objectivity and integrity of advice that has been vetted by its subjects.  The Commission leaves it to the proxy advisers to find a way to deal with this problem, without acknowledging either the substantial costs involved or the inappropriate nature of that potential outcome, which would be directly contrary to the stated objectives of the proposal.

### b. The costs of amending existing compliance programs

As reflected throughout these comments, the Commission's proposal would interfere with proxy advisers' existing obligations under the Advisers Act and, possibly, ERISA.  The proposed amendments would require ISS to amend its compliance program in at least the following respects:

> o Embedding conflict disclosures in the proxy reports, as currently proposed in Rule 14a-2(b)(9)(i), would compromise the firewall ISS has erected between its proxy advisory service and its corporate services subsidiary.[305]  ISS has gone to great expense in creating this safeguard and would incur substantial costs in developing an alternative.

---

[302] *Supra* at 62.

[303] PA Proposal at 107, 84 Fed. Reg. at 66549.

[304] If the Commission intends to include reports based on clients' custom guidelines in the review, feedback and response provisions, ISS will also be required to renegotiate its confidentiality agreements with the clients who utilize such guidelines.  These clients also may choose to terminate their agreements rather than have their private information disclosed to issuers and other soliciting parties.

[305] *Supra* at 32.

o  Giving the subjects of ISS' proxy advice the ability to vet the methodologies, opinions, and judgments reflected in that advice would create a substantial new conflict of interest that ISS would have to expend substantial resources to manage and disclose.

o  Subjecting proxy advisers to litigation risk under Rule 14a-9 for their "opinions, reasons, recommendations and beliefs" could potentially incentivize proxy advisers to alter their advice in accordance with the feedback they receive from the subjects of that advice. This creates another new conflict of interest that ISS would have to expend resources to manage and disclose.

o  The disclosure of draft proxy reports containing MNPI would require changes to ISS' existing insider trading procedures. It is unclear how ISS would satisfy its duty to enforce a new procedure in this regard, since the proposal does not permit a proxy adviser to withhold MNPI from any registrant or other solicitor who has signed a confidentiality agreement, even if that party is a known insider trader.

o  Every change to ISS' compliance program would necessitate additional training, documentation, and ongoing testing, all of which would further increase ISS' costs.

o  The Commission's assertion that,"[t]here is no specified retention period for any information maintained, disclosed or provided pursuant to the proposed amendments" is inaccurate.[306] Advisers Act Rule 204-2 would require ISS and other proxy advisers to maintain, at a minimum, the following records for a period of five years: (i) the new confidentiality agreements, (ii) communications with issuers or other covered solicitors about proxy advice, (iii) new compliance procedures, training thereon and testing thereof, and (iv) disclosures to clients.

### c.  Litigation costs

The Commission's aggressive interpretation of Rule 14a-9, coupled with the review and feedback provisions, substantially increases the litigation risk of any proxy adviser that refuses to compromise the independence of its advice. While it is impossible to put a dollar figure on insuring against this risk, ISS is disappointed that the Commission ignores this cost altogether.[307]

### 4.  The costs of the proposal on consumers of proxy advice have been grossly underestimated.

As the Commission acknowledges, some or all of the costs this proposal would impose on proxy advisers may be passed through to the investors who use their services.[308] Those

---

[306] PA Proposal at 122, 84 Fed. Reg. at 66553.

[307] *Id.* at 109, 84 Fed. Reg. at 66549.

[308] *Id.* at 108, 84 Fed. Reg. at 66549.

investors also are likely to be burdened by the fact that the time they currently have to review proxy research reports and recommendations and to make their voting decisions will be reduced, with time instead diverted to give two rounds of review to the subjects of the advice. While hard to quantify in dollars, the cost of lost time may be the greatest cost imposed on consumers by this proposal, severely compressing the time that investors have to process and use proxy research reports, to engage with the companies in which they are invested, and to thoughtfully exercise their proxy voting responsibilities.

These costs, while significant, pale in comparison with the possible loss of diverse thought in the marketplace for proxy advice. As it stands today, each proxy adviser is free to analyze corporate governance and other voting matters in accordance with methodologies and criteria of its and its clients' choosing. So long as these methodologies and criteria are properly disclosed, clients themselves can assess whether they are appropriate for their own goals and objectives. Forcing every U.S. proxy adviser to vet their methodologies, criteria, opinions and judgments through the subjects of their advice—under threat of litigation—could diminish proxy advisers' willingness to recommend votes against management or other soliciting parties, or to stray too far from corporate managements' points of view. This would substantially diminish the independent information available to shareholders, as well as their ability to hold management of public companies accountable for their actions.

### 5. The proposal's burdens on the U.S. capital markets have been grossly underestimated.

Using the proxy rules to try to keep proxy advisers from voicing opinions not acceptable to management, and reducing the availability and timeliness of independent research and advice that helps investors carry out their fiduciary duties has implications beyond any individual shareholder or ballot proposal. Silencing dissenting views on corporate governance matters like executive compensation, board independence, *etc.* would likely lead to the proliferation of unfair corporate practices that harm investors generally, which would be a tragically ironic result of the proposed rulemaking under Section 14(a).[309]

The proposed rule amendments would also discourage and diminish competition in the market for proxy advice. This is so for two reasons. First, only the largest proxy advisers would have sufficient human and financial resources to comply with the proposed review, feedback and response-insertion provisions, and to defend themselves against baseless claims by disgruntled

---

[309] See *supra* at 8.

registrants or other solicitors.  Furthermore, if every adviser's opinions and recommendations are vetted by the same parties, there would be an inherent stifling of different views, even if all equally valid.[310]  Taken to its absurd conclusion, there may not be a need for any proxy advisers, since what the Commission seemingly considers to be an "accurate and complete" analysis can be supplied by the issuer or other solicitor itself.[311]

Finally, the SEC's economic analysis fails to assess the market effects of the misuse of MNPI that would have to be supplied to registrants and other parties under the review and feedback provisions.  As discussed earlier,[312] given the volume of potentially market-moving information that will be released every year, it is likely that some parties will be unable to resist the temptation to trade on, or otherwise misuse, this information, whether it is covered by a confidentiality agreement or not.  The moral hazard of such a consequence would lie squarely with the SEC.

Even without a precise calculation of costs, therefore, it is clear that this rulemaking is economically unjustified.

## E.  Reasonable Alternatives

For the many reasons stated above, the only reasonable alternative to this proposal is to regulate all proxy advisers under the Advisers Act.  That approach will constitutionally, lawfully and effectively address any legitimate concerns there may be regarding the accuracy and integrity of proxy voting advice.

## CONCLUSION

This rulemaking exceeds the Commission's statutory authority, is unconstitutional, upends almost 90 years of U.S. securities regulation, cannot be reconciled with past Commission statements about, or existing legal requirements applicable to, proxy advisers, is impracticable, and thoroughly lacks economic justification.  ISS urges the Commission to take its fingers off the issuers' side of the scale, and—in the interests of investors and the capital markets—withdraw these proposed rule amendments.

---

[310] As things stand today, many large institutional investors subscribe to more than one proxy advisory service. *See e.g.* Remarks of Jonathan Bailey, 2018 Roundtable Transcript, *supra* note 76 at 184.

[311] If the subjects of the advice have the right to establish the "correct" methodology, there certainly would not be any need for an adviser to maintain multiple specialty voting policies.

[312] *Supra* at 60-61.

**EXHIBIT 21**



February 3, 2020

Ms. Vanessa A. Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-0609

> Re:    Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice
>        Release No. 34-87457
>        SEC File No. S7-22-19

Dear Ms. Countryman:

Thank you for the opportunity to comment on the "Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice," recently proposed by the Securities and Exchange Commission.[1]  Glass Lewis shares the Commission's goal of making sure that the proxy process functions properly and enables shareholders to exercise their right to vote at annual and special meetings.  To that end, Glass Lewis has engaged with the Commission on numerous occasions during its continuing efforts to explore how to improve the proxy process, a critical component of the corporate governance system.

Glass Lewis also fully supports and embraces the stated objectives of the Commission's proposal with respect to proxy advice — promoting the accuracy, conflict management and disclosure, and transparency of that advice.  This includes appropriate engagement with the companies that are the subject of proxy advice.  In fact, we have committed to follow the internationally-endorsed Best Practices Principles for Shareholder Voting Research Providers, which address these critical issues, and annually report on our compliance with those principles.

Regrettably, however, we believe that the proposed rules would not further those objectives, but instead would have severe adverse consequences for investors and the public interest.  In particular, we are deeply concerned that the costly and rigid "review and feedback" mechanisms in the proposed rules would introduce significant and unmanageable delays into the already compressed annual meeting time frame and threaten to impair proxy advisors'

---

[1] U.S. Securities and Exchange Commission, Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice, Release No. 34-87457 (Nov. 5, 2019) (the "Proposing Release" or "Release").

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

1



independence.  Both effects could hamper Glass Lewis' ability to meet its institutional investor clients' needs, while at the same time detracting from the limited time available for investors' deliberations and ability to engage with companies on critical corporate governance issues. These adverse consequences would be compounded by the Commission's plan to codify its August 2019 Interpretation that proxy advice is a solicitation, which introduced the specter of companies filing lawsuits to challenge matters of judgment, including proxy advisors' methodologies, opinions and recommendations.

We are also concerned that the rushed process that has been followed in this rulemaking is not sufficient to adequately consider the legal issues its novel approach would raise and to fully understand and analyze the consequences — economic and otherwise — of the untested, unprecedented regulatory regime it would introduce.  Accordingly, we respectfully submit that the Commission should not adopt the proposed rules and, instead, should continue to work with proxy advisors, investors and other stakeholders to develop a balanced and thoughtful approach to this area that better serves the interests of all market participants.

**I.  Background.**

      **A.  Glass Lewis.**

Founded in 2003, Glass Lewis is a leading independent proxy advisor.  As a proxy advisor, the Glass Lewis provides proxy research and vote management services to institutional investor clients throughout the world.  While, for the most part, investor clients use Glass Lewis research to help them make proxy voting decisions, these institutions also use Glass Lewis research when engaging with companies before and after shareholder meetings.  Further, through Glass Lewis' Web-based vote management system, Viewpoint®, Glass Lewis provides investor clients with the means to receive, reconcile and vote ballots according to custom voting guidelines and record-keep, audit, report and disclose their proxy votes.

Glass Lewis serves more than 1,300 institutional investor clients — primarily pension funds, mutual funds and other institutions that invest on behalf of individual investors and have a fiduciary duty to act, including through proxy voting, in the best interests of their beneficiaries.  In 2018, Glass Lewis issued 23,210 proxy research reports, including 5,565 reports on U.S. issuers and 17,550 reports on non-U.S. issuers.[2]

---

[2]  This letter uses 2018 numbers for consistency with our earlier submission on the Release's Paperwork Reduction Act ("PRA") analysis.  See Letter from Nichol Garzon-Mitchell, Senior Vice President and General Counsel, Glass Lewis to Alexander Goodenough, Office of Management and Budget (Jan. 7, 2020), available at https://www.sec.gov/comments/s7-22-19/s72219-



In addition, a significant majority of Glass Lewis' clients have their own custom voting policies.  Glass Lewis helps these clients implement their policies by applying them to the circumstances presented by companies in their proxy statements and recommending how they vote accordingly.  During the policy formulation process, an institution will review Glass Lewis' policies to assess the similarities and differences between the institution's views and Glass Lewis' "house policy."  Glass Lewis engages extensively with institutional investors and aims to have policies that reflect the views of its clients.  Accordingly, it is not uncommon for an investor client to elect to implement the same policy as Glass Lewis for some or all of the issues up for vote.  Institutional investors are increasingly opting for more detailed policies with specific views on how to address the issues that may come up on a proxy (e.g., U.S. companies alone have approximately 250 issues), and, as noted above, most therefore have custom voting policies.  In many instances, their views are so specific to each unique situation that they will often opt for case-by-case analysis.

Glass Lewis also executes votes on behalf of investor clients in accordance with the specific instructions of those clients.  To that end, Glass Lewis implements client voting policies on its vote management system so that each ballot populates with recommendations based on the specific policies of the client, enabling the client to submit votes in a timely and efficient manner.  (Under no circumstance is Glass Lewis authorized to deviate from a client's instructions or to determine a vote that is not consistent with the policy specified by the client.)  When a preliminary ballot is ready for review, the voting system will alert the client and provide such client with relevant disclosures and other information needed to review and evaluate the matters up for a vote.  Clients can choose to restrict the submission of a ballot until after their authorized personnel have reviewed and approved the votes.  Clients can also make — and often do make — changes to their preliminary ballots before signing off.  And, assuming the voting deadline has not passed, they can even change their votes and resubmit them.

**B.  The role of proxy advisors.**

Glass Lewis believes that proxy advisors play an important support role, providing resources and technical, subject-matter expertise to help institutional investors meet their fiduciary responsibility to vote securities on behalf of their participants and beneficiaries in a cost-effective way.  As the Commission itself has explained, "When making voting determinations on behalf of clients, many investment advisers retain proxy advisory firms to perform a variety of functions and services . . . .  Contracting with proxy advisory firms to

---

6617071-202957.pdf ("PRA Submission").  In 2019, Glass Lewis issued 26,198 reports, including 5,460 reports on U.S. issuers and 20,738 reports on non-U.S. issuers.

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

3



provide these types of functions and services can reduce burdens for investment advisers (and potentially reduce costs for their clients) as compared to conducting them in-house."[3]

As an increasing share of American investors own stock indirectly, such as through mutual and pension funds, these individual investors are dependent on those institutional investors to vote on their behalf and act in their best interest.  In order to do so both effectively and efficiently, those institutional investors often leverage their resources by using the services of a proxy advisor.  As the Council of Institutional Investors and a coalition of investors have explained:

> Retail holders now invest much of their capital with institutional investors because they understand that institutional investors' expertise and size bear the expectation of higher returns, lower costs and mitigated risks. Importantly, retail investors also understand that aggregating their individual holdings into larger, concentrated blocks through an institutional manager allows for more effective monitoring of company management.

> Even so, institutional investors themselves face challenges in spending significant time and resources on voting decisions because the funds and other vehicles they manage receive only a portion of the benefits conveyed on all investors of the relevant enterprise.

> *Proxy advisors are a market-based solution to address many of these practical cost issues.* Proxy advisors effectively serve as collective research providers for large numbers of institutional investors, providing these investors an affordable alternative to the high costs of individually performing the requisite analysis for literally hundreds of thousands of ballot proposals at thousands of shareholder meetings each proxy season.[4]

---

[3] U.S. Securities and Exchange Commission, Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers, Release No. IA-5325 at 5 (Aug. 21, 2019) ("August 2019 Guidance"); see also comments of Chairman Jay Clayton at the U.S. Chamber of Commerce event on "Corporate Governance: Making the Case for Reform" (July 16, 2019) ("Outsourcing . . . in itself is not a bad thing.  All the time in America we create value through outsourcing, outsourcing ministerial tasks, in this case, of going through filings and crunching the data, providing data reports, that's good.  It probably saves shareholders, saves investors money."), available at https://www.centerforcapitalmarkets.com/event/corporate-governance-making-the-case-for-reform/.

[4] Letter of Ken Bertsch, Executive Director, Council of Institutional Investors and 60 institutional investors to Chairman Jay Clayton, at 2 (Oct. 15, 2020) ("CII October 15 Letter").; see also Michael Cappucci, Harvard Management Company, "The Proxy War Against Proxy Advisors," at 7-8 (Nov. 16, 2019) ("Importantly, [proxy advisors] economize the  proxy research and voting

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

4



Even the largest asset managers can benefit from the work of proxy advisors.  As Professor S.P. Kothari, now the Commission's Chief Economist, has explained:

> Although large asset managers typically have a unit responsible for recommending proxy votes, it's usually small and hard-pressed to review the more than 1,000 proxies it might be sent during proxy season. Staffers in such units readily admit they lack the time and expertise to conduct in-depth analyses of complex issues like non-GAAP criteria and peer group composition. That's why most asset managers subscribe to proxy advisory services, such as Institutional Shareholder Services (ISS) and Glass Lewis (GL).[5]

In addition, proxy advisors can help asset managers and other investors mitigate their own conflicts of interest in voting shares on behalf of their participants or beneficiaries.  As the SEC has noted, an investment adviser "may look to the voting recommendations of a proxy advisory firm when the investment adviser has a conflict of interest, such as if, for example, the investment adviser's interests in an issuer or voting matter differ from those of some or all of its clients."[6]  While the investment adviser, of course, remains responsible for voting in its clients' best interests, the SEC has also noted that "this third-party input into such an investment adviser's voting decision may mitigate the investment adviser's potential conflict of interest."[7]

### C.  The regulatory environment of proxy advisors.

Proxy advisors are hired by and work to assist institutional investors in voting shares on behalf of their clients and beneficiaries.  Existing SEC rules establish a robust regulatory

---

functions by spreading the costs of tracking, analyzing, and processing many  thousands of proxy votes over a larger pool of shareholders."), available at https://corpgov.law.harvard.edu/2019/11/27/the-proxy-war-against-proxy-advisors/.

[5]  Robert C. Pozen and S.P. Kothari, "Decoding CEO Pay," Harvard Business Review (July-Aug 2017); see also United States Department of Treasury report to President Trump on "A Financial System that Creates Economic Opportunities, Capital Markets," at 31 (Oct. 2017) ("institutional investors, who pay for proxy advice and are responsible for voting decisions, find the [proxy advisory firm] services valuable, especially in sorting through the lengthy and significant disclosures contained in proxy statements").

[6]  August 2019 Guidance at 5-6.

[7]  Id. at 6.

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111       W W W . G L A S S L E W I S . C O M

5



framework for investment advisers' voting of proxies on behalf of their clients, including imposing specific responsibilities for their oversight of third-party service providers they use in the voting process.

First, advisers must comply with Rule 206(4)-6 under the Investment Advisers Act of 1940, which is specifically "designed to ensure that advisers vote proxies in the best interest of their clients."[8]  Under this rule, investment advisers must: 1) adopt policies and procedures to ensure proxies are voted in the best interest of clients; 2) disclose to clients how they can obtain information from the adviser on how their securities were voted; and 3) describe the adviser's proxy voting policies and procedures to clients, and, upon request, provide clients with a copy of those policies and procedures.  Investment advisers must also annually review the adequacy of their proxy voting policies.[9]

Second, investment companies must disclose how they vote proxies relating to portfolio securities they hold and file with the SEC and make available to shareholders information about specific proxy votes cast.[10]  Public disclosure of votes creates market discipline, allowing current and potential investors to evaluate how mutual funds and others are voting their shares on issues of concern to them.[11]

The SEC has also specifically and repeatedly addressed investment advisers' regulatory responsibilities to oversee the work of any proxy advisors they hire to aid their proxy voting. First, the Staff issued guidance in 2014 with its expectations for adviser due diligence and oversight of proxy advisors.[12]  Among other things, the Staff outlined a number of steps advisers can take before retaining a proxy advisory firm, including evaluating  the proxy advisor's: 1) staffing and personnel; 2) ability to identify and address any conflicts of interest;

---

[8]  U.S. Securities and Exchange Commission, Proxy Voting by Investment Advisers, SEC Release No. IA-2106 (Jan. 31, 2003).

[9]  Rule 206(4)-7 under the Advisers Act, 17 C.F.R. 275.206(4)-7.

[10]  U.S. Securities and Exchange Commission, Disclosure of Proxy Voting Policies and Proxy Voting Records by Registered Management Investment Companies, SEC Release No. 33-8188 (Jan. 31, 2003).

[11]  See, for example, Jeff Sommer, "Want a Bigger Say on Corporate Behavior? Move your Money," New York Times (Dec. 12, 2019).

[12]  U.S. Securities and Exchange Commission, Staff Legal Bulletin No. 20, Proxy Voting: Proxy Voting Responsibilities of Investment Advisers and Availability of Exemptions from the Proxy Rules for Proxy Advisory Firms (June 30, 2014).

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111     W W W . G L A S S L E W I S . C O M

6



and 3) policies and procedures to ensure that its voting recommendations are based on accurate information.  The Staff conveyed that it expects advisers to engage in ongoing oversight of the proxy advisor on these issues.

Most recently, just this past August, the Commission issued a release with further guidance for investment advisers on their proxy voting responsibilities, including their use of proxy advisory firms to assist them in exercising these responsibilities.  Building on the Staff's 2014 guidance, the Commission release outlines a number of steps an investment adviser can take to fulfill its regulatory responsibilities when it retains a proxy advisor.  In addition to more specific, detailed questions relating to the proxy advisor's capacity and potential conflicts, the August 2019 Guidance suggests investment advisers consider:

- Whether the proxy advisory firm has an effective process for seeking timely input from issuers and proxy advisory firm clients with respect to its proxy voting policies, methodologies and peer group constructions;

- Whether a proxy advisory firm has adequately disclosed to the investment adviser its methodologies in formulating voting recommendations;

- The nature of any third-party information sources that the proxy advisory firm uses as a basis for its voting recommendations;

- When and how the proxy advisory firm would expect to engage with issuers and third parties;

- The effectiveness of the proxy advisory firm's policies and procedures for obtaining current and accurate information relevant to matters included in its research and on which it makes voting recommendations;

- The proxy advisory firm's engagement with issuers, including the firm's process for ensuring that it has complete and accurate information about the issuer and each particular matter, and the firm's process, if any, for investment advisers to access the issuer's views about the firm's voting recommendations in a timely and efficient manner;

- The proxy advisory firm's efforts to correct any identified material deficiencies in the proxy advisory firm's analysis;

- The proxy advisory firm's disclosure to the investment adviser regarding the sources of information and methodologies used in formulating voting recommendations or executing voting instructions; and

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

7



- The proxy advisory firm's consideration of factors unique to a specific issuer or proposal when evaluating a matter subject to a shareholder vote.[13]

The August 2019 Guidance also explains that "an investment adviser is not required to accept the authority to vote client securities, regardless of whether the client undertakes to vote the proxies itself," and, in fact, gives a number of examples of arrangements an investment adviser could reach with a client that do not involve voting on all or even most proxy matters.[14]  Finally, the guidance conveys the SEC's expectations for investment advisers to engage in ongoing oversight of proxy advisors on relevant issues.

Glass Lewis' experience is that its clients take their oversight responsibilities very seriously.   Glass Lewis devotes substantial resources to regularly engaging with its clients as they carry out their due diligence by answering oral and written questions, providing written materials and facilitating visits to its office sites.

In addition to oversight by their investment adviser clients, proxy advisors hold themselves accountable to a set of best practices principles designed specifically for the proxy advisor industry.  These principles have grown out of a number of regulatory consultations around the globe on the role of proxy advisors in recent years.  Recognizing that proxy advisors are a voluntary, private-market response to investors' need for independent, cost-effective advice, most jurisdictions to study these issues have concluded that encouraging the development of best practices, rather than government regulation, was the appropriate response.

Most notably, in 2013, after a public consultation, the European Securities and Markets Authority ("ESMA") found no evidence of a market failure and therefore did not see a need for binding or quasi-binding regulation of proxy advisors.[15]  Instead, ESMA said the "appropriate

---

[13]  August 2019 Guidance.

[14]  August 2019 Guidance at 9-12.  In late 2018, the SEC Staff also withdrew two no-action letters that corporate commenters had criticized as effectively encouraging investment advisers to use an independent proxy advisor as part of fulfilling their fiduciary duty when they may have a conflict in voting on behalf of a client.  See U.S. Securities and Exchange Commission, IM Information Update, Statement Regarding Staff Proxy Advisory Letters, IM-INFO-2018-02 (Sept. 2018).

[15]  See Press Release, "ESMA recommends EU Code of Conduct for proxy advisor industry," (Feb. 19, 2013), available at https://www.esma.europa.eu/sites/default/files/library/2015/11/2013-240.pdf.; see also U.S. General Accountability Office, Report to Congress, Corporate Shareholder Meetings—Proxy

---

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

8



approach" was for the industry to develop a code of conduct, to be applied on a comply-or-explain basis that would address two areas of concern raised in the consultation: 1) identifying, disclosing and managing conflicts of interest; and 2) fostering transparency to ensure the accuracy and reliability of the advice.

In response, Glass Lewis and other leading proxy advisors formed the Best Practice Principles Group ("BPPG") to develop a code of conduct ("Principles" or "Code") for the industry, which the signatories to the Principles said they would apply globally.  The BPPG developed the Principles with input from ESMA and other stakeholders, including numerous issuer respondents to the consultation from both Europe and North America.  Following a global, public consultation, the Principles were officially launched in March 2014.[16]

The Principles encourage transparency, conflict management and disclosure and engagement with companies when appropriate.  Glass Lewis meets the Principles' standards by making the following publicly available on its website: full guidelines; research approach and methodologies; conflict avoidance and disclosure policies; and public-company engagement procedures.  Since the launch of the Principles, Glass Lewis and the other charter signatories have each published their Statements of Compliance, featuring detailed information on how the organizations comply with the Principles.  Glass Lewis applies the Code to its activities globally, including in the United States, and updates its Statement of Compliance annually.

---

Advisory Firms' Role in Voting and Corporate Governance Practices, at 11 (Nov. 2016) ("GAO 2016 Report") ("In recent years, [ESMA and the Canadian Securities Administrators] conducted reviews of the proxy advisory firm industry and concluded that *regulatory intervention was not needed*.  Specifically, the European Securities and Markets Authority concluded that regulation was not justified because there was *no evidence of a market failure in relation to how proxy advisory firms interact with institutional investors and corporate issuers*.  However, both entities proposed guidance and recommendations for the firms to enhance transparency, among other issues.") (emphases added).

[16]    More information on the BPPG is available on its website, see https://bppgrp.info/.  In 2017, the charter signatories to the Principles conducted another public consultation to elicit market feedback on the extent to which the Principles were achieving their original objectives and to identify opportunities for improving understanding and transparency.  An advisory panel, comprised of stakeholders from companies, asset owners, asset managers and other constituencies, provided input to the preparation of the consultation under the guidance of an independent chairman.  Among other things, the latest update to the Principles addresses the transparency requirements for proxy advisors outlined in the EU DIRECTIVE 2017/828 of 17 May 2017 ("SRD II") amending Directive 2007/36/EC as regards the encouragement of long-term shareholder engagement.

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

9



To enhance its governance, per the recommendation of ESMA and complementary to the requirements of SRD II as well as stewardship developments in other markets globally, the BPPG is in the process of forming an Independent Oversight Committee. The Committee will be comprised of both investor and issuer representatives, as well as independent members, including an independent oversight Chair, to provide an annual independent review of the Principles and the public Statements of Compliance of each signatory and to hold all members accountable.

Glass Lewis continues to believe, consistent with the approaches chosen by ESMA, the Canadian Securities Administrators, the Securities and Exchange Board of India,[17] and most recently, the Financial Services Agency and the Tokyo Stock Exchange, through the Council of Experts on Japan's Stewardship Code,[18] that a market-based solution to proxy advisor oversight and accountability is appropriate. In particular, Glass Lewis believes that an industry code of best practices is the appropriate means to address the issuer concerns raised in the Proposing Release – namely accuracy, conflict management, transparency of policies and methodologies, and engagement. In our view, the existing standards of conduct, coupled with a mechanism to monitor and ensure compliance, would be a more appropriate way to address these issues and would best serve the interest of all market participants.

## II. There is no need for the proposed rules.

Our first concern with the proposed rules is perhaps the most basic — the Commission has not shown any need for them. The Release contains no empirical evidence showing a proxy advice error rate that warrants regulation, nor are we aware of any. In fact, the available evidence is to the contrary. Likewise, the Commission has not explained what is deficient about proxy advisors' current conflict disclosure practices to warrant the breadth and extent of the very prescriptive disclosures that would be required. Nor does it explain why proxy advisors' current issuer engagement practices, which include the ability for issuers to fact check the data

---

[17] See "SEBI seeks public comments on Report submitted by the working group on Issues related to Proxy Advisers (PA)" (July 29, 2019) ("Establishment of and adherence to a global code of conduct, coupled with proper oversight by investors, has proven to be effective in ensuring the quality and integrity of proxy advisory research – without adding an undue burden on investors or inhibiting competition."), available at https://www.sebi.gov.in/reports/reports/jul-2019/report-of-working-group-on-issues-concerning-proxy-advisors-seeking-public-comments_43710.html.

[18] See newly proposed "Principle 8 of the Principles for Responsible Institutional Investors," (proposing a principles-based "comply or explain" approach in Japan's Stewardship Code), available at https://www.fsa.go.jp/en/refer/councils/stewardship/20191220/01.pdf.

**GLASS LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

10



used in the formulation of the proxy voting advice as well as the opportunity to provide feedback on the advice itself, are inadequate.

### A.  There is no basis for claims of inaccuracy other than issuer concerns.

The Proposing Release is premised on the proposition that radical changes are needed to how investors get proxy advice because of the current level of inaccuracy in proxy advisors' work.  While Glass Lewis, of course, shares the Commission's goal of promoting proxy advice accuracy, the Commission has not come forward with evidence that proxy advisor inaccuracy is a problem, let alone one sufficient to warrant this regulatory response.  The Proposing Release cites issuer "concerns" about inaccuracy — a term invoked dozens of times in the Release — but the Release does not evaluate or substantiate these issuer concerns in any meaningful way.  In fact, as discussed further below, even the economic analysis only tabulates the number of instances in which issuers *claimed* there was a proxy advisor error, without purporting to confirm that any of these alleged mistakes were in fact errors.  As one commenter has pointed out, "The paucity of evidence of systematic factual errors by proxy advisors suggests that, in fact, the opposite is true."[19]

As Commissioner Lee noted in dissenting from issuing the proposal, "What is missing in this proposal, however, are two critical underpinnings for the policy choices it reflects. First, it is missing data *demonstrating an error rate in proxy advice sufficient to warrant a rulemaking*."  In fact, not only is empirical evidence of a problem with proxy advisor accuracy missing, but, as Commissioner Lee noted, "[T]he proposal relies in large part not on specific instances of material factual inaccuracies, but on generalized, unsubstantiated allegations of inaccuracies."[20]

Nor did the Commission consider and rationally respond to evidence contradicting the issuer concerns cited in the Release.  As Commissioner Lee again noted, "In fact, as the comment file shows, assertions of widespread factual errors have been methodically analyzed and largely disproven."  Specifically, shortly before the proposal was issued, the Council of Institutional Investors ("CII") submitted a detailed analysis of the only industry report cited in the Release that purported to study proxy advisor errors (as opposed to surveys or generalized allegations).  That industry report had found 39 claimed errors in proxy advisor reports over a

---

[19]  CII October 15 Letter at 3.

[20]  See Statement of the Honorable Allison Herren Lee at SEC Open Meeting (Nov. 5, 2019), available at https://www.sec.gov/news/public-statement/statement-lee-2019-11-05-shareholder-rights.

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111      W W W . G L A S S L E W I S . C O M

11

# GLASS LEWIS

nearly three year period.[21]  CII analyzed each of the 39 situations, however, and reported its findings:

> From our review of the filings that ACCF references, **it is clear that most of the claimed "errors" actually are disagreements on analysis and methodologies, and that some other alleged proxy advisory firm errors derive from errors in the company proxy statements. Finally, in some cases, ACCF simply misstates what the company said.** We think ACCF has documented no more than 18 reports with factual inaccuracies that can be blamed on proxy advisory firms, not the 39 that it claims.[22]

> As CII pointed out, this amounts to "a factual error rate on a report basis of 0.057% to 0.123% (18 to 39 reports with one or more factual errors in 31,830 reports)."[23]

Nor does the Proposing Release account for the self-interest inherent in such issuer concerns.  Proxy advisors are hired by investors to provide an expert, independent perspective on management recommendations.  And while evidence shows proxy advisors generally agree with management recommendations 80-90% of the time, the remainder of the situations are instances where the proxy advisor sees the issue differently than management did.  As one commentator noted, "Almost by definition, this means that recommendations that don't agree with management are viewed as inaccurate, uninformed and value destroying."[24]  This obvious dynamic calls out for some agency scrutiny of these issuer claims.  Instead, the Release credits those concerns without accounting for their holders' perspective or the countervailing evidence.

---

[21]  Even these remarkably few reported errors were not substantiated; the report's methodology involved assuming that if an issuer claimed a proxy advisor error, there was an error.  See American Council for Capital Formation, "Are Proxy Advisors Really a Problem?," at 11 (Oct. 2018), available at https://accfcorpgov.org/wp-content/uploads/2018/10/ACCF_ProxyProblemReport_FINAL.pdf.

[22]  Letter of Ken Bertsch, Executive Director, Council of Institutional Investors to Chairman Jay Clayton, at 3 (Oct. 24, 2020) ("CII October 24 Letter") (emphasis in original).

[23]  CII October 24 Letter at 3.  Of course, each report contains many different issues and even more individual data elements.  On a per issue or data element basis, the error rate would be even lower.

[24]  See Cappucci, "The Proxy War Against Proxy Advisors," at 30.

---



In sum, faced with issuer "concerns" and evidence that those concerns were overstated, the Commission did not evaluate whether the concerns were valid. The Commission simply noted the discrepancy and moved forward with proposing an unsubstantiated, costly and harmful new regulatory system to address the asserted concerns. We respectfully submit that reasoned agency decision-making requires more than this.

Nor did the Commission assess the significance of the claimed errors in any way. Here, too, the Commission did not grapple with disconfirming evidence in its rulemaking record. In 2016, GAO conducted an extensive review of issuers' concerns about proxy advisors and specifically found that "[b]oth corporate issuers and institutional investors we interviewed said that the data errors they found in the proxy reports were mostly minor, but . . . some errors can lead to negative recommendations."[25] The Release, however, despite extensively relying on GAO's report, makes no mention of this. The SEC's approach of merely relying on issuer concerns and not validating or evaluating the asserted concerns in any way does not shed any light on the significance of the asserted problem.[26]

To be sure, proxy advisors — however rigorous their processes and quality controls — do inevitably make some mistakes and not all mistakes are as trivial as the one cited above.[27]

---

[25]  GAO 2016 Report at 29; see also Broc Romanek, "Proxy Advisers Handbook for In-House Counsel," at 22 (Jan. 2015) ("There's a realm of type of errors, some significant — some not. Some are merely a matter of interpretation — differences in opinion — and not really errors. And some "errors" are really updates as developments occur at a company. Some might be changes not reflected in a company's disclosures — so they are just additional data points not reflected in a SEC filing so the proxy advisers weren't aware of them."); see also Cappucci, The Proxy War Against Proxy Advisors, at 19 (describing an industry report that had included a survey of its members to find examples of proxy advisors' inaccuracy: "Evidence of inaccuracies in proxy advisors' research ranges from the trivial to the legitimately troubling. For example, on the lighter end, one executive noted that ISS' report stated that 'our CEO was 'entitled' to use company aircraft for personal travel, when in fact he is required to do so.'").

[26]  Cf. Hester Peirce & Jerry Ellig, "SEC Regulatory Analysis: A Long Way to Go and a Short Time to Get There", 8 Brook. J. Corp. Fin. & Com. L. at 423-24 (2014) (criticizing basis for SEC rulemaking because "The SEC did not provide evidence . . . to support the proposition that inaccurate information is a significant problem."), available at: https://brooklynworks.brooklaw.edu/bjcfcl/vol8/iss2/.

[27]  Glass Lewis' error rate is less than 1%. Its main competitor discloses a similar error rate. When Glass Lewis is notified of a purported factual error or omission in one of its research reports, Glass Lewis immediately initiates a review process of the notification and the report. If a report is updated to reflect any material revisions, new publicly-available disclosures by the

---

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111     W W W . G L A S S L E W I S . C O M

13



But this would be true of any professional adviser, especially one producing tens of thousands of reports on complex subjects a year.  If the mere occurrence of some errors were enough, every professional service would warrant regulation.  What is absent here is any evidence that there is a systemic or significant problem that warrants a regulatory response.  Indeed, we note that even a group of House members who support proxy advisor regulation have written to the SEC as part of this rulemaking asking the SEC to produce empirical evidence of proxy advisor errors.[28]

The reality is that proxy advisors' clients already have the proper incentive to seek out accurate advice.  After all, why would anyone — let alone a sophisticated institutional investor — voluntarily pay for advice that is rife with inaccuracies, especially when they are using it to inform how they vote on important matters that can affect their shareholder value?  In fact, proxy advisors compete based on the accuracy of their advice.  As one commenter put it, "Proxy advisors' business model depends on factual accuracy and their incentives are thus aligned with issuers and institutional investors alike."[29]

If market incentives were not enough, the SEC has repeatedly told investment advisers — most recently and definitively this past August — that they have a responsibility as a legal matter to evaluate the accuracy of proxy advisors' recommendations and their processes for correcting errors as part of their due diligence in using them as a service provider.  Given the market incentives and legal responsibilities already in place, the SEC should have produced a

---

issuer or the correction of a factual error, Glass Lewis notifies all clients that accessed the report or have corresponding ballots, regardless of whether the update affected any recommendations.  There is no deadline for notification of a purported material factual error.  Additionally, the exact nature of the report's updates and revisions are clearly described in the republished report.  If an issuer notifies Glass Lewis of a relevant factual error or omission in a report, Glass Lewis will respond and address the issuer's comments and/or questions.

[28]  See Comments of the Honorable Bryan Steil et al., U.S. House of Representatives, at 3 (Jan. 6, 2020) ("What does the empirical evidence suggest as to the prevalence of factual errors in proxy advisory services?"), available at https://www.sec.gov/comments/s7-22-19/s72219-6616198-202955.pdf

[29]  CII October 15 Letter at 3; see also Cappucci, The Proxy War Against Proxy Advisors at 32-33 ("If proxy advisory services were really as riddled with errors, transparency problems, and conflicts as their critics allege, one might expect their clients to be leading the charge for reform.  After all, they are the ones paying for the supposedly faulty research and it is their shareholder value that is being harmed.  But institutional investors and asset managers are not complaining.")

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

14

# GLASS LEWIS

compelling conceptual and empirical basis for believing proxy advisor inaccuracy was a sufficient concern to warrant a new regulatory regime.  Instead, the Release provides neither.

### B.  The SEC has not explained why current conflict disclosures are inadequate.

The Release is similarly vague about why current conflict disclosures are inadequate.  As to conflicts, like accuracy, there are both market incentives and existing legal requirements to promote conflict avoidance and disclosure.  Today, proxy advisors actively compete on the basis of the rigor of their conflicts policies and Glass Lewis takes pains to fully and prominently disclose even potential conflicts of interest.[30]  In addition, investment advisers that vote proxies on behalf of their clients have a legal responsibility under SEC rules to monitor and understand their proxy advisor's ability to identify and address any conflicts of interest, including a responsibility to monitor this issue on an ongoing basis.  Also, Exchange Act Rule 14a-2(b)(3) — an existing exemption available to proxy advisors — already requires disclosure of significant relationships and material interests.[31]

Given this background, one would expect there to be a compelling reason for instituting a new disclosure regime.  But the Release does not clearly explain what is deficient about current proxy advisor conflict disclosures.  In fact, in explaining the conflicts disclosure provision, the Release says that the "Commission's primary concern in proposing these amendments to Rule 14a-2(b) is with the recipients of proxy voting advice, including investment advisers who use that advice to make voting decisions on behalf of clients with whom they have a fiduciary relationship."[32]

This statement is hard to reconcile with the administrative record before the agency, however, which shows that those investment adviser clients are satisfied with current proxy advisor conflict disclosure practices.  As the Investment Adviser Association stated:

> Some commentators point to conflicts of interest as grounds for regulation of proxy advisory firms.  However, . . . proxy advisory firms currently disclose their conflicts of interest transparently in a manner sufficient for investment advisers to review and evaluate them.  Accordingly, this issue does not present a basis for a wholesale new and

---

[30]  See Glass Lewis' Policies and Procedures for Managing and Disclosing Conflicts of Interest (May 9, 2019), available at https://www.glasslewis.com/wp-content/uploads/2019/11/GL-Policies-and-Procedures-for-Managing-and-Disclosing-Conflicts-of-Interest-050819-FINAL.pdf.

[31]  See Exchange Act Rule 14a-2(b)(3)(ii), 17 C.F.R. 240.14a-2(b)(3)(ii).

[32]  Release at 34 n. 91.

---

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

15



burdensome regulatory regime that would raise costs substantially and make it more difficult for other proxy advisory firms to enter the marketplace.[33]

Nor does the Release give any reason to think that proxy advisor clients could not insist on better conflict disclosures if they thought the current ones were inadequate. They could and would, of course, if they thought more extensive or detailed conflict disclosures would be helpful or warranted.[34]

Instead, the Release here too cites the concerns of issuers, their advisers and advocacy groups.[35]  What the Release does not explain is why they — and not the proxy advisors' clients — should be the ones to evaluate whether those clients are receiving enough information or what additional disclosure would be useful. As one commentator has noted, "It is not clear what, if any, additional information critics are looking for when they call for greater disclosure,

---

[33]  See Letter from Gail C. Bernstein, General Counsel, Investment Adviser Association, at 5 (Dec. 31, 2018), available at https://www.sec.gov/comments/4-725/4725-4840960-177135.pdf.

[34]  See also Comments of Simon Frechet, Chair, Pension Investment Association of Canada (Jan. 23, 2020) ("we agree that it is beneficial to receive disclosure of relationships, transactions, or other interests that might result in a conflict between the interests of a proxy advisor and those of shareholders. However, we have found the disclosures already provided to be adequate and have not encountered significant conflict of interest problems with proxy advisors, so do not believe that specific rulemaking is necessary to address disclosures of conflicts by proxy advisors."); Comments of Sarah Wilson, Chief Executive Officer, Minerva Analytics (Jan. 2, 2020) ("If fund managers or institutional investors need protecting from proxy analysts, then we should be extremely worried for the rest of the investment management process for which they are responsible. Asset managers and institutional investors make many significant and demanding decisions every day – the allocation of trillions of Dollars, Pounds and Euros is their daily routine. Are issuers really suggesting that when it comes to ownership decisions that investors suddenly become ignorant?").

[35]  The only apparent non-issuer group cited in this section of the Release is a letter filed in a rulemaking on compensation consultant disclosure over ten years ago in which a fund group expressed concern about proxy advisor consulting for issuers (while recognizing that not all proxy advisors engage in this practice) and recommended that *issuers* be required to disclose consulting services they receive from proxy advisors. In fact, the commenter seemed to recognize that additional disclosure from the proxy advisor in the circumstances would have been counterproductive. See Release at 29 n. 78 (citing the comment letter of John Okray, Vice President and Assistant Counsel, Oppenheimer Funds, Inc. (Sep. 24, 2009)).

# GLASS LEWIS

and whether they would ever be satisfied that the proxy advisors have provided enough disclosure."[36]

Indeed, the Release itself is not clear about what additional information proxy advisor clients need.[37]  The most specific references are to "observers" asserting that there are "vague" or "boilerplate" disclosures.  This appears to be a reference to ISS's deliberate conflict mitigation practice of saying that it may have provided consulting services to an issuer in order to prevent its analysts from knowing that is the case.  In any event, if there was a legitimate concern about some proxy advisors using boilerplate, the SEC could have addressed that issue in more direct and less intrusive and costly ways.  For example, it could have simply added this as an interpretation of either investment advisers' existing responsibility or the existing solicitation exemption in its August releases or even used less formal and costly measures than a new rule to achieve its objectives.[38]  The Commission has not adequately explained this concern and why it necessitates a costly, overly broad and highly prescriptive new disclosure regime.

### C. The SEC has not explained why existing mechanisms for issuers to express their views are inadequate.

Similarly, the Release talks about providing "more complete" information to justify the new mandate that proxy advisors include a hyperlink to any issuer response in their proxy voting advice.  The Release notes that issuers today can make a supplemental proxy filing to respond to proxy advice, and that, in fact, a number of issuers use this existing mechanism

---

[36]  Cappucci, The Proxy War Against Proxy Advisors, at 29.

[37]  For example, the Release states, "Although proxy voting advice businesses have described various measures they believe mitigate this risk,[citing ISS and Glass Lewis conflict disclosure policies] the voting decisions of persons who rely on these businesses would be better informed if they received information sufficient for them to understand and assess these potential risks and measures."  Release at 28-29.  This is a circular statement and simply begs the question of what information not being supplied today should be provided.  If investors are not receiving sufficient conflict disclosures, it is incumbent on the agency to articulate how and why they are not sufficient (notwithstanding investors' lack of concern) and how the proposed rules would address that problem.

[38]  Cf. Peirce and Ellig, 8 Brook. J. Corp. Fin. & Com. L. at 424-25 ("To the extent adequate information is not being provided, the SEC could have considered working with the industry on a voluntary effort to establish best practices for disclosure to investors and potential investors.").

---

GLASS LEWIS

every year.  But the Release says, "The efficacy of these responses may be limited" because investors may choose to vote before those responses are sent.[39]

The SEC does not, however, say how often this is the case or purport to identify any useful, important new information in these supplemental proxy filings that was ignored.  Most tellingly, the SEC offers no explanation as to why institutional investor shareholders would be acting contrary to their economic interest by voting on corporate governance matters at companies they own without useful information.  Absent identification by the SEC of important, new information in these supplemental proxy filings that is not being considered today, the SEC has no rational basis, let alone a compelling reason, to mandate the novel and intrusive hyperlink requirement.[40]

* * *

In sum, despite the clamoring of interested parties, there is little evidence of a need for any new rule, let alone the sort of compelling empirical evidence that would justify risking this wholesale, new and untested regulatory intrusion into institutional investors' access to proxy advice.

**III.  The proposed rules would impair Glass Lewis' ability to provide timely and independent advice to its clients.**

To meet investors' needs, proxy advice must be timely and independent.  We are concerned that the proposed rules could impair both of these critical elements of our work.

    **A.  The two-stage issuer review and feedback procedures, if workable at all, would significantly impair proxy advisors' ability to provide timely advice.**

---

[39]  Release at 53.

[40]  Nor has the SEC explained why, if it did have evidence that investment advisers were ignoring important information in voting, that would not be better and more directly addressed through additional guidance on investment advisers' duty to vote in the best interest of their clients.

---



We do not believe that the two-stage issuer review mechanisms are workable.[41]  For the 4,912 companies that would be eligible for one of the two review periods,[42] the rule would impose a minimum of five and, depending on how weekends fall, potentially up to eleven days of issuer review time into the middle of what is already a highly compressed process.  There simply is not enough time for a week or more of issuer review in the process as it exists today.  As the Investment Adviser Association warned at the Commission's Proxy Process Roundtable, mandatory issuer advance review of proxy advisors' reports "is not likely to work in practice."[43]

The lengthy mandatory periods, combined with the logistical challenges of administering the review processes, risk compromising investors' ability to obtain proxy advice based on their selected policies and submit their votes.  The "best case scenario" will be material, adverse effects on investors' time to consider reports, engage with management and make their voting decisions.[44]  It will also impose significantly increased costs.  And, because the rule operates in a mandatory, rigid fashion, these delays and adverse effects will occur even when the issuer has no intention or interest in reviewing the proxy advice.

The unworkability of the mandatory review and feedback periods is exacerbated by the seasonality of the proxy advice business.  Glass Lewis statistics show that more than half of the

---

[41]  We recognize that the Release refers to the second review stage as provision of a "final notice."  There is no prohibition on issuers responding to this notice with additional comments or even new arguments, however.  And the Release explicitly warns proxy advisors that failure to incorporate issuer comments could precipitate legal action under Rule 14-9.  As Commissioner Lee noted, "There are two levels of review. The second one is called a "final notice" but it will function in the same way as the first review."  See Statement of the Honorable Allison Herren Lee at SEC Open Meeting, at n. 6 (Nov. 5, 2019), available at https://www.sec.gov/news/public-statement/statement-lee-2019-11-05-shareholder-rights.

[42]  Glass Lewis' analysis of the timing of proxy statement filings indicates that approximately 4,912 of the 5,565 companies it issued proxy research reports on in 2018 would have been eligible for one of the two review periods.  See Glass Lewis' PRA Submission at 20.

[43]  See Comments of Gail C. Bernstein, General Counsel, Investment Adviser Association at 5 (Dec. 31, 2018).

[44]  See Comments of Scott M. Stringer, Comptroller, City of New York, at 2 (Nov. 20, 2019) ("Our capacity to fulfill our proxy voting responsibilities, particularly during the peak of U.S. proxy season in the spring, requires a high-quality, efficient process which rests in large part on the timely receipt of the independent, expert research we receive from our two proxy advisors (presently ISS and Glass Lewis).")

---

GLASS LEWIS

annual meetings it advises on in the U.S. each year take place in April and May.[45]  And the number of meetings that must be covered over those two months is over six times as high as Glass Lewis' average workload over the ten months outside the peak of "proxy season."  Glass Lewis data below illustrates how pronounced the concentration of proxy work in the late Spring is:



Administering the mandatory review and feedback processes during the peak time period would be, at best, extraordinarily challenging.

Yet the time periods in the proposed rules are fixed; issuers would be entitled to the same number of review days — potentially up to 11 — whether it is the busiest or least busy time of the year for corporate annual meetings.  And the Release, while it does note in passing that a "significant portion of [investment advisers'] voting decisions [are] concentrated in a period of a few months," does not otherwise engage with this issue, let alone provide a compelling, reasoned explanation of how the fixed review periods would be workable during peak proxy season.

---

[45]  In 2018, 3,096 of 5,565 meetings or 55.6%.



Nor does the Proposing Release adequately consider the adverse effects these review periods would have on investors.  The point of the proxy voting process, after all, is to facilitate shareholders' decisions on important corporate governance matters.  A direct consequence of the proposal, however, would be to significantly decrease the time available for institutional investor shareholders to conduct their own analysis (including directly engaging with the company, if warranted) and make those decisions.[46]

Specifically, Glass Lewis studied the current timelines for its provision of proxy advice to its clients for the time periods used in the SEC's proposed rule, and a subset of one period where time pressure is most acute.  Assuming that Glass Lewis' preparation time remained constant and responding to issuer feedback and carrying out the other administrative steps required by the proposed rules, including entering into confidentiality agreements with issuers, would take Glass Lewis three calendar days, the proposed rule would have the following effect on its clients' time:

| Time Period (Calendar Days Before AGM Proxy Statement is Filed) | Investor Lead Time with Glass Lewis Research Today (Calendar Days to AGM) | Best-Case Average Lead Time Under Proposed Rules (Calendar Days to AGM) | Worst-Case Average Lead Time Under Proposed Rules (Calendar Days to AGM) |
|---|---|---|---|
| >45 days | 27 | 17 | 13 |
| 25-45 days | 24 | 16 | 12 |
| 25-30 days | 21 | 13 | 9 |

As can be seen, in all but the best-case scenarios, the rule will often cut investors' time for analysis, engagement and deliberation by half or more.  Because there are only five days in the work week, it will not be uncommon for one or both issuer review periods to include a weekend.  In the critical segment of companies that file their proxy statements between 25 and 30 days before the annual meeting — a segment that the SEC speculates could grow as

---

[46]  Beyond the lost time, investors and others are concerned that focusing the process on proxy advisor-issuer exchanges would exacerbate the misconception that companies should be concerned with proxy advisors' views, rather than those of their shareholders.  See Comments of Sarah Wilson, Chief Executive Officer, Minerva Analytics (Jan. 2, 2020) (" Issuers will feel that in having dealt with proxy analysts there will be less need for them to engage directly with their shareholders."); see also Securities and Exchange Board of India, Report of Working Group on Issues Concerning Proxy Advisors, at 25 (July 29, 2019) ("SEBI Working Group Report"), available at https://www.sebi.gov.in/reports/reports/jul-2019/report-of-working-group-on-issues-concerning-proxy-advisors-seeking-public-comments_43710.html.

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

21



companies seek to take advantage of the review periods — investors would lose between 38 and 57 percent of the time they have today before the meeting.[47]

   Ironically, the SEC just this past August issued guidance conveying enhanced expectations for investment advisers' diligence in exercising voting responsibilities on behalf of their clients.  Among other things, the August 2019 Guidance talked about situations where advisers may need to "conduct a more detailed analysis than what may be entailed by application of its general voting guidelines," and "to consider factors particular to the issuer or the voting matter under consideration."[48]  At the same time, the proposed rules would dramatically shorten the time for investment advisers to comply with these responsibilities.  As the New York City Comptroller stated, "We do not want company management interposed between us and our research service providers, and this is even more problematic if it involves additional cost and delay, giving us less time for our due diligence on each proxy vote."[49]

   This is not only unwise, but unnecessary.  Glass Lewis, like other proxy advisors, already has incentives to produce accurate research and therefore has designed and implemented processes where it can check key facts with issuers without compromising its time to research and write its reports or cutting into its clients' time to review the analysis and vote.  Specifically,

---

[47] Glass Lewis' data shows that report preparation and delivery timing varies significantly for mergers and acquisitions and other special situations.  On average, proxy research reports were delivered to clients 14 days before the meeting date on M&A transactions and 13 days in contested situations.  The review and feedback periods would obviously reduce the available time for our clients in these situations dramatically.  In addition, our experience is that contested situations are often much more fluid with both sides making supplemental filings on a continuing basis as the meeting date approaches.  In light of this, it is important for a proxy advisor, when appropriate to best meet its clients' needs, to be able to defer providing its advice until near-final information is available and to be able to quickly amend already-provided advice, as needed.  For these reasons, we believe the review and feedback periods are particularly unworkable in this context.  In addition, we note that commentators have raised significant questions about how the advance knowledge gained in the review processes could be misused in contested situations that should be addressed and resolved before adopting any rule mandating review in this context.  See Ronald Orol, "Activist Spotlight: SEC Rule Could Give Activists an Advantage" (Dec. 2, 2019) (noting that proxy solicitation experts said there would be "many unintended consequences associated with the early access" in contested Board elections, including potential trading based on material non-public information).

[48] See August 2019 Guidance at 14.

[49] Comments of Scott M. Stringer, Comptroller, City of New York, at 3 (Nov. 20, 2019.

---

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

22



in 2015, Glass Lewis began to provide the subjects of its research with its Issuer Data Report ("IDR"), which details the key facts underlying the relevant report for their review before the report is finalized.  This practice is deliberately limited.  Glass Lewis finds that by providing the facts underlying the report, it can gain any benefit of company review without inviting time-consuming and unproductive debates about Glass Lewis' methodology or what result that methodology should lead to in the context of a particular recommendation.[50]  This free service has been available for several years and more than 1,400 companies currently participate in it on an annual basis.  The proposed rule, however, would replace this carefully designed, tested and efficient workflow with two mandatory rounds of issuer review of both facts and recommendations.

Moreover, the SEC has invited companies to use their review periods to challenge proxy advisors' methodology, with the suggestion that lawsuits could be based on proxy advisors not incorporating issuer "feedback."  This means that, along with the five to eleven days of issuer review time, proxy advisors will need to devote time during this compressed period to respond to distracting and unproductive challenges by management to its methodology and potentially document its reasons for why it did not revise its proxy advice, in anticipation of litigation.

The review and feedback mechanisms are not workable and should be abandoned.  If they are not, the SEC should explain its basis for believing that this major change would not disrupt the proxy voting process, even during the peak proxy season.  In addition, having a reasoned basis for the rule requires accounting for the opportunity costs of: 1) constricting the time for investors to conduct their own proxy review process, including reviewing proxy advisor reports, engaging with companies, and determining how to vote; and 2) making it more difficult for proxy advisors, if needed, to expand the amount of work they do to engage in deeper research on particularly complex issues.  Absent seeing such a compelling explanation, we respectfully submit that the risks and adverse consequences of the rule far exceed any benefits to issuers.

B.  **The issuer review and feedback procedures would compromise proxy advisors' independence.**

Independence is fundamental to the proxy advisor's role.  Most parties involved in the proxy solicitation process have an interest in the outcome.  As annual meetings approach, company management and sometimes others try to persuade shareholders to support their position.  In contrast, institutional investor shareholders hire proxy advisors to be a neutral,

---

[50]  We note that this is similar to the approach taken in the context of research analysts, where, as further discussed below, SEC-approved FINRA rules allow them to check the facts in their reports with companies, but not share the full reports.

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

23



disinterested arbiter.  They want an expert who can sort through dense, lengthy and complex proxy statements and, with no interest other than aiding the shareholder client, help them come to a vote consistent with their investment philosophy and voting policy.[51]

The rule, however, seems intended to — and almost certainly would — damage this very independence and neutrality.  The proposal's new regime would create three new ways for company management to try to influence the work of or even punish proxy advisors who recommend against their proposals: the review and feedback procedures; the mandate to publish management views; and the Damocles' sword of potential company litigation.  In other words, as Commissioner Jackson put it in dissenting from issuing the proposal, the proposed rule "imposes a tax on firms who recommend that shareholders vote in a way that executives don't like."[52]

From an investor's perspective, the previously objective advice they paid for would now be potentially conflicted.  As the Comptroller of the City of New York and trustee of the New York City Retirement Systems commented on this proposal:  "While proxy advisory firms should, and do, have procedures in place to mitigate any potential conflicts of interest, I can conceive of no conflict of interest more insidious than the one created by a Proposal that would

---

[51]  See Nell Minow, Value Edge Advisors, "Response to the Chamber of Commerce's Outrageous Comment to DOL, Harvard Law School Corporate Governance Blog (Oct. 30, 2019) ("Proxy advisory firms are the only independent source for evaluation of proxy issues."), available at https://corpgov.law.harvard.edu/2019/10/30/response-to-the-chamber-of-commerces-outrageous-comment-to-dol/.

[52]  Statement of the Honorable Robert J. Jackson, Jr. at SEC Open Meeting (Nov. 5, 2019), available at https://www.sec.gov/news/public-statement/statement-jackson-2019-11-05-openmeeting; see also Matt Levine, "Advice is Different than Solicitation," Bloomberg Opinion (Nov. 6, 2019) ("if [proxy advisors] get stuff wrong by [] managers' standards, those managers can now make life hard for them.  Whereas if they just do what the managers want there's no problem."), available at https://www.bloomberg.com/opinion/articles/2019-11-06/advice-is-different-from-solicitation; Cappucci, The Proxy War Against Proxy Advisors, at 30-31 ("Further, giving companies an additional say in the process could have a chilling effect on proxy advisors' willingness to issue truly independent advice. If they believe that every disagreement over a subjective determination like a say-on-pay vote is likely to lead to a messy confrontation with management, they may be less inclined to issue negative advice.").

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

24



grant a company that is the subject of proxy voting advice the right to review and provide feedback on that advice."[53]

In fact, the SEC has acknowledged that issuer review presents a conflict of interest in an analogous context. At the Open Meeting at which the Commission proposed these rules, Chairman Clayton noted that proxy advisors' services to investment advisers "are comparable to the services of other significant third-party market participants on whom shareholders rely, including auditors, rating agencies and research analysts."[54] But the SEC was presented with this very issue in the context of regulating analysts[55] and, rather than *mandating* issuer review, agreed that it should be *prohibited* because of the conflict it presents.

With the SEC's oversight and express approval, the Financial Industry Regulatory Authority ("FINRA") has promulgated rules that regulate the conflicts of interest research analysts face in researching and reporting on the advisability of investing in public companies.[56] While many of its research analyst rules are disclosure-based, FINRA Rule 2241 requires broker-dealers to have policies and procedures that "prohibit prepublication review of a research

---

[53] Comments of Scott M. Stringer, Comptroller, City of New York, at 3 (Nov. 20, 2019); Comments of Sarah Wilson, Chief Executive Officer, Minerva Analytics (Jan. 2, 2020) ("Various commentators have claimed that lack of objectivity and independence and so therefore issuers must have the last word. This does not make sense. If research becomes conflicted or tainted by the involvement of issuers in the research process because they are buying, receiving or commenting on research then surely there should be less involvement, not more?").

[54] Statement of the Honorable Jay Clayton at SEC Open Meeting (Nov. 5, 2019) (footnote omitted), available at https://www.sec.gov/news/public-statement/statement-clayton-2019-11-05-open-meeting#_ftn13.

[55] Analysts are third parties who produce research reports for investors with investment recommendations. Proxy advisors are third parties who produce research reports for investors with corporate governance recommendations.

[56] As FINRA has explained, "[t]he aim of FINRA's equity and debt research analyst and research report rules is to foster objectivity and transparency in research reports and public appearances and provide investors with more reliable and useful information to make investment decisions." FINRA, Rules and Guidance, Research Analyst Rules, available at https://www.finra.org/rules-guidance/key-topics/research-analyst-rules.

---

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

25



report by a subject company for purposes other than verification of facts."[57]  As a senior SEC official explained at the time the rule was promulgated:

> Analysts will also be prohibited from sharing draft research reports with the target companies, other than to check facts after approval from the firm's legal/compliance department. *This provision helps protect research analysts from influences that could impair their objectivity and independence.[58]*

But here, the proposed rules would require the very conflict that is prohibited in this comparable situation.  In other words, under the federal securities laws, it is illegal for an analyst to do what proxy advisers would be required to do by the proposed rule.  Administrative law, fundamental fairness and common sense require that comparable services should be regulated in comparable fashion.[59]  At a minimum, the SEC should not mandate something that presented a sufficient problem in a comparable context that it had to be prohibited.[60]

**C.  Treating methodology the same as facts is conceptually flawed and will lead to unproductive disputes.**

---

[57]  FINRA Rule 2241(b)(2)(N).  Our understanding is that the SEC has approved this rule twice, first as NASD 2711 and then, slightly amended, as FINRA 2241 in 2015.  See U.S. Securities and Exchange Commission, Release No. 34-34-75471 (July 16, 2015).

[58]  Speech of Lori Richards, Director, Office of Compliance Inspections and Examinations, U.S. Securities and Exchange, "Analysts Conflicts of Interest: Taking Steps to Remove Bias," (May 8, 2002) (emphasis added), available at https://www.sec.gov/news/speech/spch559.htm.

[59]  See also Statement of the Honorable Elad L. Roisman at SEC Open Meeting (Nov. 5, 2019), ("the same activity should be regulated consistently across our markets"), available at https://www.sec.gov/news/public-statement/statement-roisman-2019-11-05-14a-2b#_ftnref4.

[60]  Among the comparable professional services Chairman Clayton referred to, only proxy advisors would be singled out for mandatory pre-review of their reports by the subject companies.  In fact, these other services are primarily regulated to **prevent** direct or indirect management influence on the objectivity of their advice.  Nor would it would suffice for the SEC to seek to distinguish research analysts because of the history of scandals in that field.  Just because FINRA and the SEC had to step in and prohibit a conflict after a scandal in one context does not make it rational to mandate that same conflict for a comparable service that has not been ridden with scandals.

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111     W W W . G L A S S L E W I S . C O M

26



Implicitly conceding that the oft-heard criticism of proxy advisors' work as being error-prone was baseless or at least misleading,[61] the Release consistently refers to "factual errors or methodological weaknesses" in describing issuers' concerns and what the rule is meant to address.  For example, the Release states that companies "may have disagreements that extend beyond the accuracy of the data used, such as differing views about the proxy advisor's methodological approach or other differences of opinion that they believe are relevant to the voting advice."[62]

The Proposing Release does not define the term "methodological weakness" or give any examples of them.  Nor does the economic analysis try to identify methodological weaknesses as a category of issuer complaints, although it does identify what are called "analytical errors" and "general or policy dispute[s]."  (We note that there were nearly five times as many of these as purported "factual errors" in the analysis' sample.)  But issuers are nonetheless invited to review and provide feedback on "methodological weaknesses."   There are at least three problems with this.

First, methodology does not lend itself to this type of review.  Methodology is different than facts in the sense that it is judgmental.  For the most part, the issues that are put up for shareholder vote on corporate proxy statements are matters of opinion on which there is not a right or wrong answer.

In fact, this very point has been made by the Commission.  In 1992, the SEC was confronted with management arguments for a "role to play in rebutting any misstatements or mischaracterizations" made about their company in the proxy process.  Companies maintained that this was necessary for "the benefit of shareholders as a whole in ensuring that proxies are

---

[61]  This is widely recognized outside of corporate-funded studies.  See, for example, SEBI Working Group Report, at 10 ("While there have been arguments that proxy advisors are not open to factual corrections, we found factual errors both rare and non-contentious.  The most contentious issues where a company strongly dis-agreed with a recommendation is almost always an opinion formed by the proxy advisor."); Broc Romanek, Proxy Advisers Handbook for In-House Counsel, at 11 ("There's a realm of type of errors, some significant - some not.  Some are merely a matter of interpretation-differences in opinion-and not really errors.").

[62]  Release at 43-44.  Similarly, the Commission's August 2019 Interpretation maintained that the Rule 14a-9 cause of action extends to "opinions, reasons, recommendations, or beliefs."  Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice, Release No. 34-86721 (Aug. 21, 2019) ("August 2019 Interpretation").

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

27



executed on the basis of 'correct' information." [63]  But the SEC rejected this argument because the types of issues that come up on corporate proxy statements are not the sort that lend themselves to this kind of review.  As the Commission explained at that time:

> Of course, much commentary concerning corporate performance, management capability or directorial qualifications or the desirability of a particular initiative subject to a shareholder vote is by its nature judgmental.  As to such opinions, there typically is not a 'correct' viewpoint.[64]

This is no less true today.  But the SEC has not acknowledged this prior position, let alone provided a reasoned basis for its change of position.

The judgmental nature of many issues on the corporate proxy is confirmed by evidence of major investors' voting patterns.  Today, "[t]here is considerable variation in asset manager voting on shareholder proposals," even among the largest and most sophisticated institutional investors.[65]  In the frequent scenario when even the largest investors disagree on the merits of a shareholder proposal, it would be naive to attribute those differences to "methodological weakness" on the part of one of the investors.  Rather, major investors' voting patterns reflect the judgmental nature of many issues up for proxy voting, which is precisely why encouraging company-proxy advisor disputes about methodology — up to and including litigation about proxy advisors' opinions and recommendations — would be unproductive and wasteful.

Second, discussions on methodology are best conducted outside proxy season.  A proxy advisor's methodology is almost always applicable to more than one company.  Accordingly, Glass Lewis finds it most efficient to obtain issuer input on its methodology outside of the peak proxy season, when its resources need to be focused on specific analysis and application of that methodology to annual meeting proposals.[66]  But the review and feedback procedures would

---

[63] U.S. Securities and Exchange Commission, Regulation of Communication among Shareholders, Release Nos. 34-31326 (Oct. 22, 1992), 57 Fed. Reg. 48,276 ("SEC Shareholder Communications Release").

[64] Id. at 48,278.

[65] See Barbara Novick, BlackRock, Inc., "Proxy Voting Outcomes: By the Numbers, Exh. 5 (showing data from N-PX filings), Harvard Law School Corporate Governance Blog (July 24, 2019), available at https://corpgov.law.harvard.edu/2019/07/24/proxy-voting-outcomes-by-the-numbers/.

[66] For the year ended June 30, 2019, Glass Lewis analysts met with more than 1,600 companies on methodology and contacted more than 37,500 companies for feedback and input.

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

28



force these conversations to happen when there is the least time for them, with the attendant costs and risks for the proxy advice process discussed above.

Third, the focus on issuer-proxy advisor dialogue on methodology is misplaced. Proxy advisors are agents of and exist to serve their clients, the shareholders who actually vote on corporate proxies. Much of what proxy advisors do is to understand their clients' positions and voting policies, reflect the consensus positions in their house policies, and then, through careful review of proxy statements, apply those positions to the thousands of factual situations in which they arise each year. In other words, much of what proxy advisors do is to implement client voting preferences, whereas the proposal seems to assume that proxy advisors are causing investors to have those preferences.[67] Seen in this light, much of the feedback about "methodological weaknesses" that the proposed rule would steer to proxy advisors would be misdirected, particularly since "there typically is not a correct viewpoint" on these matters.

For this reason, the Release's asking whether the proposed rules should apply to custom voting policies is especially problematic and confusing. To begin with, we fail to see how this would work in practice. Glass Lewis administers custom voting policies on one or more issues for hundreds of clients, with none of those custom policies being reflected in a proxy research paper that could be provided to an issuer for its review. Doing this in some way would also have significant ramifications for the cost, time and paperwork burdens the rules would impose.[68]

Even if this could be operationalized, it would serve no apparent purpose. When a proxy advisor is implementing a client's custom policy, the vote recommendation reflects the client's position, not the proxy advisor's. Forcing a delay in that recommendation's delivery to the shareholder so that an issuer can explain to the proxy advisor why it thinks the client's policy has "methodological weaknesses" would be beside the point. By definition, the methodology being applied is different than the proxy advisor's benchmark policy. Under the proposed rules, would the proxy advisor be making a false or misleading proxy "solicitation" if it implemented the client's custom policy, just because that methodology is different than the one in its house policy? Because the proxy advisor is not exercising its own judgment when it

---

[67]  See Stephen Choi, Jill E. Fisch, and Marcel Kahan, "The Power of Proxy Advisors: Myth or Reality?," 59 Emory L.J. 869 (2010) ("Thus, ISS is not so much a Pied Piper followed blindly by institutional investors as it is an information agent and guide, helping investors to identify voting decisions that are consistent with their existing preferences.").

[68]  Glass Lewis' PRA Submission assumed the proposed rules did not apply to implementation of a client's custom policy.

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

29



implements a client's custom policy, applying the proposed rules to that function would not make sense.  The SEC should clarify in any final rule that "advice that makes a recommendation" does not include application of a client's custom voting policy.[69]

### D. The conflicts, review and feedback, and publication requirements need important technical fixes and clarifications to be operational.

#### 1. The conflicts disclosure provision.

Glass Lewis supports the Commission's objective of ensuring that proxy advisors appropriately manage and disclose conflicts and has always taken a rigorous approach to conflict avoidance and disclosure.  In light of this and the existing legal requirements around proxy advisor conflict oversight and disclosure, we are not clear why a new, highly prescriptive conflict disclosure regime is warranted.  If the Commission does move forward with this part of the proposal, however, we suggest that the proposed rule and accompanying release be revised in two respects to avoid unintended consequences.

First, we are concerned that the breadth of the definition of "affiliate" in the Proposing Release would have the unintended consequence of making Glass Lewis research analysts aware of relationships they are specifically shielded from today in order to avoid conflicts. Specifically, each of the three sub-sections of the proposed rule describing potential conflicts extends to any "affiliate" of the proxy voting advice business (as well as "affiliates" of the registrant or shareholder proponent it may have a material transaction or relationship with). And the Release explains that "affiliate" is meant to have the same meaning as Exchange Act Rule 12b-2, where it is defined as "a person that directly, or indirectly through one or more

---

[69]  As Question 33 in the Release seems to recognize, forcing "advice" in the form of implementation of a client's custom voting policy to be shared with issuers would also expose some investors' confidential, proprietary information.  Many Glass Lewis clients publish or are comfortable making their voting policies public.  Other clients, however, do not make their voting policies public and expect Glass Lewis to maintain their confidentiality.  Mandating that custom voting recommendations go through the issuer review and feedback mechanisms would expose these investors' confidential, proprietary information and force Glass Lewis to breach its commitments to these clients.  Carving custom policy implementation out of the proxy advice covered by the rule would avoid this problem.  See also Comments of Pension Investment Association of Canada (Jan. 23, 2020) (applying the rules to custom policy implementation "would be extremely inappropriate. PIAC members have the right to make their own voting determinations and to keep their voting intentions private if they desire.").

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111      W W W . G L A S S L E W I S . C O M

30



intermediaries, controls, or is controlled by, or is under common control with, the person specified."[70]

Glass Lewis is co-owned by the Ontario Teachers' Pension Plan Board ("OTPP") and Alberta Investment Management Corp. ("AIMCo").  Neither OTPP nor AIMCo is involved in the day-to-day management of Glass Lewis' business; Glass Lewis operates as an independent company separate from OTPP and AIMCo.  Moreover, Glass Lewis excludes OTPP and AIMCo from any involvement in the formulation and implementation of its proxy voting policies and guidelines, and in the determination of voting recommendations for specific shareholder meetings.  To help maintain this separation, Glass Lewis' policy on conflicts of interest provides in part: "Restricted Access to Owner Information. Glass Lewis research analysts are blocked from any access to the holdings files, custom policies, and/or voting activity of Glass Lewis' owners."[71]

As we understand the proposed rule, however, any company controlled by a Glass Lewis controlling owner would be considered an affiliate and therefore even an interest, transaction or relationship of that company with a registrant *or any registrant affiliates* would require conflict disclosure.[72]  And the Release conveys the SEC's expectation that "publicly-available information" would be used to search for affiliate relationships.  This would seem to require an unnecessarily broad inquiry into matters Glass Lewis and its analysts are deliberately not given access to – with potentially significant associated costs and delay – and lead to disclosure of situations that would not present even an appearance of a conflict, particularly given the structural mechanisms in place.[73]

---

[70]  17 C.F.R. 240.12b-2.

[71]  Glass Lewis' Policies and Procedures for Managing and Disclosing Conflicts of Interest (May 9, 2019), available at https://www.glasslewis.com/wp-content/uploads/2019/11/GL-Policies-and-Procedures-for-Managing-and-Disclosing-Conflicts-of-Interest-050819-FINAL.pdf.

[72]  To be clear, Glass Lewis does disclose today when either of its owners has a stake in a company it reports on that is significant enough to be publicly disclosed in accordance with a local market's regulatory requirements or is a Top 20 shareholder.  Our point here is about the effect of using the broad "affiliate" definition on both the proxy advisor and the subject of its advice.

[73]  Moreover, in certain situations, the interests, relationships and transactions required to be disclosed by such a broad definition of "affiliate" may implicate proprietary or potentially material non-public information.

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

31



Second, we question whether one aspect of the proposed disclosure is overbroad and therefore may risk obscuring the important information in the conflict disclosure.  Specifically, sub-section (D) would require each proxy advisor report and electronic medium noting a conflict to include disclosure of "[a]ny policies and procedures used to identify, as well as the steps taken to address, any such material conflicts of interest arising from such interest, transaction, or relationship." The Release describes this as requiring:

> a discussion of the policies and procedures, if any, used to identify and steps taken to address such potential and actual conflicts of interest.  Such disclosure should include a description of the material features of the policies and procedures that are necessary to understand and evaluate them.  Examples include the types of transactions or relationships covered by the policies and procedures and the persons responsible for administering these policies and procedures.[74]

Although it is not clear to us exactly what is expected here,[75] we are concerned that including a "discussion" of Glass Lewis' conflict policies and procedures twice with each conflict disclosure would be wasteful and potentially obscure the important information investors expect and would want to focus on.  Glass Lewis has one set of policies and procedures that describes how it identifies and addresses conflicts, which it makes available on its website.  The document is fairly lengthy and it is not readily apparent to us how it could be significantly condensed while still describing the "material features of the policies and procedures that are necessary to understand and evaluate them," as the Release says each disclosure should.  Moreover, since these policies and procedures apply to all conflicts, we do not see what value would be added by repeating them with each conflict disclosure as opposed to maintaining them on the website and perhaps including a reference to them with each conflict disclosure.[76]

---

[74]  Release at 32.

[75]  We note that the SEC's Investor Advisory Committee read this provision to require proxy advisors to disclose their detailed compliance manuals.  If that is what is intended by this provision, it would be inappropriate and problematic for the reasons identified in the IAC submission.  See Recommendation of the SEC Investor Advisory Committee (IAC) Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals, at 10 (Jan. 24, 2020).

[76]  Moreover, the Release does not explain what purpose would be served by this disclosure including the name of the person or persons responsible for administering the policies and procedures.  Glass Lewis discloses the management roles included on its Compliance Committee, which has overall responsibility for its conflicts program, as part of its conflict policies and procedures.

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111     W W W . G L A S S L E W I S . C O M

32

# GLASS LEWIS

### 2.    The issuer review and feedback mechanisms.

As noted above, Glass Lewis believes the issuer review and feedback mechanisms are unworkable and inadvisable.  If the Commission nonetheless proceeds with this part of its proposal, we are also extremely concerned that these mechanisms fail to account for a number of basic, administrative details that would be critical for the rules to be operational.  Having designed and managed our own factual review and comment mechanism (Glass Lewis' IDR program[77]), we are mindful of the complexity involved and the importance of designing the necessary processes in an efficient manner.  Given the scale and novelty of extending two rounds of issuer review of facts and methodology to some 5,000 reports a year, we strongly encourage the Commission to address these issues and seek supplemental comment on their practical operation before finalizing any rules.[78]

Today, issuers seeking to participate in Glass Lewis' IDR process must indicate their interest a set period of time before the data is ready for their review.  This facilitates Glass Lewis' planning and avoids wasted effort and lost time seeking factual review from issuers that have no interest in reviewing Glass Lewis' proxy advice.  While many issuers sign up for and participate in the process, many others do not.  In contrast, the rule would mandate three or five business days of review for most issuers.  The review and feedback mechanisms should give proxy advisors' flexibility to not jump through these hoops when they would serve no purpose.

Including an opt-in on the issuer's part would also solve another seemingly mundane, but critical part of trying to carry out the review and feedback processes for some 5,000 issuers a year — knowing whom to provide the proxy advice to.  The issuers covered by the proposed rule often have thousands of employees and the rule provides no guidance on whom it should be provided to or any assurance that sending it to any appropriate company employee whose contact information can be obtained would satisfy its requirements.  Having issuers opt in would allow proxy advisors to collect this information before the process begins.  Absent that, the Commission should amend the proxy statement to require issuers to specify a contact

---

[77] Glass Lewis operates a program today where issuers have the opportunity to review a data-only version of the proxy research report – for free – prior to publication of the report to Glass Lewis' clients.  See https://www.glasslewis.com/issuer-data-report/.

[78]  Alternatively, if the Commission determines to move forward with the issuer review and feedback mechanisms, a pilot program outside peak proxy season would be an appropriate vehicle to test the rule's practical operation before extending these untested requirements to the entire proxy advice market.



person and clarify in the rule that proxy advisors need only provide a copy to the designated contact and consider feedback from that designated contact.

Both the three- and five-day issuer review periods require the proxy advisor to "provide[] . . . a copy" of the proxy advice to the registrant for review.  The "final notice" requirement is phrased similarly.  Given the enormous logistical burden the proposed rule's mechanisms would cause, proxy advisors would almost certainly need to develop and implement software to try to carry out this back and forth process.  For example, it might require developing an issuer-facing electronic platform that could host the drafts and facilitate the review and feedback process.[79]  Framing this requirement in more general terms, such as "makes available to," rather than "provides," would enable proxy advisors to attempt to carry out the rule's requirements in a less inefficient and costly manner.

Similarly, the rule should allow proxy advisors to specify how the feedback is transmitted, with express assurance in a note that proxy advisors are not obligated to consider feedback not provided through the designated channel.  Issuers participating in Glass Lewis' IDR process provide their comments in a specified format that increases the efficiency and auditability of the process.  Failing to allow the proxy advisor to specify an appropriate channel for the communication of feedback puts the proxy advisor in the position of having to potentially query its entire workforce for any communication from any company employee (or their outside lawyers) before it can conclude an issuer has not provided feedback, which would be time-consuming and a recipe for missed communications.

The SEC should also clarify that the initial review period runs from when the proxy advisor makes the proxy advice available to the company, subject to the company signing a confidentiality agreement that is consistent with Note 2.  The rule should also clarify that a registrant that does not agree to the proxy advisor's standard confidentiality agreement for these purposes — not just "such an agreement," as sub-section (B) of Note 2 in the proposed rule reads — would not be entitled to the review mechanisms.  As highlighted by Glass Lewis' PRA Submission, the vagueness of the current rule raises the prospect of proxy advisors having to negotiate confidentiality agreements with issuers, which could consume significant amounts of time.  Moreover, if the review period does not commence while this negotiation is taking place, it could cause significant, further delays and potentially be used in an opportunistic manner by companies anticipating an adverse proxy advisor recommendation.[80]

---

[79]  The Release seems to recognize this might be the most efficient way to carry out the review mechanisms.  See Release at 58-59 (discussing a 2018 BlackRock letter).

[80]  Likewise, we fail to see what would be accomplished by forbidding provision of a final notice, assuming it was ready, before the initial review period ends even if the issuer has



Likewise, the rule's unexplained statement that any confidentiality agreement "[s]hall cease to apply once the proxy voting advice business provides its advice to one or more recipients" is inconsistent with proxy advisors' standard business terms and should be stricken. Proxy advisors' advice is their product. Accordingly, Glass Lewis' clients, whether they purchase an individual report or a subscription, are not allowed to redistribute its proxy research reports. There is no reason non-paying issuers should not be subject to the same restrictions and any final rule should strike this sentence and clarify that a proxy advisor has a right to protect its intellectual property in the same manner as it does with its paying clients.

The SEC should also clarify that multiple rounds of "final notices" are not required. The rule, as proposed, states the proxy advisor must give companies two business days with a final notice that "must include a copy of such proxy voting advice that the proxy voting advice business will deliver to its clients." The Release explains that "'will deliver to its clients' [] effectively requires that the version of voting advice included in the final notice of voting advice will be the actual voting advice that will be disseminated to clients."[81]

This is not workable, however. As we have previously noted, nothing in the rule prevents an issuer from commenting on the final notice and other events may happen that require changes to the proxy advice included in the final notice. As proposed, the rule would require that each time the intended final proxy advice changes (whether in response to issuer comment, an update, to correct an error, or otherwise), it triggers another requirement to transmit it to the company for another two business days of review, further delaying the client's receipt of the advice or even potentially inviting gamesmanship at the final notice stage. The rule should not penalize or discourage updates, corrections or just accommodation of issuer suggestions at this stage, when appropriate, and the Commission should therefore clarify that there is only one final notice stage, even if the proxy advice changes.[82]

If it preserves the two rounds of review, the Commission should also provide that standard "exhaustion" principles apply. Companies should be deemed to have waived any objections that they could have raised at the initial review stage, but did not, and should not be

---

already provided its feedback. This seems to impose an arbitrary delay in the process, with no corresponding benefit we can discern.

[81]   Release at 48 n. 121.

[82]   As noted in our PRA Submission, we understand that the SEC Staff has acknowledged that the rule should not require multiple final notices and that this would be corrected in any final rule. Accordingly, our paperwork burden hour estimates assumed that revision will be made.

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

35



allowed to press these objections for the first time at the final notice stage (or, for that matter, in an action under Rule 14a-9).[83]  As the Commission knows from its role as an appellate body, standard requirements that an argument be raised when a party is first aware of it — and the party it is presented to has the best opportunity to respond to it — are critical to the efficiency of any review process.  Not including this standard principle would increase the chances objections are first raised at the final notice stage, reducing the opportunity for the proxy advisor to fully consider the objection, risking further delays to the delivery of proxy advice and inviting opportunistic misuse of what we understand the Commission intended by including the final notice.

The proposed rule should also contain appropriate guardrails around the use of non-public information.  Glass Lewis' analysis and reports are based solely on publicly-available information; under no circumstance does Glass Lewis develop its research or make vote recommendations based on non-public information.  As drafted, however, there does not seem to be any prohibition in the proposed rule on an issuer providing non-public information as part of its feedback.  The rule should require that any information provided as part of the feedback process be publicly available, with the company's feedback including appropriate citations to the public source for the information, such as the company's filings.  At the same time, proxy advisors cannot be in the position of having to research and assure themselves of the public nature of any issuer feedback they receive and decide to incorporate in their proxy advice.  Accordingly, any final rule should make clear that the proxy advisor may incorporate into its analysis and distribute to its clients any information provided by the company as part of its feedback and that the proxy advisor is in no way liable for any adverse consequences stemming from dissemination of any information provided by the company as part of its feedback.

Many of these practical concerns could be addressed by moving to a principles-based rule and using Commission or Staff guidance to ensure that the mechanisms are being administered in a fair and efficient manner.[84]  If the Commission determines to go forward with a detailed, prescriptive rule, we believe that successful resolution of these operational issues is

---

[83]  Glass Lewis, like other proxy advisors, obviously has an incentive to correct factual errors whenever it becomes aware of them and would do so whenever and however it learns of them. We focus here on the claims of "methodological weakness" that we suspect, based on our experience, will be the primary focus of the review periods.

[84]  For example, the exemptive condition could be as concise as a requirement that proxy advisors "maintain policies and procedures that provide registrants (and certain other soliciting persons) a meaningful opportunity to comment on proxy advice and final notice of any proxy advice," with Staff or Commission guidance filling in the timing and other elements.

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

36



critical to the workability of the resulting regime and we encourage the Commission to consider our suggestion that supplemental comment and/or a pilot program would be prudent given the scale and untested nature of the proposed requirements, as well as the importance of the continued, effective functioning of the proxy voting process to our corporate governance system.

**3.  The mandate to carry the issuer's hyperlinked response.**

We also have practical concerns about the mandate to publish a hyperlink to the issuer's response.  Most importantly, this part of the rule should clearly indicate that the requested hyperlink must be "provided to" the proxy advisor before the end of the relevant period.[85]  As proposed, the rule merely requires that the company has "requested" this by the deadline, which could be understood to allow a timely request to be made with the actual hyperlink to follow.  This is not what the Commission seems to have intended,[86] and it would present serious difficulties in practice, including allowing a company to indefinitely delay adverse proxy advice.

We would also ask the Commission to reconsider the practicality of its expectations that the hyperlink would be "activated concurrently" with publication of the proxy advisor's report.  While we understand that the Staff is trying to reconcile the proposal's unusual third-party publication mechanism with its existing rules on the filing of supplemental proxy materials, this sort of intricate coordination between the proxy advisor and company on a regular basis would be time-consuming, at best, and likely prone to error and delay.  For issuers to avail themselves of this opportunity, they should provide the proxy advisor with an active, functional hyperlink within the two-day period, with no further obligation on the proxy advisor's part other than including the link in its proxy advice and electronic medium.

The proposed rule should also contain some reasonable guidelines and limitations on the communications that proxy advisors would be required to hyperlink to in their reports and

---

[85]  This part of the proposed rule's reference to "the period described in paragraph (b)(9)(ii)" is also ambiguous and conceivably could refer to any of three different periods of time.  We assume what was intended here was the two business day period specified in paragraph (b)(9)(ii)(B).  See Release at 55.

[86]  See Release at 55 ("registrants would be required *to provide* the hyperlink (or other analogous electronic medium) to the proxy voting advice business no later than *the expiration of the two-day final notice period* that would be required under proposed Rule *14a-2(b)(9)(ii)(B)*") (emphases added).



thereby transmit to their clients.[87]  At a minimum, the response should: 1) be relevant to the matter at hand; 2) exclude any libelous or defamatory material; 3) exclude non-public information; and 4) exclude any unnecessary personal names or other personally-identifiable information.  Also, as noted above, for basic reasons of fairness and efficiency, companies should not be allowed to use their response to present arguments (whether alleged factual errors or methodological weaknesses) that were not first presented to the proxy advisor during the initial review period or other earliest opportunity.

Much of this could be accomplished through a general proviso in the rule that the hyperlinked response is only available to companies that agree, in advance, to a proxy advisor's reasonable terms and conditions.  (Issuers participating in Glass Lewis' Report Feedback Statement ("RFS") service[88] must agree to both terms and conditions and an etiquette guide.)  Absent that, the Commission should include the points above in the rule and proxy advisors should also be allowed, as a condition of posting the hyperlink, to require the company to fully indemnify them for any loss or claim arising out of the content of the company's response or from distributing the hyperlink and its clients' subsequent use of the hyperlinked site.

The Release does say, "In our view, proxy voting advice businesses would not be liable for the content of the registrant's (or certain other soliciting person's) statement solely due to inclusion of a hyperlink (or other analogous electronic medium) to such a statement in their voting advice."[89]  While we certainly agree that proxy advisors should not be liable for the mandated dissemination of third parties' statements, the only basis for this view cited in the Release is a Commission interpretation on companies' use of electronic media and the federal securities laws. The rule should include express liability protection for proxy advisors on this point, including preemption of any applicable state law (e.g., defamation).  Absent that sort of meaningful protection, allowing proxy advisors to require reasonable terms and conditions, such as indemnification, becomes all the more important.

Finally, as noted above, it is important that the Commission clarify that changes to the proxy voting advice at this point in the process do not trigger new two-day notice periods.  In particular, if the proxy advisor feels it necessary to respond in some way to a company's response (for example, to rebut what it sees as a false or misleading statement about its

---

[87]  Cf. Release at 65 Q. 38.

[88]  Glass Lewis operates a service today where issuers can sign up to have their responses to proxy research reports transmitted to Glass Lewis clients.  See https://www.glasslewis.com/report-feedback-statement-service/.

[89]  Release at 65-66; see also Release at 55 n. 140.

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

38

# GLASS LEWIS

advice), that should not restart a new final notice review period.  If this were not made clear, the rule could lead to repeated cycles of responses and responses to responses.

### E.  Other Issues.

#### 1.  Transition.

We appreciate the Commission's recognition that there should be an appropriate transition period for proxy advisors to develop and implement the systems and processes that would be needed to comply with the proposed rules.  We have two comments on the proposed period.  First, in light of the pendency of litigation raising, at a minimum, significant issues about the statutory and constitutional bases for this rulemaking, we believe the appropriate course would be to delay the effectiveness of any final rules until these threshold legal issues are resolved by the courts.  Absent that, proxy advisors may be required to begin to make substantial investments to develop the necessary systems while uncertain whether these systems will ultimately be needed.  These costs, of course, could not be later recovered and may have to be passed on to proxy advisors' clients and, in turn, those clients' participants and beneficiaries.  Second, given our expectations for what would be required to develop, implement and test the necessary systems and processes,[90] we believe an 18-month transition period after publication of the final rule in the Federal Register would be more appropriate.  Also, given the intense seasonality of proxy advisors' work, the Commission should ensure that the transition period does not end during or shortly before the Spring proxy season and consider a phased implementation schedule.

#### 2.  Rule 14a-9 interpretation.

The Commission also proposes to add four examples of how a proxy advisor's failure to disclose information could be a misleading statement under Rule 14a-9.  Specifically, the rule would codify three examples briefly noted in the August 2019 Interpretation – "the proxy voting advice business's methodology, sources of information, [and] conflicts of interest."  The rule would also add failure to disclose material information regarding "use of standards that materially differ from relevant standards or requirements that the Commission sets or approves" as another example of a misleading statement.

This is a significant change in the law, effectively requiring proxy advisors to make compliant disclosures or face SEC enforcement or private litigation.  But, as to the first three — on methodology, sources of information and conflicts – the new rules are barely mentioned in the Release.  The Release contains no discussion of the Commission's bases for adding these to

---

[90]  See note 138 below.

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111            W W W . G L A S S L E W I S . C O M

39



Rule 14a-9 or what would be required by the new rule text.  Nor does the August 2019 Interpretation include any description of the Commission's basis for concluding that a lack of disclosure on these topics could be misleading or its expectations for non-misleading disclosure, beyond a few short and general footnotes.[91]  Absent any such explanation, there will be significant, harmful uncertainty about the scope of Rule 14a-9 for proxy advisors, as well as unanswered questions about the implications of these interpretations for other parties that file proxy materials and face potential liability under Rule 14a-9  – and who, of course, have their own conflicts and use their own methodology and information sources.  The Commission should withdraw this rule change or repropose it with a detailed description of what the Commission expects and its basis for adding these examples to its rules.

Likewise, while it does discuss the issue, the Release does not explain why an investor would have been misled by proxy advisors' past recommendations that were based on standards other than legal requirements.  Specifically, the Release states, "clients may mistakenly infer that the negative voting recommendation is based on a registrant's failure to comply with the applicable Commission requirements when, in fact, the negative recommendation is based on the determination that the registrant did not satisfy the criteria used by the proxy voting advice business."[92]

Many of Glass Lewis' clients expect their portfolio companies to exceed minimum legal requirements (including Commission requirements) in some respects and Glass Lewis' house policy reflects that expectation.  Also, as noted throughout this letter, vote recommendations issued by a proxy advisor may vary and mirror the custom policy selected by the client itself and many of Glass Lewis' clients' voting policies are also based on some standards that exceed minimum legal requirements.  Given how common this is, the Commission's assumption that a client would be misled if a proxy advisor did not specifically point this out is unfounded and arbitrary.  We believe compliance with Commission requirements is both the norm for public companies and reasonably expected by most parties involved in the proxy voting process; if a company were in violation of SEC requirements in some respect, that would likely warrant

---

[91]  See August 2019 Interpretation at 12-13.  For example, there is no explanation of what the Commission expects to be disclosed about a proxy advisor's "methodology" for its advice to not be misleading, other than a footnote in the August 2019 Interpretation related to peer group construction.  Glass Lewis makes its house voting policies publicly available, but the details of some aspects of its methodology are Glass Lewis' proprietary information and accordingly are not publicly disclosed.

[92]  Release at 70.



specific mention in the proxy advice.[93]  The Commission should withdraw this rule change or adequately explain how and why a shareholder would be misled by the common practice of evaluating companies against proxy advisors' and shareholders' own voting policies, rather than just compliance with law.

**IV.  The economic analysis does not comply with the Commission's Current Guidance.**

To its credit, the Commission has made rigorous economic analysis a centerpiece of its rulemaking process.  And, while economic analysis is always important, surely it is most vital in atypical rulemakings like this one, where the Commission is not implementing a statutory directive or making incremental changes to an existing rule, but is instead electing to use its discretionary rulemaking authority to intervene in the private market and take a service it has not regulated directly and subject it to a new and detailed regulatory regime.

Nor is this a rulemaking where the relevant data is outside the Commission's purview or the rule is intended to further a non-economic goal outside of the Commission's area of expertise.  Proxy advisors' primary role is to review public companies' SEC filings and advise entities, many of whom are subject to SEC regulation, on how to vote on corporate governance matters.  In fact, the SEC has previously used its examination authority to review in detail how investors use proxy advice in their voting.  Countless public company letters and trade group-funded studies have been submitted to the SEC trying to make corporate managers' case for the Commission to regulate proxy advisors.  As Commissioner Roisman emphasized at the Open Meeting, the Commission and Staff engaged in "extensive study" to put together its proposal on this issue that the SEC and others "have grappled with for well over a decade."[94]

It is all the more surprising then how little the economic analysis included in the Release says about why this new regulatory regime is needed and what its consequences would be from an economic perspective.  In fact, the economic analysis included in the Release falls short of the Commission's responsibilities and its own standards on almost every count.  No market failure is identified.  No data or even information from the Commission's examinations was used to establish the baseline in practice.  Reasonable alternatives — including ones

---

[93]  See Comments of the Pension Investment Association of Canada (Jan. 23, 2020) ("Any noncompliance with SEC rules should be a matter for SEC enforcement rather than a shareholder vote.  It does not appear from our perspective that there is confusion as to whether proxy advisors are making recommendations based on legal non-compliance.").

[94]  Statement of the Honorable Elad L. Roisman at SEC Open Meeting (Nov. 5, 2019), available at https://www.sec.gov/news/public-statement/statement-roisman-2019-11-05-14a-2b#_ftnref4.

GLASS LEWIS

chosen by coordinate regulators and even raised by the SEC itself in its 2010 Concept Release — were ignored. No benefits or even costs are quantified, except for the burdens that had to be quantified for the PRA analysis. (And, as to those, Glass Lewis has already explained how they were vastly understated.) In fact, other than general market statistics, the only data in the economic analysis is a tabulation of issuer complaints in SEC filings, with no effort made to analyze whether those complaints were justified. The Release says little on the significant issue of competition, ignoring the concerns of other regulators. Nor does the analysis discuss or reconcile the proposed rules with the broader academic literature on the balance of power between management and shareholders in corporate governance. And the economic analysis sidesteps what may be the most significant economic consequence of the proposal, claiming that subjecting proxy advisors to potential litigation by companies was the result of an August 2019 Commission interpretation (with no economic analysis or public comment) and need not be economically analyzed now because the interpretation was already in place before this rule was proposed.[95]

### A. No market failure has been identified.

The first, most basic principle of economic analysis of regulation is that the government should identify a market failure before intervening in the private market.[96] As a former SEC Chief Economist has explained, "'the first element of [] an SEC . . . economic analysis is to identify the need for a rule. Often, this will involve a market failure."[97] But the economic

---

[95] We also note that the entire economic analysis ignores the implications of subjecting proxy advice to the information and filing requirements of the SEC's proxy rules and only discusses the consequences of the new exemptive conditions. The economic analysis should consider all consequences of the new rules, however, which subject proxy advice to the information and filing requirements and add new exemptive conditions. See Glass Lewis' PRA submission at 5-9. If the Commission considers proxy advisors' compliance with the information and filing requirements impossible or so impractical as to not be worth analyzing, it should state that explicitly and explain why.

[96] See U.S. Securities and Exchange Commission RSFI and OGC, Current Guidance on Economic Analysis in SEC Rulemaking, at 4-5 (March 16, 2012) ("Current Guidance").

[97] Speech of Mark Flannery, Director, Division of Economic and Risk Analysis, U.S. Securities and Exchange, "Economic Analysis: Providing Insight to Advance the Missions of the SEC and the PCAOB" (Oct. 22, 2015), available at https://www.sec.gov/news/speech/keynote-address-pcaob-missions-of-sec-and-pcaob.html; see also Exec. Order No. 12,866, sec. 1[b][1] ("each agency shall identify the problem that it intends to address (including, where applicable, the failures of private markets or public institutions that warrant new regulatory action) as well as assess the significance of that problem").

---

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111     W W W . G L A S S L E W I S . C O M

42



analysis in the Proposing Release does not identify a market failure that provides the need for the rule.  The term "market failure," or recognizable variations of it, simply do not appear in the Release.[98]

This absence is particularly striking given that some of the Commission's fellow regulators have studied the proxy advisor industry and concluded that there was no market failure.  Most notably, ESMA, after an "extensive analysis" of proxy advisors, specifically said that it "found no evidence of a market failure requiring regulatory intervention."[99]

Commentators have also made this point to the Commission.  As one of the nation's foremost corporate governance experts put it:

> So, what we have is the most sophisticated institutional investors in the world, with access to the greatest resources for researching portfolio companies ever assembled, making a free market decision to pay for outside, objective analysis, no different from other securities analysis reports they may purchase, to help them better understand their holdings and better meet their obligation as fiduciaries for the people whose money they are investing to respond to corporate initiatives appropriately. There is no monopoly and no requirement to buy these services; they can buy from one, all, or none. There could not be a better example of market efficiency or a worse argument for government interference. And yet, here we are.[100]

---

[98]  The SEC's Current Guidance on economic analysis in rulemaking further explains: "Traditional market failures include market power, externalities, principal-agent problems (such as economic conflicts of interest), and asymmetric information."  Again, however, the Release does not use these terms or clearly identify any of them as the market failure warranting this intervention.  (While the Release does talk about proxy advisor conflicts, it does not identify these as a market failure warranting regulation, nor, as discussed below, could it make this case.)

[99]  See Comments of Steven Maijoor, ESMA Chair, "ESMA recommends EU Code of Conduct for proxy advisor industry," (Feb. 19, 2013), available at https://www.esma.europa.eu/sites/default/files/library/2015/11/2013-240.pdf.

[100]  See Nell Minow, "Regulating Proxy Advisors is Anticompetitive, Counterproductive, and Possibly Unconstitutional," Harvard Corporate Governance Blog (Mar. 2, 2018), available at https://corpgov.law.harvard.edu/2018/03/02/regulating-proxy-advisors-is-anticompetitive-counterproductive-and-possibly-unconstitutional/; see also CII October 15 Letter at 2 ("[p]roxy advisory firms provide market-based solutions, and the SEC policy initiatives have the potential

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

43



Faced with this record, the Release does not grapple with these issues, let alone reach and provide a reasoned conclusion that there is a market failure or other need for this rule.

To be sure, there are passages in the Release on the importance of proxy voting and advice, as well as issuers' concerns about accuracy and conflicts. But even if proxy advisors' critics' claims were substantiated — which, as discussed above and below, they are not — this is not a sufficient basis to warrant government involvement under the SEC's economic analysis guidance. Many fields — law, management consulting, academia, journalism and countless others — are no less important and their practitioners sometimes make errors and face conflicts. What is missing from the analysis is a market failure — that is, the Release should explain why the market would not care about and address any accuracy or inadequate conflict disclosure issues over time. As a foreign regulator concluded after its own study: "[T]he overwhelming evidence supports the positive impact of proxy advisors. The criticisms of the workings are issues which can easily be resolved through market forces and are part of the evolution of both proxy advisors and investors."[101]

In contrast, the types of economic conflicts warranting SEC regulation are structural issues that result in misaligned incentives. As a former SEC Chief Economist has explained:

> For example, consider credit ratings agencies and audit firms . . . . [T]he *raison d'etre* for credit rating and auditing firms has embedded within it a potential information problem of the sort they are intended to correct. Both types of agents are selected and paid by the affected firm, for the purpose of conveying information to third parties, i.e., investors. To whom do auditors and rating agencies ultimately owe their allegiance? Are their economic incentives consistent with this allegiance? Relevant policies in this area can seek to improve incentives without compromising the value of the services being provided.[102]

---

to adversely affect the voluntary, uncoerced, private contracts between investors and their proxy advisors").

[101]  SEBI Working Group Report at 10.

[102]  See Speech of Mark Flannery, Director, Division of Economic and Risk Analysis, U.S. Securities and Exchange, "Economic Analysis: Providing Insight to Advance the Missions of the SEC and the PCAOB" (Oct. 22, 2015), available at https://www.sec.gov/news/speech/keynote-address-pcaob-missions-of-sec-and-pcaob.html;  see also Cezary Podkul, "SEC Urged to End Ratings Firms Conflicted Business Model," Wall Street Journal (Nov. 4, 2019) (industry advisory group urging SEC to change payment model for CRAs to user-pays (i.e., the same as proxy advisors) in order to improve the reliability of ratings), available at

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

44



Here, however, there is no such conflict in the payment model or other structural misalignment of incentives. Proxy advisors are paid by the investors they advise.[103] Or, as CII put it, "Proxy advisors' business model depends on factual accuracy and their incentives are thus aligned with issuers and institutional investors alike."[104] The Commission should recognize, as other regulators have, that there is no market failure here and decline to intervene in this market.

   **B. Evidence for claims of inaccuracy is lacking.**

   As noted above, the Release references issuers' "concerns" dozens of times. And foremost among those concerns are claims of proxy advisor inaccuracy. But SEC rules must be based on evidence, not just assertions.[105]

---

https://www.wsj.com/articles/sec-urged-to-end-ratings-firms-conflicted-business-model-11572911797.

[103] See SEBI Working Group Report at 10 ("the level of conflict is substantially lower than other intermediaries like auditors and credit rating agencies, where the company being scrutinised is itself paying the intermediary").

[104] CII October 15 Letter at 3. Apparently sensing this problem in the SEC's economic analysis, an industry-funded group submitted a comment letter arguing, based on an academic study from 1982, that shareholders face a "collective action problem" in voting proxies. See Comments of Bernard Sharfman, Chairman, Advisory Council, Main Street Investors Coalition (Dec. 20, 2019). But, to the extent this is meant to provide the missing economic need for this rulemaking, there are at least two problems with it. First, there have been significant changes in the size and share of securities held by institutional investors over the last 40 years, greatly mitigating the issue discussed in the article. Second, SEC guidance says: "Frequently, the proposed rule will be a response to a market failure **that market participants cannot solve because of collective action problems**." Current Guidance at 5 (emphasis added). Here, proxy advisors are a private market solution that helps address the collective action problem Sharfman describes (which exists much less today than 1982). This is not a logical reason to regulate proxy advice.

[105] See Current Guidance; see also Peirce and Ellig, 8 Brook. J. Corp. Fin. & Com. L. at 388 (criticizing SEC rulemaking for being "more willing than executive branch agencies to base decisions on beliefs or assertions rather than evidence").

---

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

45



Here, that evidence is missing.  To begin with, commenters have provided no logical explanation as to why proxy advice purchasers would not care if the advice was rife with errors.  They do care and would be concerned if this was the case, which it is not.  Both Glass Lewis and its largest competitor disclose an error rate of less than 1%.  More to the point, commenters have not provided actual evidence of a concerning error rate.  After all, whether proxy advisors commit frequent errors is an empirical question, but no empirical evidence has been provided to answer it.

The closest the economic analysis comes to providing evidence on this central issue is a table in the economic analysis that compiles situations in which a company filed supplemental proxy materials over a three-year period expressing various "concerns" about proxy advisors ("Table 2").  For four reasons, however, Table 2 does not provide a basis for the rules.

First, the SEC has not actually substantiated any of these concerns.  The economic analysis only describes these as the views expressed in the company filing and we understand that the Staff have confirmed that they did not do any work to evaluate whether these claims were valid or baseless.  This begs the question why Table 2 was included in the Release.  Proxy advisors are hired to critically evaluate management recommendations, and they do sometimes recommend against these recommendations.  It is therefore not particularly notable or significant that some companies — 264 of a possible 17,296 in the SEC's sample[106] — expressed some sort of continued disagreement or concern about proxy advice.

Second, commenters cannot evaluate and provide meaningful comments on Table 2 because the SEC has not provided basic details about the analysis it summarizes.  Seeking comment on a proposed economic analysis is only meaningful if the SEC provides enough detail for commenters to understand and react to the Commission's analyses.[107]  To that end, another former SEC Chief Economist has explained that "[o]ur goal is to be transparent about our methodologies, assumptions, and data sets and we hope that commentators will provide rigorous feedback on our analyses."[108]  But, here, the SEC has not been transparent.  Despite repeated requests and explanations of why these details are needed, the Staff have not

---

[106]  Based on our count of the reclassified information in the DERA supplemental memo.

[107]  See Portland Cement Association v. Ruckelshaus, 486 F.2d 375, 394 (D.C. Cir. 1973) ("It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data, or on data that, [to a] critical degree, is known only to the agency.").

[108]  See Speech of Craig M. Lewis, Director, Division of Economic and Risk Analysis, U.S. Securities and Exchange, "The Expanded Role of Economists in SEC Rulemaking," (Oct. 16, 2012), available at https://www.sec.gov/news/speech/2012-spch101612cmlhtm.

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

46



divulged basic information about their analysis — most notably, which companies they categorized as expressing concern about factual errors.  This has frustrated commenters' ability to evaluate whether these were or were not factual errors, a central issue in this rulemaking.[109]

Third, the SEC has not adequately explained why it included the categories it did, particularly "Amended or modified proposal."  The Release describes this category as situations where the "registrant responds to a current or prior year negative recommendation from a proxy voting advice business by indicating that it has amended or modified proposals or existing governance practices prior to the annual meeting and requests investor consideration of these facts in making their vote."[110]  To be fair, the SEC did only describe this as a "registrant concern."  But, by classifying it with factual errors and other registrant concerns, the economic analysis suggests the SEC sees it as a problem the proposal would address.  Other regulators have considered the adoption of corporate governance best practices to avoid adverse proxy advisor recommendations a positive development: "Boards are therefore ensuring support of shareholders when endeavouring to meet the parameters within proxy advisers' recommendations.  This is appropriate and aligns the interests of the shareholders with the board and management of their companies, which are sometimes not fully aligned."[111]  If the SEC has a different view and sees a company adopting such a practice as akin to a factual error, it should explain that view and support its contention with evidence of the harm resulting from these situations.[112]

---

[109]  While the DERA staff did add a memorandum to the file towards the end of the comment period, after a FOIA request and multiple other letters and in-person requests, that memorandum does not include basic information like which companies claimed factual errors or were included in the SEC's other categories.

[110]  Release at 96 n. 239.

[111]  SEBI Working Group Report at 17; see also id. at 9 ("In fact, some of the benefits of proxy advisors may be invisible, as people would have altered their actions to escape the critical analysis of proxy advisors.  So, a person sitting on too many boards may opt to give up her board seat by withdrawing from the slate of directors up for election.  In other words the impact of possible proxy advisor's recommendation would have altered behaviour even though no one will notice the impact.").

[112]  Similarly, the supplemental DERA memo states that the Staff included in its sample of "concerns" situations in which the "registrant identified changes of circumstance that should warrant reconsideration of an adverse voting recommendation."  Again, this does happen, but we are not clear why the Staff would categorize it as a concern or how it provides a basis for this new regulatory regime.

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111     W W W . G L A S S L E W I S . C O M

47



Fourth and finally, Table 2 shows at most that 54 of 17,296 or .3% of company filings over this time period claimed a factual error and 260 or 1.5% contained a more general "concern," broadly defined, with some aspect of some proxy advisors' proxy advice.[113]  The Release suggests there may be some other companies that believed there was an error or had other concerns with proxy advice during this time period, but did not say anything.[114]  At the same time, it is likely that some of these claimed errors or concerns were exaggerated or just unfounded.  Glass Lewis has long disclosed that its error rate is less than 1%.  Nothing in Table 2 gives any reason to believe errors are more frequent than that.

In short, the economic analysis lacks empirical evidence on the empirical question at the foundation of the proposed rules.  The Commission should answer this empirical question before imposing a costly, untested, new regulatory regime premised on concerns about proxy advisor accuracy.

### C.  The economic analysis fails to understand the baseline.

As the SEC Staff's Current Guidance recognizes, the second element of a good economic analysis is understanding the baseline, which is "the best assessment of how the world would look in the absence of the proposed action."[115]  As a SEC Chief Economist explained:

A baseline . . . is vital to understand how a market is functioning before we can identify what might be wrong within it. This goes beyond a simple recitation of current

---

[113]  Based on Table 2 data since the additions and reclassifications in the DERA supplemental memorandum are not classified.  We note that both these rates are for all proxy advisors.  The rate for any individual proxy advisor would be lower.

[114]  There is no reason to think this would be a significant number.  As the IAC notes, company management can use the company's resources and has strong incentives to bring any material proxy advice errors to their shareholders' attention.  Recommendation of the SEC Investor Advisory Committee (IAC) Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals  at n. 21 (Jan. 24, 2020) ("It is insufficient to claim, as do some commentators, that the supplemental proxies filed by corporate managers establish a lower bound on the number of errors in proxy reports. There is nothing to suggest that proxy advisors ever retaliate against companies for correcting factual errors, and if potentially material to vote outcomes, corporate managers have ample incentives to seek corrections, and they can use investor funds to do so.").

[115]  Current Guidance at 6.

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

48

# GLASS LEWIS

regulatory requirements or an overview of general market statistics. It is incumbent upon regulators to understand fully the complexities of the markets we regulate. Only then can we make a theoretical market failure concrete and specific.[116]

Here, however, the economic analysis does little beyond reciting some general market statistics.  Even though accuracy appears to be the Commission's primary concern, the economic analysis, as noted above, does not even claim to evaluate whether that is a problem. Nor does it contain any original information about proxy advisor conflict policies and conflict disclosures, instead just noting, based on letters, that "some proxy voting advice businesses have disclosure practices and procedures regarding conflicts of interest that may be similar to these proposed disclosure requirements,"[117] without further discussing what those practices are or what may be wrong with them.[118]  Nor did the SEC use any original information on the timing of companies' filing of proxy statements or when investment advisers typically vote, critical start and end points for evaluating the effect of the proposed rules on the timing of proxy advice and voting.

Here, the failure to provide evidence of actual market practices is all the more surprising because the SEC conducted focus examinations of proxy advisors and investment advisers' use of proxy advisors in 2015.[119]  While the resulting examination reports are not available to the public, GAO reported in November 2016 that "SEC staff also considered some of the issues discussed previously [i.e., accuracy, conflicts disclosure, "over-reliance" on proxy advisors] through examinations of proxy advisory firms registered as investment advisers and registered investment companies using proxy advisory firms."[120]  GAO further explained that, while the

---

[116]  Speech of Mark Flannery, Director, Division of Economic and Risk Analysis, U.S. Securities and Exchange, "Economic Analysis: Providing Insight to Advance the Missions of the SEC and the PCAOB" (Oct. 22, 2015), available at https://www.sec.gov/news/speech/keynote-address-pcaob-missions-of-sec-and-pcaob.html.

[117]  Release at 92.

[118]  The Release does cross-reference an earlier footnote that notes that "there is no uniform set of standards" for conflicts mitigation and that "concerns remain about the adequacy of these firms' conflicts of interest disclosures."  This obviously falls far short of a full understanding of current market practices and why and how they need to be improved.

[119]  See Office of Compliance Inspections and Examinations, National Examination Priorities for 2015 at 4, available at https://www.sec.gov/about/offices/ocie/national-examination-program-priorities-2015.pdf.

[120]  GAO 2106 Report at 35.

---

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

49



2015 proxy advisor priority examinations were ongoing, GAO reviewed 41% of them completed as of August 2016 and "confirmed that the SEC examined risk areas related to conflict of interest, proxy voting policies and procedures, and oversight of proxy advisory services, among other issues.  None of the examinations we reviewed resulted in serious violations leading to an enforcement action."[121]

        The SEC should use its direct evidence from these examinations to understand the baseline-in-practice and evaluate for itself both the concerns precipitating this rulemaking and the proposed rules' potential consequences.[122]  Information collected in examinations could provide actual evidence on issuers' claims of inaccuracy and lack of adequate conflict disclosure.  It also would give the SEC a factual basis to understand the consequences of the regulatory approach chosen, including its effect on the timing of a complex, time-sensitive process.  If the SEC somehow has no relevant data from its 2015 or other examinations, it should state so and explain why and how it could nonetheless reach a sufficient, reasoned understanding of the market practices of proxy advisers and investment advisers' proxy voting.

        The SEC also failed to adequately consider the regulatory baseline.  First, the economic analysis' discussion of the regulatory baseline does not mention the SEC's recent expansion of investment advisers' responsibilities to oversee proxy advisors.  As discussed above, however, in guidance issued just this past August, the SEC addressed a number of the issues in this rulemaking, including proxy advisors' conflicts policies, engagement with issuers and accuracy.  The SEC conveyed its expectation that investment advisers would review their oversight of proxy advisors in response to this guidance and commentators agreed that it would lead to changes for both proxy advisors and investment advisers.[123]

---

[121] Id. at 36 (footnote omitted).  GAO's report indicated that SEC Staff reviewed and provided technical comments on the report before it was issued.

[122] See Marc Wyatt, Director, Office of Compliance Inspections and Examinations, "Inside the National Exam Program in 2016" (Oct. 17, 2016) ("As the SEC's "eyes and ears" in the field, OCIE strives to use our perspective to provide support to the rule-making process and inform other guidance issued by the SEC, and its Divisions and Offices. . . .  Based on our exams, we provide our rule-writing colleagues information about the evolution of market practices and the most common exam observations."), available at https://www.sec.gov/news/speech/inside-the-national-exam-program-in-2016.html.  Of course, the SEC can also ask for other information it needs to understand the need for or potential consequences of a rule and also has other authority to obtain such information.  See, for example, 15 U.S.C. 77s(e).

[123] See The Conference Board, "On Governance: What Does the Latest SEC Guidance Mean for Proxy Advisors, Companies?," (Aug. 26, 2019) ("It looks like both the [proxy] advisors and their

**GLASS LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

50



Nor does the economic analysis — or any other part of the Release, for that matter — mention the Best Practices Principles for Shareholder Voting Research instituted in response to ESMA's consultation.  As noted above, the Best Practices Principles focus on identifying, disclosing and managing conflicts of interest and fostering transparency to ensure the accuracy and reliability of proxy advice, the same concerns at issue here.  And signatory proxy advisors apply and measure themselves against these principles on a global basis annually.

The baseline, of course, "includes both the economic attributes of the relevant market and the existing regulatory structure."[124]  But the baseline — and the economic analysis as a whole — does not discuss either the August 2019 Guidance or the Best Practices Principles, let alone consider them adequately to show that it "understand[s] fully" the regulatory baseline. The SEC should not institute a significant new regulatory regime without first considering and understanding the effect of existing regulatory measures that address the same issues.

### D.  The economic analysis fails to consider reasonable alternative approaches.

As the Current Guidance explains, the Commission is required to consider reasonable alternative regulatory approaches, including "reasonable alternatives raised during the rulemaking."[125]  To his credit, Chairman Clayton told the Senate Banking Committee when he testified on December 10, 2019 about this proposed rulemaking that he was "very open" to alternative ways to promote proxy advisor accuracy.

This is not reflected in the economic analysis, however.  While six "reasonable alternatives" are mentioned, the first four are variations on the chosen regulatory approach — issuer pre-review, mandated publication of the issuer's response and prescribed conflicts

---

clients will need to adopt and implement some new policies and procedures, and that in some cases existing policies and procedures will need to be modified and/or documented.") (quoting Robert Lamm, Esq.), available at https://www.conference-board.org/blog/environmental-social-governance/SEC-Addressing-Proxy-Advisor-Influence.

[124]  Current Guidance at 7.

[125]  Current Guidance at 9 (citing the D.C. Circuit decision in Chamber I); see also Speech of Craig M. Lewis, Director, Division of Economic and Risk Analysis, U.S. Securities and Exchange, "The Expanded Role of Economists in SEC Rulemaking," (Oct. 16, 2012) ("when the Commission adopts a rule, the rule release must articulate why the Commission chose the alternative it did, fully engaging with those reasonable alternatives raised in the proposing release or suggested by commentators"), available at https://www.sec.gov/news/speech/2012-spch101612cmlhtm

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

51



disclosure.  While the details of the proposed rules need to be explored in other parts of the Release, we do not believe this is what the Current Guidance meant in saying that the Commission should consider "alternative regulatory approaches."  The fifth alternative discussed is a tangentially-related concern of companies about shareholders voting before reading company responses.  The last "alternative" — exempting smaller proxy advisors — is already covered in the Release's mandatory regulatory flexibility analysis.  Notably, none of the alternatives included in the Release even contemplates the possibility proxy advisor accuracy could be enhanced in some way other than government-mandated issuer pre-review.[126]

In reality, there are a number of genuine "alternative regulatory approaches" that the Commission should consider.  In fact, the SEC itself has previously raised other alternatives to address these issues.

In its 2010 Concept Release on the Proxy Process, after noting issuers' concerns with proxy advisors, the Commission specifically sought comment on:

> whether proxy advisory firms operate the kind of national business or have an impact on the securities markets that Advisers Act Section 203A(c) was designed to address, and whether, as a result, we should establish an additional exemption from the prohibition on federal registration for proxy advisory firms to register with the Commission as investment advisers.[127]

The Concept Release then discussed how guidance could be used in that framework to enhance conflict of interest disclosures.

---

[126]    As the IAC has noted, with one exception, the alternatives are all more burdensome on proxy advisors and their clients.   See Recommendation of the SEC Investor Advisory Committee (IAC) Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals, at 8 (Jan. 24, 2020).  Tellingly, the SEC does not consider an alternative of mandating that issuers file their proxy statements sufficiently early to avoid the compression of investor time the proposal would create.  For example, the SEC should have considered an alternative of mandating that companies either file proxy statements a sufficient number of weeks before their annual meeting (or just adjusting the thresholds for review and feedback period eligibility enough), so as to allow investors the same time they have today to consider proxy advice and vote.  The SEC should then have assessed the costs and benefits of that approach relative to the proposal.

[127]    2010 Concept Release at 120 (citation omitted).

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

52



Likewise, the Concept Release discussed "potential approaches that might address concerns about accuracy or transparency in the formulation of voting recommendations," and specifically suggested that "proxy advisory firms could provide increased disclosure regarding the extent of research involved with a particular recommendation and the extent and/or effectiveness of its controls and procedures in ensuring the accuracy of issuer data."[128]  The Concept Release further noted a suggestion that the Commission's NRSRO rules "may be useful templates for developing a regulatory program addressing conflicts of interest and other issues with respect to the accuracy and transparency of voting recommendations provided by proxy advisory firms."[129]  The Commission here noted that the NRSRO regulatory regime includes measures such as disclosure of performance measurement statistics.[130]  Both of these alternatives should have been considered in the economic analysis.[131]

In addition, there are at least two other reasonable alternatives, in addition to the status quo, that should have been fully explored.  First, as Glass Lewis has previously suggested,[132] the Commission should have considered a market-based approach that builds on the existing, industry-developed Best Practices Principles.  In fact, ESMA chose this very approach.  Adding a regulatory compliance, reporting or assurance mechanism to the current Best Practices Principles could add rigor and ensure consistency, while still preserving the benefits of this approach.

Critically, these alternatives would provide a more complete and balanced framework to advance the Commission's stated goal of improving proxy advisor accuracy.  After all, the issuer review and feedback periods at best only address accuracy from the company's point of view — a one-sided approach that will not address any other type of factual error.  In fact, there is no reason to think companies would even bother to review for accuracy roughly half of proxy

---

[128]  2010 Concept Release at 122.

[129]  Id. at 121 n. 287

[130]  Id.

[131]  See, for example, Chamber of Commerce of the United States v. Securities and Exchange Commission, 412 F.3d 133, 144 (D.C. Cir. 2005) ("Chamber I") (finding an APA violation when the Commission chose a mandate as an exemptive condition and did not consider a suggested disclosure alternative).

[132]  See Letter of Katherine Rabin, Chief Executive Officer, Glass Lewis to Chairman Jay Clayton (Nov. 14, 2018), available at https://www.sec.gov/comments/4-725/4725-4649188-176490.pdf.

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

53



research reports, which typically do not contain any recommendation adverse to management's recommendations, meaning there would not even be a potential for accuracy improvement in those situations.  At the same time, the delays associated with the issuer review periods would greatly compress the time for investor due diligence before voting.  If the Commission determines it has a sufficient basis to regulate proxy advisors to enhance the accuracy of their work and elects to do so through issuer review and feedback, it should explain why choosing a regulatory approach that only affects one dimension of accuracy is a better alternative than more holistic approaches.

Second, if the Commission felt only an issuer-review mandate could address its concerns about accuracy, it should have considered having issuers review just the facts that would go into the proxy advice.  In fact, this would be more consistent with the approach chosen in the context of analyst regulation, where, with appropriate safeguards, analysts are permitted to verify facts with the companies that are the subject of their reports, but are prohibited from sharing their full reports.[133]  As noted above, Glass Lewis has a current practice of sharing the key facts in its reports, free of charge, with all U.S. companies through its IDR.  Glass Lewis finds that through this practice it can get any benefit of company review without compromising the independence of its advice or inviting time-consuming and unproductive debates about Glass Lewis' methodology or what result that methodology should lead to in the context of a particular recommendation. This approach would also have been consistent with the Commission's prior recognition that, on most corporate governance questions, there "typically is not a correct viewpoint."

**E.  The economic analysis fails to quantify any costs or benefits.**

The economic analysis does not quantify any costs or benefits of the proposed rule.  Nor does it make any of the underlying estimates that would be essential to understanding the costs and potential benefits of the proposed rules, such as the number of reviews that would be required, the time they would take, the number of conflicts that would be disclosed, and projections of decreased errors.  In fact, other than some general market statistics, the only effort at quantifying anything in the economic analysis is the table showing the number of issuer complaints about proxy advice discussed above.[134]

---

[133]  See the discussion of FINRA Rule 2241 above.

[134]  While the Release's PRA analysis does, as required, make some estimates of paperwork burdens, these are incomplete and vastly understated, as explained in Glass Lewis' PRA Submission.

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111     W W W . G L A S S L E W I S . C O M

54



This does not meet the Commission's standards for economic analysis.  As the Current Guidance explains, the economic analysis should "quantify [the] expected benefits and costs to the extent possible . . . and [] for those elements that are not quantified, explain why they cannot be quantified."[135]  Courts have imposed similar obligations.  When, as here, data is available, the Commission must estimate and quantify the costs it expects parties to incur.[136]

When the Commission first explicitly exempted proxy advice, it acknowledged that forcing parties to comply with proxy solicitation rules was "very costly."[137]  And, as illustrated in Glass Lewis' PRA Submission,[138] just the paperwork burdens of the exemptive conditions on proxy advisors — a subset of the direct costs imposed by the proposed rules — would be substantial.  Other direct costs and indirect costs — such as the opportunity costs discussed above and the effect on competition discussed below[139] — should also be considered and estimated to the extent possible.

---

[135]   Current Guidance at 9-10.

[136]   Business Roundtable v. Securities and Exchange Commission, 647 F.3d 1144, 1150 (D.C. Cir. 2011).

[137]   SEC Shareholder Communications Release at 49,278.

[138]   See PRA Submission at 10-20.  Subsequent to our PRA Submission, we have made further efforts to estimate the first-year costs of developing and deploying the customized software that we think would be needed to efficiently carry out the two-stage issuer reviews contemplated in the proposed rules.  Glass Lewis does not, of course, have existing systems that would be sufficient to track the time periods and manage the necessary workflows to carry out the review processes in the proposed rules.  Cf. Release at 106.  Our estimate at this point is that it would take six people twelve months to build such a platform. That level of effort translates to about 13,000 development hours.  At $100/hour, we expect this would require approximately $1.25M in development costs.  If such a system could be developed and deployed, that could affect some of our other time estimates for some of the ongoing administrative tasks that would be involved in carrying out the rules.

[139]   The Current Guidance also notes that costs include "negative collateral consequences, such as the potential misuse of newly created rights."  Current Guidance at 11.  This issue, which as noted above is implicated here, is not considered in the economic analysis.

---

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

55



The Commission should make the necessary estimates, quantify the costs and benefits of its proposed rules to the extent possible, and seek supplemental comment on its revised analysis.[140]

**F. The economic analysis fails to seriously consider the effect on competition.**

The Commission, of course, has an explicit statutory requirement to consider the effect on competition in its rulemaking under the Exchange Act.  Here, that obligation should have special resonance given the long-standing questions about competition in this space.

Despite this, the Proposing Release's effect on competition analysis consists of two pages, a significant part of which is devoted to speculating — contrary to the evidence before the agency of proxy advisors' customers' actual views — that the proposed rules might increase demand and stimulate competition because the advice will be more accurate and conflicts more apparent.  A revised economic analysis should give this issue serious consideration and account for two significant items in the administrative record.

First, this is the unusual case where the Commission has actual, first-hand evidence that the rule would adversely affect competition.  Minerva Analytics, a UK-based proxy advisor, has commented that the prospect of the proposed rules being adopted has, in fact, deterred it from entering the U.S. proxy advisor market:

> The proposed rules will not, as argued by the pro-regulation lobby, enhance competition; they will kill it outright. For as much as Minerva would like to make a formal entry into the US market with a local presence, the implicit threat of expensive and burdensome litigation as proposed by the regulations for "errors" together with the mandating of free and prior distribution of our research at the expense of our clients' contractual rights renders that possibility highly unlikely for the foreseeable future.[141]

---

[140]  The Commission should also consider the significance of the costs and benefits it cannot quantify.  Much of the Commission's economic analysis reads like its drafter sought to pair each very real and substantial cost it acknowledges with a countervailing benefit, however speculative, abstract or minor, such as the "benefit" of "more clear notice" that rules apply to certain conduct.  And the paired costs and benefits are often followed with a statement that the Commission cannot quantify either, leaving a false sense of equivalence.  A meaningful economic analysis would genuinely and candidly assess and convey the significance of the qualitative costs and benefits it discusses, even if they cannot be quantified.

[141]  Comments of Sarah Wilson, Chief Executive Officer, Minerva Analytics (Jan. 2, 2020).

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

56



Second, over 60 prominent finance and legal scholars, with a range of ideological perspectives, have submitted a comment letter expressing concern about the anti-competitive effect of the proposed rules.  The letter states:

> We share the Commission's concerns about concentration in the proxy advisory market. Yet, we disagree with the following proposed remedies: 1) forcing proxy advisors to share their opinions with managers ahead of time and 2) treating opinions on proxies as proxy solicitations. By increasing the cost of opining on proxy statements such proposals will only discourage new entry into the proxy advisory market and exacerbate the problem of market concentration in this sector. We ask the Commission to strike these proposed changes.[142]

The Commission should take this direct evidence and strong academic consensus into account and engage in a serious consideration of the effect of the proposed rules on proxy advisor competition.[143]

The Commission should also consider the effect of the proposed rules on competition among asset managers.  As the Release recognizes, in order to save costs, many asset managers choose to outsource much of the data collection, research tasks and other administrative functions associated with proxy voting to proxy advisors.[144]  As one commentator explained, proxy advisors "economize the proxy research and voting functions by spreading the costs of tracking, analyzing, and processing many thousands of proxy votes over a larger pool of shareholders."[145]  And, as the Release also notes, smaller asset managers are more dependent

---

[142]  See Comments of Anat Admati, Luigi Zingales et al. (Jan. 15, 2020).

[143]  In addition to its broader obligation to consider the economic implications of its rules, the Commission is specifically required to consider the impact that any rule promulgated under the Exchange Act would have on competition and to include in the rule's statement of basis and purpose "the reasons for the Commission's . . . determination that any burden on competition imposed by such rule or regulation is necessary or appropriate in furtherance of the purposes of [the Exchange Act]."  Exchange Act Section 23(a)(2), 15 U.S.C. 78w(a)(2).

[144]  Release at 79-80.

[145]  Cappucci, The Proxy War Against Proxy Advisors at 7; see also id. at 7-8 ("If asset managers or owners had to perform these functions themselves, they would face an unattractive choice between bearing the costs of additional staff to perform the research and not adding resources and being less informed and less responsible voters.").



on outsourcing these functions to proxy advisors than the largest asset managers.[146] Accordingly, a reduction in competition and/or increase in costs of proxy advice could disproportionately affect smaller asset managers.[147]  The Release does not consider this effect on competition, however.  Particularly in light of the trend toward asset manager concentration, the Commission should consider the potential effect of the rules on the asset management industry.

### G. The economic analysis fails to consider any effects of exposing proxy advisors to private litigation by issuers.

As Commissioner Jackson recognized at the Open Meeting, "[T]he real costs of today's new regime lie in considering the issuer's feedback, including the issuer's response in the proxy advisor's report, and facing litigation from an issuer angry about the methodology used to provide anti-management advice."[148]  But this prospect of issuer litigation against proxy advisors is not even mentioned in the economic analysis.  Instead, the Release explains, "Overall, we do not expect this proposed amendment [amending the definition of solicitation in the Commission's rules to include proxy advice] to have a significant economic impact because it codifies an already-existing Commission interpretation."  In fact, the only mention of litigation in the entire release is a question.  After noting CII's concern about subjecting proxy advisors to increased litigation through the August 2019 Interpretation, the Release asks: "Would these concerns similarly apply to aspects of the proposed amendments, or is this concern overstated in that the aspects of the interpretation and guidance that are encompassed in the proposed amendments reflect current legal obligations regarding solicitation activities?"

In other words, the Commission is disclaiming any responsibility to assess the costs and benefits and other economic consequences of exposing proxy advisors to the unprecedented prospect of litigation by companies displeased with their advice.  This is because the proposed rules would codify the August 2019 Interpretation that proxy advisors are subject to this litigation threat — an interpretation adopted 3-2 over the dissent of a Commissioner who said it should have been the subject of public comment and economic analysis.  Through this two-

---

[146]   Release at 80.

[147]  If smaller managers more frequently chose not to vote, that could also have adverse consequences for our system of corporate governance that the Commission should consider.

[148]   Statement of the Honorable Robert J. Jackson, Jr. at SEC Open Meeting (Nov. 5, 2019), available at https://www.sec.gov/news/public-statement/statement-jackson-2019-11-05-openmeeting.



step process,[149] the Commission could end up with a rule on its books exposing an industry to a new type of private litigation without ever having to follow its "statutory obligation to determine as best it can the economic implications of the rule."[150]

Establishing this precedent would allow an easy end run around the National Securities Markets Improvement Act considerations in similar circumstances, in the future.  In fact, by the Release's logic, an interpretation imposing exorbitant costs could be issued the day before a rule proposal with no economic analysis and then the rule proposal issued the next day could simply say the rules have no costs because the rules would only codify the interpretation.  We do not believe this is good administrative practice or consistent with the Commission's responsibilities.

Here, the Commission is engaged in rulemaking that would result in an Exchange Act rule exposing proxy advisors to Rule 14a-9 litigation.  To our knowledge, the Commission has never previously examined the costs, benefits and other economic consequences of doing so and it has the opportunity to do so as part of this rulemaking.[151]  And this is not some technical defect in process; the prospect of issuer litigation poses very real and significant risks and costs to proxy advisors that should be analyzed and considered.  If these costs are outweighed by the benefits, in the Commission's view, the economic analysis should explain how and why the Commission came to that conclusion.

### H.  The economic analysis fails to engage with broader literature on executive compensation and corporate governance.

---

[149]  When the Commission adopted the August 2019 Interpretation, the Chairman described it as "just a first step," and disclosed that he had "asked the staff to also consider whether the current rule definition of the term 'solicitation' under the federal proxy rules should be amended to codify today's interpretation."  See Statement of the Honorable Jay Clayton at Open Meeting (Aug. 21, 2019), available at https://www.sec.gov/news/public-statement/statement-clayton-082119.

[150]  Chamber I, 412 F.3d at 143.

[151]  See also Motion of the U.S. Securities and Exchange Commission, at 3-4 in ISS v. Clayton, Case No. 1:19-cv-3275-APM (D.D.C. Jan. 17, 2020) ("Because the challenged Interpretation and Guidance has been incorporated into the rulemaking, **the rulemaking will enable ISS to raise any of its objections to the Interpretation and Guidance during the rulemaking process, and it will afford the Commission an opportunity to consider those objections**. If the Commission adopts the proposed amendments after notice and comment, this Court would have the benefit of a more robust administrative record.") (emphasis added).

---

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

59



Finally, the economic analysis should have considered the effect the proposed rule could have on corporate governance and executive compensation practices and reconciled the Commission's proposal with the broader academic literature on these points.[152]  As Commissioner Jackson noted at the Open Meeting, "Proxy advisors play an important role in striking the right balance in allocating power between corporate executives and investors."[153]  And, as he also noted, there is a well-established body of legal and economic scholarship examining that issue that was not considered in the Proposing Release.  Given the implications of the proposed rules for the balance of power between management and shareholders, the Commission should have considered this literature and reconciled its policy choices with it.[154]

For example, the Commission's Chief Economist has argued that investors need to be more skeptical than they are today about executive pay recommendations.  Writing in the Harvard Business Review, then-Professor S.P. Kothari and Robert Pozen explain that: "More than 95% of the time, shareholders overwhelmingly approve the pay recommendations.  Yet our research suggests that investors should be more skeptical.  Compensation committees frequently adjust company performance numbers in complex and even obscure ways, for a variety of reasons."  Although he notes the challenges they face in doing so, Kothari concludes

---

[152]  The economic analysis does contain an overview of some of the academic literature specifically on proxy advisors.  See Release at 81-83.  Our point here is that the analysis did not engage with the broader economic literature the proposed rules implicate, especially in light of the scope of some of its analysis.  See, for example, Release at 113 (arguing, with no reference to the literature, that investors may make better voting decisions, thereby leading to better investing outcomes and promoting capital formation).

[153]  Statement of the Honorable Robert J. Jackson, Jr. at SEC Open Meeting (Nov. 5, 2019) ("Taxing anti-management advice in this way makes it easier for insiders to run public companies in a way that favors their own private interests over those of ordinary investors."), available at https://www.sec.gov/news/public-statement/statement-jackson-2019-11-05-openmeeting.

[154]  See Peirce and Ellig, 8 Brook. J. Corp. Fin. & Com. L. at 400 (criticizing the say on pay rulemaking mandated by Dodd-Frank: "the SEC could have taken advantage of a large literature on executive compensation and corporate governance.  Among other things, academics have looked extensively at issues related to agency problems and asymmetric information in the governance of publicly held corporations.  The SEC would have had to look at this literature in the context of its existing mandates, including extensive compensation disclosure requirements.") (footnote omitted).

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111     W W W . G L A S S L E W I S . C O M

60



that, among other things, investors should engage in "meaningful dialogue" with companies about "overly generous compensation" practices.  The proposed rules, by shortening the time an investor has to vote, would drastically limit the investor's ability to engage with a company on a compensation issue, if required.  Yet the Commission's Release does not mention this article or reconcile its approach with the costs to shareholders of compressing their review and voting time and the resulting risk of inadequate oversight of management compensation practices.

## V.  The proposed rules have fundamental legal flaws.

### A.  Proxy advice is not a proxy solicitation.

Absent a legislative framework for proxy advisor regulation, the Commission proposes to regulate proxy advisors as proxy solicitors.   As we understand it, the sole statutory term providing the foundation for the new proxy advisor regulatory framework is the verb "solicit" in Section 14(a) of the Exchange Act.  Proxy solicitation is fundamentally different than proxy advice, however; the simple, unavoidable fact is that solicit and advise mean two different things.

To "solicit" means to "[a]sk for or try to obtain (something) from someone."[155] Here, that something is a proxy — i.e., the authority to vote on that party's behalf in a corporate election.  Consistent with this, there are two fundamental characteristics of proxy solicitors' work that makes it a solicitation:

1)  Proxy solicitors ask for or try to obtain proxy authority from shareholders; and

2)  Proxy solicitors have an interest in the outcome (or are hired by someone with an interest in the outcome) and therefore play an advocacy role to "try to obtain" shareholders' proxy authority.

In contrast, proxy advisors do not meet either of these two characteristics of a solicitation.  Proxy advisors do not ask for or try to obtain proxy authority from their shareholder clients.  And proxy advisors have no stake in the outcome.  They are simply hired by the shareholder to provide them with objective research and advice as a disinterested party.

---

[155]  Lexico, Oxford University Press (2019); see also Oxford English Dictionary (2020) ("To entreat or petition (a person) for, or to do, something"; "To request, petition, or sue for (some thing, favour, etc.); to desire or seek by petition"; "Of things: To call or ask for, to demand").

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

61



The SEC's approach depends on conflating these two, quite different roles.  In fact, the interpretation blurs the fundamental distinction in this process — between the side campaigning for an outcome on the vote and the side actually voting.  Proxy solicitors are the ones asking for votes and shareholders, with the assistance of their proxy advisor agents, are the ones voting.

This common sense difference in meanings is reflected in industry practice.  Proxy solicitors and proxy advisors have long been understood to have separate roles, indeed separate industries.  When the SEC itself described the players in the proxy landscape in its 2010 Concept Release, its background included one section on "proxy solicitors" and another on "proxy advisory firms."[156]  And the fundamental difference between these two activities is reflected in the reaction of knowledgeable industry participants, who have reacted with surprise and concern to the SEC's efforts to conflate the two.[157]

The SEC's new interpretation also does not fit with the overall statutory scheme of the Exchange Act's regulation of the proxy voting process.  The "words of the statute should be read in context, the statute's place in the overall statutory scheme should be considered, and the problem Congress sought to solve should be taken into account to determine whether

---

[156]  See 2010 Concept Release at 23-25 (explaining, in part, that "Issuers sometimes hire third-party proxy solicitors to identify beneficial owners holding large amounts of the issuers' securities and to telephone shareholders to encourage them to vote their proxies consistent with the recommendations of management.").

[157]  See Comments of Dana Investment Advisers Letter (Dec. 5, 2019) ("The characterization of proxy-voting advice provided by proxy-advisory firms as "solicitation" is blatantly false and demonstrates a grave misinterpretation (or misrepresentation) of the process."); Comments of Theresa Whitmarsh, State of Washington Investment Board (Jan. 22, 2020) ("WSIB's proxy advisors are providing guidance, data, tracking and timely execution of our voting on proxy resolutions. Our advisors are NOT soliciting us to vote in support of particular policies or in a particular direction."); see also Nell Minow, Comment on Ted Allen, "A 'Draft Review' as a Safeguard on Proxy Advisors," Harvard Law School Corporate Governance Blog (May 18, 2019) ("The reference to proxy solicitation rules is so inapposite as to be absurd. The proxy solicitation rules are a safeguard against the advocacy of parties with a clear incentive to provide only one side of the story on matters that are fundamental to a company's continuing operations and structure. Proxy advisors are independent third parties who sell a product no one has to buy with recommendations no one has to follow."), available at https://corpgov.law.harvard.edu/2019/05/18/roundtable-on-proxy-voting-process/.

---

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

62



Congress has foreclosed the agency's interpretation."[158]  Here, the SEC's proposed construction does not fit with the statute's scheme or its purpose.  The federal securities laws' proxy solicitation information and public filing requirements are wholly unsuited to proxy advice. Where solicitors want their communications to be public — because they are soliciting proxy authority, after all — proxy advisors only provide their research and advice to their paying clients.[159]  And, unlike soliciting parties, proxy advisors produce thousands of proxy research reports a year.  In fact, the Proposing Release implicitly concedes this by not even discussing the possibility that proxy advisors would seek to comply with the information and filing requirements for proxy solicitations.[160]  And the statute's underlying purpose — deterring the deceptive speech self-interested "[i]nsiders" had used to defraud investors in proxy campaigns[161] — is irrelevant to disinterested proxy advice.

In defense of its new interpretation, the SEC invokes its prior "broad" interpretations of the statute, particularly an amendment to its rules in 1956 that provided a catch-all in the SEC's definition of solicitation.  The August 2019 Interpretation puts a broad gloss on this broad catch-all, expansively reading it to cover "any person seeking to influence the voting of proxies

---

[158]  <u>Goldstein v. SEC</u>, 451 F.3d 873 (D.C. Cir. 2006) (quoting  <u>PDK Labs. Inc. v. DEA</u>, 362 F.3d 786, 796 (D.C.Cir. 2004)) (internal quotation marks omitted); see also <u>Abbott Labs. v. Young</u>, 920 F.2d 984, 988 (D.C.Cir. 1990) ("The 'reasonableness' of an agency's construction depends on the construction's 'fit' with the statutory language as well as its conformity to statutory purposes.").

[159]  See the longer discussion of this at pages 5-10 of our PRA Submission.

[160]   The Release does assert: "We further believe that the regulatory framework of Section 14(a) and the Commission's proxy rules, with their focus on the information received by shareholders as part of the voting process, is well-suited to enhancing the quality and availability of the information that clients of proxy voting advice businesses are likely to consider as part of their voting determinations."  Release at 17-18.  This statement is not explained, however, and it is hard to reconcile with the reality of those requirements or the fact that the possibility of proxy advisors complying with them is not otherwise discussed in the Release.

[161]   See H.R. Rep. No. 1383, 73d Cong., 2d Sess., at 14 (Apr. 27, 1934) ("Insiders have at times solicited proxies without fairly informing the stockholders of the purposes for which the proxies are to be used and have used such proxies to take from the stockholders for their own selfish advantage valuable property rights . . . .  For this reason the proposed bill gives the Federal Trade Commission power to control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which have frustrated the free exercise of the voting rights of stockholders.").

---

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

63

# GLASS LEWIS

by shareholders, regardless of whether the person itself is seeking authorization to act as a proxy."[162]

There are at least two problems with this, though.  First, the SEC has previously recognized that its catch-all definition was "sweeping" and "excessive" — potentially covering, among other things, newspaper op-eds and legal advice.  As the SEC put it in 1992, "the [1956] definition of solicitation was so great as potentially to turn almost every expression of opinion concerning a publicly-traded corporation into a regulated proxy solicitation."[163]  In fact, the SEC called this overbreadth a "distortion of the purposes of the proxy rules."[164]  None of this is mentioned in the Proposing Release or August 2019 Interpretation, however.  Instead, the SEC now has not only embraced that "sweeping" and "excessive" definition, but actually proposes to expand it through its new interpretation and a specific rule provision covering proxy advice.

Second, even if the overbroad definition in the SEC's rules were a valid reading of the Exchange Act, properly read, it would not cover proxy advice.  The SEC's catch-all in the rules covers a "communication to security holders under circumstances *reasonably calculated to* result in the procurement, withholding or revocation of a proxy" (emphasis added).  But, as unmoored as this is from the statutory phrase "solicit any proxy," even this broad formulation includes an element of intent to achieve an outcome that is absent with proxy advice.  "Calculated" means "planned or contrived to accomplish a purpose."[165]  And "procurement" is "the act or process of procuring," which, in turn, is defined as "to get possession of

---

[162]  See August 2019 Interpretation at 5.  In the wake of the August 2019 Interpretation, some of the Commissioners have started referring to the "proxy solicitation umbrella."  See, for example,  Statement of  the Honorable Hester M. Peirce at the Open Meeting (Nov. 5, 2019) ("proxy voting advice falls under the proxy solicitation umbrella"), available at https://www.sec.gov/news/public-statement/statement-peirce-2019-11-05-proxy-voting-advice.

[163]  SEC Shareholder Communications Release at 48,278; see also id. at 48,279 ("As a result of [the 1956] definition, almost any statement of views could be alleged to be a solicitation").

[164]  While the SEC addressed this problem by exempting these types of communications from the information and filing requirements, rather than creating a more reasonable regulatory definition, its action had the effect of eliminating any practical effect of its overbroad definition on most groups of persons that otherwise would have been covered by it.  The proposed rules would undo those exemptions for proxy advisors.

[165]  Merriam-Webster Dictionary (2019); see also American Heritage Dictionary (5th ed. 2018) ("Made or planned to accomplish a certain purpose").

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

64



(something): to obtain (something) by particular care and effort."[166]   In contrast, a proxy advisor is a disinterested third-party who is not planning or contriving to achieve any outcome and who is not trying to obtain any shareholder's proxy authority.  Proxy advisors simply assist their shareholder clients through research and advice (as well as the mechanical casting of votes) — essentially an outsourced version of what a sufficiently large institutional investor would ask its own staff to do. [167]

In short, the SEC interpretation ignores the distinction between an advocate with its own interest trying to achieve an outcome — with the attendant risks Congress saw in that sort of speech —  and a disinterested third party providing advice.  Both might "influence" the shareholders' vote, as the August 2019 Guidance strains to redefine the issue.[168]  But at that level of generality, any number of disparate types of communications might be covered.  In a court, both a counsel's argument and a law clerk's legal research might "influence" the judge's decision, but that in no way makes the two roles equivalent.

If this reading were not clear on its face — and it is — basic principles of statutory construction would compel it.  Courts construe statutes narrowly, rather than broadly and flexibly, when an expansive reading would either: 1) raise a serious constitutional issue; or 2) expand the scope of an implied private right of action.  Here, the SEC's proposed interpretation would do both.

---

[166]   Merriam-Webster Dictionary (2019).

[167]   Just because proxy advisors at times act as shareholders' agents in administrative parts of the proxy voting process does not make them "proxy solicitors."  State corporate law clearly recognizes a distinction between granting a proxy to a party and a shareholder authorizing an agent to act on its behalf in a voting matter, such as granting that proxy.  See DEL Code 8-212(c)(1) ("A stockholder may execute a writing authorizing another person or persons to act for such stockholder as proxy.  Execution may be accomplished by the stockholder or such stockholder's authorized officer, director, employee **or agent** signing such writing or causing such person's signature to be affixed to such writing by any reasonable means including, but not limited to, by facsimile signature.") (emphasis added).

[168]  Nor do the new, historical definitions of "solicit" brought forth in the Release help this argument. Release at 19 n. 48.  These, too, include an element of intent to achieve an outcome, with the exception of the outlier "[t]o take charge or care of, as business."  But this meaning does not make sense in the statutory context "solicit" is used and, taken literally, would seem to turn any business related to the proxy process, such as a print shop or vote counter, into a proxy solicitor.  In any event, we note that the Oxford English Dictionary (1933) describes this meaning of the term as "obsolete."

---



First, as further discussed below, the SEC has already acknowledged that interpreting the statute as broadly as it now proposes to do would raise "serious questions under the free speech clause of the First Amendment."  Courts construe statutes to avoid such issues, not to invite them.[169]

Second, the SEC's interpretation would expand an implied private right of action.  In fact, the SEC's initial reason for making this new interpretation was to do just that,[170] thereby subjecting proxy advisors to this implied cause of action. As the Supreme Court has said in the context of reviewing a prior SEC interpretation, "[c]oncerns with the judicial creation of a private cause of action caution against its expansion."  Accordingly, the Court said, in reviewing

---

[169]  See Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 348 (1936) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.") (Brandeis, J. concurring). Reading the statute in this broad a manner would also create a serious constitutional problem under the non-delegation doctrine, since there is no intelligible principle in the Exchange Act for how to regulate proxy advisors.  Proxy advisors are not mentioned in the Exchange Act. Instead, purporting to use its exemptive authority, the SEC proposes to create an entirely new regulatory scheme of its own design for proxy advisors — similar to ones Congress considered, but did not enact into law.  In doing so, the SEC would be making all the major policy decisions — beginning with whether to regulate proxy advisors down to every detail of the review periods — on its own with no Congressional direction or guidance beyond a general "necessary or appropriate in the public interest" standard and consistent with the protection of investors' standard.  This is a far cry from a situation where an agency is being asked to "fill up the details" or address a "statutory gap."  See Gundy v. United States, 588 U.S. ___ (2019) (Gorsuch, J. dissenting) (reviewing the history of the non-delegation doctrine; see also id. (Alito, J. concurring) ( indicating support for revisiting the Court's approach to nondelegation questions). For this reason also, the statute should not be read in such a broad manner as to invite this problem.  See Utility Air Regulatory Group v. EPA, 573 U.S. 302 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism.") (internal citation and quotations omitted).

[170]  See August 2019 Interpretation at 11 ("Does Exchange Act Rule 14a-9 apply to proxy voting advice?  **Response:** Yes.").

---

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

66

# GLASS LEWIS

the SEC's interpretation, "we are mindful that we must give narrow dimensions . . . to a right of action Congress did not authorize when it first enacted the statute . . . ."[171]

The SEC has previously acknowledged that what it called a literal reading of the solicitation definition in its rules would be "sweeping" and "excessive."[172]  But now the SEC seeks to expand that "sweeping" and "excessive" definition even further, to explicitly cover proxy advisors.  But no amount of breadth and flexibility can turn the term "solicit" into "advise."[173]  The interpretation at the foundation of this rulemaking is simply not consistent with the statute.

### B.  The proposed rules violate the First Amendment.

The issuer review and feedback and compelled access mechanisms — which, as far as we know, have no precedent in other contexts of securities regulation — also violate the First Amendment.

#### 1.  Requiring government or issuer review.

The SEC itself has recognized the First Amendment implications of its broad definition of solicitation.  The SEC's "solution" to this in 1992 was to create multiple exemptions that cover that speech and therefore keep it outside the regulatory scheme for proxy solicitations.  As the SEC said 28 years ago when it exempted proxy advice and other types of shareholder communications from the notice and filing requirements of the proxy rules:

> A regulatory scheme that inserted the Commission staff and corporate management into every exchange and conversation among shareholders, their advisors and other parties on matters subject to a vote certainly would raise serious questions under the free speech clause of the First Amendment, particularly where no proxy authority is being solicited by such persons. This is especially true where such intrusion is not necessary to achieve the goals of the federal securities laws.

---

[171]  See Janus Capital Group v. First Derivative Traders, 564 U.S. 135 (2011) (internal quotations and citations omitted).

[172]  SEC Shareholder Communications Release at 48,277-78.

[173]  Goldstein, 451 F.3d at 882 ("That the Commission wanted a hook on which to hang more comprehensive regulation of hedge funds may be understandable.  But the Commission may not accomplish its objective by a manipulation of meaning.").

---

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

67



The purposes of the proxy rules themselves are better served by promoting free discussion, debate and learning among shareholders and interested persons, than by placing restraints on that process to ensure that management has the ability to address every point raised in the exchange of views.[174]

Now, though, the SEC proposes to add onerous conditions to those exemptions for a particular type of speaker whose speech some market participants do not like. As previously discussed, the proposed rules would force proxy advisors to submit their research and advice to issuers for their prior review and feedback before they can publish it to their clients in order to avoid having to comply with a government filing requirement that is wholly impractical and incompatible with their business model.

As the Supreme Court has explained, "Any system of prior restraints of expression . . . bear[s] a heavy presumption against its constitutional validity."[175] The "Government thus carries a heavy burden of showing justification for the imposition of such a restraint."[176] The proposed rules' effective mandate that proxy advisors clear their reports with issuers amounts to a prior restraint on speech and there is nothing close to such a justification here.[177]

Even if not analyzed as a prior restraint, the proposed rules would chill proxy advisors' speech in a manner incompatible with the First Amendment. The First Amendment prevents the government from imposing overbroad measures that discriminate based on the content of the speech or tilt the marketplace of ideas in favor of a preferred view or party. Here, by deputizing one group (corporate management) to review and police the speech of another group (proxy advisors), the proposed rules would single out a type of speech and skew the marketplace of ideas in favor of a preferred group's preferred speech. Of all the types of solicitations the SEC purports to regulate, only proxy advisors are covered by the proposed

---

[174]  SEC Shareholder Communications Release at 48,279.

[175]  New York Times v. United States, 403 U.S. 713, 714 (1971).

[176]  Id.

[177]  Following the approach of this proposal, the SEC could attach similar exemptive conditions to other things it has found to be "solicitations," such as newspaper op-eds or legal advice. For example, the SEC could mandate that newspaper opinion pieces that might influence a proxy vote first be reviewed by the company involved before being published. Few would deny that such a requirement would be antithetical to the First Amendment, but that is the regime the SEC proposes here for proxy advice.

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

68



rules.  And only the soliciting party — corporate management in the vast majority of cases — gets to review and provide feedback on proxy advisors' speech.[178]  Accordingly, the rules only work to complicate and deter recommendations expressing one type of view — an anti-management recommendation.[179]  In fact, the Proposing Release even raises the concept of only requiring review when the proxy advisor's opinion is anti-management, but then dismisses that idea — not because it is incompatible with the rule's intended purposes — but for practical reasons.[180]  Thus, the proposed rules are content-based and viewpoint-based restrictions on speech.[181]  Content-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."[182]  Here, for all the reasons discussed above, the proposed rules cannot survive strict scrutiny; they are far from narrowly tailored to serve compelling state interests.[183]

---

[178]  This viewpoint bias is reflected in the decision to not afford pre-review rights to shareholder proponents.

[179]  As the IAC Recommendation explains: "If [the rules were adopted], the effect would not be viewpoint neutral – the views that would be advanced would be those of corporate managers, not anyone else's views. The rule proposal cannot reasonably be expected to cause proxy advisors to revise initial opinions further away from or against those of corporate managers, because the only new information (except in a rare proxy contest) will be from managers and will favor managers. Peer groups will make performance look better, and executive pay look lower. To the extent proxy advisors draw an opinion out of a spectrum of plausible opinions, the rule proposal will push in one and only one direction – towards corporate managers. The result would be to bias the analysis."

[180]  Release at 45 n. 112.

[181]  <u>Reed v. Town of Gilbert</u>, 576 U.S. __ (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."); id. ("Our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be " 'justified without reference to the content of the regulated speech,' " or that were adopted by the government "because of disagreement with the message [the speech] conveys").

[182]  Id.

[183]  See Richard A. Kirby and Beth-ann Roth, "A Step Too Far: The SEC's Attempt to Regulate Proxy Advisory Services Violates the First Amendment," at 5 (Jan. 2020) ("Demanding disclosure of methodology and making proxy advisory firms give prior notice of the content of their advice is perhaps the most intrusive rather than the least intrusive alternative that could have been

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111     W W W . G L A S S L E W I S . C O M

69



Nor does the "commercial speech" doctrine apply here.  Just because speech is on a commercial topic does not make it commercial speech.[184]  Instead, as the Supreme Court has repeatedly explained, commercial speech is "speech which does no more than propose a commercial transaction."[185]  That is plainly not what is at issue here.  Likewise, "professional speech" is not entitled to lesser First Amendment protection.  The "Court has not recognized 'professional speech' as a separate category of speech. Speech is not unprotected merely because it is uttered by 'professionals.'"[186]

As the SEC recognized in 1992, the type of speech at issue here — proxy advisors' disinterested research and advice on matters of fact and opinion about important corporate governance matters at public companies — is entitled to First Amendment protection. Content-based restrictions on such speech, like those that would be imposed here, are presumptively unconstitutional and must be narrowly tailored to serve compelling state interests.  Here, the overbroad and unnecessarily intrusive measures in the proposed rules cannot withstand any level of First Amendment scrutiny, much less the strict scrutiny they are subject to under longstanding Supreme Court precedent.

### 2. The mandate to publish the issuer's rebuttal.

The proposed rules' requirement that proxy advisors publish the company's reply to its report in the form of a hyperlink also violates the First Amendment.  As the Supreme Court held in unanimously striking down a state "right of reply" statute that granted a political candidate a

---

chosen by the Commission.").  For similar reasons, the SEC's extension of Rule 14a-9 to cover "opinions" and "beliefs" and proposed promulgation of multiple interpretations of that rule directed toward proxy advisors also amounts to a content-based and viewpoint-based regulation of speech that violates the First Amendment.

[184] <u>Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York</u>, 447 U.S. 557, 571 (1980); <u>Virginia State Board of Pharmacy</u>, 425 U.S. 748 (1976).

[185] <u>Virginia State Board of Pharmacy</u> at 762 (internal quotations and citation omitted).

[186] <u>Nat'l Inst. of Family and Life Advocates v. Becerra</u>, 578 U.S. __ (2018).  As the Supreme Court held in a different case involving an investment advice and research publication, "To the extent that the chart service contains factual information about past transactions and market trends, and the newsletters contain commentary on general market conditions, there can be no doubt about the protected character of the communications."  <u>Lowe v. SEC</u>, 472 U.S. 181, 210 (1985).

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

70

# GLASS LEWIS

right to equal space to answer criticism in a newspaper, "any such a compulsion to publish that which reason tells [the publisher] should not be published is unconstitutional."[187]  In fact, the Supreme Court has applied this principle in a case with circumstances remarkably similar to those presented here and found, for three separate reasons, that the state action violated the First Amendment.

In Pacific Gas & Electric v. Public Utility Commission,[188] a state agency permitted a public interest group to use "extra space" in a utility's billing envelope to convey its own messages, including criticism of the utility, so long as there was a disclaimer making it clear those were not the utility's views.  As here, the state agency reasoned that access to multiple viewpoints would benefit ratepayers:

> Our goal . . . is to change the present system to one which uses the extra space more efficiently for the ratepayers' benefit. It is reasonable to assume that the ratepayers will benefit more from exposure to a variety of views than they will from only that of PG&E.[189]

The Court, however, had no trouble concluding that this "compelled access" violated the First Amendment.  First, the Court found that it infringed the utility's First Amendment rights by forcing it "to help disseminate hostile views."  As the Court noted, the utility "might well conclude" that, under these circumstances, "the safe course is to avoid controversy, thereby reducing the free flow of information and ideas that the First Amendment seeks to promote."[190]

Second, the law also abridged the First Amendment because it required the utility –

> to assist in disseminating [the public interest group's] views; it does not equally constrain both sides of the debate about utility regulation.  This kind of favoritism goes well beyond the fundamentally content-neutral subsidies that we sustained in *[Buckley and Regan]*.  Unlike these permissible government subsidies of speech, the Commission's order identifies a favored speaker "based on the identity of the interests

---

[187]  Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 256 (1974) (internal quotations omitted).

[188]  475 U.S. 1 (1986).

[189]  Id. at 6.

[190]  Id. at 14.

---

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

71



that [the speaker] may represent," . . . and forces the speaker's opponent — not the taxpaying public — to assist in disseminating the speaker's message. Such a requirement necessarily burdens the expression of the disfavored speaker.[191]

Third, the Court found that the law "impermissibly requires [the utility] to associate with speech with which [the utility] may disagree."  Since the public interest group can discuss any issue, the utility may be forced to either appear to agree or respond:

> Especially since [the public interest group] has been given access in part to create a multiplicity of views in the envelopes, there can be little doubt that [the utility] will feel compelled to respond to arguments and allegations made by [the public interest group] in its messages to [the utility's] customers.  That kind of forced response is antithetical to the free discussion that the First Amendment seeks to foster.[192]

Each of the reasons the Court gave for striking down the state order in PG&E applies here.  Proxy advisors would be "forced to help disseminate hostile views," which might have a chilling effect on their speech to begin with.  Second, as in PG&E, the compelled access is only available to one specific actor — the soliciting party, who in the vast majority of cases will be corporate management.  A shareholder or employee of the company cannot have its views distributed through the proxy advisor's report, and neither can an investor group that agrees with the proxy advisor recommendation or one that thinks a proxy advisor should not have recommended in favor of a management proposal.  Third, it requires proxy advisors to associate with speech they might disagree with, which, in turn, might compel them to use their space, time and resources to respond to views that they disagree with.

For all the same reasons identified by the Court in PG&E, this is content-based, compelled access of the sort that violates the First Amendment.[193]

---

[191]  Id. at 14-15.

[192]  Id. at 16.

[193]  Nor does it somehow make a difference for constitutional purposes that the rule requires the proxy advisor to publish a hyperlink, rather than the entire text of the issuer's reply, in its report.  The speech-altering and chilling effects the Court identified as infringing the First Amendment in PG&E apply to the hyperlink, no less than they did to the slip of paper at issue there.



### C.  The SEC's reliance on dubious "comment letters" has corrupted the notice and comment process.

The rulemaking is also tainted by the Commission's reliance on apparently fraudulent evidence.  The Commission's Proposing Release — the vehicle for conveying the substance and basis for the SEC's proposal in order to facilitate public comment — relied on evidence that has been shown to be suspect and potentially fraudulent.  Specifically, the Proposing Release states that "representatives of the registrant and retail investor communities have expressed concerns about the oversight and accountability over proxy voting advice businesses."  Cited as support for this statement are several letters purportedly from retail investors.  These letters, however, have had their authenticity called into question and they and others are reportedly now the subject of an SEC Inspector General investigation.  For example, this statement in the Proposing Release cites the views of Pauline Yee, whose two-page letter explains that she is a retired teacher with concerns about the effect of proxy advisors on her pension.  As Bloomberg News later reported, however: "That retired teacher?  Pauline Yee said she never wrote a letter, although the signature was hers."[194]

Most importantly, this is not just any another statement in the Release.  A majority of the Commissioners who voted to propose the rules have indicated that the point made in this statement was central to their support for the initiative.  Most notably, at the Open Meeting where these rules were proposed, Chairman Clayton gave remarks summarizing the proposed rules, explaining their basis and encouraging public comment.  In doing so, the Chairman explained his rationale, after receiving extensive, conflicting input in connection with the Commission's Proxy Roundtable, for proceeding to regulate proxy advisors:

> Some of the letters that struck me the most came from long-term Main Street investors, including an Army veteran and a Marine veteran, a police officer, a retired teacher, a public servant, a single Mom, a couple of retirees who saved for retirement, all of whom expressed concerns about the current proxy process.  A common theme in their letters was the concern that their financial investments — including their retirement funds — were being steered by third parties to promote individual agendas, rather than to further their primary goals of being able to have enough money to lessen the fear of "running out" in retirement or to leave money to their children and grandchildren. These letters are a helpful reminder that the issues the Commission grapples with in this

---

[194]  See Zachary Mider and Ben Elgin, "SEC Chairman Cites Fishy Letters in Support of Policy Change," Bloomberg News (Nov. 19, 2019) ("Bloomberg I").



area are not a matter of (1) shareholders versus companies or (2) businesses that provide proxy voting advice versus companies.  These are false dichotomies.[195]

Likewise, in supporting the related August 2019 Interpretation and Guidance, Commissioner Roisman rejected institutional investors' supportive views about proxy advisors, noting that, in contrast, retail investors had expressed concerns about proxy advisors in letters that he "encourage[d] everyone to look at."[196]  All seven letters cited by the Chairman, as well as the letters cited by Commissioner Roisman, were apparently produced as part of an effort to deceive the Commission that is now under investigation.

In the wake of the disturbing revelations about the apparent fraud at the heart of this rulemaking, however, the Commission took no action to preserve the integrity of the notice and comment process.  Although the Bloomberg article came out in mid-November 2019, several weeks before the Proposing Release appeared in the Federal Register and despite being asked

---

[195]  Statement of the Honorable Jay Clayton at SEC Open Meeting (Nov. 5, 2019) (footnotes omitted), available at https://www.sec.gov/news/public-statement/statement-clayton-2019-11-05-open-meeting#_ftn13.

[196]  See Statement of the Honorable Elad L. Roisman at SEC Open Meeting (Aug. 21, 2019), available at https://www.sec.gov/news/public-statement/statement-roisman-082119 ("I have heard the warnings that any action, regulation, or oversight that directly or indirectly constrains proxy advisory firms will be viewed by some as a gift to the management and directors of public companies, resulting in harm to investors.  For example, I have heard that the Commission should not take any action related to proxy voting advice provided by proxy advisory firms because "…the investors themselves…the ones paying for proxy advice…are not asking for protection."  To be clear, in this context, I do not consider asset managers to be the "investors" that the SEC is charged to protect.  Rather, **the investors that I believe today's recommendations aim to protect are the ultimate retail investors**, who may have their life savings invested in our stock markets.  These Main Street investors who invest their money in funds are the ones who will benefit from (or bear the cost of) these advisers' voting decisions.  In essence, I believe it is our job as regulators to help ensure that such advisers vote proxies in a manner consistent with their fiduciary obligations and that the proxy voting advice upon which they rely is complete and based on accurate information.  **I encourage everyone to look at the public comments received in connection with the Staff Roundtable on the Proxy Process last year.  We have heard not only from hundreds of public companies, but from investor groups and individual investors.  These commenters have expressed varying concerns relating to the influence that proxy advisory firms appear to have over proxy voting decisions in our markets.")** (footnotes omitted).  In making these comments, Commissioner Roisman cited the same retail investor comment letters as the Proposing Release.

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

74



to "repair the rulemaking record,"[197] the Commission did not amend its release to remove the suspect information.  Nor did the SEC revise or annotate the Chairman's Open Meeting statement, or, to our knowledge, take any other action that would lessen the risk of commenters also being deceived by the misinformation.[198]

Predictably, commenters picked up on the misinformation they had been encouraged to look at and commented assuming the genuineness of those statements.  For example, on December 6, 2019, Ken Blackwell wrote a comment letter quoting at length from the part of Chairman Clayton's Open Meeting remarks on individual investor support for the proposal and exclaiming, "*This* is the issue . . . .  I completely agree with the Chairman."[199]  In fact, Mr. Blackwell quoted from the "couple of retirees" highlighted by the Chairman, even though, as the SEC knew by this point, when contacted by Bloomberg the purported author of that letter had said, "I never wrote a letter. . . . What's this all about?"

Nor was the harm limited to just an isolated comment letter.  Others also relied on this dubious information.[200]  And Mr. Blackwell seems to have raised enough concern with others that they, too, wrote in support of the SEC's rule.[201]  In fact, the corruption of the comment process has spread beyond this original batch of dubious letters and the misunderstandings that stemmed from their promotion.  Perhaps emboldened by the success of this initial effort, a significant percentage of the unique comment letters filed to date show signs of having been orchestrated by organizations that conduct "astroturf" campaigns and were presumably paid to

---

197  Better Markets Press Release, "The SEC and Justice Department Should Investigate Allegations That Fraudulent Comment Letters Were Submitted in Support of Recent Rule Proposals Favoring Vested Corporate Interests," (Dec. 9, 2019), available at https://bettermarkets.com/newsroom/sec-and-justice-department-should-investigate-allegations-fraudulent-comment-letters-were

198  In fact, in response to the Bloomberg article, a SEC spokesperson dismissed the issue, saying "[t]he various letters we received on the proxy process highlighted the importance of these issues.  We welcome all interested parties, particularly our Main Street investors, to comment on our proposals." Bloomberg I.

199  Comments of Ken Blackwell (Dec. 6, 2019) (emphasis in original).

200  See also Comments of Benjamin Zycher, Ph.D. (Jan 17, 2020) (quoting Chairman Clayton's statements at the Open Meeting about the concerns of these "Main Street investors").

201  See, for example, Comments of Nathan Martin (Dec. 30, 2019) ("I had read something from Ken Blackwell which alerted me that the SEC was considering this rule to regulate proxy advisors.").

---

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

75



generate support for the rules.[202]  The result has been a further corruption and politicization of the SEC's notice-and-comment process for this rulemaking.

Under the Administrative Procedure Act, an agency engaged in informal rulemaking must provide interested persons a reasonable and meaningful opportunity to participate in the rulemaking process.[203]  And, for there to be such a meaningful opportunity, the agency must provide adequate notice of what the agency is proposing to do **and its basis** for doing so.[204]  This principle has obvious implications for the unusual situation presented here — when an agency learns before the comment period even starts that part of the basis for its proposal, especially the part its Chairman said was particularly significant to his thinking about the rule, was likely fabricated.  But the Commission took no action to amend its Proposing Release or otherwise alert commenters to the misinformation it had highlighted.  By not doing so, commenters could be, and in fact were, misled by the same false information.  Other individual commenters perhaps did not weigh in at all, having been told that a number of their fellow retail investors were concerned about proxy advisors and that this disproved that this was an issue of corporate versus shareholder interests.  Either way, the result of not correcting this misinformation was to deprive the public of a meaningful opportunity to comment on the rules based on genuine, non-fraudulent information.[205]

---

[202]  See Andrew Ramonas and Andrea Vittorio, "SEC Proxy-Firm Rules Spur YouTube Call to Stop 'Liberal Agenda'," Bloomberg Law (Jan. 17, 2020) (describing efforts of groups to spread misinformation that proxy advisors are supporting "liberal causes" like abortion and "sanctuary cities" to generate SEC comment letters supporting proxy advisor regulation).

[203]  See <u>Forester v. CPSC</u>, 559 F.2d 774 (D.C. Cir. 1977); <u>United Steelworkers v. Marshall</u>, 647 F.32d 1189 (D.C. Cir. 1980).

[204]  See <u>Portland Cement Association v. Ruckelshaus</u>, 486 F.2d 375, 394 (D.C. Cir. 1973) ("In order that rule-making proceedings to determine standards be conducted in orderly fashion, information should generally be disclosed as to the basis of a proposed rule at the time of issuance.").

[205]  See Howard Fischer, "INSIGHT: Fact and Fantasy in SEC Rules—The Battle Over Proxy Contests Relies on Imaginary Soldiers," Bloomberg Law (Jan. 13, 2020) ("Fischer") ("While these are not yet approved rules, simply proposals, the claimed reliance on the letters has infected the rule-making process.  The letters represent not merely statements of fact, but reflect statements about what ordinary investors want and believe—statements that have proven to be false."), available at <u>https://news.bloomberglaw.com/securities-law/insight-fact-and-fantasy-in-sec-rules-the-battle-over-proxy-contests-relies-on-imaginary-soldiers.</u>

---

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

76



To be sure, mass and fake comment letters are becoming an issue in agency rulemakings across the government.[206]  Here, however, the issue is different and more significant than just trying to keep fake emails out of the comment file.  In this case, the problematic information was relied upon by the SEC as a pivotal part of the basis for the proposed rules and, through individual Commissioner's statements, was actually highlighted as a specific and important point about their basis for supporting the rule and who would benefit from it.  In these circumstances, providing a meaningful comment period required correcting the record.

Related but separate from the legal considerations at issue here, we would encourage the Commission to consider the potential ramifications of these events for its rulemaking processes and the public's faith in those processes.  The SEC has a deserved reputation for the quality of its administrative practices and the non-partisan nature of its work.  At a minimum, what happened here has harmed the integrity of this rulemaking — which, after all, is intended to address issues of accuracy, transparency and disclosure of conflicts — as well as public perceptions of the rulemaking's integrity and fairness.[207]

Perhaps even more concerning, though, are its future implications.  The unfortunate effect of not correcting the rulemaking record and just proceeding to rule adoption would be to reward the misconduct of those who deceived the Commissioners and thereby tainted the administrative record.  And, if successful here, the purveyors of this misinformation and others like them will only be encouraged, risking this sort of deception becoming a regular feature of SEC rulemakings.  In addition to the obvious harms of this, it could also cause the agency and others to question the authenticity of actual individual investors who take the time and make the effort to write in with their genuine comments.  These would be grave harms to the Commission's processes and we encourage the Commission to take strong remedial measures to avoid them, including repairing the rulemaking record in this proceeding and inviting additional comment on a basis that does not include fabricated letters.

---

[206]  See, for example, Administrative Conference of the United States, Forum on Mass and Fake Comments in Agency Rulemaking (Oct. 15, 2018).

[207] See Fischer (the Commission's reliance on these letters "undermines the integrity of the rule-making process").

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

77



**Conclusion.**

For all the reasons stated above, Glass Lewis respectfully requests that the Commission not adopt the proposed rules and, instead, continue to work with proxy advisors, investors and other stakeholders to develop a balanced and thoughtful approach to this area that better serves the interests of all market participants.  Thank you for your consideration of our comments.

Sincerely,

Kevin Cameron
Executive Chair

Nichol Garzon-Mitchell
Senior Vice President, General Counsel

cc:     Chairman Jay Clayton
          Commissioner Robert J. Jackson, Jr.
          Commissioner Hester M. Peirce
          Commissioner Elad L. Roisman
          Commissioner Allison Herren Lee

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

78

**EXHIBIT 22**



Contact Us
**TOLL FREE:** 1-866-9-NO-SCAM



**JAMES UTHMEIER**

FILE COMPLAINT

Select Language ▼

☰

🏠 Home     〉     News Releases     〉     Attorney General James Uthmeier Announces Investigation Glass Lewis Co and

# ATTORNEY GENERAL JAMES UTHMEIER ANNOUNCES INVESTIGATION INTO GLASS LEWIS & CO. AND INSTITUTIONAL SHAREHOLDER SERVICES INC. FOR ESG AND DEI POLICIES

[View PDF](#)

**Release Date**   Mar 20, 2025

**Contact**   Communications

**Phone**   (850) 245-0150

TALLAHASSEE, Fla.—Today, Attorney General James Uthmeier directed an investigation into proxy advisors Glass Lewis & Co. and Institutional Shareholder Services Inc. (ISS) for potential misrepresentations related to their Environmental, Social, and Governance (ESG) and Diversity, Equity, and Inclusion (DEI) investing policies in violation of the Florida Deceptive and Unfair Trade Practices Act and possible unlawful collusion in adopting and enforcing these policies in violation of the Florida Antitrust Act of 1980. The Civil Investigative Demands are available [here](#) and [here](#).

"We won't allow ESG goals to handcuff Florida businesses and threaten Floridians investments," said **Attorney General James Uthmeier**. "If these proxy advisors use their overwhelming market power to advance partisan political agendas rather than maximizing shareholder value, we will hold them accountable."

Glass Lewis and ISS provide vote recommendations to institutional investors and control a large share of the proxy-advisory market, with some estimates as high as 97%. Institutional investors, such as those who manage the portfolios of many Americans' retirement accounts, rely on proxy advisors to direct them on how to vote their shares. Thus, the decisions of proxy advisors have substantial influence over how major American companies are run.

Glass Lewis and ISS told their clients and the public that their decisions were not politically motivated and instead based purely on economic factors. Glass Lewis claimed that the company "evaluates all environmental and social issues through the lens of long-term shareholder value." ISS has similarly argued that all its research is grounded in a "neutral and analytical perspective" and places its "clients' interests first and above" its own. But pushing racial and gender quotas and attacking the concept of a meritocracy destroys long-term shareholder value.

Glass Lewis and ISS asserted that their ESG investment strategies improve financial performance. But the numbers tell a different story. ESG funds have broadly underperformed the market for years, trailing the S&P 500, posting double-digit losses in 2022, and continuing to underperform through 2024.

While these advisors represented ESG as a sound, apolitical investment strategy, their motivations for recommending ESG to investors may have been to advance particular ideological views. Investors were trapped with few alternatives for services because Glass Lewis and ISS control a large portion of the market and have the power to negatively impact corporations' ratings if shareholders reject their advice or drop their services. These factors suggest very real anti-competitive and consumer protection infirmities.

# # #

## Resources

AG Opinions

Annual Regulatory Plan

Consumer Protection

Doing Business with the Office

FAQ

Florida Digital Bill of Rights Annual Enforcement Report

Opioid Settlements

Statement of Agency Organization and Operation

## Quick Links

Consumer Alerts

Military and Veterans Assistance Program

Open Government

Dose of Reality Florida

Request for Proposal for Professional Legal Services – Roku

Crime Prevention Summit



**EXHIBIT 23**

**INSIGHTS**
(https://insights.issgovernance.com)

TOPIC

# SUSTAINABILITY (HTTPS://INSIGHTS.ISSGOVERNANCE.COM/TOPICS/SUSTAINAB

SEPTEMBER 25, 2024

## Materiality Assessments: Expectations and Best Practices

*Tags: Corporate Sustainability (https://insights.issgovernance.com/tags/corporate-sustainability/), ISS-Corporate (https://insights.issgovernance.com/tags/iss-corporate/), Materiality Assessments (https://insights.issgovernance.com/tags/materiality-assessments/), Sustainability Regulations (https://insights.issgovernance.com/tags/sustainability-regulations/)*



*Below is an excerpt from ISS-Corporate's recently released article "Materiality Assessments: Expectations and Best Practices". The full article (https://www.iss-corporate.com/library/materiality-assessments-expectations-and-best-practices/) is available on the ISS-Corporate online library.*

# Materiality Assessments Evolve as Key Tool for Corporate Sustainability Management

Over the past decade, the business world has made significant strides in establishing standardized and methodical approaches for corporates developing their sustainability strategies and relevant disclosures. Today, a materiality assessment for identifying and prioritizing key issues has become a basic expectation among stakeholders, with certain jurisdictions beginning to require companies to conduct such assessments according to prescribed standards, including assurance requirements.

Through stakeholder engagement and data analysis, materiality assessments can be instrumental tools for companies to identify, manage, and communicate their impacts, risks, and opportunities. Several standards and regulations have established guidance or set expectations for companies to conduct materiality assessments, including the IFRS S1 and S2 (and the legacy TCFD and SASB standards) and GRI. Globally, regulations also set these expectations, with the EU's European Sustainability Reporting Standards (ESRS) emerging as the preeminent standard for double materiality assessments.

ISS-Corporate reviewed corporate disclosure data on whether companies conduct an evaluation of material sustainability topics.

**READ THE FULL ARTICLE >** (https://www.iss-corporate.com/library/materiality-assessments-expectations-and-best-practices/)

---

By:
Jessica Lobo, Sustainability Advisor, ISS-Corporate
Kosmas Papadopoulos, Head of Sustainability Advisory, Americas, ISS-Corporate

---

**SHARE THIS**

 

## RELATED POSTS

**EXHIBIT 24**

SJ Quinney College of Law, University of Utah

# Utah Law Digital Commons

Utah Law Faculty Scholarship                                    Utah Law Scholarship

2023

# The Levers of Sustainability: The EU Directive on Corporate Sustainability Due Diligence in Comparison to US Law

Jeff Schwartz

Follow this and additional works at: https://dc.law.utah.edu/scholarship

Part of the Environmental Law Commons, Natural Resources Law Commons, and the Oil, Gas, and Mineral Law Commons

**The Levers of Sustainability:  The EU Directive on Corporate Sustainability Due Diligence in Comparison to US Law**

*Forthcoming Podjetje in Delo (Company and Labour): A Journal for Commercial, Labour and Social Law*

*Jeff Schwartz*[*]

*ABSTRACT*

In February 2022, the European Commission proposed a far-reaching and comprehensive directive on corporate sustainability due diligence (the "Directive").  This Article describes the Directive, compares it to sustainability efforts in the US, and offers observations and critiques about both the Directive and US law.  The comparison reveals several primary takeaways.  First, likely owing to their significantly different social and political cultures, the EU Directive goes far beyond any US sustainability efforts.  Second, and relatedly, the Directive is part of a rapidly progressing EU sustainability framework, which embraces sustainability as a stand-alone goal.  In the US, however, considerations of sustainability are almost always framed within a financial paradigm, which distracts policy discussions and stalls regulatory efforts.  Third, the Directive applies to companies based on size and industry.  Enacting a rule with similar coverage would be difficult in the US because the corporate and securities laws on which sustainability obligations would most likely be based are jurisdictionally fragmented.  Finally, in a departure from its usual hesitancy in the area, the US experimented with human-rights due diligence a decade ago, with the so-called conflict minerals rule.  The rule failed for a range of reasons—political, structural, and regulatory—which still resonate and provide grounds for caution about the potential of the Directive to significantly improve human rights.

Keywords: EU Directive on Corporate Sustainability Due Diligence; Sustainability; Due Diligence; Comparative Law; Shareholder Primacy; Stakeholder Theory; Conflict Minerals Rule; Fiduciary Duties

**<u>Introduction</u>**

In February 2022, the European Commission proposed a far-reaching and comprehensive directive on corporate sustainability due diligence (the "Directive").[1]  The Directive is currently in the approval stages at the Council of the European Union and the European Parliament.[2]  This

---

[*] Hugh B. Brown Presidential Professor of Law, University of Utah, S.J. Quinney College of Law.

[1] European Commission, Proposal for a Directive of the European Parliament and of the Council on Corporate Sustainability Due Diligence and amending Directive (EU) 2019/1937 [hereinafter the "Directive"].  The Directive builds on human rights due diligence rules in place in some members states.  *See* Malcolm Rogge, *Risk, Uncertainty, and the Future of Corporate Human Rights Due Diligence*, Corporate Responsibility Initiative Working Paper Series 2022.81, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4317128&dgcid=ejournal_htmlemail_corporate%3Alaw%3Acorporate%3Afinancial%3Alaw%3Ainterdisciplinary%3Aapproaches%3Aejournal_abstractlink.

[2] European Commission, Corporate Sustainability Due Diligence, Fostering Sustainability in Corporate Governance and Management Systems, https://commission.europa.eu/business-economy-euro/doing-business-eu/corporate-

Electronic copy available at: https://ssrn.com/abstract=4489417

Article describes the Directive, compares it to sustainability efforts in the US, and offers observations and critiques about both the Directive and US law.

The comparison reveals several primary takeaways.  First, there is nothing like the Directive in the US, nor will something like it appear anytime soon.  The Directive results from a political and cultural consensus that sustainability is a corporate obligation.  In the US, this principle is much more controversial.  It is, in fact, a wedge issue between the major political parties.  Second, and relatedly, while the Directive is part of a web of integrated sustainability laws, US law remains focused solely on financial matters.  Officers and directors owe fiduciary duties to maximize shareholder value (rather than operate sustainably), and there are no sustainability-related disclosure responsibilities.  There is a movement in the US to update corporate and securities laws to include sustainability, but there are significant headwinds. While there are signs that US corporations are acting more sustainably, this shift results from pressure from employees, customers, and shareholders rather than regulation.

Third, there is a structural problem with mandating sustainability in the US.  The Directive applies to all EU companies over a certain size, as well as companies that do substantial business in the EU.  Because of the fragmented structure of US law, which depends on the state of formation and whether a company has public investors, the US could not easily impose such broad-based and even-handed obligations.  Finally, the US experimented with a substantive due diligence obligation, Section 1502 of Dodd Frank, which required public companies to trace and report the extent to which their products contained conflict minerals originating from the Congo region of Africa (the "conflict minerals rule").[3]  The rule failed—and is no longer enforced—largely because of political resistance, but also because companies failed to engage in meaningful conflict-mineral tracing and disclosure.  While the Directive improves upon the conflict minerals rule, it suffers from some of the same problems—some of which are inherent in sustainability due diligence—which threaten to compromise the Directive's effectiveness.

## I. The European Commission's Proposal on Corporate Sustainability Due Diligence

The Directive is ambitious in both its substance and scope.[4]  This section outlines the requirements of the rule and the companies bound to comply.

## A. Procedural Status

This Directive is a proposal of the European Commission.  To become law, it must be approved by both the Council of the European Union, which consists of the government

---

sustainability-due-diligence_en.  The European Parliament approved the Directive on June 1, 2023 without major modifications.  *See infra* note 7.

[3] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, § 1502 (2010) [hereinafter Dodd-Frank Act].

[4] Aoife White, Alberto Nardelli and Stephanie Bodoni, *Unethical Firms Risk Massive Bills in EU Supply-Chain Crackdown*, Bloomberg (Feb. 21, 2022), https://www.bloomberg.com/news/articles/2022-02-21/unethical-firms-risk-massive-bills-in-eu-supply-chain-crackdown#xj4y7vzkg (quoting Richard Gardiner of Global Witness, as declaring that the Directive is "a watershed moment for human rights and the environment").

Electronic copy available at: https://ssrn.com/abstract=4489417

ministers of each member state,[5] and the European Parliament, which consists of 705 members elected within each member state.[6]  The European Parliament has approved the Directive.[7]  Once approved by the Council of the European Union, the Directive is not immediately binding on EU countries but rather, upon adoption, must be incorporated into the law of EU members states.

## B. Substantive Due Diligence Requirements

The centerpiece of the rule is that companies must engage in the necessary due diligence to "identify actual and potential adverse human rights impacts and adverse environmental impacts arising from their own operations or those of their subsidiaries and, where related to their value chains, from their established business relationships."[8]

A company's value chain includes all "activities related to the production of goods or the provision of services by a company, including the development of the product or the service and the use and disposal of the product as well as the related activities of upstream and downstream established business relationships of the company."[9]  The above language covers the entire lifecycle of a company's products. Consider a Philips light bulb.  All corporate activities and activities by companies in the supply chain for producing the light bulb would be captured.  The rule would also capture activities related to disposal of used lightbulbs and any companies engaged in such disposal.

The rule defines "adverse human rights impacts" and "adverse environmental impacts" by reference to its Annex.  The Annex, in turn, lists international agreements, the violation or potential violation of which are the subject of the due diligence obligations.[10]

For instance, Part I of the Annex, the human rights annex, lists 21 international human rights agreements and 22 human rights and fundamental freedom conventions.  The first is the Universal Declaration of Human Rights.  This applies to all members of the United Nations, but

---

[5] European Union, Council of the European Union, https://european-union.europa.eu/institutions-law-budget/institutions-and-bodies/search-all-eu-institutions-and-bodies/council-european-union_en.

[6] MEPS European Parliament, https://www.europarl.europa.eu/meps/en/home.

[7] Huw Jones, *European Parliament Backs Company Checks on Suppliers for Human Rights Abuses*, Reuters (June 1, 2023) ("Parliament voted 366 in favour, with 225 against"), https://www.reuters.com/sustainability/eu-parliament-backs-company-checks-suppliers-human-rights-abuses-2023-06-01/.  The EU Parliament's version includes, among other things, some modifications to the size thresholds of companies subject to the Directive.  *See* Hogan Lovells, *Human Rights Due Diligence Moves Apace with the EU Parliament Expanded Version of the Proposed CSDDD*, Lexology (June 8, 2023), https://www.lexology.com/library/detail.aspx?g=6cce3e54-3c43-44af-a2bd-fefcf7fe8415; Huw Jones, *EU Lawmakers Back Human Rights, Environmental Checks for Big Companies*, Reuters (April 25, 2023), https://www.reuters.com/business/environment/eu-lawmakers-back-human-rights-environmental-checks-big-companies-2023-04-25/; European Parliament, Amendments adopted by the European Parliament on 1 June 2023 on the Proposal for a Directive of the European Parliament and of the Council on Corporate Sustainability Due Diligence and amending Directive (EU) 2019/1937, https://www.europarl.europa.eu/doceo/document/TA-9-2023-0209_EN.html.

[8] Directive, Article 6(1).

[9] *Id.* at Article 3(g).

[10] European Commission, Annex to the Proposal for a Directive of the European Parliament and of the Council on Corporate Sustainability Due Diligence and amending Directive (EU) 2019/1937 [hereinafter the Annex].

Electronic copy available at: https://ssrn.com/abstract=4489417

is not binding.[11]  The first article states that "[a]ll human beings are born free and equal in dignity and rights. They are endowed with reason and conscience and should act towards one another in a spirit of brotherhood."[12]

The Directive transforms this aspirational soft-law obligation into hard law.  A company would need to conduct due diligence to ascertain whether any of its activities, or activities in its value chain, violate or potentially violate, this principle.  As is typical of non-binding international accords, identifying violations will be difficult and subjective.

Climate change is the environmental challenge of our time, but it is not directly addressed through the substantive due diligence requirement. The Annex, Part II, includes 12 "Internationally Recognized Objectives and Prohibitions Included in Environmental Conventions."[13]  The conventions are not as far-reaching as one might imagine.  They have to do with, among other things, the handling of hazardous waste, mercury, and other chemicals.

The Directive addresses climate change from a different angle.  It requires certain companies (discussed below) to adopt a plan to conform to the Paris Agreement:

"Member States shall ensure that companies referred to in Article 2(1), point (a), and Article 2(2), point (a), shall adopt a plan to ensure that the business model and strategy of the company are compatible with the transition to a sustainable economy and with the limiting of global warming to 1.5 °C in line with the Paris Agreement. This plan shall, in particular, identify, on the basis of information reasonably available to the company, the extent to which climate change is a risk for, or an impact of, the company's operations."[14]

"Member States shall ensure that, in case climate change is or should have been identified as a principal risk for, or a principal impact of, the company's operations, the company includes emission reduction objectives in its plan."[15]

In sum, covered companies would be required to adopt a plan for operating their business in conformity with the Paris Agreement and a plan for reducing emissions if emissions are a principal risk or impact of the company.

---

[11] *See* United Nations, Declaration on Human Rights Defenders, https://www.ohchr.org/en/special-procedures/sr-human-rights-defenders/declaration-human-rights-defenders#:~:text=The%20Declaration%20is%20not%2C%20in,on%20Civil%20and%20Political%20Rights, ("The Declaration is not, in itself, a legally binding instrument. However, it contains a series of principles and rights that are based on human rights standards enshrined in other international instruments that are legally binding").

[12] United Nations, Universal Declaration of Human Rights, https://www.un.org/en/about-us/universal-declaration-of-human-rights.

[13] Annex, Part II.

[14] Directive, Article 15(1).

[15] *Id.* at Article 15(2). The Directive also links the corporation's climate change plan to compensation: "Member States shall ensure that companies duly take into account the fulfilment of the obligations referred to in paragraphs 1 and 2 when setting variable remuneration, if variable remuneration is linked to the contribution of a director to the company's business strategy and long-term interests and sustainability." *Id.* at Article 15(3).

Electronic copy available at: https://ssrn.com/abstract=4489417

What constitutes "due diligence" into companies' adverse human rights and environmental impacts is defined in Articles 5 through 11.[16]  The core obligation is that companies develop a code of conduct.  Ostensibly, this code of conduct companies adopt will demand compliance with the international agreements listed in the Annex.  The company is then tasked with implementing policies and procedures to ensure compliance with that code.  The most natural way to accomplish this would be through a certification system.  Internally, department heads and managers would be required to certify compliance with the code of conduct.  Members of the value chain would be contractually required to act in accordance with the code of conduct and to so certify.[17]

The problem with relying on certifications is that they may not be taken seriously.  In particular, far-flung members of a company's value chain might falsely certify compliance so as not to lose business.  Likely for these reasons, the Directive views certifications alone as insufficient.  It notes that "contractual assurances should be accompanied by appropriate measures to verify compliance."[18]  Appropriate measures include "suitable industry initiatives or independent third-party verification."[19]  Some have characterized this aspect of the rule as an audit requirement.  It adds an outside set of eyes to the company's due diligence process.

Better Factories Cambodia is an example of the type of industry initiative[20] that the Directive likely has in mind.  The organization inspects and issues reports regarding factory conditions in Cambodia.[21]  These reports could be used by EU companies to verify certifications by subcontractors about factory working conditions.

The idea is that the code of conduct, together with certifications and audits to assure compliance (likely along with other risk-mitigation efforts),[22] will cause companies and their value chains to identify and then eliminate adverse human rights and environmental impacts.  Crucially, as part of this process, these entities will be required to shed problematic practices.  The Directive specifies the steps companies must take in doing so.

As part of their duty to mitigate the impact of these activities, companies must implement a "corrective action plan."[23]  When the problem stems from a member of the company's value chain, there are several paths forward.  At the very least, the company is prohibited from renewing a contract with the offending party.[24]  If the law allows, companies must also suspend their commercial relations with the offending party, and where the impact is severe, sever the relationship.[25]

---

[16] *See id.* at Article 4(1).
[17] *See id.* at Article 7(2)(b).
[18] *Id.* at Article 8(5).
[19] *Id.* at Article 8(5).
[20] Better Work, Better Factories Cambodia, https://betterwork.org/where-we-work/cambodia/.
[21] Human Rights Watch, *"Work Fast or Get Out," Labor Rights Abuses in Cambodia's Garment Industry*, (discussing Better Factories Cambodia and its limitations), https://www.hrw.org/report/2015/03/11/work-faster-or-get-out/labor-rights-abuses-cambodias-garment-industry.
[22] See *infra* Part II.A.3.b (discussing internal controls generally).
[23] Directive, Article 8(3)(b).
[24] *See* Directive, Article 7(5).
[25] *See id.*

Electronic copy available at: https://ssrn.com/abstract=4489417

## C. Reporting Requirements

The Directive includes a reporting requirement.  Some covered companies will be required to report under Articles 19a and 29a of Directive 2013/34/EU.[26]  Others will be required to produce an annual report describing their due diligence.[27]  Article 19a of 2013/34/EU requires "sustainability reporting,"[28] which contemplates a comprehensive report that tracks the Directive's due diligence obligations.  Companies are required to provide—

"a description of:
(i)    the due diligence process implemented by the undertaking with regard to sustainability matters, and, where applicable, in line with Union requirements on undertakings to conduct a due diligence process;
(ii)    the principal actual or potential adverse impacts connected with the undertaking's own operations and with its value chain, including its products and services, its business relationships and its supply chain, actions taken to identify and monitor those impacts, and other adverse impacts which the undertaking is required to identify pursuant to other Union requirements on undertakings to conduct a due diligence process;
(iii)    any actions taken by the undertaking to prevent, mitigate, remediate or bring an end to actual or potential adverse impacts, and the result of such actions;"[29]

## D. Director Sustainability Duties

The Directive also links sustainability due diligence to the fiduciary duties of the board of directors.[30]  Namely, the directors are "responsible for putting in place and overseeing the [company's] due diligence actions."[31]  The Directive also imposes a broad obligation on directors to "take into account the consequences of their decisions for sustainability matters, including, where applicable, human rights, climate change and environmental consequences, including in the short, medium and long term."[32]  This sustainability-linked concept of fiduciary duties serves as a principles-based backstop to the due diligence requirements, which are otherwise tied to the treaty obligations specified in the Annex.

## E. Enforcement and Liability

---

[26] Directive (Eu) 2022/2464 of the European Parliament and of the Council of 14 December 2022 amending Regulation (EU) No 537/2014, Directive 2004/109/EC, Directive 2006/43/EC and Directive 2013/34/EU, as regards corporate sustainability reporting, https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:32022L2464 [hereinafter Corporate Sustainability Reporting Directive].
[27] Directive, Article 11.
[28] Corporate Sustainability Reporting Directive, Article 19a.
[29] *Id.* at Article 19a(2)(f).  Article 29a has identical language except that it applies to consolidated groups of entities. *Id.* at 29a(2)(f).
[30] Directive, Articles 25, 26.
[31] *Id.* at Article 26(1).
[32] *Id.* at Article 25(1).  This is not a significant departure from the law of member states.  *See* Paul Krüger Andersen et al*., Response to the Proposal for a Directive on Corporate Sustainability Due Diligence by Nordic and Baltic Company Law Scholars*, Nordic & European Company Law, LSN Research Paper Series No. 22-01, 10 ("national company law of the Member States already respects sustainability and sustainability").

Electronic copy available at: https://ssrn.com/abstract=4489417

The Directive envisions public and private enforcement (what the Directive refers to as civil liability).  Under Article 18, each member state is to have a supervisory authority with the power to investigate compliance, impose fines for noncompliance, and issue injunctions.[33]  Fines will be tied, not only to the offense, but to the net turnover (discussed below) of the offending entity.[34]

The companies are also liable for damages to private parties caused by their failure to conduct appropriate due diligence, when that failure causes damages "that should have been identified, prevented, mitigated, brought to an end or its extent minimised" through due diligence.[35]

To mitigate the risk of excessive liability, companies are not liable for damages caused by "indirect partner[s]" in their value chain if the damages occurred despite the company having taken reasonable steps to verify compliance with its code of conduct.[36]

## F. Companies Obligated to Comply

The Commission estimates that the Directive will directly cover about 17,000 companies, 13,000 from the EU and 4,000 third-country companies.[37]

Although these figures seem large at first blush, the Commission estimates that the Directive will apply to only 1% of EU companies.[38]  It divides these companies into two categories.[39]  EU companies with more than 500 employees and a net turnover[40] of more than EUR 150 million are subject to the entirety of the Directive.[41]  Companies with more than 250 employees and a net turnover of more than EUR 40 million[42] are included only if they are in a "high-impact sector."  The definition of high-impact sectors is pulled from OECD guidance.[43]  It includes the extractive sector (mining, oil, and gas), the mineral supply chain, agricultural supply

---

[33] Directive, Article 18(5).

[34] *Id.* at Article 17.

[35] *Id.* at Article 22(1)(b).

[36] *Id.* at Article 22(2).  The Directive suggests that an indirect partner is an entity in a company's value chain with which it does not have a contract.  An example would be a supplier to one of the company's suppliers. *Id* at Whereas Clause 36.

[37] *Id.* at 16.

[38] *Id.* at 14.

[39] The Directive applies to all companies "which are formed in accordance with the legislation of a Member State." *Id.* at Article 2.

[40] Net turnover is defined in Article 3(m)(i) through cross-reference to the Corporate Sustainability Reporting Directive, which defines the term as "the amounts derived from the sale of products and the provision of services after deducting sales rebates and value added tax and other taxes directly linked to turnover."  Corporate Sustainable Reporting Directive, Article 2(a)(5).

[41]  Directive, Article 2(1)(a).

[42] *Id.* at Article 2(1)(b).

[43] OECD Responsible Business Conduct, OECD Guidelines for Multinational Entities, http://mneguidelines.oecd.org/sectors/.  Although the finance industry is included in the OECD Guidance, the sector is not included as a high-impact sector in the Directive.  Thus, financial industry participants are only bound if they qualify under the largest tier.  In addition, such companies are only required to conduct due diligence when they provide "credit, loan or other financial service" before initiating the relationship.  Directive, Article 6(3).

Electronic copy available at: https://ssrn.com/abstract=4489417

chain, and the garment supply chain.[44]  Companies in these high-impact sectors only must conduct due diligence sufficient to uncover and eliminate "severe adverse impacts" that are relevant to their sector.[45]  They are also exempt from Article 15, which as discussed above, requires a climate-action plan to comply with the Paris Agreement.

Similar criteria apply to third-country companies.[46]  The Directive applies to those companies with a EUR 150 million net turnover within the EU.[47]  Those with EU net turnover between EUR 40 million and EUR 150 million,[48] and in one of the high impact categories, are subject to due diligence obligations only with respect to severe adverse impacts within their sector.[49]  Articles 25 and 26, which impose sustainability obligations on corporate directors, do not apply to non-EU companies.[50] As above, the smaller category of companies are also exempt from Article 15.[51]

Note that while the Directive directly applies to the aforementioned companies, it indirectly applies to all companies in these companies' value chains (and, potentially, companies in those companies value chains).[52]  For the covered companies to meet their obligations, companies in their value chains will be required to certify the absence of adverse impacts and to potentially audit their operations.  To offset these costs, the Directive requires that companies that are directly subject to the due diligence requirement support smaller and medium-sized enterprises (SMEs) in their value chains "where compliance with the code of conduct or the corrective action plan would jeopardize the viability of the SME."[53]

In sum, the Directive embeds due diligence regarding adverse human rights and environmental impacts into the operations of large EU companies, third-country companies that do a great deal of business in the EU, and companies that operate in sectors with value chains that are known to be problematic.  It also requires that large companies, whether formed in the EU or in a non-member state, to take steps to comply with the Paris Accord.

## G. Other EU Sustainability Obligations

Although this Article focuses on the Directive, it is noteworthy from a comparative perspective that it is part of a network of emergent rules that creates a sustainability framework

---

[44] *Id.* at Article 2(1)(b).

[45] *See id.* at Article 6(2).

[46] *See* Luca Enriques & Matteo Gatt*i, The Extraterritorial Impact of the Proposed EU Directive on Corporate Sustainability Due Diligence: Why Corporate America Should Pay Attention,* Oxford Business Law Blog (April 22, 2022), https://blogs.law.ox.ac.uk/business-law-blog/blog/2022/04/extraterritorial-impact-proposed-eu-directive-corporate (discussing extraterritorial application of the Directive).

[47] *Id.* at Article 2(2)(a).

[48] *Id.* at Article 2(2)(b).

[49] *See id.* at Article 6(2).

[50] *See id.* at Article 25(1).

[51] *See id.* at Article 15(1).

[52] It would apply to these twice-removed companies where a value-chain member would need a sub-certification to allow it to certify to the company conducting the due diligence.  Depending on the complexity of companies' value chains, there could potentially be layers on layers of sub-certifications.  The Directive anticipates this sort of "contractual cascading."  *Id.* at Article 7(2)(b).

[53] *Id.* at Article (8)(3)(e).

Electronic copy available at: https://ssrn.com/abstract=4489417

for EU companies. The framework includes the Taxonomy Regulations, which defines sustainable business activities,[54] SFDR, which imposes ESG disclosure obligations on asset managers, [55] and CSRD, which revises the sustainability disclosure obligations of EU companies.[56]

## II. US Corporations and Sustainability

The bold EU framework stems from broad agreement that corporations are socio-economic entities that have an obligation to act ethically and sustainably. As evidence, businesses themselves overwhelmingly supported regulation of sustainability due diligence.[57] No such consensus exists in the US. The social responsibility of business is a hotly contested topic. Conventional wisdom since the 1980s maintained that executives should run corporations to maximize shareholder profits. This so-called shareholder primacy approach contrasts with the stakeholder approach. While the former is deeply embedded in corporate culture, it is currently under significant stress as more and more have turned to the latter, which holds that companies should be run for the benefit of all stakeholders, not just shareholders.

The law has not kept up with the shifting intellectual current. It remains rooted in shareholder primacy as there is no legal obligation for directors or companies to act sustainably, let alone an obligation to conduct sustainability due diligence and eliminate problematic practices. The following sections discuss US law, the potential to reform it to include sustainability obligations, and the hurdles involved.

## A. Fragmentation of US Business Law

One significant issue when it comes to sustainability efforts in the US is the bifurcation between state and federal law. State law addresses the fiduciary duties of officers and directors. Federal law addresses the reporting obligations of public companies. Neither currently imposes sustainability obligations although both have that potential.

## 1. State Law Fiduciary Duties

A key innovation in the Directive is linking fiduciary duties to sustainability. In the US, there is no such link. Officers and directors in the US are subject to the fiduciary duties of

---

[54] Regulation (EU) 2020/852 of the European Parliament and of the Council of 18 June 2020 on the Establishment of a Framework to Facilitate Sustainable Investment, and amending Regulation (EU) 2019/2088, https://eur-lex.europa.eu/eli/reg/2020/852/oj.

[55] Regulation (EU) 2019/2088 of the European Parliament and of the Council of 27 November 2019 on Sustainability-related Disclosures in the Financial Services sector, https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32019R2088.

[56] Directive (Eu) 2022/2464 of the European Parliament and of the Council of 14 December 2022 amending Regulation (EU) No 537/2014, Directive 2004/109/EC, Directive 2006/43/EC and Directive 2013/34/EU, as regards corporate sustainability reporting, https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:32022L2464.

[57] *See* European Commission, *supra* note 2 ("70% of the businesses who responded to the public consultation sent a clear message: EU action on corporate sustainability due diligence is needed."). Although the concept of sustainability appears well accepted, the details remain sharply debated. *See, e.g* Andersen et al., *supra* note 32, at 4 (raising strong objections to the Directive, while at the same time remarking that the initiative is of "great importance, and the Commission's initiative is therefore commendable").

Electronic copy available at: https://ssrn.com/abstract=4489417

loyalty and care. The duty of loyalty requires that they put the corporation's and the shareholders' interests above their own. The duty of care requires that they represent those interests in a competent manner. Although the test for compliance is complex, the basic standard of liability for the duty of care is gross negligence.[58]

Sustainability issues arise in connection with the duty of care. The pattern is that shareholders allege that an executive's decision fails the gross negligence standard. The executive then defends that the challenged action was not ill-conceived, but taken to serve stakeholder (rather than shareholder) interests. The defense always fails. The most famous example is *Dodge v. Ford*.[59] In the case, the board of directors of Ford decided against paying special dividends to its shareholders even though the company was profitable enough to do so. Henry Ford, the corporation's controlling shareholder, argued that the company retained the money so that it could hire more people, increase wages, and decrease the prices of its cars—not to earn profits, but to serve the community. Ford's commitment to sustainability (at least his rhetoric in court) was ahead of its time—

"Counsel for Dodge: [D]o you still think that those profits were awful profits?

Ford: Well, I guess I do, yes.

Counsel: And for that reason you were not satisfied to continue to make such awful profits?

Ford: We don't seem to be able to keep the profits down.

Counsel: ... Are you trying to keep them down? What is the Ford Motor Company organized for except profits, will you tell me, Mr. Ford?

Ford: Organized to do as much good as we can, everywhere, for everybody concerned.... And incidentally to make money.

Counsel: Incidentally make money?

Ford: Yes, sir.

Counsel: But your controlling feature ... is to employ a great army of men at high wages, to reduce the selling price of your car ... and give everybody a car that wants one.

Ford: If you give all that, the money will fall into your hands; you can't get out of it."[60]

The court rejected Ford's magnanimous rationales, and held that Ford and his company had to serve shareholders. As a result, *Dodge v. Ford* has come to stand for the proposition that

---

[58] *See* Aronson v. Lewis, 473 A.2d 805 (Del. 1984).
[59] 204 Mich. 459, 170 N.W. 668 (Mich. 1919).
[60] A. Nevins & F. Hill, Ford: Expansion and Challenge, 1915-1933, 99-100 (1957).

Electronic copy available at: https://ssrn.com/abstract=4489417

US corporations exist to maximize shareholder value and corporate executives must use their power to that end.[61]

Despite this well-accepted legal doctrine, many argue that executives can serve other interests if they frame the defense of their challenged actions differently.  For example, if Ford had plausibly argued that he wished to reinvest corporate profits, rather than payout dividends, so as to increase the profits for the company, he would have likely won his case.

Along the same lines, the courts instruct executives to manage firms for long-term value, and taking long-term value seriously often means taking stakeholder, in addition to shareholder interests, into account.  For example, it is in the shareholders' interest to treat employees well, because if they fail to do so, employees will shirk or quit.  Because of the interrelationship between stakeholder and shareholder interests, many actions that serve stakeholders actually benefit shareholders as well.[62]  Nevertheless, the articulated rationale for any corporate action must be shareholder value.  Executives cannot choose to treat employees well because they believe that it is the right thing to do; they must do so—or at least claim to do so— because they believe treating employees well serves shareholders.[63]

If corporations wish to have broader flexibility to act according to stakeholder interests, they can choose to incorporate as a so-called benefit corporation.  Whereas the purpose of a typical US company is to maximize shareholder value, executives in a benefit corporation commit to running the corporation in the interest of all its stakeholders.[64]

Thus, with the exception of benefit corporations, US corporate law does not incorporate sustainability into director fiduciary duties.  It rejects it.  Legally, sustainability can only be a factor in an executive's decision if it increases long-term value for shareholders.

## 2. State Law Due Diligence Obligations

Fiduciary duty law includes an obligation that board members monitor corporate conduct.  More specifically, the so-called *Caremark* duty requires that directors put an internal reporting system in place to inform them about the corporation's compliance with its legal obligations.[65] *Caremark* can be interpreted as a substantive due diligence obligation in that it requires the board

---

[61] For a more recent example, *see* eBay Domestic Holdings, Inc. v. Newmark, 16 A.3d 1 (Del. Ch. 2010), discussed in Jeff Schwartz, *De Facto Shareholder Primacy*, 79 Md. L. Rev. 652, 669-670 (2020).

[62] *See* Leo E. Strine, et al., *Caremark and ESG, Perfect Together: A Practical Approach to Implementing an Integrated, Efficient, and Effective Caremark and EESG Strategy*, 106 Iowa L. Rev. 1885, 1887 (2021) ("many corporate fiduciaries believe that companies are most likely to create sustainable profits if they act fairly toward their employees, customers, creditors, the environment, and the communities the company's operations affect").

[63] For a more extension discussion of the overlap between shareholder primacy and stakeholder theory, Schwartz, *supra* note 61, at 659-72.

[64] Del. Code Ann. tit. 8, § 365(a) ("The board of directors shall manage or direct the business and affairs of the public benefit corporation in a manner that balances the pecuniary interests of the stockholders, the best interests of those materially affected by the corporation's conduct, and the specific public benefit or public benefits identified in its certificate of incorporation.").

[65] *In re* Caremark Int'l Inc. Derivative Litig., 698 A.2d 959 (Del. Ch. 1996).

Electronic copy available at: https://ssrn.com/abstract=4489417

to take the steps necessary to understand the organization it oversees.[66]  Thus, a board has a *Caremark* obligation, for example, to monitor corporate compliance with environmental laws, labor laws, and sexual harassment laws.[67]

       *Caremark* is similar to the Directive, but what distinguishes the Directive from *Caremark* is that the latter only applies to national or international laws that, according to their terms, directly apply to US corporations.  The Directive expands this due diligence obligation to international treaties that were formerly understood as soft law.  It also, importantly, obligates companies to change their practices.

       Some have argued that *Caremark* should be expanded.  An influential former jurist, Leo Strine, along with his coauthors, have argued that *Caremark*, should include an obligation for boards to ensure that companies operate sustainably.[68]  Such an expansion would carry *Caremark* toward the Directive's rule, but so far ideas like this have gained little traction.

## 3. Federal Securities Law

       All US companies are subject to the fiduciary laws of their state of incorporation.  While all US companies are also subject to the federal securities laws, only those that sell shares to the public (i.e., public companies) are subject to the requirement to periodically disclose financial statements and related information.  Sustainability has typically not been a part of these disclosures.  As with corporate law, however, there has recently been a push to change that.

### a. SEC Proposed Climate Change Disclosure Rules

       In March 2022, the securities regulator in the US, the Securities and Exchange Commission (SEC), proposed rules to mandate public company disclosure related to climate change.[69]  Broadly speaking, the rules would require disclosure of two categories of climate-related information.  The first category relates directly to climate-change risk.  Public companies would be required to disclose the risk that climate change poses to its business.[70]  As the SEC explains,

---

[66] *See id.* at 970 ("[C]orporate boards may [not] satisfy their obligation to be reasonably informed concerning the corporation, without assuring themselves that information and reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance.").

[67] *See, e.g., In re* McDonald's Corp. S'holder Derivative Litig., 2023 WL 2293575 (Del. Ch. Mar. 1, 2023) (dismissing a *Caremark* claim involving sexual harassment laws).

[68] Leo E. Strine, et al., *supra* note 62, at 1895 ("a corporation's plan to fulfill its legal compliance obligations should not be viewed as separate and distinct from the corporation's plan to operate in a sustainable, ethical manner with fair regard for all the corporation's stakeholders. Rather, when viewed through the correct prism, there should not be two plans for these related objectives, because the objectives are not in fact meaningfully distinct; there should be just one integrated scheme.").  *See also* Stavros Gadinis & Amelia Miazad, *Corporate Law and Social Risk,* 73 Vand. L. Rev. 1401, 1459 (2020) (arguing that "courts should recognize ESG as an essential part of boards' monitoring mission").

[69] SEC, The Enhancement and Standardization of Climate-Related Disclosures for Investors, 87 Fed. Reg. 21334 (2022).

[70] *Id.* at 21334

Electronic copy available at: https://ssrn.com/abstract=4489417

> "Climate-related risks can affect a company's business and its financial performance and position in a number of ways. Severe and frequent natural disasters can damage assets, disrupt operations, and increase costs. Transitions to lower carbon products, practices, and services, triggered by changes in regulations, consumer preferences, availability of financing, technology and other market forces, can lead to changes in a company's business model."[71]

If companies are exposed to any of the above risks (or other climate-related risks that it identifies), it must disclose that it in its annual reports.[72] As is typical in the securities laws, this climate-change risks would only need be disclosed if material.[73] The meaning of materiality is notoriously (and purposefully) vague, but at the most general level is defined as information that is important to a reasonable investor.[74]

Note that the rules are focused on how climate change impacts the financial position of companies, not about climate change per se. According to the SEC, "We are proposing to require disclosures about climate-related risks … because this information can have an impact on public companies' financial performance or position and may be material to investors in making investment or voting decisions."[75] Such framing allows the SEC to argue that the new disclosure requirements fall within its mission to protect investors and do not represent administrative creep. As one critic (and former SEC Commissioner) chided in critique of the rule, the SEC does not stand for the "Securities and Environmental Commission."[76]

The second category of new disclosure requirements have an even more tenuous tie to investor protection. Under the proposed rules, companies would be required to disclose their greenhouse gas ("GHG") emissions and the GHG emissions in their value chain.[77] The rule divides GHG disclosure obligations into Scope 1 (direct emissions), Scope 2 (indirect emissions "resulting from the generation of electricity purchased and consumed by the company"), and Scope 3 emissions (indirect emissions not captured under Scope 2).[78] Scope 3 emissions include, for example, "emissions associated with the production and transportation of goods a registrant purchases from third parties, employee commuting or business travel, and the processing or use of the registrant's products by third parties."[79]

---

[71] *Id.* at 21336-337.

[72] *Id.* at 21334.

[73] *Id.* at 21334.

[74] *See* Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988).

[75] *See* 87 Fed. Reg. at 21335; *see also id.* at 21335-336 ("Investors need information about climate-related risks— and it is squarely within the Commission's authority to require such disclosure in the public interest and for the protection of investors—because climate-related risks have present financial consequences that investors in public companies consider in making investment and voting decisions.)"

[76] SEC Commissioner Hester M, Peirce, We are Not the Securities and Environment Commission - At Least Not Yet (March 21, 2022), https://www.sec.gov/news/statement/peirce-climate-disclosure-20220321#_ftn19.

[77] 87 Fed. Reg. at 21468.

[78] *Id.* at 21344.

[79] *Id.* at 21344-45.

Electronic copy available at: https://ssrn.com/abstract=4489417

Scope 1 and 2 GHG emissions must be disclosed and disaggregated into constituent gases.[80]  Scope 3 emissions only need be disclosed if material or if the company has ESG emissions goals or targets that include Scope 3 emissions.[81]

The SEC's proposed rule also contains supporting disclosure obligations, including requirements to disclose how the board monitors climate-related risks, how such risks impact or are likely to impact the company's "strategy, business model, and outlook," how the company identifies, assesses, and manages climate-related risks, including the extent to which such processes are integrated into the company's risk-management framework, and the company's "climate-related targets or goals, and transition plan, if any."[82]  The result of all of this is a comprehensive disclosure mandate that covers emissions, climate change risks, and the related processes.

This rule bears some similarities to the Directive.  Even though it would be a disclosure mandate, companies would be required to conduct due diligence to ascertain and then report on their climate-related risks, emissions, and procedures.  Despite the rule's focus on climate change, however, it does not go as far as the Directive as it fails to require emissions reductions.

The most controversial aspect of the new rule is the requirement to disclose GHG emissions.  The most straightforward explanation is that this rule is designed to name and shame large polluters, thereby creating an incentive for them to cut emissions.  This explanation is problematic, however, because its policy underpinning relates to climate change rather than the SEC's core investor protection mission.  How then does the SEC defend it?  The agency again traces the rule to financial considerations.  It argues that "[q]uantitative greenhouse gas ("GHG") emissions data can enable investors to assess a registrant's exposure to climate-related risks, including regulatory, technological, and market risks driven by a transition to a lower-GHG intensive economy."[83]  In other words, the new disclosures would allow investors to see how much greenhouse gas the company and its products produce.  This would allow them to see the extent to which these companies are exposed to legal changes that would restrict such emissions. While this logic is plausible, it is also easy to argue that it is pretext for a rule that is really designed to expose companies that are major GHG emitters in the hopes that fear of public retribution will inspire them to curtail these activities.

Because these disclosures stretch the SEC's mission, they have been politically fraught. Two bills circulating in Congress are designed to obstruct the rulemaking.[84]  Congressman Rounds, a cosponsor of one of the bills, has criticized the SEC's rule as using "American businesses … as a gateway to advance climate change policy."[85]  The bills do not expressly prohibit the new rules, but instead would require that the SEC only adopt new disclosure

---

[80] *Id.* at 21345.
[81] *Id.*
[82] *Id.*
[83] *Id.* at 21344.
[84] Brian Croce, House Republicans Float Bill to Block SEC Climate Disclosure Proposal, Pension & Investments, (Dec. 5, 2022), https://www.pionline.com/legislation/house-republicans-float-bill-block-sec-climate-disclosure-proposal.
[85] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4489417

obligations after concluding that the information sought is material to investors.[86]  By only challenging the SEC's rule indirectly, the bills, if enacted, set up a fight about whether climate-related information meets the materiality threshold.

The SEC proposal may also be held unconstitutional.  In 2022, the US Supreme Court decided *West Virginia v. EPA.*[87]  The U.S. Environmental Protection Agency, which has the authority to regulate power plants, had regularly imposed regulations requiring power plants to operate more cleanly.[88]  But in 2015, it proposed a regulation that "included a requirement that such facilities reduce their own production of electricity, or subsidize increased generation by natural gas, wind, or solar sources."[89]  Applying the "major questions" doctrine, the Supreme Court found that the EPA lacked the statutory authority to "substantially restructure the American energy market."[90]  It, therefore, struck down that aspect of the rule.[91]  If the Court applied the same narrow reading of statutory authority to the SEC's actions in the climate-change proposal, there is a significant risk that the rule would be struck down.  As discussed above, while the SEC works hard to frame the rule as merely an application of its investor-protection mission, there is ample room to question whether environmental policy is the true driver.

The many hurdles to the SEC's proposal illustrate the difficulty of implementing sustainability efforts in the US.  The SEC is initially constrained because its authority is limited to disclosure requirements.  More importantly, the need to tie the rules to the SEC's historical investor protection mission gives rise to intellectual gymnastics and legal challenges.

## b. Substantive Due Diligence Related to Financial Disclosures

The securities laws also require that companies maintain internal controls in connection with their financial reporting.[92]  Internal controls for financial reporting refer to the processes, policies, and procedures that a company has in place to ensure the accuracy and reliability of its financial reporting. The purpose of these controls is to prevent errors, fraud, or other irregularities that could potentially mislead investors.

There are five key components of internal controls for financial reporting, many of which overlap with the principles in the Directive:

1. Control environment: This refers to the overall culture, values, and ethical standards of the organization. It includes factors such as the tone at the top, the organization's commitment to integrity, and the accountability of management.
2. Risk assessment: This involves identifying and analyzing the risks that could impact the accuracy and reliability of financial reporting. Risks could include errors, fraud, or noncompliance with regulations.

---

[86] *Id.*
[87] West Virginia, et al. v. EPA, et al., No. 20-1530 (2022).
[88] *Id.* at 2.
[89] *Id.*
[90] *Id.* at 20.
[91] *Id.* at 31.
[92] Technically, the rules are framed as reporting obligations.  *See* 17 CFR § 229.308.

Electronic copy available at: https://ssrn.com/abstract=4489417

3.  Control activities: These are the policies and procedures that are put in place to mitigate the risks identified in the risk assessment. Examples of control activities include segregation of duties, physical controls over assets, and reconciliations.
4.  Information and communication: This refers to the systems and processes used to capture, record, and report financial information. Effective communication of financial information to stakeholders is also important to ensure transparency and accountability.
5.  Monitoring: This involves ongoing monitoring of the effectiveness of internal controls for financial reporting. It includes regular testing of controls, analyzing results, and taking corrective action when necessary.

Overall, the goal of internal controls for financial reporting is to ensure that financial information is accurate, reliable, and consistent with generally accepted accounting principles or international financial reporting standards. Effective internal controls can help prevent financial misstatements, reduce the risk of fraud, and increase investor confidence in the organization's financial reporting.

While this structure is limited to financial matters, it is essentially the same one that a thorough company would use to comply with the Directive. The purpose of financial internal controls is to mitigate the risk of financial irregularities; but the internal controls structure is equally well-equipped to mitigate the risk of adverse human rights and environmental impacts.

It would be technically possible for the SEC to extend the internal controls requirements to sustainability matters. In fact, the rationale would be the same as for the proposed environmental rules—that internal controls over sustainability issues is important to investors because they ensure that a company is informed about and transparent with respect to such risks. Any such effort, however, would encounter the same legal and political obstacles discussed above.

## c. The Conflict Minerals Rule

In an aberration from the typical skepticism US lawmakers harbor toward sustainability efforts, Congress enacted the conflict minerals rule in the Dodd-Frank Act of 2010. Ironically, this is likely one of the intellectual progenitor of the Directive. The Act called for the SEC to implement rules requiring that public companies conduct due diligence into their supply chains and report on the extent to which their products contain conflict minerals (tin, tungsten, tantalum, and gold) from the Congo region of Africa.[93]

The SEC was never truly supportive of the legislation,[94] but it responded with a good faith effort to effectuate this intent in 2012.[95] The rule was complex, extraordinarily

---

[93] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, § 1502 (2010).
[94] *See, e.g.,* Mary Jo White, Chairwoman, U.S. Sec. & Exch. Comm'n, 14th Annual A.A. Sommer, Jr. Corporate Securities and Financial Law Lecture at Fordham Law School: The Importance of Independence (Oct. 3, 2013) (criticizing the conflict minerals rule).
[95] Conflict Minerals, 77 Fed. Reg. 56,274, 56,276 (Sept. 12, 2012).

Electronic copy available at: https://ssrn.com/abstract=4489417

controversial, and short-lived.[96]  The chief concerns were the cost of compliance and the use of the securities laws to pursue human rights goals.[97]  The strong opposition turned to litigation almost immediately.[98]  Though the rule survived largely intact, the SEC ceased enforcing it only 5 years after it was enacted.[99]  The SEC cited the court holding for its actions, but the decision to turn away from the rule was largely viewed as political.

During its brief run, the conflicts mineral rule had little success.  Unlike other US sustainability efforts, which tie sustainability to finance, this rule was unabashedly about human rights.  Congress was concerned about human-rights abuses at mining operations run by militia groups in the Congo.  The goal was to "name and shame" companies that were procuring such minerals from the region and thus indirectly complicit in the workers' mistreatment.[100]  The problem was that the reports that the companies submitted in response were too vague for anyone to decide who should be named and shamed.[101]  The most common answer to the question of whether there were conflict minerals in corporate supply chains was that the company could not figure it out—an answer acceptable under the rule.[102]  There are many reasons the rule failed, but the main one is that the SEC lacked an understanding of the conflict mineral supply chain it was regulating and therefore crafted due diligence and disclosure requirements that were easily evaded.[103]

## 4. Sustainability Through Private Ordering

With sustainability legislation and regulation lagging in the US, shareholders have increasingly pushed public companies to act in this manner.  Shareholders have exerted their influence through their power to elect directors and through the shareholder proposal process.

Probably the best example of how shareholders have used their leverage to shape corporate policy is the recent proxy contest at Exxon.  A little-known proxy hedge fund nominated a slate of directors to Exxon's boards who were committed to shifting Exxon's focus from fossil fuels to renewable energy.  Thanks to the support of large institutional shareholders, the hedge fund succeeded in nominating three members to Exxon's board.[104]

---

[96] For a detailed description of the conflict minerals rule and its aftermath, see Jeff Schwartz, *The Conflicts Mineral Experiment*,  6 Harv. B. L. Rev. 129, 134-44 (2016).

[97] *See id.* at 141-44; *see generally* Jeff Schwartz & Alexandrea Nelson, *Cost Benefits Analysis and the Conflicts Mineral Rule*, 68 Admin. L. Rev. 287 (2016) (analyzing and discrediting concerns about the costs of the conflict minerals rule).

[98] *See* Schwartz, *supra* note 96, at 140-41 (discussing litigation surrounding the rule).

[99] Sarah N. Lynch, *SEC Halts Some Enforcement of Conflict Minerals Rule Amid Review*, Reuters (April 7, 2017), https://www.reuters.com/article/us-usa-sec-conflictminerals/sec-halts-some-enforcement-of-conflict-minerals-rule-amid-review-idUSKBN1792WX.

[100] Senator Richard Durbin argued that the "transparency" elicited through the rules "will allow consumers and investors to know which companies source materials more responsibly in DRC and will hopefully persuade the industry to finally create clean supply chains out of Congo." Press Release, Senator Richard Durbin, Statement on U.S. District Court Decision Regarding Conflict Minerals (July 7, 2013), http://www.durbin.senate.gov/newsroom/press-releases/durbin-statement-on-us-district-court-decision-regarding-conflict-minerals.

[101] *See* Schwartz, *supra* note 96, at 157, tbl 4., 159.

[102] *See id.* at 139, 168-69.

[103] *See id.* at 161-67.

[104] *See* Jeff Schwartz, *Stewardship Theater*, 100 Wash. U. L. Rev. 393, 395 (2022).

Electronic copy available at: https://ssrn.com/abstract=4489417

Although less dramatic, there has also been a groundswell of shareholder proposals related to sustainability.  Under state corporate law, shareholders have the right to make precatory proposals to the board of directors of corporations in which they own shares.  Securities laws require that, if certain conditions are met, public corporations must include shareholder proposals and supporting statements in their annual meeting materials.  These proposals increasingly focus on environmental and social issues.

These proposals tend to focus on transparency.  For example, a 2022 proposal at Google's parent company, Alphabet, requested that it "publish a regular periodic assessment of resilience to the physical risks of climate change, including description of short-, medium-, and long-term measures that the Company is taking to mitigate physical risks, including threats to its headquarters and other key assets from sea level rise and flooding."  Social proposals tend to focus on what has come to be known as diversity, equity, and inclusion ("DEI").  For example, Amazon's 2022 annual meeting featured a proposal that it "report on median pay gaps across race and gender, including associated policy, reputational, competitive, and operational risks, and risks related to recruiting and retaining diverse talent."  There is also a nascent trend proposing that companies reincorporate from traditional for-profit companies into benefit corporations.[105]

Large asset manages like Vanguard and BlackRock, have waivered in their support for such initiatives.  They embraced them in 2021 after a period of skepticism, but now appear to be cooling again in the face of strong political opposition.[106]  But shareholders are not the only ones pushing companies to act more sustainably.  Consumers increasingly identify with the products they own.  They want to buy products manufactured sustainably.  And employees increasingly demand to work for sustainable companies.  The combined pressure has led many companies to pivot toward more sustainable operations.[107]

Perhaps the best evidence of this shift comes from a statement from the Business Roundtable.  The Business Roundtable is a traditionally conservative business advocacy organization (it was one of the organizations that sued over the conflict minerals rule).  Since the 1980s, it had espoused a shareholder primacy view of the firm.  In 2019, however, it pivoted to stakeholder theory.  In a statement signed by over 200 CEOs of public companies, it embraced the proposition that corporate leadership's duty was to serve all of the corporation's constituents.[108]  While this statement may be as much (or more) about marketing than substance, it still signals the pressure corporations are under to at least appear more sustainable.

---

[105] *See* Jill E. Fisch, *Purpose Proposals*, 1 U. Chi. Bus. L. Rev. 113, 122-126 (2022) (describing evolution and impact of shareholder proposals).

[106] *See* Schwartz, *supra* note 104, at 441, 421-24 (describing different "eras" of asset manager stewardship); Collin Eaton, *ESG Blowback: Exxon, Chevron Investors Reject Climate Measures*, Wall St. J. (June 1, 2023), https://www.wsj.com/articles/esg-blowback-exxon-chevron-investors-reject-climate-measures-4532da99?mod=article_inline (describing asset manager pullback from ESG); *see also* Jeff Schwartz, *"Public" Mutual Funds*, *in* The Cambridge Handbook on Investor Protection (Arthur Laby ed., 2021) (arguing that asset-manager voting is driven by fear of regulation).

[107] Another form of private ordering is through contractual social responsibility, "KSR."  *See generally* Jonathan C. Lipson, *Promising Justice:  Contract as Social Responsibility*, 2019 Wis. L. Rev. 1109 (2019).

[108] Business Roundtable Redefines the Purpose of a Corporation to Promote 'An Economy That Serves All Americans,' Bus. Roundtable (Aug. 19, 2019).  Commentators have pointed out that this statement is seemingly in

Electronic copy available at: https://ssrn.com/abstract=4489417

## III. Conclusions

## A. Comparative Observations about US Law

The Directive is not only ambitious, but fits into a comprehensive sustainability structure in the EU that the US completely lacks.  This divergence likely owes, at least in part, to differences in public and related political attitudes toward sustainability and to differences in the legal structure.  The EU has embraced sustainability as a stand-alone goal, while in the US, the concept has been bound up with and weighed down by its relationship to financial materiality and shareholder value.  A regulatory structure designed to specifically target sustainability is not on the table in the US.  Similarly, as noted above, while the structures of corporate and securities law could rather easily be extended to directly embrace sustainability, the US currently lacks the political will and public consensus[109] about these topics to make the necessary adjustments.

Another significant impediment to US sustainability efforts is its disjointed structure.  As noted above, the periodic disclosure requirements of the securities laws only apply to public companies.  Thus, even if the laws did include sustainability obligations, they would only apply to the small subset of companies that have chosen to sell shares to the public.  Also problematic is that public companies could go private to avoid such rules.  Further still, public companies could easily sell problematic assets to private companies, giving them the public companies the appearance of sustainability without making any real progress toward sustainability goals.[110]

A better option than the federal securities laws might be to regulate sustainability through state law fiduciary duties.  As noted above, the *Caremark* doctrine, which imposes liability on directors for failure to oversee their companies, offers a plausible structure.  But the problem here is similar.  Laws vary by state and, while unusual, corporations could change their state of incorporation to avoid laws they deem too costly. Probably of larger concern, fiduciary duties are typically defined through judge-developed case law.  Judges hesitate to make big moves, like extending fiduciary duties to sustainability.

## B. Comparative Observations about the Directive

Even though the US lags far behind, its experience with the conflict minerals rule offers some takeaways.  The conflict minerals rule was one of the first attempts to incorporate sustainability due diligence and disclosure obligations into corporate operations.  The Directive, however, adds a key third component—substantive change.  Under the conflict minerals rule, US companies were under no obligation to actually remove conflict minerals from their value chains.

---

tension with their fiduciary duties to maximize shareholder value.  As noted above, any actions must be plausibly defensible in value terms.

[109] The Wall Street Journal runs an editorial critiquing ESG almost daily.  *See, e.g.,* James Freeman, *ESG Movement Fails at the Scene of Its Greatest Triumph*, Wall St. J. (June 2, 2023), https://www.wsj.com/articles/esg-movement-fails-at-the-scene-of-its-greatest-triumph-8b75861c?mod=hp_opin_pos_4#cxrecs_s ("Environmental, social and governance" activists try to shame companies into adopting destructive political agendas that voters reject.").

[110] Jeff Schwartz & Jill Fisch, *Corporate Democracy and the Intermediary Voting Dilemma*, European Corporate Governance Institute - Law Working Paper No. 685/2023, at 26, 102 Texas Law Review (forthcoming 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4360428.

Electronic copy available at: https://ssrn.com/abstract=4489417

The theory was that market forces would punish companies that failed to do so.  Rather than rely on the market, the Directive directly requires companies to change their practices to eliminate human rights abuses.  This is a significant improvement.

Nevertheless, there are questions about whether the Directive will live up to its ambitions.  Human-rights abuses, like those targeted by the conflict minerals rule and the Directive, tend to happen at the far-reaches of a corporation's supply chain.  It is the laborers at mines, factories, and fields that are the most at risk of abuse.  Yet conditions at these places are the most difficult and costliest to understand.  Due diligence into complex and sometimes opaque international value chains is well-known to be a fraught exercise.  Complexity, opacity, and a corporate incentive to not look too hard, pose a significant risk that corporations may report an absence of human rights risks based on a level of diligence that is not sufficient to support such a claim.  Whether companies subject to the Directive garner insight into the treatment of their workers in what may be rural areas in developing countries will depend on their commitment to the rule and on the robustness and reliability of institutional efforts to monitor and audit working conditions at these locations.[111]  Moreover, since the Directive targets a wide range of human-rights risks, compliance may be uneven.

The success of the Directive will also depend on the usefulness of its enforcement mechanisms.  It will be up to member states to enable muscular regulators and states may vary in their commitment to doing so.  Further, while the Directive envisions private enforcement, it may be difficult to prove inadequate due diligence and demonstrate damages.  Including the compliance obligations of the Directive as part of directors' fiduciary duties may expose them to additional liability risk, but challenges around proof and damages likely mean that the risk is small.

This explicitly stakeholderist view of fiduciary duties has proven controversial, with a group of Nordic and Baltic scholars expressing strongly opposed views.[112]  As noted above, the Directive's approach is at odds with US law, which remains committed to the shareholder primacy norm.  Nevertheless, I do not view the move as overly significant.  While there are no doubt situations where a commitment to sustainability dictates a different decision than a focus on shareholder profits, these cases are likely rare.  The US view is that shareholder value incorporates sustainability if there is a plausible link to long-term profits.  Since this is almost always the case, the debate is more about semantics and symbolism than about actual boardroom practices.

Finally, a key innovation of the rule is to transform soft-law international obligations to hard law matters of corporate social responsibility.  The problem is that these treaties are worded ambiguously and aspirationally, which means it will be up to corporations to decide exactly what compliance entails.  Corporations looking to minimize costs and disruption to parts of their

---

[111] *See* Galit A. Sarfaty and Raphaël Deberdt, *Supply Chain Governance at a Distance*, Law & Social Inquiry (forthcoming) (studying at critiquing institutional efforts to validity conflict mineral supply chains).
[112] *See* Andersen et al., *supra* note 32.

Electronic copy available at: https://ssrn.com/abstract=4489417

business that incorporate questionable value chain practices have an incentive to read their obligations narrowly.[113]

      Eradicating global adverse human rights risks and environmental risks is an enormously difficult regulatory challenge. It is thus no surprise that there is reason for caution about the impacts of the Directive. Nevertheless, the thoughtful structure provides reason for optimism that the risks of greenwashing and the costs involved with compliance are outweighed by the potential for positive change.

---

[113] Andersen et al., make a similar point. *See id.* at 16 ("If obligations are going to be transplanted from the very different world of international law into the realm of national law with all the serious implications of liability for companies and individual directors that entails, it is crucial that these obligations are specified and made exact, which is not by far accomplished in the present Annex.").

Electronic copy available at: https://ssrn.com/abstract=4489417

**EXHIBIT 25**

SUSTAINABILITY SOLUTIONS / RATINGS & RANKINGS

# ESG Corporate Rating

Assess sustainability risks in your portfolio with data-driven & analyst-led ratings

CONTACT A SOLUTIONS EXPERT

## Evaluate companies' sustainability-related risks, opportunities, and impact along the corporate value chain.

The ratings are supported by a global team of in-house experts led by a team of sector heads with significant capital markets experience, who bring further depth of sectoral expertise to the team.

DOWNLOAD BROCHURE

## ACCESS HIGHLY RELEVANT, MATERIAL, AND FORWARD-LOOKING RATINGS

Enhance your security
selection process

Develop investible
products

Inform your proxy voting
decisions

Identify companies for
engagement

Report on portfolio ESG metrics
with a high degree of transparency



## IFRS Sustainability Alliance Member

As a IFRS Alliance Member, we aim to educate asset owners and asset managers on the importance of materiality and the inclusion of performance information for successful sustainable investing integration.

Holistic Approach to Assessing Sustainability Through a Double-materiality Lens

## Building on extensive experience and expertise in the field of sustainability

We have developed a holistic and
forward-looking concept of materiality
that focuses on long-term value creation.

Our performance analysis assesses risks and impacts related to all relevant stakeholders such as:

EMPLOYEES

SUPPLIERS



CUSTOMERS

COMMUNITIES

ECOSYSTEMS

Awarded to companies with an ESG performance above the sector-specific Prime threshold, which means that they fulfil ambitious absolute performance requirements.

## ESG CORPORATE RATING PERFORMANCE SCALE

Companies are rated, from D- to A+, on their sustainability performance on an absolute best-in-class basis.



**Introducing the Financial and ESGF (ESG + Financial) Ratings**

The Financial Rating is a standalone rating that can be used on its own to assess companies' financial performance. The ESGF Rating combines the Financial Rating and ESG Rating to provide a holistic assessment of companies' performance. Both ratings and the underlying data factors leverage data from ISS EVA, an established standard in measuring, analyzing, projecting, valuing, and discounting a firm's underlying economic profit rather than its accounting profit.

## High-level and detailed company reports are available for download on our proprietary DataDesk platform. Recent enhancements to the reports include:

»  New design that presents key outputs and signals in an easily digestible manner

»  Further insights related to Key Issues (Key Issue detail, Key Issue materiality graph)

»  Introduction of new financial (EVA Margin), SDG-, and climate-related scores and metrics

»  Additional rating performance summary pages

»  Integration of a year-on-year trend factor at the indicator level

**REQUEST A DEMO**

Absolute performance assessments, beyond
'best-in-class'

Transparent disclosure of all indicator scores and weights

Industry- and company-specific approach to assessing material risks and opportunities

Systematic consideration of the impact of companies' products and services on the UN SDGs

Alignment with market expectations and regulatory frameworks on materiality

Continuous issuer dialogue and feedback are key components of the quality assurance process

Methodology is guided by established international guidelines, such as the

» UN Global Compact
» UN Sustainable Development Goals
» International Labour Organization
» OECD Guidelines for Multinational Enterprises
» UN Principles for Responsible Investment
» EU Sustainable Finance Regulation

**EXPLORE ESG RATINGS**

LEARN MORE

ESG RATINGS THOUGHT LEADERSHIP



Trust our solutions to help you manage risks & seize investment opportunities.

CONTACT A SOLUTIONS EXPERT






**EXHIBIT 26**



(https://insights.issgovernance.com)

☰  🔍

TOPIC

## ISS NEWS, EVENTS, & COMMENTARY (HTTPS://INSIGHTS.ISSGOVERNANCE.COM/TOPICS/ISS-NEWS-EVENTS-COMMENTARY/)

FEBRUARY 11, 2025

# Statement Regarding Consideration of Diversity Factors in U.S. Director Election Assessments

*Tags: Benchmark Policy (https://insights.issgovernance.com/tags/benchmark-policy/), DEI (https://insights.issgovernance.com/tags/dei/), Specialty Policy (https://insights.issgovernance.com/tags/specialty-policy/)*



Institutional Shareholder Services (ISS) annually conducts a thorough, rigorous, and transparent policy review to consider updates to its Benchmark policy and its Specialty policies for the upcoming proxy season. On an exceptional basis, ISS also considers updates to its policies in light of relevant legal and regulatory changes and/or other emerging issues affecting investors and their portfolio companies.

In the United States, there recently has been increased attention on diversity, equity, and inclusion (DEI) practices, including the issuance last month of Presidential Executive Orders on DEI. We anticipate that institutional investors and U.S. companies will have a range of perspectives on DEI, including whether and how companies can or should adapt their specific policies and practices to the evolving market and governmental activity.

In light of these developments, ISS will indefinitely halt consideration of certain diversity factors in making vote recommendations with respect to directors at U.S. companies under its proprietary Benchmark and Specialty policies. Specifically and for shareholder meeting reports published on or after February 25th, ISS will no longer consider the gender and racial and/or ethnic diversity of a company's board when making vote recommendations with respect to the election or re-election of directors at U.S. companies under its Benchmark and Specialty policies. Assessments and vote recommendations on directors of U.S. companies will continue to be evaluated under the other considerations outlined in the Benchmark and Specialty voting guidelines (accessible here (https://www.issgovernance.com/policy-gateway/voting-policies/)) including independence, accountability and responsiveness.

ISS will continue to review its Benchmark and Specialty guidelines as appropriate.

### ###

SHARE THIS

RELATED POSTS

**EXHIBIT 27**

United States



Supplemental Statement on Diversity
Considerations at U.S. Companies

March 2025

www.glasslewis.com



# Diversity Considerations at U.S. Companies

The current US Administration has signaled a pronounced shift in the government's approach to diversity, equity and inclusion ("DEI") programs. Multiple Executive Orders have targeted DEI programs in the federal government and at private companies, including one instructing the Attorney General to provide "recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI." The Department of Justice in turn has indicated that its Civil Rights Division will "investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private sector…"

These developments have caused many in the private sector to review and, in some cases, reconsider their policies on diversity. Glass Lewis has also been monitoring these developments and, in consultation with its clients, considering how they may affect the proxy voting guidance we provide to them.

We continue to believe that diversity contributes to improved company performance and long-term shareholder value. In the case of board elections, our US Benchmark Policy takes the view that a board can best protect and enhance the interests of shareholders if it is sufficiently independent, has a record of positive performance, and consists of individuals with diverse backgrounds and relevant experience. In fact, today, the vast majority of the boards of S&P 500 companies have at least 30% gender diverse board representation. Only a small percentage of larger US companies do not provide director demographic information or do not have at least one racially and/or ethnically diverse director. As these companies have explained in their disclosures, having directors from different backgrounds helps ensure a broad range of perspectives and insights and can help them better understand and navigate complex issues.

At the same time, we recognize that the current environment in the US is leading companies to assess the risks of maintaining their diversity programs, including their efforts to diversify their boards. Likewise, we recognize that institutional investors – both those based in the US and those in other countries – have different perspectives, as well as different mandates, and may also choose to take different approaches to voting on diversity matters.

In light of these developments, we are modifying our approach to providing proxy voting guidance related to diversity factors at US companies under our US Benchmark Policy, effective March 10, 2025.

## Election of Directors

For Proxy Papers published beginning on that date, we will flag all director election proposals at US companies in which our recommendation is based, at least in part, on considerations of gender or underrepresented community diversity and offer our clients two recommendations – one that applies our Benchmark Policy approach as articulated in our 2025 Benchmark Policy Guidelines for the US Market, and one that does not consider gender or underrepresented community diversity as part of the recommendation. As always, our clients will have the choice of which recommendation to consider, if any, in casting their proxy votes.

We also reiterate how our US Benchmark Policy approaches these issues. As noted above, boards with gender diversity and underrepresented community representation have become the market standard. Accordingly, our benchmark policies on these issues expect most companies to have met this market practice. Importantly,

GLASS LEWIS

however, these policies operate on a "comply or explain" basis. As such, the numerical standards in those policies align with the typical market practice and remain flexible, rather than imposing rigid requirements. When confronted with outliers that do not meet these standards, we take a case-by-case approach and invite companies to provide sufficient rationale or context regarding the composition of their boards in disclosures to shareholders. Examples of relevant factors we regularly consider include, but are not limited to, the alignment of diversity in recent years to market standard, recent board composition changes, commitments and timelines to enhance diversity. We also recognize, as noted above, that the current US legal and policy environment may pose additional challenges for some companies' efforts and plans for their board composition. As part of this case-by-case analysis, we will, of course, also consider any company disclosures about such challenges.

## Shareholder Proposals

This modified approach also applies to proxy voting guidance on diversity-related shareholder proposals. For Proxy Papers published beginning March 10, 2025, we will flag all shareholder proposals at US companies where Glass Lewis is recommending in favor of the proposal and the proposal is related to a company's diversity policies and/or initiatives or if diversity is considered as a factor in our recommendation. In those instances, we will offer our clients two recommendations – one that applies our 2025 Benchmark Policy Guidelines for Shareholder Proposals & ESG-Related Issues, and one that does not consider diversity considerations as part of the recommendation.

## Custom/Thematic Voting Policies

In addition to its Benchmark Policy, Glass Lewis also offers its clients thematic policies, some of which consider gender and underrepresented community diversity, and some of which may also support shareholder proposals related to diversity, and some of which do not. Likewise, many of our clients receive recommendations under custom policies that we help to administer. These, too, vary widely in whether and how they take diversity considerations into account. We respect our clients' choices and, as a service provider, our role is to support their chosen approach to stewardship and proxy voting. Accordingly, we will continue to provide recommendations under these policies as we do today. As always, our client service teams will work closely with all of our clients to confirm policy preferences.

*** 

While we believe that our modified approach to these issues accommodates the evolving landscape, we will continue to monitor developments and will reassess our approach if further developments, such as regulatory or legislative changes on this issue, occur. We will provide our clients with updates on any material changes.

# About Glass Lewis

Glass Lewis is the world's choice for governance solutions. We enable institutional investors and publicly listed companies to make informed decisions based on research and data. We cover 30,000+ meetings each year, across approximately 100 global markets. Our team has been providing in-depth analysis of companies since 2003, relying solely on publicly available information to inform its policies, research, and voting recommendations.

Our customers include the majority of the world's largest pension plans, mutual funds, and asset managers, collectively managing over $40 trillion in assets. We have teams located across the United States, Europe, and Asia-Pacific giving us global reach with a local perspective on the important governance issues.

Investors around the world depend on Glass Lewis' **Viewpoint** platform to manage their proxy voting, policy implementation, recordkeeping, and reporting. Our industry leading **Proxy Paper** product provides comprehensive environmental, social, and governance research and voting recommendations weeks ahead of voting deadlines. Public companies can also use our innovative **Report Feedback Statement** to deliver their opinion on our proxy research directly to the voting decision makers at every investor client in time for voting decisions to be made or changed.

The research team engages extensively with public companies, investors, regulators, and other industry stakeholders to gain relevant context into the realities surrounding companies, sectors, and the market in general. This enables us to provide the most comprehensive and pragmatic insights to our customers.

## Join the Conversation

Glass Lewis is committed to ongoing engagement with all market participants.

info@glasslewis.com    |    www.glasslewis.com

# Connect with Glass Lewis

Corporate Website  | www.glasslewis.com

Email  | info@glasslewis.com

Social  | 🐦 @glasslewis   in Glass, Lewis & Co.

## Global Locations

**North America**

**United States**
*Headquarters*
100 Pine Street, Suite 1925
San Francisco, CA 94111
+1 415 678 4110

New York, NY
+1 646 606 2345

2323 Grand Boulevard
Suite 1125
Kansas City, MO 64108
+1 816 945 4525

**Europe**

**Ireland**
15 Henry Street
Limerick V94 V9T4
+353 61 534 343

**United Kingdom**
80 Coleman Street
Suite 4.02
London EC2R 5BJ
+44 20 7653 8800

**France**
*Proxinvest*
6 Rue d'Uzès
75002 Paris
+33 ()1 45 51 50 43

**Germany**
*IVOX Glass Lewis*
Kaiserallee 23a
76133 Karlsruhe
+49 721 35 49622

**Asia Pacific**

**Australia**
*CGI Glass Lewis*
Suite 5.03, Level 5
255 George Street
Sydney NSW 2000
+61 2 9299 9266

**Japan**
Shinjuku Mitsui Building
11th floor
2-1-1, Nishi-Shinjuku, Shinjuku-ku,
Tokyo 163-0411, Japan

GLASS LEWIS

# DISCLAIMER

© 2025 Glass, Lewis & Co., and/or its affiliates. All Rights Reserved.

This document is intended to provide supplemental information on the Glass Lewis Benchmark Policy considerations of diversity in recommendations at US companies.

This document should be read and understood in the context of other information Glass Lewis makes available concerning, among other things, its research philosophy, approach, policy guidelines, supplementary guidance and methodologies, sources of information, and conflict management, avoidance and disclosure policies and procedures, which information is incorporated herein by reference. Glass Lewis recommends all clients and any other consumer of this report carefully and periodically evaluate such information, which is available at: http://www.glasslewis.com.

None of the information included herein has been set or approved by the U.S. Securities and Exchange Commission or any other regulatory body nor should it be relied upon as investment advice. The content of this document has been developed based on Glass Lewis' experience with proxy voting and corporate governance issues, engagement with clients and issuers and review of relevant studies and surveys, and has not been tailored to any specific person or entity. Moreover, it is grounded in corporate governance best practices, which often exceed minimum legal requirements. Accordingly, unless specifically noted otherwise, a failure to meet certain guidelines set forth herein should not be understood to mean that the company or individual involved has failed to meet applicable legal requirements.

No representations or warranties express or implied, are made as to the accuracy or completeness of any information included herein. In addition, Glass Lewis shall not be liable for any losses or damages arising from or in connection with the information contained herein or the use, reliance on or inability to use any such information. Glass Lewis expects its subscribers possess sufficient experience and knowledge to make their own decisions entirely independent of any information contained in this report and subscribers are ultimately and solely responsible for making their own decisions, including, but not limited to, ensuring that such decisions comply with all agreements, codes, duties, laws, ordinances, regulations, and other obligations applicable to such subscriber.

All information contained in this report is protected by law, including but not limited to, copyright law, and none of such information may be copied or otherwise reproduced, repackaged, further transmitted, transferred, disseminated, redistributed or resold, or stored for subsequent use for any such purpose, in whole or in part, in any form or manner or by any means whatsoever, by any person without Glass Lewis' prior written consent. The foregoing includes, but is not limited to, using this report, in any manner and in whole or in part, in connection with any training, self-improving, or machine learning software, algorithms, hardware, or other artificial intelligence tools or aids of any kind, including, without limitation, large language models or other generative artificial intelligence platforms or services, whether proprietary to you or a third party, or generally available (collectively, "AI") as well as any services, products, data, writings, works of authorship, graphics, pictures, recordings, any electronic or other information, text or numerals, audio or visual content, or materials of any nature or description generated or derived by or using, in whole or in part, AI.