UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| GLASS, LEWIS & CO., LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| KEN PAXTON, *in his Official Capacity as Attorney General of Texas*, | ) ) ) |
| | ) |
| Defendant, | ) |
| | ) |
| THE TEXAS STOCK EXCHANGE LLC and THE TEXAS ASSOCIATION OF BUSINESS, | ) ) ) |
| | ) |
| Intervenor-Defendants. | ) |

Civil Action No. 1:25-cv-1153-ADA

## SECOND AMENDED COMPLAINT

Plaintiff Glass, Lewis & Co., LLC ("Glass Lewis") files this Second Amended Complaint against Defendant Ken Paxton, in his official capacity as Attorney General of Texas.

## INTRODUCTION

1.     Senate Bill 2337 ("S.B. 2337" or the "Act"), Act of June 20, 2025, 89th Leg., R.S., 2025 Tex. Sess. Law Serv. Ch. 1153, attached as Ex. 1, is a novel, first-of-its-kind law that regulates Glass Lewis' speech and violates the First Amendment's prohibition on viewpoint discrimination. Whenever Glass Lewis' speech reflects certain viewpoints disfavored by the government, the Act compels Glass Lewis to broadcast the government's contrary viewpoint and publicly condemn itself: Glass Lewis must tell its clients that its services are "not being provided solely in the financial interest of the company's shareholders" and "conspicuously disclose" this warning on the firm's website homepage.

2.     The Act's legislative sponsors did not hide their viewpoint-discriminatory purpose: Glass Lewis takes non-public "positions on so many issues that affect our daily lives" in areas

"where tremendous policy decisions are being made," so the legislators sought to counteract speech "on political hot-button issues" that they perceived as "increasingly political with a hard *left* bent." Texas Sen. Comm. on State Affairs, 89th Leg., R.S., Debate on S.B. 2337, (April 24, 2025), at 0:58:50 (statement of Sen. Hughes) (video at https://senate.texas.gov/videoplayer.php?vid=21888&lang=en); *H.B. 4079*, Hearing before Texas H. Comm. on Trade, Workforce & Economic Development, 89th Leg., R.S., Debate on H.B. 4079, at 1:14:08 (statement of Rep. Leach) (video at https://house.texas.gov/videos/21855). The Act's egregious viewpoint discrimination is dispositive and fatal under the First Amendment.

3.      The Act also violates the First Amendment because it infringes Glass Lewis' freedom of association: although the Act is unclear, it appears to require Glass Lewis to convey a government-mandated message any time Glass Lewis' own speech is based on or takes into account its "membership in . . . an organization or group that wholly or partly bases its evaluation or assessment of a company's value over any period on nonfinancial factors." Thus, the Act imposes heavy burdens on Glass Lewis because of membership in groups with certain viewpoints. By doing so, the Act impermissibly infringes Glass Lewis' freedom of association.

4.      In addition to violating the First Amendment, the Act is unconstitutionally vague, chilling Glass Lewis' speech by defining the Act's requirements with intensely politicized terms that have no agreed meanings.

5.      The Act is also expressly preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), which instructs Glass Lewis' clients—the fiduciaries who invest for employee benefit plans—to consider all relevant facts.

6.      Finally, the Act violates the Dormant Commerce Clause.

7.      For these reasons and those detailed below, Glass Lewis seeks declaratory and injunctive relief barring the Attorney General's enforcement of S.B. 2337 against Glass Lewis.

## PARTIES

8.      Plaintiff Glass, Lewis & Co., LLC is a Delaware limited liability company with its principal place of business in California. Glass Lewis is a "proxy advisor" within the meaning of S.B. 2337 § 6A.001(3). Glass Lewis' core business is to provide the speech—"proxy advisory services"—regulated by the Act. *Id.* § 6A.001(4).

9.      Defendant Ken Paxton is the Attorney General of Texas. He is sued in his official capacity. The Attorney General is the ultimate head of the Consumer Protection Division, and, as such, is expressly charged with enforcing the Act. *Id.* § 6A.201; Tex. Bus. & Com. Code § 17.47.

## JURISDICTION AND VENUE

10.     This action arises under 42 U.S.C. §§ 1983 and 1988, 28 U.S.C. §§ 2201-02, and under the United States Constitution. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

11.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because the Attorney General resides in this District for purposes of official-capacity suits and a substantial part of the events giving rise to the claims occurred in this District.

## SENATE BILL 2337

12.     The Texas Legislature passed S.B. 2337 as part of a wave of political pushback against ESG (environmental, social, governance) and DEI (diversity, equity, and inclusion) initiatives. The bill's House sponsor explained that restricting related viewpoints in advice was the goal: "[T]he point here is to make sure that proxy advisory firms, when they're rendering advice . . . that they're focused on economic factors . . . . So, when they're focused on non-economic-type factors, whether it's ESG, whether it's DEI . . . that's what we want to prevent[.]" Texas H.R.,

89th Leg., R.S., Floor Debate on H.B. 4079, (May 27, 2025), at 9:47:36-9:48:25 (video at https://house.texas.gov/videos/22298) (statement of Rep. Leach). The bill's legislative sponsor in the Senate complained that "proxy advisory firms have become increasingly political with a hard *left* bent. . . . Some are basing their advice on ESG standards, other times on DEI priorities." Texas Sen. Comm. on State Affairs, 89th Leg., R.S., Debate on S.B. 2337, (April 24, 2025), at 0:58:50 (statement of Sen. Hughes).

13.     That bill's Senate sponsor explained the connection between proxy advisors' speech and important matters of public concern. This is an "area where tremendous policy decisions are being made by folks . . . who have never publicly stated positions on so many issues that affect our daily lives." *Id.* at 1:01:00.

14.     At a high level, the Act compels proxy advisors to "publicly and conspicuously" disparage themselves with government-mandated statements whenever: (1) their advice goes against a Texas company's management or board; (2) they provide different advice to different clients (even though the clients may be differently situated); or (3) the proxy advisors' speech reflects the relevance of *any* of the following factors to companies' financial performance: diversity, equity, inclusion, sustainability, environmental, social, or *governance* factors. It allows for enforcement by the Attorney General and by a variety of private parties.

15.     The Act has a broad scope. It covers "proxy advisors," but defines that term to cover anyone who gets paid to provide to shareholders of a Texas company any of the following forms of speech, defined as "proxy advisory service[s]":

> (1) "advice or a recommendation on how to vote on a proxy proposal or company proposal";
>
> (2) "proxy statement research and analysis regarding a proxy proposal or company proposal";
>
> (3) "a rating or research regarding corporate governance"; or

(4) "development of proxy voting recommendations or policies, including establishing default recommendations or policies."

S.B. 2337 § 6A.001(3)-(4).

16.    The Act's definition of "company" limits the scope of the Act to speech about Texas companies or companies that could move here. It is a company:

(1) "that is organized or created under the laws of" Texas;

(2) "has its principal place of business in" Texas; or

(3) "is a foreign entity that has made a company proposal to become a domestic entity."

*Id.* § 6A.001(1).

17.    The Act then ties the scope of its coverage to this defined term "company," which means Texas companies or potential Texas companies. By definition, a "proxy advisor" is limited to one who provides services to shareholders of a "company"; and the regulated speech—"proxy advisory service"—is limited to speech "in connection with or in relation to a company." *Id.* § 6A.001(3)-(4). Section 101 applies when "a proxy advisor provides a proxy advisory service that is not provided solely in the financial interest of the shareholders of a *company*." *Id.* § 6A.101(b) (emphasis added). Section 102's scope also turns on the term "company." It applies to advice about a "company proposal" or "proxy proposal," both of which incorporate and turn on the Texas-based definition of "company." *Id.* § 6A.001(2), (5); *id.* § 6A.102(a).

18.    So, the Act's scope turns on whether the company that is the subject of Glass Lewis' advice is Texas-based or potentially moving here. It does not turn on the location of the proxy advisor or the client. The Act therefore covers non-Texan proxy advisors' advice to non-Texan clients whenever that extra-Texas speech concerns a Texas company or potential Texas company. *See infra* ¶¶ 179-180. Conversely, so long as the speech is not about Texas companies or potential Texas companies, the Act does not cover advice by Texans, to Texans, or in Texas.

19.    In sum, the Act targets worldwide speech about Texas companies, not speech by Texans or in Texas or to Texas investors. *See infra* ¶¶ 179-180 (discussing speech outside Texas).

20.    S.B. 2337 can be broken into three operative provisions:

(1)    Section 101, which compels proxy advisors to publicly disparage themselves with government-mandated statements when their proxy advice takes into account certain factors or goes against companies' management;

(2)    Section 102, which compels proxy advisors to publicly disparage themselves with government-mandated statements when they provide different advice to different clients or advice "in opposition to" companies' management; and

(3)    Sections 201-202, which authorize enforcement by the Attorney General and private parties.

21.    **Section 101(a)** provides that proxy advisors' advice is "not provided solely in the financial interest of the shareholders of a company if the" speech reflects consideration of certain factors (such as governance) or advises *against* the company's board or management:

(1) is wholly or partly based on, or otherwise takes into account, one or more nonfinancial factors, including a commitment, initiative, policy, target, or subjective or value-based standard based on:

(A) an environmental, social, or governance (ESG) goal, factor, or investment principle;

(B) diversity, equity, or inclusion (DEI), including any attempt to provide preferential treatment based on characteristics protected under Section 21.051, Labor Code;

(C) a social credit or sustainability factor or score; or

(D) membership in or commitment to an organization or group that wholly or partly bases its evaluation or assessment of a company's value over any period on nonfinancial factors;

(2) involves providing a voting recommendation with respect to a shareholder-sponsored proposal that:

(A) is inconsistent with the voting recommendation of the board of directors or a board committee composed of a majority of independent directors; and

(B) subject to Subsection (c), does not include a written economic analysis of the financial impact on shareholders of the proposal;

(3) is not based solely on financial factors and subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk to promote nonfinancial factors; or

(4) advises against a company proposal to elect a governing person unless the proxy advisor affirmatively states that the proxy advisory service solely considered the financial interest of the shareholders in making such advice.

*Id.* § 6A.101(a). This bespoke definition is broad, vague, and at odds with ordinary meaning.

22.    Under **Section 101(b)**, the proxy advisor must provide self-denigrating statements to its clients and the subject company—and publish them prominently on its website homepage—any time Section 101(a) is triggered. Section 101(b) states that Glass Lewis shall:

(1) include a disclosure to each shareholder or entity or other person acting on behalf of a shareholder receiving the service that:

(A) conspicuously states that the service is not being provided solely in the financial interest of the company's shareholders because it is based wholly or partly on one or more nonfinancial factors; and

(B) explains, with particularity, the basis of the proxy advisor's advice concerning each recommendation and that the advice subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk to promote one or more nonfinancial factors;

(2) immediately provide a copy of the notice under Subdivision (1) to the company that is the subject of the service; and

(3) publicly and conspicuously disclose on the home or front page of the proxy advisor's publicly accessible Internet website that the advisor's proxy advisory services include advice and recommendations that are not based solely on the financial interest of shareholders.

23.    **Section 102** compels disparaging disclosures when a proxy advisor provides different voting advice to different clients (even though they may be differently situated or have different investing approaches) *or* advice "in opposition to the recommendation of the company's management." *Id.* § 6A.102(a). It applies where a proxy advisor provides "materially different" advice. Advice is "materially different" if the proxy advisor is "simultaneously advising or recommending" that:

> (1) one or more clients vote for the proposal and one or more clients vote against the proposal;
>
> (2) one or more clients vote for a nominee for a company's governing authority and one or more clients vote against or abstain from voting for the same nominee; or
>
> (3) one or more clients vote for or against the proposal in opposition to the recommendation of the company's management.

*Id.* § 6A.102(a).

24.    **Section 102(b)** compels disparaging disclosures when proxy advisors give such advice. "If a proxy advisor provides to different clients who have not expressly requested services for a nonfinancial purpose either advice or a recommendation on how to vote . . . that is materially different the advisor shall":

> (1) if applicable, comply with disclosure requirements for nonfinancial proxy advisory services under Section 6A.101(b);
>
> (2) notify the following persons, in writing or by electronic means, of the conflicting advice or recommendation:
>
>> (A) each shareholder receiving the advice or recommendation;
>>
>> (B) each entity or other person receiving the advice or recommendation on behalf of a shareholder;
>>
>> (C) the company that is the subject of the company or proxy proposal; and
>>
>> (D) the attorney general; and
>
> (3) disclose which of the conflicting advice or recommendations is:
>
>> (A) provided solely in the financial interest of the shareholders; and
>>
>> (B) supported by any specific financial analysis performed or relied on by the advisor.

25.    Presumably, the meaning of the terms "nonfinancial" and "solely in the financial interest of the shareholders" supplied in Section 101(a) carry through to Section 102(b), but that is unclear. Section 101 says that the definition of "not provided solely in the financial interest of the shareholders" is "[f]or purposes of *this* section." *Id.* § 6A.101(a) (emphasis added).

26.    Finally, Sections 201 and 202 provide for enforcement.

27.    **Section 201** states that a violation of the Act is a deceptive trade practice and "is actionable under Section 17.47" of the Texas Business and Commerce Code. Section 17.47, in turn, specifically authorizes the Consumer Protection Division of the Office of the Attorney General to seek injunctive relief and civil penalties in the amount of "not more than $10,000 per violation."  Tex. Bus. & Com. Code § 17.47.

28.    **Section 202** allows for a suit for declaratory and injunctive relief by any "affected party." An "affected party" is defined to include "any shareholder" of any Texas company that is the subject of Glass Lewis' advice:

> (1) the recipient of proxy advisory services provided by the proxy advisor;
> (2) the company that is the subject of the proxy advisory services; or
> (3) any shareholder of the company described by Subdivision (2).

29.    In addition, private plaintiffs must "provide notice to the attorney general, who may intervene in the action." S.B. 2337 § 6A.202(b).

## BACKGROUND

### I.    Glass Lewis and its business.

30.    Glass Lewis is a proxy-advisory firm. It provides institutional investors with independent research, data analytics, and voting recommendations, so that those investors can discharge their fiduciary duty to cast informed votes on company ballot items. Through its proxy-voting solutions and independent analysis, Glass Lewis supports the creation and preservation of long-term shareholder value.

31.    Glass Lewis falls under the Act's definition of "proxy advisor." Its speech qualifies as "proxy advisory service[s]" as defined by the Act: Glass Lewis provides advice and recommendations on how to vote on what the Act calls proxy proposals and company proposals, distributes proxy statement research and analytics on those proposals, creates corporate

governance assessments, and develops proxy voting recommendations and policies. *Id.* § 6A.001(3)-(4).

32.    Glass Lewis' clients include some of the world's largest public pension plans, mutual funds, and asset managers. Glass Lewis exclusively serves highly sophisticated institutional investors. Glass Lewis does not serve retail investors.

33.    Glass Lewis serves over a dozen institutional investors in Texas.

34.    Glass Lewis provides advice on hundreds of companies as defined by the Act: companies created under Texas law, having their principal place of business in Texas, or with a proposal to become a domestic Texas entity. *Id.* § 6A.001(1). Glass Lewis provides advice and recommendations on Texas companies that go against company management, differ among clients based on client preferences, and consider ESG, DEI, and sustainability factors when relevant. To continue to serve its clients, Glass Lewis will be providing this same speech regarding Texas companies after the Act's effective date of September 1, 2025.

35.    A core function of Glass Lewis' business is to provide proxy research reports with recommendations on how to vote on upcoming shareholder meetings and proposals ("Proxy Papers").

36.    Glass Lewis' Proxy Papers reflect the company's views and beliefs about the best interests of the client based on established corporate governance best practices. They reflect the opinions of the company and its analysts. When Glass Lewis recommends a vote, it does so because Glass Lewis views that specific voting position as in the best interests of its clients.

37.    Each Glass Lewis Proxy Paper report contains a detailed explanation of the facts relied upon, the policy provisions applied, and the reasoning behind the recommendation. Glass Lewis' Proxy Papers prominently display any evaluation of environmental, social, governance,

diversity, or sustainability factors. The full Proxy Paper is shared with clients via the Glass Lewis research and voting platforms together with the corresponding voting recommendations, enabling clients to fully evaluate and question the recommendations as they see fit prior to making their final voting decisions.

38.    As a matter of practice, Glass Lewis publishes its reports in the United States an average of 21 days prior to the company's annual meeting. This allows time for clients to consider Glass Lewis' recommendation, discuss it internally along with other information the client may consider, engage with the company, if necessary, and decide how to vote. Glass Lewis also allows companies to respond to its proxy reports within this window. Glass Lewis may then issue a supplemental or amended report based on the company's feedback.

39.    Glass Lewis will only submit votes for a client if that client separately and expressly asks it to do so, pursuant to the client's chosen voting policy, for types of votes chosen by the client, and on timing specified by the client.

40.    Glass Lewis' recommendations are tailored to each client's specific voting policy. Glass Lewis' Benchmark Policy considers governance, environmental, social, financial, and reputational risks insofar as they affect shareholder value. The consideration and relevance of these factors reflect the consensus views of Glass Lewis' 1300+ institutional investor clients, with trillions of dollars in assets under management, as supported by two decades of Glass Lewis' research and analysis on the factors for creating and preserving shareholder value. Corporate governance is assessed in virtually every report.

41.    Glass Lewis offers clients the option to choose policies tailored to their specific investment preferences. Each Glass Lewis client has unique investment approaches, risk

tolerances, views, and needs. For that reason, Glass Lewis offers its clients a menu of voting options.

42.    A significant majority of Glass Lewis' institutional-investor clients vote according to a custom policy or via a custom process for reaching vote decisions. Customization "empowers investors to express their unique ideologies and allocate their attention more efficiently, leading to potentially more informed voting that accurately reflects institutional investors' preferences." Edwin Hu, et al., *Custom Proxy Voting Advice*, Harv. L. Sch. F. on Corp. Governance (May 23, 2024), available at https://perma.cc/QB3R-4RF5. The creation of a custom policy involves extensive discussions with and explicit confirmation upon implementation from the client.

43.    Custom policies allow Glass Lewis to focus its attention on issues that are important to investor clients to better inform clients about upcoming votes and ensure that the recommendations for those items are aligned with their guidelines. Custom voting policies are now a standard practice among institutional investors.

44.    Glass Lewis also offers thematic voting policies. Glass Lewis has developed a Catholic Policy that reflects the unique fiduciary responsibility of Catholic institutions and that is informed by the voting guidelines of the Conference of Catholic Bishops. It has a Climate Policy for investors focused on mitigating risks associated with climate change. And it has a Corporate Governance Focused policy that provides recommendations that focus on the most commonly accepted components of corporate governance, while generally recommending in line with management on environmental and social issues.

45.    Because different clients adopt different policies, it is common—and entirely expected and appropriate—for Glass Lewis to provide differing recommendations on the same

ballot item to different clients. That variability simply reflects differences among clients' own stated preferences and fiduciary objectives.

46.     These recommendations can vary based on factors that likely do not qualify as "nonfinancial" under the Act. For example, Glass Lewis may appropriately recommend voting "FOR" a proposal to investors with certain investment strategies and voting policies, but "AGAINST" the same proposal to investors with different strategies and voting policies. These differences reflect the reality that clients can seek to maximize shareholders' financial interests with different strategies and perspectives.

47.     The bill's legislative sponsor used an analogy:

> So, imagine a situation, members, where an advocate brought forth a bill and outlined all the ways that it was good for you and for your district and why you should vote for it, and they ask for your support. And then you learned that that same advocate told . . . the person sitting right next to you that the bill . . . would be terrible for their district and would cause them to lose re-election and they should vote against it. That is what is happening here.

Texas H. Comm. on Trade, Workforce & Economic Development, 89th Leg., R.S., Debate on H.B. 4079, (Apr. 23, 2025), at 1:13:16 (video at https://house.texas.gov/videos/21855) (statement of Rep. Leach). Of course, for any given piece of legislation, it is entirely possible that the legislation is good for one district and bad for another, leading appropriately to differing recommendations for the legislators representing those differently situated districts. So, too, with proxy advice: differently situated clients might, appropriately, receive differing recommendations on how to vote on the same ballot item.

## II.    ESG, DEI, and voting against company management.

48.     Glass Lewis believes that a company's long-term financial performance is shaped by a range of factors that include corporate governance.

49.     There is no agreed definition of "environmental, social, and governance," "diversity, equity, and inclusion," or "sustainability" used by investors or the business community. These terms are highly controversial topics in corporate governance and investment. For example, a recent PwC survey shows that 66% of corporate directors agreed that "ESG means different things to different people." Ray Garcia, et al., PwC's 2024 Annual Corporate Directors Survey, at 4, available at https://perma.cc/TNM6-S6GV. Numerous commentators have recognized the controversial and amorphous nature of these concepts.

50.     Glass Lewis reports typically use terms like "governance" and "diversity." However, the use of those terms reflects Glass Lewis' own internal understanding. Outside the specific context of Glass Lewis' Proxy Papers, buzzwords like ESG and DEI often take on broader meanings. In political discourse especially, ESG and DEI frequently refer to positions that are seen as politically left-leaning. Glass Lewis does not agree with this understanding of those terms or use the terms in this political context. Glass Lewis has no way of knowing if its own understanding of those terms matches those of the company that is the subject of the advice, or the Attorney General's, or those of the thousands (or millions) of people who qualify as an "affected party" and are permitted to sue under the Act. *See* S.B. 2337 § 6A.202 (permitting "any shareholder" of any "company" being discussed to sue).

51.     S.B. 2337 refers to "social credit" scores, but "social credit" is not a common term used by proxy advisory services or investors. *Id.* § 6A.101(a)(1)(C).

52.     S.B. 2337 brands all ESG, DEI, and sustainability considerations as "nonfinancial." But Glass Lewis considers "governance" factors in some form or fashion in nearly every single Proxy Paper it produces. Governance is a pervasive concept for investment and shareholder

decisions. It is a critical part of Glass Lewis' services and assessing governance is a well-established industry best practice.

53.    Glass Lewis recognizes effective corporate governance as a critical driver of long-term financial performance. Strong governance practices—such as independent board oversight, transparent executive compensation, and robust risk management—help ensure that companies are managed in the best interests of shareholders. Conversely, poor governance can lead to mismanagement, regulatory penalties, reputational harm, and ultimately, diminished shareholder value. Glass Lewis' research and the views of institutional investors reflect the importance of governance factors in evaluating a company's financial prospects and the fiduciary duty of institutional investors to consider corporate governance.

54.    Texas' own, government-operated retirement funds contradict the Legislature's branding ESG as *per se* "nonfinancial." The Teacher Retirement System of Texas ("TRS") explicitly states that ESG can affect financial performance: "Environmental, social, and governance ('ESG') factors influence the performance of TRS' investments. In making investment decisions, the Investment Division will consider ESG factors that are material to long-term returns and levels of risk." *See* Investment Strategy, Tex. Teachers Ret. Sys., (June 3, 2025), available at https://perma.cc/ZBR4-YUM8. And the Texas Employee Retirement System ("ERS") acknowledges that "Intangible factors such as social and environmental issues are increasingly being incorporated into valuation models to better quantify the risks and opportunities of long-term investing in a company." *See* Investment Strategy, Tex. Emp. Ret. Sys., (Aug. 21, 2024), available at https://perma.cc/7Y77-23UP. Both TRS and ERS are operated by the Texas state government. Tex. Const. art. XVI, § 67.

55.     Indeed, although market participants often disagree about how important they are, the view that environmental, social, and governance factors can be relevant to shareholders' financial interest is nearly universally held in the investment and, for that matter, business community.[1]

56.     Glass Lewis also accounts for social considerations, when relevant, in its reports and recommendations. While the term "social" is broad, topics such as labor practices and talent retention can directly affect a company's financial outlook. Significant labor concerns can subject a company to increased regulatory scrutiny, diminish its ability to retain talent, and ultimately harm its financial outlook. Among the social considerations that may be material to a company are issues that potentially fall under the umbrella of diversity, equity, and inclusion.

---

[1]     *See, e.g.*, Martin, Lipton, *Update on ESG, Stakeholder Governance, and Corporate Purpose*, Harv. L. Sch. F. on Corp. Governance (Jan. 28, 2023), available at https://perma.cc/5RPK-GKJH ("Regardless of one's political preferences, the inescapable reality is that ESG risks have long been considered by boards and management — along with all other material risks and issues . . . — and must continue to be so considered in order to ensure the company's value over the long term."); Mathieu Pellerin, *The Economics of Corporate Governance*, Harv. L. Sch. F. on Corp. Governance (Aug. 30, 2022), available at https://perma.cc/RDN3-CAJE ("There is also mounting evidence that governance practices that increase the oversight and accountability of management, like appointing strong boards and letting takeover markets operate freely, benefit firm value."); Leo E. Strine Jr., *Ignorance is Strength: Climate Change, Corporate Governance, Politics, and the English Language*, Harv. L. Sch. F. Corp. Governance (Feb. 13, 2024), available at https://perma.cc/S447-GUUD ("Settled law permits corporations and institutional investors to take into account ESG factors that are rationally related to the profitability of their businesses and investments[.]"); Hester Peirce, Commissioner, U.S. Sec. & Exch. Comm'n, Speech on The Hitchhiker's Guide to ESG, (June 29, 2024), available at https://perma.cc/9PBU-MHDD ("In seeking maximum financial returns, asset managers serving investors routinely consider ESG factors that they believe affect financial returns."); Mark T. Uyeda, Commissioner, U.S. Sec. & Exch. Comm'n, Remarks at the California '40 Acts Group (Jan. 27, 2023), available at https://perma.cc/MVN3-XFR3 ("The preamble to the [Trump Administration's Department of Labor rule on ESG factors in private retirement plans] appropriately recognized that there are instances where one or more ESG factors will present an economic business risk or opportunity that may appropriately be treated as material economic considerations under generally accepted investment theories." (cleaned up)); Where is the World Going in 2024 and Beyond?, Teneo (Dec. 19, 2023) ("[A] vast majority of CEOs continue to believe that certain ESG issues are critical to their business and to their stakeholders," and 92% of CEOs said they were "standing by their ESG-related programs.").

57.     While not conclusive, some research and market experience indicate that companies with diverse leadership and inclusive cultures can be better positioned to attract and retain talent, foster innovation, and understand a broader range of customer needs. Failure to address issues of inclusion can expose companies to legal risks, employee turnover, and reputational damage, all of which may negatively impact financial performance. PwC's 2024 survey shows that 79% of corporate directors believe that increases to diversity "brought unique perspectives to the board" and 68% believe it "enhanced board performance." *See* Ray Garcia, et al., PwC's 2024 Annual Corporate Directors Survey at 4, available at https://perma.cc/BP3J-JRWJ. Accordingly, when factors that may relate to diversity, equity, or inclusion are material to a company's operations or risk profile, they are appropriately considered in Glass Lewis' analysis and recommendations.

58.     Sustainability considerations, including how a company manages environmental risks and opportunities, can also impact financial outcomes. For example, companies that fail to address material environmental risks—such as those related to climate change, resource scarcity, or regulatory compliance—may face increased costs, litigation, or loss of market access. On the other hand, companies that proactively manage sustainability issues may benefit from operational efficiencies, enhanced brand reputation, and improved access to capital. Sustainability often operates as a financial concern that can materially affect long-term shareholder value. Proxy Voting Guidelines for Benchmark Policies – U.S. Securities, BlackRock (Jan. 2025), available at https://perma.cc/DS4E-X24Q ("It is our view that well-managed companies will effectively evaluate and manage material sustainability-related risks and opportunities relevant to their businesses. As with all risks and opportunities in a company's business model, appropriate

oversight of material sustainability considerations is a core component of having an effective governance framework, which supports durable, long-term financial value creation.").

59.     Glass Lewis regularly advises that shareholders vote against the recommendation of company management when doing so is in the best interests of shareholders. Votes against company management are often the most critical to investors because they help ensure accountability to shareholders.

60.     Votes for or against company management reflect Glass Lewis' opinions on that company and the proposals at issue. Glass Lewis may recommend against company management if it believes greater transparency is needed, shareholder interests are being discounted, or the proposal would lead to fewer checks on management. In cases of poor financial performance or problematic governance practices, Glass Lewis may also take the position that board members should be changed or that the company's performance does not warrant a substantial increase in compensation. Again, these opinions reflect Glass Lewis' viewpoints about the company, its performance, and which corporate governance methods most effectively serve the interests of its clients based on established best practices.

III.    **The Consequences of S.B. 2337.**

61.     If S.B. 2337 takes effect, Glass Lewis will be required to prepare and deliver separate notices for essentially every recommendation it makes because its research invariably addresses governance factors and often addresses other factors deemed "nonfinancial" by S.B. 2337.

62.     Glass Lewis will be required to send immediate disclosures to the companies that are the subject of its advice whenever its tailored recommendations differ across clients. This will be a routine occurrence because of the variance in client preferences, policy choices, and customization.

63.     S.B. 2337 will also impose significant compliance costs by forcing Glass Lewis to prepare detailed disclosures for effectively every company meeting covered by S.B. 2337. At minimum, these disclosures will cost Glass Lewis hundreds of thousands of dollars in annual compliance costs. Glass Lewis will need to hire several additional analysts to monitor whether disclosures or written economic analyses are needed. And it will need to hire compliance officers and other personnel to ensure these disclosures and reports are properly provided to all required recipients under the law. And those costs are separate from the substantial risk of litigation. This will be especially chilling because S.B. 2337 does not specify what constitutes a "violation" of the Act, allows for huge numbers of uninjured parties to bring suit (all shareholders of any company being discussed), and allows the Attorney General to bring enforcement actions *and* intervene in private actions.

64.     Glass Lewis will likely lose clients if the firm routinely sends clients notices that it is not acting in shareholders' financial interest. Glass Lewis will suffer reputational harm by being forced to tell clients that it is endorsing proposals against the interests that those clients want to, or may be required to, advance. Glass Lewis will also suffer harm to its reputation and credibility by endorsing policies like corporate governance only to then be forced by the government to tell clients that such policies are against their interests.

65.     Glass Lewis expects that many clients could misinterpret S.B. 2337's required warnings. Because Glass Lewis must say that its advice "subordinates the financial interests of shareholders," clients may be wrongly led to believe that a vote the other way will result in greater financial returns. As a result, clients may risk not voting or delaying their votes due to internal approvals, which would ultimately harm the company.

66.    The "written economic analyses" under Section 101(a)(2)(B) require extensive detail and would force Glass Lewis to undertake substantial economic analyses, in addition to its existing voting-recommendation analysis. Upon information and belief, no other proxy advisor, board of directors, or other market participant currently engages in the sort of economic analysis called for by S.B. 2337. That analysis would entail significant additional cost for Glass Lewis, above and beyond the hundreds of thousands of dollars in annual compliance costs.

67.    Glass Lewis' Proxy Papers and client voting policies may be confidential. If Glass Lewis is required to disclose when and to whom it has recommended differing positions, it will necessarily have to violate the confidentiality of its recommendations and custom-voting policies.

68.    Many Glass Lewis clients are asset managers to employee retirement plans governed by ERISA. If Glass Lewis were forced to label its tailored recommendations "nonfinancial" and to send those labels to issuers and regulators, certain clients could feel compelled to disengage from Glass Lewis' services rather than risk being portrayed as violating their own fiduciary duties under ERISA.

69.    A website disclaimer that forces Glass Lewis to conspicuously state that it does not act in the financial interest of shareholders will deter clients from retaining Glass Lewis' services. Glass Lewis will suffer reputational harm by conspicuously disclosing on its website homepage that its services include advice and recommendations that are not based solely on the financial interest of shareholders in circumstances in which Glass Lewis does not believe that to be true. Glass Lewis will be forced to contradict its viewpoint—that governance is important to a company's long-term value—with the government's contrary viewpoint that governance is not in the financial interest of the company's shareholders. This will confuse actual and prospective

clients about Glass Lewis' true beliefs, undermine its credibility, and inhibit its ability to gain and maintain its clients' trust.

70.    Without a preliminary and ultimately permanent injunction, Glass Lewis faces irreparable harm. The Act requires it to distort its speech and serve as a mouthpiece for the State's viewpoint. Glass Lewis would also incur substantial unrecoverable costs and sustain reputational damage.

71.    The threat posed by enforcement of the Act by the Attorney General is substantial. In September 2025 alone, Glass Lewis anticipates it will provide over 1,300 clients approximately ten reports on Texas companies' meetings. If each report to each client were to qualify as a violation carrying with it a $10,000 penalty, the threatened penalties for September 2025 alone could be $130 million.

72.    Glass Lewis has already changed its speech in preparation for potential compliance with the Act. Specifically, prior to the preliminary injunction, to ensure that any required disclosures are received by the proper client contact, Glass Lewis asked its clients where the disclosures should be sent. It had also diverted time and resources to communicate to its clients explaining how it plans to attempt to comply with the Act in the absence of injunctive relief. Absent the threat of enforcement of the Act, Glass Lewis would not have sent such messages to its clients.

73.    The Act has already changed the cadence of Glass Lewis' proxy research reports. Glass Lewis accelerated the issuance of reports into August to avoid their coverage by the Act—changing how it would otherwise speak as a direct result of the threat of forthcoming enforcement of the Act.

74.    Glass Lewis' preparations to comply with the Act have already imposed concrete economic harm on Glass Lewis. In undergoing these preparation efforts, and as a result of the Act, Glass Lewis was forced to divert time and resources away from its regular business.

75.    As noted above, Glass Lewis has diverted time and resources away from its business to communicate with its clients about the Act and how it plans to attempt compliance.

76.    Prior to the entry of a preliminary injunction on August 29, 2025, Glass Lewis' senior executives dedicated hundreds of hours toward attempted compliance with the Act in the event Glass Lewis' request for a preliminary injunction were denied. These meetings involved Glass Lewis' entire executive team, including its CEO, COO, President, Chief Legal Officer, Chief Strategy Officer, Chief Financial Officer, and Chief Technology Officer. These meetings diverted significant attention away from other pressing issues, like Glass Lewis' budgeting and strategic financial planning processes and towards its efforts to comply with the Act. These activities have delayed Glass Lewis' response to other pending tasks, including significant information technology initiatives central to its business plans. If the preliminary injunction is later dissolved or the permanent injunction is not granted, the senior executive team will have to dedicate even more time to figuring out how to try to comply with the Act.

77.    Glass Lewis has taken such significant time to develop a compliance plan in part because the Act's requirements are so vague, so there is enormous uncertainty about how to comply with the law. For example, Section 101(b)(1)(B) requires Glass Lewis to provide the "particular basis" for its recommendation but never defines what constitutes a "particular basis." Similarly, Section 102(b)(3)(B) requires a "specific financial analysis" but gives no indication as to what that entails.

## STANDING AND SOVEREIGN IMMUNITY

78.    Glass Lewis has standing to bring this challenge. It has (1) "suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (citing *Lujan v. Def's of Wildlife*, 504 U.S. 555, 560–61 (1992)). Chilling speech and unconstitutionally compelling speech are injuries in fact. *See id.* at 330-31.

79.    ***First***, Glass Lewis has shown an injury. In a pre-enforcement challenge, a plaintiff can establish injury in fact if "(1) they have an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) their intended future conduct is arguably proscribed by the policy in question, and (3) the threat of future enforcement of the challenged policies is substantial." *Id.*; *see Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 926 (5th Cir. 2023).

80.    Glass Lewis intends to—and will—engage in a course of conduct affected with a constitutional interest. Glass Lewis engages in First Amendment protected speech and expression when it provides advice and recommendations on how to vote on proxy proposals and company proposals, distributes proxy statement research and analytics on those proposals, creates corporate governance assessments, and develops proxy voting recommendations and policies. *Id.* § 6A.001(3)-(4). These services consist of speech and are at the core of Glass Lewis' business. Thus, Glass Lewis intends to engage in a course of conduct protected by the First Amendment by providing  "proxy advisory services" that will be regulated by S.B. 2337.

81.    Glass Lewis also speaks through its internet website: https://www.glasslewis.com. On the website, Glass Lewis promotes itself and its services, and it conveys Glass Lewis' views on numerous matters of public concern.

82.    The Act proscribes the course of conduct that Glass Lewis would engage in without the threat of enforcement by the Attorney General—(1) to provide advice and recommendations

about Texas companies after September 1, 2025, without including Texas' views compelled by Sections 101(b) and 102(b) of the Act; and (2) to express itself on its website without including the self-denigrating statement that its "services include advice and recommendations that are not based solely on the financial interest of shareholders."

83.    Absent S.B. 2337, Glass Lewis' speech would not convey Texas' views reflected in Section 101(b) and Section 102(b). For example, Glass Lewis would not convey Texas' viewpoint—with which Glass Lewis vehemently disagrees—that consideration of governance factors makes advice not in the financial interest of shareholders. S.B. 2337 § 6A.101(b)(1). Glass Lewis' core business involves advice on corporate governance and its institutional investor clients retain it precisely because they believe that good corporate governance promotes their financial interest as shareholders of companies. It is hard to imagine statements more antithetical to Glass Lewis' views, business, and purpose than those compelled by Section 101(b).

84.    Additionally, absent S.B. 2337, Glass Lewis' speech would not convey Texas' viewpoint that providing differing advice to differently situated clients is a "conflict" and necessarily means one client is not receiving advice in the financial interest of shareholders. S.B. 2337 § 6A.102(b)(2)-(3).

85.    Absent S.B. 2337, Glass Lewis certainly would not "publicly and conspicuously disclose on the home or front page of [Glass Lewis'] publicly accessible Internet website that the [Glass Lewis'] services include advice and recommendations that are not based solely on the financial interest of shareholders." S.B. 2337 § 6A.101(b)(3).

86.    The threat of enforcement is substantial. *See infra* ¶¶ 93-99. Each violation of the Act qualifies as a "deceptive trade practice," meaning that the Attorney General can seek penalties of $10,000 per violation. S.B. 2337 § 6A.201; Tex. Bus. & Comm. Code § 17.47(c)(1). If each

report to each client were to qualify as a violation carrying with it a $10,000 penalty, the threatened penalties for each month could easily exceed $100 million. Indeed, the State takes aggressive positions in counting violations. Recently, the State's method for counting DTPA violations yielded potential statutory penalties of "$230 quadrillion." *See* Pls.' Resp. to Mot. to Exclude at 58, *Texas v. Google LLC*, No. 4:20-cv-00957-SDJ (E.D. Tex. Dec. 30, 2024), ECF 750-1.

87.    The Attorney General has shown a clear intent to enforce the Act. *See infra* ¶¶ 93-99. On August 22, 2025, he issued a Civil Investigative Demand ("CID") against Glass Lewis that seeks documents directly related to enforcement of S.B. 2337, including consideration of ESG factors and alleged "conflicts of interest." *See* ECF 31-1. He has called the law "critical," stated that he will "aggressively" defend it, and has accused proxy advisors like Glass Lewis of "secretly trying to push a woke agenda." Press Release, Attorney General Ken Paxton Defends State Law Protecting Texans from Proxy Advisors Pushing Woke Ideology (Aug. 22, 2025), available at https://perma.cc/J2CG-XQH8. And he has issued similar press releases stating, in connection with consideration of DEI and ESG, that "[a]ny institution found to be violating the law will be held accountable." Press Release, Attorney General Ken Paxton Warns Major Financial Institutions that DEI and ESG Commitments Could Lead to Enforcement Actions if Found to Violate State or Federal Laws (Jan. 23, 2025), available at https://perma.cc/9ASH-PRX2.

88.    ***Second***, these injuries are fairly traceable to the Attorney General. The Act expressly states that a violation of the Act "is actionable under Section 17.47" of the Texas Business and Commerce Code, which authorizes suits by the Consumer Protection Division of the Office of the Attorney General. *See* S.B. 2337 § 6A.201; Tex. Bus. & Com. Code § 17.47; *see also Computer & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1022, 1028 (W.D. Tex. 2024) ("*CCIA*") ("Paxton, as Attorney General, is in charge of the Consumer Protection Division

of the Attorney General's Office. He enforces the law through its subdivisions, including the Consumer Protection Division.") (quotation marks omitted).

89.    ***Third***, a declaration and injunction would remove the substantial threat of civil suit by the Attorney General. *See Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 515 (5th Cir. 2017).

90.    The Attorney General is not immune under the Eleventh Amendment because this is a pre-enforcement challenge seeking prospective relief for ongoing violations of federal law. *See Ex parte Young*, 209 U.S. 123 (1908).

91.    The *Ex parte Young* exception applies because the Attorney General has "some connection" to enforcement. *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). He has (1) the particular duty to enforce the challenged law; (2) a demonstrated willingness of enforcement; and (3) enforcement authority that amounts to "compulsion" or "constraint." *Mi Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024).

92.    The Act expressly authorizes the Attorney General's enforcement, so the Attorney General has a particular duty to enforce it. S.B. 2337 § 6A.201; *In re Paxton*, 60 F.4th 252, 257 (5th Cir. 2023); *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020). This authorization satisfies the particular duty prong. "As eight Members of the Court agree, petitioners may bring a pre-enforcement suit challenging the Texas law in federal court under *Ex parte Young* because there exist state executive officials who retain authority to enforce it." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 59-60 (2021) (Roberts, C.J., concurring in part and dissenting in part); *see CCIA*, 747 F. Supp. 3d at 1027.

93.    The Attorney General has demonstrated a clear willingness to enforce S.B. 2337. On August 22, 2025, the Attorney General issued a CID against Glass Lewis. *See* ECF 31-1. The

CID maps onto many of the same issues S.B. 2337 purports to regulate, including company proposals to reincorporate in Texas, exemplars "about the opportunity cost to ESG-oriented decisions," and exemplars regarding "potential conflicts of interest." *Id.* The CID was sent by the same Consumer Protection Division of the Office of the Attorney General that enforces S.B. 2337. *Id.*; S.B. 2337 § 6A.201. The CID seeks documents pursuant to Chapter 17 of the Texas Business and Commerce Code, which is the same chapter that the Attorney General shall use to enforce S.B. 2337. ECF 31-3; S.B. 2337 § 6A.201. In short, the CID is an attempt by the Attorney General to begin enforcing S.B. 2337. Additionally, the Attorney General has made a variety of statements demonstrating his eagerness to enforce the Act.

94.    On August 22, 2025, the Attorney General issued a press release confirming his commitment to "aggressively" defend S.B. 2337 and use the law to target Glass Lewis for purportedly providing advice based on ESG and DEI factors. Press Release, Attorney General Ken Paxton Defends State Law Protecting Texans from Proxy Advisors Pushing Woke Ideology (Aug. 22, 2025), available at https://perma.cc/J2CG-XQH8. The press release says:

> Attorney General Ken Paxton is defending a new Texas state law that ***requires proxy advisors to disclose when they're pushing left-wing goals*** as opposed to making recommendations based solely on financial considerations. . . .
>
> The new rule would apply to recommendations if they are made in regards to companies based in Texas. ***S.B. 2337 would prevent companies from secretly trying to push a woke agenda*** in corporate America by ***forcing them to disclose if their motivations are aimed at promoting political goals, including DEI and ESG***.
>
> "The role of a proxy advisor is to provide sound guidance based on financial considerations, ***not use their position to promote woke, left-wing ideology***," said Attorney General Paxton. "***S.B. 2337 stops liberal activists posing as proxy advisors from giving guidance based on their ideological goals*** without making that clear to their clients. The new law is critical for promoting transparency in corporate America, and ***I will continue to defend it aggressively in the courts.***"

*Id.* (emphasis added).

95.     This press release unquestionably satisfies the "scintilla" of enforcement needed to apply the *Ex parte Young* exception to sovereign immunity. *Texas Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020).

96.     In a January 2025 press release, the Attorney General promised to hold accountable "[a]ny institution found to be violating the law" in connection with ESG and DEI issues and criticized major financial institutions like BlackRock and Citigroup for "prioritizing a radical climate agenda over consumer and investor interests." Press Release, Attorney General Ken Paxton Warns Major Financial Institutions that DEI and ESG Commitments Could Lead to Enforcement Actions if Found to Violate State or Federal Laws (Jan. 23, 2025), available at https://perma.cc/9ASH-PRX2.

> Banks and financial institutions are finally starting to realize that the ESG and DEI policies pushed by radical activist groups are bad for consumers and potentially violate the law," said Attorney General Paxton. "Unlawful race- and sex-based quotas and so-called 'green energy' schemes will not be allowed to stand and I will continue to urge these organizations to uphold the legal obligations they owe to consumers and investors. ***Any institution found to be violating the law will be held accountable***."

*Id.* (emphasis added).

97.     The Attorney General has not disavowed these threats of enforcement, even after they were repeatedly included in Glass Lewis' preliminary injunction briefing. *See* ECF 4, at 6-7; ECF 20, at 2-6.

98.     Additionally, the Attorney General has threatened to sue financial companies for allegedly "violating fiduciary duties" by endorsing ESG and DEI policies, which is the precise behavior regulated by S.B. 2337.  Letter from Ken Paxton to JP Morgan Chase & Co, et al., (Jan. 27, 2025), available at https://perma.cc/2FVV-GUN2.

99.    The Attorney General's authority to enforce the Act's compelled speech provisions amounts to "compulsion." The Attorney General may seek $10,000 per violation as well as declaratory and injunctive relief. S.B. 2337 § 6A.201; Tex. Bus. & Com. Code § 17.47(c)(1).

## CLAIMS

100.    Glass Lewis raises a challenge to the Act as applied to Glass Lewis.

## COUNT I

### 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES THROUGH THE FOURTEENTH AMENDMENT (FREEDOM OF SPEECH)

101.    Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

102.    The First Amendment to the U.S. Constitution provides that the government "shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I. When the Government regulates speech, it "bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

103.    The First Amendment "protect[s] the freedom to think as you will and to speak as you think." *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (citation and quotation marks omitted). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

104.    The Act engages in viewpoint-based discrimination. Without the need for any strict scrutiny analysis, the "Court's finding of viewpoint bias" effectively "end[s] the matter." *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019). The Act also engages in content-based discrimination and fails strict scrutiny. Although the Act does not regulate commercial speech, it also fails under intermediate scrutiny.

105.    **<u>Viewpoint discrimination</u>**. The "First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others[.]" *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 394 (1993). S.B. 2337 discriminates based on viewpoint when it subjects certain viewpoints to rigorous regulation but not their counterpoints. Worse, it compels private speakers to adopt and parrot the government's viewpoint on hotly contested topics.

106.    Viewpoint discrimination is a "particularly egregious form of content discrimination." *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (citation omitted). "A viewpoint-based regulation targets . . . particular views taken by speakers on a subject." *Id.* (citation omitted).

107.    The Act targets particular views taken by Glass Lewis. When Glass Lewis' advice reflects the relevance of governance or diversity or sustainability to companies' performance *or* advises against the views of a company's management or board, Section 101 heavily regulates that speech. *See* S.B. 2337 § 6A.101. On the contrary, advice that disparages the relevance of governance and diversity does not trigger regulation. Likewise, advice favoring company management avoids regulation. So, anti-management views result in burdensome regulation, while pro-management views are unregulated and unburdened. And the Act punishes Glass Lewis for taking the view that ESG or DEI factors are relevant to a company's financial performance, but not the opposite view.

108.    Section 102 also engages in viewpoint-based discrimination. *Id.* § 6A.102. Section 102 targets "materially different" advice to different clients and any advice to vote "in opposition to" company management's recommendation. *Id.* § 6A.102(a). Glass Lewis must disclose "which of the conflicting advice" was "provided solely in the financial interest of the shareholders,"

incorporating the blatant viewpoint discrimination found in Section 101. And again, pro-management views escape regulation, while anti-management views are heavily burdened.

109.    Restricting speech with certain viewpoints was the express intent of the bill's sponsor: "[T]he point here is to make sure that proxy advisory firms, when they're rendering advice . . . that they're focused on economic factors . . . . So, when they're focused on non-economic-type factors, whether it's ESG, whether it's DEI . . . that's what we want to prevent[.]" Texas H.R., 89th Leg., R.S., Floor Debate on H.B. 4079, (May 27, 2025), at 9:47:50-9:49:21 (video at https://house.texas.gov/videos/22298).

110.    This is viewpoint discrimination. The purpose is to "excis[e] certain ideas or viewpoints from the public dialogue." *Turner Broadcasting System, Inc. v. FCC*, 512 U. S. 622, 642 (1994). The Act impermissibly seeks to "tilt public debate in a preferred direction" and "interfere with an uninhibited marketplace of ideas." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578-79 (2011); *303 Creative*, 600 U.S. at 585.

111.    Both on its face and in its purpose, the Act impermissibly seeks to "interfere with an uninhibited marketplace of ideas." *Id.* at 585 (citation and quotation marks omitted).

112.    The Act also discriminates on viewpoint when it compels Glass Lewis to speak the Texas government's viewpoints—even when they contradict Glass Lewis' own perspective. Texas "seeks to compel this speech in order to 'excis[e] certain ideas or viewpoints from the public dialogue.'" *303 Creative*, 600 U.S. at 588 (quoting *Turner Broadcasting*, 512 U.S. at 642); *see Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 14-15 (1986). The Supreme Court has "held time and again that freedom of speech includes both the right to speak freely and the right to refrain from speaking at all." *Janus v. Am. Fed'n. of State, Cnty., and Mun. Employees, Council 31*, 585 U.S. 878, 892 (2018) (collecting cases) (quotation marks omitted). "Compelling

individuals to mouth support for views they find objectionable violates that cardinal constitutional command[.]" *Id.*; *see also Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*"). The "government may not compel a person to speak its own preferred messages." *303 Creative*, 600 U.S. at 586. "Nor does it matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include. All that offends the First Amendment just the same." *Id.* at 586-87 (citations omitted).

113.    The Act compels Glass Lewis to make disparaging disclosures and notices about its own services to its clients. S.B. 2337 §§ 101(b), 102(b). Compelled disclosures impermissibly "alter the content of [Glass Lewis'] speech." *NIFLA*, 585 U.S. at 766. They force Glass Lewis to "provide a government-drafted script" advocating positions it vehemently opposes. *Id.*

114.    Section 101 requires Glass Lewis to state the State's view that any advice which considers DEI, ESG, or sustainability is "not being provided solely in the financial interest of the company's shareholders because it is based" on "nonfinancial factors." S.B. 2337 § 6A.101(a). Most egregiously, it must make this disclosure "publicly and conspicuously . . . on the home or front page" of its website. *Id.* § 6A.101(b)(3). "[R]equiring a company to publicly condemn itself is undoubtedly a more 'effective' way for the government to stigmatize and shape behavior than for the government to have to convey its views itself, but that makes the requirement more constitutionally offensive, not less so." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (citation omitted).

115.    Likewise, Section 102 demands that, whenever Glass Lewis provides materially different advice to different clients, it must state "which of the conflicting advice [is] . . . provided

solely in the financial interest of the shareholders," even if it does not believe that is true. S.B. 2337 § 6A.102(b)(3).

116.    Thus, whenever Glass Lewis wishes to speak with a certain viewpoint, the Act compels Glass Lewis to speak the Texas government's viewpoints. *See Pac. Gas & Elec. Co.*, 475 U.S. at 16 ("Were the government freely able to compel corporate speakers to propound political messages with which they disagree, this protection would be empty, for the government could require speakers to affirm in one breath that which they deny in the next."). It is similar to the unconstitutional law in *303 Creative*: Here, Texas "seeks to put [Glass Lewis] to a similar choice: If [it] wishes to speak, [it] must either speak as the State demands or face sanctions for expressing [its] own beliefs." 600 U.S. at 589. Under the Supreme Court's precedents, that is "more than enough[] to represent an impermissible abridgment of the First Amendment's right to speak freely." *Id.*

117.    Viewpoint discrimination "is inherent in the design and structure of this Act." *NIFLA*, 585 U.S. at 779 (Kennedy, J. concurring). "[T]he history of the Act's passage . . . suggest[s] a real possibility that" proxy advisors' speech was targeted because the State disagrees with the positions they have taken. *Id.* The purpose of the Act is to punish disfavored viewpoints, whether those views advocate for the relevance of ESG and DEI or against company management. A "State may not interfere with private actors' speech to advance its own vision of ideological balance." *Moody*, 603 U.S. at 741. "On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Id.* at 741-42.

118.    The Act's blatant viewpoint discrimination, by itself, renders S.B. 2337 unconstitutional. "In the ordinary case it is all but dispositive to conclude that a law is . . . viewpoint

discriminatory." *Id.* at 571. Without the need for any strict scrutiny analysis, "[t]he Court's finding of viewpoint bias end[s] the matter." *Iancu*, 588 U.S. at 399. "Modern First Amendment cases establish a *per se* rule making the punishment of speech flatly unconstitutional if the penalty is based on the offensiveness or the undesirability of the viewpoint expressed. . . . While the First Amendment as a whole is not an absolute, the prohibition against viewpoint discrimination is a 'pocket of absolutism' in which the Supreme Court has tolerated no abridgments." 1 Rodney A. Smolla, *Smolla & Nimmer on Freedom of Speech* § 4:8 (Mar. 2025).

119.    Texas is entitled to its view of ESG. It may not, however, compel proxy advisors to parrot that view, nor regulate their speech because Texas disagrees with their views. "The government may not discriminate against speech based on the ideas or opinions it conveys," full stop. *Id.* at 393.

120.    **Content-based discrimination**. The Act also fails because it engages in content discrimination and fails strict scrutiny.

121.    A law is content based if it "target[s] speech based on its communicative content." *NIFLA*, 585 U.S. at 766 (quoting *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)). It does so when "a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163 (quotation marks omitted). That is undeniably the case here, because the Act regulates reports based on the content of Glass Lewis' advice and their ultimate recommendations.

122.    Additionally, a compelled "notice is a content-based regulation of speech." *NIFLA*, 585 U.S. at 766. "By compelling individuals to speak a particular message, such notices 'alter the content of their speech.'" *Id.* (cleaned up); *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,

487 U.S. 781, 797 (1988) (the First Amendment protects the freedom to decide "both what to say and what *not* to say").

123.    **Strict Scrutiny applies, and the Act does not survive it**. Because the Act engages in content-based discrimination, it is subject to strict scrutiny, which it fails.

124.    "Content-based laws . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. "Strict scrutiny is unforgiving because it is the standard for reviewing the direct targeting of fully protected speech. Strict scrutiny is designed to enforce the fundamental principle that governments have no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2310 (2025) (citation and quotation marks omitted). In practice, it must be "fatal in fact absent truly extraordinary circumstances." *Id.*

125.    The Act's stated interest is likely not genuine. "Government justifications for interfering with First Amendment rights must be genuine, not hypothesized[.]" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (cleaned up). The Act states a goal to "prevent fraudulent or deceptive acts and practices in this state." S.B. 2337 § 1(4). This interest appears to be pretext for regulating disfavored views.

126.    Most notably, the Act is "wildly underinclusive." *NIFLA*, 585 U.S. at 774 (citation omitted). "Such underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Id.* (cleaned up); *City of Ladue v. Gilleo*, 512 U.S. 43, 51-52 (1994) (underinclusiveness may "diminish the credibility of the government's rationale for restricting speech in the first place"). It only targets speech *about Texas companies*—it does not address speech occurring *in Texas* or *by*

*Texans* or *to Texans*. S.B. 2337 § 6A.001(1). So long as proxy advisors avoid discussing Texas companies or companies that might move here, they may give mountains of advice to Texas investors on DEI or ESG—or differing advice to different Texas investors—without being covered by the Act. The Act purportedly targets conflicts, but does not require disclosures of conflicts of interest. Recommendations against company management are regulated, but recommendations that align with management are unregulated, even if they do not maximize shareholder value. This underinclusiveness strongly suggests the Act's true interest is suppressing disfavored views about Texas companies, not stopping purported fraud in Texas.

127.    Even if the State had a genuine interest in preventing fraud, the Act fails strict scrutiny because it is not narrowly tailored to serve that interest.

128.    Glass Lewis exclusively serves highly sophisticated institutional clients who know whether to consider ESG or DEI. The majority use custom voting policies, and all Glass Lewis clients choose their voting policy and thereby tell Glass Lewis when and how they want to consider such factors. Glass Lewis is transparent about how it considers the factors at issue. Glass Lewis' voting policies and Proxy Papers *already* inform clients what Glass Lewis has considered. Glass Lewis' sophisticated clients are not deceived by its speech, so government-mandated warnings will not reduce fraud.

129.    There is nothing inherently fraudulent about the targeted speech. Proxy advisers appropriately give different recommendations to different clients who have different investment preferences and situations. As noted above, the bill sponsor compared it to telling one legislator to vote for a bill because it is good for her district while telling a different legislator to vote against it because it would be bad for their district. That differing advice does not indicate fraud—only that differently situated clients can have different interests and approaches. A long-term investment

outlook might appropriately factor in sustainability and climate change, while a short-term outlook might not. Nor is there anything fraudulent in recommending a vote against the position of the company's management or board. *Id.* §§ 6A.101(a)(2)(A), .102(a)(3). Shareholders regularly vote against company management, especially when its proposal is self-interested. So, targeting this speech, which is not at all fraudulent, will not reduce fraud.

130.     The Act's regulatory technique, a sweeping scheme of self-denigrating disclosures, does not use "the least restrictive means" available. *Free Speech Coal.*, 145 S. Ct. at 2302. Texas could conceivably have regulated material misrepresentations or regulated instances where proxy advisors failed to follow their client's chosen voting policies. And the Legislature's failure to consider other, less burdensome alternatives, such as a "government-funded public information campaign," is fatal. *See Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 284 (5th Cir. 2024), *aff'd*, 145 S. Ct. 2291 (2025); *see Sec. Indus. & Fin. Markets Ass'n v. Ashcroft*, 745 F. Supp. 3d 783, 800 (W.D. Mo. 2024); *NIFLA*, 585 U.S. at 775.

131.     Because the Act discriminates based on the content of speech and is not narrowly tailored to serve a compelling state interest, the Act violates the First Amendment.

132.     **<u>The Act does not regulate commercial speech</u>**. Commercial speech doctrines are inapplicable to laws that discriminate against viewpoints. *Sorrell*, 564 U.S. at 566. Even setting that aside, the Act does not regulate commercial speech, so no lower standard of scrutiny applies.

133.     The "core notion" of commercial speech is "speech which does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (citation and quotation marks omitted). That speech "has an economic motivation" is "insufficient by itself" to turn it into commercial speech." *Id.* at 67.

134.    Glass Lewis' proxy research and voting recommendations are not "commercial speech" under the First Amendment because they do not "propose a commercial transaction" and are not "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 561-62 (1980). Whether speech is commercial turns on three factors: "(i) whether the communication is an advertisement, (ii) whether the communication refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech." *Phi Theta Kappa Honor Soc'y v. HonorSociety.org., Inc.*, 2025 WL 1030240, at *2 n.2 (5th Cir. 2025) (per curiam).

135.    All three factors show the Act does not target commercial speech. ***First***, proxy advice is not an advertisement, and the Act's definition of "proxy advisory service" confirms this. *See* S.B. 2337 § 6A.001(4). Glass Lewis only provides recommendations and reports to existing clients. Glass Lewis' advice reflects the company's opinions, often on matters of significant public importance, unrelated to its own business interests.

136.    ***Second***, the Act regulates speech on "how to vote on a proxy proposal or company proposal" and "corporate governance"—not products or services. S.B. 2337 § 6A.001(4). The targeted speech does not describe or price any product or service for sale. Indeed, the Act targets certain proxy advice precisely because it contains allegedly "nonfinancial" content about matters of public concern.

137.    ***Third***, the purpose of the speech is to provide advice on how to vote, not to solicit clients. The Act targets Glass Lewis' speech to existing clients on how to vote on important corporate matters—not speech seeking to sell services. The regulated "proxy advisory services" are analogous to the editorial opinions of a newspaper or the endorsement of a political candidate:

they offer judgment and analysis, not products. This is pure speech at the heart of the First Amendment, not commercial speech.

138.    Even under commercial speech doctrines, the Act cannot withstand scrutiny. It imposes overly burdensome disclosures on hot-button political topics in a manner tailored to punish purportedly liberal views, not to prevent fraud.

139.    **Even if *Central Hudson* intermediate scrutiny applies, the Act fails**. Even if the Court were to treat the Act as a viewpoint-neutral regulation of commercial speech, the Act fails intermediate scrutiny. The *Central Hudson* test provides:

> First, the court "must determine whether the expression concerns lawful activity and is not misleading." Second, the court asks "whether the asserted governmental interest is substantial. If both inquiries yield positive answers, [the court] must determine whether the regulation advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest."

*Free Speech Coal.*, 95 F.4th at 283 (quoting *Cent. Hudson*, 447 U.S. at 566).

140.    The first factor applies to "*restrictions* on commercial speech, not *compelled* speech." *Id.* At any rate, Glass Lewis' services are lawful and its advice on matters of judgment is reasoned, clear, and not misleading.

141.    The Act fails under the third and fourth factors. Texas has made no findings that compelled disclosures are effective at achieving its goals. *See Edenfield v. Fane*, 507 U.S. 761, 771 (1993). And the fact that the Legislature failed to consider less burdensome alternatives and its failure to try "a government-funded public information campaign" is fatal under intermediate scrutiny. *See Free Speech Coal.*, 95 F.4th at 284; *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417, n.13 (1993). So, the Act fails under *Central Hudson*.

142.    ***Zauderer* does not apply.** In *Zauderer*, the Supreme Court explained that the State may at times prescribe what shall be orthodox in commercial advertising by requiring the dissemination of purely factual and uncontroversial information." *Book People, Inc. v. Wong*, 91

F.4th 318, 339-40 (5th Cir. 2024) (footnote and quotation marks omitted). But "outside that context, it may not compel affirmance of a belief with which the speaker disagrees." *Id.* (alteration omitted). Even if proxy advice qualified as commercial speech—it does not—to apply *Zauderer* to the Act's compelled warnings, the State bears the burden to "show that the warnings are both (1) purely factual and (2) uncontroversial." *Free Speech Coal.*, 95 F.4th at 281. The Act fails both prongs.

143.    The compelled statements are highly controversial. A "compelled statement is 'uncontroversial' for purposes of *Zauderer* where the truth of the statement is not subject to good-faith . . . evidentiary dispute and where the statement is not an integral part of a live, contentious political . . . debate." *Free Speech Coal.*, 95 F.4th at 281-82. Here, the compelled statements are either abjectly false or subject to dispute and part of a live, contentious political debate. Most notably, the Act forces Glass Lewis to convey the Texas Legislature's wrong view that any advice taking into account an environmental, social, or even a corporate governance factor "is not being provided solely in the financial interest of the company's shareholders" and "that the advice subordinates the financial interests of shareholders to other objectives." S.B. 2337 § 6A.101(b)(1), (3).

144.    Corporate governance is widely, if not universally, considered a material risk-return consideration. Independent boards, annual election of directors, linking executive pay with company performance, and other corporate governance considerations are sound business practices that are relevant, if not essential, to a company's risk mitigation and long-term financial performance and therefore its shareholders' financial interest. So, as to corporate governance, the statement is not only controversial, the compelled disclosure is abjectly false. *See RJ Reynolds Tobacco Co. v. Food & Drug Admin.*, 96 F.4th 863, 881 (5th Cir.) ("A factual statement is

'controversial' under Zauderer where the truth of the statement is not settled or is overwhelmingly disproven or where the inherent nature of the subject raises a live, contentious political dispute."). Indeed, the Attorney General's CID defines "ESG" to include factors like wages, pay, and executive compensation, which are intrinsically and undeniably "financial." *See* ECF 31-1. And it defies common sense to say that a recommendation automatically "subordinates the financial interests of shareholders" whenever it considers pay or compensation.

145.    The remaining factors are likewise subject to a good-faith evidentiary dispute and part of a live, contentious political debate. BlackRock's 2025 Proxy Voting Guidelines, for example, state that "well-managed companies will effectively evaluate and manage material sustainability related risks and opportunities" and "[m]any S&P 500 companies report in their disclosures benefitting from their current levels of diversity." Proxy Voting Guidelines for Benchmark Policies – U.S. Securities, BlackRock (Jan. 2025), available at https://perma.cc/DS4E-X24Q. A Republican SEC Commissioner has acknowledged that ESG factors, while divisive, include considerations "historically factored into assessments of the long-term value of companies." Hester Peirce, Commissioner, U.S. Sec. & Exch. Comm'n, Speech on The Hitchhiker's Guide to ESG, (June 29, 2024), available at https://perma.cc/9PBU-MHDD. And one recent survey of CEOs shows that 92% are overall "standing by their ESG-related programs." Where is the World Going in 2024 and Beyond?, Teneo, at 26 (Dec. 19, 2023), available at https://perma.cc/WS6M-YJBS.

146.    Notably, Texas' own legislators confirm the compelled disclosures are controversial and subject to a live, contentious political debate. The Act's House sponsor expressly sought to regulate speech on "political hot-button issues." Texas H. Comm. on Trade, Workforce & Economic Development, 89th Leg., R.S., Debate on H.B. 4079, (Apr. 23, 2025), at 1:1409

(video at https://house.texas.gov/videos/21855). The Senate sponsor supported the compelled disclosures by saying that "proxy advisory firms have become increasingly political and with a hard left bent." Texas Sen. Comm. on State Affairs, 89th Leg., R.S., Debate on S.B. 2337, (Apr. 24, 2025), at 58:40 (video at https://senate.texas.gov/videoplayer.php?vid=21888&lang=en). And the Attorney General believes that DEI and ESG involve "unlawful race- and sex-based quotas and radical environmental policies" and the "sordid business of divvying us up by race." ECF 6-2; Resp., ECF 17, at 28.

147.    Section 102 incorporates Section 101's controversial disclosures and then forces Glass Lewis to choose which factor is "provided solely in the financial interest of the shareholders" based on the Legislature's controversial, hotly debated criteria. S.B. 2337 § 6A.102(b)(3)(A). And Section 102 requires Glass Lewis to label its advice "conflicting" even when it perfectly aligns with the custom policy chosen by each client and is specifically tailored to their preferences. *Id.* § 6A.102(b)(2). The compelled disclosures falsely and wrongly assume that giving different recommendations is a "conflict." In fact, custom policies are a key component of Glass Lewis' services that clients themselves request. Tellingly, the Act's House sponsor conceded without argument that the Act fails to take different client preferences into account. Texas H.R., 89th Leg., R.S., Floor Debate on H.B. 4079, at 9:18:00 (May 27, 2025) (video at https://house.texas.gov/videos/22298). The Legislature invented the "conflict" language out of whole cloth and never even considered the obvious, benign alternative. Section 102's ill-conceived disclosures are highly contentious, if not overwhelmingly disproven.

148.    Nor are the compelled disclosures purely factual. "[T]he 'factual' nature of a statement turns on the certainty the statement expresses." *RJ Reynolds*, 96 F.4th at 879 n.48. Non-falsifiable "interpretations, reactions, or opinions" are nonfactual. *Id.* at 879 (cleaned up). The SEC

has long recognized that "desirability of a particular initiative subject to a shareholder vote is by its nature judgmental" and "there is typically not a 'correct' viewpoint." Sec. & Exch. Comm'n, Regulation of Communication among Shareholders, Release No. 34-31326 (Oct. 22, 1992), 57 Fed. Reg. 48,276 at 48,278. So, when the Act requires Glass Lewis to state that advice is not "solely in the financial interest of shareholders" or state that it is "sacrificing investment returns," this compelled statement reflects the subjective view of the Texas Legislature—not verifiable truth. Texas cannot turn its subjective beliefs into "facts" by legislative fiat. Nor can it force private parties to broadcast those beliefs.

149.    Again, the same is true for Section 102. By forcing Glass Lewis to choose which advice is "solely in the financial interest of shareholders," the Act requires Glass Lewis to pick a "correct" viewpoint—the very concept that the SEC rejects.

150.    Whatever test the Court applies, the Act violates the First Amendment. Unless declared unconstitutional and its enforcement enjoined, S.B. 2337 will unlawfully deprive Glass Lewis of its fundamental First Amendment rights and cause Glass Lewis irreparable harm.

### COUNT II

#### 42 U.S.C. § 1983
#### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES THROUGH THE FOURTEENTH AMENDMENT (FREEDOM OF ASSOCIATION)

151.    Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

152.    The First Amendment to the U.S. Constitution provides that the government "shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. "[I]mplicit in the right to engage in activities protected by the First Amendment a

corresponding right to associate with others." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (citation omitted).

153.    S.B. 2337 infringes on this constitutionally protected interest by burdening membership in a small set of organizations. Whenever proxy advice is "based on, or otherwise takes into account"  "membership in or commitment to an organization or group that wholly or partly bases its evaluation or assessment of a company's value over any period on nonfinancial factors" it is subject to onerous disclosure requirements. S.B. 2337 § 101(a)(1)(D), (b). The term "nonfinancial factors," as used in the Act, includes governance. *Id.* § 101(a)(1)(A).

154.    Glass Lewis is associated with at least two groups that emphasize the importance of corporate governance.

155.    Glass Lewis is a signatory to the Principles for Responsible Investment ("PRI"), a United Nations-affiliated group that works "to understand the impact of environmental, social, and governance factors" and "to support its international network of investor signatories in incorporating these factors into their investment . . . decisions."  PRI Ass'n, *About the PRI*, available at https://perma.cc/4FMW-D8KT. PRI promotes corporate governance and other social principles, such as preventing investments that contribute to modern slavery and human trafficking. *Id.*

156.    Additionally, Glass Lewis is a member of the Society for Corporate Governance ("the Society"). The Society's mission is to support corporate governance professionals through education, collaboration, and advocacy, with the ultimate goal of creating long-term shareholder value through better governance. *See* Soc'y for Corp. Governance, *About the Society*, available at https://perma.cc/UY28-GNNB. The Society typically submits annual comment letters in response

to Glass Lewis' Stakeholder Policy Survey. Glass Lewis uses the information gleaned from this survey to refine its Benchmark Policy Guidelines.

157.    Regulations that infringe the freedom of association are subject to "exacting scrutiny." *Americans for Prosperity Found.*, 594 U.S. at 610 (cleaned up). "Under that standard, there must be a substantial relation between the [burden] and a sufficiently important governmental interest." *Id.*

158.    S.B. 2337 fails this test. Branding advice that is "partly" based on or "takes into account" commitment to an organization (like PRI or the Society for Corporate Governance) as "not solely in the financial interest of the shareholders" is a burden that has no substantial connection to an important governmental interest. The burden on association does nothing to remedy alleged concerns about fraud, the purported reason for the Act.

159.    The Act is also unconstitutional because it "rests on the doctrine of 'guilt by association' which has no place here." *Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 607 (1967). The Act assumes that because a proxy advisory service "takes into account" a "commitment" to an organization that "bases *its* evaluation or assessment of a company's value over any period on nonfinancial factors" *the proxy advisor* is considering "nonfinancial factors." Section 101(a)(1)(D) is triggered regardless of whether Glass Lewis actually considers non-financial factors; instead, liability flows automatically from the fact that Glass Lewis belongs to or expresses a commitment to an organization that considers DEI or ESG. Section 101(a)(1)(D) presumes an impermissible motive from organizational ties alone.

160.    "When it comes to a person's beliefs and associations, broad and sweeping state inquiries into these protected areas discourage citizens from exercising rights protected by the Constitution." *Americans for Prosperity Found.*, 594 U.S. at 610 (cleaned up).

161. The Act punishes Glass Lewis for its membership in organizations that the State disfavors and therefore violates the First Amendment. Unless declared unconstitutional and its enforcement enjoined, S.B. 2337 will unlawfully deprive Glass Lewis of its freedom of association and cause Glass Lewis irreparable harm.

### COUNT III

**42 U.S.C. § 1983**
**VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS**

162. Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

163. The Due Process Clause of the Fourteenth Amendment "proscribes laws so vague that persons of common intelligence must necessarily guess at their meaning and differ as to their application." *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001) (cleaned up) (citation omitted).

164. A "fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012).

165. "A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Id.* Because the Act affects First Amendment rights, the test is especially stringent. *Book People, Inc. v. Wong*, 692 F. Supp. 3d 660, 695 (2023) (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)).

166. The Act fails this test. It gives the key phrase "solely in the financial interest of the shareholders," which appears in both sections 101 and 102, a vague and idiosyncratic definition. That sweeping, bespoke definition depends on buzzwords whose meanings are notoriously

amorphous and subjective, leaving the phrase open to politically charged interpretations. Glass Lewis must guess when to disclose and what to say—a wrong guess can result in steep penalties.

167.    The Act does not provide "a reasonable opportunity to know" when Glass Lewis must make the mandated disclosures and what those disclosures must contain. Section 101 requires proxy advisors to make disclosures when a proxy advisory service is "not provided solely in the financial interest of the shareholders." S.B. 2337 § 6A.101(a). But the Act gives that phrase a bespoke meaning dependent on undefined buzzwords. It applies to any advice that "takes into account[] one or more *nonfinancial factors*, including" *any* of the following factors: diversity, equity, inclusion, sustainability, environmental, social, or governance factors. *Id.* § 6A.101(a)(1) (emphasis added). This bespoke definition—at odds with reality—displaces any common understanding of the key phrase and replaces it with something subjective and vague. Section 102 employs the same phrase, presumably with its bespoke meaning. *Id.* § 6A.102(b)(3).

168.    The bespoke definition confuses rather than clarifies because it uses terms that are "broad and undefined" and susceptible to "multiple definitions." *CCIA*, 747 F. Supp. 3d at 1040; *People for Ethical Treatment of Animals v. Hinckley*, 526 F. Supp. 3d 218, 238 (S.D. Tex. 2021). When a statute "fails to define key categories," it is unconstitutionally vague. *Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575, 602 (W.D. Tex. 2025).

169.    "ESG" and "DEI" specifically are subject to shifting political and social interpretations. It is unclear whether advice that considers long-term risk, reputational harm, or regulatory compliance—factors often associated with ESG—would be deemed not "solely" in the shareholders' financial interest, even though such considerations are widely accepted as material to financial performance.

170.    Within ESG, the outer boundaries of the term "governance" are especially broad and unclear. It "encompasses so wide an ambit that people of common intelligence can do no more than guess at its application." *CCIA*, 747 F. Supp. 3d at 1040 (quotation marks omitted).

171.    In his CID, the Attorney General takes an extraordinarily broad view of "ESG." ECF 31-1, at 3-4. He defines "social" as "issues such as, but not limited to, workplace and board diversity . . . racial justice, environmental justice, social justice, pay equity, labor standards, wages and benefits, human rights, talent management, community relations, privacy and data protection, health and safety, and supply-chain management." *Id.* at 3. He defines "governance" as "corporate board composition and structure, strategic sustainability oversight and compliance, executive compensation, political contributions and lobbying, and bribery and corruption." *Id.* at 4. These are sweeping and unclear definitions. And applying this definition to S.B. 2337 would lead to absurd results: whenever Glass Lewis considers executive compensation, pay, and wages, it will have to tell clients it is considering "nonfinancial" factors.

172.    Indeed, the CID does not even purport to exhaustively define "ESG." The Attorney General could easily take an even broader definition of "ESG" under S.B. 2337.

173.    "DEI" is similarly ill-defined. Other federal courts have held that "vaguely-defined prohibitions on DEI initiatives" were void for vagueness. *NAACP v. U.S. Dep't of Educ.*, 2025 WL 1196212, at *6-7 (D.D.C. 2025); *Perkins Coie LLP v. U.S. Dep't of Justice*, 2025 WL 1276857, at *45-46 (D.D.C. 2025) (collecting cases).

174.    The Attorney General has taken a sweeping view of what DEI means and has used it to target law firms and major financial institutions. *See, e.g.*, Letter from Ken Paxton to JP Morgan Chase & Co., et al., (Jan. 27, 2025), available at https://perma.cc/2FVV-GUN2; Press Release, Office of the Att'y Gen., *Attorney General Ken Paxton Sues BlackRock, State Street, and*

*Vanguard for Illegally Conspiring to Manipulate Energy Markets, Driving Up Costs for Consumers*, (Nov. 27, 2024), available at https://perma.cc/84GD-36FV; Press Release, Office of the Att'y Gen., *Attorney General Ken Paxton Sues BlackRock, State Street, and Vanguard for Illegally Conspiring to Manipulate Energy Markets, Driving Up Costs for Consumers*, (Nov. 27, 2024), available at https://perma.cc/84GD-36FV.

175.    In an analogous case, a federal court struck down as vague a Missouri rule requiring securities firms to obtain consent before incorporating a "'nonfinancial objective' into their securities recommendations or investment advice." *Ashcroft*, 745 F. Supp. 3d at 790, 800-01.

176.    The same is true here: the definition of "solely in the financial interest of the shareholders" depends on terms that themselves are vague and subject to differing interpretations. And failure to comply can result in $10,000 penalties for each violation. Tex. Bus. & Com. Code § 17.47(c).

177.    For the same reasons the Act leaves ordinary people to guess at its meaning, "officials could attach different meaning to the words in an arbitrary and discriminatory manner," leading to arbitrary and discriminatory enforcement. *Shamloo v. Mississippi State Bd. of Trustees of Institutions of Higher Learning*, 620 F.2d 516, 523-24 (5th Cir. 1980). The lack of a commonly understood meaning for ESG and DEI means that enforcement will inevitably turn on the subjective views of the Attorney General, rather than any objective standard.

178.    The Attorney General's August 22 press release confirms his discriminatory intent. *See* Press Release, Attorney General Ken Paxton Defends State Law Protecting Texans from Proxy Advisors Pushing Woke Ideology (Aug. 22, 2025), available at https://perma.cc/J2CG-XQH8. In the press release, the Attorney General confirms he intends to selectively use S.B. 2337 to punish proxy advisors "from secretly trying to push a woke agenda" or "left-wing goals." *Id.* He states,

"S.B. 2337 stops liberal activists posing as proxy advisors from giving guidance based on their ideological goals" and accuses proxy advisors of "us[ing] their position to promote woke, left-wing ideology." *Id.* The Court should take the Attorney General at his word: he will use S.B. 2337 to discriminate against disfavored political views and selectively target positions he sees as "left-leaning." His own press release confirms the law is a blank check for discriminatory enforcement.

179.    Finally, the law is unconstitutionally vague because it does not give Glass Lewis a reasonable opportunity to know whether its speech outside Texas will be regulated. It is unclear whether Texas courts would conclude that the Act may properly be applied to speech occurring entirely outside of Texas. On that question, Texas courts employ a somewhat complex, indeterminate multi-part analysis. *See Pohl v. Cheatham*, 2025 WL 1349691, at *8-12 (Tex. May 9, 2025). First, they assess whether a law "expresses an intent that it apply extraterritorially"; and, if not, they assess whether a "suit seeks a permissible domestic application or an impermissible foreign application" by "identify[ing] the 'focus' of the Legislature's concern underlying the provision at issue." *Id.* at *8-9. The "focus" analysis sweeps in various considerations: the "focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate as well as the parties and interests it seeks to protect or vindicate." *Id.* at *9 (citation omitted). Courts "then ask whether the conduct relevant to that focus occurred within or outside Texas." *Id.*

180.    Glass Lewis cannot confidently predict how Texas courts would apply this multi-part analysis to proxy advice occurring outside of Texas. The Attorney General's interpretation does not help. He interprets the scope of the Act with qualifications not found anywhere in the statutory text—he states that the Act only regulates proxy advice "to Texas shareholders" or "other persons with authority to vote on behalf of shareholders in Texas." ECF 17 at 7. This second category of "persons with authority to vote on behalf of shareholders in Texas"—which has no

basis in the statutory text—would sweep in broad swaths of speech occurring entirely outside of Texas. This uncertainty over the scope of the speech outside Texas covered is one of the reasons the Act is unconstitutionally void for vagueness. If Glass Lewis guesses wrong about this issue, it could face claims for $10,000 penalties per violation.

181.    Unless declared unconstitutional and its enforcement enjoined, S.B. 2337 will unlawfully deprive Glass Lewis of its Due Process rights and cause Glass Lewis irreparable harm.

## COUNT IV

**FEDERAL STATUTORY PREEMPTION UNDER 29 U.S.C. §§ 1001 (ERISA), 42 U.S.C. § 1983, AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION**

182.    Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

183.    S.B. 2337 is preempted by ERISA, 29 U.S.C. §§ 1001, et seq.

184.    ERISA has a "broad pre-emption provision," which states that ERISA "supersede[s] any and all State laws insofar as they . . . relate to any employee benefit plan." 29 U.S.C. § 1144(a); *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137-38 (1990). Interpreting this language, the Supreme Court has held that ERISA preempts "a state law that has an impermissible 'connection with' ERISA plans, meaning a state law that governs a central matter of plan administration or interferes with nationally uniform plan administration." *Gobeille v. Liberty Mut. Ins.*, 577 U.S. 312, 320 (2016) (cleaned up) (citation omitted). ERISA preempts the Act because it inappropriately interferes with the information available to plan fiduciaries and puts a heavy thumb on the scale of what they should consider.

185.    Federal regulations require a plan fiduciary, such as an asset manager for a company pension plan, to "[e]valuate relevant facts that form the basis for any particular proxy vote." 29 C.F.R. § 2550.404a-1(d)(2)(ii). Fiduciaries' decisions "must be based on factors that the fiduciary reasonably determines are relevant to a risk and return analysis." *Id.* § 2550.404a-1(b)(4).

"Risk and return factors may include the economic effects of climate change and other environmental, social, or governance factors[.]" *Id.* "Whether any particular consideration is a risk-return factor depends on the individual facts and circumstances." *Id.* Thus, fiduciaries must consider "relevant facts," which, in various circumstances, will include environmental, social, or governance factors.

186.    ERISA also regulates fiduciaries' use of proxy advisors. A fiduciary may not "follow[] the recommendations of a proxy advisory firm . . . without a determination that such firm['s] . . . proxy voting guidelines are consistent with the fiduciary's obligations." 29 C.F.R. § 2550.404a-1(d)(2)(iii). So, when advising ERISA fiduciaries, Glass Lewis must evaluate relevant facts and "risk and return" factors, including ESG. Many of Glass Lewis' asset manager clients are ERISA fiduciaries. At these clients' requests, Glass Lewis signs certifications stating that it has considered relevant facts to show compliance with ERISA.

187.    The Act has the requisite connection with ERISA to fall within its broad pre-emption provision. S.B. 2337 interferes with a central matter of plan administration by shaping the advice Glass Lewis may give its employee-benefit-plan clients and actively discouraging the consideration of relevant facts. In doing so, the Act differentiates advice about Texas companies and thereby disrupts a nationally uniform system. The Act's disclosure requirements affect the substance of the advice given to fiduciaries, which necessarily affects their decisions. If each state, based on its own views of ESG and DEI, can shape what factors asset managers and their advisers consider in voting on their state's companies (including those incorporated in other states), ERISA's nationally uniform regulation of fiduciaries' proxy voting decisions will be severely disrupted.

188.    The Act interferes with ERISA's requirements for fiduciaries and their advisors in three ways:

189.    **First**, the Act's disclosure requirements—as expressly intended by the Act's sponsor—discourage proxy advisors from considering facts and factors that must be considered under ERISA. *See Nat'l Ass'n of Mfrs.*, 800 F.3d at 530 (recognizing effectiveness of requiring a company to publicly condemn itself to shape behavior). ERISA fiduciaries face an impossible choice under the law: ignore material financial considerations or follow advice that allegedly "subordinates the financial interests of shareholders."

190.    **Second**, when Glass Lewis considers all relevant facts (something ERISA fiduciaries must do), S.B. 2337 requires it to make statements that both stigmatize its advice and make it misleading. Because Glass Lewis must state that advice based on ESG or DEI "subordinates the financial interests of shareholders" and "sacrific[es] investment returns," the Act forces Glass Lewis to lie to ERISA fiduciaries and thereby interferes with their ability to properly evaluate a proxy advisory firm's recommendation.

191.    **Third**, by following a proxy advisor's recommendation marred by the Act's warnings, the fiduciary exposes itself to lawsuits for considering allegedly inappropriate factors. ERISA requires that fiduciaries act "solely in accordance with the economic interest of the plan and its participants and beneficiaries." 29 C.F.R. § 2550.404a-1(d)(2)(ii)(A); *see Utah v. Micone*, 766 F. Supp. 3d 669, 686 (N.D. Tex. 2025) (opining that ERISA rules "do not permit a fiduciary to act for . . . other purposes than the beneficiaries' financial benefit"). By considering advice labeled as "not solely in the financial interest of the company's shareholders," an ERISA fiduciary could be perceived to be violating its fundamental duty, opening itself to litigation. Perversely, the

risk stems from doing just what ERISA requires (but the Act undermines): considering relevant facts.

192.    In an analogous case, a court held that Missouri rules requiring securities firms to obtain a specified form of written consent before incorporating "nonfinancial objectives" into their recommendations were preempted by ERISA. *Ashcroft*, 745 F. Supp. 3d at 797. These rules were preempted by ERISA because they restricted "what investments may be recommended or selected" and "mandate[d] disclosure and recordkeeping requirements not required by ERISA." *Id.*

193.    The Act imposes similar requirements and is similarly preempted by ERISA.

194.    Unless declared preempted and its enforcement enjoined, S.B. 2337 will cause Glass Lewis irreparable harm.

### COUNT V

**U.S. Const., Art. I, § 8, cl. 3.**
**VIOLATION OF THE DORMANT COMMERCE CLAUSE**

195.    Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

196.    "The Commerce Clause provides that 'Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States.' Although the Constitution does not in terms limit the power of States to regulate commerce, [the Supreme Court has] long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) (citation omitted) (quoting U.S. Const., art. I, § 8, cl. 3).

197.    "Two primary principles mark the boundaries of a state's authority to regulate interstate commerce: A state (1) may not discriminate against interstate commerce and (2) may not impose undue burdens on interstate commerce." *Hignell-Stark v. City of New Orleans*, 46 F.4th 317, 325 (5th Cir. 2022) (citation omitted) (cleaned up).

198.    A law is unduly burdensome where "the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits." *Id.* (quotation marks omitted) (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

199.    S.B. 2337 fails that test. The purported purpose of the Act is to prevent shareholders from being defrauded, but the shareholders need not reside in Texas, so there is no guaranteed local benefit. *See infra* ¶¶ 179-180 (discussing speech outside Texas). Meanwhile, the Act burdens interstate commerce by requiring out-of-state proxy advisors to give out-of-state shareholders time-consuming, expensive, and distracting disclosures about companies that need not even be incorporated in Texas.

200.    The Act also opens up foreign companies to gamesmanship. A company with no Texas ties might put forth a resolution to reincorporate in Texas solely to trigger regulation under the Act. So, a recommendation provided by Glass Lewis, a non-Texas company, to non-Texas clients, about another non-Texas company's shareholder proposal, could be subject to the Act. The extreme burdens imposed by the law in these circumstances outweigh any hypothetical local benefit.

201.    The Act's discriminatory intent is made clear by the recent actions taken by the Attorney General. In the CID, the Attorney General demands documents related to Glass Lewis' recommendation that shareholders vote against MercadoLibre, Inc.'s proposal to reincorporate in Texas. *See* ECF 31-1. By issuing this CID, the Attorney General of Texas is seeking to punish Glass Lewis for recommending business be conducted outside Texas. That is the precise harm the Dormant Commerce Clause prevents: using the state police power to burden out-of-state commerce. This "differential treatment of in-state and out-of-state economic interests that benefits

the former and burdens the latter" violates the Dormant Commerce Clause. *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007).

202.    Unless declared invalid and its enforcement enjoined, S.B. 2337 will cause Glass Lewis irreparable harm.

## REQUESTS FOR RELIEF

### EQUITABLE RELIEF

203.    Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

204.    S.B. 2337 violates the Constitution and federal law, as applied to Glass Lewis, and deprives Glass Lewis of its enforceable rights secured by federal law.

205.    Federal courts have the power to enjoin actions by state officials that violate federal law. *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326-27 (2015).

206.    This Court can and should exercise its equitable power to enter a preliminary injunction and a permanent injunction precluding Attorney General Paxton (and those in his office) from enforcing S.B. 2337 against Glass Lewis.

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201
### DECLARATORY RELIEF

207.    Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

208.    For the reasons discussed above, S.B. 2337 violates the First and Fourteenth Amendments, including the Free Speech Clause, the right of association, and the Due Process Clause, as applied to Glass Lewis, and thereby deprives Glass Lewis of its enforceable rights.

209.    For the reasons discussed above, S.B. 2337 is void for vagueness under the Due Process Clause of the Fourteenth Amendment, as applied to Glass Lewis.

210.    For the reasons discussed above, S.B. 2337 is preempted by federal law, as applied to Glass Lewis.

211.    For the reasons discussed above, S.B. 2337 violates the Dormant Commerce Clause, U.S. Const., art. I, § 8, cl. 3, as applied to Glass Lewis.

212.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

213.    This Court can and should exercise its power to enter a declaration that S.B. 2337 is unconstitutional and otherwise unlawful, as applied to Glass Lewis.

### PRAYER FOR RELIEF

Glass Lewis respectfully requests that the Court:

A.    Declare that S.B. 2337 is unlawful, as applied to Glass Lewis;

B.    Declare that S.B. 2337 violates the First and Fourteenth Amendments, including the Free Speech Clause, the right of association, and the Due Process Clause, as applied to Glass Lewis;

C.    Declare that S.B. 2337 is void for vagueness under the Due Process Clause of the Fourteenth Amendment, as applied to Glass Lewis;

D.    Declare that S.B. 2337 is preempted by federal law, as applied to Glass Lewis;

E.    Declare that S.B. 2337 violates the Dormant Commerce Clause, U.S. Const., art. I, § 8, cl. 3, as applied to Glass Lewis;

F.    Preliminarily and permanently enjoin Ken Paxton, in his official capacity as Attorney General of Texas—and his officers, agents, and employees, including the Consumer Protection Division of the Office of the Attorney General, and all other persons who are in active concert or participation with the Attorney General—from enforcing S.B. 2337 against Glass Lewis;

G.    Enter judgment in favor of Glass Lewis;

H. Award Glass Lewis its reasonable attorneys' fees and costs incurred in bringing this action under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

I. Award Glass Lewis all other such relief as the Court deems just and proper.

Dated: November 20, 2025                    Respectfully submitted,

                                            YETTER COLEMAN LLP

                                            /s/ *Bryce L. Callahan*
                                            Bryce L. Callahan
                                            State Bar No. 24055248
                                            bcallahan@yettercoleman.com
                                            Grant B. Martinez
                                            State Bar No. 24104118
                                            gmartinez@yettercoleman.com
                                            Lily E. Hann
                                            State Bar No. 24133836
                                            lhann@yettercoleman.com
                                            Jared LeBrun
                                            State Bar No. 24144647
                                            jlebrun@yettercoleman.com
                                            811 Main Street, Suite 4100
                                            Houston, Texas  77002
                                            (713) 632-8000
                                            (713) 632-8002 (fax)

                                            *Attorneys for Plaintiff Glass, Lewis & Co., LLC*

## Certificate of Service

I certify that on November 20, 2025, a copy of this document will be served on counsel of record via the Court's e-filing system.

                                            /s/ *Bryce L. Callahan*
                                            Bryce L. Callahan