UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| GLASS, LEWIS & CO., LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KEN PAXTON, *in his Official Capacity as* | ) | |
| *Attorney General of Texas,* | ) | |
| | ) | |
| Defendant, | ) | Civil Action No. 1:25-cv-01153-ADA |
| | ) | |
| THE TEXAS STOCK EXCHANGE LLC | ) | |
| and THE TEXAS ASSOCIATION OF | ) | |
| BUSINESS, | ) | |
| | ) | |
| Intervenor-Defendants. | ) | |

**PLAINTIFF GLASS LEWIS' MOTION FOR SUMMARY JUDGMENT**

YETTER COLEMAN LLP
Bryce L. Callahan
State Bar No. 24055248
bcallahan@yettercoleman.com
Grant B. Martinez
State Bar No. 24104118
gmartinez@yettercoleman.com
Lily E. Hann
State Bar No. 24133836
lhann@yettercoleman.com
Jared LeBrun
State Bar No. 24144647
jlebrun@yettercoleman.com
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
(713) 632-8002 (fax)

*Attorneys for Plaintiff Glass, Lewis & Co., LLC*

# TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Statement of Facts ................................................................................................. 1

I.    Glass Lewis provides advice and recommendations on corporate governance
      matters. ........................................................................................................ 1

II.   The Texas Legislature seeks to prevent proxy advisors' considering DEI and ESG
      in their speech. ........................................................................................... 2

III.  Overview of S.B. 2337 ................................................................................. 3

      A.   The Act applies to proxy advice and recommendations on Texas
           companies. ........................................................................................... 3

      B.   Section 101 mandates disclosures when advice reflects certain viewpoints. ......... 3

      C.   Section 102 requires disclosures when a proxy advisor provides differing
           advice or advice contrary to the views of a company's management .................... 4

      D.   The Act expressly authorizes enforcement by the Attorney General. ................... 5

      E.   The Attorney General's Office has begun official enforcement of the Act
           against Glass Lewis ............................................................................... 5

Legal Standards ..................................................................................................... 6

Argument ............................................................................................................... 6

I.    Glass Lewis has Article III Standing to Challenge the Act. ................................ 6

      A.   Glass Lewis has economic and constitutional injuries-in-fact. ........................ 6

      B.   Glass Lewis' injuries are traceable to the Attorney General's enforcement
           and redressable through a declaration and injunction restraining him. ............... 7

II.   Sovereign Immunity Does Not Protect the Attorney General from Suit. ............... 8

III.  Merits: As Applied to Glass Lewis, the Act Violates the First Amendment. ........... 9

      A.   Applying viewpoint discrimination analysis, the Act is unconstitutional. ........... 9

           1.    Overview of viewpoint-discrimination principles. ............................... 9

           2.    The Act discriminates against particular views on its face ..................... 10

           3.    The purpose of the Act is to discriminate against certain
                 viewpoints. ........................................................................... 12

           4.    At minimum, viewpoint discrimination triggers strict scrutiny,
                 regardless of category. .............................................................. 12

      B.   The Act fails strict scrutiny ...................................................................... 14

C.     Using the same analysis as *Book People*, the Act compels speech in violation of the First Amendment. ........................................................... 16

D.     *Zauderer* does not apply. ..................................................................... 18

    1.     The compelled self-shaming statements are not "uncontroversial." ......... 18

    2.     The compelled self-shaming statements are not "purely factual." ........... 20

    3.     The Act does not regulate commercial speech or advertising. ................. 22

E.     The Act cannot survive scrutiny under *Central Hudson*. .................................... 23

IV.    Merits: As Applied to Glass Lewis, the Act is Unconstitutionally Vague. ...................... 24

A.     Persons of ordinary intelligence must guess at the Act's meaning....................... 25

B.     The Act allows arbitrary and discriminatory enforcement. ................................... 27

V.    The Remaining Permanent Injunction Factors Favor Glass Lewis. ................................... 29

A.     Glass Lewis faces irreparable harm, for which remedies at law are inadequate. ........................................................................................... 29

B.     The balance of harms and public interest favor permanent injunctive relief........ 30

Conclusion and Prayer ........................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**                                                         **Page(s)**

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023) ................................................................................................ 16, 17

*Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*,
    851 F.3d 507 (5th Cir. 2017) .................................................................................... 8

*Bolger v. Youngs Drug Prods. Corp.*,
    463 U.S. 60 (1983) ................................................................................................... 22

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) ............................................................................. *passim*

*Book People, Inc. v. Wong*,
    2025 WL 3035109 (W.D. Tex. 2025) ................................................................. *passim*

*Brown v. Entm't Merchants Ass'n*,
    564 U.S. 786 (2011) ................................................................................................. 15

*Cocroft v. Graham*,
    122 F.4th 176 (5th Cir. 2024) ................................................................................. 23

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ................................................................................................. 6

*Edenfield v. Fane*,
    507 U.S. 761 (1993) ................................................................................................. 24

*Elrod v. Burns*,
    427 U.S. 347 (1976) ................................................................................................. 29

*Free Speech Coal., Inc. v. Paxton*,
    95 F.4th 263 (5th Cir. 2024) ............................................................................. *passim*

*Free Speech Coal., Inc. v. Paxton*,
    606 U.S. 461 (2025) ........................................................................................... 14, 15

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ................................................................................................. 28

*Harris v. Quinn*,
    573 U.S. 616 (2014) ................................................................................................. 22

*Healthy Vision Ass'n v. Abbott*,
    138 F.4th 385 (5th Cir. 2025) .............................................................................. 9, 30

*Hignell-Stark v. City of New Orleans*,
  154 F.4th 345 (5th Cir. 2025) .................................................................. 23

*Iancu v. Brunetti*,
  588 U.S. 388 (2019) ................................................................. 10, 12, 13

*In re Paxton*,
  60 F.4th 252 (5th Cir. 2023) ...................................................................... 8

*Inst. for Free Speech v. Johnson*,
  148 F.4th 318 (5th Cir. 2025) .......................................................... 7, 8, 9

*Institutional S'holder Servs., Inc. v. SEC*,
  142 F.4th 757 (D.C. Cir. 2025) .................................................................. 1

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022) ................................................................................ 15

*Lorillard Tobacco Co. v. Reilly*,
  533 U.S. 525 (2001) ................................................................................ 24

*Mahmoud v. Taylor*,
  606 U.S. 522 (2025) ................................................................................ 29

*Matal v. Tam*,
  582 U.S. 218 (2017) ................................................................................ 13

*Minn. Voters All. v. Mansky*,
  585 U.S. 1 (2018) .................................................................................... 13

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ........................................................................*passim*

*NAACP v. Button*,
  371 U.S. 415 (1963) ................................................................................ 28

*NAACP v. U.S. Dep't of Educ.*,
  779 F. Supp. 3d 53 (D.D.C. 2025) .......................................................... 26

*Nat'l Ass'n for Gun Rts., Inc. v. Garland*,
  2023 WL 5610293 (N.D. Tex. 2023) ...................................................... 29

*Nat'l Ass'n of Mfrs. v. SEC*,
  800 F.3d 518 (D.C. Cir. 2015) ................................................................ 17

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
  585 U.S. 755 (2018) ................................................................ 15, 16, 22, 24

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024) ............................................................................................... 10

*NH Attorney Gen.*,
    2025 WL 2807652 (D.N.H. 2025) ................................................................ 26, 27

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*,
    475 U.S. 1 (1986) ................................................................................................... 23

*Papachristou v. City of Jacksonville*,
    405 U.S. 156 (1972) ............................................................................................... 28

*Perkins Coie LLP v. U.S. Dep't of Justice*,
    783 F. Supp. 3d 105 (D.D.C. 2025) .................................................................... 26

*Pohl v. Cheatham*,
    718 S.W.3d 173 (Tex. 2025) ................................................................................. 26

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ............................................................................................... 13

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015) ....................................................................................... 9, 10, 14

*Rest. L. Ctr. v. DOL*,
    66 F.4th 593 (5th Cir. 2023) ................................................................................ 29

*RJ Reynolds Tobacco Co. v. FDA*,
    96 F.4th 863 (5th Cir. 2024) .............................................................. 14, 18, 19, 20

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ......................................................................................... 10, 12

*Sec. Indus. & Fin. Markets Ass'n v. Ashcroft*,
    745 F. Supp. 3d 783 (W.D. Mo. 2024) .............................................................. 20

*Serafine v. Branaman*,
    810 F.3d 354 (5th Cir. 2016) ............................................................................... 22

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ............................................................................................... 13

*Students Engaged in Advancing Tex. v. Paxton*,
    765 F. Supp. 3d 575 (W.D. Tex. 2025) ............................................................ 8, 25

*Turner Broad. Sys., Inc. v. F.C.C.*,
    512 U.S. 622 (1994) ............................................................................................... 13

*Vidal v. Elster*,
  602 U.S. 286 (2024) .................................................................................... 9, 13

*Wages & White Lion Investments, L.L.C. v. U.S. FDA*,
  16 F.4th 1130 (5th Cir. 2021) ......................................................................... 29

*Woodlands Pride, Inc. v. Paxton*,
  --- F.4th ----, 2025 WL 3096979 (5th Cir. 2025) ............................................ 8

*Zauderer v. Office of Disciplinary Coun. of Supreme Ct. of Ohio*,
  471 U.S. 626 (1985) ........................................................................................ 18

**Statutes**

S.B. 2337 .................................................................................................. *passim*

Tex. Bus. & Com. Code § 17.47 ................................................................ 5, 8, 25

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................... 6

**Federal Register Notices**

*Proxy Voting Advice*,
  87 Fed. Reg. 43,168 (July 19, 2022) ............................................................ 2, 21

*Regulation of Communications Among Shareholders*,
  57 Fed. Reg. 48,276 (Oct. 22, 1992) ............................................................ 2, 21

## INTRODUCTION

Plaintiff Glass, Lewis & Co., LLC ("Glass Lewis") moves for summary judgment. It requests that the Court (1) declare that S.B. 2337 (the "Act", Ex. A), as applied to Glass Lewis, violates the Constitution and (2) permanently enjoin the Attorney General of Texas from enforcing the Act against Glass Lewis. The following analysis turns on the statutory text and legislative history of the Act, with few material facts required. As to those few facts, there is no genuine dispute, and Glass Lewis is entitled to judgment as a matter of law.

## STATEMENT OF FACTS

### I.     Glass Lewis provides advice and recommendations on corporate governance matters.

Glass Lewis is a proxy advisory firm as defined by the Act because it provides proxy advisory services to shareholders of Texas companies and others with authority to vote on behalf of Texas companies' shareholders. S.B. 2337 § 6A.001(3); Decl. of J. Wieck (Ex. 1) ¶ 4. Glass Lewis' core business is providing speech defined by the Act as a "proxy advisory service": advice and recommendations on how to vote on proposals; proxy statement research and analysis regarding proposals; ratings and research regarding corporate governance; and development of proxy voting recommendations or policies. S.B. 2337 § 6A.001(4); Ex. 1 ¶ 5. Glass Lewis provides such speech to clients both in Texas and outside Texas. Ex. 1 ¶ 6.

Glass Lewis takes into account corporate governance factors in virtually every report that it provides. *Id.* ¶ 7. Glass Lewis' recommendations are tailored to clients' voting policies. *Id.* ¶ 8. Because different clients adopt different voting policies, it is common—and entirely expected and appropriate—for Glass Lewis to provide differing recommendations on the same ballot item to different clients. *Id.* No client has suggested this advice is deceptive. *Id.* ¶ 10.

"Proxy-voting advice rendered by a third party for a fee . . . is simply a recommendation." *Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 768 (D.C. Cir. 2025). For decades, the

SEC has recognized that commentary on the "desirability of a particular initiative subject to a shareholder vote is by its nature judgmental" and "there is typically not a 'correct' viewpoint." SEC, *Regulation of Communications Among Shareholders*, 57 Fed. Reg. 48,276, 48,278 (Oct. 22, 1992) (Ex. 2). The SEC "recognize[s] that the formulation of proxy voting advice often requires subjective determinations and the exercise of professional judgment[.]" SEC, *Proxy Voting Advice*, 87 Fed. Reg. 43,168, 43,181 (July 19, 2022) (Ex. 3). Glass Lewis' reports contain the following disclaimer:

> "Glass Lewis' proxy vote recommendations are solely statements of opinion, and not statements of fact, on matters that are, by their nature, judgmental."

ECF 5-4 at 27; ECF 5-5 at 45; Ex. 1 ¶ 34.

## II.    The Texas Legislature seeks to prevent proxy advisors' considering DEI and ESG in their speech.

In recent years, ESG and DEI have come to the forefront of public discourse. The Texas Legislature became concerned about proxy advisors' expression of certain views on these issues, and, in response, crafted a novel, unprecedented law seeking to change proxy advisors' speech. Introducing a companion bill in the House, the bill's sponsor expressed "that these [proxy advisory] firms are basing their advice to clients based on factors . . . such as in many cases environmental, social, and governance, political hot-button issues, DEI factors." Decl. of J. LeBrun (ECF 6) ¶ 6. The bill's sponsor in the Senate had similar concerns: "Sadly, in recent years, proxy advisory firms have become increasingly political and with a hard left bent. . . . Some are basing their advice on ESG standards, other times on DEI priorities." *Id.* ¶ 5. That same Senate sponsor noted the connection between proxy advisors' speech and important matters of public concern: this is an "area where tremendous policy decisions are being made by folks . . . who have never publicly stated positions on so many issues that affect our daily lives." *Id.*

The bill's sponsor said the "point" of the Act was to "prevent" advice focused on certain

factors: "the point here is to make sure that proxy advisory firms, when they're rendering advice . . . that they're focused on economic factors . . . . So, when they're focused on non-economic-type factors, whether it's ESG, whether it's DEI . . . that's what we want to prevent." *Id.* ¶ 4.

## III.    Overview of S.B. 2337.

The Act burdens speech reflecting disfavored viewpoints and compels private parties to broadcast the government's viewpoint. *See* 2d Am. Compl., ECF 59, ¶¶ 12-29.

### A.    The Act applies to proxy advice and recommendations on Texas companies.

The Act has a broad scope. It covers "proxy advisors," but defines that term to cover anyone who gets paid to provide to shareholders of a Texas company any of the following forms of speech:

(A)    advice or a recommendation on how to vote on a proxy proposal or company proposal;

(B)    proxy statement research and analysis regarding a proxy proposal or company proposal;

(C)    a rating or research regarding corporate governance; or

(D)    development of proxy voting recommendations or policies, including establishing default recommendations or policies.

S.B. 2337 § 6A.001(3)-(4). The Act's definition of "company" extends the scope of the Act to speech about companies incorporated or headquartered in Texas or companies that have proposed to move here. *See id.* § 6A.001(1).

Glass Lewis regularly engages in these covered forms of speech about Texas companies or companies that propose to move here. Ex. 1 ¶ 5.

### B.    Section 101 mandates disclosures when advice reflects certain viewpoints.

Section 101 requires disclosures when proxy advisors' advice is not provided "solely in the financial interest of the shareholders," as that phrase is defined by the Act. S.B. 2337 § 6A.101(a). The Act defines that phrase vaguely and misleadingly. In part, it states that advice "is not provided solely in the financial interest of the shareholders" whenever it "takes into

account[] one or more nonfinancial factors," including "an environmental, social, or governance (ESG) goal, factor, or investment principle" or "diversity, equity, or inclusion (DEI)" or "sustainability"; "involves providing a voting recommendation with respect to a shareholder-sponsored proposal that . . . is inconsistent with the voting recommendation of the board of directors"; or "advises against a company proposal to elect a governing person unless the proxy advisor affirmatively states that the proxy advisory service solely considered the financial interest of the shareholders in making such advice." *Id.* This bespoke definition is broad, vague, and conflicts with ordinary meaning.

If one of these ill-defined circumstances applies, the Act compels the proxy advisor to publicly and harshly disparage its own services through warnings to its clients and on its website homepage. *Id.* § 6A.101(b). The proxy advisor must publish the government-mandated statements, even if it believes they are false or misleading.

In these warnings, the advisor must tell its client that the advice "is not being provided solely in the financial interest of the company's shareholders." *Id.* § 6A.101(b)(1)(A). The advisor must also state that "the advice subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk to promote one or more nonfinancial factors." *Id.* § 6A.101(b)(1)(B). The disclosure must be provided to each shareholder receiving the advice and to the company. *Id.* § 6A.101(b)(1)-(2). Also, the advisor must "publicly and conspicuously disclose" on its homepage that its "proxy advisory services include advice and recommendations that are not based solely on the financial interest of shareholders." *Id.* § 6A.101(b)(3).

### C.    Section 102 requires disclosures when a proxy advisor provides differing advice or advice contrary to the views of a company's management.

Section 102 compels speech when a proxy advisor provides different voting advice to

different clients (even though they may be differently situated or have different investing approaches) *or* advice "in opposition to the recommendation of the company's management." *Id.* § 6A.102(a). The proxy advisor must notify the clients of "conflicting" advice and must identify "which of the conflicting advice or recommendations" is "provided solely in the financial interest of the shareholders" and is "supported by any specific financial analysis." *Id.* § 6A.102(b). This compelled speech must be provided to:

> (A)  each shareholder receiving the advice or recommendation;
> (B)  each entity or other person receiving the advice or recommendation on behalf of a shareholder;
> (C)  the company that is the subject of the company or proxy proposal; and
> (D)  the attorney general[.]

*Id.* § 6A.102(b)(2).

### D.    The Act expressly authorizes enforcement by the Attorney General.

The Act contains an express enforcement provision for the Attorney General. It specifies that a violation "is actionable under section 17.47" of the Business and Commerce Code, which is enforced solely by the Consumer Protection Division of the Attorney General's Office. *Id.* § 6A.201; Tex. Bus. & Com. Code § 17.47. Section 17.47 permits the Attorney General to seek civil penalties of "$10,000 per violation"—without defining what qualifies as a "violation"—and seek injunctive relief. Tex. Bus. & Com. Code § 17.47(a), (c).

### E.    The Attorney General's Office has begun official enforcement of the Act against Glass Lewis.

The Consumer Protection Division has attempted to enforce the Act against Glass Lewis. It issued a Civil Investigative Demand ("CID") to Glass Lewis seeking information directly related to the Act. *See* Civil Investigative Demand (Ex. 4). For example, the CID demands documents regarding Glass Lewis' "disclaimers or explanations about the opportunity cost to ESG-oriented decisions . . . communicated prior or during . . . rendering of advisory services to institutional

investors" and "disclaimers or explanations about potential conflicts of interest to your rendering of advisory services"—which map directly onto the Act's required disclosures. Ex. 4 at 6.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To receive a permanent injunction, a plaintiff must first establish success on the merits and then meet a four-part test showing that: (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

## ARGUMENT

## I.    Glass Lewis has Article III Standing to Challenge the Act.

At the preliminary injunction phase, this Court correctly determined that Glass Lewis has Article III standing. *See* Text Order (Aug. 29, 2025). Glass Lewis easily satisfies the requirements. *See Book People, Inc. v. Wong*, 2025 WL 3035109, at *4 (W.D. Tex. 2025). "If a plaintiff is an object of a regulation, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.*

### A.    Glass Lewis has economic and constitutional injuries-in-fact.

On injury-in-fact, Glass Lewis has both economic and constitutional injuries. *See Book People, Inc. v. Wong*, 91 F.4th 318, 328-32 (5th Cir. 2024). "[E]conomic harm—like damage to one's business interest—is a quintessential Article III injury." *Id.* at 331. The Fifth Circuit has "found a concrete injury when a plaintiff is forced to divert time and resources away from their

regular business." *Id.* (cleaned up). Glass Lewis was already forced to divert time and resources away from its regular business to try to comply with the Act before the preliminary injunction; and, absent an injunction, it would be forced to expend significant amounts to develop the systems and hire the personnel necessary to comply with the Act. Ex. 1 ¶¶ 18-24.

Glass Lewis will also suffer constitutional injury because: (1) it intends to continue providing advice that is covered by the Act; (2) the Act proscribes the course of conduct that Glass Lewis would engage in otherwise—providing advice and recommendations on Texas companies to its clients *without* broadcasting Texas' views and *without* falsely denigrating itself on its own website; and (3) the threat of enforcement is credible and substantial. *Id.* ¶¶ 11-17; *see Book People*, 91 F.4th at 329-32.

On the threat of enforcement prong, courts "assume that Plaintiffs face a credible threat of enforcement [when] the State has provided no compelling contrary evidence." *Book People*, 91 F.4th at 330 (quotation marks omitted). Here, Glass Lewis has far more than that assumption: the Attorney General issued the CID to Glass Lewis, taking official action to enforce the Act against Glass Lewis. Ex. 4. And he has issued numerous press releases and letters indicating he will enforce DEI- and ESG-related laws against Glass Lewis—including specifically S.B. 2337. *See* Exs. 6-8, 15. The economic and constitutional injuries satisfy the injury-in-fact requirement.

### B. Glass Lewis' injuries are traceable to the Attorney General's enforcement and redressable through a declaration and injunction restraining him.

Generally, traceability and redressability elements "are easily satisfied when the potential enforcement of the challenged law causes injury, and the injury could be redressed by enjoining enforcement of the challenged law." *Inst. for Free Speech v. Johnson*, 148 F.4th 318, 330 (5th Cir. 2025) (cleaned up). Traceability requires that Glass Lewis show "a causal connection between the injury and the conduct complained of." *Book People*, 91 F.4th at 332. The Attorney General

enforces the Act through his office's Consumer Protection Division, so his "potential enforcement" of the Act has a causal connection to Glass Lewis' injury. *Inst. for Free Speech*, 148 F.4th at 331; S.B. 2337 § 6A.201; Tex. Bus. & Comm. Code § 17.47.

Redressability requires only that Glass Lewis show "a favorable decision will relieve a discrete injury." *Book People*, 91 F.4th at 332. A declaration and injunction against the Attorney General would "remove a 'discrete injury' caused by state defendants' enforcement of" the Act. *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 515 (5th Cir. 2017); *Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575, 589 (W.D. Tex. 2025) (law enforced by Consumer Protection Division was traceable to Attorney General and redressable through an injunction against him). Thus, Glass Lewis has established Article III standing.

## II.    Sovereign Immunity Does Not Protect the Attorney General from Suit.

The Attorney General correctly conceded sovereign immunity at the preliminary injunction hearing. Hr'g Tr. at 13:23-25 (ECF 37). Sovereign immunity does not protect him from suit because he is a state official who bears a "sufficient connection" to the Act's enforcement. *Book People*, 91 F.4th at 335. This inquiry "significantly overlap[s]" with standing. *Id.* (citation omitted). The *Ex parte Young* exception applies if the official has "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Id.* (citation omitted).

The "*Ex parte Young* exception . . . turns principally on whether Paxton is statutorily tasked with enforcing the challenged law." *In re Paxton*, 60 F.4th 252, 257 (5th Cir. 2023). Here, the Act expressly authorizes the Attorney General's enforcement. S.B. 2337 § 6A.201; Tex. Bus. & Com. Code § 17.47. The Attorney General's Consumer Protection Division has sole authority to recover civil penalties for S.B. 2337 violations and the authority to obtain injunctions to restrain S.B. 2337 violations. *Id.* This suffices to show he has the "particular duty" to enforce the Act. *Woodlands Pride, Inc. v. Paxton*, --- F.4th ----, 2025 WL 3096979, at *6 n.8 (5th Cir. 2025).

On willingness, a plaintiff "has only to provide 'some scintilla' of an indication that a defendant official is willing to enforce the challenged statute[.]" *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 398 (5th Cir. 2025); *accord Book People*, 91 F.4th at 335. Glass Lewis has provided much more than a scintilla here. The Attorney General has demonstrated willingness to enforce the Act (1) by taking official steps to enforce the Act—issuing the CID to Glass Lewis; and (2) by stating, in connection with DEI and ESG, "[a]ny institution found to be violating the law will be held accountable." Ex. 4 at 6; Ex. 5 at 2. He issued other press releases indicating he is willing to enforce the Act. *See* Exs. 6- 8. "[T]here is no indication that [the Attorney General] will not initiate enforcement here. *Ex parte Young* therefore applies." *Inst. for Free Speech*, 148 F.4th at 333.

III.    **Merits: As Applied to Glass Lewis, the Act Violates the First Amendment.**

As applied to Glass Lewis, the Act violates the First Amendment. There are multiple analytical paths that yield this conclusion. First, the Act engages in viewpoint discrimination, rendering it either *per se* unconstitutional or, at minimum, subject to strict scrutiny, which it cannot survive. Second, like the law in this Court's recent *Book People* decision, the Act impermissibly compels Glass Lewis' speech, and no exception applies to save the Act.

A.    **Applying viewpoint discrimination analysis, the Act is unconstitutional.**

1.    **Overview of viewpoint-discrimination principles.**

There are "two distinct but related limitations that the First Amendment places on government regulation of speech." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 168-69 (2015). First, content-based discrimination targets *topics*; it exists when a law "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163. Second, a "viewpoint-based regulation targets not merely a subject matter, but particular *views* taken by speakers on a subject." *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (emphasis added) (quotation marks omitted). "Government discrimination among viewpoints . . . is a more blatant and

egregious form of content discrimination." *Reed*, 576 U.S. at 168 (quotation marks omitted).

"At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). Indeed, a "core postulate of free speech law" is: "The government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019). A state "cannot advance some points of view by burdening the expression of others. To give government that power is to enable it to control the expression of ideas, promoting those it favors and suppressing those it does not. And that is what the First Amendment protects all of us from." *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024) (quotation marks and citation omitted). So, the First Amendment achieves its goals "not by licensing the government to stop *private actors* from speaking as they wish and preferring some views over others," but rather "by preventing *the government* from tilting public debate in a preferred direction." *Id.* at 741 (alteration and quotation marks omitted) (original emphasis).

The Supreme Court has recognized that laws can engage in viewpoint discrimination in at least two ways: (1) "facial viewpoint bias," where "the statute, on its face, distinguishes between two opposed sets of ideas" in regulating speech; and (2) viewpoint discrimination in purpose, "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *See Iancu*, 588 U.S. at 394-95; *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). In regulating Glass Lewis' speech, the Act engages in viewpoint discrimination both on its face and in its purpose.

### 2.    The Act discriminates against particular views on its face.

On its face, whenever Glass Lewis' opinions express certain viewpoints disfavored by the Texas government, the Act compels Glass Lewis to broadcast the government's contrary viewpoint and publicly, harshly condemn itself. Under Section 101, when Glass Lewis' speech (1) *supports*

the relevance of various factors—like corporate governance—to shareholders' interests, or (2) advises *against* a Texas company's proposal, Glass Lewis must:

- Tell its own clients that "the advice *subordinates the financial interest of shareholders* to other objectives, including *sacrificing investment returns* or undertaking additional investment risk."

- Tell its own clients that its advice is "not being provided solely in the financial interest of the company's shareholders."

- Publicly and "conspicuously disclose" on its own website homepage that its services "include advice and recommendations that are not based solely on the financial interest of the shareholders."

S.B. 2337 §§ 6A.101(a), (b)(1)(A)-(B), (b)(3) (emphasis added). Under Section 102, when Glass Lewis recommends voting "in opposition to the recommendation of the company's management," it must label its recommendation as "conflicting" and somehow "disclose which of the conflicting advice or recommendations is . . . provided solely in the financial interest of the shareholders." *Id.* § 6A.102(a)(3), (b)(2)-(3).[1] The opposing viewpoints (*against* the relevance of the listed factors or *in favor of* companies' proposals) are not likewise burdened with the compelled statements. The following chart gives two examples of the facial viewpoint bias:

|              **Views burdened by the Act**              |            **Contrary views unburdened by the Act**            |
| ------------------------------------------------------- | ------------------------------------------------------------- |
| Anti-management: "In our opinion, the board of directors' proposal is not in the long-term interest of shareholders, and we recommend you vote AGAINST." | Pro-management: "We think the board of directors' proposal is in the interest of shareholders, and we recommend you vote FOR." |
| Pro-governance-relevance: "In recommending you vote FOR the proposal, we took into account our view that corporate governance factors are essential to shareholders' financial interests." | Anti-governance-relevance: "We recommend you vote AGAINST. In making this recommendation, we have not considered corporate governance factors in any way because of our belief that they do not matter." |

Thus, the Act engages in viewpoint discrimination because "the statute, on its face,

---

[1] Glass Lewis strongly disagrees with these statements and would never make them absent the threat of governmental penalties. Ex. 1 ¶¶ 13-14.

distinguishes between two opposed sets of ideas": those supporting the relevance of the listed factors and those hostile to such relevance; those who view company management's proposal as good for shareholders and those who view such proposal as bad for shareholders. *See Iancu*, 588 U.S. at 394. As a result, "it must be invalidated." *Id.* at 398-99.

### 3.    The purpose of the Act is to discriminate against certain viewpoints.

This viewpoint discrimination is by design. The legislative sponsor and the Attorney General both agree that the "point" of the Act is to "prevent" expression of certain viewpoints when giving opinions and advice:

> **Bill sponsor:** "[T]he point here is to make sure that proxy advisory firms, *when they're rendering advice* . . . that they're focused on economic factors . . . . So, *when they're focused on non-economic-type factors*, whether it's ESG, whether it's DEI . . . that's what *we want to prevent*."

> **Attorney General:** "S.B. 2337 *stops liberal activists* posing as proxy advisors *from giving guidance based on their ideological goals* without making that clear to their clients."

> **Attorney General:** "S.B. 2337 would *prevent* companies from secretly *trying to push a woke agenda* in corporate America by forcing them to disclose *if their motivations are aimed at promoting political goals*, including DEI and ESG."

ECF 6 ¶ 4; Ex. 7 (emphases added). Thus, "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. This viewpoint-discriminatory purpose is reflected in the viewpoint discrimination on the Act's face.

### 4.    At minimum, viewpoint discrimination triggers strict scrutiny, regardless of category.

"Modern First Amendment cases establish a *per se* rule making the punishment of speech flatly unconstitutional if the penalty is based on . . . the undesirability of the viewpoint expressed. . . . While the First Amendment as a whole is not an absolute, the prohibition against viewpoint discrimination is a 'pocket of absolutism' in which the Supreme Court has tolerated no

abridgments." 1 Rodney A. Smolla, *Smolla & Nimmer on Freedom of Speech* § 4:8 (Mar. 2025).

Recent Supreme Court opinions support this conclusion. "[R]estrictions . . . based on viewpoint are prohibited." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018). "[I]t is all but dispositive to conclude that a law is . . . viewpoint discriminatory." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011). "The Court's finding of viewpoint bias ended the matter." *Iancu*, 588 U.S. at 399. "The government may not discriminate against speech based on the ideas or opinions it conveys." *Id.* at 393. A state "cannot advance some points of view by burdening the expression of others." *Moody*, 603 U.S. at 744. Just a flat prohibition—no balancing or tiers of scrutiny required.

Viewpoint discrimination always requires at least strict scrutiny—even for commercial speech or categorically unprotected speech. "The First Amendment requires heightened scrutiny *whenever* the government creates a regulation of speech because of disagreement with the message it conveys. . . . Commercial speech is no exception." *Sorrell*, 564 U.S. at 566 (emphasis added); *see also Matal v. Tam*, 582 U.S. 218, 251 (2017) (Kennedy, J., concurring) (same); *accord Vidal*, 602 U.S. at 293. For example, "a State may choose to regulate price advertising in one industry . . . because the risk of fraud . . . is in its view greater there. But a State may not prohibit only that commercial advertising that depicts men in a demeaning fashion." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388-89 (1992) (citations omitted). So, too, for unprotected speech: "the government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government." *Id.* at 384, 388-89. Supreme Court precedents "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). "Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny." *Id.* Thus, viewpoint discrimination *always* requires at least strict scrutiny.

B.    **The Act fails strict scrutiny.**

If the Court does not conclude the Act is *per se* unconstitutional for its viewpoint discrimination, the Act should fail because it cannot survive strict scrutiny. As discussed above, *viewpoint* discrimination always requires at least strict scrutiny. Beyond viewpoint discrimination, the Fifth Circuit "generally review[s] content-based regulations of speech under strict scrutiny unless they come within an exception such as the commercial speech exceptions of *Zauderer* or *Central Hudson.*" *RJ Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 876 (5th Cir. 2024). "[S]trict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based." *Reed*, 576 U.S. at 166.

Here, the Act engages in content-based discrimination. It "target[s] speech based on its communicative content," "applies to particular speech because of the topic discussed or the idea or message expressed," "'on its face' draws distinctions based on the message a speaker conveys," and was "adopted by the government because of disagreement with the message [the speech] conveys." *Id.* at 163-64 (quotation marks omitted). *See* Sections III.A.2-3. Any one of these formulations suffices. And "government-compelled speech inherently regulates speech on the basis of its content." *RJ Reynolds*, 96 F.4th at 875-76.

Laws engaging in viewpoint-based or content-based discrimination "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. "That standard requires that a law be the least restrictive means of achieving a compelling state interest." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025) (quotation marks omitted). Further, the government's "curtailment of free speech must be actually necessary to the solution." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011). And the government must show a "direct causal link" between the restriction imposed and the injury to be prevented. *Id.*

"Strict scrutiny is unforgiving[.]" *Id.* at 484. It "is designed to enforce the fundamental principle that governments have no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Id.* at 484-85 (quotation marks omitted). In practice, it must be "fatal in fact absent truly extraordinary circumstances." *Id.* at 485. Such extraordinary circumstances do not exist here, and the Act cannot survive this standard.

The Attorney General cannot show that the Act satisfies any part of the test for strict scrutiny. On narrow tailoring, the Legislature's failure to consider or try less restrictive alternatives such as a government-funded public information campaign is fatal. *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 284 (5th Cir. 2024), *aff'd*, 606 U.S. 461 (2025); *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 775 (2018) ("*NIFLA*"); ECF 37 at 93:11-18; Att'y Gen. Answer to Interrog. (Ex. 9) at 9. To prevent fraud, Texas could have regulated through less restrictive means, such as regulating material misrepresentations in proxy advice, rather than compelling statements anytime a proxy advisor "takes into account" numerous factors or anytime its advice goes against company management or boards of directors. The Act's compelled speech has no direct causal link to the prevention of purported fraud or deception in proxy advice. Nor is there any evidence that these compelled statements are actually necessary and will help achieve the Act's nominal interests.

The Act also fails because its stated interest is likely not genuine. "Government justifications for interfering with First Amendment rights must be genuine, not hypothesized." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (cleaned up). The Act states a goal to "prevent fraudulent or deceptive acts and practices in this state." S.B. 2337 § 1(4). This interest appears to be pretext for regulating disfavored views because the Act is "wildly underinclusive." *NIFLA*, 585 U.S. at 774 (citation omitted). "Such underinclusiveness raises serious doubts about

- 15 -

whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Id.* (cleaned up). The Act only targets speech *about Texas companies*—it does not address speech occurring *by Texans* or *to Texans*. S.B. 2337 § 6A.001(1). So long as proxy advisors avoid discussing Texas companies or companies that propose to move here, they may say *anything* to Texas investors without being covered by the Act. This wild underinclusiveness strongly suggests the Act's true interest is suppressing disfavored views about Texas companies, not stopping fraud in Texas or to Texans.

The Attorney General cannot meet his burden to show the Act satisfies strict scrutiny. Because the Act discriminates based on content and viewpoint and is not narrowly tailored to serve a compelling state interest, the Act violates the First Amendment.

### C.    Using the same analysis as *Book People*, the Act compels speech in violation of the First Amendment.

A finding of viewpoint discrimination is not necessary: many paths yield the conclusion that the Act violates the First Amendment. Following the path of this Court's *Book People* decision, the Act impermissibly compels speech, and *Zauderer* does not apply.

As this Court recently summarized in *Book People*: "The First Amendment protects against the government compelling a person to speak its message when he would prefer to remain silent or to include ideas within his speech that he would prefer not to include." *Book People*, 2025 WL 3035109, at *6. Indeed, the "government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 585-87 (2023).

In "case after case, the [Supreme] Court has barred the government from forcing a private speaker to present views it wished to spurn in order to rejigger the expressive realm." *Moody*, 603 U.S. at 733. "However imperfect the private marketplace of ideas, here was a worse proposal— the government itself deciding when speech was imbalanced, and then coercing speakers to

provide more of some views or less of others." *Id.*

"[R]equiring a company to publicly condemn itself is undoubtedly a more 'effective' way for the government to stigmatize and shape behavior than for the government to have to convey its views itself, but that makes the requirement more constitutionally offensive, not less so." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (citation omitted).

The Act indisputably compels Glass Lewis to include with its speech Texas' messages that Glass Lewis would not otherwise convey. Because Glass Lewis "takes into account" corporate governance factors in virtually all of its covered speech, Ex. 1 ¶ 7, the Act continuously compels Glass Lewis to state that its "advice subordinates the financial interests of shareholders" and post on its website that its "advice and recommendations . . . are not based solely on the financial interest of shareholders." S.B. 2373 §§ 6A.101(a)(1)(A), (b)(1)(A)-(B), (b)(3). When Glass Lewis provides differing advice and recommendations to differently situated clients *or* merely advice "in opposition to the recommendation of the company's management," the Act compels Glass Lewis to notify clients of "conflicting" advice and state "which" of the "conflicting" advice or recommendations is "provided solely in the financial interest of the shareholders." S.B. 2337 §§ 6A.102(a), (b)(2)-(3).

Glass Lewis disagrees with these views, which the Act would compel Glass Lewis to convey. Ex.1 ¶¶ 13-14. It would not express them absent the threat of government penalties. *Id.*

Like the unconstitutional law in *303 Creative*, here the Act puts Glass Lewis "to a similar choice: If [it] wishes to speak, [it] must either speak as the State demands or face sanctions for expressing [its] own beliefs." 600 U.S. at 589. That is "more than enough[] to represent an impermissible abridgment of the First Amendment's right to speak freely." *Id.*

Texas is entitled to its views on corporate governance or anti-management proxy advice.

But, when advancing those views, "it cannot do so by compelling [Glass Lewis'] speech in . . .

ways the Supreme Court has clearly forbidden." *Book People*, 2025 WL 3035109, at *7.

### D. *Zauderer* does not apply.

The Act is not saved by the standard in *Zauderer v. Office of Disciplinary Coun. of Supreme Ct. of Ohio*, 471 U.S. 626, 651-52 (1985). *Zauderer* does not apply because the compelled statements are controversial, because the compelled statements are non-factual, and because the proxy advisors' speech regulated by the Act is not commercial speech or advertising.

"In *Zauderer*, the Supreme Court explained that the State may at times prescribe what shall be orthodox in commercial advertising by requiring the dissemination of purely factual and uncontroversial information." *Book People*, 91 F.4th at 339-40 (footnote and quotation marks omitted). But "outside that context, it may not compel affirmance of a belief with which the speaker disagrees." *Id.* (alteration omitted).

On whether *Zauderer* applies, the Attorney General bears the burden to "show that the warnings are both (1) purely factual and (2) uncontroversial." *Free Speech Coal.*, 95 F.4th at 281. He cannot meet that burden. The Act's compelled statements are (1) non-factual statements of interpretation and opinion and (2) controversial. All the compelled statements are simply the Texas Legislature's controversial opinions—neither uncontroversial nor purely factual. The Attorney General cannot show otherwise under the governing Fifth Circuit tests, discussed below.

### 1. The compelled self-shaming statements are not "uncontroversial."

The Act's compelled self-shaming statements do not satisfy *Zauderer*'s "uncontroversial" prong. In *Free Speech Coalition*, the Fifth Circuit held: "a compelled statement is 'uncontroversial' for purposes of *Zauderer* where the truth of the statement is not subject to good-faith . . . evidentiary dispute and where the statement is not an integral part of a live, contentious political . . . debate." *Free Speech Coal.*, 95 F.4th at 281-82. Two weeks later in *RJ Reynolds*, the Fifth

Circuit held: "A factual statement is 'controversial' under *Zauderer* where the truth of the statement is not settled or is overwhelmingly disproven or where the inherent nature of the subject raises a live, contentious political dispute." *RJ Reynolds*, 96 F.4th at 881.

The inherent nature of the subject of the Act's compelled statements raises a live, contentious political dispute. Politicians agree. The Act's legislative sponsor described proxy advice as based on "political hot-button issues" like ESG and DEI: "these firms are basing their advice to clients based on factors . . . such as in many cases environmental, social, and governance, *political hot-button issues*, DEI factors." ECF 6 ¶ 6. Another legislative sponsor said: "in recent years, proxy advisory firms have become increasingly political and with a hard left bent," pointing to "advice on ESG standards, other times on DEI priorities." *Id.* ¶ 5.

The Attorney General's statements reinforce that the compelled statements are part of a live, contentious political debate. He (erroneously) accused Glass Lewis of "issuing voting recommendations *that advance radical political agendas* rather than sound financial principles." Ex. 8 (emphasis added). He continued: "Proxy firms like Glass Lewis and ISS too often sacrifice sound financial guidance *to advance left-wing political goals*[.]" *Id.* (emphasis added). He expressly tied accusations of advancing political goals to the DEI and ESG considerations targeted by the Act: "DEI, gender-based hiring quotas, and aggressive climate activist policies." *Id.* In another press release, the Attorney General said the Act operates on proxy advisors "by forcing them to disclose if their motivations are aimed at *promoting political goals, including DEI and ESG*." Ex. 7 (emphasis added). And the Attorney General believes that DEI and ESG involve "unlawful race- and sex-based quotas and radical environmental policies" and the "sordid business of divvying us up by race." Ex. 5; ECF 17 at 28 (citation omitted). The Court need look no further than the defendant's overheated rhetoric to see that the compelled statements are controversial.

*See Sec. Indus. & Fin. Markets Ass'n v. Ashcroft*, 745 F. Supp. 3d 783, 799 (W.D. Mo. 2024).

Reinforcing the controversial nature of the subject are two letters from 26 Republican financial officials and 17 Democratic financial officials sent to BlackRock, an asset manager. The first letter accuses BlackRock of advancing "political agendas that fall outside the scope of materiality and positive financial return" and points to using "proxy voting policies to advance environmental, social, and governance (ESG) goals[.]" Ltr. to L. Fink (Ex. 10). The Republican letter contrasts "shareholder value" with "environmental or social goals imposed by activists." *Id.* at 2. The Democratic letter expressly disagrees with the Republican letter, saying that fiduciary duty "requires—not prohibits—investor consideration of material risks" such as "climate-related, governance-related, or supply chain-related" risks. Ltr. to L. Fink (Ex. 11). BlackRock's response said the two letters "continue a concerning trend by both parties of politicizing the management of public pension funds." Ltr. to M. Oaks et al. (Ex. 12). *Compare also, e.g.*, ECF 6-5 at 48-49, 55-57 (House Judiciary Committee describing proxy advice as part of "climate cartel") *with* ECF 6-6 at 1 ("Subcommittee Democrats underscored the importance of access to environmental, social, and governance (ESG) data in . . . making prudent investment decisions.").

The Attorney General cannot show that the inherent nature of the subject of the compelled statements *does not* raise a live, contentious political dispute. He cannot show that the truth of those statements is settled. Both failures are dispositive. "Because the state has not met its burden on the uncontroversial nature of the warnings . . . *Zauderer* is inapplicable." *Free Speech Coal.*, 95 F.4th at 281.

### 2.    The compelled self-shaming statements are not "purely factual."

Independently dispositive, the Act's compelled self-disparaging statements also do not satisfy *Zauderer*'s "purely factual" prong. In *RJ Reynolds*, the Fifth Circuit explained that "the 'factual' nature of a statement turns on the certainty the statement expresses." 96 F.4th at 879 n.48.

Non-falsifiable "interpretations, reactions, or opinions" are non-factual. *Id.* at 878-79 (cleaned up). So, the Attorney General bears the burden to show that the Act's compelled statements are "not akin to unfalsifiable statements of opinion." *Id.* at 879.

He cannot. The Act's compelled public-shaming statements are not falsifiable facts, but unfalsifiable statements of opinion. Ex. 1 ¶ 34 For decades, the SEC has recognized the non-falsifiable, subjective nature of proxy advice and other commentary on shareholder votes:

- "Of course, much commentary concerning corporate performance, management capability or directorial qualifications or the desirability of a particular initiative subject to a shareholder vote is by its nature judgmental. As to such opinions, there typically is not a 'correct' viewpoint." SEC, *Regulation of Communications Among Shareholders*, 57 Fed. Reg. 48,276, 48,278 (Oct. 22, 1992) (Ex. 2).

- "We recognize that the formulation of proxy voting advice often requires subjective determinations and the exercise of professional judgment[.]" SEC, *Proxy Voting Advice*, 87 Fed. Reg. 43,168, 43,181 (July 19, 2022) (Ex. 3).

One SEC Commissioner explicitly discussed the difficulty in measuring whether ESG factors are in the financial interest of shareholders:

> "E, S, and G tend to travel in a pack these days, which makes it hard to establish reliable metrics for affixing scarlet letters. Governance at least offers some concrete markers, such as whether there are different share classes with different voting rights, the ease of proxy access, or whether the CEO and Chairman of the Board roles are held by two people. Even with these examples, however, people do not agree on which way they cut, and they may not cut the same way at every company. . . . Not only is it difficult to define what should be included in ESG, but, once you do, it is difficult to figure out how to measure success or failure."

Hester M. Peirce, *Scarlet Letters: Remarks Before the American Enterprise Institute* at 2 (Ex. 13).

Indeed, Glass Lewis' reports already contain the following disclaimer:

> "Glass Lewis' proxy vote recommendations are solely statements of opinion, and not statements of fact, on matters that are, by their nature, judgmental."

ECF 5-4 at 27; ECF 5-5 at 45; Ex. 1 ¶ 34.

So, when the Act requires Glass Lewis to state that advice is not "solely in the financial interest of shareholders" or state that its "advice subordinates the financial interests of shareholders," these compelled statements reflect the unfalsifiable, subjective (and dubious) views of the Texas Legislature—not verifiable truth. Texas cannot turn its opinions into "facts" by fiat.

The Act compels Glass Lewis to carry Texas' self-denigrating messages and value-laden judgments about which considerations are in shareholders' financial interests. S.B. 2337 §§ 6A.101(b)(1)(A)-(B), 101(b)(1)(3), 102(b). These are the kinds of unfalsifiable "statements of opinion" that fall outside *Zauderer*'s ambit because they are not factual.

Thus, the Attorney General cannot show that the compelled statements are uncontroversial or purely factual. They are part of a contentious political debate and are not falsifiable. Because the compelled statements are controversial, non-factual opinions, *Zauderer* does not apply.

### 3.     The Act does not regulate commercial speech or advertising.

Independently dispositive, *Zauderer* does not apply because the Act, by definition, does not regulate "commercial speech" or "commercial advertising." *Book People*, 91 F.4th at 339-40. "[T]he Court emphasized that the lawyer's statements in *Zauderer* would have been 'fully protected' if they were made in a context other than advertising." *NIFLA*, 585 U.S. at 771.

None of the speech covered by the Act is either "commercial speech" or advertising. Supreme Court "precedents define commercial speech as speech that does no more than propose a commercial transaction." *Harris v. Quinn*, 573 U.S. 616, 648 (2014) (quotation marks omitted); *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (same). Even where speech "has an economic motivation," that is "insufficient by itself to turn" it into commercial speech. *Bolger*, 463 U.S. at 67. As the Fifth Circuit emphasized, "[c]ommercial speech is speech that *proposes* a commercial transaction, not speech for profit." *Serafine v. Branaman*, 810 F.3d 354, 365 (5th Cir.

2016) (quotation marks omitted) (original emphasis). Here, the Act defines the covered speech as: "advice or a recommendation on how to vote," "proxy statement research and analysis," "a rating or research regarding corporate governance," and "development of proxy voting recommendations or policies." S.B. 2337 § 6A.001(4).

Based on the Act's own definitions, then, the speech covered by the Act "extends well beyond speech that proposes a business transaction, [citing *Zauderer*; *Central Hudson*], and includes the kind of discussion of 'matters of public concern' that the First Amendment both fully protects and implicitly encourages." *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 8-9 (1986) (plurality); *Free Speech Coal.*, 95 F.4th at 282 n.61 (quoting *Pac. Gas*); *see* Ex. 1 ¶¶ 27-29. This is by design: one of the legislative sponsors noted that proxy advice is an "area where tremendous policy decisions are being made" and involves "so many issues that affect our daily lives." ECF 6 ¶ 5. So, proxy advisors' speech covered by the Act is not commercial speech, but discussion on matters of public concern that the First Amendment fully protects.

Nor is it advertising. *See* Ex. 1 ¶ 27. An analogy may help: the *Wall Street Journal*'s billboard trying to convince someone to subscribe would be advertising, but the contents of the *Journal*'s Opinion page sent to subscribers would not. Here, the Act's definitions do not include the sales pitch to prospective clients, but rather the advice, recommendations, research, and analysis provided to those clients after they sign up. *See* S.B. 2337 § 6A.001(4).

Because the Act regulates outside the context of commercial advertising, *Zauderer* does not apply, and Texas may not compel Glass Lewis to state beliefs with which it disagrees. *Book People*, 91 F.4th at 339-40.

### E. The Act cannot survive scrutiny under *Central Hudson*.

If the Court were to apply *Central Hudson*, the Act fails intermediate scrutiny. The Attorney General bears "the burden to prove all elements of the *Central Hudson* test." *Cocroft v.*

*Graham*, 122 F.4th 176, 179 (5th Cir. 2024) (citation omitted). Those elements are: the "asserted governmental interest must be substantial, the regulation must directly advance the governmental interest asserted, and it must not be more extensive than is necessary to serve that interest." *Hignell-Stark v. City of New Orleans*, 154 F.4th 345, 358 (5th Cir. 2025) (cleaned up).

The last factor is dispositive and straightforward: the undisputed fact that the Legislature failed to consider or try less restrictive alternatives and failed to try "a government-funded public information campaign" is fatal under intermediate scrutiny. *See Free Speech Coal.*, 95 F.4th at 284; *NIFLA*, 585 U.S. at 775; ECF 37 at 93:11-18; Ex. 9 at 9.

The Act also fails under the other factors. The asserted governmental interest is pretextual. Section III.B. Moreover, the Attorney General cannot show that the State's interest is "unrelated to the suppression of free expression." *Moody*, 603 U.S. at 740. Both the Act's legislative sponsor and the Attorney General agree that the "point" of the Act is to "prevent" expression of certain viewpoints. *See* Section III.A.3. Given these statements, the Attorney General cannot show that the Act's interest is "unrelated to the suppression of free expression," and it also fails for that reason. *See Moody*, 603 U.S. at 740-43.

Likewise, the Act does not "directly and materially advance the asserted government interest[.]" *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). Texas has made no findings that compelled disclosures are effective at achieving the Act's interests. *See Edenfield v. Fane*, 507 U.S. 761, 771 (1993).

The Attorney General cannot show that the Act survives intermediate scrutiny.

*    *    *

As applied to Glass Lewis, the Act violates the First Amendment under any applicable test.

**IV.    Merits: As Applied to Glass Lewis, the Act is Unconstitutionally Vague.**

The Act is also unconstitutionally vague. "A law is void for vagueness under the First

Amendment when it (1) fails to provide a 'person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly' or (2) fails to provide 'explicit standards' for applying the law 'to avoid arbitrary and discriminatory applications.'" *Book People*, 2025 WL 3035109, at *7 (citation omitted). "A more stringent vagueness test applies when a law interferes with the right of free speech." *Id.* (quotation marks omitted). S.B. 2337 is unconstitutionally vague under either prong of the test.

The stakes are high. If Glass Lewis fails to correctly divine when and how to give the compelled warnings, the Act allows for steep penalties of $10,000 per violation. S.B. 2337 § 6A.201; Tex. Bus. & Com. Code § 17.47(c)(1).

### A.    Persons of ordinary intelligence must guess at the Act's meaning.

The Act is unconstitutionally vague both in the front-end triggering sections—what speech is covered—and in the back-end compliance sections—what exactly proxy advisors must do.

**What is "solely in the financial interest of the shareholders"?** Section 101 requires proxy advisors to make disclosures when a proxy advisory service is not provided "solely in the financial interest of the shareholders." S.B. 2337 § 6A.101(a). Section 102 employs the same key phrase. *Id.* § 6A.102(b)(3). But the Act gives that key phrase a bespoke meaning dependent on undefined buzzwords. It applies to any advice that "takes into account[] one or more *nonfinancial factors*, including" *any* of the following factors: diversity, equity, inclusion, sustainability, environmental, social, or governance factors. *Id.* § 6A.101(a)(1) (emphasis added). This bespoke definition displaces any common understanding of the key phrase and replaces it with a laundry list of undefined terms with no agreed meaning in the industry. Ex. 1 ¶ 35. When a statute "fails to define key categories," it is unconstitutionally vague. *Students Engaged*, 765 F. Supp. 3d at 602.

ESG is "a concept that is so undefined as to be virtually all encompassing." ECF 5-6 at 11. In a survey of corporate directors, 66% agreed that "ESG means different things to different

people." ECF 5-1 at 15. Unmoored from any specific meaning, "ESG" has "almost become a kind of Rorschach test." ECF 5-8 at 4. As an SEC Commissioner noted, it is "difficult to define what should be included in ESG," and "ESG may not be the same to you as it is to me." Ex. 13; Hester M. Peirce, *My Beef with Stakeholders: Remarks at the 17th Annual SEC Conference* (Ex. 14).

"DEI" is similarly undefined. Numerous federal courts "have struck down similar anti-DEI laws as void for vagueness." *Nat'l Educ. Ass'n-N.H. v. NH Attorney Gen.*, 2025 WL 2807652, at *15 (D.N.H. 2025) (collecting cases); *NAACP v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 53, 65-67 (D.D.C. 2025); *Perkins Coie LLP v. U.S. Dep't of Justice*, 783 F. Supp. 3d 105, 175-76 (D.D.C. 2025) (collecting cases). The Act does not define this broad, vague term. Ex. 1 ¶ 35.

Here, the definition of "solely in the financial interest of the shareholders" depends on terms that themselves are vague and subject to differing interpretations.

**Speech outside Texas?** The Act does not say, and it is unclear whether the Texas courts would conclude, that the Act may be applied to Glass Lewis' speech occurring entirely outside of Texas. On that extraterritoriality question, Texas courts employ a complex, indeterminate, multi-step analysis. *See Pohl v. Cheatham*, 718 S.W.3d 173, 183-88 (Tex. 2025). Within the Texas Supreme Court, justices disagree on how to apply this test. *See id.* at 189-93 (Busby, J., joined by Lehrmann and Boyd, JJ., dissenting). Indeed, one step in the "test has been criticized as indeterminate, difficult to apply consistently (as shown by the splits of authority it has produced), and subject to manipulation by courts . . . ." *Id.* at 191 (dissenting opinion). Given this indeterminacy, Glass Lewis cannot confidently predict how the Attorney General or Texas courts would apply this extraterritoriality analysis to proxy advice occurring outside of Texas.

The Attorney General's interpretation does not help. He interprets the scope of the Act with qualifications found nowhere in the statutory text: he states that the Act only regulates proxy advice

"to Texas shareholders" or "other persons with authority to vote on behalf of shareholders in Texas." ECF 17 at 7. This latter category would sweep in broad swaths of speech occurring entirely outside of Texas. Also, when asked in discovery whether the Act requires the website statement to be visible to website visitors outside of Texas, the Attorney General gave a non-answer: "The statute does not mention or otherwise address where the visitors to the website are located." Ex. 9 at 6. This is exactly the problem.

Glass Lewis provides its speech to many clients outside of Texas and displays its website to visitors outside of Texas. Ex. 1 ¶¶ 6, 12. The Act fails to provide a person of ordinary intelligence a reasonable opportunity to know whether it applies to (or compels) speech outside Texas, rendering it void for vagueness. *See Book People*, 2025 WL 3035109, at *7

**<u>How exactly to comply?</u>** Numerous details of compliance are left unresolved by the Act's text. Under Section 101(b), how long does Glass Lewis have to keep the self-disparaging statement up on its website? Can Glass Lewis disclaim the disclosure? Glass Lewis must "immediately" provide a copy of the notice to the company that is the subject of advice, but is the next day fine?

Under Section 102(b), can Glass Lewis simply say it gave "conflicting advice," without saying on what voting item, why, and to whom it was given? Or does Glass Lewis have to provide all those details? Likewise, it is unclear what it means to "disclose which of the conflicting advice or recommendations is . . . provided solely in the financial interest of the shareholders." Does the Act mandate that Glass Lewis always pick *one* recommendation? These and numerous other questions about how to comply with the Act's requirements are left unanswered by the statutory text, leaving Glass Lewis in the dark on what it must do to comply with the Act. Ex. 1 ¶ 38.

**B.    The Act allows arbitrary and discriminatory enforcement.**

"Where the plain language of a statute prohibits such a wide swath of conduct that it authorizes or encourages arbitrary and discriminatory enforcement, the statute is void for

vagueness." *Nat'l Educ.*, 2025 WL 2807652, at *13-18 (analyzing precedent). "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [law enforcement], judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) (footnote omitted). "Where, as here, there are no standards governing the exercise of the discretion granted by the [Act], the scheme permits and encourages an arbitrary and discriminatory enforcement of the law. It furnishes a convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972) (quotation marks omitted). "It is enough that a vague and broad statute lends itself to selective enforcement against unpopular causes." *NAACP v. Button*, 371 U.S. 415, 435 (1963).

Here, the vague Act covers all of Glass Lewis' speech (in Texas, at least), which almost always takes into account governance factors. Ex. 1 ¶ 7. The Act's broad triggering provisions, combined with its vague provisions on how to comply, mean that enforcement inevitably will turn on the ad hoc, subjective, politically motivated views of the Attorney General—who refers to Glass Lewis and ISS as "woke corporations smuggling radical, liberal ideology into the companies they advise and into the entirety of America's financial system" (Ex. 8)—rather than any standard set by the Texas Legislature. Such a statute is void for vagueness.

*    *    *

The Act, as applied to Glass Lewis, violates the First Amendment and is void for vagueness. There is no genuine dispute as to any material fact, and Glass Lewis is entitled to judgment as a matter of law declaring the Act, as applied to Glass Lewis, is unconstitutional.

## V.    The Remaining Permanent Injunction Factors Favor Glass Lewis.

Glass Lewis has established success on the merits, for all the reasons explained above. Glass Lewis is entitled to permanent injunctive relief under the four-part test.

### A.    Glass Lewis faces irreparable harm, for which remedies at law are inadequate.

As the Supreme Court has repeatedly recognized, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025); *Book People*, 2025 WL 3035109, at *10. "Absent an injunction, Glass Lewis will alter its speech to carry Texas' viewpoints with which Glass Lewis vehemently disagrees, as required by S.B. 2337." Ex. 1 ¶¶ 13-14, 17. "Because [the Act] threatens [Glass Lewis'] right to be free from compelled speech, [Glass Lewis has] shown an irreparable injury." *Book People*, 91 F.4th at 341.

Additionally, absent an injunction, the Act will cause Glass Lewis to suffer irreparable reputational harm. *See Book People*, 2025 WL 3035109, at *10. Here, "Glass Lewis will suffer reputational harm by being forced to disparage its own services to its clients, the companies being discussed, the Attorney General, and the general public on its website homepage. The Act causes reputational harm by forcing Glass Lewis to falsely tell its clients that its services are not in their financial interests, that it gives them 'conflicting' advice, and that Glass Lewis' 'advice subordinates the financial interest of shareholders to other objectives.'" Ex. 1 ¶ 25. This reputational and constitutional harm satisfies the irreparable harm prong. *Book People*, 2025 WL 3035109, at *10.

Additionally, absent an injunction, Glass Lewis will be forced to incur unrecoverable compliance costs, totaling hundreds of thousands of dollars at minimum. *See Rest. L. Ctr. v. DOL*, 66 F.4th 593, 600 (5th Cir. 2023); Ex. 1 ¶¶ 21-24. Sovereign immunity bars the recovery of these costs as damages, rendering the harm irreparable and remedies at law inadequate. *Nat'l Ass'n for*

*Gun Rts., Inc. v. Garland*, 2023 WL 5610293, at \*4-8 (N.D. Tex. 2023). "[C]omplying with [a law] later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Wages & White Lion Investments, L.L.C. v. U.S. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).

Remedies at law, such as damages, cannot compensate for the irreparable harm Glass Lewis would suffer absent injunctive relief. "Monetary damages are inadequate to compensate for the loss of First Amendment Freedoms." *Book People*, 2025 WL 3035109, at \*10. "Because of the irreparable harm to [Glass Lewis'] First Amendment rights and reputation as earlier discussed, the Court [should find] that this factor favors granting a permanent injunction." *Id.*

**B.    The balance of harms and public interest favor permanent injunctive relief.**

The final factors "overlap considerably in suits against public officers" and support an injunction. *Healthy Vision*, 138 F.4th at 408 (cleaned up). Here, there is no harm to the government because it "suffers no injury when a court prevents it from enforcing an unlawful law." *Free Speech Coal.*, 95 F.4th at 287. "Neither the State nor the public has any interest in enforcing a regulation that violates federal law. Indeed, injunctions protecting First Amendment freedoms are always in the public interest." *Book People*, 91 F.4th at 341 (cleaned up). Even if the Act served a "good and noble" interest—which is dubious here—"that does not outweigh the fact that [the Act] tries to serve that goal in an unconstitutional way." *Book People*, 2025 WL 3035109, at \*10.

## CONCLUSION AND PRAYER

Glass Lewis respectfully requests that the Court grant summary judgment, declare that the Act as applied to Glass Lewis violates the Constitution, and permanently enjoin the Attorney General—and his officers, agents, and employees, including the Consumer Protection Division of the Office of the Attorney General—from enforcing the Act against Glass Lewis. Glass Lewis further requests all other legal and equitable relief to which it may be entitled.

Dated: November 20, 2025

Respectfully submitted,

YETTER COLEMAN LLP

*/s/ Bryce L Callahan*
Bryce L. Callahan
State Bar No. 24055248
bcallahan@yettercoleman.com
Grant B. Martinez
State Bar No. 24104118
gmartinez@yettercoleman.com
Lily E. Hann
State Bar No. 24133836
lhann@yettercoleman.com
Jared LeBrun
State Bar No. 24144647
jlebrun@yettercoleman.com
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
(713) 632-8002 (fax)

*Attorneys for Plaintiff Glass, Lewis & Co., LLC*

## Certificate of Service

I certify that on November 20, 2025, a copy of this document was served on all counsel of record using the Court's e-filing system.

*/s/ Bryce L. Callahan*
Bryce L. Callahan