**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| GLASS, LEWIS & CO., LLC,           ) | |
|                   ) | |
|         Plaintiff,       ) | |
|                   ) | |
|      v.                ) | |
|                   ) | |
| KEN PAXTON, *in his Official Capacity as*   ) | |
| *Attorney General of Texas,*       ) | Civil Action No. 25-cv-01153-ADA |
|                   ) | |
|         Defendant;      ) | |
|                   ) | |
| THE TEXAS STOCK EXCHANGE LLC   ) | |
| and THE TEXAS ASSOCIATION OF     ) | |
| BUSINESS,            ) | |
|                   ) | |
|         Intervenors.     ) | |

**INTERVENORS' MOTION PURSUANT TO RULE 56(d) TO DEFER OR DENY
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

The Court should defer Glass Lewis's motion for summary judgment, or deny it outright, until discovery is finished and the parties can present a complete factual record.[1] To resolve this First Amendment challenge, "a developed factual record is essential." *Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014). The Court must fully understand both the plaintiff's activities and the challenged law's applications to those activities to assess its constitutionality. *NetChoice, L.L.C. v. Paxton*, 121 F.4th 494, 497-500 (5th Cir. 2024). This requires the Court to be presented with detailed facts, such as:

- how Glass Lewis advertises and represents its services to clients;

- how Glass Lewis makes recommendations and the basis for those recommendations;

- whether Glass Lewis conducts or relies on any financial analysis to make its recommendations;

- whether any financial analysis conducted by Glass Lewis is tailored to each company and recommendation; and

- whether the disclosures required by SB 2337 require Glass Lewis to "*falsely* denigrat[e] itself on its own website," as opposed to state the truth, Pl.'s Mot. at 7 (emphasis added).

Acting under time pressure created by Glass Lewis, the Court preliminarily enjoined SB 2337 without the benefit of having any of this information. Now, Glass Lewis asks the Court to make that interim relief permanent on the same thin record. The sole evidence Glass Lewis attaches regarding its practices is a conclusory affidavit of its chief operating officer, but "[i]t is well-settled law" that relying on "a self-serving affidavit alone" is "insufficient to sustain a motion for summary judgment." *S. U.S. Trade Ass'n v. Unidentified Parties*, 2012 WL 579439, at *2 (E.D. La. Feb. 22, 2012) (citation

---

[1] Pursuant to Fed. R. Civ. P. 56(d), a declaration signed by undersigned counsel is attached as Exhibit A (the "Rasmussen Decl.").

omitted). Meanwhile, Glass Lewis stonewalled Intervenors' efforts to develop the facts necessary to respond. Glass Lewis moved for summary judgment just a week after it produced its first batch of documents to Intervenors and before the Court has been able to resolve Intervenors' motion to compel other discovery. Moreover, since document discovery has effectively just begun, Intervenors have had no opportunity to take depositions, not even of the affiant supporting Glass Lewis's motion.

Also, even though Intervenors have not had an opportunity to fully review the materials that Glass Lewis has produced, an initial review has revealed evidence showing that Glass Lewis's recommendations—which significantly affect corporate America and the retirement savings of millions of individuals—are not based on financial analysis or, indeed, on any principled analyses at all. For instance, a single produced document containing Slack chats show Glass Lewis's employees—including the employee responsible for ESG-related ballot items—discussing whether to support or oppose various shareholder proposals based on such nonfinancial factors as (1) ████████████ ████████████████████████████████ (Rasmussen Decl. Ex. 1) (2) ████████████ ████████████████; (Rasmussen Decl. Ex. 2) (3) ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ (Rasmussen Decl. Ex. 3); and (4) ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ (Rasmussen Decl. Ex. 3). Also, ████ ████████████████████████████████████████████████████ ████ (Rasmussen Decl. Ex. 3).[2]

---

[2] Intervenor-Defendants are separately submitting a motion for leave to file under seal for the redacted information and referenced exhibits.

Intervenors have discovered these revealing assessments based only on a preliminary review of the documents Glass Lewis has produced to date, which includes a mere 12 reports and apparently *no other internal communications* regarding the companies or annual meetings that are the subject of Defendants' discovery requests. Given the nature of Glass Lewis's internal deliberations about its recommendations, it is unsurprising that the proxy advisor seeks to rush this Court to a final decision based on an incomplete factual record. It is wrong for Glass Lewis to invite that sort of "rushed, high-stakes, and low-information decisionmaking" for summary judgment. *Trump v. CASA, Inc.*, 606 U.S. 831, 855-56 (2025) (cleaned up). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The purpose of summary judgment, by contrast, is to test the factual support for a plaintiff's claims after a fair opportunity for discovery by the opposing party, and Rule 56(d) ensures parties like Glass Lewis cannot create an artificially favorable record by short-circuiting that process.

Thus, the Court should deny or defer Glass Lewis's motion until it has resolved the parties' outstanding discovery disputes and Intervenors have had a chance to review the produced materials and take necessary depositions. Alternatively, Intervenors request a 14-day extension from the Court's ruling on this Rule 56(d) motion to respond to Glass Lewis's motion for summary judgment.

## BACKGROUND

### A. Factual Background.

**1.** The vast majority of stocks—"by some estimates, between 70 and 80 percent of the market value of U.S. public companies"—are held by institutional investors. 84 Fed. Reg. 66,518, 66,519 (Dec. 4, 2019). "[B]y virtue of their significant holdings," these institutional investors "must manage the logistics of voting in potentially hundreds, if not thousands, of shareholder meetings and on thousands of proposals that are presented at these meetings each year." *Id.* Plainly, investors do not have time to

review the details of each proposal, so they instead rely on proxy advisors like Glass Lewis for voting recommendations. *See Enhance Decision-Making with Consistent Proxy Voting Policies*, GLASS LEWIS, https://tinyurl.com/3xcz7vmd (last visited Dec. 9, 2025). ("Glass Lewis' Proxy Voting Policies . . . help[] [institutional investors] meet fiduciary obligations and regulatory requirements.").

"Numerous studies" have documented the "significant impact" proxy advisors' recommendations have on shareholder votes. Paul Washington, *Testimony in House Hearing: "Exposing the Proxy Advisory Cartel: How ISS & Glass Lewis Influence Markets,"* HARV. L. SCH. FORUM ON CORP. GOVERNANCE (May 5, 2025), https://tinyurl.com/2m2w434n. A 2021 study, for example, "identified 114 financial institutions managing $5 trillion in assets that automated their votes in a manner aligned with ISS recommendations 99.5% of the time." *Id.* Other studies conclude that "negative recommendations from the two proxy firms" swing votes anywhere from 17% to 36% on certain proposals. *Id.* Glass Lewis accumulated this influence on the promise that its advice would "enable institutional clients" to fulfill their fiduciary duties and "maximize the value of their investments." 75 Fed. Reg. 42,982, 43,010 (July 22, 2010); *see also* Dkt. 5 ¶ 12 (asserting that Glass Lewis reports help investors "maximize shareholder value"). Indeed, Glass Lewis boasts that its clients manage more than *$40 trillion* in assets. Glass Lewis Website Homepage, GLASS LEWIS, https://www.glasslewis.com/ (last visited Dec. 9, 2025). And Glass Lewis advertises to those clients (and the market) that its role is to provide "objective research"[3] and "data-driven insights."[4]

Glass Lewis provides little in the way of transparency that would enable investors, the public, or the businesses subject to its recommendations to determine whether Glass Lewis lives up to its promises, although the scant information that is publicly available indicates that it does not. *See* Dkt.

---

[3] Letter from Kevin Cameron, Exec. Chair, Glass Lewis to Att'ys Gen at 2 (Jan. 31, 2023), https://perma.cc/A92F-4D5U.

[4] *About Us*, GLASS LEWIS, https://tinyurl.com/nh2fwrjh (last visited Dec. 9, 2025).

39, at 6-7. Moreover, although Glass Lewis has refused to produce most of the documents requested by Defendants in this litigation, those that it has produced demonstrate that its recommendations are far from "objective" or "data-driven." *See* Rasmussen Decl. Exs. 1-3; *infra* at 13.

Against this backdrop, numerous states are investigating whether Glass Lewis is living up to its representations. This summer, Missouri issued civil investigative demands to Glass Lewis "[b]ased on serious allegations of fraudulent practices." Petition, *Missouri v. Glass, Lewis & Co., LLC*, No. 25AC-CC05536 (Mo. Cir. Ct. July 8, 2025). Florida likewise opened an investigation into violations by Glass Lewis of the state's consumer protection laws. *See* Press Release, *Attorney General James Uthmeier Announces Investigation into Glass Lewis & Co. and Institutional Shareholder Services Inc. for ESG and DEI Policies* (Mar. 20, 2025), https://tinyurl.com/4bkj9ju5. That investigation culminated in a suit against Glass Lewis under the Florida Deceptive and Unfair Trade Practices Act. *See* Ex. B, Complaint. Florida's complaint alleges that Glass Lewis "assure[s] consumers and investors that their recommendations are based on rigorous analysis" but that "[o]ften, there is no analysis at all supporting [Glass Lewis's] recommendations—just ideology." Complaint, 95.  Florida cites ample documentary support for its allegations; however, the complaint is heavily redacted, underscoring both the lack of publicly available information and Defendants' stark need for discovery to defend SB 2337. *See generally* Complaint.

**2.** Despite these significant issues, proxy advisors remain essentially unregulated at the federal level; indeed, federal courts recently rejected an effort by the SEC to regulate proxy advisors by preventing them from making misleading statements. *See ISS v. SEC*, 142 F.4th 757 (D.C. Cir. 2025). To fill that regulatory gap, Texas enacted SB 2337. Section 101 requires a proxy advisor to disclose when its advice "is not provided solely in the financial interest of the shareholders." § 101(b). Advice is not solely financial when, for example, it "is wholly or partly based on"  "a commitment, initiative, policy, target, or subjective or value-based standard based on" ESG, DEI, or social credit scores,

§ 101(a)(1), or the proxy advisor makes a recommendation "inconsistent with the voting recommendation of the board of directors," § 101(a)(2). In such circumstances, the proxy advisor must acknowledge that the advice is not based "solely" on financial factors, § 101(b)(1)(A). It must also "explain[], with particularity," the basis for its advice and acknowledge that the recommendation "subordinates the financial interests of the shareholders to other objectives." § 101(b)(1)(B).

Separately, § 102 requires a distinct disclosure when proxy advisors give conflicting advice to different clients, or advice that is contrary to management's recommendation. In these cases, § 102 requires the proxy advisor to: (1) notify the company, the recipients of its advice, and the Attorney General of Texas (the "Attorney General"); (2) indicate whether it has performed "any specific financial analysis"; and (3) if so, identify which recommendation furthers the shareholders' financial interests. § 102(b). Notably, § 102 applies only if clients "have not expressly requested services for a nonfinancial purpose." *Id.* Section 102 benefits the clients that rely on proxy advisors to act in shareholders' financial interests—and the small businesses, employees, and retirees relying on those clients to maximize their 401(k)s and pension funds.

### B. Procedural History.

Weeks before SB 2337 was set to take effect, Glass Lewis challenged the law, and it moved for a preliminary injunction based on a record consisting primarily of Glass Lewis's own untested statements about its business practices and its clients. Glass Lewis represented that it "evaluates all environmental and social issues through the lens of long-term shareholder value." Dkt. 5-2, at 85. Glass Lewis further argued that SB 2337 would require Glass Lewis to "falsely tell [] asset managers that by considering material information like governance, environmental, or social risks, they are making a 'nonfinancial' decision." Dkt. 5 ¶ 47. On August 29, the Court granted Glass Lewis's motion in an oral order with written reasons to follow separately. *See* Dkt. 37, at 137. The Court has not yet issued its written order.

The Court also set a February trial date in the matter, and thus, the scheduling order required expedited discovery, with a 68-day fact discovery window that closed on November 19, 2025.[5] *See* Dkt. 47. To test Glass Lewis's representations and support their defenses of SB 2337, Defendants jointly sought discovery from Glass Lewis on key topics such as Glass Lewis's reports and recommendations to clients, the basis for those recommendations, and the supporting financial analysis (if any). In light of the short discovery window, Defendants served their discovery on the first day under the scheduling order—September 12—and simultaneously asked Glass Lewis to meet and confer promptly (Glass Lewis refused). *See* Dkt. 52-3. Eventually, the parties met and conferred but disagreements remained—primarily due to Glass Lewis's position that discovery is "not necessary to resolve this case" Dkt. 54 at 3. Defendants thus moved to compel the production of critical documents. *See* Dkt. 52. Likewise, the parties were unable to reach an agreement on a protective order, and Glass Lewis refused to produce any documents until that issue was resolved. Following the Court's entry of a protective order on November 12, Defendants received 3,832 documents totaling 55,372 pages from Glass Lewis on November 13 and another 72 pages on November 19, which Defendants are diligently analyzing. No depositions have occurred yet.

As noted in the motion to compel, Glass Lewis's production remains deficient in several respects. *See* Dkt. 52. Glass Lewis has refused to produce the vast majority of Benchmark Reports requested: it agreed to produce only 12 total reports, and refused to produce *any* of the reports that Defendants requested from a tailored sample of 50 Texas public companies. Similarly, Glass Lewis has not produced *any* of the custom recommendations its complaint repeatedly references.

Finally, and perhaps most importantly, Glass Lewis has refused to produce *any* of the internal communications, analyses (including financial analyses), or drafts that lead up to its reports and

---

[5] Defendants have moved to modify the trial date and case schedule as part of their motion to consolidate cases. *See* Dkt. 57.

recommendations. These documents, and the others outlined in Defendants' Motion to Compel, are critical to the defense of SB 2337, including the central question of whether Glass Lewis's reports and recommendations are "provided solely in the financial interest" of shareholders.  Nevertheless, Glass Lewis refused to produce them, representing to the Court that "[i]f there is relevant information about a [report], it goes into those reports" and that any "financial analysis," if it exists, "is reflected in" the reports. Dkt. 54, at 8-9.  But these assertions are not accurate.  Indeed, and as discussed, Glass Lewis has *already* produced Slack communications where Glass Lewis employees substantively discuss voting recommendations, and which indisputably contain "relevant information" and "analysis" (or lack thereof) about those recommendations. Rasmussen Decl. Exs. 1-3.  These communications are contained in a single PDF document and apparently are the only Slack communications produced.

While Defendants' Motion to Compel critical documents withheld by Glass Lewis was pending, new plaintiffs emerged to challenge the constitutionality of SB 2337. On November 10, the Interfaith Center on Corporate Responsibility and other plaintiffs brought a facial challenge to SB 2337, and a week later, Defendants moved to consolidate this new challenge with the preexisting lawsuits brought by Glass Lewis and Institutional Shareholder Services. *See* Dkt. 57. In light of the outstanding discovery issues outlined above and to coordinate the cases, Defendants also sought to modify the scheduling order. *Id.* Oral argument on these motions is set for December 19. *See* Dkt. 68.

With the motions to compel and to consolidate still pending—and just a week after its first., incomplete production—Glass Lewis moved for summary judgment. Dkt. 60. Intervenors now move under Rule 56(d) to defer summary judgment until the parties' outstanding discovery disputes can be resolved.

## LEGAL STANDARD

"Summary judgment is a lethal weapon," and courts "must afford prospective victims some protective armor if" they are "to properly defend against it." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1268 (5th Cir. 1991). To that end, the Federal Rules of Civil Procedure provide that "[s]ummary judgment is appropriate only where the [nonmoving party] has had a full opportunity to conduct discovery." *Bailey v. KS Mgmt. Servs., LLC*, 35 F.4th 397, 401 (5th Cir. 2022); *see* Fed. R. Civ. P. 56. "[I]f the nonmovant shows an inability to support its opposition factually," Rule 56(d) permits "the district court to provide additional time for discovery before ruling on" the summary judgment motion. *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 422 (5th Cir. 2016).

Rule 56(d) is "usually invoked when a party claims that it has had insufficient time for discovery or that the relevant facts are in the exclusive control of the opposing party." *Union City Barge Line, Inc. v. Union Carbide Corp.*, 823 F.2d 129, 136 (5th Cir. 1987). To obtain relief, a party must identify "a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion." *Smith*, 827 F.3d at 423. "Rule 56(d) motions for additional discovery are broadly favored and should be liberally granted." *Am. Family Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013) (quotation marks omitted); *see also Int'l Shortstop*, 939 F.2d at 1267 ("Where the party opposing the summary judgment informs the court that its diligent efforts to obtain evidence from the moving party have been unsuccessful, a continuance of the motion for summary judgment for purposes of discovery should be granted almost as a matter of course.").

## ARGUMENT

## I.    Summary Judgment Is Premature Because Intervenors Have Not Been Able to Fully Conduct Discovery.

As even a quick review of the procedural history of this case confirms, summary judgment is premature. Intervenors and the Attorney General of Texas have moved to compel production of

several critical categories of documents relevant to their defense of SB 2337, but as of the date of this filing, the Court has not heard argument on that motion. Supreme Court and Fifth Circuit precedent make clear that this outstanding discovery is required before the Court can resolve this First Amendment challenge. Moreover, Intervenors and the Attorney General of Texas have reason to believe it will undermine many of the unsupported factual representations in Glass Lewis's summary judgment motion. It would thus be improper to force them to mount a defense of SB 2337 without this critical information, and a host of Fifth Circuit precedent confirms that the Court should defer summary judgment briefing until after it resolves the motion to compel. *See, e.g.*, *Int'l Shortstop*, 939 F.2d at 1267-68; *Wichita Falls Office Assocs. v. Banc One Corp.*, 978 F.2d 915, 918-20 (5th Cir. 1992); *James v. Smith*, 152 F.4th 594, 603-05 (5th Cir. 2025); *Ala. Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 609 (5th Cir. 1979).

### A. The Court cannot properly rule on Glass Lewis's motion for summary judgment without a developed factual record.

Glass Lewis opens its motion for summary judgment with the stunning claim that "few material facts [are] required" to resolve its First Amendment challenge. Dkt. 60, at 1. To the contrary, "a developed factual record is *essential*" to resolving a challenge that a statute is unconstitutional as applied to the plaintiff.[6] *Justice*, 771 F.3d at 292 (emphasis added); *accord Educational Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013) ("[A]n as-applied challenge is based on a developed factual record and the application of a statute to a specific person." (cleaned up)); *Harmon*

---

[6] Glass Lewis argues that factual development is unnecessary because its challenge "turns on the statutory text and legislative history of the Act." Dkt. 60, at 1. But "an attack on a statute itself as opposed to a particular application" is properly characterized as *facial*, rather than as-applied. *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015). Glass Lewis originally characterized its challenge as facial but it amended its complaint specifically "to drop its facial challenge to the Act" just two days before filing its motion for summary judgment. Dkt. 58, at 2. At any rate, *Moody v. NetChoice* confirms that a sufficiently developed record often is just as critical to assessing sweeping challenges to the statute as a whole as it is to an as-applied challenge. 603 U.S. 707, 723-26 (2024); *accord NetChoice*, 121 F.4th at 498 (directing the district court to permit sufficient discovery even though the issues were alleged to be "purely legal questions").

*v. City of Norman*, 61 F.4th 779, 789 (10th Cir. 2023) (explaining that a First Amendment as-applied challenge "demands a developed factual record"). Here, a more developed record is necessary to address several aspects of Glass Lewis's claim.

*First*, to understand the parties' dispute and craft "a narrowly tailored and circumscribed remedy," the Court must have a thorough understanding of the conduct by Glass Lewis that is covered by SB 2337. *Justice*, 771 F.3d at 292; *see also NetChoice*, 121 F.4th at 498-99 (the district court must understand "*who* and *what* is covered"); *Fusaro v. Howard*, 19 F.4th 357, 368 (4th Cir. 2021) ("As-applied challenges are fact-specific inquiries because of 'the general rule that constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court.'"); *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 103 (2d Cir. 2024) (holding that a "developed and specific factual record regarding [plaintiff's] business" was necessary to resolving compelled speech claim). This case concerns, among other things, SB 2337's applications to Glass Lewis's Benchmark Policies, Benchmark Reports, and Custom Recommendations, so detail about both the preparation of those materials and their content is necessary. Yet Glass Lewis continues to deny Defendants critical information on each of these products. *See* Dkt. 52, at 8-10.

Instead, Glass Lewis asks the Court to accept as a substitute an affidavit of its Chief Operating Officer, John Wieck, purporting to describe its business practices. Dkt. 61-1. Among other things, Wieck asserts (without citation) that Glass Lewis's recommendations are based on "independent research," *id.* ¶ 5; that they "reflect Glass Lewis' views and beliefs about how to best promote and maintain shareholder value," *id.* ¶ 31; and that many are personalized "to clients' voting policies," *id.* ¶ 8. But saying that does not make it so. A deposition of Mr. Wieck is necessary to test the validity of these self-serving assertions. On a motion for summary judgment, a court must credit "the evidence of the nonmoving party and draw all reasonable inferences in favor of that party," not simply credit a movant's "self-serving affidavit[]." *Sturm v. Ross*, 11 F. Supp. 2d 942, 946 (S.D. Tex. 1998); *accord S.*

*U.S. Trade*, 2012 WL 579439 at *2; *Century Surety Co. v. Nafel*, 2015 WL 5012146, at *17 (M.D. La. Aug. 24, 2015). Glass Lewis cannot circumvent this standard of review by denying Defendants the opportunity to build their own record on the relevant facts.

*Second*, because Glass Lewis challenges the entirety of SB 2337, it must provide sufficient information about how *each provision* of the law applies to it. *See NetChoice*, 121 F.4th at 500. "'[S]tanding is not dispensed in gross,'" so Glass Lewis cannot challenge the law as a whole without making "a certain threshold showing" as to each particular provision. *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). Glass Lewis's motion does not even try to make an individualized showing as to each provision of SB 2337 and Defendants need discovery to test Glass Lewis's imprecise arguments. Nor does the motion even mention the possibility of severing the allegedly unconstitutional provisions and applications of SB 2337 from the valid ones, even though Texas law requires courts to do so when the remainder of a statute "'is complete in itself, and is capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected.'" *Rose v. Drs. Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990). Defendants should at least have a chance to subject Glass Lewis's blunderbuss assault to the crucible of meaningful discovery.

*Third*, outstanding discovery is essential to determining the proper First Amendment analysis. Glass Lewis has consistently represented to Congress, the public, this Court, and its clients that its recommendations promote shareholder value. *See, e.g.*, Dimitri Zagoroff, *The Expansion of ESG Beyond Proxy Voting*, HARV. L. SCH. FORUM ON CORP. GOVERNANCE (June 18, 2024), https://tinyurl.com/4pdat8v6 ("[A]sset managers generally make voting, engagement and stewardship decisions based on their assessment of how the issues involved impact the bottom line over the long term. The same general approach, grounded in financial materiality … underlies Glass Lewis' benchmark voting recommendations."); Oversight of the Proxy Advisory Industry: Hearing

Before the Subcomm. on Oversight & Investigations of the H. Comm. on Fin. Servs., No. 118-39, at 51 (2023). Indeed, the Wieck affidavit asserts that "Glass Lewis would never state that its services are 'not being provided solely in the financial interest of [a] company's shareholders'" because "Glass Lewis disagrees with these statements." Dkt. 61-1 ¶ 13 (alteration in original).

Intervenors, however, have already uncovered evidence that Glass Lewis's representations to its clients and the public about the financial value of its recommendations are false—and moreover that Glass Lewis is aware its services are "not being provided solely in the financial interest" of shareholders. *Id.* For instance, Slack messages produced by Glass Lewis show Glass Lewis employees—including the employee identified by Glass Lewis as responsible for ESG-related ballot items—███████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ ████████████████████████ Rasmussen Decl. Ex. 2 (emphasis added). In another message, █████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████—a far cry from sophisticated (or even rudimentary) financial analysis. Rasmussen Decl. Ex. 1. Other messages show its employees making decisions based on ████████████████████████████████████ ██████████████ (Rasmussen Decl. Ex. 3), or ████████████████████████████ ████████████████████████████ (Rasmussen Decl. Ex. 3). █████████████████ █████████████████████████████████████████████████████████████████████ ██████ Rasmussen Decl. Ex. 3. Critically, these isolated messages were likely produced because they were previously produced to regulators, but Glass Lewis has otherwise refused to produce the internal communications underlying its recommendations.

The documents that Glass Lewis has refused to produce—including benchmark reports and custom recommendations; as well as the underlying communications, financial analyses (if any), and

drafts—are critical to understanding what criteria Glass Lewis *actually* uses to make voting recommendations, whether those recommendations are based solely on the financial interests of shareholders, and whether Glass Lewis has performed any financial analysis in support. *See* Dkt. 52 at 8-10.

If Glass Lewis is misleading its clients, as materials reviewed to date indicate, that false commercial speech would not receive First Amendment protection. "Where false claims are made to effect a fraud or secure moneys or other valuable considerations, … it is well established that the Government may restrict speech without affronting the First Amendment." *United States v. Alvarez*, 567 U.S. 709, 723 (2012); *see also Dial One of the Mid-South, Inc. v. BellSouth Telecomms., Inc.*, 269 F.3d 523, 526 (5th Cir. 2001) ("[C]ommercial speech that is false does not receive First Amendment protection."). Although the Supreme Court has recognized that the First Amendment protects commercial speech, it has reaffirmed time and time again that those protections do not extend to false, deceptive, or misleading speech. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 771 (1976) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake."); *see Illinois v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud."); *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743 (1983) ("[F]alse statements are not immunized by the First Amendment right to freedom of speech."). By the same token, the First Amendment does not prevent States from requiring those who are speaking falsely to correct the record. *See Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1126 (5th Cir. 1991); *Warner-Lambert Co. v. FTC*, 562 F.2d 749, 758-59 (D.C. Cir. 1977). The Court should allow Intervenors the chance to develop a record in support of this theory before ruling on summary judgment.

*Fourth*, under any level of scrutiny, a developed factual record along the lines Defendants seek is necessary to balancing Texas's interests in SB 2337 with the alleged burden on Glass Lewis. For example, SB 2337's purpose statement indicates that the Legislature sought to promote truthfulness

and transparency about the financial analyses (or lack thereof) underpinning proxy advisor recommendations. *See* SB 2337 § 1(3)(A) (expressing concern that proxy advisors "have not conducted financial analyses before making … recommendations … despite having proxy voting policies claiming that the purpose of the recommendation is maximizing and protecting shareholder value"); *id.* § 1(5) (explaining that providing companies with notice of proxy advisor proposals "would allow the company to provide relevant information to shareholders that may prevent fraudulent or deceptive practices associated with proxy advisors making recommendations for nonfinancial reasons"). Probing the extent to which Glass Lewis's recommendations consider financial benefit to shareholders is critical to understanding the strength of the State's asserted interest.

### B. Intervenors have reason to believe the discovery they seek will undermine Glass Lewis's cursory representations.

As summarized above, most outstanding discovery requests test Glass Lewis's assertion that its recommendations are in the best financial interests of shareholders (and thus, that SB 2337 requires it to speak falsely). There is ample reason to believe that discovery will confirm that Glass Lewis is misleading customers on this point. *See Smith*, 827 F.3d at 423 (requiring the Rule 56(d) movant to show a "plausible basis for believing that specified facts … probably exist"). To take a few examples:

- The Slack messages referenced above indicate that Glass Lewis's recommendations are not based solely on financial factors *and* that additional internal communications regarding those recommendations would yield more proof on this point.

- Bolstering Intervenors' suspicions, Glass Lewis has asserted that there are no materials containing financial analysis outside of its Benchmark Reports. Dkt. 54, at 8. If true, this means that there are no underlying work papers, such as spreadsheets or calculations, to support what is in the Benchmark Reports. This admission by Glass Lewis that it does not

have work product to back up its purported financial analysis strongly indicates that no meaningful analysis exists.

- In this litigation, Glass Lewis has repeatedly defended its practices by arguing that the vast majority of its recommendations are custom and "tailored to clients' voting policies," Dkt. 61-1 ¶ 8, and thus, reflect "exactly what [the clients] want." PI Hearing Tr. 127:11-19. Nevertheless, Glass Lewis has refused to produce *any* custom materials, attempting to shield from discovery what it describes as the "significant majority" of its business. Declaration of John Wieck, ¶ 18.  Indeed,  Glass Lewis recently announced in the Wall Street Journal that moving forward, it will *only* offer custom recommendations because its clients "have made clear that a uniform approach is insufficient."  Bob Mann, *Glass Lewis Is Adapting to Customer Needs*, THE WALL STREET JOURNAL (Nov. 25, 2025), https://tinyurl.com/3t3h79jb. But Glass Lewis provides no detail on the level of customization that its policies truly contain, and the uniform swing that results from its recommendations suggests that client customization is minimal.  Glass Lewis cannot use its custom recommendations as a shield, while simultaneously refusing to provide the discovery necessary to test Glass Lewis's claims about those recommendations. *See* Dkt. 52 at 8-9; Dkt. 55, at 3.

- Glass Lewis represents that the environmental and social factors it considers "reflect Glass Lewis' views and beliefs about how to best promote and maintain shareholder value." Dkt. 61-1 ¶ 31.  But when questioned under oath, Glass Lewis admitted that it does not perform an economic analysis "[o]n a lot of the issues that we provide recommendations on." Oversight of the Proxy Advisory Industry: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Fin. Servs., No. 118-39, at 10 (2023). And another proxy advisor has admitted that proposals based on ESG "are not good for—not linked

to long-term shareholder value." CNBC Squawk Box, Interview with Lorraine Kelly at 7:19 A.M. (Mar. 11, 2024), https://tinyurl.com/4mhpj32x.

- Glass Lewis represents that it only advises clients to "vote against the recommendation of company management" when "doing so is in the best interests of shareholders." Dkt. 61-1 ¶ 32. But some recommendations about which Intervenors are aware—such as recommending a vote against a female director to promote female representation—have no apparent relation to shareholder interests. *See* Stockinsights.ai, *Gentex Corporation (NASDAQ:GNTX) Q1 2025 Earnings Call Transcript* (Apr. 26, 2025), https://tinyurl.com/3kr7nnea.

Further bolstering Intervenors' suspicions about what discovery will reveal, as previously discussed, the State of Florida recently sued Glass Lewis under the Florida Deceptive and Unfair Trade Practices Act, alleging that the proxy advisor's claim it is a "neutral expert[] who consumers can trust to act in their best interest" is "likely to mislead." *See* Ex. B, Compl. ¶ 145. Florida's lawsuit comes after it obtained many of the materials Defendants seek pursuant to a civil investigatory demand. *See* Press Release, *Attorney General James Uthmeier Announces Investigation into Glass Lewis & Co. and Institutional Shareholder Services Inc. for ESG and DEI Policies* (Mar. 20, 2025), https://tinyurl.com/4bkj9ju5. The contents of these materials have been redacted in the State's complaint.

*    *    *

In short, the outstanding discovery Defendants seek "will influence the outcome of the pending summary judgment motion." *Smith*, 827 F.3d at 423. The Court should accordingly defer summary judgment pursuant to Rule 56(d) until Defendants have received and reviewed this discovery or deny summary judgment outright.

## II.     The Court Should Deny Summary Judgment for the Reasons in Intervenors' Prior Briefing.

Should the Court deny Intervenors' Rule 56(d) motion, Intervenors request that they be given a subsequent 14 days to substantively respond to the motion for summary judgment, as contemplated by the Scheduling Order. Dkt. 47; *see, e.g.*, *U.S. Bank Nat'l Ass'n v. Lamell*, 2020 WL 11368695, at *2 (S.D. Tex. Aug. 17, 2020) (granting nonmovant time to respond to summary-judgment motion after denial of Rule 56(d) motion); *Wells Fargo Bank, N.A. v. Malloy*, 2020 WL 7010037, at *5 (S.D. Tex. Oct. 7, 2020) (same).

In all events, Intervenors expressly incorporate by reference and preserve the legal arguments in their preliminary injunction briefing. Dkt. 39. As described above, Intervenors maintain that Glass Lewis's representations that it offers objective, financially-driven advice rather than an ideological agenda is the kind of commercial deception that is unprotected by the First Amendment. Moreover, Glass Lewis's claims that the statute is unconstitutionally vague have no merit. The term "nonfinancial" has an obvious meaning, and Glass Lewis's own policies indicate that it understands well what ESG and DEI constitute. For these reasons, SB 2337 is constitutional. To the extent the Court disagrees and finds any provision or application unlawful, Texas law requires the Court to sever that provision from the remainder. At this stage, however, this Court need only make clear that summary judgment is inappropriate in the absence of further discovery.

## CONCLUSION

For the foregoing reasons, the Court should grant Intervenors' Rule 56(d) motion and delay consideration of Glass Lewis's motion for summary judgment or deny it outright. In the alternative, the Court should permit Intervenors an additional 14 days from the date of its order denying the Rule 56(d) motion to respond substantively.

Dated: December 9, 2025

Respectfully submitted,

By: */s/ Mark W. Rasmussen*

Mark W. Rasmussen
Attorney-in-charge
Texas State Bar No. 24086291
Sidney Smith McClung
Texas State Bar No. 24083880
Timothy M. Villari
Texas State Bar No. 24125870
JONES DAY
2727 N. Harwood St., Suite 500
Dallas, Texas 75201
mrasmussen@jonesday.com
smcclung@jonesday.com
tvillari@jonesday.com
Telephone: +1.214.220.3939
Facsimile: +1.214.969.5100

Noel J. Francisco (admitted *pro hac vice*)
D.C. Bar No. 464752
Brinton Lucas (admitted *pro hac vice*)
D.C. Bar No. 1015185
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
njfrancisco@jonesday.com
blucas@jonesday.com
Telephone: +1.202.879.3939
Facsimile: +1.202.626.1700

*Attorneys for Intervenors the Texas Stock
Exchange and the Texas Association of Business*

## CERTIFICATE OF CONFERENCE

I certify that counsel for Defendants has conferred with counsel for Plaintiff on December 9, 2025, concerning the subject matter of this Motion.  Plaintiff opposes this Motion.


*/s/ Mark W. Rasmussen*
Mark W. Rasmussen

**CERTIFICATE OF SERVICE**

I certify that on December 9, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States District Court for the Western District of Texas.  I also certify that on December 9, 2025, I caused a copy of the separate motion for leave to file under seal and related materials to be served via electronic mail on counsel for all parties of record.

_/s/ Mark W. Rasmussen_
Mark W. Rasmussen