**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| GLASS, LEWIS & CO., LLC<br>*Plaintiff,*<br><br>v.<br><br>KEN PAXTON, in his Official Capacity as Attorney General of Texas<br>*Defendant,*<br><br>THE TEXAS STOCK EXCHANGE LLC and THE TEXAS ASSOCIATION OF BUSINESS,<br>*Intervenor-Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.<br>1:25-cv-01153-ADA |

**DECLARATION OF JOE NWAOKORO IN SUPPORT OF DEFENDANT'S MOTION FOR PROTECTIVE ORDER**

I, Joe Nwaokoro, declare as follows:

1. I am an Assistant Attorney General in the General Litigation Division of the Office of the Attorney General of Texas (the "Office") and counsel of record for Defendant. I am over eighteen and competent to make this declaration. The facts below are based on my personal knowledge and on my review of Office records and inquiry of Office personnel in the course of my duties. I make this declaration solely in support of Defendant's Motion for Protective Order; nothing in it waives any privilege or protection.

2. **The separate state action.** The State of Texas, acting through the Consumer Protection Division of the Office (the "Division"), filed *State v. Glass, Lewis & Co.*, No. 471-04895-2026, in the 471st District Court of Collin County, Texas (the "State DTPA Action"). It asserts claims under Sections 17.46(a), (b)(5), (b)(7), and (b)(24) of the Texas Deceptive Trade

Practices Act, seeks relief under Section 17.47, and pleads no claim under Senate Bill 2337. A true and correct copy of the State's petition is attached as Exhibit 1.

3. **Separate counsel.** The attorneys prosecuting the State DTPA Action are Assistant Attorneys General in the Division. None of them is counsel of record in this action or in No. 1:25-cv-01160-ADA, and none participates in the defense of S.B. 2337.

4. **No enforcement of S.B. 2337.** S.B. 2337 took effect on September 1, 2025. The Court's preliminary injunction issued on August 29, 2025. Since the injunction issued, the Office has taken no step to enforce S.B. 2337 against Glass Lewis. I know this from my review of Office records and my inquiry of Division personnel.

5. **The CID.** On August 22, 2025, the Division issued a civil investigative demand (the "CID") to Glass Lewis. The Division's authority to issue civil investigative demands arises under Section 17.61 of the Texas Business and Commerce Code and has existed for decades. The CID issued before S.B. 2337 took effect. Glass Lewis responded and produced materials, so it already has the CID and its own production.

6. **The investigative file.** The Division's investigative file concerning Glass Lewis consists of internal investigative memoranda, the mental impressions and work product of Division attorneys and investigators, internal communications about enforcement and charging decisions, and information provided by third parties. It is maintained as confidential, and material produced under the CID is held subject to Tex. Bus. & Com. Code § 17.61(f). I describe the file based on my review of Office records and my inquiry of Division personnel.

7. **Preparing a designee.** Topic Nos. 2, 3, 4, and 8 of Plaintiff's Rule 30(b)(6) notice concern complaints and referrals received, the Office's investigation of Glass Lewis, and the events preceding the State DTPA Action. A designee could be prepared on those topics only by

reviewing the file described in Paragraph 6 and the Office's internal deliberations, and could not testify to them without disclosing privileged and protected material.

8. **No non-privileged witness.** Topic No. 5 seeks the Office's communications and coordination with the Intervenor-Defendants, their counsel, and the Legislature concerning Glass Lewis or S.B. 2337. Based on my inquiry, I am not aware of any person in the Office who holds non-privileged personal knowledge of those communications and who is not also counsel for Defendant in this action or the State DTPA Action.

9. **Public statements.** The public statements referenced in the notice are public records equally available to Plaintiff. The Office will authenticate identified statements by stipulation or sworn declaration.

10. **Privileges.** The Office formally asserts the deliberative-process, informer's, and law-enforcement and investigative privileges over the material described in Paragraph 6 through the accompanying Declaration of Johnathan Stone, the Chief of the Division, who is authorized to invoke those privileges on the Office's behalf and has personally considered the file.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on October 9, 2026, in Houston, Texas.

*/s/ Joe Nwaokoro*
**JOE NWAOKORO**
Assistant Attorney General
Office of the Attorney General of Texas

# EXHIBIT 1

Filed: 7/13/2026 8:50 AM
Michael Gould
District Clerk
Collin County, Texas
By Darcey Bursik Deputy
Envelope ID: 117238012

**CAUSE NO:** 471-04895-2026

| | | |
|---|---|---|
| **STATE OF TEXAS,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **COLLIN COUNTY, TEXAS** |
| | § | |
| **GLASS, LEWIS & CO., LLC,** | § | |
| | § | |
| ***Defendant.*** | § | **________ JUDICIAL DISTRICT** |

**STATE'S ORIGINAL VERIFIED PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF**

"[C]onsistent and transparent governance decisions." Helping consumers make "informed decisions with confidence." These are just some of the false representations Glass, Lewis & Co., LLC ("Glass Lewis") made to investors across the county, including investors in Texas, about Glass Lewis's investment advice. In fact, Glass Lewis prioritizes its own environmental, social, and governance ("ESG") agenda over the fiscal well-being of its clients. These false, deceptive, and misleading practices of advertising independent and objective advice while secretly prioritizing a private agenda violate the laws of Texas. As such, Plaintiff, the State of Texas, acting by and through the Attorney General of Texas, Ken Paxton, brings this action against Defendant Glass, Lewis & Co., LLC for violations of the Texas Deceptive Trade Practices Act-Consumer Protection Act, Texas Business & Commerce Code §§17.41-17.63.

## I. DISCOVERY CONTROL PLAN

1. Discovery in this case should be conducted under Level 3 pursuant to Texas Rule of Civil Procedure 190.4. Restrictions concerning expedited discovery under Texas Rule of Civil Procedure 169 do not apply because Texas seeks non-monetary injunctive relief, and claims for monetary relief including penalties, attorneys' fees and costs in excess of $1,000,000.

## II. PARTIES

2. Plaintiff is the State of Texas, by and through the Consumer Protection Division of the Office of the Attorney General of Texas.

3. Defendant Glass, Lewis & Co., LLC ("Glass Lewis") is a limited liability company with its headquarters in San Francisco, California. The company is registered to do business in Texas with the Texas Secretary of State. Glass Lewis is one of two companies that possess a combined share of greater than 90% of the proxy advisory market. Glass Lewis can be served through its registered agent for service of process located at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## III. JURISDICTION AND VENUE

4. This enforcement action is brought by the Attorney General of Texas, Ken Paxton, through his Consumer Protection Division in the name of the State and in the public interest, pursuant to the authority granted to him by Section 17.47 of the Texas Deceptive Trade Practices Act ("DTPA"), on the ground that Glass Lewis has engaged in false, deceptive, and misleading acts and practices in the course of trade and commerce, as defined in and declared unlawful by, sections 17.46(a) and (b) of the DTPA. In enforcement suits filed under section 17.47 of the DTPA, the Attorney General is authorized to seek civil penalties, redress for consumers, and equitable relief in accordance with Texas Government Code Section 402.006(c).

5. Texas courts may exercise personal jurisdiction over a nonresident entity if the Texas long-arm statute authorizes the exercise of personal jurisdiction and the exercise is consistent with federal, and state constitutional due-process guarantees. *State v. Yelp, Inc.*, 725 S.W.3d 170, 181–87 (Tex. App.—15th Dist. 2025, pet. filed), *Moki Mac Rivr Expeditions v.*

*Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *see also* Tex. Civ. Prac. & Rem. Code § 17.042 (Texas long-arm statute).

6. Jurisdiction is proper because Glass Lewis has established minimum contacts in Texas such that maintenance of this suit does not offend traditional notions of fair play and substantial justice. *see Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945). Glass Lewis purposefully directs its activities toward Texas residents and purposefully avails itself of the benefits and protections of Texas law, by providing proxy advisory services to Texas consumers; allowing access to its online platform in Texas; collecting data and payments from Texas users; and otherwise entering into ongoing electronic transactions with Texas residents. Texas' claims arise out of and relate to these contacts, including Glass Lewis's deceptive and unfair practices that have injured Texas consumers.

7. The Court has general jurisdiction over Glass Lewis because its contacts and affiliations with Texas are so continuous and systematic as to render them essentially at home in Texas. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 797 (Tex. 2002). Glass Lewis has engaged in continuous and systematic business contacts with Texas, including by offering proxy advisory services to Texas-based consumers.

8. Additionally, the Court has jurisdiction over Glass Lewis because it consented to personal jurisdiction by registering with the Texas Secretary of State for the transaction of business in Texas. *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023); *see also Acacia Pipeline Corp. v. Champlin Expl., Inc.*, 769 S.W.2d 719, 720 (Tex. App.—Houston [1st Dist.] 1989, no writ) ("In return for the privilege of doing business in Texas, and enjoying the same rights and privileges as a domestic corporation, Champlin has consented to amenability to jurisdiction for purposes of all lawsuits within the state.").

9. Venue is proper in Collin County, Texas, under section 17.47(b) of the DTPA and Tex. Civ. Prac. & Rem. Code § 15.002. Specifically, venue is proper because upon information and belief the cause of action arose, in substantial part, in this County and throughout Texas. Defendant's conduct – including offering its proxy advising services – constitutes transactions and events occurring in this State, including within Collin County. *See* Tex. Bus. & Com. Code § 17.47(b). In the alternative, because Defendant is a nonresident corporation, venue is proper in any Texas County under § 15.002.

## IV. PUBLIC INTEREST

10. The State has reason to believe that Defendant has engaged in, and continues to engage in, the unlawful acts and practices described below. In addition, the State has reason to believe that Defendant has caused injury, loss, and damage to the State, and has caused adverse effects to the lawful conduct of trade and commerce, thereby directly or indirectly affecting the people of this State. Therefore, the Consumer Protection Division of the Office of the Attorney General initiates this proceeding in the public interest. Tex. Bus. & Com. Code Ann. § 17.47.

## V. TRADE AND COMMERCE

11. At all times described below, Glass Lewis and its agents have engaged or continue to engage in conduct that constitutes "trade" and "commerce" as defined in Section 17.45(6) of the Texas Deceptive Trade Practices Act as follows:

> "Trade" and "commerce" mean the advertising, offering for sale, sale, lease, or distribution of any good or service, of any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value, wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this state.

## VI. ACTS OF AGENTS

12. Whenever in this Petition it is alleged that Defendant did any act, it is meant that Defendant performed or participated in the act or Defendant's officers, agents, or employees performed or participated in the act on behalf of and under the authority of Defendant.

## VII. FACTUAL ALLEGATIONS

### A. Proxy Advising Companies Background

13. This is a DTPA action against Glass Lewis, a highly influential proxy advisor, for misrepresentations to its shareholder clients. Instead of providing objective and impartial investment advice, as advertised, Glass Lewis provides advice influenced by its own Environmental, Social, and Governance ("ESG") ideological considerations, apart from its clients' best financial interests.

14. As owners of the companies in which they invest, shareholders possess governance rights permitting them to vote on important corporate decisions, such as executive compensation, electing directors to the board, and ruling on proposals put forth by other shareholders. Harvard Law School reports that the number of proposals presented to shareholders of Russell 3000 companies increased approximately 730 percent between 2000 and 2024.[1]

15. Institutional investors—such as pension plans, universities, mutual funds, or other asset managers who invest on behalf of some principal beneficiary—must sift through the ever-increasing amount of shareholder proposals and determine how to vote in their beneficiaries' financial interest.

16. These institutional investors hold approximately 70 percent of all public shares in the United States, which typically makes their votes outcome determinative. Given that

[1] https://tinyurl.com/5f5v85yp (last visited June 30, 2026)

institutional investors regularly hold shares in hundreds of companies, most become clients of a proxy advisor, such as Glass Lewis, who recommends how they should vote on the many shareholder voting proposals. Additionally, Glass Lewis offers a service whereby institutional investors can delegate voting authority to it based on its recommendations—known as "robo-voting."

17. Glass, Lewis, together with Institutional Shareholder Services, Inc., have a combined share of greater than 90% of the proxy advisory market, making Glass Lewis half of a proxy advisor duopoly. These companies' recommendations, therefore, carry immense influence and the two companies sit at a center of power in terms of their ability to influence corporate behavior.

18. Glass Lewis's client base is vast and wields much power on shareholder votes. This client base includes Texas residents—both those who subscribe directly to Glass Lewis's services and those who receive such services through investment in funds and other vehicles, whose advisors subscribe to Glass Lewis's services.

**B. Glass Lewis's false, misleading, and deceptive representations regarding its proxy voting guidelines**

19. Glass Lewis's advertising is deceptive as it fails to adequately inform clients of its ESG initiatives. Specifically, the company incorporates these financially imprudent ideologies into its "Benchmark" objective analyses, without providing empirical support for its preferences or emphasizing the opportunity costs to the investor's bottom line. By excluding financial analyses in these benchmark reports, Glass Lewis fails to show whether the ESG-oriented advice given was in clients' best financial interests. This is a violation of Glass Lewis's fiduciary duty as a proxy advisor to provide such advice, as well as to Texas consumers who depend on such advice to grow

their pensions and other investment accounts. It also stands in contrast to current financial market and political trends regarding ESG.




*Figure 1: Screenshot from Glass Lewis's website*

20. Glass Lewis represents that it is "a leading global provider of independent corporate governance research" and that its policy recommendations are "Informed by Research and Data."[2] The company boasts that it will help consumers "Enhance Decision-Making with Consistent Proxy Voting Policies" and make "consistent and transparent governance decisions."[3]




*Figure 2: Screenshot from Glass Lewis's website*

21. But Glass Lewis's Benchmark Proxy Voting Guidelines tell a different story. Glass Lewis states that its Benchmark policy "reflects broad investor opinion and widely accepted

[2] https://www.glasslewis.com/about-us (last visited June 30, 2026)
[3] https://www.glasslewis.com/investor-solutions/proxy-voting-policies (last visited June 30, 2026)

governance principles and is intended to provide clients with nuanced analysis formation by market best practice, regulation, and prevailing investor sentiment."[4] While ESG-minded consumers have the option to incorporate Glass Lewis's ESG and Climate Thematic Voting Policy Guidelines into their investment processes, the Benchmark analyses are apparently geared toward the average consumer interested in pure financial gain. However, these "Benchmark" analyses—supposedly the most objective and ideologically neutral of all the company's sets of proxy voting guidelines—incorporate financially imprudent ideologies without providing empirical support for their ESG-focused goals.

22. For example, Glass Lewis claims in its Benchmark Proxy Voting Guidelines that "[c]ompanies face significant financial, legal and reputational risks resulting from poor environmental and social practices," so "in cases where the board or management neglected to take action on a pressing issue that could negatively impact shareholder value, we believe that shareholders should take the necessary action in order to effect changes that will safeguard their financial interests."[5]

23. Glass Lewis's guidelines call for every board to establish a "nominating and governance committee" that is "reasonably diverse on the basis of age, race, gender, and ethnicity."[6] Glass Lewis recommends voting against the entire board of directors and all director nominees up for election if the board does not have such a committee and "the board did not implement a shareholder proposal that received requisite support."[7]

24. If a board has a nominating committee, Glass Lewis will continue to vote against the chair of the nominating committee if the board is less than 30% gender diverse, or all members

---

[4] Glass Lewis 2026 Benchmark Policy Guidelines at page 7.
[5] *See* Glass Lewis 2025 Benchmark Policy Guidelines at page 84.
[6] *See id.* at page 23.
[7] *See id.* at pages 23-24, n.21.

of the nominating committee of a board with no gender diverse directors.[8] For companies outside the Russell 3000 index, Glass Lewis recommends voting against the chair of the nominating committee if there are no gender diverse directors.[9] Glass Lewis will also recommend opposing the chair of the nominating committee unless the board includes a "director from an unrepresented community."[10]

25. Glass Lewis also typically recommends voting against the chair of a nominating or governance committee if the company's proxy statement fails to mention any of the following: (a) the board's current percentage of racial and ethnic diversity; (b) whether the board's definition of diversity fails to explicitly include gender and/or race and ethnicity; and (c) whether the board has failed to adopt a policy requiring women and minorities to be included in the initial pool of candidates when selecting new director nominees.[11]

26. On the environmental side of its ESG initiative, Glass Lewis also "views climate risk as a material risk for all companies"[12] and states that climate change "has quickly become one of the most pressing issues facing companies and investors."[13] Accordingly, if a company does not disclose oversight responsibility for "climate-related issues," Glass Lewis will recommend voting against the chair of the governance committee.[14]

27. Glass Lewis's guidelines also lack transparency. For example, Glass Lewis vaguely defines "social risk" to include "issues that adversely affect the company's stakeholders."[15] Glass Lewis states that it may recommend opposing the board "when companies

[8] *Id. at* page 26.
[9] *Id.*
[10] *Id.* at page 41.
[11] *Id.* at page 42.
[12] *Id.* at page 30.
[13] Glass Lewis Scope 3 Emissions – Investor Primer at page 4.
[14] Glass Lewis 2025 Benchmark Policy Guidelines at page 30.
[15] *See id.* at 84-85.

have not provided for explicit, board-level oversight of environmental and social matters and/or when a substantial environmental or social risk has been ignored or inadequately addressed."[16] The inclusion this subjective catch-all category as a means for complete opposition of a company's board illustrates just one way in which Glass Lewis's guidelines lack transparency and can be used to further its own ESG-focused agenda. This is a far cry from the "Consistent Proxy Voting Policies" that Glass Lewis advertises.

28. But Glass Lewis's ESG-focused initiatives are distinctly different from current financial market trends. According to Oliver Wyman, a leading global management consulting firm, in 2022, many ESG funds suffered a 3 to 4 percent underperformance compared with broad equity markets.[17] Yahoo Finance reported that in 2023, ESG funds faced their worst year on record.[18] Morgan Stanley reported that in 2024, traditional funds offered four times the return of sustainable funds.[19] In 2025, Europe saw a net withdrawal from ESG funds, with a $1.2 billion outflow in Q1, according to Morningstar.[20] Globally, sustainable funds recorded $8.6 billion in net outflows in Q1 2025.[21]

29. What is more, Glass Lewis's ESG initiatives stand in contrast to current political trends. For example, in January 2026, the United States withdrew from the Paris Agreement, which required signatories to publish and update emissions-cutting targets.[22] The United States has also rescinded the Environmental Protection Agency's long-standing findings of contribution and endangerment, along with motor vehicle emissions standards based on those findings.[23] And

---

[16] *Id.*
[17] https://tinyurl.com/4b9unerv (last visited June 30, 2026)
[18] https://tinyurl.com/3fe85b3n (last visited June 30, 2026)
[19] https://tinyurl.com/43sfb344 (last visited June 30, 2026)
[20] https://tinyurl.com/yp9ewxwy (last visited June 30, 2026)
[21] *Id.*
[22] https://www.cfr.org/articles/united-states-exits-paris-agreement (last visited June 30, 2026)
[23] https://www.govinfo.gov/content/pkg/FR-2026-02-18/pdf/2026-03157.pdf (last visited June 30, 2026)

the United States Department of Energy reported in January 2026 that it had "achieved record-high levels of output" of domestic oil and gas production.[24] The United States has also issued stricter policies and regulations related to wind and solar power, such as pausing the leases for all large-scale offshore wind projects under construction[25] and eliminating subsidies for wind and solar sources.[26]

30. It is clear from the aforementioned examples that Glass Lewis's commitment to ESG initiatives goes against both financial market trends and political trends and is not made in the best fiscal interests of its clients. Instead of basing its Benchmark guidelines on a rational analysis of the effects that anticipated changes to government policy would have on any given company, Glass Lewis's actions resemble those of an ESG activist forcing companies to comply with rules that governments will not otherwise adopt and that instead align with Glass Lewis's own views on society's environmental and social needs. And instead of fulfilling its duty to focus on a client's financial interests, Glass Lewis incorporates these ESG initiatives into its Benchmark guidelines without sufficiently disclosing its agenda to the average company in search of pure financial gain.

31. Glass Lewis's agenda becomes even more harmful in instances of "robo-voting," a service in which institutional investors follow the voting recommendations of a proxy advisor without engaging in an independent review of those recommendations. Glass Lewis's Benchmark Policy Guidelines demonstrate why robo-voting cannot reflect a meaningful consideration of the proxy advisory firms' analyses. As stated above, vague definitions like "social risk" can lead to

---

[24] https://www.energy.gov/articles/fact-sheet-delivering-us-oil-and-natural-gas-production (last visited June 30, 2026)

[25] https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases (last visited June 30, 2026)

[26] https://www.whitehouse.gov/fact-sheets/2025/07/fact-sheet-president-donald-j-trump-ends-market-distorting-subsidies-for-unreliable-foreign-controlled-energy-sources/ (last visited June 30, 2026).

complete opposition of a company's board. Moreover, the guidelines repeatedly reference that Glass Lewis makes some recommendations on a "case-by-case basis," without sufficiently detailing the considering factors and how much weight is given to each considering factor.[27] Glass Lewis does not sufficiently disclose to its clients the irreconcilable conflict between automated robo-voting in accordance with the advisors' guidelines and "case-by-case" assessments.

## VIII. CAUSES OF ACTION

### Violation of the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code §§ 17.46 *et seq*. ("DTPA")

32. Texas incorporates the forgoing allegations as set forth fully herein.

33. The Texas Deceptive Trade Practices Act prohibits false, misleading, or deceptive acts or practices in the conduct of trade and commerce. As alleged herein and detailed above, Glass Lewis has in the course and conduct of trade and commerce engaged in false, misleading, or deceptive acts or practices declared unlawful by and in violation of Section 17.46(a) and (b) of the DTPA.

### Count 1: False, Misleading, or Deceptive Acts Regarding Glass Lewis's Representations to Consumers Regarding its ESG Initiatives

34. Through false, misleading, or deceptive acts, either expressly or by implication, Glass Lewis misrepresents to Texas consumers advice influenced by its own ESG ideological considerations and apart from its clients' best financial interests.

35. Through their false, misleading, or deceptive acts, Glass Lewis violated the following DTPA sections:

- 17.46(a) which prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce;"

---

[27] *See*, e.g., Glass Lewis 2025 Benchmark Policy Guidelines at 26 and 73.

- 17.46(b)(5) which prohibits "representing that goods or services have sponsorship, approval, characteristics, ingredients uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not;"

- 17.46(b)(7) which prohibits "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

- 17.46(b)(24) which prohibits "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction which the consumer would not have entered had the information been disclosed".

**Count 2: Failure to Disclose that Its ESG Initiatives are Not in Consumers' Best Financial Interests**

36. Texas Bus. & Com. Code § 17.46(b)(24) provides that "false, misleading, or deceptive acts or practices" includes "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed."

37. Glass Lewis engaged and continues to engage in false, misleading, and deceptive acts when it fails to disclose to Texas consumers that the ESG initiatives it prioritizes are not in its customers' best financial interests. By withholding this information, Glass Lewis intends to induce Texas consumers into transactions they would not have entered had Glass Lewis disclosed this information.

38. In doing so, Glass Lewis violated Section 17.46(b)(24) of the DTPA.

## IX. TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

39. Texas incorporates the foregoing allegations as if set forth fully herein.

40. Generally, an applicant for a temporary restraining order or temporary injunction must plead and prove (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.[28]

41. However, "[w]hen an applicant relies upon a statutory source for injunctive relief . . . the statute's express language supersedes the common law injunctive relief elements such as imminent harm or irreparable injury and lack of an adequate remedy at law."[29]

42. The Texas Supreme Court has held that "when it is determined that [a] statute is being violated, it is within the province of the district court to restrain it" so "[t]he doctrine of balancing the equities has no application to this statutorily authorized injunctive relief."[30]

43. Under the DTPA, Texas need only prove the following to obtain a temporary restraining order and temporary injunction against Glass Lewis: (1) that the Attorney General has reason to believe it is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by the DTPA, and (2) that proceedings would be in the public interest.[31]

44. This Court may issue a temporary restraining order with or without notice to the opposing party. [32]

45. Whether to grant a temporary restraining order or temporary injunction rests with a trial court's sound discretion.[33]

---

28 *Butnaru v. Ford Motor Co*., 84 S.W.3d 198, 204 (Tex. 2002); *Polston v. State*, No. 03-20-00130-CV, 2022 WL 91974, at *3 (Tex. App.—Austin Jan. 6, 2022, no pet.); *Trove v. Scott*, No. 03-99-00118-CV, 1999 WL 546997, at *1 (Tex. App.—Austin July 29, 1999, no pet.) (not designated for publication); Tex. R. Civ. P. 680.

29 *West v. State*, 212 S.W.3d 513, 519 (Tex.App.—Austin 2006, no pet.).

30 *State v. Texas Pet Foods, Inc.*, 591 S.W.2d 800, 805 (Tex. 1979).

31 Tex. Bus. & Com. Code § 17.47(a).

32 *See* Tex. R. Civ. P. 680-81.

33 *In re MetroPCS Communications, Inc*., 391 S.W.3d 329, 336 (Tex. App.—Dallas 2013, no pet.); *Butnaru*, 84 S.W.3d at 204.

46. The Attorney General is charged with pursuing an action for a temporary restraining order, temporary injunction, or permanent injunction to prevent and restrain any violations of DTPA section 17.46(a)–(b).

47. The list of deceptive acts in section 17.46(b) is non-exhaustive and a restraining order is appropriate if Defendant engaged in any "[f]alse, misleading, or deceptive act[] or practice[]."[34]

48. The Attorney General has reason to believe that Glass Lewis is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by the DTPA and that a temporary restraining order and thereafter temporary injunction would be in the public interest. Consequently, this Court should immediately enter a temporary restraining order enjoining Glass Lewis from failing to disclose its ESG initiatives to Texas consumers.

49. The State requests the Court set a hearing for a temporary injunction and that, after notice and hearing, Glass Lewis be temporarily enjoined from continuing the alleged violative conduct detailed herein pending a final trial.

50. The State requests that the Clerk of the court issue such Writs of Injunction pursuant to any injunctive order issued by this Court in conformity with the law, and that the same be issued and be effective without the execution and filing of a bond, as the State is exempt from such bonds under Texas Business and Commerce Code § 17.47(b).

## X. CIVIL PENALTIES

51. Texas incorporates the foregoing allegations as if set forth fully herein.

52. The State of Texas is entitled to recover up to $10,000 for each violation of the DTPA. Tex. Bus. & Com. Code § 17.47(c)(1).

---

[34] Tex. Bus. & Com. Code § 17.46(a).

53. Section 17.47(g) of the Texas Business & Commerce Code describes six factors that the trier of fact "shall consider" when determining the amount of civil penalties to impose:

(1) The seriousness of the violation, including the nature, circumstances, extent, and gravity of any prohibited act or practice;

(2) The history of previous violations;

(3) The amount necessary to deter future violations;

(4) The economic effect on the person against whom the penalty is to be assessed;

(5) Knowledge of the illegality of the act or practice; and

(6) Any other matter that justice may require.

54. Glass Lewis's current financial situation must also be considered by the jury when determining civil penalties to impose. *See* Tex. Bus. & Com. Code § 17.47(g)(3)–(4), (6).

55. Texas is not required to allege injuries to bring claims seeking civil penalties under the DTPA. Tex. Bus. & Com. Code § 17.47(a) (creating a cause of action "[w]henever the consumer protection division has reason to believe that any person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by [the DTPA]…"); *see e.g. Holzman v. State*, No. 13-11-00168-CV, 2013 WL 398935, at *3 (Tex. App.—Corpus Christi 2013, pet. denied) ("Moreover, it is not necessary for the State to allege any injury to a [consumer] to recover the civil penalties it seeks in its live petition."); see also *Texas v. Colony Ridge, Inc.*, Civil Case No. CV-H-24-0941, 2024 WL 4553111, at *8 (S.D. Tex. 2024) (same).

## XI. DEMAND FOR TRIAL BY JURY

56. The State demands a jury trial and tenders the appropriate fee with this petition.

## XII. PRAYER FOR RELIEF

57. In addition to a temporary restraining order, temporary injunction, and permanent injunction, Texas claims entitlement to monetary relief in an amount greater than $1,000,000.00, including civil penalties, reasonable attorneys' fees, litigation expenses, and costs.

## XIII. RIGHT TO ISSUE WITHOUT BOND

58. The State requests that the Clerk of the Court issue such Writs of Injunction pursuant to any Injunction issued by this Court in conformity with the law, and that the same be issued and be effective without the execution and filing of a bond, as the State is exempt from such bonds under § 17.47(b) of the Texas Business and Commerce Code.

## XIV. PRAYER

The State respectfully requests that the Court enter a final judgment in its favor and issue an order for the following:

a. Finding that Defendant has violated §§ 17.46(a) and (b) of the DTPA by engaging in the false, misleading, or deceptive acts or practices alleged above;

b. Requiring Defendant to pay civil penalties of up to $10,000 per violation of the DTPA as authorized by Tex. Bus. & Com. Code § 17.47 (c)(1);

c. Enter a temporary restraining order prohibiting Glass Lewis from continuing to provide proxy advising service that are made by considering ESG initiatives;

d. Enter a temporarily and thereafter permanently enjoining Defendant from engaging in the above acts, practices, and conduct in trade or any other practice in violation of the DTPA, such injunctive relief being authorized by § 17.47 of the DTPA; including but not limited to:

1) Order Glass Lewis to make clear and conspicuous representations to U.S. consumers that its proxy advising services are not made from a purely financial standpoint and focus heavily on ESG initiatives;

2) Enjoin Glass Lewis from providing proxy advisory services without providing customers with a clear and conspicuous notice of Glass Lewis's focus on ESG initiatives;

e. Requiring Defendant to pay all attorneys' fees and costs for the prosecution and investigation of this action, as authorized by Tex. Gov't Code Ann. §402.006(c); and

f. Ordering that the State be awarded any further relief to which it demonstrates entitlement under the law.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

JOHNATHAN STONE
Chief, Consumer Protection Division

*/s/Scott Froman*
**LAUREN MCGEE**
State Bar No. 24128835
Assistant Attorney General
Tel: (512) 475-3203
Lauren.Mcgee@oag.texas.gov

**SCOTT FROMAN**
State Bar No. 24122079

Assistant Attorney General
Tel: (512) 463-1264
Scott.Froman@oag.texas.gov
**Office Of The Attorney General Of Texas**
Consumer Protection Division
P.O. Box 12548, MC-010
Austin, Texas 78711-2548
Tel: (512) 463-2185
Fax: (512) 473-8301

**ATTORNEYS FOR THE STATE OF TEXAS**

## VERIFICATION

Pursuant to Tex. Civ. Rem. & Prac. Code § 132.001(f), Scott Froman submits this unsworn declaration in lieu of a written sworn declaration, verification, certification, oath, or affidavit required by Texas Rule of Civil Procedure 682. I am an employee of the following governmental agency: Texas Office of the Attorney General. I am executing this declaration as part of my assigned duties and responsibilities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Travis County, State of Texas, on the 10th day of July, 2026.

*/s/ Scott Froman*
Scott Froman

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Zoann Willis on behalf of Scott Froman
Bar No. 24122079
zoann.willis@oag.texas.gov
Envelope ID: 117238012
Filing Code Description: Plaintiff's Original Petition (OCA)
Filing Description: State's Original Verified Petition and Application for Temporary Restraining Order and Injunctive Relief
Status as of 7/13/2026 9:15 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Scott Froman | | scott.froman@oag.texas.gov | 7/13/2026 8:50:45 AM | SENT |
| Lauren McGee | | lauren.mcgee@oag.texas.gov | 7/13/2026 8:50:45 AM | SENT |
| Lupita Rodriguez | | lupita.rodriguez@oag.texas.gov | 7/13/2026 8:50:45 AM | SENT |
| Melinda Pate | | melinda.pate@oag.texas.gov | 7/13/2026 8:50:45 AM | SENT |
| Zoann Willis | | zoann.willis@oag.texas.gov | 7/13/2026 8:50:45 AM | SENT |
| Johnathan Stone | | johnathan.stone@oag.texas.gov | 7/13/2026 8:50:45 AM | SENT |
| Jerry Bergman | | jerry.bergman@oag.texas.gov | 7/13/2026 8:50:45 AM | SENT |