**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| GLASS, LEWIS & CO., LLC<br>*Plaintiff,*<br><br>v.<br><br>KEN PAXTON, in his Official Capacity as Attorney General of Texas<br>*Defendant,*<br><br>THE TEXAS STOCK EXCHANGE LLC and THE TEXAS ASSOCIATION OF BUSINESS,<br>*Intervenor-Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.<br>1:25-cv-01153-ADA |

---

**DECLARATION OF JOE NWAOKORO IN SUPPORT OF DEFENDANT ATTORNEY GENERAL'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY RESPONSES**

---

I, Joe Nwaokoro, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am an Assistant Attorney General in the Office of the Attorney General of Texas and counsel of record for Defendant Ken Paxton, in his official capacity as Attorney General of Texas (the "Attorney General"), in this action. I submit this Declaration in support of the Attorney General's Response to Plaintiff Glass, Lewis & Co., LLC's ("Glass Lewis") Motion to Compel Discovery Responses (the "Response"). The statements below are based on my personal knowledge and my review of the files maintained by the Office of the Attorney General in the ordinary course of this litigation. If called as a witness, I could and would testify competently to these facts.

2. This Declaration authenticates the exhibits cited in the Response and describes the Attorney General's written-discovery responses, privilege log, and the parties' communications after Glass Lewis filed its Motion on October 19, 2026. I incorporate by reference my prior Declaration filed with the Attorney General's Reply in support of his Motion for Protective Order (Dkt. 110-1) (the "Nwaokoro Reply Declaration") and its exhibits, my Declaration filed with the Attorney General's Motion for Protective Order (Dkt. 101-1), and the Declaration of Division Chief Johnathan Stone (Dkt. 101-2).

3. As set forth in the Nwaokoro Reply Declaration, the Attorney General served amended objections and responses, a document production, and an itemized privilege log on October 16, 2026, and served his Second Amended Objections and Responses, a supplemental production, and a supplemental privilege log on October 20, 2026.

4. On October 22, 2026, at 2:35 p.m., Jared LeBrun, counsel for Glass Lewis, sent me and co-counsel an email identifying what Glass Lewis contended were deficiencies in the Attorney General's privilege log and discovery responses, including claimed internal inconsistencies regarding the Alliance for Corporate Excellence, objections to the common-interest and work-product designations, and a contention that the log was incomplete. The email demanded that the Attorney General confirm by the end of the following day that he would produce certain communications, withdraw his work-product assertions, and individually log each withheld document. A true and correct copy of that email, and the email thread that followed, is attached as Exhibit C.

5. On October 23, 2026, the Attorney General responded to each of Glass Lewis's points and served supplemental discovery materials. At 3:38 p.m., I sent Mr. LeBrun a written response addressing his concerns item by item and stating that the Attorney General remained

available to confer. At 5:56 p.m., the Attorney General served, by email, the Attorney General's Supplemental Objections and Responses to Plaintiff's Second Set of Interrogatories and Second Set of Requests for Production, the Attorney General's Second Amended Privilege Log, and a chart identifying deficiencies in Glass Lewis's own privilege log. Both emails are included in Exhibit C.

6. The Attorney General's Supplemental Objections and Responses, served October 23, 2026, conformed the objections to Interrogatories 14 and 20 and supplemented the responses to Requests for Production 24 and 27. A true and correct copy is attached as Exhibit A.

7. The Attorney General's Second Amended Privilege Log, served October 23, 2026, lists each withheld item separately, with its author, date, and recipients. In preparing it, the Attorney General located the first two drafts of the document logged as DOC000001 and logged those drafts individually. On October 26, 2026, after Glass Lewis's counsel advised that several cells had been truncated when the log was converted to PDF for service on October 23, 2026, the Attorney General re-served the Second Amended Privilege Log in corrected form so that each entry displays in full. The corrected log is identical in substance to the version served on October 23, 2026; no entry, description, or privilege assertion was changed. A true and correct copy of the corrected Second Amended Privilege Log is attached as Exhibit B.

8. As reflected in the Supplemental Objections and Responses and the Second Amended Privilege Log, after a diligent search, the Attorney General has no responsive, non-privileged documents concerning the Alliance for Corporate Excellence to produce. The Attorney General's communications with the United States Department of Justice, the Office of the Indiana Attorney General, and counsel for the Alliance are withheld as attorney work product, and the Second Amended Privilege Log states that basis and the grounds for each entry. The Attorney

General does not assert common interest as an independent ground for withholding any document; the designation is on the log to explain why sharing these materials with aligned, non-adverse counsel did not waive the work-product protection.

9. Attached as Exhibit D is a true and correct copy of a chart showing the comprehensive deficiencies in Glass Lewis's October 19, 2026 privilege log.

10. The chart the Attorney General served on October 23, 2026 identifies entries in Glass Lewis's October 19, 2026 privilege log that reflect the same categories of deficiency Glass Lewis attributes to the Attorney General (automated notifications, public-statute attachments, business emails with no attorney on them, communications sent to outside domains and personal accounts, work-product claims unsupported by any anticipated litigation, drafts meant for publication or clients and factual status emails, and entries too thin to evaluate under Rule 26(b)(5)(A)) and states, for each, the specific deficiency and the requested cure. A true and correct copy of the chart is attached as Exhibit E.

11. Attached as Exhibit F is a true and correct copy of a chart that matches, request by request, each challenged request in Glass Lewis's second set to the request in its first set that it duplicates, drawn from the Attorney General's cumulativeness objections. The Attorney General answered Glass Lewis's first set of discovery on October 31, 2025.

12. Attached as Exhibit G is a true and correct copy of a chart that pairs each of the Attorney General's Second-Set Interrogatories 14-25 and Requests for Production 22-36, the requests Glass Lewis's Motion claims were refused, with the Attorney General's actual responses, served October 16 and superseded and supplemented on October 20 and 23, 2026, identifying for each the substantive answer, the answer by reference, or the responsive, non-privileged documents produced at Bates range AG 002090-AG 003289.

13. Attached as Exhibit H is a true and correct copy of the State's verified Second Amended Petition in the State DTPA Action, *State v. Glass, Lewis & Co.*, No. 471-04895-2026 (471st Dist. Ct., Collin County), which pleads the State's deceptive-trade-practices claim against Glass Lewis in detail, drawn from Glass Lewis's own public statements and admissions.

14. The following exhibits are attached to this Declaration:

a. Exhibit A: Attorney General's Supplemental Objections and Responses to Plaintiff's Second Set of Interrogatories and Second Set of Requests for Production (served October 23, 2026);

b. Exhibit B: Attorney General's Second Amended Privilege Log (served October 23, 2026; re-served in corrected form October 26, 2026);

c. Exhibit C: Email thread between Jared LeBrun and Joe Nwaokoro, dated October 22-23, 2026, including the Attorney General's October 23, 2026 transmittal of the materials in Exhibits A, B, and E;

d. Exhibit D: Comprehensive Deficiencies in Glass Lewis's October 19, 2026 Privilege Log (chart);

e. Exhibit E: Deficiencies in Glass Lewis's October 19, 2026 Privilege Log (chart) (served October 23, 2026);

f. Exhibit F: Chart matching each challenged second-set discovery request to the duplicative first-set request;

g. Exhibit G: Chart pairing Glass Lewis's challenged second-set requests (Interrogatories 14-25 and Requests for Production 22-36) with the Attorney General's actual responses and production; and

h. Exhibit H: State's verified Second Amended Petition in *State v. Glass, Lewis & Co.*, No. 471-04895-2026 (471st Dist. Ct., Collin County).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 26, 2026, in Houston, Texas.

*/s/ Joe Nwaokoro*
**JOE NWAOKORO**
Texas Bar No. 24032916
Assistant Attorney General
General Litigation Division
Office of the Attorney General of Texas

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| GLASS, LEWIS & CO., LLC<br>*Plaintiff,*<br><br>v.<br><br>KEN PAXTON, in his Official Capacity as Attorney General of Texas<br>*Defendant,*<br><br>THE TEXAS STOCK EXCHANGE LLC and THE TEXAS ASSOCIATION OF BUSINESS,<br>*Intervenor-Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.<br>1:25-cv-01153-ADA |

---

**DEFENDANT THE ATTORNEY GENERAL'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF'S SECOND SET OF INTERROGATORIES AND SECOND SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS**

---

TO: Plaintiff, Glass, Lewis & Co., LLC, through its counsel of record, Bryce L. Callahan, Yetter Coleman LLP, 600 Travis Street, Suite 5400, Houston, Texas 77002.

Defendant Ken Paxton, in his official capacity as Attorney General of Texas ("Defendant" or the "Office"), submits these Supplemental Objections and Responses to Plaintiff Glass, Lewis & Co., LLC's ("Glass Lewis") Second Set of Interrogatories and Second Set of Requests for Production.

Dated: October 23, 2026.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**WILLIAM D. WASSDORF**
Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Chief, General Litigation Division

*/s/ Joe Nwaokoro*
**JOE NWAOKORO**
Attorney-in-Charge
Texas Bar No. 24032916
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 979-5382 | FAX: (512) 477-2348
Joe.Nwaokoro@oag.texas.gov

***Defendant Ken Paxton, in his official capacity as Attorney General of Texas***

## CERTIFICATE OF SERVICE

I certify that on October 23, 2026, a true and correct copy of the foregoing was served on all counsel of record by electronic mail.

*/s/ Joe Nwaokoro*
**JOE NWAOKORO**
Assistant Attorney General

## DEFENDANT'S GENERAL OBJECTIONS

Each of these general objections is deemed incorporated into Defendant's specific objections to each individual request:

1. Defendant objects to each request for production and interrogatory to the extent that it seeks materials protected from discovery by the attorney-client privilege, the work product doctrine, the common-interest doctrine, the investigative privilege, the law-enforcement privilege, the informer's privilege, the deliberative process privilege, or any other applicable privilege or protection. To the extent that each request seeks such privileged or protected material, Defendant claims such privilege and invokes such protection. Defendant does not intend to waive, and shall not be construed as having waived, any such privilege or protection by failing to make a specific objection.

2. Defendant objects to each request for production and interrogatory to the extent that it is vague, overly broad, and fails to specify the materials sought with reasonable particularity. Defendant will attempt to construe the request in a reasonable manner in providing a response.

3. Defendant objects to the definitions and instructions to Plaintiff's Second Request for Production and Second Set of Interrogatories on the grounds that they are overly broad, render the requests unduly burdensome, and exceed what is required by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 26(b)(1), 34.

4. Defendant objects to each request for production to the extent it seeks documents not in Defendant's possession, custody, or control. Defendant can only produce those documents in his possession, custody, or control.

5. Defendant objects to each request to the extent it seeks information that is irrelevant to any party's claim or defense or not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

6. Defendant incorporates by reference his objections and preliminary statement in his prior responses to Plaintiff's Second Request for Production and Second Set of Interrogatories.

## SCOPE

These Supplemental Objections and Responses supplement and supersede only the responses to Interrogatory Nos. 14 and 20 and Requests for Production Nos. 24 and 27 in Defendant's Second Amended Objections and Responses served October 20, 2026. Otherwise, the October 20, 2026 service remains in effect and is incorporated by reference.

**SUPPLEMENTAL OBJECTIONS AND RESPONSES TO SECOND SET OF INTERROGATORIES**

**INTERROGATORY NO. 14:** Identify each Texas resident, consumer, customer, company, or shareholder that You contend has been deceived or misled by any statement made by Glass Lewis in connection with its provision of proxy advisory services, and for each, describe the statement and the manner in which You contend that person was deceived or misled.

**OBJECTIONS:** Defendant objects that identification of persons deceived in the State DTPA Action is not relevant to whether S.B. 2337 is unconstitutional as applied to Glass Lewis and is not proportional to the needs of this case. Fed. R. Civ. P. 26(b)(1). Defendant objects that the identity of persons, other than the Alliance for Corporate Excellence, whose identity Defendant has disclosed, who furnished information to the Consumer Protection Division (the "Division") is protected by the informer's privilege (Decl. of Johnathan Stone, Dkt. 101-2 ("Stone Decl.") 4); Defendant's disclosure of the Alliance's identity does not waive that privilege as to any other source. The content of the information furnished to the Division, and the Division's evaluation of it, is protected by the law-enforcement privilege, the deliberative-process privilege, and the work-product doctrine (Stone Decl. 2-3, 5). Defendant objects that the interrogatory is cumulative of First Set Interrogatory No. 11, answered October 31, 2025. Fed. R. Civ. P. 26(b)(2)(C)(i). Subject to these objections, Defendant answers as follows:

**ANSWER**: Defendant's contentions concerning Glass Lewis's statements are pleaded in the verified petition in the State DTPA Action (Dkt. 101-1) ("Pet.") 13-38 and the statements are identified in the Answer to Interrogatory No. 17. Defendant refers Glass Lewis to its prior identification of the Alliance for Corporate Excellence as a person who furnished information to the Division, and to Defendant's Answer to First Set Interrogatory No. 11. As stated there, counsel for the Alliance identified only, and generally, the Alliance's belief that Glass Lewis makes false or misleading statements to its customers. Besides the Alliance for Corporate Excellence, no other person furnished information to the Division concerning Glass Lewis's statements.

**INTERROGATORY NO. 20**: Identify each Texas-based client of Glass Lewis that has complained to You about Glass Lewis, and for each, state the date of the complaint, the person who made it, the manner in which it was communicated, and its substance.

**OBJECTIONS**: Defendant objects that the interrogatory seeks information that is not relevant to the as-applied challenge or proportional to the needs of this case. Fed. R. Civ. P. 26(b)(1). Defendant objects that the identity of persons, other than the Alliance for Corporate Excellence, whose identity Defendant has disclosed, who furnished information to the Division, and documents tending to reveal their identity, are protected by the informer's privilege (Stone Decl. 4); Defendant's disclosure of the Alliance's identity does not waive that privilege as to any other source. The content of the information furnished, and the Division's evaluation of it, is

protected by the law-enforcement privilege, the deliberative-process privilege, and the work-product doctrine (Stone Decl. 2-3, 5). Defendant objects that the interrogatory is cumulative and duplicative of First Set Interrogatory No. 11 and of Interrogatory No. 14 of this Set. Fed. R. Civ. P. 26(b)(2)(C)(i). Subject to these objections, Defendant answers as follows:

**ANSWER**: Defendant has not received a complaint about Glass Lewis from any person it knows to be a Texas-based client of Glass Lewis. Defendant is not aware that the Alliance for Corporate Excellence, identified in Defendant's answer to First Set Interrogatory No. 11, is a client of Glass Lewis, and does not have information regarding its state of organization or principal place of business.

**SUPPLEMENTAL OBJECTIONS AND RESPONSES TO SECOND SET OF REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 24**: All documents concerning any complaint, report, or communication received by the Office of the Attorney General from any consumer, customer, company, or shareholder asserting that Glass Lewis made a false or misleading statement, and all documents sufficient to show any deception or harm You contend resulted.

**OBJECTIONS**: Defendant objects that the Division's complaint intake is not relevant to the as-applied challenge or proportional to the needs of this case. Fed. R. Civ. P. 26(b)(1). Defendant objects that the identity of any person, other than the Alliance for Corporate Excellence, who furnished such information is protected by the informer's privilege, and that the content of any such materials and the Division's evaluation of them are protected by the law-enforcement privilege, the deliberative-process privilege, and the work-product doctrine as part of the Division's confidential DTPA investigative file (Stone Decl. 2-5). Defendant objects that the request is cumulative of First Set Request Nos. 11, 12, and 13. Defendant refers Glass Lewis to the Answers to Interrogatory Nos. 14 and 17. Subject to these objections, Defendant responds as follows:

**RESPONSE**: Defendant refers Glass Lewis to its prior identification of the Alliance for Corporate Excellence and to the Answer to Interrogatory No. 14. Other than the Alliance for Corporate Excellence, Defendant has identified no other person who furnished such information. After a diligent search, Defendant has no documents to produce.

**REQUEST FOR PRODUCTION NO. 27**: All communications and documents exchanged between You and the Alliance for Corporate Excellence, Foley & Lardner LLP, or Peter Loh concerning Glass Lewis, proxy advisors, or S.B. 2337.

**OBJECTIONS:** Defendant objects that communications between Office counsel and counsel for the Alliance for Corporate Excellence, which has since appeared as amicus curiae in this action, Dkt. 26, were exchanged in furtherance of a common legal interest in defending S.B. 2337 and are protected work product. Defendant further objects that the informer's privilege protects the identity of any source other than the Alliance, whose identity Defendant has disclosed, and that communications reflecting the motive behind S.B. 2337's enactment are not relevant to the as-applied challenge. Subject to these objections, Defendant responds as follows:

**RESPONSE**: Defendant is withholding the communications with counsel for the Alliance identified on its privilege log and has located no other responsive communications.

**VERIFICATION**

I, Assistant Attorney General Joe Nwaokoro, am authorized to make this verification on behalf of Defendant. I have read the foregoing answers to Plaintiff's Second Set of Interrogatories, and the factual statements in them are true and correct to the best of my knowledge, information, and belief, based on information assembled by authorized personnel of the Office of the Attorney General.

Executed on October 23, 2026.

*/s/ Joe Nwaokoro*
**JOE NWAOKORO**
Assistant Attorney General

# EXHIBIT B

**DEFENDANT'S SECOND AMENDED PRIVILEGE LOG — Glass, Lewis & Co., LLC v. Paxton, No. 1:25-cv-01153-ADA (W.D. Tex.); Oct. 23, 2026**

*Key: AC = attorney-client privilege; WP = work product (Fed. R. Civ. P. 26(b)(3)); DPP = deliberative-process privilege; CI = common-interest doctrine (asserted only as the basis on which disclosure to an aligned, non-adversary third party did not waive work product; not an independent ground of withholding); * = attorney. This log amends and replaces the previous privilege logs dated October 16 and October 20, 2026, and is supported by the Declaration of Johnathan Stone (Dkt. 101-2).*

| No. | Doc. ID / Bates | Date(s) | Type | Author (* = attorney) | Recipients (To / CC) | Description and basis | Protection | Treatment |
|---|---|---|---|---|---|---|---|---|
| 1 | DOC000051 (version 1 of 3) | 8/11/2025 | Word memorandum | Christopher Molak* | CPD management and executive, including Johnathan Stone (Division Chief) and Jerry Bergman (Deputy Division Chief); Clayton Watkins* (Assistant Attorney General); Jennifer Roscetti* (Deputy Chief) | First draft of the internal memorandum from a Division attorney to Division management providing legal analysis and enforcement recommendations concerning proxy advisors under the DTPA, prepared in anticipation of enforcement litigation. Predecisional draft reflecting counsel's mental impressions; the later versions are withheld at Entries 2 and 3. | AC; WP; DPP | Withhold |
| 2 | DOC000052 (version 2 of 3) | 8/14/2025 | Word memorandum | Christopher Molak* | CPD management and executive, including Johnathan Stone (Division Chief) and Jerry Bergman (Deputy Division Chief); Clayton Watkins* (Assistant Attorney General); Jennifer Roscetti* (Deputy Chief) | Second draft of the same internal memorandum (see Entries 1 and 3) reflecting counsel's continued revisions, legal analysis, and mental impressions concerning proxy advisors under the DTPA, prepared in anticipation of enforcement litigation. Predecisional draft. | AC; WP; DPP | Withhold |
| 3 | DOC000001 (version 3 of 3) | 8/14/2025 | Word memorandum | Christopher Molak* | CPD management and executive, including Johnathan Stone (Division Chief) and Jerry Bergman (Deputy Division Chief); Clayton Watkins* (Assistant Attorney General); Jennifer Roscetti* (Deputy Chief) | Final version of the internal memorandum concerning proxy advisors under the DTPA (see Entries 1 and 2). | AC; WP; DPP | Withhold |
| 4 | AG_002098 (email 1 of 2) | 9/10/2025 | Email | Lee Winkelman* | Christopher Molak*; Gina McDonald (Division investigator) | Internal Division email seeking legal input on the Office's response to Glass Lewis counsel's 9/10/2025 CID email. Glass Lewis counsel's own quoted text is produced; the request for legal input and the Office's internal analysis are redacted. | AC; WP | Produce w/ redaction |
| 5 | AG_002098 (email 2 of 2) | 9/11/2025 | Email | Gina McDonald (Division investigator); forwarded by Christopher Molak* | Jennifer Roscetti*; Clayton Watkins*; Scott Froman* | Internal email within the OAG's confidential consultation on its response to the Glass Lewis CID, forwarded among Division counsel. | AC; WP | Withhold |
| 6 | AG_002108 | 9/10/2025 | Email | Jerry Bergman* (Deputy Chief, Division) | Christopher Molak*; cc Jennifer Roscetti*, Clayton Watkins*, Scott Froman* | Internal Division email routing the CID inquiry to the assigned Division team. Glass Lewis counsel's quoted CID text is produced; the OAG's internal case-handling comment is redacted. | WP; DPP | Produce w/ redaction |
| 7 | AG_002110 (email 1 of 2) | 9/10/2025 | Email | Lee Winkelman* | Jerry Bergman* | Forward of Glass Lewis counsel's 9/10/2025 email with the forwarding attorney's comments. Glass Lewis counsel's text is produced; OAG attorney's comments are redacted. | AC; WP | Produce w/ redaction |
| 8 | AG_002110 (email 2 of 2) | 9/10/2025 | Email | Jerry Bergman* | Lee Winkelman*; Jennifer Roscetti*; cc Clayton Watkins*, Scott Froman* | Same-day reply among OAG attorneys routing the CID inquiry to the assigned team; the internal comment is redacted; remaining text is produced. | AC; WP | Produce w/ redaction |
| 9 | DOC000022 | 10/28/2025 (filed 10/29/2025) | Word memorandum | Jennifer Roscetti* (Deputy Chief) (author); Clayton Watkins* (listed in the document's metadata as custodian (document owner/last-saved-by)) | Division attorneys and management within the Office of the Attorney General | Internal memorandum reflecting OAG attorney's legal analysis and mental impressions concerning S.B. 2337 and Glass Lewis, prepared in anticipation of litigation. | AC; WP; DPP | Withhold |
| 10 | DOC000023 | 10/28/2025 (filed 10/30/2025) | Word memorandum (annotated) | Jennifer Roscetti* (Deputy Chief) (author); Clayton Watkins* (listed in the document's metadata as custodian (document owner/last-saved-by)) | Division attorneys and management within the Office of the Attorney General | Annotated iteration of the memorandum at Entry 9, bearing interlineated comments and edits (in red and blue) from multiple Division attorneys reflecting their legal feedback and mental impressions, and incorporating supporting case-law research by Scott Froman* (Division attorney). Opinion work product. | AC; WP; DPP | Withhold |
| 11 | DOC000025 | 8/25/2025 (filed 9/22/2025) | Microsoft Teams conversation | William Wassdorf* (Associate Deputy Attorney General); Rebecca Cabrera (Compliance Analyst); Michael O'Leary (Data Analyst) | Same participants | Internal OAG conversation among an Associate Deputy Attorney General and Office staff deliberating how OAG would implement S.B. 2337's reporting mechanism. Predecisional and deliberative agency decision-making. | DPP | Withhold |
| 12 | DOC000029 | 9/14/2026 | Email string | Joe Nwaokoro*; H. Christopher Bartolomucci* (Schaerr Jaffe, outside counsel for the Indiana Attorney General) | Each other; cc Stephanie Freudenberg* (Schaerr Jaffe) | Communications between OAG counsel and outside counsel for the Indiana Attorney General concerning the parallel litigation defending similar statutes (ISS & Glass Lewis v. Rokita), exchanged in furtherance of a common legal interest. | WP; CI | Withhold |
| 13 | DOC000030 | 9/15, 9/17, 9/24, 9/28/2026 | Email string | Troy Sager (paralegal, Office of the Attorney General); John Lowrey*, James Barta* (Indiana Attorney General's Office) | Each other | Cover emails between OAG counsel's staff and counsel for the Indiana Attorney General coordinating the exchange of deposition transcripts in the parallel Indiana (Rokita) litigation defending similar statutes, in furtherance of a common legal interest. The attached Wieck and Goldstein deposition transcripts and the Seventh Circuit appendix have been produced. | WP; CI | Withhold cover emails; attachments are public record |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 14 | DOC000031 (email 1 of 3) | 8/4/2025 | Email (PDF) | John Sepehri* (Foley & Lardner, counsel for the Alliance for Corporate Excellence) | William Wassdorf*; Lee Winkelman*; Abhishek Kambli* (U.S. DOJ); cc Ketan Bhirud* (U.S. DOJ), Austin Kinghorn*, and other Foley & Lardner personnel (Converse, Babcock, Burbach, Cabrales) | Originating email coordinating the defense of S.B. 2337 among Office counsel, U.S. Department of Justice counsel, and the Alliance's counsel (Foley), concerning potential federal participation in the litigation and the timing of the State's responsive filings, in furtherance of a common legal interest. | WP; CI | Withhold |
| 15 | DOC000031 (email 2 of 3) | 8/5/2025 | Email (PDF) | Lee Winkelman* | John Sepehri* (Foley); William Wassdorf*; Abhishek Kambli* (U.S. DOJ); cc Ketan Bhirud* (U.S. DOJ), Austin Kinghorn*, and other Foley & Lardner personnel | Reply to the aligned-counsel group regarding the timing of the State's responsive filings in the defense of S.B. 2337. | WP; CI | Withhold |
| 16 | DOC000031 (email 3 of 3) | 8/6/2025 (two messages) | Email (PDF) | John Sepehri* (Foley); Lee Winkelman* | Each other; cc Laura Hendrix (Office of the Attorney General staff) | 8/6/2025 exchange among aligned counsel regarding the timing of the State's response to the preliminary-injunction motions, in furtherance of the joint defense. | WP; CI | Withhold |
| 17 | DOC000032 | 8/6–8/11/2025 | Email string (PDF) | Lee Winkelman*; John Sepehri* (Foley & Lardner) | Each other; cc Laura Hendrix (Office of the Attorney General staff) | Continuation of the OAG/ DOJ / Foley coordination thread regarding the schedule for, and the State's response to, the preliminary-injunction motions, in furtherance of the joint defense. | WP; CI | Withhold |
| 18 | DOC000038 | 8/4–8/13/2025 | Email string (PDF) | John Sepehri* (Foley & Lardner, counsel for the Alliance for Corporate Excellence); Lee Winkelman* | Each other; cc Laura Hendrix (Office of the Attorney General staff); the 8/4/2025 originating email also to William Wassdorf* and Abhishek Kambli* (U.S. DOJ), cc Ketan Bhirud* (U.S. DOJ), Austin Kinghorn*, and other Foley & Lardner personnel | OAG / DOJ / Foley coordination thread arranging a call among aligned defense counsel to coordinate the joint defense of S.B. 2337 and the preliminary-injunction response, in furtherance of a common legal interest. | WP; CI | Withhold |
| 19 | DOC000036 | 8/8–8/12/2025 | Email string (PDF) | Mark W. Rasmussen*, Sidney Smith McClung* (Jones Day); Lee Winkelman*, William Wassdorf* (Office of the Attorney General) | Among the same OAG and Jones Day counsel; cc other Jones Day attorneys (Ferrell Keel, Charlotte Taylor, A.J. Jeffries, John Henry Thompson, Hannah Templin) and Laura Hendrix (Office of the Attorney General staff) | Email thread between OAG counsel and Jones Day exchanged after Glass Lewis filed suit, conveying counsel's mental impressions and litigation strategy for the defense and coordinating the joint defense. Opinion work product exchanged in furtherance of a common legal interest. | WP; CI | Withhold |
| 20 | DOC000036.0001 | 8/12/2025 | Word memorandum (attachment to Entry 19) | Mark W. Rasmussen* (Jones Day) | Office counsel (as attachment to Entry 19) | Counsel's memorandum conveying preliminary legal analysis of defenses to S.B. 2337; opinion work product. | WP; CI | Withhold |
| 21 | DOC000037 | 8/8–8/12/2025 | Email string (PDF) | Office counsel (Lee Winkelman*, William Wassdorf*) and Jones Day counsel (Mark W. Rasmussen*, Sidney Smith McClung*) | Among the same counsel; cc Ferrell Keel* (Jones Day) and Laura Hendrix (Office of the Attorney General staff) | Joint-defense email thread with Jones Day conveying counsel's litigation strategy for the S.B. 2337 defense; Counsel's mental impressions and strategy; opinion work product exchanged in furtherance of a common legal interest. | WP; CI | Withhold |
| 22 | DOC000039 | 8/8–8/14/2025 | Email string (PDF) | Same participants as Entry 19 (Office and Jones Day counsel) | Same participants as Entry 19; cc additional Jones Day counsel | Joint-defense email thread with Jones Day conveying counsel's assessment of defenses. Core opinion work product (counsel's mental impressions and legal theories) exchanged in furtherance of a common legal interest. | WP; CI | Withhold |
| 23 | DOC000041 | 8/8–8/14/2025 (filed 8/19/2025) | Email string (PDF) | Same participants as Entry 19 (Office and Jones Day counsel) | Same participants as Entry 19 | Continuation of the same joint-defense thread (same participants) conveying counsel's litigation strategy and legal analysis. Opinion work product exchanged in furtherance of a common legal interest. | WP; CI | Withhold |

# EXHIBIT C

**From:** Troy Sager
**To:** LeBrun, Jared; Villari, Timothy M.; Rasmussen, Mark W.; McClung, Sidney Smith
**Cc:** Callahan, Bryce; Martinez, Grant; Hann, Lily; Brumbaugh, Austin; Joe Nwaokoro
**Subject:** RE: Glass Lewis v. Paxton - Defendants" Privilege Log
**Date:** Friday, October 23, 2026 5:56:31 PM
**Attachments:** 20261023 AG"s Supplemental Responses.pdf
20261023 AG"s Second Amended Privilege Log.pdf
20261023 Deficiencies in Glass Lewis" Privilege Log.pdf

---

Good afternoon,

Please see the attached Defendant Ken Paxton, in his official capacity as Attorney General of Texas Supplemental Objections and Responses to Plaintiff Glass, Lewis & Co., LLC's Second Set of Interrogatories and Second Set of Requests for Production.

Please see the attached 2nd Amended Privilege Log.

Finally, please see the attached Deficiencies in Glass Lewis's October 19, 2026 Privilege Log/Chart.

Please let us know if you're unable to view all three PDF files.

Thank you,

Troy Sager
Legal Assistant
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711-2548
(512) 475-4263

---

**From:** Joe Nwaokoro
**Sent:** Friday, October 23, 2026 3:38 PM
**To:** LeBrun, Jared <jlebrun@yettercoleman.com>; Villari, Timothy M. <tvillari@jonesday.com>; Rasmussen, Mark W. <mrasmussen@jonesday.com>; McClung, Sidney Smith <smcclung@jonesday.com>
**Cc:** Callahan, Bryce <bcallahan@yettercoleman.com>; Martinez, Grant <gmartinez@yettercoleman.com>; Hann, Lily <lhann@yettercoleman.com>; Brumbaugh, Austin <abrumbaugh@yettercoleman.com>
**Subject:** RE: Glass Lewis v. Paxton - Defendants' Privilege Log

Good afternoon, Jared,

Thanks for your email below. I have reviewed and offer the following response:

1. We will serve an amended privilege log this afternoon to address the concerns you raised,

with each withheld item listed separately with its author, date, and recipients.

2. We researched further and were able to locate the first two drafts of DOC000001 and have logged them individually.
3. We have conformed our Interrogatories 14 and 20 objections and supplemented our responses to RFPs 24 and 27. We will serve our supplemental responses this afternoon.
4. Our supplemental responses and amended log also address the specific items you raised. On the Alliance for Corporate Excellence, after a diligent search, we have no responsive, non-privileged documents to produce. Our communications with the Department of Justice, the Indiana Attorney General's office, and the Alliance's counsel are attorney work product, and the amended log reflects that basis and provides the grounds for each. Regarding the common-interest point you raised, we are not asserting it as a standalone privilege. It is on the log to explain why sharing these materials with aligned, non-adverse counsel did not waive the work-product protection, not as an independent ground for withholding.
5. Turning to Glass Lewis's own privilege log, we have identified several entries that raise the same issues cited in your email. These include automated system notices, the public text of S.B. 2337, an employee-only thread with no attorney on it, communications sent to outside domains and personal accounts, and entries described too generally to assess. We will provide, alongside our supplemental responses and amended privilege log, a chart listing the entry numbers, specific deficiencies, and requested cures (produce where the material is plainly not privileged; otherwise, substantiate or provide a fuller description).

We remain available to confer. Thanks, and have a nice weekend.
Joe

---

**From:** LeBrun, Jared <jlebrun@yettercoleman.com>
**Sent:** Thursday, October 22, 2026 2:35 PM
**To:** Joe Nwaokoro <Joe.Nwaokoro@oag.texas.gov>; Villari, Timothy M. <tvillari@jonesday.com>; Rasmussen, Mark W. <mrasmussen@jonesday.com>; McClung, Sidney Smith <smcclung@jonesday.com>
**Cc:** Callahan, Bryce <bcallahan@yettercoleman.com>; Martinez, Grant <gmartinez@yettercoleman.com>; Hann, Lily <lhann@yettercoleman.com>; Brumbaugh, Austin <abrumbaugh@yettercoleman.com>
**Subject:** Glass Lewis v. Paxton - Defendants' Privilege Log

**CAUTION - EXTERNAL EMAIL:** This message originated from outside the OAG. Do not click links, open attachments, or act on requests unless you recognize the sender and can verify the request is legitimate. Report suspicious emails using the Phishing Button.

Joe, Mark, Tim,

We are writing to identify deficiencies in your privilege log.

Starting with Intervenors, you did not serve a log at all. You claimed associational privilege over whole categories of documents, but discovery closed on October 20

and you have not logged any of those withheld documents. *See LUPE v. Abbott*, 2022 WL 17574079, at *9 (W.D. Tex. Dec. 9, 2022) (ordering Defendant Intervenors to produce a document-by-document privilege log for associational privilege claims). Please confirm by the end of tomorrow that you will be serving a privilege log by Tuesday, October 27.

For the Attorney General, we will not repeat the log issues that overlap with your deficient production and are the subject of our motion to compel. But we reiterate that it is wholly improper to assert a blanket privilege over the investigative file, and there is no reason those documents could not (at a minimum) be individually logged. Even setting aside those deficiencies, there are four issues with your log:

1. Your privilege claims are internally inconsistent. You say that the Alliance for Corporate Excellence is an informant (Rog 14), but then you state that you have no responsive documents other than emails about this lawsuit (RFPs 24, 27). Those cannot both be true. You also invoke the informer's privilege (Rogs 14, 20), but then you name the Alliance, which renders the privilege inapplicable. Your log claims attorney-client privilege over emails with the Alliance, but your discovery responses state that these emails are work product and common interest.
2. Your assertion of common interest contravenes Fifth Circuit precedent. Common interest applies only to "potential co-defendants." *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001). The Alliance, DOJ, and the Indiana Attorney General are not and never have been co-defendants. In fact, the Alliance explicitly told the Court that it "does not seek leave to have the Alliance become a party to the litigation" and Indiana has disclaimed that its law targets ESG.
3. Your assertions of work product are improper. To start, your log never explains how most documents qualify as work product. Many are routine emails about scheduling and have nothing to do with attorney impressions.
4. Your privilege log is incomplete. It lists 17 items, but many of those appear to be logging an entire email chain with multiple parts. For example, on DOC000038, your October 16 log lists at least six different exchanges. DOC000001 lists "version 3" of a memo, but you never logged previous versions. It does not give the author, date, and recipients of each email. It is improper to only log the last message in an email chain or the final version of a document. Each responsive, withheld document must be separately logged.

Please confirm by the end of tomorrow that you will: (1) produce your communications with the Alliance for Corporate Excellence; (2) produce your communications with the Department of Justice and the Indiana Attorney General's office; and (3) withdraw your unsupported assertions of attorney work product; and (4) individually log each document that is being withheld.

Best,
Jared

**Jared LeBrun | Associate | Yetter Coleman**

600 Travis Street, Suite 5400, Houston, Texas 77002
(D) 713.457.3093 | (O) 713.632.8000
Bio | vCard | www.yettercoleman.com

This transmission is confidential and intended solely for the person or organization to which it is addressed. It may contain privileged and confidential information. If you are not the intended recipient, you should not copy, distribute, or take any action in reliance on it. If you have received this transmission in error, please notify the sender at the e-mail address above.

# EXHIBIT D

**Comprehensive Deficiencies in Glass Lewis's October 19, 2026 Privilege Log**

| Category | Entries (by Glass Lewis's Log No.) | Deficiency |
|---|---|---|
| Boilerplate, uniform "reasons" | Substantially all 109 entries; e.g., 1, 2, 4–7, 29–37, 41–51, 58–65, 101 | Nearly every entry recites one of a handful of canned descriptions ("Privileged communication to in-house counsel seeking legal advice"; "...providing legal advice"; "Attorney work product ... regarding regulatory updates"), without the subject matter needed to test the claim. Fed. R. Civ. P. 26(b)(5)(A). |
| No attorney identified / employee-to-employee | 1, 2, 4–7, 11, 14, 15, 66, 70 | The From/To fields show only Glass Lewis business personnel, with no attorney named; entries 14–15 are expressly logged as a "communication between employees regarding review by in-house counsel." A communication among non-lawyers is not privileged merely because it mentions counsel. |
| Automated system notifications | 26, 82, 85, 86 | Machine-generated alerts logged as privileged—a Slack "You've got 3 unread messages" notice (26) and SharePoint "Administrator has responded"/"replied to a comment" notices (82, 85, 86). These carry no legal advice and no attorney input. |

| | | |
|---|---|---|
| Public statute attachment | 53, 55, 72 | "Texas Bill_SB02337F.pdf"—the enacted public text of S.B. 2337—withheld as attorney-client privileged. Attaching a public statute to an email does not make it privileged. |
| Work product with no litigation anticipated | 3, 8, 9, 10, 16–25 | Materials from November 2020, October 2021, March 2024, and April 2025—all predating the CID (August 2025) and the State DTPA Action (July 2026)—logged as "attorney work product," several as routine "regulatory update" briefings. Work product requires that the document be prepared because of anticipated litigation. |
| Disclosure to outside domains / personal accounts | 16, 18, 24, 40, 104, 106, 107 | Materials sent to non-Glass Lewis domains (firstnational.ca, smithfc.ca, pelotoncm.com) and personal accounts (kcameron@gmail.com; a yahoo.com account), with nothing on the log showing a common interest or that confidentiality was maintained. Disclosure to third parties ordinarily waives the privilege. |
| Drafts for publication or client distribution | 27–45 (incl. "GL Blog Post – DRAFT.docx," 39), 73–81, 87–104 | Press-query, blog-post, and client-communication drafts ("Draft response for client inquiries," "Client Communication Pertaining to Texas Legislation," "Glass Lewis Client Communication: Texas Senate Bill 2337"). Material prepared for public or client dissemination is not privileged as to its intended-to-be-disclosed content. |

| | | |
|---|---|---|
| Factual status broadcast to wide internal lists | 52, 54, 56–66 | "Texas Proxy Advisor Bill – Final Legislative Step Completed," a factual status email blasted to eleven-plus executives, logged as privileged along with its public-statute attachment. |
| Missing metadata (Rule 26(b)(5)(A)) | e.g., 3, 9, 10, 27, 63, 67–69, 74, 77–80, 90, 92, 94, 95, 98, 99 | Numerous entries omit author, recipients, and/or Bates numbers, making it impossible to assess the claim or even confirm the document's participants. |

Note: This exhibit shows the deficiencies in Glass Lewis's own log comprehensively. Exhibit E is the narrower, category-by-category deficiency chart the Attorney General served on Glass Lewis on October 23, 2026.

# EXHIBIT E

## ENCLOSURE — Deficiencies in Glass Lewis's October 19, 2026 Privilege Log

***Glass, Lewis & Co. v. Paxton, No. 1:25-cv-01153-ADA (W.D. Tex.)***

The entries are grouped by the problems they share. The OAG asks Glass Lewis to produce each document or back up the claim, entry by entry, as Glass Lewis has asked of the OAG. Where the

**Category 1 — Automated notifications (Produce)**

| Entry No(s). | Document / Subject | Problem | Our ask |
|---|---|---|---|
| 26 | Slack alert, "You've got 3 unread messages," from notification@slack.com to C. Gustitus; logged Attorney-Client | A system-generated alert is not a request for or a delivery of legal advice, and it carries no attorney input. | Produce. If any attorney text is embedded, redact and produce the rest. |
| 82, 85, 86 | SharePoint "no-reply@sharepointonline.com" notices ("Administrator has responded to your request"; "Gordon Seymour replied to a comment"); logged Work Product and Attorney-Client | Machine-generated access and comment alerts are not privileged communications. | Produce. Redact any embedded attorney comment rather than withhold the entire notice. |

**Category 2 — Public statute attachments (Produce)**

| Entry No(s). | Document / Subject | Problem | Our ask |
|---|---|---|---|
| 53, 55, 72 | "Texas Bill_SB02337F.pdf"; logged Attorney-Client | This is the enacted text of S.B. 2337. Attaching a public statute to an email does not make it privileged. | Produce, or stipulate that the attachment is the public bill and drop it from the log. |

**Category 3 — Business emails with no lawyer on them (Produce)**

| Entry No(s). | Document / Subject | Problem | Our ask |
|---|---|---|---|
| 14, 15 | "Tesla Response to Proxy Paper" (Lili Mehta and Brianna Castro); logged Attorney-Client / Privileged-Redacted | Both are employees, no lawyer is on the thread, and the log itself calls them a "communication between employees regarding review by in-house counsel." | Produce. If attorney text was added later in the chain, redact. |

**Category 4 — Sent to outside domains and personal accounts**

| Entry No(s). | Document / Subject | Problem | Our ask |
|---|---|---|---|
| 16, 18 | "Regulatory Update" from N. Garzon to outside recipients; logged Attorney Work Product and Attorney-Client | Sent to non-Glass Lewis domains (firstnational.ca, smithfc.ca, pelotoncm.com) and a personal account, with nothing in the log showing a common interest or that confidentiality was kept. | Identify who each outside recipient is and why they are inside the privilege, or produce. |
| 106, 107 | "FW: Glass Lewis Client Communication: Texas Senate Bill 2337" from B. Mann to outside recipients (PLF0010753-56, PLF0010765-68); logged Attorney-Client / Privileged-Redacted | Forwarded to pelotoncm.com, firstnational.ca, smithfc.ca, a yahoo.com account, and kcameron@gmail.com, again with no common-interest or confidentiality showing. | Same: identify the recipients and the basis, or produce. |
| 24, 25 | "FW: Regulatory Update" and its attachment, from President C. Busch to kcameron@gmail.com; logged Attorney-Client | Counsel's analysis was forwarded to an executive's personal Gmail account. | Confirm that the account belongs to Kevin Cameron and that the personal account was used consistent with Glass Lewis's confidentiality practices. If not, produce. |

| Category 5 — Work product with no litigation in sight | | | |
|---|---|---|---|
| **Entry No(s).** | **Document / Subject** | **Problem** | **Our ask** |
| 3, 8, 9 | "GL RAC Policy Meeting" materials about regulatory updates (Nov. 2020 and Oct. 2021); logged Work Product | These are from 2020 and 2021, well before any litigation, and read as routine regulatory briefings. Work product requires that the document be prepared because of litigation. | Withdraw the work-product claim, or produce the factual portions. |
| 16-23 | April 2025 "Regulatory Update" and "Regulatory Updated.pptx" to the board and executive team; logged Work Product and Attorney-Client | The log does not show that these were prepared because of anticipated litigation. | Establish that litigation was anticipated (dates, the claims expected, and that the documents were prepared because of it), or drop the work-product claim and produce the factual portions. |

| Category 6 — Drafts for publication or clients, and status emails | | | |
|---|---|---|---|
| **Entry No(s).** | **Document / Subject** | **Problem** | **Our ask** |
| 27-45 | "press query - Texas SB 2337" chain and the "Blog Post on Texas Proxy Advisor Bill?" thread and draft ("GL Blog Post - DRAFT.docx," #39); logged Attorney-Client, some Work Product | These look like public-relations and drafting work, and some of the drafts appear meant for publication. | State whether the drafts were meant for publication or for clients, and produce the business and PR text with narrow redactions for actual legal advice. |
| 73-81; 89-97; 102-104 | "Texas write up," "Client note," "Client Communication Pertaining to Texas Legislation," and "Draft response for client inquiries"; logged Attorney-Client / Work Product | These read as client-facing material, where privilege is thin as to what was meant to go out. | Segregate and produce the parts meant for clients; log counsel's input separately with a real basis. |
| 52-65 | "Texas Proxy Advisor Bill - Final Legislative Step Completed" broadcast and its bill attachment; logged Attorney-Client, some Work Product | This is a factual status email to a wide internal list, and the attachment is public. | Produce the status text and the public attachment; redact any attorney opinion. |

| Category 7 — Entries too thin to evaluate (Rule 26(b)(5)(A)) | | | |
|---|---|---|---|
| **Entry No(s).** | **Document / Subject** | **Problem** | **Our ask** |
| 4-7; 12-13; 105-109 | Repeated one-liners such as "Privileged communication to in-house counsel seeking legal advice" and "Privileged-Redacted" | These say nothing about the subject, so we cannot test the claim; some leave out the attorney's role. | Add the subject of the advice (for example, "legal advice on S.B. 2337 compliance as to [topic]") and name the attorney by role. We are not asking you to combine duplicates. |

# EXHIBIT F

**Glass Lewis's Second-Set Discovery Requests That Duplicate Its First Set**

| Second-Set Request | Subject | Duplicative First-Set Request (served/answered Oct. 31, 2025) | Nature of Duplication (per the Attorney General's served objection) |
|---|---|---|---|
| Interrogatory No. 14 | Identify each Texas person the Attorney General contends Glass Lewis "deceived or misled," and describe the statement. | First Set Interrogatory No. 11 (persons who complained about Glass Lewis's statements) | Objected as "cumulative of First Set Interrogatory No. 11, answered October 31, 2025," citing Rule 26(b)(2)(C)(i). |
| Interrogatory No. 16 | Identify communications with other States' attorneys general, the SEC, FTC, or DOL concerning proxy advisors, Glass Lewis, ESG, DEI, or S.B. 2337. | First Set Request for Production No. 21 (communications with other state attorney general offices re S.B. 2337, Glass Lewis, or proxy advisory services) | Objected as cumulative of First Set RFP No. 21; the answer expressly "supplements Defendant's October 31, 2025 response to First Set Request for Production No. 21." |
| Interrogatory No. 17 | Identify each statement by which Glass Lewis represents its advice is made in its customers' financial interests. | First Set Interrogatory No. 1 (all false or misleading statements the Attorney General asserts Glass Lewis made) | Objected as "cumulative of First Set Interrogatory No. 1, answered October 31, 2025," citing Rule 26(b)(2)(C)(i). |
| Interrogatory No. 20 | Identify each Texas-based Glass Lewis client that complained to the Attorney | First Set Interrogatory No. 11 (persons who complained about Glass Lewis's statements, with dates and | In the Oct. 23 Supplemental Response, objected as "cumulative and duplicative of First Set |

| **Second-Set Request** | **Subject** | **Duplicative First-Set Request (served/answered Oct. 31, 2025)** | **Nature of Duplication (per the Attorney General's served objection)** |
| --- | --- | --- | --- |
| | General, with date, person, manner, and substance. | descriptions); and Second-Set Interrogatory No. 14 | Interrogatory No. 11 and of Interrogatory No. 14 of this Set," citing Rule 26(b)(2)(C)(i) — i.e., duplicative of both a first-set request and another second-set request. |
| Interrogatory No. 22 | Identify each investigative or enforcement step concerning Glass Lewis between Jan. 1, 2023 and July 24, 2026. | First Set Interrogatory Nos. 7 and 8 (steps taken before and after Sept. 1, 2025 to enforce S.B. 2337) | Objected that, as to S.B. 2337, the interrogatory is "cumulative of First Set Interrogatory Nos. 7 and 8, answered October 31, 2025." |
| Interrogatory No. 24 | Identify each Texas consumer or company that allegedly suffered monetary harm from a Glass Lewis statement. | First Set Request for Production No. 13 (documents showing harm to Texas companies/shareholders from Glass Lewis's statements) | Objected as "cumulative of First Set Request for Production No. 13." |
| Request for Production No. 22 | All documents concerning any investigation, CID, or inquiry concerning Glass | First Set Requests Nos. 3, 11, and 12 (CIDs to proxy advisors; documents evidencing Glass Lewis's alleged false statements) | Objected as "cumulative of First Set Request Nos. 3, 11, and 12." |

| **Second-Set Request** | **Subject** | **Duplicative First-Set Request (served/answered Oct. 31, 2025)** | **Nature of Duplication (per the Attorney General's served objection)** |
|---|---|---|---|
| | Lewis, including the investigative file. | | |
| Request for Production No. 24 | All documents concerning any complaint or communication that Glass Lewis made a false or misleading statement, and resulting harm. | First Set Requests Nos. 11, 12, and 13 (documents evidencing false/misleading statements and resulting harm) | Objected as "cumulative of First Set Request Nos. 11, 12, and 13." |
| Request for Production No. 30 | All documents supporting the contention that Glass Lewis represents its recommendations are made in its customers' financial interests. | First Set Requests Nos. 9, 10, 11, and 12 (documents supporting the "maximize returns / minimize risks" assertions and the false-statement contentions) | Objected as "cumulative of First Set Request Nos. 9, 10, 11, and 12." |
| Request for Production No. 32 | All documents prepared by Division investigators McDonald, Hanlan, or Vasquez concerning proxy | First Set Requests Nos. 1, 5, and 6 (documents re S.B. 2337 and its interpretation/enforcement) | Objected that, as to S.B. 2337, the request is "cumulative of First Set Request Nos. 1, 5, and 6." |

| **Second-Set Request** | **Subject** | **Duplicative First-Set Request (served/answered Oct. 31, 2025)** | **Nature of Duplication (per the Attorney General's served objection)** |
|---|---|---|---|
| | advisors, Glass Lewis, or S.B. 2337. | | |
| Request for Production No. 34 | All documents reviewed by McDonald, Hanlan, or Vasquez in investigating Glass Lewis. | First Set Requests Nos. 3, 11, and 12 (CIDs to proxy advisors; documents evidencing Glass Lewis's alleged false statements) | Objected as "cumulative of First Set Request Nos. 3, 11, and 12." |
| Request for Production No. 36 | All documents concerning any statement of intent to investigate, sue, or take enforcement action against Glass Lewis or any proxy advisor. | First Set Request No. 18 (documents showing statements of any intent to enforce against proxy advisors) | Objected as "cumulative of First Set Request No. 18." |

# EXHIBIT G

**The Requests Glass Lewis Claims the Attorney General "Refused," and the Attorney General's Actual Responses**

Glass Lewis's Motion color-codes the Attorney General's Second-Set Interrogatories 14–25 and Requests for Production 22–36 as "substantive refusal[s]" and claims that he "substantively answered none" of his interrogatories and produced only Glass Lewis's and ISS's own documents. Dkt. 109 at 2–4.

The chart below pairs each request with the Attorney General's operative responses: his First Amended Objections and Responses served October 16, 2026, as superseded by his Second Amended Responses on October 20 and supplemented on October 23, 2026. Dkt. 109-3 (Ex. 2); Nwaokoro Resp. Decl. Ex. A (Oct. 23 Supplemental Responses). The rows for Interrogatories 14 and 20 and Requests for Production 24 and 27 reflect the October 23 Supplemental Responses, which supersede those four responses; the remaining rows reflect the October 16 responses carried forward on October 20. Together they answer the relevant interrogatories, state for each request whether material is withheld and why, and produce responsive, non-privileged documents at Bates range AG 002090–AG 003289 (the ~1,200-page October 16 production). Only the separate DTPA investigative file and enforcement-motive material is withheld, on stated grounds.

| Request | Glass Lewis's Claim | The Attorney General's Operative Response (Second Amended, Oct. 20; Supplemented Oct. 23) | Answered / Produced |
|---|---|---|---|
| Interrog. 14 (persons deceived) | "Substantively answered none." | (Oct. 23 Suppl.) Identifies the Alliance for Corporate Excellence and states that, besides the Alliance, no other person furnished the Division information about Glass Lewis's statements; refers to the verified DTPA petition ¶¶ 13–38 and the thirteen statements quoted in Interrogatory 17. Suppl. Resp.; Resp. Decl. Ex. A. | Answered |

| | | | |
|---|---|---|---|
| Interrog. 15 (decision to file DTPA suit) | Refusal | States the fact and date of filing on the public Collin County docket; withholds only privileged charging deliberations. Ex. 2 at 4. | Answered, in part |
| Interrog. 16 (communications with other AGs/SEC/FTC/DOL) | Refusal | States that a diligent search identified no responsive, non-privileged SEC, FTC, or DOL communications and that none are known; any AG-to-AG coordination is withheld as work product/common-interest. Ex. 2 at 5. | Answered |
| Interrog. 17 (statements re financial-interest representations) | Refusal | Identifies thirteen specific, quoted Glass Lewis public statements. Ex. 2 at 5–6. | Answered in full |
| Interrog. 18 (Texas-directed conduct) | Refusal | States the contention is at issue in the Collin County DTPA action (personal jurisdiction). Ex. 2 at 7. | Answered by reference |
| Interrog. 19 (investigative steps) | Refusal | Withholds the Division's DTPA investigative steps as privileged and outside scope. Ex. 2 at 7. | Withheld, grounds stated |
| Interrog. 20 (Texas clients who complained) | Refusal | (Oct. 23 Suppl.) States the Attorney General has not received a complaint about Glass Lewis from any person he knows to be a Texas-based client of Glass Lewis. Suppl. Resp.; Resp. Decl. Ex. A. | Answered in full |
| Interrog. 21 (acts violating DTPA) | Refusal | States the contentions are set out in the State's Collin County petition. Ex. 2 at 8. | Answered by reference |
| Interrog. 22 (investigative/enforcement steps 2023–2026) | Refusal | States the Office has taken no step to enforce S.B. 2337 since the injunction; withholds DTPA-matter steps as privileged/outside scope. Ex. 2 at 8. | Answered, in part |
| Interrog. 23 (timing of the CID) | Refusal | States the CID's issuance and date appear in the CID itself, which Glass Lewis already introduced into the record; Division's CID authority predates S.B. 2337. Ex. 2 at 8–9. | Answered |
| Interrog. 24 (monetary harm) | Refusal | States DTPA harm and damages are at issue in Collin County, not in the as-applied challenge. Ex. 2 at 9. | Withheld, grounds stated |

| | | | |
|---|---|---|---|
| Interrog. 25 (basis for public statements) | Refusal | Declines a narrative of enforcement/political motive as irrelevant to the as-applied challenge; any factual basis is in the public record. Ex. 2 at 9. | Answered by reference |
| RFP 22 (investigative file/CID) | "Withholds investigative file wholesale … does not list it on his privilege log." | Produces responsive non-privileged documents at AG 002090–AG 003289; states it is withholding the DTPA investigative file and CID materials on scope grounds. Ex. 2 at 10. | Produced + withhold stated |
| RFP 23 (ISS investigative file) | Refusal | States it will not produce; the ISS file belongs to the separate DTPA matter and a co-plaintiff, and is not the Office's to produce absent consent/order under § 17.61(f). Ex. 2 at 10. | Withheld, grounds stated |
| RFP 24 (consumer complaints) | Refusal | (Oct. 23 Suppl.) Refers to the Alliance and to Interrogatory 14; states that, after a diligent search, there are no documents to produce. Suppl. Resp.; Resp. Decl. Ex. A. | Answered (none exist) |
| RFP 25 (public statements re Glass Lewis) | Refusal | Produces post-June 20, 2025 public statements at AG 002090–AG 003289; notes they are public and already in the record. Ex. 2 at 11. | Produced |
| RFP 26 (pre-suit communications with TAB/TXSE/Jones Day) | Refusal | Produces responsive non-privileged documents at AG 002090–AG 003289. Ex. 2 at 11–12. | Produced |
| RFP 27 (communications with the Alliance/Foley/Loh) | Refusal | (Oct. 23 Suppl.) States it is withholding the logged communications with counsel for the Alliance and has located no other responsive communications. Suppl. Resp.; Resp. Decl. Ex. A & Ex. B (log). | Withhold stated + logged |
| RFP 28 (June 23, 2026 Senate hearing) | Refusal | Refers to the public hearing record, equally available to Glass Lewis. Ex. 2 at 12. | Answered by reference |

| | | | |
|---|---|---|---|
| RFP 29 (campaign contributions) | Refusal | States public campaign-finance filings are equally available; will not produce (political motive, irrelevant/overbroad). Ex. 2 at 12–13. | Withheld, grounds stated |
| RFP 30 (financial-interest-representation documents) | Refusal | States the documents are equally available in Glass Lewis's own materials and website; refers to the statements identified in Interrogatory 17. Ex. 2 at 13. | Answered by reference |
| RFP 31 (Texas-contacts documents) | Refusal | Refers to the record, including Glass Lewis's own Second Amended Complaint ¶¶ 33–34; produces any additional responsive non-privileged documents at AG 002090–AG 003289. Ex. 2 at 13. | Produced by reference |
| RFP 32 (investigator-prepared documents) | Refusal | Withholds the DTPA investigative file on scope; produces responsive non-privileged S.B. 2337 documents, if any, at AG 002090–AG 003289. Ex. 2 at 14. | Produced, in part |
| RFP 33 (investigator documents re the DTPA suit) | Refusal | Will not produce; directed at the separate Collin County action and privileged. Ex. 2 at 14. | Withheld, grounds stated |
| RFP 34 (documents investigators reviewed) | Refusal | Produces responsive non-privileged S.B. 2337 documents, if any, at AG 002090–AG 003289; withholds the DTPA investigative file. Ex. 2 at 14. | Produced, in part |
| RFP 35 (press/social-media re Glass Lewis) | Refusal | Produces responsive documents at AG 002090–AG 003289; notes they are public and already in the record; duplicative of RFP 25. Ex. 2 at 15. | Produced |
| RFP 36 (statements of intent to investigate/sue) | Refusal | Produces responsive documents at AG 002090–AG 003289; notes public statements already in the record. Ex. 2 at 15. | Produced |

# EXHIBIT H

**CAUSE NO: 471-04895-2026**

| | | |
|---|---|---|
| STATE OF TEXAS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| GLASS, LEWIS & CO., LLC, | § | |
| | § | |
| *Defendant.* | § | 471ST JUDICIAL DISTRICT |

**TEXAS'S SECOND AMENDED VERIFIED PETITION AND APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION**

"*[R]eflects broad investor opinion and widely accepted governance principles* . . . ."

"*[R]eflects the current, predominant views of our institutional investor clients on corporate governance best practices*."

"*[I]ndependent corporate governance research*."

"*[O]bjective, reliable, and timely advice.*"[1]

Glass, Lewis & Co., LLC ("Glass Lewis") makes these types of representations about itself and its Benchmark Policy, the ready-made voting rules it sells to investors.[2] Yet they are all false, deceptive, and misleading.

Glass Lewis is one of two firms that dominate the business of advising big investors how to vote at shareholder meetings. Its clients include pension plans and mutual funds that hold the savings of ordinary Texans. It sends Benchmark recommendations to every client that receives its research.[3]

---

1 *See infra* ¶¶ 58, 60, 95.
2 *See infra* ¶¶ 49–50, 58.
3 *See infra* ¶¶ 38, 42, 50.

But the Benchmark Policy did not reflect broad investor opinion. For years, its rules called for recommending votes against directors because of a board's gender makeup. Other rules turned on whether a board had a director "from an underrepresented community," or on a company's climate or social-oversight disclosures. Its 30% gender threshold was the same one Glass Lewis used in its separate ESG and Climate policies. Year after year, shareholders voted down almost every environmental and social proposal. And Glass Lewis admitted that the evidence "cannot determine the effect" of the climate and diversity proposals it backed on any individual company.[4]

Glass Lewis knew its statements were false, deceptive, and misleading. In a January 2023 letter to the attorneys general of Texas and other States, Glass Lewis claimed the Benchmark Policy reflects its clients' "predominant views." But in the same letter it said that "a significant majority of our clients have elected to simply not follow any Glass Lewis policy." Then in October 2025, Glass Lewis admitted that "the traditional one-size-fits-all model of proxy advice no longer meets the needs of a diverse client base." It then published new Benchmark guidelines claiming the policy "reflects broad investor opinion."[5] Both things cannot be true.

Glass Lewis also told investors its advice was independent. Its October 2025 report on Tesla, a Texas company, listed Glass Lewis's "Potential Conflicts." The list left out that Glass Lewis was then suing the Texas Attorney General over a Texas law that regulates proxy advisors. In 2026, Glass Lewis urged the shareholders of Exxon Mobil Corporation ("Exxon") to vote against making Texas the company's legal home. Exxon publicly said that Glass Lewis "failed to disclose an obvious conflict of interest resulting from its ongoing litigation with the Texas Attorney

---

4 *See infra* ¶¶ 64–69, 102.

5 *See infra* ¶¶ 58, 61, 83, 85–86.

General."[6] Exxon's shareholders approved the move anyway, as Tesla's had in 2024 over Glass Lewis's opposition.[7]

Glass Lewis made these statements to Texans on its website, in its reports, and to the Texas investors who pay for its services. Glass Lewis may hold any view it wants about board diversity, climate change, or anything else. But when a business tells customers what its product is and whose views it reflects, those statements must be true.[8]

The Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA") forbids "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce."[9] The State of Texas, acting through Attorney General Ken Paxton, brings this suit to stop Glass Lewis's deception.

## I. DISCOVERY CONTROL PLAN

1. The State intends to conduct discovery under Level 3 and asks the Court to enter a Level 3 discovery control plan. Tex. R. Civ. P. 190.4. The expedited-actions process does not apply because the State does not seek only monetary relief of $325,000 or less. Tex. R. Civ. P. 169(a).

## II. PARTIES

2. Defendant Glass, Lewis & Co., LLC is a Delaware limited liability company with its principal place of business in California.[10] Glass Lewis has been registered with the Texas Secretary

---

6 *See infra* ¶¶ 77, 99.
7 *See infra* ¶¶ 74, 77, 99, 101.
8 *See infra* ¶¶ 134–137.
9 Tex. Bus. & Com. Code § 17.46(a).
10 Decl. of John Wieck ¶ 4 (Aug. 9, 2026), filed with Def. Glass Lewis' Verified Special Appearance and, Alternatively, Mot. to Transfer Venue (Aug. 10, 2026) [hereinafter *Wieck Decl.*].

of State to do business in Texas since November 19, 2003.[11] It applied for its certificate of authority to pursue the "[t]ransaction of lawful business" in Texas, and it appointed a registered agent in Austin.[12] It has filed public information reports with the State, most recently for 2024.[13]

3. Glass Lewis has appeared in this suit through counsel, subject to its special appearance, and may be served through its attorneys of record. Tex. R. Civ. P. 21a.

## III. JURISDICTION AND VENUE

### A. The DTPA authorizes this suit.

4. The Attorney General brings this suit through the Consumer Protection Division, in the name of the State and in the public interest. Tex. Bus. & Com. Code § 17.47(a). The DTPA allows the Division to sue whenever it has reason to believe two things. First, a person "is engaging in, has engaged in, or is about to engage in" an unlawful act or practice. Second, the suit would be in the public interest. *Id.* The State alleges that Glass Lewis is engaging in, has engaged in, and is about to engage in false, misleading, or deceptive acts or practices in trade and commerce. *Id.* §§ 17.46(a)–(b), 17.47(a).

5. In a suit under section 17.47, the Court may grant temporary and permanent injunctions that restrain unlawful acts and practices. Tex. Bus. & Com. Code § 17.47(a)–(b). The trier of fact may award civil penalties of up to $10,000 for each violation. *Id.* § 17.47(c)(1). It may award up to $250,000 more for each violation when the act or practice was calculated to acquire or deprive money or other property from a consumer 65 or older. *Id.* § 17.47(c)(2). The Court may

---

11 *Wieck Decl.* ¶ 11; Tex. Sec'y of State, Business Organizations Inquiry, Glass, Lewis & Co., LLC, File No. 800270189, Filing History (viewed Apr. 24, 2026).

12 Glass, Lewis & Co., LLC, Application for Certificate of Authority 1–2 (filed Nov. 19, 2003), Tex. Sec'y of State File No. 800270189.

13 Tex. Sec'y of State, Filing History, *supra*.

also award civil penalties against a defendant that violates an injunction. *Id.* § 17.47(e). And the State may recover reasonable attorney's fees and court costs. Tex. Gov't Code § 402.006(c).

**B. Glass Lewis is subject to personal jurisdiction in Texas.**

6. A Texas court may exercise personal jurisdiction over a nonresident when the Texas long-arm statute allows it and doing so is consistent with due process.[14] A nonresident does business in Texas if it contracts with a Texas resident and either party is to perform the contract in whole or in part in Texas. Tex. Civ. Prac. & Rem. Code § 17.042(1). It also does business in Texas if it commits a tort in whole or in part here. *Id.* § 17.042(2). That list is not exclusive. *Id.* § 17.042.

7. Due process requires that the nonresident have minimum contacts with Texas, and that the suit not offend traditional notions of fair play and substantial justice.[15] Purposeful availment asks whether the nonresident sought "some benefit, advantage, or profit" by availing itself of Texas.[16] Sellers that "reach out beyond one state and create continuing relationships and obligations with citizens of another state" may be sued there on claims based on those activities.[17] The United States Supreme Court has listed soliciting business "through advertising reasonably calculated to reach the State" among the "affiliating circumstances" that support jurisdiction.[18]

8. Targeting Texas is the touchstone.[19] "[A] nonresident that directs marketing efforts to Texas in the hope of soliciting sales is subject to suit here in disputes arising from that

14 *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *State v. Yelp, Inc.*, 725 S.W.3d 170, 176, 180 (Tex. App.—15th Dist. 2025, pet. denied).

15 *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

16 *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784–85 (Tex. 2005).

17 *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985)).

18 *Id.* at 786–87 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)).

19 *BRP-Rotax GmbH & Co. KG v. Shaik*, 716 S.W.3d 98, 108 (Tex. 2025).

business."[20] "[C]ertain activities over the Internet" meet that standard.[21] A defendant "need not single Texas out in some unique way to satisfy constitutional dictates."[22] This is so because directing activity to every State "is no less a targeting of Texas as to whatever activity occurred within Texas."[23] That rule has added force when the State sues to enforce its own law.[24] And "a truly interstate business may not shield itself from suit by a careful, but formalistic structuring of its business dealings."[25] That includes "explicitly structuring its transactions with Texans to take place outside Texas while directly marketing those transactions inside Texas to Texans."[26] Conduct that shows an intent to serve the Texas market includes "establishing channels for providing regular advice to customers in the forum State."[27]

9. Glass Lewis has purposeful contacts with Texas, and the State's claims arise out of and relate to them. ¶¶ 10–19. The State adopts and incorporates by reference into this section the facts alleged in Sections V and VI, which describe what Glass Lewis sold and what it told Texans. ¶¶ 30–138.

---

20 *Michiana*, 168 S.W.3d at 785.

21 *Id.*

22 *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 420 (Tex. 2023); *Yelp*, 725 S.W.3d at 185 (applying that rule in the State's DTPA suit).

23 *BRP-Rotax*, 716 S.W.3d at 110.

24 *See id.* (contrasting a case "where no sovereign is prosecuting any case against [the defendant] for purposefully violating Texas law inside Texas"); *Volkswagen*, 669 S.W.3d at 432 (relying on "Texas's strong interest in protecting its regulatory scheme, which includes ensuring faithful observance by nonresidents and vindicating violations of its own laws in its own courts").

25 *BRP-Rotax*, 716 S.W.3d at 107 (quoting *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 437 (Tex. 1982)).

26 *Id.*

27 *TV Azteca, S.A.B. de C.V. v. Ruiz*, 490 S.W.3d 29, 54 (Tex. 2016) (quoting *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010)).

**i. Glass Lewis markets and advertises its services to Texans.**

10. Glass Lewis advertises its services on its website to investors across the United States, including in Texas.[28] Its web pages are sales pages. They invite visitors to "Request More Information," "Download Brochure," and "Contact Us."[29] One tells visitors, "Contact us to learn how we can help you make informed decisions with confidence."[30]




*Figure 1: Glass Lewis web page inviting visitors to contact Glass Lewis*

11. Glass Lewis asks visitors to fill out forms to download some of its materials or to have its team contact them.[31] Its privacy statement says it may collect a visitor's name, email address, employer's name, and title when the visitor contacts it or completes a registration form.[32] It may also collect visitors' IP addresses and "geolocation information," and it uses cookies to learn "where a user is located."[33] Its marketing cookies "track your activity on Our Platforms and

---

28 Glass Lewis, *Proxy Voting Policies*, https://www.glasslewis.com/investor-solutions/proxy-voting-policies (last visited Oct. 18, 2026); Glass Lewis, *Thematic Voting Policies*, https://www.glasslewis.com/investor-solutions/thematic-voting-policies (last visited Oct. 18, 2026); Glass Lewis, *Corporate Governance and ESG Data*, https://www.glasslewis.com/investor-solutions/corporate-governance-and-esg-data (last visited Oct. 18, 2026).

29 Glass Lewis, *Proxy Voting Policies*, *supra*; Glass Lewis, *About Us*, https://www.glasslewis.com/about-us (last visited Oct. 18, 2026).

30 Glass Lewis, *Corporate Governance and ESG Data*, *supra*.

31 Glass Lewis, *Download Your Copy of the Proxy Season Briefing for the United States*, https://grow.glasslewis.com/download-season-briefing-us-0 (last visited Oct. 18, 2026); Glass Lewis, *Contact Us*, https://www.glasslewis.com/contact-us (last visited Oct. 18, 2026).

32 Glass Lewis, *Privacy Statement* (eff. June 1, 2026), https://www.glasslewis.com/privacy (last visited Oct. 18, 2026).

33 *Id.*

other websites you visit."[34] Glass Lewis says the traffic data it gathers "may be helpful for marketing purposes."[35] It uses personal information for "[p]roviding promotional material or other marketing materials."[36] Glass Lewis can thus tell when Texans visit its website, and it markets to them. On information and belief, visitors from Texas, including from Collin County, have visited Glass Lewis's website and read and downloaded its guidelines, reports, and marketing materials.

12. Glass Lewis currently has at least 27 clients with billing addresses in Texas.[37] On information and belief, it has had other Texas clients in past years. It told the federal district court in Austin that it "serves over a dozen institutional investors in Texas."[38] Glass Lewis did not identify those clients in the declaration it filed with its special appearance.[39] Texas public funds buy proxy advice. ¶ 37. A Texas Senate committee has reported that Glass Lewis and one other firm "control an estimated 97% of the market" for that advice.[40] On information and belief, Texas public funds use, or have used, Glass Lewis's services. ¶¶ 37, 42. Glass Lewis says that 95% of its institutional clients renew each year.[41] Each renewal is a new sale that Glass Lewis solicits and makes to a Texas client.

---

[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Wieck Decl.* ¶ 22.
[38] First Am. Compl. ¶ 33, *Glass, Lewis & Co. v. Paxton*, No. 1:25-cv-01153-ADA (W.D. Tex. Sept. 9, 2025), ECF No. 40 [hereinafter *Glass Lewis Am. Compl.*].
[39] *Wieck Decl.* ¶ 22.
[40] S. Comm. on State Affs., Tex. Senate, *Interim Report* 34 (Jan. 2025), https://senate.texas.gov/cmtes/89/c570/c570_InterimReport_2024.pdf (last visited Oct. 18, 2026).
[41] Glass Lewis, *About Us*, *supra*.

**ii. Glass Lewis contracts with Texans and profits from Texas.**

13. Glass Lewis has contracts with its Texas clients to provide its proxy advisory services.[42] Those clients pay Glass Lewis by ACH transfer, an electronic payment drawn from the client's bank account.[43] Each payment moves money from a Texas client to Glass Lewis for the services this suit concerns. Through these contracts and payments, Glass Lewis has created continuing relationships and obligations with Texas residents, and it profits from Texas year after year.

14. Glass Lewis says it did not sign these contracts in Texas, that its bank accounts are elsewhere, and that its online systems are hosted in Virginia and Iowa.[44] That is the kind of "formalistic structuring" that cannot shield a business that markets its services to Texans.[45]

**iii. Glass Lewis delivers its reports and recommendations into Texas.**

15. Glass Lewis's chief operating officer has sworn that its advice "comes in the form of a detailed report sent to clients before a shareholder meeting." He has also sworn that every client who receives research gets a "Proxy Paper," Glass Lewis's report on a shareholder meeting. Each Proxy Paper "sets out voting recommendations under Glass Lewis' Benchmark Policy."[46] Each of Glass Lewis's Texas clients that receives research thus receives the Benchmark recommendations this suit concerns. Those clients receive the reports and recommendations by

---

42 *Wieck Decl.* ¶ 18 (describing "its contracts with Texas-based clients").
43 *Id.* ¶ 20.
44 *Id.* ¶¶ 16, 18–20.
45 *BRP-Rotax*, 716 S.W.3d at 107.
46 *Wieck Decl.* ¶ 7.

accessing Glass Lewis's online systems from Texas.[47] Glass Lewis also casts votes for clients who ask it to, under the voting policy each client chooses.[48]

16. Glass Lewis issues advice on the shareholder meetings of "hundreds of companies" organized under Texas law or based in Texas.[49] In September 2025 alone, it expected to send its more than 1,300 clients about 10 reports on Texas companies' meetings.[50] Glass Lewis knows its work reaches Texas. It told the federal district court in Austin that it had "accelerated the issuance of reports into August" because of a Texas law.[51]

**iv. Glass Lewis works with Texas investment firms and directs its statements to Texas.**

17. Charles Schwab Investment Management, part of The Charles Schwab Corporation of Westlake, Texas, has retained Glass Lewis for research, voting recommendations, and vote execution.[52] Schwab lets shareholders of its Schwab 1000 Index Fund choose to have their shares voted under the "Glass Lewis Benchmark" policy.[53]

18. A Dallas investment firm, Westwood Holdings Group, says it uses Glass Lewis's guidelines and "generally follow[s]" Glass Lewis's recommendations when it votes its clients'

---

47 *Id.* ¶¶ 16, 18.

48 Compl. ¶ 38, *Glass, Lewis & Co. v. Paxton*, No. 1:25-cv-01153-ADA (W.D. Tex. July 24, 2025), ECF No. 1 [hereinafter *Glass Lewis Compl.*].

49 *Glass Lewis Am. Compl.* ¶ 34.

50 *Id.* ¶ 71.

51 *Id.* ¶ 73.

52 Schwab Asset Mgmt., *Proxy Voting Policy Options*, https://www.schwabassetmanagement.com/proxy-voting/policy-options (last visited Oct. 18, 2026); Charles Schwab Corp., Annual Report (Form 10-K) (Feb. 25, 2026), https://www.sec.gov/Archives/edgar/data/316709/000031670926000009/schw-20251231.htm (last visited Oct. 18, 2026).

53 Schwab Asset Mgmt., *Proxy Voting Choice FAQ*, https://www.schwabassetmanagement.com/proxy-voting/faq (last visited Oct. 18, 2026).

shares.[54] Westwood has also adopted the Glass Lewis voting guidelines for a mutual fund it helps manage for American Beacon Funds, a fund company based in Irving, Texas.[55]

19. Glass Lewis has directed statements about its Benchmark Policy to the Texas Attorney General, and it posted those statements on its website for investors to read.[56]

**v. The State's claims arise from these contacts.**

20. Specific jurisdiction requires "a substantial connection between [the defendant's] contacts and the operative facts of the litigation."[57] It "does not necessarily require proof of causation."[58] The United States Supreme Court asks whether a suit "arise[s] out of or relate[s] to the defendant's contacts with the forum."[59] The back half of that test, after the "or," "contemplates that some relationships will support jurisdiction without a causal showing."[60] When all claims arise from the same forum contacts, a court need not analyze them claim by claim.[61] The operative facts here are what Glass Lewis told people in Texas about its services and its sale of those services to Texas clients. ¶¶ 56–138. The statements describe the very product that Glass Lewis markets in Texas, sells in Texas, and delivers to each of its Texas clients. ¶¶ 10–19. When a nonresident's actionable statements are received and cause harm in Texas, the

---

54 Westwood Holdings Grp., Inc., Annual Report (Form 10-K) (Mar. 4, 2026), https://www.sec.gov/Archives/edgar/data/1165002/000116500226000020/whg-20251231.htm (last visited Oct. 18, 2026).

55 Am. Beacon Funds, Supplement to Statement of Additional Information (Form 497) app. B, at B-43 (Mar. 7, 2025), https://www.sec.gov/Archives/edgar/data/809593/000113322825002276/abscf-efp14988_497.htm (last visited Oct. 18, 2026).

56 Letter from Kevin Cameron, Exec. Chair, Glass Lewis, to State Attorneys General 1–2 (Jan. 31, 2023), https://resources.glasslewis.com/hubfs/Compliance/2023%20Letter%20to%20State%20AGs.pdf (last visited Oct. 18, 2026) [hereinafter *Glass Lewis Reply to Attorneys General*].

57 *Moki Mac*, 221 S.W.3d at 585.

58 *Volkswagen*, 669 S.W.3d at 431; *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 16–17 (Tex. 2021).

59 *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021).

60 *Id.*

61 *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150–51 (Tex. 2013); *Luciano*, 625 S.W.3d at 18.

actionable conduct occurs in Texas, even if the statements come from elsewhere.[62] By enacting the DTPA, Texas "has demonstrated a special interest in protecting its citizens from the sort of activity" alleged here.[63] Texas has a "strong interest in exercising jurisdiction to protect its citizens from activities that may violate the Deceptive Trade Practices Act."[64]

**vi. In the alternative, Glass Lewis is subject to general jurisdiction in Texas.**

21. In the alternative, the Court has general jurisdiction over Glass Lewis. General jurisdiction exists when a defendant's contacts with Texas are so "continuous and systematic" that it is "essentially at home" here.[65] Glass Lewis has marketed, offered, and sold its proxy advisory services to Texans for decades. ¶¶ 10–19. It also consented to general jurisdiction in Texas by registering with the Texas Secretary of State to do business here. ¶ 2.[66]

**C. Venue is proper in Collin County.**

22. Venue is proper in Collin County. Tex. Bus. & Com. Code § 17.47(b); Tex. Civ. Prac. & Rem. Code § 15.002(a)(1). The DTPA allows the State to sue in any county where the defendant "has done business" or "where the transaction occurred." Tex. Bus. & Com. Code § 17.47(b).

23. Glass Lewis has done business in Collin County. It markets its services to investors there through its website. On information and belief, Collin County residents and businesses visit that website and read the statements alleged in this petition there and in Glass Lewis's guidelines, reports, and marketing materials. ¶ 11. On information and belief, Glass Lewis has clients or

62 *TV Azteca*, 490 S.W.3d at 54.
63 *Siskind*, 642 S.W.2d at 437.
64 *Yelp*, 725 S.W.3d at 187.
65 *Yelp*, 725 S.W.3d at 176 (quoting *Volkswagen*, 669 S.W.3d at 412).
66 *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 134–36 (2023); *Acacia Pipeline Corp. v. Champlin Expl., Inc.*, 769 S.W.2d 719, 720 (Tex. App.—Houston [1st Dist.] 1989, no writ).

subscribers in Collin County, who receive its reports and Benchmark recommendations there. ¶¶ 12, 15. On information and belief, Collin County residents also receive those reports and recommendations indirectly, through the funds, advisers, and voting-choice programs that use them. ¶¶ 17–18, 134–135. And on information and belief, Collin County residents invest in funds and plans, wherever based, that receive Glass Lewis's reports or vote on its recommendations. ¶¶ 36, 44–45. Each of these is an act or practice in Collin County and business Glass Lewis has done there. Tex. Bus. & Com. Code §§ 17.45(6), 17.46(a), 17.47(b). On information and belief, transactions at issue occurred there. ¶ 12. A substantial part of the events giving rise to the State's claims occurred in Collin County. Tex. Civ. Prac. & Rem. Code § 15.002(a)(1).

24. Glass Lewis also issues reports and recommendations on the shareholder meetings of public companies based in Collin County, and its clients use them to vote at those meetings. For example, Glass Lewis issued reports recommending how to vote at the 2018, 2019, and 2021 annual meetings of Denbury Inc., an oil company then based in Plano.[67] In 2017, Glass Lewis recommended that shareholders of Rent-A-Center, Inc., a Plano company, elect two directors nominated by an activist investor. Shareholders elected both.[68] Tyler Technologies, Inc., also

---

[67] Denbury Res. Inc., Additional Proxy Materials (Schedule 14A) (May 16, 2018), https://www.sec.gov/Archives/edgar/data/945764/000094576418000069/dnr-2018xproxyamiss.htm (last visited Oct. 18, 2026); Denbury Res. Inc., Additional Proxy Materials (Schedule 14A) (May 14, 2019), https://www.sec.gov/Archives/edgar/data/945764/000094576419000063/dnr-2019xproxysupplementam.htm (last visited Oct. 18, 2026); Denbury Inc., Additional Proxy Materials (Schedule 14A) (May 13, 2021), https://www.sec.gov/Archives/edgar/data/945764/000094576421000070/den-2021xproxysupplement.htm (last visited Oct. 18, 2026); Denbury Inc., Annual Report (Form 10-K) (Mar. 5, 2021), https://www.sec.gov/Archives/edgar/data/945764/000094576421000022/den-20201231.htm (last visited Oct. 18, 2026).

[68] Press Release, Rent-A-Center, Inc., Rent-A-Center Comments on Glass Lewis Report (June 1, 2017), https://investor.upbound.com/node/10946/pdf (last visited Oct. 18, 2026); Engaged Capital, LLC, Additional Proxy Materials (Schedule 14A) (June 1, 2017), https://www.sec.gov/Archives/edgar/data/0000933036/000092189517001689/dfan14a09455023_06012017.htm (last visited Oct. 18, 2026); Rent-A-Center, Inc., Current Report (Form 8-K) ex. 99.1 (June 8, 2017), https://www.sec.gov/Archives/edgar/data/933036/000119312517202205/d404599dex991.htm (last visited Oct. 18, 2026).

based in Plano, told its shareholders that votes on two of its directors in 2023 "were influenced by commentary from Glass Lewis."[69] Cinemark Holdings, Inc., another Plano company, has met with representatives of Glass Lewis.[70] Glass Lewis also sells services to public companies, including consulting and the right to send "Report Feedback Statements" to its clients. ¶¶ 47, 101, 104. On information and belief, public companies based in Collin County have been solicited for Glass Lewis's services and some have purchased them. Each such solicitation and sale is business Glass Lewis has done in Collin County. Tex. Bus. & Com. Code § 17.47(b).

## IV. PUBLIC INTEREST, TRADE, AND COMMERCE

25. The State adopts and incorporates by reference all preceding paragraphs and allegations of this petition.

26. The Consumer Protection Division has reason to believe that Glass Lewis is engaging in, has engaged in, or is about to engage in acts and practices the DTPA forbids. Tex. Bus. & Com. Code § 17.47(a). They are false, misleading, or deceptive acts or practices in the conduct of trade and commerce. *Id.* § 17.46(a). Those acts and practices have directly or indirectly affected the people of Texas. *See id.* § 17.45(6). The Division believes that this suit is in the public interest. *Id.* § 17.47(a). The State may bring it whether or not any consumer has complained or been injured. *See id.* § 17.47(a), (c); ¶ 187.

27. The DTPA defines "trade" and "commerce" this way. Tex. Bus. & Com. Code § 17.45(6).

[69] Tyler Techs., Inc., Proxy Statement (Schedule 14A) (Mar. 29, 2024), https://www.sec.gov/Archives/edgar/data/860731/000086073124000015/tyl-20240329.htm (last visited Oct. 18, 2026).

[70] Cinemark Holdings, Inc., Proxy Statement (Schedule 14A) (Apr. 6, 2022), https://www.sec.gov/Archives/edgar/data/1385280/000114036122013386/ny20002675x1_def14a.htm (last visited Oct. 18, 2026).

> "Trade" and "commerce" mean the advertising, offering for sale, sale, lease, or distribution of any good or service, of any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value, wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this state.

28. Glass Lewis advertises, offers for sale, sells, and distributes proxy research, voting recommendations, voting policies, and vote-casting services.[71] Its website is a place where it advertises and offers those services. That is why its pages invite visitors to "Request More Information" and to "Download Brochure." ¶¶ 10–11. Glass Lewis has engaged in trade and commerce directly and indirectly affecting the people of Texas at all times relevant to this suit.

29. The DTPA defines a "consumer" as one who "seeks or acquires by purchase or lease, any goods or services." Tex. Bus. & Com. Code § 17.45(4). A consumer may be an individual, partnership, or corporation. It may also be this State or a subdivision or agency of this State. *Id.* The term excludes a "business consumer" with assets of $25 million or more. *Id.* That limit governs who may sue under section 17.50. It does not limit the State's power to sue over "any act or practice declared to be unlawful" by the DTPA.[72] Nor does it limit the civil penalties that section 17.47(c)(1) allows. Tex. Bus. & Com. Code § 17.47(c)(1). Where a DTPA provision itself uses the word "consumer," the State pleads consumers who meet the definition. ¶¶ 129, 152. A person who acquires services that someone else buys for that person's benefit is a consumer.[73]

---

[71] Glass Lewis, *About Us*, *supra*; Glass Lewis, *Proxy Voting Policies*, *supra*; *Glass Lewis Compl.* ¶ 38.

[72] Tex. Bus. & Com. Code § 17.47(a); *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 541 (Tex. 1981) (explaining that section 17.45(4) "does nothing more than describe the class of persons who can bring a suit for treble damages under section 17.50"); *Flenniken v. Longview Bank & Tr. Co.*, 661 S.W.2d 705, 706 (Tex. 1983) (explaining that section 17.45(4) "only describes the class of persons entitled to bring suit under section 17.50"); *Bourland v. State*, 528 S.W.2d 350, 358 (Tex. Civ. App.—Austin 1975, writ ref'd n.r.e.) (explaining that private suits, not the State's, restrict claimants to "consumers"); *Texas v. Colony Ridge, Inc.*, No. H-24-0941, 2024 WL 4553111, at *7 n.4 (S.D. Tex. Oct. 11, 2024), *report and recommendation adopted*, No. H-24-0941 (S.D. Tex. Nov. 26, 2024).

[73] *Kennedy v. Sale*, 689 S.W.2d 890, 892 (Tex. 1985) (holding that an employee covered by a group policy his employer bought was a consumer); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 815 (Tex. 1997)

Glass Lewis's Texas consumers still include individuals who seek or acquire its services through funds, advisers, and others who buy them. ¶¶ 10–19, 135. This State and its agencies are never "business consumers" subject to exclusion from the DTPA's protections. Tex. Bus. & Com. Code § 17.45(10). So a state pension fund that buys proxy advice, as the Teacher Retirement System's policy requires, is a consumer of that advice. ¶¶ 36–37. On information and belief, such funds are or have been among Glass Lewis's Texas clients. ¶ 12.

## V. BACKGROUND: HOW SHAREHOLDER VOTING WORKS

30. The State adopts and incorporates by reference all preceding paragraphs and allegations of this petition.

### A. Shareholders own public companies and vote on how they are run.

31. A share of stock is a piece of ownership in a company. As the investor website of the Securities and Exchange Commission ("SEC") puts it, "When you own a share of stock, you own part of a company."[74] Large companies whose shares anyone can buy on a stock exchange are called public companies. Their owners are called shareholders. Shareholders do not run the company day to day. Under Texas law, a corporation's board of directors directs "the management of the business and affairs of the corporation."[75] Shareholders elect the directors, usually at an

(holding that a buyer that required an audit was a consumer of the auditor's services, though the company being sold paid for them).

[74] Investor.gov, U.S. Sec. & Exch. Comm'n, *Stocks FAQs*, https://www.investor.gov/introduction-investing/investing-basics/investment-products/stocks (last visited Oct. 18, 2026).

[75] Tex. Bus. Orgs. Code § 21.401(a)(2).

annual meeting.[76] Each share usually carries one vote, so the more shares an investor owns, the more votes it casts.[77]

32. Voting gives shareholders the power to elect directors and to make their views known "on significant issues that may affect the value of [their] shares."[78] Shareholders may also put their own proposals on a company's ballot. A shareholder "owning a relatively small amount of a company's securities" can have a proposal "placed alongside management's proposals" for a vote.[79] Some proposals deal with how a company is run, such as proposals to elect all directors every year or to make it easier for shareholders to call a special meeting.[80] Other proposals push a company on environmental or social issues. At Amazon's 2025 annual meeting, for example, shareholders voted on proposals asking for reports on plastic packaging, greenhouse-gas emissions, and warehouse working conditions.[81]

33. The number of these votes has exploded. Elizabeth Ising, a securities lawyer, testified to Congress that "the number of items voted on increased approximately 730% between 2000 and 2024 at Russell 3000 companies."[82] The Russell 3000 is a stock index made up of

---

[76] Tex. Bus. Orgs. Code § 21.405(a); Investor.gov, U.S. Sec. & Exch. Comm'n, *Annual Meeting* (glossary), https://www.investor.gov/introduction-investing/investing-basics/glossary/annual-meeting (last visited Oct. 18, 2026).

[77] Tex. Bus. Orgs. Code § 21.366(a).

[78] Investor.gov, U.S. Sec. & Exch. Comm'n, *Shareholder Voting*, https://www.investor.gov/research-before-you-invest/research/shareholder-voting (last visited Oct. 18, 2026).

[79] U.S. Sec. & Exch. Comm'n, Div. of Corp. Fin., Staff Legal Bulletin No. 14, § B.1 (July 13, 2001), https://www.sec.gov/interps/legal/cfslb14.htm (last visited Oct. 18, 2026).

[80] Investor.gov, U.S. Sec. & Exch. Comm'n, *Investor Bulletin: Voting in Annual Shareholder Meetings—What's New in 2012* (Mar. 28, 2012), https://www.investor.gov/news-alerts/investor-bulletins/voting-annual-shareholder-meetings-what-s-new-2012 (last visited Oct. 18, 2026).

[81] Glass Lewis, *Proxy Paper: Amazon.com, Inc.* 2 (May 1, 2025), https://resources.glasslewis.com/hubfs/Northern%20Trust/Amazon_PP25.pdf (last visited Oct. 18, 2026) [hereinafter *Amazon Proxy Paper*]; Amazon.com, Inc., Current Report (Form 8-K) Item 5.07 (May 22, 2025), https://www.sec.gov/Archives/edgar/data/1018724/000110465925052014/tm2515134d1_8k.htm (last visited Oct. 18, 2026).

[82] *Exposing the Proxy Advisory Cartel: How ISS & Glass Lewis Influence Markets: Hearing Before the Subcomm. on Cap. Mkts. of the H. Comm. on Fin. Servs.*, 119th Cong. (2025) (statement of Elizabeth A. Ising, Partner, Gibson, Dunn & Crutcher LLP), *reprinted in* Harv. L. Sch. F. on Corp. Governance (May 5, 2025),

roughly the 3,000 largest U.S. public companies. The 1,000 largest of them make up the "Russell 1000." These votes matter to every investor. They decide who sits on a company's board, and they tell directors what shareholders want the company to do with its money.

34. Environmental and social issues, together with governance, are often called "ESG," short for "environmental, social, and governance." A related term, "DEI," stands for "diversity, equity, and inclusion." The President's December 2025 order on proxy advisors treats both as "non-pecuniary factors in investing."[83] It states that some proxy advisors use their power to advance DEI and ESG agendas "even though investor returns should be the only priority."[84]

**B. Institutional investors cast most of the votes.**

35. Millions of Americans hold stock through mutual funds and exchange-traded funds.[85] The pension plans, mutual funds, and asset managers that invest other people's money are called institutional investors.[86] They vote the shares they hold, and many of them owe a "fiduciary duty to cast informed votes."[87] Institutional investors hold most of the stock in America. The SEC has cited an estimate that they "hold around 72% of the domestic stock market value."[88] In other words, about $7 of every $10 invested in U.S. stocks is held by institutional investors. Because each share carries a vote, they cast most of the votes at shareholder meetings.

---

https://corpgov.law.harvard.edu/2025/05/05/testimony-in-house-hearing-exposing-the-proxy-advisory-cartel-how-iss-glass-lewis-influence-markets-3/ (last visited Oct. 18, 2026) [hereinafter *Ising Testimony*].

83 Exec. Order No. 14,366, 90 Fed. Reg. 58,503, 58,504 (Dec. 16, 2025).

84 *Id.* at 58,503.

85 Exec. Order No. 14,366, 90 Fed. Reg. at 58,503.

86 *Glass Lewis Compl.* ¶ 32; Def. Glass Lewis' Mot. to Dismiss Am. Pet. Under Rule 91a 1–2 (Sept. 14, 2026) [hereinafter *Glass Lewis Rule 91a Mot.*].

87 *Glass Lewis Compl.* ¶ 30.

88 Exemptions From the Proxy Rules for Proxy Voting Advice, 85 Fed. Reg. 55,082, 55,085 n.36 (Sept. 3, 2020) (quoting A. De La Cruz et al., OECD, *Owners of the World's Listed Companies* 22 (2019)).

36. Texas is home to some of the largest institutional investors in the country. The Teacher Retirement System of Texas managed a fund worth about $225 billion as of August 2025, and it serves more than two million Texans.[89] The Employees Retirement System of Texas managed a fund worth about $40 billion as of August 2024. It serves more than 400,000 members, retirees, and beneficiaries.[90] The Texas Permanent School Fund, which helps pay for Texas public schools, has more than $64 billion in investments. It calls itself "the nation's oldest and largest educational endowment."[91] The University of Texas/Texas A&M Investment Management Company ("UTIMCO") manages about $92 billion for the University of Texas and Texas A&M systems.[92]

37. Texas public funds buy proxy advice. The Teacher Retirement System's policy requires its board to "retain a reputable, independent proxy advisory service."[93] The Texas Permanent School Fund uses an "external proxy voting manager," and its "ESG skeptical" voting policy "is offered through Institutional Shareholder Services (ISS)."[94] UTIMCO's policy names

89 Teacher Ret. Sys. of Tex., *2025 Popular Annual Financial Report* 1 (Nov. 2025), https://www.trs.texas.gov/sites/default/files/2025-11/2025-Popular-Annual-Financial-Report.pdf (last visited Oct. 18, 2026).

90 Emps. Ret. Sys. of Tex., *Serving Texans: Fiscal Year 2024 at a Glance* (Dec. 6, 2024), https://ers.texas.gov/about-ers/reports-and-studies/reports-on-overall-ers-operations-and-financial-ma/2024-at-a-glance (last visited Oct. 18, 2026).

91 Tex. Permanent Sch. Fund Corp., *Legislative Appropriations Request for Fiscal Years 2028 and 2029* 1 (Aug. 2026), https://texaspsf.org/wp-content/uploads/2026/08/706-Texas-PSF-2028-29-LAR.pdf (last visited Oct. 18, 2026).

92 Univ. of Tex./Tex. A&M Inv. Mgmt. Co., *Assets Under Management* (July 31, 2026), https://www.utimco.org/media/qzrfrsk1/fye2026oamassets.pdf (last visited Oct. 18, 2026).

93 Teacher Ret. Sys. of Tex., *Proxy Voting Policy* § 2 (rev. Dec. 5, 2025), https://www.trs.texas.gov/files/migrated/proxy_voting_policy.pdf (last visited Oct. 18, 2026).

94 News Release, Tex. Permanent Sch. Fund Corp., Texas PSF Corporation Implements Proxy Voting Directives Focused on Fiduciary Responsibility, Not Political Activism (Apr. 15, 2024), https://texaspsf.org/wp-content/uploads/2024/10/Proxy-Voting-News-Release_04152024_a11y.pdf (last visited Oct. 18, 2026).

Glass Lewis's "Governance-Focused" guidelines as an example of guidelines "that prioritize effective corporate governance and align with board recommendations."[95]

38. Investors like these must vote in the financial interest of the people they serve. The Teacher Retirement System, for example, requires that its proxies be voted "in the best economic interests of the pension plan."[96] The federal Employee Retirement Income Security Act ("ERISA") imposes a similar duty on many private retirement plans, whose managers must act for the exclusive purpose of "providing benefits to participants and their beneficiaries."[97] When those plans vote, federal rules require their fiduciaries to "[a]ct solely in accordance with the economic interest of the plan and its participants and beneficiaries."[98] A fiduciary "may not adopt a practice of following the recommendations of a proxy advisory firm" without first deciding that the firm's voting guidelines are consistent with those duties.[99] Glass Lewis has told the federal district court in Austin that "[m]any Glass Lewis clients are asset managers to employee retirement plans governed by ERISA."[100]

**C. Most shareholders vote by proxy, and many large investors rely on proxy advisors.**

39. Few shareholders attend shareholder meetings. Most vote by "proxy," which means "authorizing someone . . . to vote according to your wishes" at the meeting.[101] Texas law

---

95 Univ. of Tex./Tex. A&M Inv. Mgmt. Co., *Proxy Voting Policy* (Sept. 17, 2024), https://fas.utimco.org/media/4413/final-utimco-proxy-voting-policy-9172024.pdf (last visited Oct. 18, 2026).

96 Teacher Ret. Sys. of Tex., *Proxy Voting Policy*, *supra*, § 1.

97 29 U.S.C. § 1104(a)(1)(A)(i).

98 29 C.F.R. § 2550.404a-1(d)(2)(ii)(A) (2025).

99 *Id.* § 2550.404a-1(d)(2)(iii).

100 *Glass Lewis Am. Compl.* ¶ 68.

101 Investor.gov, U.S. Sec. & Exch. Comm'n, *How Do I Vote at a Corporate Election?*, https://www.investor.gov/research-before-you-invest/research/shareholder-voting/how-do-i-vote-corporate-election (last visited Oct. 18, 2026).

allows shareholders to vote by proxy.[102] Before each meeting, the company sends shareholders a "proxy statement." Proxy statements "describe matters up for shareholder vote."[103]

40. A large institutional investor may own stock in hundreds or thousands of companies. Glass Lewis agrees that "[b]ecause institutional investors may own hundreds or thousands of stocks, they rely on proxy advisors to provide advice about upcoming shareholder votes."[104] A proxy advisor is a business that researches the matters up for a vote and recommends how its clients should vote. Some investors go further and give proxy advisors "authority to execute votes" for them.[105] Proxy advisors also sell ready-made voting policies, such as Glass Lewis's Benchmark Policy and its "thematic" policies, and they apply custom policies that clients write themselves. ¶¶ 49, 51, 82.

41. Proxy advisors sell this as a way to save time and money. Glass Lewis, for example, advertises "ready-to-use guidelines that eliminate the need for in-house development and management of voting policies."[106] The SEC has stated that proxy advisors are "uniquely situated in today's market to influence, and in many cases directly execute, these investors' voting decisions."[107]

42. A 2016 federal report found five firms in the industry, "two of which are the largest and most dominant proxy advisory firms." Those two firms are Glass Lewis and Institutional

[102] Tex. Bus. Orgs. Code § 21.367(a).
[103] U.S. Sec. & Exch. Comm'n, *Annual Meetings and Proxy Requirements* (June 6, 2024), https://www.sec.gov/smallbusiness/goingpublic/annualmeetings (last visited Oct. 18, 2026).
[104] *Glass Lewis Rule 91a Mot.* at 2.
[105] 85 Fed. Reg. at 55,083.
[106] Glass Lewis, *Proxy Voting Policies*, *supra*.
[107] 85 Fed. Reg. at 55,083.

Shareholder Services Inc. ("ISS").[108] As of 2021, ISS held 48% and Glass Lewis held 42% of the proxy advisory market for U.S. mutual funds, measured by the assets they advise on.[109] The State has also sued ISS under the DTPA. That suit is also pending before this Court.[110]

### D. Proxy advisors shape how shareholders vote.

43. Ising testified to Congress that ISS and Glass Lewis "exercise significant influence over the voting outcomes" on thousands of proposals.[111] Georgeson, a firm that helps companies win shareholder votes, measured that influence. In 2025, environmental proposals that both ISS and Glass Lewis supported received, on average, 31% of the votes cast. Proposals that both opposed received, on average, 12%.[112] One study of votes on executive pay found that a negative Glass Lewis recommendation was associated with 12.9% more votes against the pay plan.[113]

44. Some investors follow a proxy advisor's recommendations automatically. This is called "robo-voting."[114] One study found that 114 institutional investors managing more than $5 trillion voted in lockstep with ISS or Glass Lewis in 2020. About one in seven of them followed

---

[108] U.S. Gov't Accountability Off., GAO-17-47, *Corporate Shareholder Meetings: Proxy Advisory Firms' Role in Voting and Corporate Governance Practices* i, 7–8 (2016), https://www.gao.gov/assets/gao-17-47.pdf (last visited Oct. 18, 2026).

[109] Chong Shu, *The Proxy Advisory Industry: Influencing and Being Influenced*, 154 J. Fin. Econ. 103810 (2024), *summarized at* Harv. L. Sch. F. on Corp. Governance (May 2, 2024), https://corpgov.law.harvard.edu/2024/05/02/the-proxy-advisory-industry-influencing-and-being-influenced (last visited Oct. 18, 2026).

[110] Pl.'s Original Pet., *State v. Institutional S'holder Servs., Inc.*, No. 471-03459-2026 (471st Dist. Ct., Collin County, Tex. filed May 20, 2026).

[111] *Ising Testimony*, *supra*.

[112] Georgeson, *Full Season Report* 19 (Sept. 29, 2025), https://content-assets.computershare.com/eh96rkuu9740/6JRQJDMCnAm6pCXhn5v1zy/5e1a1f8f1fd06b0d8f841cc12479dbba/Georgeson_Full_Season_Report_FINAL_9.29.2025.pdf (last visited Oct. 18, 2026) [hereinafter *Georgeson 2025*].

[113] Fabrizio Ferri, *Shareholder Votes and Proxy Advisors: Evidence from Say on Pay*, Harv. L. Sch. F. on Corp. Governance (Apr. 9, 2012), https://corpgov.law.harvard.edu/2012/04/09/shareholder-votes-and-proxy-advisors/ (last visited Oct. 18, 2026).

[114] Shu, *supra*.

Glass Lewis.[115] Ising testified that she routinely sees "a flood of votes" cast "strictly in line with the advisory firm's recommendations" soon after the recommendations come out.[116] For a robo-voting investor, the proxy advisor's recommendation is the vote. The rules the advisor writes decide how that investor's shares are cast.

45. Glass Lewis's voting platform makes lockstep robo-voting easier. One study looked at funds that subscribe to both ISS and Glass Lewis. Those using Glass Lewis's platform "tend to vote 19 percentage points more consistently with Glass Lewis's advice."[117] Glass Lewis's voting platform is called Viewpoint. Glass Lewis says investors "depend on Glass Lewis' Viewpoint platform to manage their proxy voting," and Viewpoint offers clients "pre-populated" votes.[118] A Dallas investment firm, for example, says it "generally follow[s]" Glass Lewis's recommendations. ¶ 18.

46. Glass Lewis has taken sides in real contests at Texas companies, and its side has often won. In 2021, an activist fund ran a proxy fight at Exxon, then based in Irving, Texas. Glass Lewis backed two of the fund's nominees, Gregory Goff and Alexander Karsner. It wrote that Exxon "has not effectively communicated a compelling overall strategy and capital spending program that is indicative of a clear, cohesive plan for Exxon in a lower-carbon world."[119] The fund

---

115 Paul Rose, *Proxy Advisors and Market Power: A Review of Institutional Investor Robovoting*, Harv. L. Sch. F. on Corp. Governance (May 27, 2021), https://corpgov.law.harvard.edu/2021/05/27/proxy-advisors-and-market-power-a-review-of-institutional-investor-robovoting/ (last visited Oct. 18, 2026).

116 *Ising Testimony*, *supra*.

117 Shu, *supra*.

118 Glass Lewis, *Due Diligence: A Resource for Investment Advisers on Glass Lewis Policies and Procedures* 4, 7 n.10 (Oct. 2025), https://resources.glasslewis.com/hubfs/Compliance/2025%20Due%20Diligence%20Resource%20Guide.pdf (last visited Oct. 18, 2026) [hereinafter *2025 Due Diligence Guide*].

119 Engine No. 1 LLC, Additional Proxy Materials (Schedule 14A) (May 20, 2021), https://www.sec.gov/Archives/edgar/data/34088/000090266421002867/p21-1450dfan14a.htm (last visited Oct. 18, 2026); Rob Ball et al., *Was the Exxon Fight a Bellwether?*, Harv. L. Sch. F. on Corp. Governance (July 24, 2021), https://corpgov.law.harvard.edu/2021/07/24/was-the-exxon-fight-a-bellwether/ (last visited Oct. 18, 2026).

won three seats, including both of Glass Lewis's picks. Mr. Karsner drew the fewest votes of the fund's three winners. He still received about 73 million more votes than the Exxon nominee with the most votes who was not elected.[120] In Collin County, Glass Lewis backed two activist nominees at Rent-A-Center, and both won. Tyler Technologies told its shareholders that votes on two of its directors "were influenced by commentary from Glass Lewis." ¶ 24.

### E. Glass Lewis sells research, voting policies, and a voting platform.

47. Glass Lewis was founded in 2003. It says it serves more than 1,300 investors, covers more than 30,000 shareholder meetings a year, and has clients who manage about $40 trillion.[121] It also sells services to more than 2,300 public companies, the same kind of companies on whose votes it advises investors.[122]

48. Glass Lewis sells three main things to investors. They are research reports called Proxy Papers, voting policies, and its Viewpoint voting platform. Each Proxy Paper analyzes each item on a meeting's ballot and recommends how to vote.[123] A voting policy is a set of rules that turns Glass Lewis's research into "for" and "against" recommendations.[124]

49. Glass Lewis's own standard policy is called the Benchmark Policy. It is Glass Lewis's "house" policy.[125] Glass Lewis writes a version of the Benchmark Policy for each country or region, such as the United States or Canada. These are its "regional benchmark guidelines" or

[120] Ball et al., *supra*; Exxon Mobil Corp., Current Report (Form 8-K/A) Item 5.07 (June 21, 2021), https://www.sec.gov/Archives/edgar/data/34088/000003408821000037/xom-20210526.htm (last visited Oct. 18, 2026).

[121] Glass Lewis, *About Us*, *supra*.

[122] *Id.*

[123] *Wieck Decl.* ¶ 7.

[124] *See* 85 Fed. Reg. at 55,083.

[125] Glass Lewis, *Benchmark Policy Guidelines 2027: Canada* 7 (2026), https://resources.glasslewis.com/hubfs/Policy%20Guidelines/2027%20Guidelines/Benchmark%20Policy%20Guidelines%202027%20-%20Canada.pdf (last visited Oct. 18, 2026) ("Glass Lewis' single house policy has traditionally anchored the regional benchmark guidelines.").

"market-specific" policies.[126] Glass Lewis publishes new Benchmark guidelines on its website late each year. They apply to meetings held from the following January.[127]

50. Every Glass Lewis client that receives research gets a Proxy Paper with Benchmark recommendations, no matter which policy the client chose.[128] Even clients with their own custom policies receive Proxy Papers "which feature analysis and recommendations based on the Glass Lewis benchmark policy."[129] A client may also pay for recommendations under its own "custom" policy or one of Glass Lewis's "thematic" policies.[130] Glass Lewis says it tailors those recommendations "to each client's specific voting policy."[131] In this petition, "Benchmark services" means the Benchmark Policy, its guidelines, and the Benchmark recommendations Glass Lewis delivers to clients in Proxy Papers and through Viewpoint.

## F. Glass Lewis sells separate policies for investors who want different things.

51. Glass Lewis also sells "thematic" policies, which are ready-made rules built around a theme. It tells buyers to "[c]hoose a thematic policy that reflects your goals and values."[132] Its menu runs from one end to the other. Its ESG Policy "[s]upports investors focused on environmental and social issues."[133] Its Climate Policy "was designed for clients with a strong focus on environmental risk mitigation."[134] Its Corporate Governance Focused Policy generally

---

126 Glass Lewis, *Benchmark Policy Guidelines 2027: Canada*, *supra*, at 7; Glass Lewis, *Policy Guidelines*, https://www.glasslewis.com/policy-guidelines (last visited Oct. 18, 2026).

127 Glass Lewis, *Policy Guidelines*, *supra*; Glass Lewis, *Proxy Voting Policies*, *supra*.

128 *Wieck Decl.* ¶ 7.

129 Glass Lewis, *Best Practice Principles for Providers of Shareholder Voting Research & Analysis: Statement of Compliance* 10 (2025) (covering 2024), https://bppgrp.info/wp-content/uploads/2025/06/Glass-Lewis-BPP-Report-2024.pdf (last visited Oct. 18, 2026) [hereinafter *2024 Compliance Statement*].

130 *Wieck Decl.* ¶ 7; *Glass Lewis Am. Compl.* ¶¶ 41–42, 44.

131 *Glass Lewis Am. Compl.* ¶ 40.

132 Glass Lewis, *Thematic Voting Policies*, *supra*.

133 *Id.*

134 Glass Lewis, *Climate Thematic Voting Policy Guidelines 2026* 6, https://resources.glasslewis.com/hubfs/2026%20Guidelines/Thematic/Thematic%20Voting%20Policy%202026%20-%20Climate.pdf (last visited Oct. 18, 2026) [hereinafter *2026 Climate Policy*].

recommends "in line with management on environmental and social issues."[135] And its Bowyer Research Policy is sold "for investors skeptical of politicized ESG and DEI initiatives."[136]

52. The policy a client picks changes the advice it gets. Under the Climate Policy, for example, Glass Lewis will oppose the chair of the board committee that oversees environmental and social issues if the company has not disclosed its greenhouse-gas emissions.[137] Glass Lewis has said that an emissions-target proposal "is far more likely to be supported under our Climate Policy than our Governance-Focused Policy."[138]

53. This menu is Glass Lewis's own admission that investors do not share one view on environmental and social issues. It sells one policy for investors who want those priorities and another for investors who reject them. A firm would not need both unless its clients disagreed. ¶ 51.

54. The menu also tells buyers where the Benchmark Policy sits. With an ESG Policy on one side and an ESG-skeptic policy on the other, the Benchmark reads as the mainstream middle. Glass Lewis says as much when it describes the Benchmark as reflecting "broad investor opinion." ¶ 58. A buyer who wants mainstream advice focused on shareholder value has every reason to choose the Benchmark Policy. A buyer who wants an ESG focus has reason to choose the ESG Policy.[139]

---

135 *Glass Lewis Compl.* ¶ 43.
136 Glass Lewis, *Thematic Voting Policies*, *supra*.
137 *2026 Climate Policy* at 5.
138 Letter from Kevin Cameron, Exec. Chair, Glass Lewis, to State Treasurers and Financial Officers 4 (June 29, 2023), https://resources.glasslewis.com/hubfs/Compliance/State%20Treasurers%20Group%20Response%20Letter.pdf (last visited Oct. 18, 2026) [hereinafter *2023 Treasurers Letter*].
139 *See* Glass Lewis, *Thematic Voting Policies*, *supra*; Glass Lewis, *ESG Thematic Voting Policy Guidelines 2026* 7, https://corporate.vanguard.com/content/dam/corp/advocate/investment-stewardship/pdf/investor-choice/esg_policy_by_glass_lewis.pdf (last visited Oct. 18, 2026) [hereinafter *2026 ESG Policy*].

## VI. GLASS LEWIS'S FALSE, MISLEADING, AND DECEPTIVE STATEMENTS

55. The State adopts and incorporates by reference all preceding paragraphs and allegations of this petition.

56. Since at least 2016, Glass Lewis has made false, misleading, and deceptive statements about its proxy advice and voting policies, above all its Benchmark Policy. The statements concern the nature, basis, purpose, and quality of what Glass Lewis sells. Glass Lewis made them in its guidelines, compliance statements, website, survey reports, Proxy Papers, marketing materials, and letters it posted online for investors. It also made them in its dealings with clients and prospective clients.

57. The statements fall into four groups. Glass Lewis said its Benchmark Policy reflects broad investor opinion and its clients' predominant views. It said the policy reflects best practices and widely accepted governance principles. It said its advice is independent, objective, and aimed at long-term shareholder value. And it said its policies are built from the bottom up, on client input. Glass Lewis also kept from investors facts that showed these statements were false or misleading. It made these statements far more often than the examples below.

### A. Glass Lewis said the Benchmark Policy reflects "broad investor opinion."

#### i. Glass Lewis made this statement in its guidelines, compliance statements, and published letters.

58. Glass Lewis's 2026 Benchmark guidelines for the United States describe the Benchmark Policy this way.[140]

[140] Glass Lewis, *Benchmark Policy Guidelines 2026: United States* 7 (2025), https://resources.glasslewis.com/hubfs/2026%20Guidelines/Benchmark/Benchmark%20Policy%20Guidelines%202026%20-%20United%20States.pdf (last visited Oct. 18, 2026) [hereinafter *2026 Benchmark Guidelines*].

> The Benchmark Policy reflects broad investor opinion and widely accepted governance principles and is intended to provide clients with nuanced analysis informed by market best practice, regulation, and prevailing investor sentiment.

59. Glass Lewis's 2026 guidelines on shareholder proposals say the same thing.[141] Glass Lewis has said that its 2026 guidelines "will remain static for 2027," so the same description applies to meetings in 2027.[142]

60. Glass Lewis's compliance statements for 2023 and 2024 each say that "the benchmark policy reflects the current, predominant views of our institutional investor clients on corporate governance best practices." The same sentence ends, "we recognize that our clients have differing needs and views."[143] Its 2024 policy-survey report says the guidelines "generally reflect the current, predominant views of institutional investor clients on corporate governance best practices."[144] For years before that, its compliance statements explained how clients choose a policy. Those for 2016, 2018, and 2020 through 2022 said that clients who adopt its policies "generally do so after determining that the Glass Lewis approach closely reflects their own view."[145]

---

141 Glass Lewis, *Benchmark Policy Guidelines 2026: Shareholder Proposals & ESG-Related Issues* 7 (2025), https://resources.glasslewis.com/hubfs/2026%20Guidelines/Benchmark/Benchmark%20Policy%20Guidelines%202026%20-%20Shareholder%20Proposals.pdf (last visited Oct. 18, 2026) [hereinafter *2026 Shareholder Proposal Guidelines*].

142 Glass Lewis, *Benchmark Policy Guidelines 2027: United States* 7 (2026), https://resources.glasslewis.com/hubfs/Policy%20Guidelines/2027%20Guidelines/Benchmark%20Policy%20Guidelines%202027%20-%20United%20States.pdf (last visited Oct. 18, 2026) [hereinafter *2027 Benchmark Guidelines*].

143 Glass Lewis, *Best Practice Principles for Providers of Shareholder Voting Research & Analysis: Statement of Compliance* 13 (covering 2023), https://resources.glasslewis.com/hubfs/Compliance/2023%20BPP%20Statement.pdf (last visited Oct. 18, 2026); *2024 Compliance Statement* at 13.

144 Glass Lewis, *Glass Lewis Policy Survey 2024: Results & Key Findings* 5 (2024), https://resources.glasslewis.com/hubfs/2024%20Policy%20Survey/2024%20Glass%20Lewis%20Policy%20Survey%20Results.pdf (last visited Oct. 18, 2026) [hereinafter *2024 Survey Report*].

145 Glass Lewis, *Best Practice Principles for Providers of Shareholder Voting Research & Analysis: Statement of Compliance* 12 (covering 2016), https://bppgrp.info/wp-content/uploads/2017/03/GL_BPP_Compliance_Statement_FY-2016_0317.pdf (last visited Oct. 18, 2026) [hereinafter *2016 Compliance Statement*]; Glass Lewis, *Best Practice Principles for Providers of Shareholder Voting Research & Analysis: Statement of Compliance* 13 (covering 2018), https://resources.glasslewis.com/hubfs/Compliance/2019%20BPP%20Statement.pdf (last visited Oct. 18, 2026)

61. In January 2023, Glass Lewis wrote to the attorneys general of Texas and other States. It said its Benchmark Policy "generally reflects the current, predominant views of our institutional investor clients on corporate governance best practices."[146] In June 2023, it told state treasurers the same thing. Glass Lewis posted both letters on its website for investors to read.[147]

62. Glass Lewis said the same thing to the federal district court in Austin. It said the factors its Benchmark Policy considers "reflect the consensus views of Glass Lewis' 1300+ institutional investor clients."[148] In June 2025, it told United States Senators that its Benchmark board-diversity policy "reflects an emerging consensus over recent years in the business and investor community."[149] Glass Lewis posted that letter on its website and encouraged "our clients and anyone else interested in these issues to check the facts."[150] It made similar claims to the SEC. In 2020, it said it "aims to have policies that reflect the views of its clients."[151] In 2021, it said that

---

[hereinafter *2018 Compliance Statement*]; Glass Lewis, *Best Practice Principles for Providers of Shareholder Voting Research & Analysis: Statement of Compliance* 11 (covering 2020), https://resources.glasslewis.com/hubfs/Compliance/2020%20Best%20Practice%20Principles%20for%20Shareholder%20Voting%20Research%20Analysis.pdf (last visited Oct. 18, 2026) [hereinafter *2020 Compliance Statement*]; Glass Lewis, *Best Practice Principles for Providers of Shareholder Voting Research & Analysis: Statement of Compliance* 11 (covering 2021), https://resources.glasslewis.com/hubfs/Compliance/2021%20BPP%20Statement.pdf (last visited Oct. 18, 2026) [hereinafter *2021 Compliance Statement*]; Glass Lewis, *Best Practice Principles for Providers of Shareholder Voting Research & Analysis: Statement of Compliance* 12–13 (covering 2022), https://www.glasslewis.com/wp-content/uploads/2024/04/Glass-Lewis-BPP-Statement-2022.pdf (last visited Oct. 18, 2026) [hereinafter *2022 Compliance Statement*].

146 *Glass Lewis Reply to Attorneys General* at 1–2.

147 *2023 Treasurers Letter* at 2.

148 *Glass Lewis Am. Compl.* ¶ 40.

149 Letter from Bob Mann, CEO, Glass Lewis, to Sens. Tim Scott, Bill Hagerty & M. Michael Rounds 7 (June 10, 2025), https://resources.glasslewis.com/hubfs/Client%20Communication/Glass%20Lewis%20Letter%20to%20Senate%20Banking%20Members%20-%20June%202025.pdf (last visited Oct. 18, 2026) [hereinafter *Senate Letter*].

150 Glass Lewis, *Glass Lewis Letter to Senate Banking Committee Members* (June 11, 2025), https://www.glasslewis.com/article/glass-lewis-letter-to-senate-banking-committee-members (last visited Oct. 18, 2026).

151 Letter from Glass, Lewis & Co. to Vanessa A. Countryman, Sec'y, SEC 3 (Feb. 3, 2020) (File No. S7-22-19), https://resources.glasslewis.com/hubfs/Compliance/Comment%20Letter%20Final.pdf (last visited Oct. 18, 2026) [hereinafter *2020 SEC Comment Letter*].

"on many issues, our recommendations are based on corporate governance best practices that reflect the consensus view of most institutional investors."[152]

63. In its 2026 guidelines, Glass Lewis also changed its voice. The 2025 guidelines said, "We believe part of the board's role is to ensure that management conducts a complete risk analysis . . . ."[153] Now they say, "The Benchmark Policy is of the view that part of the board's role is to ensure that management conducts a complete risk analysis . . . ."[154] The view did not change. Only the label did. Glass Lewis's own views now appear as the views of a policy that Glass Lewis says reflects broad investor opinion.

**ii. The Benchmark Policy carries voting rules that most investors do not share.**

64. The 2026 Benchmark guidelines contain voting rules on board diversity, board oversight of environmental and social issues, and climate disclosure.[155] The nominating committee picks a company's director candidates. For that committee, the Benchmark Policy "will consider recommending that shareholders vote against" three kinds of directors. The first is the committee chair at a Russell 3000 company whose board "is not at least 30% gender diverse." The second is every committee member at a Russell 3000 company with "no gender diverse directors." The third is the committee chair at a Russell 1000 company with "fewer than one director from an underrepresented community on the board."[156] Outside the Russell 3000, the policy "will

---

152 Letter from Nichol Garzon-Mitchell, Gen. Counsel, Glass Lewis, to Vanessa A. Countryman, Sec'y, SEC 3 (Dec. 27, 2021) (File No. S7-17-21), https://www.sec.gov/comments/s7-17-21/s71721-20110796-264649.pdf (last visited Oct. 18, 2026).

153 Glass Lewis, *2025 Benchmark Policy Guidelines: Shareholder Proposals & ESG-Related Issues* 26 (2024), https://resources.glasslewis.com/hubfs/2025%20Guidelines/2025%20Shareholder%20Proposals%20&%20ESG%20Benchmark%20Policy%20Guidelines.pdf (last visited Oct. 18, 2026) [hereinafter *2025 Shareholder Proposal Guidelines*].

154 *2026 Shareholder Proposal Guidelines* at 26.

155 *2026 Benchmark Guidelines* at 27, 29, 33.

156 *Id.* at 27.

recommend voting against the chair of the nominating committee if there are no gender diverse directors."[157]

65. The Benchmark Policy also targets the governance committee chair of a large company that does not disclose the board's role in overseeing environmental and social issues.[158] For certain companies, it checks whether climate disclosures follow outside frameworks, such as the one published by the Task Force on Climate-related Financial Disclosures. If those disclosures fall short, the policy "may recommend voting against the chair of the committee" that oversees climate issues.[159]

66. Glass Lewis has applied rules like these since 2019. Its 2018 guidelines announced that, "[b]eginning in 2019," it "will generally recommend voting against the nominating committee chair of a board that has no female members."[160] Its 2020 guidelines repeated that rule.[161] Its 2021 guidelines announced that, starting in 2022, it would "generally recommend voting against the nominating committee chair of a board with fewer than two female directors."[162] They also announced a rule for the governance chair of an S&P 500 company that "fails to provide explicit disclosure concerning the board's role in overseeing these issues." Those issues are environmental and social issues, and Glass Lewis would generally recommend voting against that

---

157 *Id.*

158 *Id.* at 29 ("[T]he Benchmark Policy will generally recommend voting against the governance committee chair of a company in the Russell 1000 index that fails to provide explicit disclosure concerning the board's role in overseeing these issues.").

159 *Id.* at 33.

160 Glass Lewis, *2018 Proxy Paper Guidelines: United States* 2 (2017), https://www.faegredrinker.com/webfiles/5%202018_proxy.pdf (last visited Oct. 18, 2026) [hereinafter *2018 Guidelines*].

161 Glass Lewis, *2020 Proxy Paper Guidelines: United States* 25 (2019), https://resources.glasslewis.com/hubfs/2020%20Guidelines/2020%20United%20States%20Benchmark%20Policy%20Guidelines.pdf (last visited Oct. 18, 2026) [hereinafter *2020 Guidelines*].

162 Glass Lewis, *2021 Proxy Paper Guidelines: United States* 1 (2020), https://resources.glasslewis.com/hubfs/2021%20Guidelines/2021%20United%20States%20Benchmark%20Policy%20Guidelines.pdf (last visited Oct. 18, 2026) [hereinafter *2021 Guidelines*].

chair.[163] Its 2022 guidelines adopted the 30% gender rule for 2023.[164] They also announced a racial-disclosure rule for 2023. If an S&P 500 company had not disclosed "individual or aggregate racial/ethnic minority demographic information," Glass Lewis would generally recommend voting against its governance committee chair.[165] The 2023, 2024, and 2025 editions each said Glass Lewis "will generally recommend voting against" the nominating committee chair of a board that is not at least 30% gender diverse.[166] The 2027 guidelines keep the same 30% rule.[167]

67. Since March 2025, Glass Lewis has flagged director recommendations that rest on board diversity, and it offers clients a second recommendation that ignores diversity.[168] But the Benchmark recommendation itself still applies the diversity rules.[169] The flag covers only board diversity. It does not mark recommendations driven by the oversight or climate rules. And it sits beside guidelines that still say the policy reflects broad investor opinion. ¶ 58. In its March 2025 statement, Glass Lewis said it "continue[s] to believe that diversity contributes to improved company performance and long-term shareholder value."[170] It had told state treasurers in June

---

163 *Id.* at 2.

164 Glass Lewis, *2022 Policy Guidelines: United States* 7 (2021), https://resources.glasslewis.com/hubfs/2022%20Guidelines/2022%20United%20States%20Benchmark%20Policy%20Guidelines.pdf (last visited Oct. 18, 2026) [hereinafter *2022 Guidelines*].

165 *Id.* at 8.

166 Glass Lewis, *2023 Policy Guidelines: United States* 42 (2022), https://resources.glasslewis.com/hubfs/2023%20Guidelines/2023%20United%20States%20Benchmark%20Policy%20Guidelines.pdf (last visited Oct. 18, 2026) [hereinafter *2023 Benchmark Guidelines*]; Glass Lewis, *2024 Benchmark Policy Guidelines: United States* 43 (2023), https://resources.glasslewis.com/hubfs/2024%20Guidelines/2024%20US%20Benchmark%20Policy%20Guidelines.pdf (last visited Oct. 18, 2026) [hereinafter *2024 Benchmark Guidelines*]; Glass Lewis, *2025 Benchmark Policy Guidelines: United States* 41 (2024), https://resources.glasslewis.com/hubfs/2025%20Guidelines/2025%20US%20Benchmark%20Policy%20Guidelines.pdf (last visited Oct. 18, 2026) [hereinafter *2025 Benchmark Guidelines*].

167 *2027 Benchmark Guidelines* at 25.

168 Glass Lewis, *Supplemental Statement on Diversity Considerations at U.S. Companies* 2 (Mar. 2025), https://resources.glasslewis.com/hubfs/Supplementary%20Guidance/2025%20Supplemental%20Statement%20on%20Diversity%20Consideration%20at%20US%20Companies.pdf (last visited Oct. 18, 2026) [hereinafter *Diversity Statement*].

169 *Senate Letter* at 8; *2026 Benchmark Guidelines* at 27.

170 *Diversity Statement* at 2.

2023 that the evidence could not determine the effect of the board-diversity proposals it backed. ¶ 102.

68. These are the same kinds of rules found in the thematic policies Glass Lewis sells to ESG-focused clients. Its ESG Policy and its Climate Policy use the same 30% gender-diversity threshold.[171] So a buyer who chose the mainstream middle got the same gender threshold that Glass Lewis uses for ESG-focused clients. ¶¶ 51, 54.

**iii. Investors voted against the positions those rules produced.**

69. Shareholders voted down almost every environmental and social proposal. In the 2023 proxy season, only 4 of 86 environmental proposals and 5 of 207 social proposals at Russell 3000 companies won majority support.[172] In 2024, only 2 of 83 environmental proposals and 1 of 220 social proposals won majority support.[173] In 2025, none of the 72 environmental proposals that came to a vote won majority support.[174] Average shareholder support for environmental proposals fell from 39% in 2022 to 15% in 2025.[175] State Street reported that, "[f]or the third consecutive year," overall support for environmental and social proposals fell.[176]

70. Glass Lewis backed these proposals far more often. By its own count, its Benchmark Policy supported "roughly 30% of all environmental and social shareholder proposals in both 2023

---

171 *2026 ESG Policy* at 6, 11; *2026 Climate Policy* at 10.
172 Georgeson, *A Look at the 2024 Proxy Season* 7, 15–16, 22 (2024), https://images.info.computershare.com/Web/CMPTSHR1/%7B2a45ede2-ccec-45da-968e-a8d7cb082e30%7D_Georgeson_2024_Proxy_Season_Review.pdf (last visited Oct. 18, 2026) [hereinafter *Georgeson 2024*].
173 *Id.* at 15–16, 18, 21.
174 *Georgeson 2025* at 16.
175 *Georgeson 2024* at 18; *Georgeson 2025* at 18.
176 State Street Glob. Advisors, *Stewardship Report 2025* (Apr. 2026), https://ssga.com/library-content/assets/pdf/global/asset-stewardship/introduction-to-2025-proxy-season.pdf (last visited Oct. 20, 2026).

and 2024."[177] Georgeson reported the figures by category. It found that in 2023, Glass Lewis recommended voting for 30% of environmental proposals and 43% of social proposals. In 2024, it recommended voting for 25% and 43%.[178] These votes show where investors stand on the same environmental and social issues that drive the Benchmark's rules for directors. Votes on directors show the same gap. When Glass Lewis opposed directors at Texas companies, shareholders re-elected them. ¶¶ 73, 75.

71. Glass Lewis's support moves votes, but it rarely wins them. Environmental proposals that both major advisors backed drew 31% support, while those both opposed drew 12%. ¶ 43. Some of those votes come from investors who follow Glass Lewis automatically. ¶¶ 44–45. But most of the market votes on its own judgment, and it votes the other way. So Glass Lewis's environmental and social recommendations shift a bloc of votes yet rarely carry a majority. A bloc can make the difference in a close contest, such as the 2021 fight at Exxon. ¶ 46. It cannot carry a vote most investors oppose. A policy that moves a bloc but loses the market does not reflect "broad investor opinion."

72. Glass Lewis's recommendations at Texas companies are illustrative. In 2023, Glass Lewis backed a proposal asking Exxon to report on the cost of retiring its assets under a "net zero" emissions scenario. It also backed a proposal asking Exxon to study a worst-case oil spill at its

---

177 Glass Lewis, *Glass Lewis Letter to Senate Banking Committee Members*, *supra*; *Senate Letter* at 3.
178 *Georgeson 2024* at 18, 23.

offshore platforms.[179] Exxon's shareholders rejected both. The net-zero proposal received 16.0% of the votes cast for or against it, and the oil-spill proposal received 13.3%.[180]

73. In 2024, Glass Lewis recommended voting against Joseph Hooley, Exxon's lead director. Exxon wrote to Glass Lewis and filed the letter with its proxy materials. It said Glass Lewis "appears to be recommending that shareholders vote against Mr. Hooley for no other reason than the company's decision to seek clarity" on the shareholder-proposal rules.[181] Shareholders re-elected Mr. Hooley with 87.1% of the votes cast for or against him.[182]

74. Also in 2024, Glass Lewis recommended that Tesla's shareholders vote against moving the company's legal home from Delaware to Texas. It also recommended against ratifying the pay package of Tesla's chief executive.[183] Tesla told its shareholders that Glass Lewis had "recognized that the 'changes to shareholder rights are technically positive.'" Tesla added that Glass Lewis "is on record as recommending FOR 3 other recent reincorporations from Delaware

---

179 Sabrina Valle, *Exxon Rebuts Proxy Advisor, Says Net Zero Emissions Scenario Unlikely*, Reuters (May 18, 2023), *reprinted at* https://boereport.com/2023/05/18/exxon-rebuts-proxy-advisor-says-net-zero-emissions-scenario-unlikely/ (last visited Oct. 18, 2026).

180 Exxon Mobil Corp., Current Report (Form 8-K) Item 5.07 (June 6, 2023), https://www.sec.gov/Archives/edgar/data/34088/000003408823000036/xom-20230531.htm (last visited Oct. 18, 2026).

181 Exxon Mobil Corp., Additional Proxy Materials (Schedule 14A) (May 15, 2024), https://www.sec.gov/Archives/edgar/data/34088/000119312524139185/d822081ddefa14a.htm (last visited Oct. 18, 2026).

182 Exxon Mobil Corp., Current Report (Form 8-K) Item 5.07 (May 31, 2024), https://www.sec.gov/Archives/edgar/data/34088/000003408824000036/xom-20240529.htm (last visited Oct. 18, 2026).

183 Dana Hull, *Tesla Shareholders Should Reject Elon Musk's 'Excessive' Pay Package, Proxy Advisor Says*, Fortune (May 25, 2024), https://fortune.com/2024/05/25/tesla-shareholders-elon-musk-pay-package-proxy-advisor-glass-lewis (last visited Oct. 18, 2026).

to Texas."[184] Tesla's shareholders approved the move to Texas with about 87% of the votes cast for or against it. They approved the pay package with about 77%.[185]

75. In 2025, Glass Lewis recommended voting against Ira Ehrenpreis, a Tesla director who chairs the board committee that picks directors. Among its reasons, Glass Lewis listed "[i]nsufficient board gender diversity," because Tesla's board would be only "22.2% gender diverse."[186] Tesla's shareholders re-elected Mr. Ehrenpreis. About 65% of the votes cast for or against him were in his favor.[187]

76. The same gap appeared elsewhere. In 2025, Glass Lewis backed proposals asking Amazon to report on its warehouse working conditions and on the risks of how it gets data for artificial intelligence.[188] Amazon's shareholders rejected both. The working-conditions proposal received about 23% of the votes cast for or against it, and the data proposal received about 11%.[189] Glass Lewis also backed a proposal asking Dollar General to adopt a human-rights policy.[190] Dollar General's shareholders rejected it with about 23% support.[191]

---

[184] Tesla, Inc., Additional Proxy Materials (Schedule 14A) (May 29, 2024), https://www.sec.gov/Archives/edgar/data/1318605/000110465924066122/tm2413800d12_defa14a.htm (last visited Oct. 18, 2026).

[185] Tesla, Inc., Current Report (Form 8-K) Item 5.07 (June 14, 2024), https://www.sec.gov/Archives/edgar/data/1318605/000110465924071439/tm2413800d31_8k.htm (last visited Oct. 18, 2026).

[186] Glass Lewis, *Proxy Paper: Tesla, Inc.* 13, 20 (Oct. 17, 2025), https://resources.glasslewis.com/hubfs/Glass%20Lewis%202025%20Tesla%20Proxy%20Paper.pdf (last visited Oct. 18, 2026) [hereinafter *Tesla Proxy Paper*].

[187] Tesla, Inc., Current Report (Form 8-K) Item 5.07 (Nov. 7, 2025), https://www.sec.gov/Archives/edgar/data/1318605/000110465925108507/tm2530590d1_8k.htm (last visited Oct. 18, 2026).

[188] *Amazon Proxy Paper* at 2.

[189] Amazon.com, Inc., Form 8-K, *supra*.

[190] Glass Lewis, *Proxy Paper: Dollar General Corp.* 1 (May 7, 2025), https://resources.glasslewis.com/hubfs/Northern%20Trust/Dollar%20General.pdf (last visited Oct. 18, 2026).

[191] Dollar Gen. Corp., Current Report (Form 8-K) Item 5.07 (June 3, 2025), https://www.sec.gov/Archives/edgar/data/29534/000110465925055706/tm2516684d1_8k.htm (last visited Oct. 18, 2026).

77. In 2026, Glass Lewis recommended that Exxon's shareholders vote against moving the company's legal home from New Jersey to Texas. Exxon, now based in Spring, Texas, said the recommendation rested on "misunderstandings, speculation, and immaterial factors."[192] Shareholders approved the move. It received 71.2% of the votes cast for or against it.[193]

78. BlackRock, Vanguard, and State Street are among the largest investment managers in the world. The index equity assets eligible for their voting-choice programs alone total nearly $10 trillion.[194] BlackRock supported only 7 of 358 environmental and social proposals around the world from July 2024 through June 2025.[195] Vanguard's U.S. funds supported none of the 241 environmental and social proposals they reviewed in 2025.[196] The votes of these large investors are a large part of what investor opinion is. They did not support the positions the Benchmark rules produced.

79. In February 2025, ISS announced that it would no longer consider the gender and racial or ethnic diversity of U.S. boards in its vote recommendations.[197] In early 2025, BlackRock

[192] Exxon Mobil Corp., Additional Proxy Materials (Schedule 14A) (May 12, 2026), https://www.sec.gov/Archives/edgar/data/34088/000119312526219320/d121241ddefa14a.htm (last visited Oct. 18, 2026) [hereinafter *Exxon 2026 Proxy Supplement*].

[193] Exxon Mobil Corp., Current Report (Form 8-K) Item 5.07 (May 29, 2026), https://www.sec.gov/Archives/edgar/data/34088/000003408826000078/xom-20260527.htm (last visited Oct. 18, 2026); Matthew Fazelpoor, *ExxonMobil Shareholders Approve Redomicile Plan*, NJBIZ (May 28, 2026), https://njbiz.com/exxonmobil-texas-redomiciliation-approved/ (last visited Oct. 18, 2026).

[194] BlackRock, *BlackRock Voting Choice*, https://www.blackrock.com/corporate/about-us/investment-stewardship/blackrock-voting-choice (last visited Oct. 18, 2026); Vanguard, *Vanguard Investor Choice*, https://corporate.vanguard.com/content/corporatesite/us/en/corp/how-we-advocate/investment-stewardship/investor-choice.html (last visited Oct. 18, 2026); State Street Glob. Advisors, *Proxy Voting Choice*, https://www.ssga.com/us/en/intermediary/etfs/about-us/what-we-do/asset-stewardship/proxy-voting-choice (last visited Oct. 18, 2026).

[195] BlackRock Inv. Stewardship, *2025 Global Voting Spotlight*, Harv. L. Sch. F. on Corp. Governance (Dec. 9, 2025), https://corpgov.law.harvard.edu/2025/12/09/2025-global-voting-spotlight/ (last visited Oct. 18, 2026).

[196] Vanguard, *2025 Investment Stewardship Annual Report* 4 (2026), https://corporate.vanguard.com/content/dam/corp/advocate/investment-stewardship/pdf/policies-and-reports/2025_investment_stewardship_annual_report.pdf (last visited Oct. 18, 2026).

[197] Debevoise & Plimpton LLP, *Proxy Advisors and Institutional Shareholders Revise Voting Guidelines on Board Diversity* (Feb. 24, 2025), https://www.debevoise.com/insights/publications/2025/02/proxy-advisors-and-institutional-shareholders (last visited Oct. 18, 2026); Akin Gump Strauss Hauer & Feld LLP, *ISS Indefinitely*

and State Street removed numeric board-diversity targets from their U.S. voting policies.[198] Vanguard dropped its statement that boards should, "at a minimum, represent a diversity of personal characteristics."[199] Its 2026 policy "no longer identifies personal characteristics (such as age, gender or race/ethnicity) as a relevant consideration" in judging a board.[200]

80. Glass Lewis kept its board-diversity rules in its Benchmark Policy anyway, and it plans to keep them in 2027. ¶¶ 64–68. In December 2025, a presidential executive order noted that one of the two major proxy advisors "continues to provide guidance based on the racial or ethnic diversity of corporate boards." ISS had stopped. Glass Lewis had not.[201]

81. Glass Lewis's own 2025 survey found "significant divergences between U.S. and non-U.S. investor views" on board diversity, climate, and other topics.[202] U.S. investors were "far more likely to report ignoring diversity factors in their evaluation of boards (42%)" than investors elsewhere (6%).[203] Glass Lewis published those results in October 2025. It then kept its board-diversity and climate rules in its 2026 U.S. Benchmark guidelines.[204] By Glass Lewis's own count,

---

*Halts Consideration of Diversity Factors When Making Proxy Voting Recommendations* (Feb. 13, 2025), https://www.akingump.com/en/insights/alerts/iss-indefinitely-halts-consideration-of-diversity-factors-when-making-proxy-voting-recommendations (last visited Oct. 18, 2026).

198 Cooley LLP, *Board Diversity: Policy Updates and Considerations for Proxy Season* (Feb. 28, 2025), https://cooley.com/news/insight/2025/2025-02-28-board-diversity-policy-updates-and-considerations-for-proxy-season (last visited Oct. 18, 2026).

199 Debevoise & Plimpton LLP, *supra*.

200 Cooley LLP, *Key Updates in BlackRock's and Vanguard's 2026 US Proxy Voting Guidelines* (Jan. 22, 2026), https://www.cooley.com/news/insight/2026/2026-01-22-key-updates-in-blackrocks-and-vanguards-2026-us-proxy-voting-guidelines (last visited Oct. 18, 2026).

201 Exec. Order No. 14,366, 90 Fed. Reg. at 58,503; Akin Gump Strauss Hauer & Feld LLP, *supra*; *2026 Benchmark Guidelines* at 27.

202 Glass Lewis, *2025 Policy Survey Results* (2025), https://grow.glasslewis.com/2025-policy-survey-results (last visited Oct. 18, 2026).

203 Brianna Castro et al., *Policy Survey Shows a Shifting Stewardship Landscape, and Diverging Investor Views Across Regions*, Harv. L. Sch. F. on Corp. Governance (Oct. 31, 2025), https://corpgov.law.harvard.edu/2025/10/31/policy-survey-shows-a-shifting-stewardship-landscape-and-diverging-investor-views-across-regions/ (last visited Oct. 18, 2026).

204 Glass Lewis, *Policy Survey Shows a Shifting Stewardship Landscape, and Diverging Investor Views Across Regions* (Oct. 22, 2025), https://www.glasslewis.com/article/policy-survey-shows-a-shifting-stewardship-landscape-and-diverging-investor-views-across-regions (last visited Oct. 18, 2026); *2026 Benchmark Guidelines* at 27, 33.

U.S. investors split sharply on whether board diversity matters at all. A rule that votes against directors on that factor takes one side of the divide in opinion. It does not reflect "broad investor opinion."

**iv. Most of Glass Lewis's own clients do not use the Benchmark Policy.**

82. Glass Lewis has long known that most of its clients vote under custom policies rather than its house policy. Its compliance statements for 2016, 2018, and 2020 through 2022 each said that "[t]he supermajority" of its clients "vote according to a custom policy or via a custom process."[205] In 2018, it told the SEC that adopting a proxy advisor's house policy "is by no means the norm."[206] In 2020, it told the SEC again that "a significant majority of Glass Lewis' clients have their own custom voting policies."[207]

83. In January 2023, Glass Lewis told the attorneys general that the Benchmark Policy reflects its clients' "predominant views." ¶ 61. In the same letter, it said that "a significant majority of our clients have elected to simply not follow any Glass Lewis policy."[208] In June 2023, it told state treasurers that "most Glass Lewis clients have not adopted our Benchmark Policy."[209] In September 2025, it admitted to the federal district court in Austin that "[a] significant majority" of its clients "vote according to a custom policy or via a custom process."[210] And on October 15,

---

[205] *2016 Compliance Statement* at 9; *2018 Compliance Statement* at 10; *2020 Compliance Statement* at 10; *2021 Compliance Statement* at 9; *2022 Compliance Statement* at 10.

[206] Letter from Katherine H. Rabin, CEO, Glass Lewis, to Jay Clayton, Chairman, SEC, File No. 4-725 (Nov. 14, 2018), https://www.sec.gov/comments/4-725/4725-4649188-176490.pdf (last visited Oct. 18, 2026).

[207] *2020 SEC Comment Letter* at 3.

[208] *Glass Lewis Reply to Attorneys General* at 2.

[209] *2023 Treasurers Letter* at 4.

[210] *Glass Lewis Am. Compl.* ¶ 42.

2025, it announced that "[a] majority of the firm's clients already use their own custom policy guidelines or a specific thematic policy."[211]

84. Glass Lewis has said how clients pick a policy. Those who adopt one "generally do so after determining that the Glass Lewis approach closely reflects their own view." ¶ 60. The Benchmark Policy is ready to use and spares a client the cost of writing its own rules. ¶ 41. Yet most of its clients have not adopted it. ¶¶ 82–83. The reasonable inference is that it does not closely reflect most of its clients' views. Glass Lewis left those facts out of its Benchmark guidelines, sales pages, and Proxy Papers. ¶¶ 58–59, 89–90, 111. Without them, the claim that the policy reflects "broad investor opinion" and its clients' "predominant views" misled buyers. ¶¶ 58–60.

85. In the same October 2025 announcement, Glass Lewis said it would end its one-size-fits-all approach, citing "[d]iverging investor priorities." Its chief executive explained that "the traditional one-size-fits-all model of proxy advice no longer meets the needs of a diverse client base."[212] Its chief operating officer has since sworn that Glass Lewis "has announced that it will move all clients off the Benchmark Policy by the end of 2027."[213] Glass Lewis thus admitted that investors do not share one view.

86. On November 25, 2025, Glass Lewis's chief executive wrote that it would "move away from a single house view."[214] He wrote that it would offer recommendations "that reflect the varying viewpoints of our institutional clients."[215] Soon after, in early December 2025, Glass Lewis

---

[211] Press Release, Glass Lewis, Glass Lewis Leads Change in Proxy Voting Practices (Oct. 15, 2025), https://www.glasslewis.com/news-release/glass-lewis-leads-change-in-proxy-voting-practices (last visited Oct. 18, 2026) [hereinafter *Oct. 15, 2025 Press Release*].

[212] *Oct. 15, 2025 Press Release*.

[213] *Wieck Decl.* ¶ 7.

[214] Bob Mann, *A Personal Commitment to Change Proxy Voting Practices*, Glass Lewis (Nov. 25, 2025), https://www.glasslewis.com/article/personal-commitment-change-proxy-voting-practices (last visited Oct. 18, 2026).

[215] *Id.*

published its 2026 Benchmark guidelines. They told investors that the Benchmark Policy "reflects broad investor opinion."[216] In September 2026, Glass Lewis cited "the growing divergence in how investors, particularly those in Europe and the U.S., approach fiduciary duty and stewardship."[217] Glass Lewis was telling the market that investors' views were diverging and that one policy could not serve them all. It could not, at the same time, truthfully tell investors that its single house policy reflected "broad investor opinion."

**v. The statement tells buyers whose views the policy reflects.**

87. Whose views a policy reflects is a central fact about the product. ¶¶ 54, 58. A buyer that wants mainstream advice, reflecting what most investors think rather than an ESG focus, would choose the Benchmark Policy because of this statement. Glass Lewis sells its policies as "ready-to-use guidelines that eliminate the need for in-house development," so buyers rely on the label in place of studying each rule. ¶ 41. The Federal Trade Commission ("FTC") presumes that express claims like this one are material.[218] The federal district court in Tyler has held it plausible that a misstatement about a fund's ESG involvement is important to a reasonable investor.[219] Investors may avoid ESG for political reasons, for performance reasons, or both.[220]

88. A client on the Benchmark Policy that follows its recommendations automatically, or that uses Glass Lewis's pre-populated votes, casts votes under rules it was told reflect broad

[216] Glass Lewis, *Proxy Voting Policies*, *supra*; *2026 Benchmark Guidelines* at 7; Paul, Weiss, Rifkind, Wharton & Garrison LLP, *Glass Lewis Releases 2026 Benchmark Policy Guidelines* (Dec. 8, 2025), https://www.paulweiss.com/insights/client-memos/glass-lewis-releases-2026-benchmark-policy-guidelines (last visited Oct. 18, 2026).

[217] Glass Lewis, *Research Methodology Comment Period* (Sept. 2026), https://www.glasslewis.com/landing-page/research-methodology-comment-period (last visited Oct. 18, 2026).

[218] *Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 1984 WL 565319, at *49 (1984) (appending FTC Policy Statement on Deception (Oct. 14, 1983)) [hereinafter *FTC Deception Statement*].

[219] *Texas v. BlackRock, Inc.*, No. 6:24-cv-00437-JDK, 2025 WL 2201071, at *24 (E.D. Tex. Aug. 1, 2025).

[220] *Id.*

investor opinion. ¶¶ 44–45. And because every client receives Benchmark recommendations, the statement shapes how every client views them, even clients that chose a different policy. ¶ 50.

## B. Glass Lewis said the Benchmark Policy reflects "best practices" and "widely accepted governance principles."

### i. Glass Lewis made this statement on its website and in its guidelines.

89. Glass Lewis tells buyers to "[e]nsure your governance decisions reflect industry best practices with Glass Lewis' Proxy Voting Policies."[221]




*Figure 2: Glass Lewis web page advertising its proxy voting policies*

90. It says its policies are "tailored to industry standards and local market best practices," and that "[a] comprehensive voting policy underpins consistent and transparent governance decisions."[222] It says its policies help investors "meet fiduciary obligations and regulatory requirements."[223]

91. Its 2026 Benchmark guidelines say the Benchmark Policy reflects "widely accepted governance principles" and is meant to provide analysis "informed by market best practice."[224]

---

221 Glass Lewis, *Proxy Voting Policies*, *supra*.
222 *Id.*
223 *Id.*
224 *2026 Benchmark Guidelines* at 7.

Its guidelines on shareholder proposals and ESG issues for 2023, 2024, and 2025 each said that "Glass Lewis' proxy voting guidelines are grounded in corporate governance best practices."[225] Its 2022 compliance statement said that its content "is grounded in corporate governance best practices."[226] Its compliance statements, survey report, and letters described the Benchmark Policy as reflecting "corporate governance best practices." ¶¶ 60–61.

**ii. Rules that most investors reject are not widely accepted.**

92. A voting rule is not a "best practice" or a "widely accepted" principle when most investors, the largest investment managers, and the other major proxy advisor reject it. ¶¶ 69–86. In March 2025, Glass Lewis admitted that institutional investors "have different perspectives" and "may also choose to take different approaches to voting on diversity matters."[227] In December 2024, the Fifth Circuit, sitting en banc, vacated the SEC's approval of Nasdaq's board-diversity rule. That rule required listed companies to have two "diverse" directors or explain why they did not.[228] The court found that Nasdaq "offered little support" for a link "between the racial, gender, and sexual composition of a company's board and the quality of its governance." The SEC itself had found Nasdaq's evidence "mixed."[229] The Fifth Circuit observed that it could "think of few more politically divisive issues in the Nation."[230] On that divisive issue, Glass Lewis's rules are

[225] Glass Lewis, *2023 Policy Guidelines: ESG Initiatives* [43] (2022), https://resources.glasslewis.com/hubfs/2023%20Guidelines/2023%20ESG%20Initiatives%20Benchmark%20Policy%20Guidelines.pdf (last visited Oct. 18, 2026) [hereinafter *2023 ESG Guidelines*]; Glass Lewis, *2024 Benchmark Policy Guidelines: Shareholder Proposals & ESG-Related Issues* [44] (2023), https://resources.glasslewis.com/hubfs/2024%20Guidelines/2024%20Shareholder%20Proposals%20ESG%20Benchmark%20Policy%20Guidelines.pdf (last visited Oct. 18, 2026) [hereinafter *2024 Shareholder Proposal Guidelines*]; *2025 Shareholder Proposal Guidelines* at 43.

[226] *2022 Compliance Statement* at 47.

[227] *Diversity Statement* at 2.

[228] *All. for Fair Bd. Recruitment v. SEC*, 125 F.4th 159, 164, 166, 185 (5th Cir. 2024) (en banc).

[229] *Id.* at 179.

[230] *Id.* at 181.

like Nasdaq's. ¶¶ 64, 66. Glass Lewis has also admitted that its 2024 survey focused in part on topics where its talks with investors and others "have not yielded a clear consensus."[231] Glass Lewis's own menu admits as much. It sells a separate policy for investors "skeptical of politicized ESG and DEI initiatives." ¶¶ 51–53. A rule on a topic without a clear consensus is not a widely accepted principle. Yet Glass Lewis put such rules in its Benchmark Policy and called the result "widely accepted."

**iii. The statement tells buyers that the policy is the safe choice.**

93. Calling a policy "best practice" and "widely accepted" tells buyers about its standard, quality, and grade. It tells them that following the policy is the safe and prudent choice. That message matters most to fiduciaries, who must vote prudently for the people they serve. Glass Lewis markets its policies to them as a way to "meet fiduciary obligations." ¶¶ 38, 90.

**C. Glass Lewis said its advice is "independent," "objective," and focused on "shareholder value."**

**i. Glass Lewis has made this statement since at least 2016.**

94. Glass Lewis has called itself independent and objective for at least a decade. Its 2016 compliance statement called it "a leading, independent governance services firm," and its 2018 statement did the same.[232] Both described its mission as serving investors "with objective advice and services."[233] Its new owners' March 2021 press release called Glass Lewis "the leading provider of independent global governance solutions," with "unbiased research reports."[234] Its

---

231 *2024 Survey Report* at 5.

232 *2016 Compliance Statement* at 5; *2018 Compliance Statement* at 6.

233 *2016 Compliance Statement* at 16; *2018 Compliance Statement* at 17.

234 Press Release, Peloton Capital Mgmt., Peloton Capital Management and Stephen Smith Acquire Glass Lewis (Mar. 16, 2021), https://www.businesswire.com/news/home/20210316005393/en/Peloton-Capital-Management-and-Stephen-Smith-Acquire-Glass-Lewis (last visited Oct. 18, 2026).

compliance statements for 2020 through 2022 each said that its research "meets the highest standards of quality, objectivity, and independence."[235]

95. Today, Glass Lewis calls itself "a leading global provider of independent corporate governance research." Its "About Us" page carries the heading, "Trusted by Investors, Informed by Research and Data."[236] Its compliance statement says, "Our role is to provide objective research and other tools to help our clients vote as they see fit."[237] In 2023, it told state treasurers, "Our research and recommendations are made independently, based on the best interests of our clients."[238] In 2025, it told the public that it is "committed to serving our clients and providing them with objective, reliable, and timely advice."[239]

96. Glass Lewis has also long tied its advice to shareholder value. Its compliance statements for 2016, 2018, and 2020 through 2022 each said that Glass Lewis "is dedicated to supporting the creation and preservation of long-term shareholder value."[240] Its U.S. guidelines for 2018 and for 2020 through 2025 each described the purpose of its advice this way.[241]

> The purpose of Glass Lewis' proxy research and advice is to facilitate shareholder voting in favor of governance structures that will drive performance, create shareholder value and maintain a proper tone at the top.

97. Glass Lewis has said many times that it "evaluates all environmental and social issues through the lens of long-term shareholder value."[242] Its guidelines said that it weighs

---

235 *2020 Compliance Statement* at 18; *2021 Compliance Statement* at 19; *2022 Compliance Statement* at 23.

236 Glass Lewis, *About Us*, *supra*.

237 *2024 Compliance Statement* at 14.

238 *2023 Treasurers Letter* at 10.

239 Glass Lewis, *Glass Lewis Letter to Senate Banking Committee Members*, *supra*.

240 *2016 Compliance Statement* at 6–7; *2018 Compliance Statement* at 7; *2020 Compliance Statement* at 7; *2021 Compliance Statement* at 7; *2022 Compliance Statement* at 8.

241 *2018 Guidelines* at 3; *2020 Guidelines* at 3; *2021 Guidelines* at 5; *2022 Guidelines* at 13; *2023 Benchmark Guidelines* at 12; *2024 Benchmark Guidelines* at 12; *2025 Benchmark Guidelines* at 9.

242 *2022 Guidelines* at 10; *2023 Treasurers Letter* at 5; *Glass Lewis Reply to Attorneys General* at 4, 7; Glass Lewis, *Glass Lewis Letter to Senate Banking Committee Members*, *supra*.

environmental and social proposals "in the context of the financial materiality of the issue to the company's operations."[243]

98. Glass Lewis's description reaches individual investors through the firms that use its policies. Schwab, a Texas company, tells its fund shareholders that Glass Lewis describes the Benchmark Policy as having "the objective of enhancing long-term shareholder value."[244]

**ii. Glass Lewis did not disclose conflicts that bear on its independence.**

99. In 2026, Glass Lewis urged Exxon's shareholders to vote against moving to Texas. ¶ 77. At the time, Glass Lewis was suing the Texas Attorney General in the federal district court in Austin over a Texas law that regulates proxy advisors.[245] Exxon wrote to Glass Lewis and filed the letter with its proxy materials. It said Glass Lewis "failed to disclose an obvious conflict of interest resulting from its ongoing litigation with the Texas Attorney General." That litigation, Exxon said, "directly relates to a law affecting its business interests." Exxon added that "it would have been relevant for investors who rely on its assertions of impartiality to know" of that conflict.[246]

100. Exxon raised a similar concern in 2024. It asked Glass Lewis to "amend its report to make clear its relationships with the Interfaith Center on Corporate Responsibility (ICCR) and Arjuna Capital."[247] Ising testified to Congress about the same kind of problem. At one company,

---

[243] Glass Lewis, *2022 Policy Guidelines: ESG Initiatives* 25 (2021), https://www.skadden.com/-/media/files/publications/2022/03/annual-meeting-filing-and-disclosure-reminders/esginitiativesvotingguidelinesgl2022.pdf (last visited Oct. 18, 2026); *2023 ESG Guidelines* at 27; *2024 Shareholder Proposal Guidelines* at 27; *2025 Shareholder Proposal Guidelines* at 26.

[244] Schwab Asset Mgmt., *Proxy Voting Policy Options*, *supra*; Charles Schwab Corp., Form 10-K, *supra*.

[245] *See generally Glass Lewis Am. Compl.*

[246] *Exxon 2026 Proxy Supplement*.

[247] Exxon Mobil Corp., Additional Proxy Materials (Schedule 14A) (May 28, 2024), https://www.sec.gov/Archives/edgar/data/34088/000119312524147226/d717960ddefa14a.htm (last visited Oct. 18, 2026).

Glass Lewis "repeated in its proxy report the viewpoint of a shareholder organization" without disclosing that Glass Lewis was a member of that organization.[248]

101. Ising also testified that "Glass Lewis previously touted that it did not provide 'consulting services' to public companies." Today, she testified, it sells consulting that helps companies "understand how their compensation programs will be evaluated and rated by Glass Lewis."[249] Glass Lewis sells services to more than 2,300 public companies, the same kind of companies on whose votes it advises investors. ¶ 47. Its Proxy Papers say that an affiliate sells "Equity Plan Advisory services" to public companies.[250] But they do not say whether the company the report covers bought those services. A client must look that up on Glass Lewis's Viewpoint platform or email its compliance staff.[251] Similarly, Glass Lewis's October 2025 Proxy Paper on Tesla, a Texas company, lists its "Potential Conflicts." That list does not mention that Glass Lewis was then suing the Texas Attorney General over a Texas law that regulates proxy advisors.[252] The report a client reads before it votes thus leaves out facts that bear on Glass Lewis's independence. ¶ 95.

**iii. Glass Lewis could not tie its diversity and climate rules to shareholder value.**

102. State treasurers asked Glass Lewis whether it knew of any "empirical evidence that any climate report or audit that your firm recommended supporting has in fact increased shareholder value."[253] Glass Lewis answered that "the empirical evidence on this issue cannot determine the effect of climate reporting on an individual company." It added that it had

248 *Ising Testimony*, *supra*.
249 *Id.*
250 *Tesla Proxy Paper* at 2; *Amazon Proxy Paper* at 2.
251 *Tesla Proxy Paper* at 2.
252 *Tesla Proxy Paper* at 2; *see generally Glass Lewis Compl.*
253 *2023 Treasurers Letter* at 10.

considered the available evidence in developing its policies.[254] It gave the same answer about the board-diversity proposals it recommended supporting.[255] Glass Lewis told buyers it applies these rules for shareholder value. It told state treasurers that the evidence could not show their effect on any individual company. But it never said so in its guidelines, sales pages, or Proxy Papers. After a bench trial, the federal district court in Fort Worth found that, "[a]bsent a cognizable basis," asserting that an ESG factor captures financial risk "serves as mere pretext."[256]

103. Glass Lewis also tied its climate rule to an outside advocacy group. In 2023, the U.S. Benchmark Policy pointed to an outside list to identify the companies its climate rule covered. Its examples were "those companies identified by groups including Climate Action 100+."[257] Climate Action 100+ is a group of investors focused on climate change. Vanguard agreed, in its settlement with Texas and other States, to stay out of Climate Action 100+ and similar groups. Those groups advocate for "the setting of specific output or emissions targets."[258] Tying a voting rule to an advocacy group's list is not independent analysis of shareholder value.

**iv. Glass Lewis's advice was not as reliable as it claimed.**

104. Ising testified to Congress that "[a] company's Glass Lewis report indicated that its board does not oversee cybersecurity risk." The company pointed Glass Lewis to its disclosures about the board's oversight. Even so, "Glass Lewis failed to correct this error."[259] She also testified that companies may send "Report Feedback Statements" to Glass Lewis's clients only

---

[254] *Id.* at 10–11.
[255] *Id.* at 14.
[256] *Spence v. Am. Airlines, Inc.*, 775 F. Supp. 3d 963, 992 (N.D. Tex. 2025).
[257] *2023 Benchmark Guidelines* at 32.
[258] Settlement Agreement § 5.6, *Texas v. BlackRock, Inc.*, No. 6:24-cv-00437-JDK (E.D. Tex. Feb. 25, 2026), https://www.texasattorneygeneral.gov/sites/default/files/images/press/Settlement_1.pdf (last visited Oct. 18, 2026) [hereinafter *Vanguard Settlement*].
[259] *Ising Testimony*, *supra*.

after buying the report, which can cost several thousand dollars. Companies have described this approach as "pay to play."[260] Advice that stays wrong after the error is pointed out, and that a company must pay Glass Lewis to correct, is not the "objective, reliable, and timely advice" Glass Lewis promised. ¶ 95.

#### v. The statement matters most to investors who must vote for financial returns.

105. Many of Glass Lewis's clients must vote only for the financial benefit of the people they serve. ¶ 38. For them, a promise that advice is objective and aimed at shareholder value is the reason to buy it. An ERISA fiduciary may follow a proxy advisor's guidelines only after deciding that they serve the plan's economic interest, the very thing Glass Lewis promises. ¶¶ 38, 96. A Dallas investment firm shows how this works. Westwood says it uses Glass Lewis guidelines "that we believe create value for our clients." It explains, "The Glass Lewis policy states that it will vote in favor when there is a clear link between the proposal and value enhancement or risk mitigation."[261]

### D. Glass Lewis said its policies are built from the bottom up on client input.

#### i. Glass Lewis has made this statement since at least 2016.

106. Its compliance statements for 2016, 2018, and 2020 through 2022 each said that "Glass Lewis policies are formulated via a bottom-up approach." That approach, they said, "involves extensive discussions with a wide range of market participants."[262] Its 2023 and 2025 guides for investment advisers said the same, describing "a bottoms-up approach that involves

---

[260] *Id.*

[261] Westwood Holdings Grp., Inc., Form 10-K, *supra*.

[262] *2016 Compliance Statement* at 11; *2018 Compliance Statement* at 12; *2020 Compliance Statement* at 11; *2021 Compliance Statement* at 11; *2022 Compliance Statement* at 12.

extensive discussions with a wide range of market participants, including investor clients."[263] In 2023, it told state treasurers that its voting policies are formulated through a "'bottom-up' approach."[264]

107. Its compliance statement says it uses its annual policy survey "to best align our benchmark guidelines to our clients' expectations."[265] Its website says it updates its policies each year by "incorporating input from issuer engagement, client calls and roundtables."[266]

**ii. Few of Glass Lewis's clients gave that input.**

108. In 2025, Glass Lewis's survey "received 76 responses from investors and 310 responses from non-investors."[267] Glass Lewis says it has more than 1,300 investor clients. So the investor answers equaled fewer than 6% of that number, and most of the answers came from companies and other non-investors. ¶ 47. The 2024 survey was similar. It drew 113 responses from investors and 374 from non-investors.[268] Glass Lewis opened the survey in 2024 to "not just Glass Lewis clients, but also other institutional investors, companies, corporate advisors, and other stakeholders."[269]

109. So most of the survey answers Glass Lewis used to "align" its Benchmark guidelines with its clients' expectations did not come from its clients, or from investors at all. Glass Lewis also does not say whose input shaped its rules. Ising testified that "neither ISS nor Glass

---

[263] Glass Lewis, *Due Diligence: A Resource for Investment Advisers on Glass Lewis Policies and Procedures* 8–9 (Oct. 2023), https://resources.glasslewis.com/hubfs/Compliance/2023%20Due%20Diligence%20Resource%20Guide.pdf (last visited Oct. 18, 2026); *2025 Due Diligence Guide* at 8–9.
[264] *2023 Treasurers Letter* at 6.
[265] *2024 Compliance Statement* at 11.
[266] Glass Lewis, *Proxy Voting Policies*, *supra*.
[267] Castro et al., *supra*.
[268] *2024 Survey Report* at 7.
[269] *2025 Due Diligence Guide* at 8.

Lewis disclose information about which commenters most influenced their voting policy positions."[270]

**iii. The statement tells buyers that the rules came from investors like them.**

110. "Bottom-up" tells buyers that the Benchmark rules reflect the views of investors like them. That is why a buyer would trust the rules without writing its own. ¶ 41. The rules do not reflect those views. The statement is false, misleading, and deceptive.

**E. Glass Lewis omits facts that undercut its claims in its guidelines and sales pages.**

111. Glass Lewis knew the facts below. It mentioned some of them in letters, court filings, compliance statements, press releases, and survey reports. It never put them next to the claims they undercut, in the guidelines, sales pages, and Proxy Papers where it described the Benchmark services to buyers. ¶¶ 58–110. A true fact in one place does not cure a false impression made in another. In suits like this one, Texas courts construe section 17.46(a) in light of the FTC Act. They are to be guided, to the extent possible, by how the FTC and the federal courts have read section 5(a)(1) of that Act. Tex. Bus. & Com. Code § 17.46(c)(1). The FTC has long recognized that "[w]ritten disclosures or fine print may be insufficient to correct a misleading representation."[271]

112. **Client choices.** Most of Glass Lewis's own clients do not use the Benchmark Policy, and Glass Lewis has said so since 2016. ¶¶ 82–84.

113. **Survey results and response.** Glass Lewis's own survey showed that U.S. investors were far more likely than others to report ignoring board diversity. Few investors answered that survey, and most answers came from non-investors. ¶¶ 81, 108–109.

---

270 *Ising Testimony*, *supra*.
271 *FTC Deception Statement*, 1984 WL 565319, at *48.

114. **How often the rules drove its advice.** Glass Lewis knew how often its board-diversity, oversight, and climate rules caused it to recommend votes against directors. It does not put those totals in its guidelines or sales pages. Before March 2025, it flagged none of those recommendations. It still does not flag those driven by the oversight or climate rules. ¶ 67.

115. **How shareholders voted.** Glass Lewis knew how often shareholders rejected the positions its Benchmark recommendations took. It tracks how often its Benchmark Policy supports environmental and social proposals, and it publishes yearly reviews of each proxy season.[272]

116. **The evidence.** By Glass Lewis's own account, the evidence could not determine the effect of climate-reporting and board-diversity proposals on an individual company. ¶ 102.

117. **Conflicts.** Glass Lewis had business and legal interests that bore on its advice. They included services it sold to the companies it covered and its suit against the Texas Attorney General. ¶¶ 99–101.

118. Glass Lewis withheld these facts to induce Texas consumers to buy and renew its services and to rely on its Benchmark recommendations. ¶¶ 88, 93, 105, 110. Many Texas consumers wanted advice that reflected broad investor opinion and focused on shareholder value. Had they known these facts, they would not have bought or renewed the Benchmark services, or relied on Benchmark recommendations. Some would have chosen a different policy or a different provider.

[272] *Senate Letter* at 3; Glass Lewis, *Season Reviews*, https://www.glasslewis.com/resources-content-types/season-reviews (last visited Oct. 18, 2026).

**F. Glass Lewis knew its statements were false and misleading, and it kept making them.**

119. Glass Lewis writes the Benchmark guidelines and updates them each year.[273] It tracks how often its Benchmark Policy supports shareholder proposals, and it surveys investors on governance topics, including board diversity and climate.[274] Glass Lewis itself stated many of the facts that show its statements were false or misleading. ¶¶ 81–83, 102.

120. In January 2023, the attorneys general of Texas and 20 other States wrote to Glass Lewis. They pointed out that "many States have prohibitions on unfair or deceptive trade practices."[275] They also told Glass Lewis that it appeared to have "promoted and relied upon false or misleading statements."[276] Glass Lewis answered that letter.[277] It then kept making the same statements. ¶¶ 58–63.

121. In September 2025, the Texas Attorney General announced that he had issued civil investigative demands to Glass Lewis. Their purpose was to learn whether Glass Lewis had "violated Texas consumer protection laws, including those prohibiting nondisclosures of material facts."[278] In November 2025, Florida sued Glass Lewis, alleging that it had deceived Florida consumers. ¶ 123. In December 2025, the President directed the Federal Trade Commission to investigate proxy advisors. The FTC is to determine whether they engage in "unfair or deceptive

---

273 *2026 Benchmark Guidelines* at 7.

274 *Senate Letter* at 3; Castro et al., *supra*.

275 Letter from Sean D. Reyes, Utah Att'y Gen., Ken Paxton, Tex. Att'y Gen., et al., to Gary Retelny, President & CEO, Institutional S'holder Servs. Inc., and Kevin Cameron, Exec. Chairman, Glass, Lewis & Co. 3 (Jan. 17, 2023), https://attorneygeneral.utah.gov/wp-content/uploads/2023/01/2023-01-17-Utah-Texas-Letter-to-Glass-Lewis-ISS.pdf (last visited Oct. 18, 2026).

276 *Id.* at 4.

277 *Glass Lewis Reply to Attorneys General* at 1–2.

278 Press Release, Off. of the Tex. Att'y Gen., Attorney General Ken Paxton Investigates Proxy Advisors Glass Lewis and ISS for Misleading Public Companies to Push Radical Agenda (Sept. 16, 2025), https://texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-investigates-proxy-advisors-glass-lewis-and-iss-misleading-public (last visited Oct. 18, 2026).

acts or practices that harm United States consumers," including by "providing misleading or inaccurate information."[279]

122. Glass Lewis kept making its statements after each of these warnings, and even after this suit was filed. Its 2026 guidelines say the Benchmark Policy "reflects broad investor opinion," and Glass Lewis has said those guidelines will stay the same for 2027. ¶¶ 58–59. As of the date of this petition, Glass Lewis's website still makes the statements alleged above.

**G. Other States and the federal government have acted against similar conduct.**

123. On November 20, 2025, the Florida Attorney General sued Glass Lewis and ISS in the circuit court for Gulf County, Florida, under Florida's consumer protection and antitrust laws.[280] Florida alleges that "Defendants have deceived Florida consumers through their statements, acts, practices, and material omissions."[281] ISS removed the case to the federal district court in Panama City, with Glass Lewis's consent. Florida then dropped its antitrust claim, and the federal court remanded the case.[282] In July 2025, the Missouri Attorney General sued Glass Lewis and ISS in the Cole County Circuit Court to enforce civil investigative demands under Missouri's consumer protection law.[283]

---

279 Exec. Order No. 14,366, 90 Fed. Reg. at 58,504.

280 Complaint, *Office of the Att'y Gen. v. Institutional S'holder Servs. Inc.* (Fla. Cir. Ct. Gulf Cnty. filed Nov. 20, 2025), https://www.myfloridalegal.com/sites/default/files/complaint.pdf (last visited Oct. 18, 2026) [hereinafter *Florida Compl.*]; Press Release, Fla. Off. of the Att'y Gen., Attorney General James Uthmeier Sues Proxy Advisory Giants for Deceiving Investors and Manipulating Corporate Governance (Nov. 20, 2025), https://www.myfloridalegal.com/node/28054 (last visited Oct. 18, 2026).

281 *Florida Compl.* ¶ 144; First Am. Compl. ¶ 121, *Office of the Att'y Gen. v. Institutional S'holder Servs. Inc.*, No. 5:26-cv-00026-MW-MJF (N.D. Fla. Feb. 26, 2026), ECF No. 40.

282 Pl.'s Consol. Resp. Mem. to Defs.' Mots. to Dismiss 12, *Office of the Att'y Gen.*, No. 5:26-cv-00026-MW-MJF (N.D. Fla. May 8, 2026), ECF No. 63.

283 Press Release, Mo. Att'y Gen., Attorney General Bailey Leads Fight Against Hidden ESG and DEI Agendas in Corporate America (July 11, 2025), https://ago.mo.gov/attorney-general-bailey-leads-fight-against-hidden-esg-and-dei-agendas-in-corporate-america/ (last visited Oct. 18, 2026).

124. On May 20, 2026, Texas, Nebraska, Iowa, and West Virginia each sued ISS under their consumer protection laws.[284] Iowa's petition, filed in the Polk County District Court, alleges that "ISS advertised to its Iowa clients that it would provide objective and impartial investment advice."[285]

125. Texas and 12 other States have also sued BlackRock, State Street, and Vanguard in the federal district court in Tyler, Texas. There, the States allege that BlackRock advertised certain funds as not following an "ESG investment strategy" while "using the funds to pursue an ESG agenda through engagements and proxy voting."[286] That court refused to dismiss most of the States' consumer protection claims against BlackRock, including their claim under the DTPA.[287]

126. In February 2026, Vanguard settled with Texas and the other States and agreed to pay $29.5 million.[288] Vanguard also agreed to vote and engage with companies "solely to further the financial interests of investors" in its funds.[289] It agreed to use commercially reasonable efforts, by June 2027, to offer a choice of voting policies in funds holding at least half of its U.S. stock-fund assets. The choices must include voting with company management.[290] And it agreed not to

284 *State v. Institutional S'holder Servs., Inc.*, No. 471-03459-2026; *State ex rel. Hilgers v. Institutional S'holder Servs. Inc.*, No. D02CI260001712 (Neb. Dist. Ct. filed May 20, 2026); Petition, *State ex rel. Bird v. Institutional S'holder Servs., Inc.* (Iowa Dist. Ct. Polk Cnty. filed May 20, 2026), https://www.iowaattorneygeneral.gov/media/cms/5_ECAAEB881A444.pdf (last visited Oct. 18, 2026) [hereinafter *Iowa Pet.*]; *State ex rel. McCuskey v. Institutional S'holder Servs. Inc.*, No. CC-17-2026-C-113 (W. Va. Cir. Ct. filed May 20, 2026); Ballotpedia News, *Texas, Nebraska, Iowa, West Virginia Sue ISS over ESG Disclosures* (June 3, 2026), https://news.ballotpedia.org/2026/06/03/texas-nebraska-iowa-west-virginia-sue-iss-over-esg-disclosures-2/ (last visited Oct. 18, 2026).

285 *Iowa Pet.* ¶ 4.

286 *BlackRock*, 2025 WL 2201071, at *1.

287 *Id.* at *22, *24.

288 Press Release, Off. of the Tex. Att'y Gen., Attorney General Paxton Secures Historic, Industry-Changing Agreement with Vanguard to Protect the Coal Industry and Empower Investors (Feb. 26, 2026), https://www.texasattorneygeneral.gov/news/releases/attorney-general-paxton-secures-historic-industry-changing-agreement-vanguard-protect-coal-industry (last visited Oct. 18, 2026); *Vanguard Settlement* § 1.12.

289 *Vanguard Settlement* § 5.

290 *Id.* §§ 4.1–4.2.

participate in Climate Action 100+ or similar climate groups, and to publish its votes at least four times a year.[291]

127. In December 2025, the President also directed the SEC to enforce anti-fraud law "with respect to material misstatements or omissions contained in proxy advisors' proxy voting recommendations."[292]

### H. Glass Lewis's statements affected Texas consumers.

128. The State need not allege that any Texan was harmed. ¶ 187. But Glass Lewis's statements did affect Texas consumers. Texas clients bought and renewed Glass Lewis's Benchmark services, and they received Benchmark recommendations under a policy Glass Lewis had misdescribed. ¶¶ 12, 15. Clients who relied on Glass Lewis's statements cast votes based on those recommendations, including diversity-based recommendations against directors at Texas companies. ¶¶ 44–45, 75.

129. Many of the Texans affected are 65 or older. The Teacher Retirement System pays pensions to more than 500,000 retirees.[293] The Employees Retirement System serves more than 125,000 retirees and beneficiaries.[294] And about a third of U.S. households that own mutual funds are headed by someone 65 or older.[295] Glass Lewis sells its policies through the funds and voting-choice programs that serve these older investors. ¶¶ 134–135. Older Texans in those funds and programs are consumers. They seek or acquire Glass Lewis's services by purchase, through the funds and advisers that buy those services for them. Tex. Bus. & Com. Code § 17.45(4); ¶ 29.[296]

---

[291] *Id.* §§ 5.4, 5.6.
[292] Exec. Order No. 14,366, 90 Fed. Reg. at 58,503.
[293] Teacher Ret. Sys. of Tex., *2025 Popular Annual Financial Report*, *supra*, at 1.
[294] Emps. Ret. Sys. of Tex., *Serving Texans*, *supra*.
[295] Daniel Schrass & Michael Bogdan, Inv. Co. Inst., *Profile of Mutual Fund Shareholders, 2025*, at 4 (Nov. 2025), https://www.ici.org/system/files/2025-11/25-rpt-profiles.pdf (last visited Oct. 18, 2026).
[296] *Kennedy*, 689 S.W.2d at 892; *Arthur Andersen*, 945 S.W.2d at 815.

Glass Lewis knows that those funds and advisers buy its services to vote for their investors, to whom many owe a "fiduciary duty to cast informed votes." ¶ 35. Glass Lewis's acts and practices were calculated to acquire or deprive money or other property from consumers who were 65 or older when the acts occurred. Tex. Bus. & Com. Code § 17.47(c)(2).

130. Texans' retirement savings are invested in the companies whose votes Glass Lewis shapes. ¶¶ 36, 38. When advice sold as value-focused pushes companies toward measures with no proven link to value, those companies spend money and management time that could have gone to their business. That affects the returns of the pension plans and funds that own those companies, and of the Texans whose savings they hold. The research in ¶¶ 131–133 bears on whether these rules serve investors. A fiduciary that must vote for returns would want to know where a policy sold as value-focused stands on that question. ¶¶ 38, 87, 105.

131. Investors who follow ESG strategies have often paid a price. The federal district court in Fort Worth found that "ESG investments often underperform traditional investments by approximately 10%." In 2023, it found, ESG funds returned about 8%, compared with about 14% for the S&P 500 and Russell 1000 indexes.[297] Oliver Wyman reported that "[m]any ESG funds suffered a roughly three to four percentage-point underperformance" compared with broad stock markets in 2022.[298] Morgan Stanley reported that in the second half of 2024, sustainable funds

[297] *Spence*, 775 F. Supp. 3d at 985.

[298] Huw van Steenis, *The Next Phase of Climate-Aware Investing*, Oliver Wyman (Oct. 31, 2023), https://www.oliverwyman.com/our-expertise/journals/energy-and-natural-resources-journal/2024/the-next-phase-of-climate-aware-investing.html (last visited Oct. 18, 2026), *also available at* https://www.oliverwyman.com/content/dam/oliver-wyman/v2/publications/2023/september/Oliver_Wyman_The_Next_Phase_of_Climate_Aware_Investing.pdf.

posted a median return of 0.4%, compared with 1.7% for traditional funds.[299] The same report found that, over a longer period, sustainable funds had done slightly better. A $100 investment made in December 2018 would have grown to $136 in a sustainable fund, against $131 in a traditional fund.[300] A peer-reviewed study found that "ESG funds appear to underperform financially relative to other funds within the same asset manager and year, and to charge higher fees."[301] Another did "not find evidence that high sustainability funds outperform low sustainability funds."[302] Investors have pulled their money out. U.S. sustainable funds had net outflows of $21 billion in 2025, after outflows of $20 billion in 2024.[303]

132. Research on diversity training reports that it often fails to reduce bias and can increase it.[304] Sociologists Frank Dobbin and Alexandra Kalev report that "hundreds of studies dating back to the 1930s suggest that antibias training does not reduce bias."[305] They also report that "training alone does not change attitudes or behavior, or not by much and not for long."[306] And "asking people to suppress stereotypes tends to reinforce them."[307] A 2024 study by researchers at Rutgers University and the Network Contagion Research Institute found that DEI

---

299 Morgan Stanley Inst. for Sustainable Investing, *Sustainable Fund Returns Lag Peers' in Second Half of 2024* (Mar. 4, 2025), https://www.morganstanley.com/insights/articles/sustainable-funds-performance-second-half-2024 (last visited Oct. 18, 2026).

300 *Id.*

301 Aneesh Raghunandan & Shivaram Rajgopal, *Do ESG Funds Make Stakeholder-Friendly Investments?*, 27 Rev. Acct. Stud. 822, 822 (2022).

302 Samuel M. Hartzmark & Abigail B. Sussman, *Do Investors Value Sustainability? A Natural Experiment Examining Ranking and Fund Flows*, 74 J. Fin. 2789, 2789 (2019).

303 Morningstar Sustainalytics, *Global Sustainable Fund Flows: Q4 and Full-Year 2025 in Review* 22, 24 (2026), https://www.morningstar.com/content/cs-assets/v3/assets/blt9415ea4cc4157833/blt1d54e64f88b82b3b/Global_ESG_Flows_Q4_2025_Report.pdf (last visited Oct. 18, 2026).

304 Frank Dobbin & Alexandra Kalev, *Why Doesn't Diversity Training Work? The Challenge for Industry and Academia*, 10 Anthropology Now 48, 48–50 (2018); Network Contagion Rsch. Inst., *Instructing Animosity: How DEI Pedagogy Produces the Hostile Attribution Bias* 3 (Nov. 2024), https://networkcontagion.us/wp-content/uploads/Instructing-Animosity_11.13.24.pdf (last visited Oct. 18, 2026).

305 Dobbin & Kalev, *supra*, at 48.

306 *Id.* at 49.

307 *Id.* at 50.

training content, "instead of reducing bias," produced "a hostile attribution bias."[308] Students who read it saw about 21% more discrimination in an admissions scenario that showed none, and they were more willing to punish the admissions officer.[309]

133. Several studies have found that board-gender quotas or added board-gender diversity cut company value or profits. One study of Norway's law requiring women on corporate boards found that the quota "caused a significant drop in the stock price at the announcement of the law." It also found "a large decline in Tobin's Q," a common measure of company value, in the years that followed.[310] A study of California's board-gender law found that its announcement cut company stock prices by an average of 1.2%.[311] Another study of Norway's quota found that affected firms made fewer layoffs, "increasing relative labor costs and employment levels and reducing short-term profits."[312] A study of U.S. boards found that "the average effect of gender diversity on firm performance is negative." It concluded that "mandating gender quotas for directors can reduce firm value for well-governed firms."[313]

### I. Glass Lewis made these statements to Texans again and again.

134. Glass Lewis made its statements to every person who visited its website, downloaded its guidelines or reports, received its Proxy Papers, read its marketing materials, or bought its services. That includes ordinary Texans. Schwab, based in Westlake, lets shareholders

---

308 Network Contagion Rsch. Inst., *supra*, at 3.

309 *Id.* at 6–8.

310 Kenneth R. Ahern & Amy K. Dittmar, *The Changing of the Boards: The Impact on Firm Valuation of Mandated Female Board Representation*, 127 Q.J. Econ. 137, 137 (2012).

311 Daniel Greene, Vincent J. Intintoli & Kathleen M. Kahle, *Do Board Gender Quotas Affect Firm Value? Evidence from California Senate Bill No. 826*, 60 J. Corp. Fin. 101526 (2020).

312 David A. Matsa & Amalia R. Miller, *A Female Style in Corporate Leadership? Evidence from Quotas*, 5 Am. Econ. J.: Applied Econ. 136, 136 (2013).

313 Renée B. Adams & Daniel Ferreira, *Women in the Boardroom and Their Impact on Governance and Performance*, 94 J. Fin. Econ. 291, 291 (2009).

of its Schwab 1000 Index Fund vote under the "Glass Lewis Benchmark" policy.[314] Schwab also repeats Glass Lewis's description of that policy to them. ¶¶ 17, 98. BlackRock offers individual investors in certain U.S. funds the choice to have their shares voted under Glass Lewis's "Benchmark Policy."[315] Many of the individual investors in these funds and programs live in Texas.

135. Glass Lewis says it "does not serve retail investors."[316] But its policies and statements reach individual investors through the investment firms and funds that use them. ¶ 134. Westwood, the Dallas firm, uses Glass Lewis's guidelines and generally follows its recommendations when it votes its clients' shares. That includes a mutual fund offered by American Beacon Funds of Irving, Texas. ¶ 18.

136. Glass Lewis delivers Proxy Papers with Benchmark recommendations to each of its Texas clients that receives research. ¶¶ 12, 15. A Texas client that owns stock in hundreds of companies receives hundreds of Proxy Papers each year, each with Benchmark recommendations. Glass Lewis also posts full Proxy Papers on its website, where anyone can download them. It uses them to show "how Glass Lewis' insights can advance" a client's stewardship program.[317]

137. Texans visit Glass Lewis's website. They download its guidelines, compliance statements, survey reports, posted letters, and other materials. ¶ 11. Glass Lewis also markets,

---

[314] Schwab Asset Mgmt., *Proxy Voting Choice FAQ*, *supra*.

[315] BlackRock, *BlackRock U.S. Retail Program FAQs* (Apr. 2026), https://www.blackrock.com/corporate/literature/publication/voting-choice-usretailprogramfaqs.pdf (last visited Oct. 18, 2026).

[316] *Wieck Decl.* ¶ 8.

[317] Glass Lewis, *Northern Trust*, https://www.glasslewis.com/northern-trust (last visited Oct. 18, 2026); Glass Lewis, *Proxy Paper: Alphabet Inc.* (May 16, 2025), https://resources.glasslewis.com/hubfs/Sample%20Proxy%20Papers/Alphabet%202025%20Proxy%20Paper.pdf (last visited Oct. 18, 2026).

sells, and renews its services through communications with Texas clients and prospective clients. Each of these channels carries Glass Lewis's policies, and its descriptions of them, to Texans.

### J. Each statement to a person in Texas is a separate violation.

138. Each time Glass Lewis made a false, misleading, or deceptive statement to a person in Texas, it committed a separate violation of the DTPA. A statement on a Glass Lewis web page or document is made to each person in Texas who views or downloads it. So each such visit or download is a separate violation. The State pleads what Glass Lewis told courts, Congress, regulators, and other officials as admissions, not as violations. ¶¶ 61–62, 82–83. But when Glass Lewis posted such a letter on its website for investors, the posting is a statement to each person in Texas who read it there. ¶ 61. Each Proxy Paper with Benchmark recommendations that Glass Lewis delivered or made available to a person in Texas, directly or indirectly, is a separate violation. Each presented recommendations under a misdescribed policy without disclosing the facts alleged above. Each marketing, sales, or renewal communication with a person in Texas that carried or relied on these statements is a separate violation. So is each sale or renewal of Glass Lewis's services to a person in Texas. So is each vote that Glass Lewis cast or pre-populated for a person in Texas under Benchmark recommendations.

## VII. CAUSES OF ACTION

139. The State adopts and incorporates by reference all preceding paragraphs and allegations of this petition.

### Count 1: Glass Lewis engaged in false, misleading, or deceptive acts and practices (Tex. Bus. & Com. Code § 17.46(a)).

140. The DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46(a). Glass Lewis engaged in

trade and commerce when it advertised, offered, sold, and distributed its proxy advisory services. ¶ 28. In doing so, it made false, misleading, and deceptive statements about its services, and each had the capacity to deceive. ¶¶ 56–110.

141. An act is false, misleading, or deceptive if it "has the capacity or tendency to deceive an average or ordinary person."[318] That is so "even though that person may have been ignorant, unthinking or credulous."[319] In a suit like this one, Texas courts also look to the Federal Trade Commission. It asks "whether the act or practice is likely to mislead, rather than whether it causes actual deception."[320] The FTC judges a claim by "the net impression that it is likely to make."[321]

142. These are statements of fact about whose views the Benchmark Policy reflects, how it was built, and what it aims to do. Glass Lewis measures those facts itself, through its clients' policy elections and its own surveys. ¶¶ 82–83, 108. A statement framed as opinion is still actionable when the speaker has superior knowledge of the facts behind it.[322] Under the FTC's view, an opinion claim is also actionable if it misrepresents "the basis of [the] opinion."[323] Glass Lewis alone knew how many of its clients chose the Benchmark Policy, who answered its surveys, and how often its rules drove its recommendations. ¶¶ 67, 82–83, 108.

143. The net impression of Glass Lewis's statements was that the Benchmark Policy reflected what investors broadly think and focused on shareholder value. Glass Lewis's policy menu reinforced that impression. It placed an ESG Policy on one side and a policy for ESG skeptics

---

318 *Spradling v. Williams*, 566 S.W.2d 561, 562 (Tex. 1978).

319 *Spradling*, 566 S.W.2d at 562, 564 (approving that definition); *accord Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 479–80 (Tex. 1995).

320 Tex. Bus. & Com. Code § 17.46(c)(1); *FTC Deception Statement*, 1984 WL 565319, at *46.

321 *FTC Deception Statement*, 1984 WL 565319, at *47.

322 *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337–39 (Tex. 2011).

323 *FTC Deception Statement*, 1984 WL 565319, at *48.

on the other. ¶¶ 51, 54. But the Benchmark Policy used the same 30% gender threshold as the ESG and Climate policies. ¶¶ 64–68. Glass Lewis invited buyers to rely on that impression in place of studying each rule. ¶ 41.

144. Glass Lewis also engaged in a deceptive practice when it delivered Benchmark recommendations to Texas clients under a policy it had misdescribed. It did so without disclosing the facts that showed its descriptions were false or misleading. ¶¶ 50, 111–118. It made these statements, and engaged in these practices, in its dealings with people in Texas. ¶¶ 134–137.

145. Each false, misleading, or deceptive statement or practice directed to a person in Texas is a separate violation of section 17.46(a). ¶ 138. Glass Lewis is engaging in, has engaged in, and is about to engage in these acts and practices. ¶ 122.

**Count 2: Glass Lewis misrepresented its services and advertised them with intent not to sell them as advertised (Tex. Bus. & Com. Code § 17.46(b)(5), (7), (9)).**

146. The DTPA's list of false, misleading, or deceptive acts or practices includes three that apply here. Tex. Bus. & Com. Code § 17.46(b). The first is "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have . . . ." *Id.* § 17.46(b)(5). The second is "representing that goods or services are of a particular standard, quality, or grade . . . if they are of another." *Id.* § 17.46(b)(7). The third is "advertising goods or services with intent not to sell them as advertised." *Id.* § 17.46(b)(9).

147. Glass Lewis represented that its Benchmark services have characteristics and benefits they do not have. It said they reflect broad investor opinion and its clients' predominant views, and that they are built from the bottom up on client input. It also said they are independent and objective, and that they judge every environmental and social issue by its effect on shareholder value. ¶¶ 56–110. This violates section 17.46(b)(5).

148. Glass Lewis represented that its Benchmark services meet a particular standard, quality, or grade when they are of another. It said its research "meets the highest standards of quality, objectivity, and independence." ¶ 94. It said its policies are "tailored to industry standards and local market best practices." ¶ 90. It said the Benchmark Policy reflects "widely accepted governance principles." ¶ 58. And it called its advice "independent," "objective," and "reliable." ¶¶ 94–95, 104. This violates section 17.46(b)(7).

149. Since October 15, 2025, Glass Lewis has advertised its Benchmark services with intent not to sell them as advertised. ¶¶ 85–86. An advertisement includes "[a]ny oral, written, or graphic statement made by the seller in any manner in connection with the solicitation of business."[324] Glass Lewis's guidelines, sales pages, and compliance statements are such statements, made to win and keep clients. ¶¶ 10, 41, 56. Intention may be "inferred from objective manifestations that indicate that the person acted intentionally." Tex. Bus. & Com. Code § 17.45(13). A federal magistrate judge in Houston, in a recommendation the district court adopted, upheld the State's (b)(9) claim against a land developer. The State had alleged a plan to cut services while the developer kept advertising property owners' associations it had dissolved.[325] In October 2025, Glass Lewis announced that one policy could no longer serve a diverse client base. ¶ 85. On November 25, 2025, its chief executive wrote that it would "move away from a single house view." ¶ 86. Soon after, it published 2026 guidelines that sold the Benchmark Policy as reflecting "broad investor opinion." ¶ 86. What it delivered was its own house view, relabeled as the policy's view. ¶ 63. Glass Lewis thus advertised a consensus product while intending to deliver something else.

---

324 *Smith v. Baldwin*, 611 S.W.2d 611, 614–15 (Tex. 1980) (quoting *Black's Law Dictionary* 50 (5th ed. 1979)).

325 *Colony Ridge*, 2024 WL 4553111, at *9–10.

It also knew the policy carried rules it could not tie to shareholder value. ¶¶ 64–68, 102. This violates section 17.46(b)(9).

150. Each such representation or advertisement directed to a person in Texas is a separate violation. ¶ 138.

**Count 3: Glass Lewis failed to disclose information to induce transactions (Tex. Bus. & Com. Code § 17.46(b)(24)).**

151. The DTPA prohibits the following act. Tex. Bus. & Com. Code § 17.46(b)(24).

> [F]ailing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed[.]

152. Each time Glass Lewis sold or renewed its services with a Texas consumer, it knew the information alleged in ¶¶ 112–117. Glass Lewis did not disclose that information in the guidelines, sales pages, and Proxy Papers where it described its services to buyers. ¶ 111. It failed to disclose that information to induce Texas consumers to buy and renew its services. Texas consumers would not have entered those transactions had the information been disclosed. ¶ 118.

153. Each such failure to disclose, in connection with a transaction with a Texas consumer, is a separate violation of section 17.46(b)(24).

## VIII. APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION

154. The State adopts and incorporates by reference all preceding paragraphs and allegations of this petition.

155. An applicant for a temporary injunction generally must plead and prove three elements. They are a cause of action against the defendant, a probable right to the relief sought,

and a probable, imminent, and irreparable injury in the interim.[326] But when an injunction rests on a statute, the statute's express language supersedes common-law elements "such as imminent harm or irreparable injury."[327] When a statute authorizes injunctive relief and the statute is being violated, the court may restrain the violation without balancing the equities.[328]

156. Under the DTPA, the State may obtain an injunction on two showings. First, the Consumer Protection Division has reason to believe that a person is engaging in, has engaged in, or is about to engage in an unlawful act or practice. Second, the proceeding is in the public interest.[329] The list of deceptive acts in section 17.46(b) is not exclusive. Tex. Bus. & Com. Code § 17.46(b). Whether to grant a temporary injunction rests in the trial court's sound discretion.[330]

157. The Division has reason to believe that Glass Lewis is engaging in, has engaged in, and is about to engage in acts and practices that the DTPA declares unlawful. ¶¶ 56–122. Glass Lewis continues to make its statements on its website and in its guidelines, and it has said its 2026 guidelines will remain in effect for 2027. ¶¶ 59, 122. Glass Lewis also plans to move all clients off the Benchmark Policy by the end of 2027 and to offer recommendations that reflect varying investor views. ¶¶ 85–86. Without an injunction, nothing will stop it from describing those new offerings the same way. Nor would it matter if Glass Lewis stopped. Under the DTPA, stopping after the Division's prior contact does not moot the suit "under any circumstances." Tex. Bus. & Com. Code § 17.47(a).

---

326 *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Polston v. State*, No. 03-20-00130-CV, 2022 WL 91974, at *3 (Tex. App.—Austin Jan. 6, 2022, no pet.) (mem. op.).

327 *David Jason West and Pydia, Inc. v. State*, 212 S.W.3d 513, 519 (Tex. App.—Austin 2006, no pet.).

328 *State v. Tex. Pet Foods, Inc.*, 591 S.W.2d 800, 805 (Tex. 1979).

329 Tex. Bus. & Com. Code § 17.47(a); *West*, 212 S.W.3d at 519–21.

330 *Butnaru*, 84 S.W.3d at 204; *West*, 212 S.W.3d at 516–17.

158. An injunction is in the public interest. Texas investors, and the Texans whose savings they manage, continue to receive Benchmark recommendations under a policy that Glass Lewis has misdescribed. ¶¶ 128, 134–137. The State asks the Court to set a hearing on its application for a temporary injunction.

159. In the terms below, "clearly and conspicuously" means in a way that an ordinary reader can easily notice, read, and understand, in the same place as any statement it accompanies. An "environmental or social rule" is a voting rule that turns on the gender, racial, or ethnic makeup of a board. It also includes a rule that turns on board oversight of environmental or social issues, or on climate disclosure or emissions. And it includes a rule that relies on an outside group's list, framework, or standard on those topics. Glass Lewis makes a statement to a person in Texas when it sends the statement to that person or posts it where that person can view or download it. A statement made in litigation, or to a legislature or government official, is not a statement to a person in Texas under these terms. ¶ 138. The "Benchmark Policy" includes any policy that succeeds or replaces it as Glass Lewis's standard or default policy.

## A. The Court should enjoin Glass Lewis pending trial.

160. After notice and hearing, the State asks the Court to order Glass Lewis, pending trial, to do the following in its proxy advisory services to people in Texas. The State seeks the Proxy Paper terms in ¶¶ 167 and 169 only in the permanent injunction.

161. **Preserve evidence.** Preserve all documents and data relevant to this suit, from January 1, 2016, forward. They include its guidelines, website content, marketing materials, survey data, client policy elections, Proxy Papers, and communications with Texas clients and prospective clients. Do not destroy, delete, or alter them.

162. **Investor-opinion claims.** Do not tell any person in Texas that a voting policy reflects "broad investor opinion," "widely accepted governance principles," or the "predominant" or "consensus" views of clients or investors. Glass Lewis may make such a statement only if, in the same place, it clearly and conspicuously discloses the share of its clients that vote under that policy. ¶ 168.

163. **Best-practice claims.** Do not tell any person in Texas that the Benchmark Policy reflects "best practices," "industry best practices," or "industry standards." Glass Lewis may make such a statement only if the list of environmental or social rules required below appears in the same place. ¶ 166.

164. **Shareholder-value claims.** Do not tell any person in Texas that Glass Lewis evaluates environmental and social issues "through the lens of long-term shareholder value" or by their "financial materiality." Glass Lewis may make such a statement only if it then has competent and reliable evidence that substantiates the statement. It must keep that evidence and produce it to the Division on request.

165. **Independence claims.** Do not tell any person in Texas that Glass Lewis's research or advice is "independent," "objective," or "impartial." Glass Lewis may make such a statement only if, in the same place, it clearly and conspicuously discloses the business and legal interests listed in ¶ 169.

166. **Disclose the environmental and social rules.** On its website and at the start of each set of Benchmark guidelines, clearly and conspicuously list each environmental or social rule in the Benchmark Policy. Name any outside group whose list, framework, or standard a rule relies on.

167. **Flag the recommendations.** In each Proxy Paper given to a client in Texas, clearly and conspicuously identify each Benchmark recommendation that would have been different without an environmental or social rule. Glass Lewis already flags recommendations that rest on board diversity. ¶ 67.

168. **Disclose client use and survey responses.** On its website and in its Benchmark guidelines, clearly and conspicuously disclose the share of its clients that vote under the Benchmark Policy. Also disclose the number of investors and non-investors who answered any survey it cites as support for a policy.

169. **Disclose conflicts.** In each Proxy Paper given to a client in Texas, clearly and conspicuously disclose any business or legal interest Glass Lewis has in the matter. That includes litigation with the company or with a government official whose law bears on the vote. It also includes membership in any organization whose views the report repeats, and consulting or other services sold to the company. And it includes any interest Glass Lewis's owners have in the matter and any fees the company paid Glass Lewis or its affiliates in the prior three years.

170. **Disclose its track record.** On its website, clearly and conspicuously disclose each year how often the Benchmark Policy supported environmental and social shareholder proposals in the prior year. Show that figure next to the average shareholder support those proposals received.

## B. After trial, the Court should permanently enjoin Glass Lewis for 10 years.

171. After trial, the State asks the Court to enjoin Glass Lewis permanently, for 10 years. The injunction should bar the acts and practices the trier of fact finds unlawful in Glass Lewis's

proxy advisory services to people in Texas. The permanent injunction should include each term in ¶¶ 160–170 and the terms below.

172. **Independent auditor.** Glass Lewis should retain, at its own expense, an independent auditor approved by the Consumer Protection Division. Each year, the auditor should review Glass Lewis's compliance and report its findings to the Court and the Division. For each violation of the injunction, Glass Lewis should pay the civil penalties that section 17.47(e) allows. Tex. Bus. & Com. Code § 17.47(e).

173. **Right to cancel.** Glass Lewis should allow each Texas client to cancel its contract without penalty at any time during the first year after judgment.

174. **Compliance officer.** Glass Lewis should designate a compliance officer who reports to its chief executive and is responsible for its compliance with the judgment.

175. **Compliance records.** For the 10-year term, Glass Lewis should keep records sufficient to show its compliance. They should include the support for any statement covered by the judgment, its survey data, counts of the clients that vote under each policy, and its Proxy Paper flags. Glass Lewis should produce them to the Division on request.

176. **Compliance reports.** Each year of the term, Glass Lewis should file with the Division a written compliance report signed by its compliance officer.

177. **Corrective notice.** Within 30 days of judgment, Glass Lewis should send a court-approved notice to each current and former Texas client it has served since January 1, 2016. It should send the same notice to each investment firm or fund sponsor that offers a Glass Lewis policy to Texas investors. The notice should describe the statements the Court found false, misleading, or deceptive, the facts Glass Lewis failed to disclose, and the right to cancel.

178. **Website notice.** Glass Lewis should post the same notice prominently on its home page and its voting-policy web pages for at least one year.

179. **Show the effect of each rule.** Some Benchmark recommendations turn on an environmental or social rule. For each one in a Proxy Paper given to a client in Texas, Glass Lewis should state what the recommendation would be without that rule. Glass Lewis already does this for board diversity. ¶ 67.

180. **Automatic votes.** For each Texas client that uses pre-populated or automatic voting under the Benchmark Policy, Glass Lewis should flag each vote that turns on an environmental or social rule. It should let the client choose whether those votes are cast automatically or held for its confirmation.

181. **Free switching.** Glass Lewis should let each Texas client switch to any other Glass Lewis policy, or to its own custom policy, at no added charge.

182. **New policy descriptions.** Glass Lewis should file with the Division a copy of each new or revised description of a voting policy offered to people in Texas. It should file each copy within 10 days after publishing the description.

183. The injunctions should bind Glass Lewis and its officers, agents, servants, employees, and attorneys. They should also bind all persons in active concert or participation with any of them who receive actual notice of the order. Tex. R. Civ. P. 683. That includes any company formed through Glass Lewis's combination with Clarity AI that acts in concert with Glass Lewis and receives actual notice. ¶ 195.

184. Each term targets the statements and omissions alleged above. ¶¶ 56–118. None bars Glass Lewis from making any statement. The terms on claims let Glass Lewis make each claim

with the facts that keep it from misleading, or with evidence that backs it. ¶¶ 160–170. The substantiation term tracks the FTC's rule that objective claims represent "that the advertiser has a reasonable basis supporting these claims."[331] The federal district court in Fort Worth has ordered a similar disclosure of group memberships. It required a retirement plan's sponsor to publish its managers' memberships in any organization "principally devoted to achieving DEI, ESG, climate-focused investment or stewardship objectives."[332] The State asks the Clerk to issue writs of injunction without bond, because the State is not required to post bond under the DTPA. Tex. Bus. & Com. Code § 17.47(b).

## IX. CIVIL PENALTIES

185. The State adopts and incorporates by reference all preceding paragraphs and allegations of this petition.

186. The State may recover a civil penalty of up to $10,000 for each violation of the DTPA. Tex. Bus. & Com. Code § 17.47(c)(1). It may recover up to $250,000 more for each violation when the act or practice was calculated to acquire or deprive money or other property from a consumer 65 or older. *Id.* § 17.47(c)(2). Glass Lewis's acts and practices were so calculated. ¶ 129.

187. The State need not allege injury to recover civil penalties under the DTPA. The Thirteenth Court of Appeals in Corpus Christi said so in *Holzman v. State*, a suit over discarded

---

[331] FTC Policy Statement Regarding Advertising Substantiation, *appended to Thompson Med. Co.*, 104 F.T.C. 648, 839 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986).

[332] *Spence v. Am. Airlines, Inc.*, No. 4:23-cv-00552-O, 2025 WL 3537280, at *2 (N.D. Tex. Sept. 30, 2025) (final judgment).

patient files.[333] A federal magistrate judge in Houston, relying on *Holzman*, reached the same conclusion and added that the State need not allege consumer status.[334]

188. Each false, misleading, or deceptive statement Glass Lewis made to a person in Texas, and each failure to disclose, is a separate violation. ¶ 138. In setting the amount of penalties, the trier of fact must consider the following factors. Tex. Bus. & Com. Code § 17.47(g).

> (1) The seriousness of the violation, including the nature, circumstances, extent, and gravity of any prohibited act or practice;
>
> (2) The history of previous violations;
>
> (3) The amount necessary to deter future violations;
>
> (4) The economic effect on the person against whom the penalty is to be assessed;
>
> (5) Knowledge of the illegality of the act or practice; and
>
> (6) Any other matter that justice may require.

**A. The violations are serious.**

189. **Nature.** Glass Lewis misrepresented the core features of its product, namely whose views it reflects, what standard it meets, and what goal it serves. ¶¶ 56–110.

190. **Circumstances.** Glass Lewis made these statements to fiduciaries who manage the savings of millions of people and who must vote for those people's financial benefit. ¶ 38.

191. **Extent.** Glass Lewis made these statements for a decade, from at least 2016 to today. It made them on its website, in its guidelines, compliance statements, and survey reports, and in letters it posted online. It made them to all of its clients and to everyone who visited its website. ¶¶ 58–63, 94–96, 106, 134–137.

---

333 *Holzman v. State*, No. 13-11-00168-CV, 2013 WL 398935, at *3 (Tex. App.—Corpus Christi Jan. 31, 2013, pet. denied) (mem. op.) ("[I]t is not necessary for the State to allege any injury to a patient to recover the civil penalties it seeks in its live petition." (citing Tex. Bus. & Com. Code § 17.47(c))).

334 *Colony Ridge*, 2024 WL 4553111, at *7–8 & n.4.

192. **Gravity.** Glass Lewis is one of two firms that dominate its industry, and some investors follow its recommendations automatically. Its statements shaped votes at public companies, including Texas companies. ¶¶ 42–46.

**B. Glass Lewis has faced repeated government action over similar conduct.**

193. In 2023, the attorneys general of Texas and 20 other States wrote to Glass Lewis about its conduct. In 2025, Texas investigated it, Missouri went to court to enforce its investigative demands, Florida sued it, and the President directed federal agencies to examine proxy advisors. ¶¶ 120–127. Glass Lewis kept making the statements alleged above after each of them. ¶ 122.

**C. Only a substantial penalty will deter future violations.**

194. A small penalty would be a cost of doing business. Glass Lewis kept making its statements after the 2023 letter, after Texas's investigation, after Florida's suit, and after this suit was filed. ¶ 122. It now plans new voting offerings for 2027. ¶ 85. A substantial penalty will help ensure that it describes them truthfully.

**D. Glass Lewis can pay a substantial penalty.**

195. Glass Lewis is a large, sophisticated company. It serves more than 1,300 investors and more than 2,300 companies, and 95% of its institutional clients renew each year. ¶¶ 12, 47. Glass Lewis is privately owned. In 2021, Peloton Capital Management and Stephen Smith bought it from the Ontario Teachers' Pension Plan Board and the Alberta Investment Management Corporation.[335] Glass Lewis does not publish its revenue or its value, and the price of the 2021 sale was not disclosed. For comparison, in 2021 Deutsche Börse bought an 81% stake in Glass Lewis's

---

[335] Press Release, Peloton Capital Mgmt., *supra*.

main rival, ISS, for about $1.8 billion.[336] In September 2026, Glass Lewis combined with another company, Clarity AI. The combined company has "more than 900 professionals" in 20 offices around the world.[337]

### E. Glass Lewis knew its conduct was unlawful.

196. In January 2023, the attorneys general of Texas and 20 other States told Glass Lewis that state laws prohibit deceptive trade practices. They also said it appeared to have relied on false or misleading statements. ¶ 120. Glass Lewis went forward anyway. It kept making the same statements through 2023, 2024, 2025, and 2026, even after Texas opened its investigation and Florida sued. ¶ 122.

### F. Justice requires a substantial penalty.

197. Glass Lewis's statements affected Texas consumers. Texas clients bought, renewed, and received Benchmark services that Glass Lewis had misdescribed, and they voted Texans' savings on that advice. ¶¶ 128–133. Glass Lewis profited from Texas while doing so. ¶¶ 12–13.

198. Glass Lewis's statements also reached Texans who never dealt with Glass Lewis directly, through the investment firms, funds, and voting-choice programs that use its policies. ¶¶ 134–135. And they harm the shareholder vote itself. Shareholders hold companies accountable through their votes, and advice that misdescribes itself distorts those votes.

---

[336] *Canadian Pension Fund Managers Selling Proxy Advisor Glass Lewis*, Globe & Mail (Mar. 15, 2021) (with a report from Reuters), https://www.theglobeandmail.com/business/article-canadian-pension-fund-managers-selling-proxy-advisor-glass-lewis-to/ (last visited Oct. 18, 2026).

[337] Press Release, Glass Lewis, Glass Lewis and Clarity AI Join Forces to Integrate Sustainability, Governance, and Stewardship (Sept. 24, 2026), https://www.glasslewis.com/news-release/glass-lewis-and-clarity-ai-join-forces-to-integrate-sustainability-governance-and-stewardship (last visited Oct. 18, 2026); *Glass Lewis and Clarity AI Merge*, NordSIP (Sept. 25, 2026), https://nordsip.com/2026/09/25/glass-lewis-and-clarity-ai-merge/ (last visited Oct. 18, 2026).

199. The State asks the trier of fact to assess civil penalties of up to $10,000 for each violation, and up to $250,000 more for each violation under section 17.47(c)(2).

## X. DEMAND FOR JURY TRIAL

200. The State demands a jury trial and tenders the jury fee. Tex. R. Civ. P. 216.

## XI. RELIEF SOUGHT

201. The relief the State seeks is within the jurisdictional limits of this Court. Tex. R. Civ. P. 47(b). The State seeks monetary relief over $1,000,000, including civil penalties, reasonable attorney's fees, and court costs, and nonmonetary relief, including injunctive relief. Tex. R. Civ. P. 47(c)(4).

## XII. PRAYER

The State asks the Court to grant the following relief:

a. Set a hearing on the State's application for a temporary injunction;

b. After notice and hearing, temporarily enjoin Glass Lewis, pending trial, as requested in paragraphs 160–170, except paragraphs 167 and 169;

c. Enter a final judgment finding that Glass Lewis violated sections 17.46(a) and 17.46(b)(5), (7), (9), and (24) of the DTPA;

d. Permanently enjoin Glass Lewis for 10 years, including by the terms requested in paragraphs 160–183, Tex. Bus. & Com. Code § 17.47(a);

e. Issue the temporary and permanent injunctions without bond, Tex. Bus. & Com. Code § 17.47(b);

f. Order Glass Lewis to pay civil penalties of up to $10,000 for each violation of the DTPA, Tex. Bus. & Com. Code § 17.47(c)(1);

g. Order Glass Lewis to pay an additional amount of up to $250,000 for each violation where its acts and practices were calculated to acquire or deprive money or other property from consumers 65 or older, Tex. Bus. & Com. Code § 17.47(c)(2);

h. Order Glass Lewis to pay the State's reasonable attorney's fees and court costs, Tex. Gov't Code § 402.006(c);

i. Award pre- and post-judgment interest as allowed by law; and

j. Award the State all other relief to which it is entitled.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

WILLIAM D. WASSDORF
Deputy Attorney General for Civil Litigation

*/s/ Johnathan Stone*
**JOHNATHAN STONE**
Chief, Consumer Protection Division
State Bar No. 24071779

**LAUREN MCGEE**
Assistant Attorney General
State Bar No. 24128835

**Office of the Attorney General of Texas**
Consumer Protection Division
P.O. Box 12548, MC-010
Austin, Texas 78711-2548
Telephone: (512) 463-2185
Facsimile: (512) 473-8301
Johnathan.stone@oag.texas.gov
Lauren.Mcgee@oag.texas.gov

**ATTORNEYS FOR TEXAS**

## CERTIFICATE OF SERVICE

I certify that on October 20, 2026, a true and correct copy of this document was served on all counsel of record through the electronic filing manager under Texas Rule of Civil Procedure 21a.

*/s/ Johnathan Stone*
**JOHNATHAN STONE**
Chief, Consumer Protection Division
State Bar No. 24071779

# DECLARATION OF AARON AGUILAR

Pursuant to Tex. Civ. Prac. & Rem. Code § 132.001(f), I, Aaron Aguilar, submit this unsworn declaration in lieu of a written sworn declaration, verification, certification, oath, or affidavit.

1. My name is Aaron Aguilar. I am over 18 years of age, of sound mind, and capable of making this declaration.

2. The facts stated within this declaration are within my personal knowledge and are true and correct.

3. I work as an investigator in the Office of the Texas Attorney General. In my capacity as an investigator, I have read the foregoing document titled "Texas's Second Amended Verified Petition and Application for Temporary and Permanent Injunction" and the factual allegations stated therein are true and correct. Some allegations are stated on information and belief, and some describe what Glass Lewis knew or intended. Those allegations are true and correct to the best of my knowledge, information, and belief, based on the sources the petition cites.

4. My name is Aaron Aguilar, and I am an employee of the following governmental agency: Texas Office of the Attorney General. I am executing this declaration as part of my assigned duties and responsibilities. I declare under penalty of perjury that the factual statements in the foregoing are true and correct.

Executed in Dallas County, State of Texas, on the 20th day of October 2026.

*/s/ Aaron Aguilar*
Aaron Aguilar
Investigator